# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **GARLAND BERNELL HARPER,** | § | |
| | § | |
| **Petitioner** | § | **CIVIL ACTION NO. H-16-0762** |
| | § | |
| **vs.** | § | |
| | § | |
| **WILLIAM STEPHENS,** | § | **THIS IS A CAPITAL CASE** |
| **Director, Texas Department of** | § | |
| **Criminal Justice, Institutional** | § | |
| **Division,** | § | |
| | § | |
| **Respondent** | § | |

## DEATH PENALTY CASE APPLICATION
## FOR POST-CONVICTION WRIT OF HABEAS CORPUS

TO THE HONORABLE LYNN N. HUGHES, UNITED STATES DISTRICT JUDGE:

Petitioner Garland Bernell Harper, pursuant to Title 28, U.S.C. Section 2254, moves this Court to issue a Writ of Habeas Corpus for his release from confinement by the Texas Department of Corrections on grounds that he is being denied his liberty under an illegal and unconstitutional conviction and sentence of death.

MCGUIRE LAW FIRM

BY:   /s/ Ken McGuire
         Kenneth W. McGuire
         Federal Admission No. 21917
         State Bar No. 00798361
         P.O. Box 79535
         Houston, TX 77279
         Telephone:  (713) 223-1558
         Facsimile:  (713) 335-3340
         Email: kennethmcguire@att.net

SCARDINO & FAZEL

/s/ Ali R. Fazel
Ali R. Fazel
State Bar of Texas:  24012611
4801 Woodway Drive, Suite 165 E
Houston, Texas 77056
Telephone: (713) 229-9292
Facsimile:  (713) 229-9931

ATTORNEYS for PETITIONER
GARNELL HARPER

iii

## <u>TABLE OF CONTENTS</u>

APPLICATION FOR A WRIT OF HABEAS CORPUS ........................................1

PROCEDURAL HISTORY .........................................................................4

    A. Trial Court Proceedings..............................................................4

    B. State Appellate Proceedings ........................................................5

    C. State Habeas Proceedings ...........................................................6

STATEMENT OF FACTS ........................................................................6

    A. Guilt Phase Presentation .............................................................6

    B. Punishment Phase Presentation ...................................................7

    C. Post-Conviction Investigation .....................................................9

STANDARD OF CARE ..........................................................................11

    A. Ineffective Assistance of Counsel ...............................................11

ARGUMENT ......................................................................................15

ISSUE RELATED TO JUROR MISCONDUCT...........................................15

CLAIM ONE: HARPER WAS DENIED HIS DUE PROCESS RIGHT TO AN IMPARTIALJURY WHEN JUROR BASEY COMMITTED MISCONDUCT BY AUTOMATICALLY VOTING FOR DEATH ....................................................15

    A. Legal Standard .......................................................................16

    B. Juror Basey Decided to Vote For Death Based on Harper's Guilt of Capital Murder, Before Hearing Punishment Phase Evidence .........................17

    C. Conclusion ............................................................................19

ISSUES RELATED TO PUNISHMENT....................................................20

CLAIMS TWO AND THREE: TRIAL COUNSEL INEFFECTIVELY CHALLENGED THE STATE'S ALLEGATION THAT GARLAND HARPER KILLED TEASA JACKSON AND THE STATE'S MANIPULATION OF LOUIS JACKSON'S TESTIMONY VIOLATED HARPER'S CONSTITUTIONAL RIGHT TO DUE PROCESS ..................................................................20

    A. Relevant Facts.........................................................................21

CLAIM TWO: TRIAL COUNSEL FAILED TO EFFECTIVELY CHALLENGE THE STATE'S CLAIM THAT GARLAND HARPER MURDERED TEASA JACKSON..............................................................................................31

    A. Trial Counsel's Failure to Adequately Investigate and Present a Defense to the Jackson Murder was Objectively Unreasonable............................................32

    B. Prejudice ..............................................................................53

CLAIM THREE: THE STATE'S MANIPULATION OF LOUIS JACKSON'S TESTIMONY VIOLATED HARPER'S CONSTITUTIONAL RIGHT TO DUE PROCESS ..................................................................................55

    A. Relevant Facts.........................................................................56

    B. *Napue v. Illinois*.....................................................................59

    C. The State Knowingly Manipulated Louis Jackson into Offering False Testimony at Harper's Trial...........................................................60

CLAIM FOUR: TRIAL COUNSEL WAS INEFFECTIVE AT THE PUNISHMENT PHASE IN PREPARING FOR AND CONDUCTING DR. RICHARD DUDLEY'S TESTIMONY ................................................74

    A. Relevant Factual Background........................................................75

    B. Trial Counsel was not Prepared to Present Expert Testimony about Harper's Mental Illness........................................................................77

    C. Trial Counsel's Lack of Preparation Resulted in a Failure to Dispel the State's Claim that Harper was Malingering.......................................................79

D. Trial Counsel's Ineffectiveness Prejudiced Harper in that Jurors Did not Hear Evidence that Would have Changed their Answers to Special Issues One and Two ........................................................................................................90

CLAIM FIVE: TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO PRESENT LAY WITNESSES AT THE PUNISHMENT PHASE WHO WOULD HAVE CORROBORATED DR. DUDLEY'S OPINION THAT HARPER SUFFERS FROM MENTAL ILLNESS.................................................................91

A. Trial Counsel Failed to Present Lay Witness Testimony about Signs of Harper's Mental Illness Prior to the Crime, Leaving the State's Assertion that Harper was Malingering Unchallenged .............................................................91

B. Trial Counsel's Ineffectiveness Prejudiced Harper in that Jurors did not Hear Evidence that would have Corroborated Dr. Dudley's Opinion and thus Given the Jurors a Reason to Sentence Harper to a Life Term ...................................102

CLAIM SIX: TRIAL COUNSEL WAS INFFECTIVE FOR FAILING TO PRESENT WITNESSES WHOSE TESTIMONY WOULD HAVE NEGATED THE STATE'S CLAIM THAT HARPER WAS A FUTURE DANGER ............103

A. Counsel Performed Deficiently by Not Presenting Available Evidence Tending to Disprove Harper's Future Dangerousness .....................................103

B. Harper was Harmed by Trial Counsel's Deficient Performance.................107

CLAIM SEVEN: TRIAL COUNSEL WAS INFFECTIVE FOR FAILING TO EXCLUDE DR. MOELLER'S TESTIMONY UNDER *DAUBERT*, *KUMHO TIRE* AND *KELLY* THAT HARPER WAS A FUTURE DANGER....................108

CLAIM EIGHT: TRIAL COUNSEL WAS INEFFECTIVE FOR NOT HAVING A SOCIAL HISTORIAN TESTIFY AT THE PUNISHMENT PHASE OF HARPER'S TRIAL.................................................................................................115

A. Given the Importance of Telling Harper's Story via a Well-Qualified Social Historian, Not Hiring Such an Expert Constitutes Deficient Performance ......115

B. A Social Historian Would Have Presented a Comprehensive Account of Harper's Life History.......................................................................................116

C. Expert Opinion....................................................................................133

D. Prejudice ...........................................................................................133

vi

CLAIM NINE: TRIAL COUNSEL WAS INEFFECTIVE FOR NOT PRESENTING AVAILABLE MITIGATING EVIDENCE AT THE PUNISHMENT PHASE OF HARPER'S TRIAL ................................................... 134

    A. Given the Importance of Presenting All Available Mitigating Evidence, Trial Counsel's Failure to Do so Constitutes Deficient Performance ...................... 134

    B. That Jurors Did Not Hear Testimony From these Witnesses Prejudiced the Outcome of Harper's Case ................................................................................. 147

CLAIM TEN: TRIAL COUNSEL WAS INFFECTIVE BY FAILING TO EXPLAIN TO THE JURY DURING PUNISHMEN PHASE CLOSING ARGUMENT HOW TO GIVE FULL EFFECT TO THE MITIGATING EVIDENCE THEY PRESENTED ........................................................................ 148

    A. Trial Counsel Performed Deficiently under the Recognized Standards of Care and Supreme Court Precedent ................................................................. 148

    B. Harper was Harmed by the Deficient Performance .................................... 150

ISSUES RELATED TO JURY SELECTION ....................................................... 150

CLAIM ELEVEN: DEFENSE COUNSEL'S PERFORMANCE DURING VOIR DIRE WAS DEFICIENT AND RESULTED IN A CONSTITUTIONALLY-INFIRM JURY ............................................................................................................ 151

    A. Standard of Practice/Legal Background ..................................................... 151

    B. Systemic Failure of Defense Counsel to Conduct Meaningful Voir Dire .. 153

    C. Individual Jurors ......................................................................................... 156

    D. Conclusion .................................................................................................. 169

CLAIM TWELVE: THE STATE ENGAGED IN PURPOSEFUL DISCRIMINATION BY USING A PEREMPTORY STRIKE TO REMOVE A MINORITY VENIRE MEMBER IN VIOLATION OF HARPER'S CONSTITUTIONAL RIGHTS .......................................................................... 170

    A. Legal Standard ............................................................................................ 171

    B. The Jury Selection in Harper's Case .......................................................... 174

    C. The State's Proffered Race-Neutral Explanations ...................................... 175

D. The State's Alleged Race-Neutral Reasons Are Pretextual ........................187

CLAIM THIRTEEN: APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO CONDUCT A COMPARATIVE JUROR ANALYSIS IN SUPPORT OF THE *BATSON* CLAIM ALLEGED .............................................189

A. Relevant Facts.......................................................................189

B. Harper Received Ineffective Assistance of Appellate Counsel...................190

CLAIM FOURTEEN: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESERVE POTENTIAL *BATSON* CLAIMS .............................................193

A. Relevant Facts.......................................................................193

B. Trial Counsel's Failure to Request Race-Neutral Reasons from the State Amounted to Unreasonable Performance........................................194

C. Trial Counsel's Performance Prejudiced Harper's Appellate Proceedings 195

ISSUES RELATED TO PRE-TRIAL AND GUILT/INNOCENCE....................196

CLAIM FIFTEEN: TRIAL COUNSEL WAS INEFFECTIVE BY NOT REDUCING TO WRITING AN AGREEMENT BY THE STATE THAT HARPER COULD PLEA TO A LIFE SENTENCE IF THE STATE'S MENTAL HEALTH EXPERT CAME TO THE SAME CONCLUSION AS THE DEFENSE'S EXPERT .......................................................................196

A. Trial Counsel Performed Deficiently by Failing to Get a Written Copy of the State's Agreement to Allow Harper to Plea to Life..........................................196

B. Harper Was Harmed by the Deficient Performance Because Dr. Moeller Agreed with Dr. Dudley's Diagnosis and Harper Would Have Pleaded to a Life Sentence .......................................................................198

CLAIM SIXTEEN: TRIAL COUNSEL WAS INEFFECTIVE FOR NOT PRESENTING EVIDENCE THAT HARPER SUFFERED FROM A SEVERE MENTAL ILLNESS AS A BASIS FOR SUPPRESSION OF HIS POST-ARREST CONFESSION TO POLICE.......................................................................199

A. Trial Counsel's Failure to Present Compelling Evidence they Possessed Detailing Harper's Severe Mental Illness was Deficient Performance under the Recognized Standards of Care.......................................................................200

B. Harper was Harmed by this Deficient Performance....................................206

CLAIM SEVENTEEN: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO TIMELY OBJECTTO IMPERMISSIBLE VICTIM IMPACT TESTIMONY DURING GUILT/INNOCENCE PROCEEDINGS ..............................................210

A. Relevant Facts.....................................................................................211

B. Victim Impact Testimony is Inadmissible During the Guilt/Innocence Phase . ..................................................................................................213

C. Trial Counsel's Failure to Properly Object to Victim Impact Testimony During the Guilt/Innocence Phase Constituted Ineffective Assistance of Counsel ...............................................................................................213

D. Trial Counsel was Ineffective for Failing to Move for a Mistrial..............216

E. Appellate Counsel Was Ineffective for Failing to Raise Claims Regarding the Improper Victim Impact Evidence ...........................................217

CLAIM EIGHTEEN: TRIAL COUNSEL WAS INEFFECTIVE FOR CONCEDING HARPER'S GUILT DURING CLOSING ARGUMENTS AFTER HARPER HAD PLEAD NOT GUILTY ...................................................218

A. Relevant Facts.....................................................................................218

B. Ineffective Assistance of Counsel ......................................................219

ISSUES RELATED TO POST-CONVICTION ....................................................221

CLAIM NINETEEN: APPELLATE COUNSEL EFFECTIVELY ABANDONED HARPER BY WAIVING ORAL ARGUMENT .................................................221

A. Relevant Facts.....................................................................................222

B. Appellate Counsel Effectively Abandoned Harper by Waiving Oral Argument ................................................................................................222

C. Appellate Counsel's Waiver of Oral Argument Constituted Ineffective Assistance of Counsel ...........................................................................223

CLAIM TWENTY: HARPER'S DEATH SENTENCE SHOULD BE VACATED BECAUSE THE PUNISHMENT PHASE JURY INSTRUCTION RESTRICTED THE EVIDENCE THE JURY COULD DETERMINE WAS MITIGATING.....224

A. The Texas Statute and Harper's Jury Instructions.......................................225

B. Texas' Statute Unconstitutionally Limits the Categories of Evidence a Capital Jury May Find Mitigating and Warrant a Life Sentence ....................226

C. Conclusion ...........................................................................................229

CLAIM TWENTY-ONE: APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO ARGUE THAT THE DEATH PENALTY IS UNCONSTITUTIONAL AND THAT THE TRIAL COURT ERRED IN NOT GRANTING HARPER'S TRIAL MOTIONS PRECLUDING THE DEATH PENALTY.......................................................................................................231

A. Appellate Counsel Was Ineffective by Not Raising Any of the Erroneously Denied Death Penalty Motions in Harper's Direct Appeal .............................231

B. Appellate Counsel was Ineffective for Failing to Argue the Trial Court's Denial of Harper's Motion to Preclude the Death Penalty Due to Severe Mental Illness ...................................................................................................232

C. Appellate Counsel was Ineffective for Failing to Argue the Trial Court's Denial of Harper's Motion to Preclude the Death Penalty as Arbitrary ..........232

D. Appellate Counsel was Ineffective for Failing to Argue the Trial Court's Denial of Harper's Motion to Hold the Death Penalty Unconstitutional for Improperly Shifting the Burden of Proof ........................................................233

E. Appellate Counsel was Ineffective for Failing to Argue the Trial Court's Denial of Harper's Motion to Hold the Death Penalty Unconstitutional due to the Use of Victim Impact Evidence..................................................................233

F. Appellate Counsel was Ineffective for Failing to Argue the Trial Court's Denial of Harper's Motion to Hold the Death Penalty Unconstitutional under *Furman v. Georgia* ............................................................................233

G. Appellate Counsel was Ineffective for Failing to Argue the Trial Court's Denial of Harper's Motion to Preclude the Imposition of the Death Penalty ..234

H. Appellate Counsel was Ineffective for Failing to Argue the Trial Court's Denial of Harper's Motions Regarding the "10-12 Rule"................................234

I. Appellate Counsel was Ineffective for Failing to Argue the Trial Court's Denial of Harper's Motions Regarding Proper Jury Instructions....................234

x

J. Conclusion ...................................................................................235

OTHER ISSUES .................................................................................235

CLAIM TWENTY-TWO: HARPER EXPERIENCED WITHDRAWAL SYMPTOMS DURING TRIAL AS A RESULT OF A SUDDEN STOPPAGE OF DEPAKOTE, KLONOPIN, RISPERDAL, AND PROZAC, RENDERING HIM UNABLE TO ASSIST COUNSEL ...................................................................235

A. Relevant Facts............................................................................235

B. Harper Likely Experienced Withdrawal Symptoms as a Result of a Sudden Stoppage of Klonopin ...................................................................237

C. Harper Likely Experienced Withdrawal Symptoms as a Result of a Sudden Stoppage of Prozac ...................................................................238

D. Harper Likely Experienced Withdrawal Symptoms as a Result of a Sudden Stoppage of Depakote ...................................................................240

E. Harper Likely Experienced Withdrawal Symptoms as a Result of a Sudden Stoppage of Risperdal ...................................................................241

F. Prejudice ..................................................................................242

CLAIM TWENTY-THREE: HARPER IS INELIGIBLE FOR A DEATH SENTENCE BECAUSE OF HIS SEVERE MENTAL ILLNESS ......................243

CLAIM TWENTY-FOUR: HARPER'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN THE TRIAL COURT FAILED TO INSTRUCT THE JURY THAT A VOTE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE ..... ....................................................................................................246

A. The "10-12 Rule" Generally....................................................246

B. The "10-12 Rule" in Harper's Case.........................................247

C. The "10-12 Rule" Violates Harper's Constitutional Rights.......247

CLAIM TWENTY-FIVE: HARPER'S DEATH SENTENCE IS UNCONSTITUTIONAL BECAUSE IT WAS ASSIGNED BASED ON TEXAS' ARBITRARY SYSTEM OF ADMINISTERING THE DEATH PENALTY......251

A. Supreme Court Precedent Mandates That the Death Penalty Not Be Applied Arbitrarily ..................................................................................................251

B. Texas' Death Penalty Scheme Is Unconstitutional ....................................253

C. Conclusion ..................................................................................................259

CLAIM TWENTY-SIX: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT TIMELY OBJECTIONS TO THE TRIAL COURT'S DENIAL OF DEFENSE MITIGATION EVIDENCE UNDER STATE HEARSAY RULES, UNDER *GREGG V. GEORGIA, JUREK V. TEXAS* AND *GREEN V. GEORGIA* AND HARPER'S FOURTEENTH AMENDMENT DUE PROCESS AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED BY THE EXCLUSION OF DEFENDANT'S MITIGATION EVIDENCE……………..259

CLAIM TWENTY-SEVEN: THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT THE JURY'S FINDING OF "FUTURE DANGEROUSNESS" PURSUANT TO TEX. CODE. CRIM. PROC. ANN. ART. 37.071, SEC. 2(B)(1) AT PUNISHMENT…………………………………………………………263

CLAIM TWENTY-EIGHT: MR. HARPER WAS DENIED HIS FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION WHEN THE STATE USED A PREEMPTORY STRIKE TO PREVENT VENIREPERSON DONNA BANKS FROM SERVING ON HIS JURY IN VIOLATION OF *BATSON V. KENTUCKY*…………………………………………………………………270

CLAIM TWENTY-NINE: THE TRIAL COURT ERRED IN ADMITTING MR. HARPER'S STATEMENT TO HPD OFFICER JAMES BENFORD ON OCTOBER 23, 1995 WHILE INCARCERATED IN TDCJ FOR THE REASON THAT THE STATEMENT WAS NOT FREELY AND VOLUNTARILY MADE IN VIOLATION OF THE APPELLANT'S RIGHTS UNDER THE 5TH AND 14TH AMENDMENTS OF THE U.S. CONSTITUTION……………………..276

CLAIM THIRTY: MR. HARPER WAS DENIED HIS FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS OF LAW WHEN THE STATE KNOWINGLY ALLOWED ITS EXPERT, DR. RICHARD MOELLER, TO REMAIN IN THE COURTROOM THROUGHOUT THE APPELLANT'S PUNISHMENT EVIDENCE WITHOUT ADVISING THE TRIAL COURT AND COUNSEL OF HIS PRESENCE OR SEEKING HIS EXEMPTION FROM THE RULE AT ANY TIME DURING THE APPELLANT'S TRIAL………………281

CLAIM THIRTY-ONE: THE TRIAL COURT DENIED MR. HARPER HIS FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS OF LAW WHEN IT ALLOWED THE STATE'S EXPERT, DR. RICHARD MOELLER, TO TESTIFY AT PUNISHMENT AFTER THE STATE HAD KNOWINGLY ALLOWED HIM TO REMAIN IN THE COURTROOM DURING THE APPELLANT'S PUNISHMENT EVIDENCE WITHOUT FIRST ADVISING THE COURT AND COUNSEL OF HIS PRESENCE, OR SEEKING HIS EXEMPTION FROM THE RULE……………………………………………281

PRAYER FOR RELIEF ........................................................................292

CERTIFICATE OF SERVICE ............................................................293

# TABLE OF AUTHORITIES

**Federal Cases**

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007)...........................................passim

*Adams v. Thaler*, 2010 WL 2990967 (E.D. Tex. July 26, 2010)..........................47

*Alcorta v. Texas*, 355 U.S. 28 (1957).................................................. 57, 58

*Amador v. Quarterman*, 458 F.3d 397 (5th Cir. 2006).........................................163

*Arizona v. Fulminante*, 499 U.S. 279 (1991).....................................................181

*Atkins v. Virginia*, 536 U.S. 304 (2002).............................................................passim

*Batson v. Kentucky*, 476 U.S. 79 (1985)...................................................... 144, 145

*Berger v. United States*, 295 U.S. 78 (1935) .........................................................58

*Blackmon v. Scott*, 22 F.3d 560 (5th Cir. 1994)………………………………….286

*Blackmon v. Scott*, 145 F.3d 205 (5th Cir. 1998)…………………………………..286

*Bobby v. Van Hook*, 558 U.S. 4 (2009)...................................................................12

*Brewer v. Quarterman*, 550 U.S. 286 (2007) .......................................................203

*Chapman v. California*, 386 U.S. 18 (1967)...........................................................15

*Colorado v. Connelly*, 479 U.S. 157 (1986) .........................................................173

*Cullen v. Pinholster*, __U.S.__, 131 S. Ct. 1388 (2011) ....................... 12, 122, 169

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) 110, 112, 113

*Dunn v. United States*, 307 F.2d 883 (5th Cir. 1962) ...........................................189

*Enmund v. Florida*, 458 U.S. 782 (1982) .............................................................217

*Evitts v. Lucey*, 469 U.S. 387 (1985) ............................................................ 163, 205

*Faulder v. Johnson*, 81 F.3d 515 (5th Cir. 1996) ..................................................58

*Florida v. Nixon*, 543 U.S. 175 (2004) .................................................................192

*Flores v. Johnson*, 210 F.3d 456 (5th Cir. 2000)………………………………….112

*Ford v. Wainwright*, 477 U.S. 399 (1986) ...........................................................224

*Franklin v. Lynaugh*, 487 U.S. 164 (1988)...........................................................223

*Furman v. Georgia*, 408 U.S. 238 (1972)...................................................... 206, 224

*Gardner v. Florida*, 430 U.S. 349 (1977)…………………………………….286, 291

*Gideon v. Wainwright*, 372 U.S. 335 (1963) ............................................... 16, 17

*Giglio v. United States*, 405 U.S. 150 (1972)………………………………60, 70, 73

*Godfrey v. Georgia*, 446 U.S. 420 (1980) ............................................................226

*Goodwin v. Johnson*, 132 F.3d 162 (5th Cir. 1997) .............................................58

*Green v. Georgia*, 442 U.S. 95 (1979)…………………………………………….260

*Gregg v. Georgia*, 428 U.S. 153 (1976) ...................................................... 225, 229

*Gregory v. Thaler*, 601 F.3d 347 (5th Cir. 2010) ..................................................32

*Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770 (2011)............................... 12, 14

*Hernandez v. New York*, 500 U.S. 352 (1991).....................................................145

*Irvin v. Dowd*, 366 U.S. 717 (1961)........................................................ 15, 16, 126

*Jackson v. Virginia*, 443 U.S. 307 (1974)...........................................263

*Johnson v. California*, 545 U.S. 162 (2005) ....................................144

*Jurek v. Texas*, 428 U.S. 262 (1976)........................................... passim

*Kirkpatrick v. Whitley*, 992 F.2d 491 (5th Cir. 1993)............................63, 73

*Kumho Tire v. Carmichael*, 526 U.S. 137 (1999)......................110, 112, 114

*Lockett v. Ohio*, 438 U.S. 586 (1978) ...................................... 17, 197

*Lowenfield v. Phelps*, 484 U.S. 231 (1988)......................................261

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ..........................231

*Martinez v. Ryan*, 132 S.Ct. 1309 (2012).............................115, 262

*McCleskey v. Kemp*, 481 U.S. 279 (1987) ...................................200

*McKoy v. North Carolina*, 494 U.S. 433 (1990) ..............................222

*Miller v. Dretke*, 420 F.3d 356 (5th Cir. 2005)..................................13

*Miller-El v. Cockrell*, 537 U.S. 322 (2003)......................................271

*Miller-El v. Dretke*, 545 U.S. 231 (2005) ................................. passim

*Mills v. Maryland*, 486 U.S. 367 (1988) ......................................221

*Mincey v. Arizona*, 437 U.S. 385 (1978)....................................277, 279

*Minnesota v. Murphy*, 465 U.S. 420 (1984)....................................277

*Missouri v. Frye*, __U.S.__, 132 S. Ct. 1399 (2012) ................... 169, 171

*Mooney v. Holohan*, 294 U.S. 103 (1935) .................................. 57, 58

*Morgan v. Illinois*, 504 U.S. 719 (1992)..................................... passim

*Napue v. Illinois*, 360 U.S. 264 (1959) ......................................58

*Padilla v. Kentucky*, __ U.S. __, 130 S. Ct. 1473 (2010) .....................12

*Parker v. Gladden*, 385 U.S. 363 (1966) .....................................19

*Payne v. Tennessee*, 501 U.S. 808 (1991) ...................................186

*Penry v. Johnson*, 532 U.S. 782 (2001) .................................. 122, 123, 202, 226

*Penry v. Lynaugh*, 492 U.S. 302 (1989) .................................. passim

*Porter v. McCollum*, __ U.S. __, 130 S. Ct. 447 (2009) .......................... 11, 14, 77

*Purkett v. Elem*, 514 U.S. 765 (1995)......................................146

*Reed v. Quarterman*, 504 F.3d 465 (5th Cir. 2007)..............................58

*Reed v. Quarterman*, 555 F.3d 364 (5th Cir. 2009).......................... passim

*Rice v. Collins*, 546 U.S. 333 (2006) ......................................144

*Ries v. Quarterman*, 522 F.3d 517 (5th Cir. 2008)........................ 124, 163

*Rompilla v. Beard*, 545 U.S. 374 (2005) .................................. passim

*Roper v. Simmons*, 543 U.S. 551 (2005)....................................217

*Rose v. Clark*, 478 U.S. 570 (1986) .......................................15

*Skipper v. South Carolina*, 476 U.S. 1 (1986) ............................ passim

*Smith v. Phillips*, 455 U.S. 209 (1981)......................................286

*Smith v. Zant*, 887 F.2d 1407 (11th Cir. 1989)..................................182

*Snyder v. Louisiana*, 552 U.S. 472 (2008)....................................145

*Strickland v. Washington*, 466 U.S. 668 (1984) ............................ passim

xv

*Tennard v. Dretke*, 542 U.S. 274 (2004) .............................................. 113, 122, 200
*Trevino v. Thaler*, 133 S.Ct. 1911 (2013)…………………………………..115, 262
*United States v. Anderson,* 574 F.2d 1347 (5th Cir. 1978)…………………..70, 73
*United States v. Bagley*, 473U.S. 667 (1985)……………………………………113
*United States v. Brown*, 553 F.3d 768 (5th Cir. 2008) ................................ 147, 164
*United States v. Cronic*, 466 U.S. 648 (1984) .....................................................195
*United States v. Jones*, 132 F.3d 232 (5th Cir. 1998)…………………………..261
*United State v. Mason*, 293 F.3d 826 (5th Cir. 2002)……………………………71
*United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996).................................183
*United States v. Williamson*, 183 F.3d 458 (5th Cir. 1999)..................................163
*Virgil v. Dretke*, 446 F.3d 598 (5th Cir. 2006) .....................................................11
*Wainwright v. Witt*, 469 U.S. 412 (1985) ............................................................126
*Westbrook v. Thaler*, 585 F.3d 245 (5th Cir. 2009)...............................................32
*Wiggins v. Smith*, 539 U.S. 510 (2003)..........................................................passim
*Williams v. Taylor*, 529 U.S. 362 (2000) ....................................................... 14, 92
*Witherspoon v. Illinois*, 391 U.S. 510 (1968) ....................................................128
*Woodson v. North Carolina*, 428 U.S. 280 (1976) ..............................................225
*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ..........................................................232

**State Cases**
*Andrews v. State*, 159 S.W.3d 98 (Tex. Crim. App. 2005)........................... 123, 176
*Bennett v. State*, 738 S.W.2d 33 (Tex. App.—Texarkana 1987, no pet.)...............19
*Berry v. State*, 233 S.W. 3rd 847 (Tex. Crim. App. 2007)………………………263
*Brown v. State*, 35 S.W. 3rd 183 (Tex. App. - Waco 2000)…………………….279
*Bryant v. State*, 282 S.W. 3rd 156, 162 (Tex. App.—Texarkana 2009)…………283
*Cantu v. State*, 939 S.W.2d 627 (Tex. Crim. App. 1997)................................ 47, 49
*Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010)…………………..111, 263
*Davis v. State*, 313 S.W.3d 317 (Tex. Crim. App. 2010) ....................................126
*Dinkins v. State*, 894 S.W. 2nd 330 (Tex. Crim. App, 1995*)……………………263
*Drilex System, Inc., v. Flores*, 1 S.W. 3rd 122 116 (Tex. 1999)………………...282
*Emerson v. State,* 851 S.W.2d 269 (Tex. Crim. App. 1993) ............... 160, 161, 164
*Estrada v. State*, 313 S.W. 3rd 274 (Tex. Crim. App. 2010)…………….264, 267
*Ex parte Chandler*, 182 S.W.3d 350 (Tex. Crim. App. 2005) ..............................88
*Ex parte Dunham*, 650 S.W.2d 825 (Tex. Crim. App. 1983)...............................176
*Ex parte Ellis*, 233 S.W.3d 324 (Tex. Crim. App. 2007) .............................. 88, 168
*Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006)................... 13, 14, 15
*Ex parte Gutierrez*, 337 S.W.3d 883 (Tex. Crim. App. 2011) ..............................25
*Ex parte Jimenez*, 364 S.W.3d 866 (Tex. Crim. App. 2012)................................11
*Ex parte Martinez*, 195 S.W.3d 713 (Tex. Crim. App. 2006) ..............................14
*Ex parte Miller*, 330 S.W.3d 610 (Tex. Crim. App. 2009)..................................204
*Ex parte Santana*, 227 S.W.3d 700 (Tex. Crim. App. 2007)........ 124, 163, 166, 203

*Ex parte Smith*, 309 S.W.3d 53 (Tex. Crim. App. 2010)......................................122

*Ford v. State*, 1 S.W.3d 691 (Tex. Crim. App. 1999).................................. 146, 186

*Franklin v. State*, 138 S.W.3d 351 (Tex. Crim. App. 2004)....................................15

*Gardner v. State*, 730 S.W.2d 675 (Tex. Crim. App. 1987)...................................190

*Grant v. State*, 325 S.W.3d 655 (Tex. Crim. App. 2010).....................................146

*Greer v. State*, 310 S.W.3d 11 (Tex. App.—Dallas 2009, no pet.)............. 147, 153

*Hartman v. State*, 946 S.W.2d 60 (Tex. Crim. App. 1997).........................111

*Hernandez v. State*, 116 S.W.3d 26 (Tex. Crim. App. 2003).......................112

*Keeton v. State*, 724 S.W. 2d 58 (Tex. Crim. App. 1987).........................264

*Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992)................111, 112, 114

*Kemp v. State*, 846 S.W.2d 289 (Tex. Crim. App. 1992) ................................ passim

*Kutzner v. State*, 75 S.W.3d 427 (Tex. Crim. App. 2002).......................................25

*Linscomb v. State*, 829 S.W.2d 164 (Tex. Crim. App. 1992)................................145

*Luna v. State*, 268 S.W.3d 594 (Tex. Crim. App. 2008) ......................................215

*Lykins v. State*, 784 S.W. 2nd 32 (Tex. Crim. App. 1989)....................277, 279

*Martinez v. State***,** 867 S.W. 2nd 30 (Tex. Crim. App. 1993)......................288

*Martinez v. State*, 98 S.W.3d 189 (Tex. Crim. App. 2003) ....................................28

*Meza v. State*, 206 S.W.3d. 684 (Tex. Crim. App. 2006)......................................205

*Miller-El v. State*, 782 S.W.2d 892 (Tex. Crim. App. 1990)................ 183, 186, 187

*Moore v. State*, 882 S.W. 2nd 844  (Tex. Crim. App. 1994).........................281

*Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998) ...................................181

*Munroe v. State*, 637 S.W.2d 475 (Tex. Crim. App. 1982).......................................19

*Murphy v. State*, 112 S.W.3d 592 (Tex. Crim. App. 2003)..................................126

*Nieto v. State*, 365 S.W.3d 673 (Tex. Crim. App. 2012)............................ 146, 161

*Oursbourn v. State*, 259 S.W.3d 159 (Tex. Crim. App. 2008)............ 173, 174, 175

*Reich–Bacot v. State*, 789 S.W.2d 401 (Tex. App.—Dallas 1990)......................153

*Ripkowski v. State*, 61 S.W.3d 378 (Tex. Crim. App. 2001)............... 177, 178, 181

*Russell v. State*, 155 S.W. 3rd 176 (Tex. Crim. App. 2005)...................281, 288

*Sanders v. State*, 715 S.W.2d 771 (Tex. App.—Tyler 1986, no pet.) ..................176

*Segundo v. State*, 270 S.W.3d 79 (Tex. Crim. App. 2008)...................................126

*Spence v. State*, 795 S.W. 2d 743 (Tex. Crim. App. 1990) ...................................35

*Standefer v. State*, 59 S.W.3d 177 (Tex. Crim. App. 2001) ................................127

*Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999)............ 11, 124, 171, 179

*Trevino v. State*, 991 S.W. 2nd 849 (Tex. Crim. App. 1999).......................268

*Walker v. State*, 610 S.W.2d 481 (Tex. Crim. App. 1980)..................................189

*Webb v. State*, 166 S.W. 2d 236 (Tex. Crim. App. 1989).........................283

*White v. State*, 958 S.W. 2nd 460 (Tex.App.—Waco 1997).......................282

*Whitsey v. State*, 796 S.W.2d 707 (Tex. Crim. App. 1990).......... 145, 150, 158, 160

*Young v. State*, 826 S.W.2d 141 (Tex. Crim. App. 1991) ...................................147

**Statutes**

Tex. Code Crim. Proc. Art. 35.261 .............................................................. 144, 161

Tex. Code Crim. Proc. Art.  36.06…………………………………………281, 283, 288

Tex. Code Crim. Proc. Art. 37.071 ...................................................... 89, 198, 199

Tex. Code Crim. Proc. Art. 38.22 ...................................................... 174, 175, 180

Tex. Penal Code § 19.03(a)(7)(A) ...................................................................127

Tex. Rules App. Proc. 38.3 ...................................................................... 196, 197

Tex. R. Evid. 614…………………………………………………………………...281

**Other Authority**

Adam Gershowitz, *Statewide Capital Punishment: The Case For Eliminating Counties' Role in the Death Penalty* (March 2009), *available at* http://works.bepress.com/adam_gershowitz/5/ (last visited September 20, 2012) ....................................................................................................228

American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (rev. ed. 2003) .......................... passim

Andrea Lyon, *Defending the Death Penalty Case: What Makes Death Different?*, 42 MERCER L. REV. 695 (1991) ...................................................................193

David Baldus, et al., *Race and Proportionality Since* McCleskey v. Kemp *(1987): Different Actors with Mixed Strategies of Denial and Avoidance*, 39 COLUM. HUMAN RIGHTS L. REV. 143 (Fall 2007) ...........................................................231

Isaac Unah, *Choosing Those Who Will Die: The Effect of Race, Gender, and Law in Prosecutorial Decision to Seek the Death Penalty in Durham County, North Carolina*, 15 MICHIGAN J. OF RACE & LAW 135 (2009) ....................................231

Jeffrey Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme*, 6 WM. & MARY BILL OF RIGHTS J. 345 (Spring 1998).......................................................................228

Jules Epstein, *Death-Worthiness and Prosecutorial Discretion in Capital Case Charging*, 19 TEMPLE POL. & CIVIL RIGHTS L. REV. 389 (2010) ............. 228, 231

Katherine Barnes, et al., *Place Matters (Most): An Empirical Study of Prosecutorial Decision-Making in Death-Eligible Cases*, 51 ARIZ. L. REV. 305 (2009) .................................................................................................228

Scott E. Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse and the Death Penalty*, 83 CORNELL L. REV. 1557 (1998).. ...............................................................................................................193

Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 HOUSTON L. REV. 807 (2008-2009)...............................................................231

State Bar of Texas, *Guidelines and Standards for Texas Capital Counsel* (2006). ............................................................................................. 12, 13, 122, 163

## PETITION FOR A WRIT OF HABEAS CORPUS

### This is a Capital Case

The State sought justice for Triska Rose, Briana Roberson, and Mya Love in charging Garland Harper ("Harper") with capital murder and asking jurors to sentence him to death.   And while conventional wisdom presupposes that justice is served when an individual is punished for his crimes, justice is never served when the process by which an individual is convicted and sentenced to death is riddled with error.

Time and again, Harper was denied his right to a fair trial:  during plea negotiations; throughout jury selection; at the pre-trial stage; through both the guilt and punishment phases of trial; and even during the pendency of Harper's appeal. At each stage of the proceedings, Harper's rights were violated in such ways that his conviction and death sentence became inexorable.  Because Harper was not assisted by effective trial counsel, because Harper was not sentenced by twelve impartial jurors able and willing to render a true verdict, and because Harper was prosecuted by agents of the State who failed to act in strict accordance with the law, justice was not served in this instance.

Ineffective assistance of counsel prejudiced Harper months before trial, when counsel failed to get a plea bargain agreement with the State in writing so that it could later be enforced.   In hopes of securing a life sentence, defense counsel agreed to let the State's mental health expert examine Harper with the understanding that if the expert found Harper suffered from mental illness, the State would allow Harper to plead to a sentence of life without the possibility of parole.  Ultimately the State's expert did agree that Harper was mentally ill, but because defense counsel had not reduced their understanding of the agreement with

1

the State to writing, the State went back on its word and Harper lost his chance to plead to a life sentence.

At jury selection, numerous venire members who indicated that they were likely to automatically vote for the death penalty upon finding Harper guilty were not properly questioned and disqualified, and thus ultimately sat in judgment of Harper. One juror decided to vote for Harper's death as soon as she and the other jurors found Harper guilty, and no evidence she could have heard during the punishment phase would have changed that decision. That even one juror who would not follow the law and consider all evidence sat as a juror in Harper's capital trial violates Harper's most basic right to be tried by a fair and impartial jury of his peers, and demands an automatic punishment phase re-trial.

Because Harper's trial counsel were ineffective, they also failed to properly challenge the only non-circumstantial piece of evidence tying Harper to the crime, his confession. Trial counsel should have argued that the confession was not knowing and voluntary given the symptoms of mental illness that Harper was experiencing, such as hallucinations and paranoia, which were exacerbated by drug use. Trial counsel could have presented testimony from both psychiatrist Dr. Richard Dudley and numerous lay witnesses who observed Harper's deterioration in the weeks and days leading up to, and hours immediately following, the crime. Such testimony might have convinced the trial court to suppress the confession entirely, or led jurors to discount the weight of the confession. Either way, that jurors heard the confession in the first place, and were not presented with any evidence of its involuntariness in the second, made Harper's conviction and subsequent sentence of death even more of a foregone conclusion.

The State's star witness at the punishment phase was Louis Jackson, who testified that Harper was the last person he saw his mother Teasa Jackson with over twenty years earlier on the night she was murdered, when Jackson was seven years

old.  Jackson, however, in truth has no independent memory of that fact, and was pressured by the State to say that he did.   Moreover, trial counsel's lack of preparation regarding the uncharged Teasa Jackson murder left counsel unable to present evidence of three alternate suspects, all of whom the police considered more viable than Harper until two decades later when Harper was on trial for capital murder.  The combination of Louis Jackson's improperly elicited testimony and trial counsel's ineffectiveness irrevocably prejudiced Harper, in that it led jurors to believe Harper had committed not only the instant murder, but another murder as well, making the jurors' vote for death a near inevitability.

The most important mitigating evidence trial counsel could have presented at punishment related to the mental illness Harper was suffering from leading up to, and during the commission of, the crime.  Yet trial counsel's lack of preparation left them unable to effectively elicit testimony from their own mental health expert and counter the State's claim that Harper was malingering mental illness to avoid punishment.   There was a great deal of available evidence that would have contradicted the State's malingering claim, including information about how mental illness is hereditary,  Harper's familial history of psychiatric disorders, and first-hand accounts from lay witnesses regarding Harper's delusional and paranoid behavior prior to the crime.  None of this evidence was presented and thus the likelihood that jurors would find sufficient mitigating factors to warrant a life sentence was greatly, if not entirely, diminished.

Finally, appellate counsel's ineffectiveness in waiving direct appeal oral argument before the Court of Criminal Appeals and failing to raise numerous record-based claims made it all the more likely that Harper's seemingly preordained conviction and death sentence would stand.

Throughout Harper's trial, error after error resulted in Harper not receiving the justice to which he was entitled, whether because of trial counsel's

ineffectiveness, or juror misconduct, or State over-zealousness.  In light of this lack of justice and inexorable march toward conviction and a sentence of death, Harper's entire trial must be re-examined.  Juror misconduct alone necessitates that this court grant Harper a new sentencing phase.

# I.

# PROCEDURAL HISTORY

Harper is confined under a sentence of death pursuant to the judgment of the 182nd District Court (the Honorable Jeannine Barr presiding), Harris County, Texas, case number 1272085, which was rendered and entered on October 18, 2010. (6 CR at 1537.)[1]

## A. Trial Court Proceedings

On October 27, 2008, the court appointed Gerald Bourque and James Stafford to represent Harper. (1 CR at 47-48; *see also* 1 CR at 4.)

### 1. Indictment

On January 14, 2009, a grand jury indicted Harper with the capital murders of Triska Rose and Mya Love under cause number 1189025. (1 CR at 2.)  On March 6, 2009, the State announced their intent to seek the death penalty against Harper.  (1 CR at 221.)  On July 28, 2010, the State re-indicted Harper under cause number 1272085.  (3 CR at 787.)  The re-indictment alleged that Harper knowingly and intentionally caused the death of Briana Roberson, in addition to the deaths of Triska Rose and Mya Love.  (4 CR at 788.)

---

[1]  "CR" refers to the Clerks Record in Harper's trial.  "RR" refers to the Reporters Record in Harper's trial.

### 2. Trial

Voir dire began on August 30, 2010, and concluded on September 14, 2010. (3 RR at 9; *see also* 11 RR at 227.) On October 4, 2010, Harper was arraigned and entered a plea of not guilty. (14 RR at 8-9; *see also* 14 RR at 18.) Opening statements for the guilt/innocence phase of the trial commenced on the same day. (14 RR at 19-33.) On the morning of October 7, 2010, the State rested its case-in-chief. (17 RR at 77.) Declining to present affirmative evidence, the defense rested its case immediately thereafter. (17 RR at 77.) The case was submitted to the jury for deliberations the very same day, with trial counsel conceding guilt in their closing argument. (17 RR at 87, 98.) On the afternoon of October 7, 2010, the jury found Harper guilty of capital murder as charged in the indictment. (17 RR 100-01; *see also* 6 CR at 1528.)

The punishment phase of the trial began the following day, on October 8, 2010. (18 RR at 7.) Neither party made opening remarks to the jury. (18 RR at 7; 20 RR at 241.) The State rested their case on October 12, 2010, and the defense commenced their presentation of evidence on the same day. (20 RR at 241.) The defense rested their case on October 14, 2010, at which point the State called a rebuttal witness. (22 RR at 245-50.) Together, the State and defense completed their punishment cases on Friday October 15, 2010. (23 RR at 203.) On Monday October 18, 2010, the jury retired for deliberations. (24 RR at 56.) On the same day, the jury returned a verdict of "Yes" to Special Issue Number 1, and "No" to Special Issue Number 2. (24 RR at 59-60; *see also* 6 CR at 1534-36.) Harper was sentenced to death on October 18, 2010. (24 RR at 61; 6 CR at 1537-38.)

### B. State Appellate Proceedings

On October 18, 2010, Harper was notified of his right of appeal, declared indigent, and appointed counsel to represent him. (6 CR at 1540-43.) Harper filed notice of appeal and Kurt Wentz was appointed as appellate counsel. (6 CR at

1543.)  No motion for a new trial was filed on Harper's behalf.  On March 10, 2012, Mr. Wentz filed an opening appellate brief, *Garland B. Harper v. The State of Texas*, cause number AP-76452, in the Court of Criminal Appeals ("CCA"). The State submitted a brief in response on June 13, 2012. Appellate counsel did not file a reply brief, waived oral argument, and the case was submitted on September 12, 2012.  The CCA rendered its decision denying Harper's appeal on October 10, 2012.  *Harper v. State*, No. AP-76452, 2012 WL 4833834 (Tex. Crim. App. Oct. 10, 2012).[2]

### C. State Habeas Proceedings

On October 29, 2010, the 182nd District Court appointed the Office of Capital Writs ("OCW") to represent Harper in filing an application for a writ of habeas corpus pursuant to Code of Criminal Procedure Article 11.071.  (6 CR at 1549.) The Application was filed on October 22, 2012, and on February 24, 2016 the Court of Criminal appeals adopted the trial court's findings and conclusions and denied relief.

## II.

## STATEMENT OF FACTS

### A. Guilt Phase Presentation

The State presented evidence that Harper killed his girlfriend, Triska Rose ("Rose"), and her two daughters, Briana Roberson and Mya Love.  Testimony was elicited from sixteen witnesses, including the victims' neighbors, friends and co-workers, as well as several law enforcement officers, including dispatchers, police officers, and forensic and medical experts.

Harper began dating Rose in April 2008 and moved in with her and her two daughters.  (14 RR at 198.)  Though the relationship started well, things went

---

[2] A copy of the of the CCA's opinion is attached as Exhibit 44.

downhill during the summer.  (14 RR at 199, 201-02.)  Rose's friends and co-workers noticed she was more sad and mellow than usual, and also observed Harper following and frequently telephoning Rose at work.  (14 RR at 164-65, 202.)  When Rose failed to appear at work on October 24, 2008, her co-workers became worried and went to her apartment.  (14 RR at 166, 208-09.)  Several people broke into Rose's apartment and discovered the three victims inside.  (14 RR at 169-70.)  After the police responded to the scene, Harper arrived and was promptly arrested.  (15 RR at 124-29.)

Defense counsel did not call any witnesses during the guilt phase.  (17 RR at 77.)

## B. Punishment Phase Presentation

The State opened its punishment case by calling David Rossi, a deputy with the Harris County Sheriff's Department, to detail Harper's prior convictions.  (18 RR at 8, 17-22.)  Harper had been convicted of theft of service for not paying a cab fare in 1990, as well as a robbery during that same year.  (18 RR at 17.)  In 1992, Harper was convicted of robbery for two purse-snatching incidents.  (18 RR at 18-19.)  Six years later, Harper was again convicted of robbery for stealing another purse.  (18 RR at 22.)  The State introduced testimony from several of these complainants, as well as the police officers who investigated the incidents. (18 RR at 23, 37, 46, 58, 129, 143, 169, 176, 185.)

The State also introduced evidence of several uncharged, extraneous matters.  Harper was accused of robbing an acquaintance, and mistreating an ex-girlfriend.  (18 RR at 83-84, 112-13.)  The State then implicated Harper in the twenty-year-old unsolved murder of Teasa Jackson.  (*See* Claims Two and Three, *post*; 19 RR at 11-271; 20 RR at 8-82.)

Finally, the State offered evidence of Harper's behavior while incarcerated for his prior convictions.  Though Harper had no instances involving violence

7

towards correctional officers or other inmates, the State procured testimony describing the minor disciplinary complaints Harper accrued.  (20 RR at 82, 101, 116, 130.)  These complaints included singing too loudly in the shower (20 RR at 109) and leaving the water running in the barbershop where Harper did work detail.  (20 RR at 92.)  The State ended its punishment phase by calling Stephen Rogers, a classification officer with the Texas Department of Criminal Justice ("TDCJ"), to describe the prison system and the levels of inmate classifications. (20 RR at 157.)

Defense counsel's case at punishment was centered on the fact that Harper was suffering from a severe mental illness, schizoaffective disorder, and would be a model inmate if given a life sentence.

The first witness for the defense was Susan Perryman-Evans, a former warden at TDCJ.  (20 RR at 241.)  She testified about the security and classification system within TDCJ, opining that Harper's prison records showed no serious violations during his seventeen years of incarceration.  (20 RR at 247, 250.) Perryman-Evans did not suspect that Harper would cause violence within a prison. (20 RR at 258.)

Next, defense counsel introduced the testimony of Dr. Richard Dudley, a forensic psychologist.  (21 RR at 8.)  After reviewing documents and several extensive interviews, Dr. Dudley diagnosed Harper with schizoaffective disorder, that is, that Harper was suffering from schizophrenia and major depression simultaneously.  (21 RR at 17-20, 23-24, 39-40.)  Dr. Dudley agreed with a report written by the State's expert, Dr. Mark Moeller, that Harper suffered from schizophrenia and substance dependence, but disagreed that Harper had antisocial personality disorder ("ASPD").  (21 RR at 36-37, 157-58.)

Defense counsel also called two witnesses regarding the uncharged Teasa Jackson murder who each testified that they did not see Harper at or near the scene on the night of the crime.  (22 RR at 13,19, 43.)

Defense counsel produced testimony from several of Harper's friends and family members who described Harper's devotion to the religious faith he cultivated while previously incarcerated, his paranoia and drug use prior to the crime, and his remorse for his actions.  (21 RR at 50, 147, 211.)

In rebuttal, the State called Dr. Moeller.  Defense counsel unsuccessfully attempted to prevent Dr. Moeller's testimony, as Dr. Moeller had been present for the entirety of the punishment phase without seeking an exemption for exclusion from the court.  (22 RR at 246-49; 23 RR at 6-28.)  Dr. Moeller evaluated Harper and diagnosed him with schizophrenia, paranoid type, as well as ASPD.  (23 RR at 34, 50.)

In his initial report, Dr. Moeller stated that Harper was likely to adapt to prison life and unlikely to be dangerous if he received a life sentence.  (23 RR at 58-59.)  However, on the stand Dr. Moeller reversed course, claiming that he had not previously been aware that a life sentence meant that Harper would be in general population.  (23 RR at 53, 142.)  Dr. Moeller assumed in his report that a life sentence was served in a locked down, single cell with little movement in the prison and scant interaction with other inmates.  (23 RR at 53.)

## C. Post-Conviction Investigation

Investigation by post-conviction counsel revealed a considerable amount of evidence that would have benefited Harper at trial.

### 1. Teasa Jackson

The initial police investigation of Teasa Jackson's murder focused on three suspects, each of whom had motive and opportunity to kill her, and none of whom was Harper.  (Ex. 18 [Teasa Jackson Police Report].)  Evidence regarding these

other suspects was not presented at Harper's trial, despite the fact that careful analysis of the police reports revealed a plethora of information that would have cast doubt on the State's claim that Harper committed the murder. (*Id.*)

The star witness for the State's case pertaining to this murder was her son, Louis Jackson. Louis was seven years old at the time of Teasa's death. (20 RR at 21.) At Harper's trial, some twenty years after the fact, Louis testified that Harper was the last man he saw at his mother's apartment. (*Id.* at 33-35.) However, Louis in fact has no independent recollection of seeing Harper on the night of Teasa's murder. (Ex. 52 at ¶12 [Aff. of Louis Jackson].) Rather, Louis felt pressured by the State to identify Harper as the last person seen with Teasa. (*Id.* at ¶¶13-15.)

### 2. Harper's Good Behavior while Incarcerated

During his previous incarcerations, Harper was a model inmate, whose good behavior earned him a position of trust as a barber. (Exhs. 59, 60.) Harper was entrusted with cutting the hair of TDCJ officers, including wardens. (*Id.*) Some officers even brought their children and family members to get their hair cut by Harper. (*Id.*) One former warden used to drive an hour to get his hair cut by Harper after Harper was transferred to a different unit. (*Id.*)

### 3. Evidence of Mental Illness and Other Mitigating Circumstances

Defense counsel struggled during Harper's punishment phase to demonstrate that Harper suffered from a severe mental illness prior to and contemporaneously with the charged murders. Part of this struggle was due to defense counsel's lack of preparation in regards to Dr. Richard Dudley, the forensic psychologist who testified on Harper's behalf. (Ex. 46 at ¶38 [Aff. of Dr. Richard Dudley].) Also missing from Harper's punishment case was testimony from several lay witnesses who witnessed Harper's precipitously declining mental health in the weeks leading up to the crime. (Ex. 49 at ¶5 [Aff. of Jennifer Flores]; Ex. 50 at ¶¶6-7 [Aff. of Jesse Garza].) Furthermore, several witnesses were available who saw Harper

10

immediately following the murders who could have testified about the delusions and disorganized thinking he was suffering from.  (Ex. 57; Ex. 58; 2 CR at 452.)

Several lay witnesses, including Harper's wife and cousin, could have presented testimony about the effects of Harper's unstable upbringing, including mental illness, drug abuse, and a near absence of appropriate parenting.  (Ex. 54 [Aff. of Stacy McLennon]; Ex. 55 [Aff. of Kenneth Mosby]; Ex. 56 [Aff. of Monique Young].)   Testimony from these witnesses would have provided a compelling context for Harper as a man striving for stability, but failing to attain it due to untreated mental illness and unsuccessful attempts to self-medicate its symptoms.  (Ex. 45 [Aff. of Dr. Scott Bowman].)

## III.

## STANDARD OF CARE

### A. Ineffective Assistance of Counsel

An ineffective assistance of counsel claim has two components: Harper must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Porter v. McCollum*, __ U.S. __, 130 S. Ct. 447, 452 (2009); *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Virgil v. Dretke*, 446 F.3d 598, 608 (5th Cir. 2006); *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999) ("[A]ppellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

To establish deficiency, Harper must show his counsel's representation fell below an objective standard of reasonableness.  *Porter*, 130 S. Ct. at 452 (quoting *Strickland*, 466 U.S. at 688).  A defendant need only prove ineffective assistance of counsel by a preponderance of the evidence.  *Thompson*, 9 S.W.3d at 813.  This standard governs the claim as a whole, and does not replace the more lenient

"reasonable probability" standard for the prejudice prong.

The Supreme Court has reiterated that it applies a "case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient under *Strickland*." *Rompilla v. Beard*, 545 U.S. 374, 393–94 (2005) (O'Connor, J., concurring) (*citing Strickland*, 466 U.S. 668).

Deficient performance is performance that is "inconsistent with the standard of professional competence in capital cases that prevailed [at the time of the trial]." *Cullen v. Pinholster*, __U.S.__, 131 S. Ct. 1388, 1407 (2011). The Supreme Court has repeatedly assessed the reasonableness of counsel's performance by looking to "[p]revailing norms of practice as reflected in [the] American Bar Association standards." *Strickland*, 466 U.S. at 688; *see also Padilla v. Kentucky*, __ U.S. __, 130 S. Ct. 1473, 1482 (2010) (ABA Standards "may be valuable measures of the prevailing professional norms of effective representation"); *Rompilla*, 545 U.S. at 387 ("'[W]e long have referred [to the ABA Standards for Criminal Justice] as "guides to determining what is reasonable."'") (quoting *Wiggins*, 539 U.S. at 524). Because adequacy is based upon "counsel's perspective at the time," *Strickland*, 466 U.S. at 689, courts must look to the guidelines then in effect. *See Bobby v. Van Hook*, 558 U.S. 4 (2009).

At the time of Harper's trial, his attorneys' obligations were governed by the "prevailing professional norms," even if those norms did not align with a less rigorous defense based on "most common customs." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 788 (2011). The Supreme Court instructs courts to look at the "norms of practice as reflected in the American Bar Association and the like" and to consider "all the circumstances" of a case. *Strickland*, 466 U.S. at 688. These sources of norms include the ABA's 2003 Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines"), the ABA's Standards for Criminal Justice ("ABA Standards"), and the Guidelines

12

and Standards for Texas Capital Counsel ("Texas Guidelines").

Defense counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 690-91.  "[The] Guidelines applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases and imposed . . . similarly forceful directive[s]."  *Rompilla*, 545 U.S. at 387 n.7.  Pursuant to the Guidelines, counsel was required to conduct "thorough and independent investigations relating to the issues of both guilt and penalty."  *ABA Guidelines*, Guideline 10.7.  A court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.  *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005); *Wiggins*, 539 U.S. at 521.  When defense counsel is not aware of the relevant mitigating evidence, "the issue is not whether he was ineffective for failing to present [the] evidence . . . , but rather whether he failed to conduct a reasonable investigation to uncover mitigating evidence."  *Ex parte Gonzales*, 204 S.W.3d 391, 396 (Tex. Crim. App. 2006).

Similarly, the Standards state that counsel "should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty."  *ABA Standards*, Standard 4-4.1 (emphasis added); *Texas Guidelines*, Guideline 11.1.  Most significantly, "[t]he duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty."  *Id*.  Similarly, the duty to investigate may exist despite the accused's failure to mention potentially mitigating evidence or the accused's affirmative denial that such evidence exists.  *Rompilla*, 545 U.S. at 377; *Ex parte Gonzales*, 204 S.W.3d at 396.

Once capital trial counsel completes the necessary pretrial investigation, he

13

must then formulate a defense theory "that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." *ABA Guidelines*, Guideline 10.10.1.  The CCA holds capital counsel to an even higher standard: "It is not sufficient to inquire generally and leave it up to the defendant to raise topics or respond to open-ended questions.  Like a doctor, [capital] defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic." *Ex parte Gonzales*, 204 S.W.3d at 400–01 (Cochran, J., concurring).

To establish prejudice, Harper "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in [the] outcome." *Porter*, 130 S. Ct. at 455-56 (quoting *Strickland*, 466 U.S. at 693-94).  Harper need not show that counsel's deficient conduct "more likely than not altered the outcome" in his case, *Strickland*, 466 U.S. at 693, but he must demonstrate that "the likelihood of a different result [is] substantial, not just conceivable." *Richter*, 131 S. Ct. at 792.  State courts "must decide whether the undiscovered and unoffered evidence would have created a reasonable probability that, had the jury heard it, the jury's verdict would have been different." *Ex parte Martinez*, 195 S.W.3d 713, 731 (Tex. Crim. App. 2006).

State post-conviction courts must analyze a capital penalty phase ineffectiveness claim by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.  It is not necessary for the petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances. *Williams v. Taylor*, 529 U.S. 362, 394-98 (2000).  The Constitution requires that state post-conviction courts "engage with what [a defendant] actually went through," as

14

expressed in mitigating evidence. *Porter*, 130 S. Ct. at 455. It is not only incorrect but "[i]t is unreasonable to discount to irrelevance [mitigating] evidence . . . [or] to conclude that [certain mitigating evidence] would be reduced to inconsequential proportions simply because the jury would also have learned [of related aggravating evidence.]" *Id*. The Texas Court of Criminal Appeals "[has] adapted the Supreme Court's prejudice test to require that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently." *Ex parte Gonzales*, 204 S.W.3d at 394.

## IV.

## ARGUMENT

## ISSUE RELATED TO JUROR MISCONDUCT

## CLAIM ONE

## HARPER WAS DENIED HIS DUE PROCESS RIGHT TO AN IMPARTIAL JURY WHEN JUROR BASEY COMMITTED MISCONDUCT BY AUTOMATICALLY VOTING FOR DEATH

Juror Basey violated her oath as a juror when she refused to deliberate after having found Harper guilty and automatically voted to sentence him to death without taking into account punishment phase evidence. This reversible per se violation unquestionably requires a punishment retrial for Harper.

Some constitutional rights are so basic to a fair trial that their denial can never be treated as harmless error. *Chapman v. California*, 386 U.S. 18, 23 (1967). "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also Franklin v. State*, 138 S.W.3d 351, 354 (Tex. Crim. App. 2004) ("The Sixth Amendment guarantees the right to a trial before an impartial jury."). And the violation of this right, like the violation of the right to counsel and the right to an impartial judge, undermines the integrity of the trial itself and necessitates a

reversal without a showing of prejudice.  *Rose v. Clark*, 478 U.S. 570, 578 (1986) (Harmless error analysis "presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury."); *Irvin*, 366 U.S. at 722 ("The failure to accord an accused a fair hearing violates even the minimal standards of due process.").

During jury selection for Harper's capital trial, Juror Basey agreed that she would not vote for a death sentence before hearing and considering evidence presented at the punishment phase of Harper's trial.  She affirmed this by taking her juror's oath.  Yet following the presentation of the guilt/innocence phase evidence, based on her decision that Harper was guilty of capital murder and nothing more, Basey made up her mind to vote for a death sentence.  Because of this misconduct, Harper was denied his constitutionally protected, due process right to be tried before an impartial jury.  As such, his sentence violates applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law, and should therefore be reversed.

## A. Legal Standard

"From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials *before impartial tribunals* in which every defendant stands equal before the law."  *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963) (emphasis added).  To be considered an impartial jury in a capital case, jurors must not simply meet typical standards regarding biases and prejudices; they must also be able to consider whether evidence presented by the defense is mitigating.  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) ("A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do.").

16

"[T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (emphasis in original) (plurality opinion); *accord Abdul-Kabir v. Quarterman*, 550 U.S. 233, 247-48 (2007). The corollary that the sentencer *may not refuse to consider* . . . relevant mitigating evidence is equally well established. *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (emphasis added; internal quotations omitted).

Furthermore, *each* juror individually must be able to consider mitigating evidence, since "the measure of a jury is taken by reference to the impartiality of each, individual juror." *Morgan*, 504 U.S. at 734 n.8. The importance of this focus on individual jurors is highlighted by the vast amounts of time and resources that are spent on individualized voir dire in capital cases. *Cf. Gideon*, 372 U.S. at 344 (noting that "reason and reflection" indicate the obvious need for appointed counsel because "[g]overnments, both state and federal, quite properly spend vast sums of money to establish machinery to try defendants accuse of crime.").

A juror who does not consider the evidence presented by the defendant during the punishment phase of trial, but instead automatically votes for death based on a finding of guilt, commits misconduct and violates the defendant's due process rights. *Morgan*, 504 U.S. at 735 ("[T]he belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on that individual's inability to follow the law.").

## B. Juror Basey Decided to Vote For Death Based on Harper's Guilt of Capital Murder, Before Hearing Punishment Phase Evidence

Juror Basey was questioned on voir dire on regarding her views on the death penalty. (4 RR at 187.) Despite giving somewhat unclear answers regarding her

ability to be a capital juror—and her inability to name any mitigating circumstances other than factors related to the defendant's guilt —Basey was accepted by both sides to be seated as a juror in Harper's trial.[3] (4 RR at 201-02, 224.) Along with the other jurors, she was sworn in on and took an oath that she would render a true verdict according to the law and the evidence. (14 RR at 13-14.)

During post-conviction habeas investigation, however, juror Basey revealed that she had not followed her promises to counsel or her oath. On October 6, 2012, Basey met with a post-conviction investigator and discussed her participation in Harper's trial.[4] (Ex. 17 at 2 [Juror Affidavits].) While speaking with the investigator, Basey revealed that she had not considered the mitigation evidence presented by the defense during trial. Instead, Basey stated that "[b]ecause of what was done to the children and their mother, after we found [Harper] guilty, I decided then that I was going to vote for the death penalty." (*Id.* at 1, ¶3.) Basey further stated that "[t]here is nothing I could have heard during the punishment phase that would have changed my mind." (*Id.* at 1, ¶4.)

In making these statements, Basey revealed that she had violated her oath and automatically assigned a death sentence to Harper based solely on her decision that he was guilty of a capital crime. *Morgan*, 504 U.S. at 729 ("A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do."). Because her decision was made prior to the presentation of evidence at the punishment phase, she was constitutionally

---

[3] Based on Basey's answers during voir dire, and statements made in her juror questionnaire, Harper's trial counsel should have known that juror Basey was unlikely to consider mitigation evidence and either challenged her selection for cause or exercised a peremptory strike. (*See* Claim Ten, *post*.)

[4] Sometime after Harper's trial, juror Basey married and is now Ms. C. Higgs.

impaired from being an impartial juror during the punishment phase.  *Skipper*, 476 U.S. at 4 (noting that a "sentencer may not refuse to consider" mitigation evidence).  As such, Harper was denied his right to an impartial jury.  *Cf. Munroe v. State*, 637 S.W.2d 475, 478 (Tex. Crim. App. 1982) (recognizing that a defendant is denied a fair and impartial trial when a single juror increases punishment based on impermissible discussion of parole law); *Bennett v. State*, 738 S.W.2d 33, 34 (Tex. App.—Texarkana 1987, no pet.) (finding defendant was denied right to trial by impartial jury when evidence revealed that jury determined sentence before hearing evidence on punishment).

### C. Conclusion

Juror Basey's refusal to consider evidence presented by the defense during the punishment phase of trial violated the oath she took as a juror and denied Harper his right to twelve impartial jurors.  *Parker v. Gladden*, 385 U.S. 363, 366 (1966) ("[P]etitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors.").  The presence of a juror who automatically assigned the death penalty violated Harper's due process rights.  *See Morgan*, 504 U.S. at 727 ("The failure to accord an accused a fair hearing violates even the minimal standards of due process.").  Thus, Harper's sentence is unconstitutional and cannot be carried out, and he is entitled to a new trial as to punishment.  *Id.* at 729 ("If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.").

19

**ISSUES RELATED TO PUNISHMENT**

**CLAIMS TWO AND THREE – SHARED STATEMENT OF FACTS**

**TRIAL COUNSEL INEFFECTIVELY CHALLENGED THE STATE'S ALLEGATION THAT GARLAND HARPER KILLED TEASA JACKSON AND THE STATE'S MANIPULATION OF LOUIS JACKSON'S TESTIMONY VIOLATED HARPER'S CONSTITUTIONAL RIGHT TO DUE PROCESS**

During the punishment phase of his trial, the State introduced evidence that Harper murdered and raped a woman named Teasa Jackson in 1989. Absent the introduction of this uncharged murder, the State's evidence of prior bad acts in aggravation consisted of purse snatchings, youthful altercations, and an alleged robbery with a weapon, which was substantiated only by the testimony of a woman with a substantial criminal record, whose earlier failure to pursue charges resulted in the case's dismissal.

The uncharged cold case murder of Teasa Jackson dominated the punishment phase of Harper's trial. The State called fourteen expert and lay witnesses to present Harper as the person who murdered Teasa Jackson. In stark contrast, defense counsel failed to conduct more than a cursory investigation into the extraneous offense, failed to demonstrate that there were other, more likely suspects to the Jackson murder, and failed to adequately impeach and rebut the State's evidence. These failures were objectively unreasonable and amounted to ineffective assistance of counsel under *Strickland* and its progeny

Prosecutorial misconduct also contributed to Harper's death sentence. Despite repeated requests from the defense, the State failed to provide Harper's trial counsel a full copy of the DNA report linking Harper to the Jackson murder until hours before the State's expert DNA witness testified. The prosecution also

manipulated the testimony of the State's only eyewitness, Louis Jackson, who untruthfully testified that he remembered Garland as the last person with whom he saw his mother before she was murdered, over twenty years previously, when Louis was seven.  As will be explained in detail below, the misconduct prejudiced Harper and his death sentence should be reversed.

Therefore, Harper's death sentence violates his applicable state and federal Constitutional rights, as well as state statutory law, United State Supreme Court case law, and state case law, and should be vacated.

## A.  Relevant Facts

In March of 1989, thirty-one-year-old Teasa Jackson was living in the Chateau Village apartment complex in southwest Houston with her seven-year-old son Louis, her four-year-old son Geno, and her infant daughter Sade.  (Ex. 18 at 3-4 [Teasa Jackson Police Report].)  Jackson also had a common law husband Roy "Steve" Thomas, from whom she was separated.  (*Id.* at 11.)

Shortly before 1:00 a.m. on March 31, Louis Jackson was awakened by the cries of his infant sister.  (*Id.* at 10.)  Unable to find his mother, he went upstairs to a neighbor's apartment.  (*Id.*)  The neighbor returned to Teasa's apartment with Louis, began changing the infant's diaper, and instructed Louis to get a towel from the bathroom.  (*Id.*)  Louis opened the bathroom door and found his mother's body.  (*Id.*)  She had been stabbed multiple times in the chest, and was lying naked on the bathroom floor.  (*Id.* at 3.)

### 1.  Initial Police Investigation

On the night of the murder, seven-year-old Louis Jackson told the police that he had seen four men talking with his mother in the apartment that evening.  (Ex. 18 at 10-11 [Police Report].)  He told the police that two of the men were very familiar to him, and that they normally wore blue uniforms, but that they were not wearing them that evening.  (*Id.*)

Late on March 31, 1989, the police determined that the two men who normally wore blue uniforms were Abner Freeman ("Freeman") and Ronnie Johnson ("Johnson"). (*Id.* at 20-23.) That same day, police detectives interviewed Johnson and Freeman separately. (*Id.*) Both Johnson and Freeman reported that there had been only one other man with them in Jackson's apartment the night she was murdered. (*Id.*) At the time of their statements, neither Freeman nor Johnson knew the third man's name, but they each stated that the third man had given Teasa Jackson some crack cocaine and that she had smoked it. (*Id.*) Johnson told the police that Teasa became mad at the third man and subsequently told all three men to leave. (*Id.* at 23.) Johnson also told police that before they left the apartment, Teasa's son had emerged from his bedroom and Teasa had told him to go back inside. (*Id.*)

On April 7, 1989, the police learned that the third man's full name was Emory Lockett and that he lived in the same apartment building as Teasa Jackson. (*Id.* at 33.) The police also learned that a man named Craig Anthony Roberson ("Roberson") had previously threatened Teasa's life. (*Id.* at 11, 31-32.) On April 10, 1989, a witness reported that Roberson told her that the police "should have caught the killer of [Teasa Jackson] already because the murder weapon was left on a table." (*Id.* at 36.) Based on Roberson's statement to this witness, the investigating officer excitedly inferred that Roberson must have been in Jackson's apartment during or after the murder, writing, "how would Craig know where the knife was unless he had been there!!!!!!!!!!!!!!!!!" (*Id.*) The police report indicates no further investigative activity between April 15, 1989 and March 28, 1990. (*Id.* at 37-38.)

On March 29, 1990, the police submitted fourteen items of evidence collected from Teasa's apartment to be examined for fingerprints. (*Id.* at 37-38.) On April 20, 1990, the police department laboratory identified two latent

fingerprints.  (*Id.* at 38.)  At the request of a detective assigned to the case, the latent prints were compared to prints from suspects Steve Thomas (Teasa's husband), Abner Freeman, Ronnie Johnson, and Craig Roberson, but the comparisons did not produce a match to either print.  (*Id.*)  The print examiner also told detectives that he believed that the latent prints belonged to a female.  (*Id.*)  As a result of the request, the investigating detective also learned that Roberson had been killed in the commission of a burglary during the yearlong hiatus of the police investigation.  (*Id.* at 38-39.)

On April 26, 1990, police detectives located Emory Lockett ("Lockett") and requested that he come to the police station to give a statement.  (Ex. 18 at 40-41 [Police Report].)  In that statement, Lockett admitted that he was in the apartment with Teasa and two other men on the night Teasa was murdered.  (*Id.*)  Lockett also stated that he had purchased crack-cocaine for Teasa.  (Ex. 19 [Statement of Emory Lockett].)  Lockett reported that around 8:30pm, Teasa had gotten upset and told all three men to leave.  (*Id.*)  Lockett claimed that he then went home and stayed there all night.  (*Id.*)  Lockett denied that he was sexually involved with Teasa.  (*Id.*)  Lockett also stated that he was not present when Teasa was murdered. (*Id.*)  Subsequently, Lockett submitted to polygraph test, which he failed.[5]  (*Id.*; Ex. 18 at 41 [Police Report].)

## 2. Fingerprint Match to Harper

In 1995, the Houston Police Department crime lab notified investigating officers that it had matched a print found on a scrap of paper recovered from Teasa Jackson's bathroom to Garland Harper.  (Ex. 18 at 45-46 [Police Report].)

---

[5] Both the police report and Lockett's signed statement document that Lockett failed a polygraph.  However, neither document indicates which questions Lockett answered untruthfully.

On October 23, 1995, investigating officers met with Harper at the TDCJ Central Unit in Sugar Land.[6]  (*Id.* at 45-46.)  Before detectives disclosed to Harper that his print had been found, Harper told them that he had known Teasa and that he had spent time in her apartment.  (*Id.* at 46-48.)  Harper described Teasa's apartment as "a crack house or place where people go to smoke crack," often at the kitchen table.  (*Id.* at 47.)  Harper told police that he had smoked crack at Teasa's apartment before.  (*Id.*)  When officers asked Harper whether he had ever gone into rooms other than the kitchen, Harper stated that he had smoked crack in the bathroom so that other drug users would not bother him.  (*Id.* at 48.)  When asked when he had been in Teasa's bathroom last, Harper responded that "he could not remember but guessed that it was probably several days before her death," six years earlier.  (*Id.*)  Police then informed Harper that they had "found his fingerprint on the floor next to the body."  (*Id.*)  Harper responded that he "did not know what to tell [them] but that he did not kill her and he did not know who did."  (*Id.*)  Harper denied ever having had sex with Teasa.  (*Id.* at 47.)

Following the October 23 interview, police conducted no further investigation on the case until 2009, after Garland Harper was facing charges for capital murder.  (*Id.* at 53.)

### 3.  DNA Match to Garland Harper

On May 5, 2009, Sergeant Mehl, a cold case detective from the Houston Police Department, submitted Teasa Jackson's autopsy kit for DNA analysis to Strand Analytical Laboratories ("Strand").  (Ex. 18 at 50 [Police Report]; Ex. 25 at 5, 13 [Complete DNA Report].)[7]  The kit contained two slides in cardboard

---

[6] Harper was serving time for a robbery.  (19 RR at 162; 20 RR at 219.)

[7] All references to "Complete DNA Report" are to the ninety-three page Strand Analytical Laboratories DNA report that includes the analyst's bench notes,

holders, a blood sample, fingernail clippings from both of Teasa's hands, pulled head hair, pulled pubic hair, loose pubic hair, and oral, vaginal, and rectal swabs. (Ex. 18 at 50 [Police Report].)

On July 6, 2009, Strand DNA analyst Cindy Cale noted that she had found only one sperm head on the anal swab and two sperm heads on the vaginal swab, and no sperm on the oral swab. (Ex. 25 at 30 [Complete DNA Report].)

On July 11, 2009, Cale produced an initial Laboratory Examination Report that identified semen on the vaginal and anal swabs from Teasa Jackson's autopsy kit. (Ex. 25 at 5-6 [Complete DNA Report].) This initial report also indicated that only "the vial of liquid blood said to be from Teasa Jackson," and the vaginal, anal, and oral swabs would be analyzed. (*Id.*at 5.) The initial report stated that the right and left hand fingernail clippings, loose pubic hair, pulled pubic hair, pulled head hair, and two slides in cardboard holders were: "[n]ot examined."[8] (*Id.*)

---

attached as Exhibit 25. This report is not consecutively paginated and has been batestamped for reference.

[8] Pursuant to Article 64 of the Texas Code of Criminal Procedure, Harper would like to perform DNA analysis of these untested samples as there is a significant probability that such testing would demonstrate he was not responsible for the murder of Teasa Jackson. However, Harper appears to be foreclosed from conducting post-conviction DNA testing on these samples as Chapter 64 "does not authorize testing when exculpatory testing results might affect only the punishment or sentence that he received." *Ex parte Gutierrez*, 337 S.W.3d 883, 901 (Tex. Crim. App. 2011). Article 64 was enacted as a safety net to protect innocent people and free them from prison. *See Kutzner v. State*, 75 S.W.3d 427, 438-39 n. 23-25 (Tex. Crim. App. 2002) (Discussing the legislative intent behind the enactment of Article 64). The spirit and values underlying Article 64 should protect defendants such as Harper, whose sentence was based on an uncharged crime that, due to the unavailability of additional DNA testing, cannot be effectively challenged on appeal. In the future, should the Legislature or the courts recognize the necessity to expand the scope of Article 64 to include DNA testing like in this case, Harper raises this issue for purposes of preserving such a claim.

On July 13, 2009, Cale sought permission to consume the swabs in her analysis because there was only one anal swab and one vaginal swab, and Cale had found only a few sperm cells on each.  (Ex. 25 at 18 [Complete DNA Report].) That same day, Sergeant Mehl granted permission to consume the swabs.  (*Id.* at 17.)  Subsequently, the DNA from the swabs was extracted and analyzed.  (*Id.* at 24-25.)

On August 5, 2009, Cale produced another Laboratory Examination Report, which determined that the both the anal and vaginal swabs contained a DNA profile from Teasa Jackson and the same unknown male DNA profile.  (Ex. 25 at 8 [Complete DNA Report].)

On August 27, 2009, Strand returned the autopsy kit to the Houston Police Department.  (Ex. 25 at 1 [Complete DNA Report].)

On October 6, 2009, "[a] DNA report dated July 11, 2009 was received [by the Houston Police Department] from Strand Analytical Laboratories.  The report [was] stored in the crime laboratory case file and a copy [was] provided to Sergeant Eric Mehl."  (Ex. 18 at 51 [Police Report].)

On October 8, 2009, Sergeant Paul Motard requested that the male DNA profile be entered into CODIS.  (Ex. 18 at 52 [Police Report].)

On February 19, 2010, Sergeant Motard was informed that a CODIS match had been made connecting Garland Harper to the male profile found on the swabs from Teasa Jackson's autopsy kit.  (Ex. 18 at 53 [Police Report].)

On February 22, 2010, Sergeant Motard interviewed Harper at the Baker Street Jail in Houston.[9]  (Ex. 18 at 55-56 [Police Report].)  Motard reported that he explained to Harper that he was there to question him about the Teasa Jackson murder and collect a sample of Harper's DNA.  (*Id.*)  Harper requested that his

---

[9] Harper was awaiting his capital murder trial.

attorney be present. (*Id.*)  Subsequently, Motard persuaded Harper to submit to buccal swabbings and obtained DNA samples from Harper without an attorney being present. (*Id.*)

### 4. The State's Notice of Its Intent to Present the Teasa Jackson Murder at Trial

On February 23, 2010, the State filed "State's Combined Texas Rules of Criminal Evidence 404 and 609 Notice and 37.07 (G) Notice – Third Amended" in the trial court. (3 CR at 778.)  This filing provided defense counsel notice of the State's intent to use the Teasa Jackson murder as an extraneous offense in Harper's impending capital trial. (*Id.*)

On March 1, 2010 Sergeant Motard contacted Assistant District Attorney Anna Emmons about the DNA evidence connecting Harper to Teasa's murder and also about the charges for which Harper was awaiting trial. (Ex. 18 at 57 [Police Report].)  Motard reported that Emmons did not wish to file charges against Harper for the Teasa Jackson murder but that Emmons had reserved the right to use the Teasa Jackson case in Harper's upcoming trial. (*Id.*)

On March 17, 2010, Sergeant Motard reported that Emmons had contacted him on March 12 to request that he attempt to locate some of the witnesses in the Teasa Jackson case. (Ex. 18 at 58-59 [Police Report].)

On March 23, 2010 the trial court ordered Garland Harper to allow Sergeant Howard of the Houston Police Department to take buccal swabs.[10]  (3 CR at 782.)  The following day, Sergeant Howard obtained buccal swabs form Harper and submitted them to the Houston Police Department crime lab. (Ex. 18 at 60 [Police Report].)

---

[10] A court order was required because Sergeant Motard obtained the first set of swabs without the consent of Harper's trial counsel. (19 RR at 261; Ex. 18 at 60 [Police Report].)

### 5. Further Pretrial Investigation

On April 3, 2010, Sergeant Motard interviewed Abner Freeman, one of the three men in Teasa's apartment on the night that she was murdered. (Ex. 18 at 64 [Police Report].) Motard showed Freeman a photo spread containing Harper's photograph and asked whether Harper was the third man in the apartment. (*Id.*) In this interview, Freeman was unable to recall the identity of the third man. (*Id.*) In 1989, however, Freeman had told police that the third man's name was "Emory." (*Id.* at 32.)

On May 21, 2010, Sergeant Motard interviewed Ronnie Johnson, who confirmed that he, Freeman, and another man had been in Teasa's apartment on the night that she was murdered. (Ex. 18 at 67-68 [Police Report].) Johnson did not recall the third man's name, but he told Motard that he was certain that it was not Harper. (*Id.*)

On August 2, 2010, the State filed its "Notice of Intent to Use Expert Testimony – Third Amended." (4 CR at 1017.) The filing included most of the Houston Police Department investigators who would later testify about the Teasa Jackson murder during the punishment phase of Harper's trial. (4 CR at 1017; 19 RR at 20-123, 136-272; 20 RR at 13-19.)

### 6. Harper's Trial

On October 11, 2010, during the punishment phase, defense counsel lodged a "running objection to all the testimony relating to the [Teasa Jackson] offense."[11]

---

[11] In order to preserve an issue for appeal, a party must raise a proper objection. "A proper objection is one that is specific and timely. 'Further, with two exceptions, the law in Texas requires a party to continue to object each time inadmissible evidence is offered.' The two exceptions require counsel to either (1) obtain a running objection, or (2) request a hearing outside the presence of the jury." *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003) (internal footnotes omitted). In Harper's case, trial counsel's running objection to all testimony relating to the Teasa Jackson offense preserved the issues for appeal.

(19 RR at 9.)  The court overruled the objection and the State called numerous expert and police witnesses to present evidence connecting Harper to Teasa Jackson's homicide.  (*Id.* at 10-273.)  On the same day, defense counsel argued that the State had failed to provide them the complete DNA report until that morning.  (*Id.* at 120.)  Defense counsel explained that his DNA expert would not be able to review the eighty-four pages of new information until that evening and that counsel would not agree to excuse the State's DNA expert until after they had cross-examined her the following morning.  (*Id.* at 122.)

The jury then saw photographs of the crime scene and of Teasa Jackson's autopsy.  (19 RR at 27-35, 74-81.)  The medical examiner that had conducted the autopsy was not available to testify, and the court permitted the State to call another medical examiner over defense counsel's objections.[12]  (*Id.* at 55-60.)  The jury heard testimony suggesting that Teasa had been strangled, like the three females Harper had just been convicted of killing.  (*Id.* at 79.)  The jury heard that Harper's fingerprint had been found on a scrap of paper recovered near Teasa's body.  (*Id.* at 97-109.)  The jury heard that in 1995, Harper denied that he had ever had sex with Teasa Jackson.  (*Id.* at 167-68.)  The jury then heard that Garland Harper's DNA had been matched to DNA recovered from Teasa Jackson's vaginal and rectal areas.  (*Id.* at 232-34.)

---

Where appellate counsel failed to raise a record-based issue in Harper's direct appeal, Harper suffered prejudice from ineffective assistance of appellate counsel. (*See* Claim Two – Argument, Section (A)(6), n. 19; Claim Two – Argument, Section (A)(7), n. 20.)

[12] The medical examiner who conducted the autopsy was available to testify two days later, but defense counsel declined to call him to the stand.  (21 RR at 6.) This denied Harper his rights under the Confrontation Claus according to *Crawford v. Washington*, 541 U.S. 36 (2004).  Defense counsel was ineffective for waiving this issue and appellate counsel was similarly ineffective for failing to raise it on direct appeal.  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000).

Additionally, the jury heard that Louis Jackson had seen Harper sitting with his mother on their porch the night that she was murdered.  (20 RR at 38-39; *see* Claim Three, *post*.)  Louis Jackson testified that Harper was the last person with whom he saw with his mother before he discovered her body on the bathroom floor a few hours later.  (*Id.* at 39.)  Although Louis Jackson admitted that he had never before told anyone about the man on the porch or mentioned Harper in connection to the murder, he claimed that he had identified Harper in 2010 as the man on the porch when a police investigator showed him a photo spread containing Harper's picture.  (*Id.* at 48-49.)

The jury also heard victim impact testimony about Teasa Jackson's murder.  They heard how Louis and his siblings were separated from one another after the murder.  (*Id.* at 32-33.)  The jury heard testimony from Teasa Jackson's mother, Shirley Williams, about how she was unable to sufficiently care for Teasa's children and how the murder had permanently affected Louis.  (*Id.* at 78-82.)

During Harper's trial, the State presented no evidence that Teasa Jackson had been raped.  To the contrary, Houston Police Detective Mehl testified that he saw nothing in any of the police and autopsy reports indicating that Jackson had been raped.  (19 RR at 201.)  Dr. Wilson, the assistant medical examiner for Harris County, testified that the autopsy report did not indicate that Teasa Jackson had been raped.  (*Id.* at 86.)  However, at the State's closing statement on October 18, 2010, the jury heard how "in March of 1989, [Harper] thinks that he [got] away with capital murder"; how Teasa Jackson was "stabbed to death and raped"; how "the person that raped her is the same person that killed her"; and how the cold case was not "solved until the defendant kill[ed] again."  (24 RR at 8, 10, 12-13.)

Three hours after the State's argument, the jury sentenced Garland Harper to death.  (24 RR at 61.)

## CLAIM TWO

## TRIAL COUNSEL FAILED TO EFFECTIVELY CHALLENGE THE STATE'S CLAIM THAT GARLAND HARPER MURDERED TEASA JACKSON

After the State filed notice to seek the death penalty, trial counsel had over eighteen months to prepare for the penalty phase of Harper's trial.  (1 CR at 221; 14 RR at 1.)   During Harper's guilt/innocence trial, counsel presented no witnesses, and so were free to focus their efforts on the punishment phase, a substantial portion of which would be dominated by evidence linking Harper to the 1989 murder of Jackson.

Unfortunately, trial counsel failed to prepare so that they could rebut the State's evidence linking Harper to the uncharged crime.  Counsel's failure to fully investigate and effectively challenge the State's allegations was particularly prejudicial to Harper due to the similarity between the violent 1989 murder and the crimes for which he was convicted in the instant case.  Had trial counsel presented evidence concerning police investigation into other suspects and an explanation for why evidence tied to Harper was recovered from the crime scene, they could have moved to effectively exclude the offense from evidence.  In the alternative, had counsel presented this exculpatory evidence, there is a reasonable probability that such evidence would have influenced the jury's determination of whether Harper would constitute a future danger to society.  *See Wiggins*, 539 U.S. at 538.  Trial counsel's failure to do so violated Harper's rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law.

31

## A. Trial Counsel's Failure to Adequately Investigate and Present a Defense to the Jackson Murder was Objectively Unreasonable

Whether failure to investigate, and the decisions based on inadequate investigation, are constitutionally deficient are governed by the ineffective assistance of counsel standards set forth in *Strickland*. *Wiggins*, 539 U.S. at 521-22 (2003); *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010); *Westbrook v. Thaler*, 585 F.3d 245, 251 (5th Cir. 2009). The proper measure of attorney performance is simply reasonableness under prevailing professional norms. *Westbrook*, 585 F.3d at 251. Moreover, trial counsel in capital cases has a duty to conduct an investigation to discover "all *reasonably available* mitigating evidence and *evidence to rebut any aggravating evidence that may be introduced by the prosecutor*." *Wiggins*, 539 U.S. at 524 (quoting 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases) (second emphasis added).

Here, trial's counsel performance was deficient, as reflected by the significant parallels between the instant case and *Rompilla v. Beard*, 545 U.S. 374 (2005). In *Rompilla*, the United States Supreme Court determined that Rompilla's counsel had acted ineffectively in failing to review the petitioner's prior conviction file, despite counsels' knowledge that the State intended to seek death by proving Rompilla had a significant history of felony convictions. (*Id.* at 383.) Harper's trial counsel likewise failed to familiarize themselves with the Jackson offense report, in which they could have easily discovered "a range of mitigation leads that no other source had opened up." (*Id.* at 390.)

Like in *Rompilla*, where counsel knew that the State intended to use the defendant's prior violent felonies, Harper's trial counsel had actual notice that the State intended to seek death and rely on evidence of the Jackson murder to obtain an affirmative answer to the special issue of future dangerousness. (*Rompilla*, 545

U.S at 383-84; 3 CR at 778.)  Like *Rompilla*, information regarding the Jackson murder was contained in an offense report that was readily available to trial counsel.  (*Rompilla*, 545 U.S. at 385; Ex. 18 [Teasa Jackson Police Report].) Based upon the offense report alone, trial counsel could have moved to exclude the extraneous offense's introduction into evidence prior to trial.  Counsel's failure to utilize this information also impeded their ability to rebut the State's case at punishment once the uncharged crime was admitted into evidence.

Accordingly, trial counsel's performance was constitutionally deficient because they failed to adequately investigate, develop, and present evidence that casts serious doubt on Harper's involvement in the twenty-year-old unsolved murder.  Trial counsel's deficient performance resulted in the admission of an extraneous offense upon which the State relied heavily in support of its request for the death penalty.  Neither the trial court nor the jury heard persuasive evidence that cast significant doubt on Harper's involvement in Teasa Jackson's murder, and this evidence, "taken as a whole, 'might well have influenced the jury's appraisal' of [Harper's] culpability."  *Rompilla*, 545 U.S. at 393 (citing *Wiggins*, 539 U.S. at 538).

## 1.  Facts Relevant to Trial Counsel's Failure to Adequately Investigate

The State provided defense counsel notice of its intent to introduce the Jackson case into evidence on February 22, 2010.  (3 CR at 778.)  Over a month later, defense counsel sent an email to the defense team expressing concern that the State would use the uncharged crime as "an excuse to go forward seeking death." (Ex. 21 at 1 [March 24, 2010 Email].)  The defense team had previously believed that the State might agree to allow Harper to plea to a sentence of life without the possibility of parole, thus avoiding trial and a potential death sentence.  (*Id.*)

On March 31, a defense team investigator prepared a five-page report on the Jackson cold case murder.  (Ex. 23 [Teasa Jackson Memorandum].)  Though this

first memo was based only on interviews with Harper and online research, it provided counsel with a list of potential witnesses and their locations. (*Id.*) This memorandum contained information on Louis Jackson, including the facts that he discovered his mother's body and that he was at the Eastham Unit. (*Id.* at 4) Additionally, this memorandum instructed trial counsel to collect the Houston Police Department police report; to determine the identity of the other DNA discovered in the rape kit; and to ascertain the chain of custody of the rape kit. (*Id.* at 5.)

More than three months later, on July 14, 2010, defense team investigators prepared another memo listing witnesses and their potential locations. (Ex. 26 [Culpability Investigation Plan].) Notably absent from the July memo were key witnesses and suspects readily identifiable in the Teasa Jackson police report.[13] (*Id.*)

On September 17, 2010, the trial court heard argument regarding the admissibility of extraneous offenses.[14] (13 RR at 5-63.) At the September 17, 2010 pretrial motions hearing, trial counsel failed to exhibit even a cursory familiarity with the basic facts of the Teasa Jackson offense.[15] For example,

---

[13] For example, neither defense memo contains the names of two of the men (Lockett and Johnson) that were using drugs with Teasa in her apartment on the evening of her murder; nor do the memos provide the full name of Teasa's common law husband, Steve Thomas. (*Compare* Exs. 23 and 26, *with* Ex. 18 at 34, 21, 11 [Police Report]).

[14] Trial counsel raised a motion to exclude evidence of unadjudicated extraneous offenses at punishment. (5 CR at 1186.) This motion was denied by the trial court. (5 CR 1189.) On appeal, appellate counsel failed to argue that this motion was wrongly decided. The court's denial was in error and appellate counsel's failure to raise this issue prejudiced Harper, and thus Harper's sentence should be reversed. *See Robbins*, 528 U.S. at 285.

[15] Twice defense counsel referred to Teasa Jackson by the wrong name, calling her "Tonya," and later, "Teresa." (13 RR at 33, 46.)

neither defense attorney knew in what year their client had given his statement to police, which they were attempting to exclude from evidence.[16]

On the same day as the pretrial motions hearing, the State informed trial counsel that on "August 19, 2010, Louis Jackson positively identified Garland Harper as the last person he saw with Teasa Jackson at the apartment (crime scene) before she was found murdered." (Ex. 22 [September 17, 2010 Email].) Upon learning this information, counsel asked an assistant to locate Louis Jackson. (*Id.*)

Three days later, on September 20, 2010, a defense investigator prepared a three-page summary of the sixty-nine page Teasa Jackson offense report.[17] (Ex. 24 [Cold Case Offense Report Review.])

## 2. Prior to Trial, Counsel Failed to Present Alternate Suspects to the Jackson Murder

In a capital trial, unadjudicated offenses are admissible during the punishment phase where "the State [can] 'clearly prove' that an offense was committed and that the accused was its perpetrator." *Kemp v. State*, 846 S.W.2d 289, 307 (Tex. Crim. App. 1992) (quoting *Turner v. State*, 754 S.W. 2d 668, 673 (Tex. Crim. App. 1988)). While the State is not required to prove all of the elements of the extraneous offense, *Spence v. State*, 795 S.W. 2d 743, 759 (Tex. Crim. App. 1990), it must "sufficiently connect the defendant to the alleged extraneous offense." *Kemp*, 846 S.W.2d at 307. Had trial counsel adequately

---

[16] When counsel stated that their copy of the offense report did not include Harper's statement to police, the district attorney informed the court that the statement in question was given in 1995, and that it was contained in the offense report. Trial counsel conceded that he "hadn't been able to find it." (13 RR at 33-34; *see also* 12 RR at 54.)

[17] The summary failed to address the discovery of Harper's DNA. It also contained significant factual inaccuracies. For example, it incorrectly stated that fingerprints from other, named suspects had been discovered in the apartment. In actuality, the police report makes evident that none of the prints were matched to the named suspects. (Ex. 18 at 38 [Police Report].)

investigated the uncharged offense prior to the pretrial hearing on September 17, 2010, they could have persuasively argued to exclude the extraneous offense by presenting evidence connecting the crime to suspects other than Harper. *Kemp*, S.W.2d at 307.

The initial police investigation into Teasa's murder focused on three suspects, each of whom had a motive and an opportunity kill Teasa Jackson. Trial counsel's failure to adequately investigate the murder prior to the pretrial hearing precluded them from effectively moving to exclude the uncharged offense by presenting alternate suspects and an explanation of why physical evidence tied to Harper would have been in Jackson's apartment.

### a. Craig Roberson

According to multiple witnesses, Craig Roberson threatened to kill Teasa Jackson. On April 5, 1989, a witness told police that a man named Craig told him that if Teasa did not pay Craig, "she would regret it." (Ex. 18 at 26 [Police Report].) Teasa's common law husband Steve Thomas also told the police that a black male "had brought a stolen computer to [Teasa's apartment]," and "[Teasa] threw the computer out or off the porch, because she didn't want stolen property around," and that this caused the man to threaten Teasa. (*Id.* at 27.) Thomas said the same man "threatened the store owner" of a nearby furniture store. (*Id.*) The police located the furniture store and spoke to the owner, Mary McNeil. (*Id.*) She initially told them she had not been threatened, but that "one of her employees stole her van and she just got it back [the previous day]." (*Id.*)

By April 7, 1989, the police had generated two possible matches for the man known as Craig: Craig Anthony Roberson and Craig Anthony Robinson. (*Id.* at 32.) The police prepared a photo spread with the photos of both men, as well as several fill-ins. (*Id.*)

Ronnie Johnson identified Roberson as a man he had seen around the Chateau Village apartments before, and "[a]s a matter of fact he said that [Roberson] was at the [apartment] on the night [that Johnson and Freeman visited Teasa Jackson]." (*Id.* at 32.)  Abner Freeman also identified Roberson as someone "who was up to the apartments a lot," and Freeman "thought [Roberson] was up to the apartments on the night [Teasa was killed].  (*Id.* at 32.)

Teasa's upstairs neighbor also stated that she had seen Roberson around the apartment complex.  (*Id.* at 33.)  An employee of the Chateau Village apartment complex identified Roberson as someone who "[hung] out at Apartment 276 which is supposed to be another crack house." (*Id.* at 34.)

On April 10, 1989, the police returned to the furniture store to re-interview store owner McNeil.  (*Id.* at 35.)  McNeil identified Roberson as the man that had stolen her van, and admitted that during the police's previous visit, Roberson had actually been in her store at the same time as the police, but she was afraid to identify him because he might "retaliate after he got out of jail or get one of his friends to do it." (*Id.*)

According to McNeil, Roberson told her that the police "should have caught [Teasa Jackson's killer] because the murder weapon was left on the table." (*Id.* at 36.)  Because the only knife at the scene was found in the kitchen sink, the investigating officer noted in his report that they needed to determine if someone had been in Jackson's apartment before the police arrived: "[H]ow would Craig know where the knife was unless he had been there!!!!!!!!!!!!!!!!!" (*Id.* at 36.)

On the same day that police spoke to McNeil, another witness told police that Roberson had threatened to kill Teasa Jackson, telling Teasa "the only reason he didn't do it then was because she had a little four month old baby." (*Id.* at 36.)

After April of 1989, the police conducted no further investigation into Teasa Jackson's murder for twelve months.  (*Id.* at 36-38.)  When the investigation

resumed, it was too late to pursue Roberson as a he had been killed during the commission of a burglary.  (*Id.* at 38-39.)

### b.  Steve Thomas

By all accounts, Steve Thomas and Teasa Jackson had a tumultuous relationship.  Thomas himself admitted that he and Jackson had "been living together on and off for about eight years" and that he and Teasa had again separated a week before she was murdered.  (Ex. 20 at 1 [Statement of Steve Thomas].)

One of Teasa's neighbors told police that she had seen Teasa "getting jumped on by [Thomas] and she thought he was going to kill her."  (Ex. 18 at 34 [Police Report].)  This neighbor said "she thought it strange that [Thomas] did not try" to return to Jackson's apartment after the most recent breakup because "all the other times that Teasa has thrown him out he always tried to come back in that [same] night."  (*Id.* at 34.)  According to the neighbor, Thomas "would come over and try to get in by banging on the window or door and trying to force his way in." (*Id.*)

Another one of Teasa's neighbors told police that "[t]he only person she knew the complainant [had] trouble with was [Thomas]," and that "[Teasa] had told her before that she was afraid of him."  (Ex. 18 at 33 [Police Report].)  This neighbor also reported that she believed "that all of [Thomas'] ranting and raving since [Teasa's] death was a big act," commenting that Thomas had "flopped all over the place at the funeral."  (*Id.* at 33.)

Thomas gave a written statement to police less than four hours after Teasa's murder had been discovered.  (Ex. 20 [Statement of Steve Thomas].)   In this statement, Thomas claimed to have alibi witnesses to account for his whereabouts

between nightfall and midnight on the night of Teasa's murder.[18]   (*Id.*)   Thomas told police that he borrowed some money from his mother, Asie Thomas, around 11:30pm and that when he returned to her house around midnight, she told him that Teasa had been murdered.   (*Id.*)   However, Asie Thomas told police that her son had borrowed money from her around 10:00pm and did not return to her house until "about 1:00am, or later."  (Ex. 18 at 12 [Police Report].)

The most significant difference between Steve Thomas's version of events and that of his mother is the time period during which he could be accounted for. Asie reported that she gave Steve money at 10:00pm and did not see him again until after 1:00am.  (Ex. 18 at 12 [Police Report].)   Additionally, Steve Thomas's claim that he was informed of Teasa's murder around midnight conflicts with the police report, which indicates that the murder was not reported to the police until around 1:00am.  (*Id.* at 1, 11, 34.)   Most importantly, in both versions of events there is a significant period of time during which Steve Thomas provided no reliable alibi.

### c.  Emory Lockett

On April 7, 1989, Abner Freeman told the police that he had learned the name of the third man that had been in Jackson's apartment the night of the murder, and that his name was "Emory."   (Ex. 18 at 32 [Police Report].)   That same day, the police interviewed three of Jackson's neighbors, all of whom reported that they knew "Emory," but that they had not seen him since the night of the murder, a week before.  (*Id.* at 33.)   Another one of Teasa Jackson's neighbors reported that hours before she was murdered, Teasa had told her "Emory had brought her a rock earlier."  (*Id.*)

---

[18] There is nothing in the police report that documents investigative efforts to verify any of Steve Thomas's alibi witnesses.

After a yearlong hiatus, the investigation into Teasa Jackson's murder resumed. (*Id.* at 37-38.)  When a detective finally located the "Emory," Lockett replied that he thought "that [the murder] had already been cleared up." (*Id.* at 40.) He told the police that he had been at Teasa's apartment the night of her murder, and had been there with two other men. (*Id.*)

After an initial interview, Lockett traveled to the police station to deliver a written statement. (*Id.* at 41.)  In it, he said that after he left Teasa's apartment, he went home, and that the next day, his wife called him at work and told him that Teasa was dead. (Ex. 19 [Statement of Emory Lockett].)  In Lockett's written statement, he indicated he did not own a knife before or after the murder. (*Id.*)  He also said that his wife could vouch for him that he was home all night on the night of Teasa's murder. (*Id.*)  At some point during this second interview, Lockett took a polygraph examination and failed. (*Id.*)  There is nothing in the police record that suggests that Lockett's alibi was ever verified.

### d.  Counsel's Performance was Deficient

Counsel could have presented compelling evidence linking these three other suspects to Teasa Jackson's murder at the pretrial motion hearing on September 17, 2010.  Teasa owed money to Craig Roberson, who had previously threatened to kill her and who was seen around the apartment complex on the night of her murder.  Steve Thomas's alibi conflicts with both his mother's recollection of events and with the time at which Teasa's neighbor reported the murder to police. Emory Lockett failed a polygraph test when questioned about his involvement in Teasa's murder.  Counsel's failure to adequately investigate the Teasa Jackson murder resulted in the admission of the uncharged crime into evidence.

### 3. Prior to Trial, Counsel Failed to Present an Explanation of Why Physical Evidence Tied to Harper would have been in Teasa Jackson's Apartment

Had trial counsel adequately investigated the uncharged offense prior to the pretrial hearing, they could have persuasively argued to exclude the extraneous offense by presenting evidence concerning Teasa Jackson's connection to drug activity. *Kemp*, S.W.2d at 307.

According to several sources, Teasa Jackson had a serious drug problem. At the time of her murder, she was frequently using crack cocaine and her home was regularly frequented by other drug users. (*See* 19 RR at 169; Ex. 20 [Statement of Steve Thomas]; Ex. 19 [Statement of Emory Lockett]; Ex. 18 at 10-12 [Police Report].)

On the day of her murder, Teasa spent much of the day searching for both drugs and money to buy drugs. One of Teasa's neighbors reported to police that Teasa asked her to buy some bus passes because Teasa "needed some money badly for diapers." (Ex. 18 at 10 [Police Report].) However, the neighbor reported that she knew Teasa was lying about her need to buy diapers because the neighbor had "seen . . . plenty [of] diapers in [Teasa's] apartment." (*Id.*) The neighbor said that Teasa also "appeared to be very nervous at that time." (*Id.*) Another neighbor told police that when Teasa came to his apartment on the day of her murder she "seemed nervous" and asked him for $10, with the offer to pay him back $15 if he agreed. (*Id.* at 12.) He declined and she left. (*Id.*)

In his 1995 interview with the police, Harper indicated that Jackson's apartment was essentially a "crack house" or a "place where people go to smoke crack." (Ex. 18 at 47 [Police Report].) He said that he "used [Teasa's] bathroom to smoke [when he was there] because he did not want to be bothered by anyone wanting to mooch off of him." (*Id.* at 48.)

41

The police report indicated that both Steve Thomas and Teasa Jackson were "involved in the use of drugs." (19 RR at 168-69; Ex. 18 at 27 [Police Report].) In his initial statement to the police, Thomas said "the only reason [he could] think that someone would hurt [Teasa] is that it is drug related." (Ex. 20 at 1 [Statement of Steve Thomas].) He told police that they both used crack cocaine and that they had broken up so they could both get "straightened out." (*Id.*) The police report also refers to "rumors" that Steve Thomas was dealing drugs. (Ex. 18 at 27 [Police Report].)

Teasa Jackson was suffering from a serious addition to crack cocaine. She was separated from her husband, and her home was a drug den in which she regularly entertained male visitors. In his 1995 police interview, Harper admitted to using crack cocaine in Teasa's bathroom before the police revealed to Harper that they had recovered his fingerprint from the scene. (Ex. 18 at 48 [Police Report].) During the interview, Harper untruthfully denied that he and Teasa occasionally had a sexual relationship. (*Id.*) Harper's reluctance to disclose to police that he and Jackson maintained a consensual sexual relationship wherein Harper supplied Jackson drugs in exchange for sexual act is, however, understandable—he was in state custody, without the representation of counsel, and that two police detectives were questioning him about an ongoing murder investigation. Even the detective who documented the 1995 interview concludes the report by noting "it is even more difficult to obtain a statement of any kind from [an individual] who is already incarcerated." (Ex. 18 at 48 [Police Report].)

In sum, trial counsel failed to develop a cogent defense theory prior to trial. They used none of the evidence contained in the police report to initiate an investigation into the facts of the uncharged crime. Counsel's failure to develop alternate suspects and present an explanation of why Harper's fingerprint and DNA

42

would have been in the apartment precluded the possibility of excluding the Teasa Jackson offense from evidence.

### 4. At Trial, Counsel Failed to Elicit Critical Outcry Testimony By Louis Jackson That Would Have Excluded Garland Harper As A Suspect in the Teasa Jackson Murder

Kevin Charles Hopkins was identified by investigators for trial counsel as a potential fact witness in the Teasa Jackson murder on March 31, 2010, six months before the punishment phase in October 2010. Hopkins was identified as someone who lived in the Chateau Village apartments, saw Garland Harper on the day of the Teasa Jackson murder, and who had first-hand knowledge of how Teasa Jackson's apartment in the months leading up to her murder had become a crack-smoking house for numerous individuals, and that sexual acts with numerous men were apparently performed by Teasa Jackson in exchange for the crack cocaine to which she was addicted. (Ex. 23 [Teasa Jackson Memorandum, p. 1-2].)

A reasonable investigation of the Teasa Jackson murder would have interviewed persons with personal knowledge of the facts and circumstances taking place around Teasa Jackson's apartment at the time of her murder. If a reasonable investigation of fact witnesses had been performed, Harper's trial counsel would have discovered powerful evidence excluding Harper as a suspect in the Teasa Jackson murder, sufficient to raise a reasonable doubt under Texas "clearly proven" standard for admission of extraneous offenses at punishment that an offense was committed and that the accused was its perpetrator. *Kemp v. State*, 846 S.W.2d at 307.

If Kevin Charles Hopkins had been interviewed and his testimony presented to Harper's punishment phase trial judge, Harper's trial judge and jury would have learned the following information from Kevin Charles Hopkins:

43

> I [Kevin Charles Hopkins] lived in the Chateau Village apartments with my mother in 1989. I was with Garland Harper at the Chateau Village apartments located at 3815 West Fuqua, Houston, Texas standing by apartment 140 the night Teasa Jackson was murdered. I was standing outside after the ambulance came with Louis Jackson, his father Steve Thomas and Garland Harper. Louis was telling his father, "Daddy, Daddy, you know the man that did it". Garland Harper and I were standing right there and Louis Jackson did not point to Harper or Kevin Hopkins while saying that. Louis Jackson was obviously talking about someone not present that his Father knew.
>
> I recalled Garland Harper's appearance that night. Garland Harper did not appear to be nervous, did not appear to be agitated, and did not appear to have been in a recent struggle. Garland Harper did not have any visible cuts, scratches, or blood stains on him, and showed no indications of being in any kind of struggle.
>
> I was never interviewed by the police in 1989 or at any time afterward, or by any investigators for the prosecution or the defense, until this year. I would have testified in court to what I know at Garland Harper's trial if I had been asked.

Affidavit of Kevin Charles Hopkins, Exhibit 63.

If Kevin Charles Hopkins had been interviewed and his testimony presented to Harper's punishment phase trial judge, there is a reasonable probability that the Teasa Jackson extraneous offense murder would have been excluded from the jury as not being "clearly proven" under Texas law that Garland Harper was the perpetrator of the Teasa Jackson murder. This would have been based on Louis Jackson, the then seven-year old who saw the four men inside Teasa Jackson's apartment on the night of her murder, failing to identify Garland Harper to his father as being one of the men Louis Jackson saw with his mother that night, which occurred within minutes of Louis Jackson discovering his mother's dead body. When Louis Jackson made his outcry to his father in Kevin Hopkins and Garland

Harper's presence that he knew the men in the apartment, Louis Jackson was obviously talking about someone not present that his Father knew.

### 5. At Trial, Counsel Failed to Elicit Testimony Concerning Police Investigation Into Other Suspects

Trial counsel failed to present to the jury evidence connecting the other suspects to the Teasa Jackson murder at trial.  Trial counsel failed to call the Houston Police Department detective who conducted the majority of the investigation into alternate suspects and failed to adequately cross-examine State police witnesses.  Had counsel presented evidence concerning police investigation into other suspects, there is a reasonable probability that this evidence would have influenced the jury's determination of whether Harper would constitute a future danger to society.

Houston Police Department Detective M.E. Doyle conducted the majority of the investigation into Roberson, Thomas, and Lockett.  (*See* Ex. 18 at 26-33, 33-34, 32, 41 [Police Report].).  Had defense counsel called Detective Doyle as a witness, they could have questioned him about his investigation into the alternate suspects.

Detective Doyle investigated Roberson's threat to kill Teasa.  (*Id.* at 26, 36.)  Detective Doyle heard from multiple witnesses that Roberson was seen around the apartment complex on the night of Teasa's murder.  (*Id.* at 32.)  Detective Doyle suspected that Roberson had been at the crime scene after Teasa's murder based on Roberson's purported knowledge of the location of the murder weapon: "[H]ow would Craig know where the knife was unless he had been there!!!!!!!!!!!!!!!!!," Detective Doyle wrote.  (*Id.* at 36.)

Detective Doyle learned about Teasa and Steve Thomas's contentious relationship from Teasa's neighbors.  (*Id.* at 33.)  He learned that Teasa was afraid

of Steve.  (*Id.*)  He learned that Teasa's neighbor believed that Steve's "ranting and raving" since Teasa's death was "a big act."  (*Id.*)

Detective Doyle also discovered that Emory Lockett was not seen for a week around the apartment complex following Teasa's murder.  (*Id.* at 33.)  Detective Doyle conducted the interview with Lockett, during which Lockett failed a polygraph test.  (*Id.* at 40-41.)

Additionally, trial counsel failed to elicit testimony concerning the other suspects from the police officers the State called to testify.  During cross-examination of Sergeant Benford, defense counsel was unaware of the basic facts of the police investigation.  (19 RR at 171-82.)  For example, counsel was confused about the number of men who were in Teasa's apartment using drugs on the evening she was murdered.  (*Id.* at 172.)  The prosecutor corrected defense counsel stating, "I'm sorry.  If you're reciting from the report, there were three men."  (*Id.*)

Counsel's attempt to elicit testimony from Benford concerning the alternate suspects was limited to the question, "But did the name Greg Anthony Roberson ever pop up?"  (19 RR at 181.)  When Sergeant Benford responded that he did not "recall that name,"—perhaps because counsel had called him "Greg" instead of "Craig"—counsel failed to follow-up with any details about Roberson and why he was a primary suspect.

Counsel similarly failed to effectively cross-examine Sergeant Motard concerning the alternate suspects.  (19 RR at 244-68, 270-73.)  During the cross-examination of Sergeant Motard, counsel was still confused about the number of men who were confirmed to have been in Teasa's apartment using drugs.  (*Id.* at 244-45.)  When counsel attempted to suggest that Roberson was the fourth man in the apartment, Sergeant Motard responded, "That name [was] in the report, but I don't believe that he was one of the three that were there."  (*Id.* at 245.)  Counsel's

subsequent efforts to elicit testimony regarding the alternate suspects consisted primarily of reciting the names of individuals from the police report and asking open-ended questions without providing any context or a cohesive narrative regarding the other suspects.[19]  (*Id*. at 246-68.)  For example, counsel's questions regarding Teasa's estranged husband, Thomas, as a suspect were limited to the following exchange:

> Q: And there were concerns about the estranged husband, this Roy?
> A: Roy Steven Thomas.
> Q: Roy Steven Thomas or Steven Roy Thomas – a Mr. Thomas?
> A: Right.
> Q: And then, there was Carl Davis. . . .

(*Id*. at 247-48.)  Rather than eliciting testimony concerning the police's interest in Thomas as suspect—Thomas had a violent relationship with Teasa, Thomas's alibi conflicted with both the police report and the statement provided by his mother, that Teasa's neighbors believed Thomas to be feigning grief—counsel incomprehensively made statements that distanced Thomas from the murder: "No one said that Roy Steven – or Steven Roy Thomas, no one said they saw him in or around the apartment complex that night.  Fair statement?"  (*Id*. at 257.)  Trial

---

[19]  An example of trial counsel's unfamiliarity with the case is illustrated by counsel's question about whether an individual named Randolph Scott was known to have a crack house in the apartment complex.  Scott, a witness who produced no significant leads that would have supported the culpability of alternate suspects was, as Motard responds, "just another name on the report.  I don't know that he lived at the apartments.  I don't know if he was ever around the apartments.  It was just another name that came up during through their investigation."  (*Id*. at 258-59.)  Subsequently, counsel failed to provide any further context for Scott and moved on to the next question.  (*Id*. at 259.)

While trial counsel did manage to elicit testimony that Roberson had threatened Teasa's life and that he was a suspect, counsel failed to introduce into evidence specific details such that Roberson was a known drug user, that he had robbed a furniture store, and—most importantly—that he purportedly knew the location of the murder weapon.  (*Id*. at 247.)

47

counsel's inadequate understanding of the basic facts of the police investigation is perhaps best evinced by the question about when Garland Harper became a person of interest. When questioning Sergeant Motard about the initial investigation, counsel incorrectly asserted that police learned that Harper lived in the apartment complex in 1989, despite the fact that Harper did not become a person of interest until 1995. (19 RR at 255-56; Ex. 18 at 44 [Police Report].)

In sum, counsel's failure to call additional police witnesses and their ineffective cross-examination of Sergeants Benford and Motard precluded the jury from considering compelling evidence about alternate suspects.

### 6. At Trial, Counsel Failed to Present an Explanation of Why Physical Evidence Tied to Harper Would Have Been in Teasa Jackson's Apartment

Counsel also failed to account for why Harper's DNA was recovered during the investigation. Counsel failed to demonstrate the extent of Teasa Jackson's addiction to crack cocaine—they failed to elicit testimony about Teasa's desperate search for drugs or money to buy drugs on the day of her murder. (*See* Section (A)(3), *ante*.) Trial counsel failed to demonstrate that Teasa was separated from her husband and that her apartment had become a haven for male drug users. Considering the extent of her addiction and the frequent presence of male visitors at her apartment, it is entirely plausible that she engaged in consensual sexual activities in exchange for drugs. Moreover, Harper's reluctance to fully disclose his sexual relationship with Teasa during his 1995 police interrogation is understandable considering that he was in state custody, without an attorney, and being questioned about an unsolved crime.

Coupled with an effective presentation of the alternate suspects, an explanation of why evidence tied to Harper was recovered from the crime scene

might well have influenced the jury's appraisal of Harper's culpability and its determination of whether he could constitute a future danger to society.

### 7. At Trial, Counsel Failed to Object to Extraneous Offense Victim Impact Testimony

In a capital trial, victim impact testimony related to extraneous offenses is improper, prejudicial, and inadmissible.[20]   *Cantu v. State*, 939 S.W.2d 627, 637 (Tex. Crim. App. 1997).   Evidence concerning impact of an extraneous offense on family members "serves no other purpose than to inflame the jury."   *Id.*   As the court found in *Cantu,* the "danger" of admitting such evidence is "unacceptably high."   *Id.*; *see also Adams v. Thaler*, 2010 WL 2990967, *10 (E.D. Tex. July 26, 2010) ("The Texas Court of Criminal Appeals ruled that because the prejudicial effect of this type of evidence would substantially outweigh its probative value in every case, the evidence was *per se* inadmissible.").

In Harper's case, the State elicited impermissible victim impact testimony from both Teasa Jackson's mother, Shirley Williams, and from her son, Louis Jackson.[21]   (20 RR at 78-82, 58-59.)   Despite the improper and highly prejudicial

---

[20] While the CCA has permitted surviving extraneous offense victims to testify about the impact of an extraneous offense on the witness-victim themselves, *Roberts v. State*, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007), the facts in Harper's case clearly fall under the *Cantu* jurisprudence, which prohibits testimony about the effect of an extraneous offense on people other than the victim.

[21] As a related claim, Harper alleges that the State's introduction of improper victim impact testimony constitutes State misconduct.   In addition to violating *Cantu*, the State's introduction of improper victim impact testimony related to extraneous offenses directly violated the trial court's ruling on defense counsel's Motion in Limine, Section V, "It is requested that the State be precluded from offering, at any time during the course of this trial, any 'victim impact' evidence from an alleged victim of an offense for which the Defendant is not indicted in this cause."   (5 CR at 1155; 13 RR at 18-19.)   The court granted this request and the State's violation of it amounted to misconduct.

49

nature of the evidence, trial counsel failed to raise an objection to the inflammatory testimony from Williams or Louis Jackson.

The testimony of Shirley Williams was irrelevant and prejudicial. It was proffered solely as victim-impact testimony, and provided no relevant evidence to the jury. The only topic about which she testified was the impact of Teasa Jackson's murder on the family, and especially on Louis.

First, the State gratuitously asked Williams to identify a photograph of Teasa that had already been admitted into evidence: "If you can, when you're ready to, turn that over for me and identify who's in that photograph." (20 RR at 79-80.) Subsequently, the State asked if, "[a]fter her death, you had the opportunity where you tried to take care of her children?" (*Id.* at 81.) Next, the State asked, with "regards to Louis, was he given -- or did y'all try to help him with counseling?" (*Id.*.) Williams responded:

> [W]e got counseling; and he did attend, I'd say, maybe three or four months, which didn't help because his -- nothing helped. You know, none of the family members, nothing we suggested, nothing helped. He was just -- just a little lost boy, you know. And it was nothing we could do to make him happy; or nothing that anyone tried could, you know, console him.

(*Id.* at 81-82.) The sole purpose of Williams's testimony was to demonstrate how Jackson's death affected her children, especially the State's star witness, Louis Jackson. (*Id.*)

In addition to the victim impact testimony from Shirley Williams, discussed above, the State elicited improper victim impact testimony from Louis Jackson. During direct examination of Louis, the State asked: "[h]ow did [your mother] provide for you?"; and "[D]id you have a good relationship with [your mother]?"

Further, the trial court erred in permitting the State to present the evidence. And finally, appellate counsel was ineffective for failing to raise the issue in Harper's direct appeal. *See Robbins*, 528 U.S. at 285.

(20 RR at 36-37.)  On re-direct, the State asked Louis about the meaning of two of his tattoos: the word "grief" on his neck and the teardrop tattooed below the corner of his eye.  (*Id.* at 58-59.)

The victim impact testimony from both Shirley Williams and Louis Jackson was improper and prejudicial.  It was in direct violation of *Cantu* as well as the trial court's ruling on trial counsel's motion in limine.  The introduction of impermissible victim impact testimony from Williams and Louis Jackson "serve[d] no other purpose than to inflame the jury." *Cantu*, 939 S.W.2d at 637.  The victim impact testimony from an extraneous offense prejudiced Harper and constitutes reversible error.  Trial counsel's failure to object to any of Williams's or Louis Jackson's testimony was objectively unreasonable under *Strickland*.

### 8. At Trial, Counsel Failed to Object When the State Argued in Closing Argument that Teasa Jackson had been Raped

A burden of clear proof governs the introduction of extraneous offenses at punishment.  *Kemp,* 846 S.W.2d at 307.  "It has been a longstanding principle that before a trial court can admit extraneous offense evidence the State must 'clearly prove' that an offense was committed and that the accused was its perpetrator."  *Id.* (quoting *Turner*, 754 S.W.2d at 373).  In the instant case, the State failed to present *any* evidence that Teasa Jackson was raped.

Dr. Wilson, assistant medical examiner for Harris County, testified that "[t]here [was] no way to determine" how long sperm had been in Jackson's body before she was killed.  (19 RR at 91.)  Wilson also testified that there were "no signs of trauma" on Jackson's genitalia and that her "external genitalia were intact and unremarkable."  (*Id.* at 86.)  Houston Police Sergeant Eric Mell also testified that there was nothing that he had read in any of the reports that indicated Jackson had been raped.  (*Id.* at 201.)

At closing argument, however, the State asked the jury whether Jackson "deserve[d] to be stabbed to death and raped" because she was a drug user. (24 RR at 10.) Shortly thereafter, the State asserted "the same person that raped her is the same person that killed her."[22] The State's improper allegation that Harper raped Teasa Jackson continued as follows: "And we know his DNA [was found] inside of her vagina and inside of her anus, and that's not consensual." (24 RR at 12.) Not only was there no evidence presented at trial that Jackson had been raped, this latter assertion was "clearly calculated to inflame the minds of the jury." *Kemp*, 846 S.W.2d at 308 (citing *Gardner v. State,* 730 S.W.2d 675, 696-97 (Tex. Crim. App. 1987)). This conclusory allegation also ignores the testimony of the State's expert medical witness who agreed that a paucity of sperm cells on the rectal sample could have attributed to "some sort of drainage." (19 RR at 88.) Inexplicably, trial counsel failed to object to the State's allegation that Jackson had been raped and that Harper was the person responsible.[23]

---

[22] This instance of State misconduct was clearly intended to inflame the minds of the jurors, which prejudiced Harper. Appellate counsel was ineffective for failing to raise the issues of ineffective assistance for failing to object, improper argument by the State, and State misconduct in Harper's direct appeal. *See Robbins*, 528 U.S. at 285.

[23] While trial counsel's failure to object to the allegation that Harper had raped Jackson falls well below prevailing professional norms, the need to raise an objection could have been obviated had trial counsel adequately prepared for the pretrial hearing on September 17, 2010. Prior to the hearing, trial counsel filed a "Motion to Prohibit State from Mentioning any Extraneous Offenses or Extraneous Acts of Misconduct without Prior Ruling Outside the Presence of the Jury and Memorandum in Support Thereof." (6 CR at 1382; 13 RR at 62-63.) When the Court invited argument on the motion, trial counsel was unable to locate it, responding, "Judge, I don't know where it is. It's just a memo, right?" (13 RR at 62.) After the Court states (for the second time) that the document is a motion with an attached memorandum, counsel was still unable to locate the motion. Unprepared to argue its merit, counsel instead elected to withdraw a motion that

The allegation that Teasa was raped was unsubstantiated by evidence.  The repeated allegation that Harper had raped Teasa Jackson was clearly calculated to inflame the minds of the jury.  Defense counsel's failure to object was objectively unreasonable.

## B. Prejudice

Harper's punishment case was greatly prejudiced by counsel's unreasonable investigation of and subsequent failure to rebut the State's case at punishment. Had defense counsel investigated, developed, and presented a cogent defense theory for the Teasa Jackson allegations, there is reasonable probability that the outcome at sentencing would have been different.

Counsel's performance at both the pretrial motion hearing on September 17, 2010, and during the punishment phase of Harper's trial evince trial counsel's staggering lack of familiarity with the salient details of the Jackson murder and subsequent police investigation.  At the pretrial motion hearing, counsel did not know Teasa Jackson's first name, did not know in what year the police had interviewed Harper, and were unprepared to argue motions related to the extraneous offense.  During punishment, counsel failed to exhibit more than a rudimentary familiarity with the facts of the police investigation into Jackson's murder: counsel was confused as to how many men were in the apartment with Teasa on the evening she was murdered, counsel erroneously assumed that Harper was brought to the attention of the police in the weeks following the murder, and counsel failed to call a critical police witness who had conducted the vast majority of the investigation into the alternate suspects.  Much of trial counsel's cross-examination of police witnesses amounted to the recitation of names from the

---

would have created an additional safeguard against the State's allegation that Harper raped Jackson.  (*Id.* at 63.)

police report, occasionally accompanied by a contextual fact, and a follow-up question that amounted to "What about that guy?"

The record indicates that counsel failed to conduct even a cursory investigation into the State's allegation that Harper murdered Teasa Jackson. Indeed, trial counsel's failure and the resulting prejudice to Harper is analogous to the deficiencies considered by the *Rompilla* Court. Like *Rompilla,* "there is no question that defense counsel were on notice." 545 U.S. at 383. Like *Rompilla,* it is undisputed that the files related to the Jackson offense were readily available to counsel. (*Id.* 384.) Like *Rompilla*, even with an analysis using "every effort to view the facts as a defense lawyer would have done at the time, it is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation." *Id.* at 385. And, like *Rompilla*, it "flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence." *Id.* at 389.

Trial counsel failed to exclude the introduction of the extraneous offense before trial. Trial counsel failed to present evidence in support of alternate, more likely suspects. The jury did not hear about Teasa's estranged husband's highly suspect alibi, nor did they hear a cogent and compelling theory supporting Roberson as the killer, and Emory Lockett was reduced to either the third or fourth man that might have walked back toward Teasa's apartment after the other men left. Counsel failed to explain the existence of physical evidence connecting Harper to the crime scene. The jury did not hear about the extent of Teasa's drug addiction, nor were they given the opportunity to consider Harper's reluctance to fully disclose his sexual relationship when interrogated by police investigators in a TDCJ Unit in 1995.

The jury did, however, hear improper prejudicial victim impact testimony from Shirley Williams and Louis Jackson. Trial counsel failed to raise any objection to Williams's testimony, which consisted solely of inflammatory, impermissible victim impact testimony. The jury also heard that Teasa Jackson had been raped before she was murdered. Although the State offered no evidence supporting that anyone, let alone Harper, had raped Teasa Jackson, defense counsel failed to object to the inflammatory accusation.

Like *Rompilla*, trial counsel knew that the extraneous offense "would be at the very heart of the prosecution's case." *Rompilla,* 545 U.S. at 394. Like *Rompilla,* trial counsel's decision not familiarize themselves with the extraneous offense file neither "the result of an informed tactical decision" nor the result of trial counsel's "careful exercise of judgment about how best to marshal their time and serve their client." *Id.* at 395. It was, quite simply, objectively unreasonable. Absent the attribution of Teasa Jackson's murder and alleged rape to Harper, his previous convictions and prior bad acts consisted of purse snatchings, youthful altercations, and an alleged robbery with a weapon, which was substantiated only by the testimony of a woman with a substantial criminal record, whose earlier failure to pursue charges resulted in the case's dismissal. The improper aggravating evidence that trial counsel failed to exclude might well have influenced the jury's appraisal of Harper's culpability and its determination of whether he would constitute a future danger to society.

## CLAIM THREE

## THE STATE'S MANIPULATION OF LOUIS JACKSON'S TESTIMONY VIOLATED HARPER'S CONSTITUTIONAL RIGHT TO DUE PROCESS

The State knowingly manipulated the testimony of Louis Jackson, who incorrectly testified that he remembered Harper as the last person with whom he

55

saw his mother before she was murdered, over twenty years previously, when Louis was seven.   The misconduct prejudiced Harper and thus, Harper's death sentence violates his applicable state and federal Constitutional rights, as well as state statutory law, United State Supreme Court case law, and state case law, and should be vacated.

### A. Relevant Facts

There are significant factual inconsistencies between what Louis Jackson reported to police as a seven-year-old in 1989 and his testimony at Harper's trial in 2010, twenty-one years later.   Most notably, before 2010, Louis Jackson had never mentioned that he had seen a man sitting with his mother on their porch after the other men left.   (20 RR at 49.)

### 1.  Louis Jackson's 1989 Statement to Police

Seven year old Louis Jackson gave a statement to police shortly after he discovered his mother's body early in the morning on March 31, 1989.   (Ex. 18 at 10-11 [Police Report].)   In his 1989 statement, Louis told the police that had been at a neighbor's apartment until approximately 7:00pm and upon returning to his apartment, he observed four men talking with his mother in the kitchen.   (*Id.* at 10.) Jackson told the police that two of the men were very familiar to him and that they normally wore blue uniforms, but that they were not wearing them that evening. (*Id.* at 11.)   Louis also stated that he thought "he [had] seen all the 4 men before and that he [could] possibly identify the men if he [saw] them again in the future."[24]   (*Id.*)   Louis made no statement that there was any other person present on the porch.   (*Id.*)

In the intermittent investigation that occurred in 1989 and 1990, police identified three men—Freeman, Johnson, and Lockett—that were together in

---

[24] After that night, the authorities waited twenty-one years to talk to Louis Jackson again.  (20 RR at 39.)

Jackson's apartment on the night she was murdered.  (*See* Claim Two, *ante*.)  Each of these men independently confirmed that there had only been three of them in the apartment with Teasa Jackson.  (Ex. 18 at 20-23 [Police Report]; Ex. 19 [Statement of Emory Lockett].)

## 2. Failed Police Attempts to Find an Eyewitness who Saw Harper at the Crime Scene

After learning that Harper's DNA had produced a match to evidence recovered from Teasa Jackson's autopsy kit, Houston Police Sergeant Motard reinitiated his investigation into the Jackson cold case murder on February 19, 2010.  (Ex. 18 at 53-56 [Police Report].)

On April 3, 2010, Sergeant Motard interviewed Abner Freeman, one of the three men in Teasa's apartment on the night that she was murdered.  (*Id.* at 64.)  Sergeant Motard showed Freeman a copy of the statement he had given police in 1989 which identified Emory Lockett as the third man in Teasa's apartment.  (*Id.*)  Freeman affirmed that the 1989 statement was accurate.  (*Id.*)  Sergeant Motard subsequently showed Freeman a photo spread containing Garland Harper.  (*Id.*)  Freeman did not identify Harper as the third man, or "the male who came in and handed Teasa the drug."  (*Id.*)

On May 21, 2010, Sergeant Motard interviewed Ronnie Johnson, who confirmed that he and Freeman had been in Teasa's apartment on the night that she was murdered.  (*Id.* at 67-68.)  Johnson recalled that there had been a third man in the apartment who had offered Teasa what appeared to be drugs.  (*Id.* at 68.)  Johnson recalled that the third man might have been named "Efraim," but he was unsure.  (*Id.*)  Subsequently, Motard showed Johnson the photo spread and asked Johnson if it contained an image of the third man.  (*Id.*)  Johnson selected a fill-in photograph.  (*Id.*)  When asked whether he knew Harper, Johnson pointed to Harper's image in the photo spread.  (*Id.*)  Johnson stated that Harper was not the

man that had been in Teasa's apartment with him and Freeman.  (*Id.*)

### 3.  Manipulation of Louis Jackson

On August 19, 2010, prosecutors Emmons and Bradley, and a third person,[25] interviewed Louis Jackson at the TDCJ Retrieve Unit.  (20 RR at 34; Ex. 52 at ¶3 [Affidavit of Louis Jackson].)  At the beginning of the interview, Louis was asked about his mother and was "read parts of [the Teasa Jackson police report]."  (Ex. 52 at ¶¶4-5 [Affidavit of Jackson].)  They then told Louis that they "had someone locked up and wanted to know if [Louis] recognized him."  (*Id.* at ¶6.)  They showed Louis two photo spreads, and Louis said that he recognized a photo, which he circled and initialed.  (*Id.* at ¶7.)  The State informed Louis that the photo he had circled was Garland Harper and that he was awaiting trial because "had killed his girlfriend and her two daughters."  (*Id.* at ¶8.)  The State also informed Jackson that "they had Garland's DNA at [his] mom's crime scene."  (*Id.* at ¶9.)  The State then told Louis that "everyone was accounted for, including the two men in work shirts, from the police report except for the man on the porch," and that "the person on the porch had to be Garland Harper."  (*Id.* at ¶¶10-11.)  The prosecutors "kept telling [Louis] Garland killed [his] mom, and that they were sure."  (*Id.* at ¶11.)  The male detective also told Louis, "The person on the porch must be Garland."  (*Id.* at ¶13.)  The prosecutors then told Louis, "they needed [him] to testify that Garland was the man on the porch."  (*Id.* at ¶14.)

### 4.  Louis Jackson's Trial Testimony

At Harper's trial, Louis testified that on the evening of his mother's murder, his family returned to their apartment together, Teasa made dinner, and at around

---

[25] While the third person was likely Sergeant Motard, the copy of the police report provided to trial counsel does not document any recent interviews by Motard with Louis Jackson.  Notably, the copy of the police report provided to trial counsel ends on the very same day that Louis Jackson identified Harper as the last person he saw with his mother before she was murdered.  (Ex. 18 at 71 [Police Report].)

9:00 or 10:00pm two men wearing "uniform shirts" came into the apartment.[26]   (20 RR at 22-25.)   When asked whether he saw "another man in the apartment as well," Louis testified that "maybe about a little over an hour"  later, he saw a man talking to his mother on the porch, and that he "told the police the exact TV show [he] was watching.  That's how they made the timeframes."[27]   (*Id.* at 25-26.)  Later in his testimony, Louis clarified that he remembered telling the police he saw three men in the apartment that evening, the "two dudes with the working shirts," and, later, a third man on the porch.[28]   (*Id.* at 30-31.)  Louis then testified that when the State showed him a photo spread on August 19, 2010, he identified Garland Harper as the man on the porch.  (*Id.* at 34-35.)

## B. *Napue v. Illinois*

A conviction obtained using knowingly perjured testimony violates due process.  *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *Alcorta v. Texas*, 355 U.S. 28, 31 (1957) (per curiam) (due process violated when prosecution allows jury to be presented with a materially false impression).  "A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows

---

[26] In 1989, Louis told police that the men often wore work shirts but were not wearing work shirts that evening, which is corroborated by Ronnie Johnson's 1989 statement to police that he was wearing "a maroon muscle shirt or undershirt and some jeans" that evening.  (Ex. 18 at 10, 21 [Police Report].)  Louis also told police that the men were already there when he got home from a friend's house.  (*Id.* at 10.)

[27] The police report provided to defense counsel fails to document that the police ascertained any timeframe based on what television show Jackson was watching.  The report states only that Jackson saw the men around 7:00pm, two to three hours earlier than he claimed to have seen them at trial.  (*Compare* Ex. 18 at 10 [Police Report], *with* 20 RR at 22-25.)

[28] This testimony also conflicts with Louis's 1989 statement in which he reported seeing four men in the apartment together.  (*Compare* Ex. 18 at 10-11 [Police Report], *with* 20 RR at 30-31.)

untrue testimony to go uncorrected." *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996) (citing *Giglio v. United States*, 405 U.S. 150 (1972)).

The prohibition against the use of false testimony applies even when the testimony in question was relevant only to the witness's credibility. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). When this happens, reversal of the defendant's conviction is near certainty because courts do not employ a strict materiality test or a harmless-error analysis. *See Alcorta*, 355 U.S. at 31 (reversing conviction and death sentence where sole eyewitness lied about his romantic involvement with the victim—lies the government condoned and covered up).

The presentation of false evidence is intolerable because it perpetrates a fraud on the judge and the jury and undermines the "rudimentary demands of justice." *Mooney,* 294 U.S. at 112. The fraud is also insupportable because of its corrosive effect on the judicial process and because the instrument of deceit is a prosecutor, "whose obligation . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). To prevail on a claim based on *Napue*, the petitioner must show "(1) the witness gave false testimony; (2) the falsity was material in that it would have affected the jury's verdict; and (3) the prosecution used the testimony knowing it was false." *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007).

"False evidence is 'material' only 'if there is any reasonable likelihood that [it] could have affected the jury's verdict.'" *Goodwin v. Johnson*, 132 F.3d 162, 185 (5th Cir. 1997) (quoting *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996).

## C. The State Knowingly Manipulated Louis Jackson into Offering False Testimony at Harper's Trial

Here, the State not only allowed Louis Jackson to offer false testimony, it manipulated Louis into believing that when he was seven, he told police that he

had seen his mother with the man on the porch just hours before she was murdered.[29]

### 1. Louis Jackson's Testimony was False

Louis Jackson is certain that Garland Harper was not the man on the porch. (Ex. 52 at ¶¶16, 17 [Aff. of Jackson].)  Louis feels like he was "manipulated," and that he "made a mistake" in his identification of Harper.  (*Id.* at ¶17.)

### 2. The State Knew or Should Have Known That Louis's Identification of Harper as the Man on the Porch Was False.

The record suggests that the State was extensively involved in the police investigation after Harper's DNA was matched to evidence recovered from Teasa Jackson.  After the State asked Sergeant Motard to assist them in the Jackson investigation, Motard attempted to have both Johnson and Freeman identify Harper as the third man in Teasa's apartment despite the fact that police had previously determined that Emory Lockett was the third man.   (Ex. 18 at 20-23 [Police Report]; Ex. 19 [Statement of Emory Lockett].)  At trial, Motard even testified that prior to interviewing Freeman and Johnson, he reviewed Lockett's 1990 statement to police in which he admitted to being in the apartment with Johnson and Freeman.  (19 RR at 240-41.)

Unable to obtain an identification from witnesses who were adults at the time of the crime and whose previous statements to police had been reliably corroborated, the State elected to interview Louis Jackson, who was seven years old when he discovered his mother's body.

The police report contains no mention of a man on the porch.  (*See* Ex. 18 at 10-11 [Police Report].)  The police did not document any chairs or other seating on the porch.  (*Id.*)  Yet, after Louis Jackson was read facts allegedly contained in the

---

[29] Louis Jackson still believes that he saw his mother sitting with a man on the porch.  (Ex. 52 at ¶17 [Aff. of Louis Jackson].)

police report, told that the State had someone locked up, asked to identify a photo of someone he recognized, told that the man he identified was Garland Harper, told that Harper killed his girlfriend and her two daughters, told Harper's DNA was recovered from his mother's crime scene, told "that everyone was accounted for, including the two men in work shirts, from the police report, except for the man on the porch," and then repeatedly told that the State was certain that Harper had killed his mother–Louis Jackson identified Harper as the man on the porch.  (Ex. 52 at ¶¶5-11, 13, 15 [Affidavit of Jackson].)

At best, overzealous police investigation manipulated Jackson into providing materially false testimony.  However, considering that both prosecutors were present when Louis identified Harper and that Louis's 1989 statement to police is brief, the State should have known that the police report contained no mention of a man on the porch.  (Ex. 18 at 10-11 [Police Report].)  Moreover, the significant inconsistencies between Louis's 1989 statement to police, the corroborated statements given by other witnesses in 1989, and Louis's trial testimony cast serious doubt on Louis's reliability as a witness and strongly suggest that that his trial testimony was manipulated by the State.

### 3.  The False Testimony was Material

The uncharged cold case murder of Teasa Jackson dominated the punishment phase of Harper's trial.  Without Louis Jackson's testimony, the State presented no evidence placing Harper at Jackson's apartment on the evening that she was murdered.  Thus, without Jackson's testimony, the State would have failed to meet the clear proof standard governing the introduction of extraneous offenses. *Kemp*, 846 S.W.2d at 307.  The State knew or should have known that Jackson's testimony was false, and there is a reasonable likelihood that Jackson's false testimony affected the jury verdict.  The misconduct prejudiced Harper and his sentence should be reversed.

**D. The State Knowingly Presented False Testimony at Harper's Trial, Did Not Correct The False Testimony, And The False Testimony Was Material.**

Undoubtedly, it violates due process for the government to obtain a conviction by the knowing use of perjured testimony. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *United States v. Bagley*, 473 U.S. 667, 679 n. 8, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (discussing the evolution of the rule in Napue ). But, to receive a new trial, the defendant must show "(1) that there was false testimony; (2) that the government knew or should have known it was false; and (3) that there is a likelihood that the false testimony affected the judgment of the jury." *Kirkpatrick v. Whitley,* 992 F.2d 491, 497 (5th Cir. 1993). The reasonable likelihood standard imposes a "considerably less onerous" burden than the *Brady* standard—the conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict." *Id*. at 497.

**1. Louis Jackson's Testimony was False**

Louis Jackson was the seven year-old son of Teasa Jackson, the victim of a murder in 1989 that was the centerpiece of the State's argument for future dangerousness during Garland Harper's punishment phase. Louis Jackson was allowed by the State to testify before the jury to numerous critical facts that are demonstrably false.

At first, Louis Jackson denied that District Attorneys Emmons and Bradley, who visited Jackson in jail and presented Louis Jackson with Harper's photo lineup for his identification, shared information with Jackson prior to Jackson identifying Harper in the lineup. 20 RR 52.[30] Louis Jackson then changed his testimony under

---

[30] Q. When the D.A.'s Office comes to visit with you on this case, they start sharing information with you, don't they?
A. No, sir. 20 RR 52.

cross-examination and confirmed that the State shared information with Jackson long before showing him the photo lineup where Jackson identified Harper,[31] but Jackson continued in his denials that he was given information about Harper's DNA being found inside his mother, or given information about similarities between his mother's murder and the murder of Triska Rose and her daughters.

> *Q*. Okay. And, so, once they've shared certain information with you, they're talking about DNA and they're talking about similarities and they're giving you this and giving you that and then they show you this photo spread and ask you if you recognize that person as being someone with your mother that night, didn't they?
> *A*. No, sir.
> Q. Okay. Well, would it be fair to say now, after having reviewed this, that the story about Mr. Harper being on the porch with your mother on March the 31st, 1989, the first time that you've told anyone in law enforcement, including the D.A.'s Office, about there being a porch incident, was when they came to talk to you -- "they" being the D.A.'s Office, came to talk to you just a few months ago?
> A. Yes, sir.

20 RR 53-54.

**2. The State Knew or Should Have Known That Louis's Testimony That He Was Not Provided Information by Prosecutors About Harper's DNA Being Found Inside His Mother Was False, And That Material Impeaching Information About Louis Jackson Was Not Provided To the Jury And Left A False Impression .**

This false testimony by Louis Jackson, left uncorrected by the State, about Louis Jackson not being provided information by prosecutors about Harper's DNA being found inside his dead mother's body, came out during Jackson's critical cross-examination about identifying Harper for the first time as being the man on

---

[31] Q. Okay. So, they started sharing information with you; and they start doing this long before they show you a photo spread, correct?
A. Correct.
20 RR 53.

the porch, the man last seen with his mother alive. Louis Jackson's identification of Harper, as being the last known man to be seen with Jackson's mother while she was still alive, came only months before his testimony and over twenty years after the event. Louis Jackson's identification left a materially false impression with jurors because it contained both known false testimony left uncorrected by the state, and omitted material impeaching information concerning Louis Jackson's belated identification of Harper as the unknown fourth man on the porch last seen with his mother alive, that was suppressed from the defense. We know this material impeachment testimony relevant to the cross-examination of Louis Jackson was both false and suppressed by the State because of the affidavits of prosecutors Anna Emmons and Denise Bradley, filed in the State's Original Answer to the State Writ. As sworn by prosecutor Emmons in her affidavit, Exhibit A:

> During our visit with Louis Jackson, Denise Bradley and I did not tell him that Garland Harper killed his mother and did not tell Jackson anything about the DNA prior to Jackson viewing the photo array and making an identification. After Jackson made his identification of Harper's photo, we told him that there had been a CODIS hit on the DNA recovered from his mother and that the CODIS hit came back to Harper…. Denise Bradley and I did tell Jackson what Harper was charged with and told him that his mother's case would only be used in punishment in Harper's trial. Exh. A, Emmons Affidavit, p.3.

While Jackson admitted under cross-examination that the State shared information with Jackson long before they showed Jackson the photo lineup containing Harper, 20 RR 53, Louis Jackson falsely testified that he was not given information about Harper's DNA being found inside his mother. 20 RR 53-54. Prosecutor Emmons' affidavit, however, establishes that Jackson's testimony on this critical impeaching fact was false, that the State knew it was false, and that the State let this false testimony stand uncorrected. There is a likelihood that Louis

65

Jackson's false trial testimony affected the judgment of the jury. The critical nature of this fact, denied by Louis Jackson, was compounded by the failure of the State to disclose to the defense the further impeaching fact that Louis Jackson was told by the prosecutors that, despite Harper's DNA being found inside his dead mother, Harper would never face punishment for the murder of Louis Jackson's mother, Teasa Jackson. As disclosed by prosecutor Emmons in her affidavit: "Denise Bradley and I did tell Jackson what Harper was charged with and told him that his mother's case would only be used in punishment in Harper's trial." Exh. A, Emmons Affidavit, p.3. Louis Jackson, presented with the information for the first time from the State that the State had identified his mother's killer through DNA found inside her from Harper, and that the State at the same time was going to do nothing to Harper for murdering Louis Jackson's mother Teasa Jackson, a murder which caused the breakup of Louis Jackson's family at the age of seven, and caused himself and his siblings to be separated and sent to live with different family members, had to have been psychologically overwhelming and enraging to Louis Jackson, causing him to be strongly biased and prejudiced against Harper. Louis Jackson has sworn in his habeas affidavit that is in fact what occurred-that these suppressed facts made Louis Jackson "caught up and emotional." Louis Jackson swore:

> 11. They (prosecutors) said the person on the porch had to be Garland Harper. The women kept telling me Garland killed my mom, and that they were sure.
> 12. I couldn't figure out how I knew the person whose photo I circled, but I knew I recognized him. I did not know his name until they told me.
> 13. Since the police detective said the person on the porch must be Garland, I figured that was how I knew him.
> 14. They told me they needed me to testify that Garland was the man on the porch.

15. I testified to that at trial because I was caught up and emotional about what Garland had been charged with, and I trusted the detective that I must have recognized Garland because he was the man on the porch the night my mom was murdered.

16. The simple truth is I don't remember who I saw on the porch. I don't think it was Garland, because if he was the last person I saw my mom with, I would have remembered him immediately.

Louis Jackson Affidavit, State Writ-Exhibit 52, p. 2.

The State's allowing Louis Jackson's false testimony to go uncorrected, as well as allowing critical impeaching information to not be disclosed to the defense and jury, violated Harper's due process rights. The instances of false and suppressed testimony were compounded by the State further knowingly allowing Louis Jackson's false testimony go uncorrected regarding the number of men he told police he saw in his mother's apartment on the night of his mother's murder in 1989. While telling the jury that he remembered that night "like it was yesterday," 20 RR 21, Louis Jackson was allowed by the prosecution to testify falsely before the jury that he had told police that he had seen three people in his mother's apartment the night she was murdered,[32] including most critically the third man last

---

[32] Q. Okay. So, the police came up to that apartment to talk to you?

A. Yes, ma'am.

Q. Do you remember that? Do you remember talking to them?

A. Yes, ma'am.

Q. All right. And at that time did you tell them as best you could what you had seen or what had

been going on at your house earlier in the evening?

A. Yes, ma'am.

Q. And did you describe the men that you had seen earlier in the house?

A. Exactly.

Q. All right. And then did you tell them how many people that you'd seen in the apartment?

A. Yes, ma'am.

Q. Do you remember how many people you told them?

A. Uh-huh.

seen on the porch alone with his mother still alive, 20 RR 25-26, and that his memory was exact. Louis Jackson's testimony under direct examination by the State was knowingly false and left uncorrected by the State because in fact he had told police in 1989 that he had seen four people in the apartment and he had seen them in the kitchen, thus directly impeaching his memory of events, and Louis Jackson had never stated to police in 1989 that there was a third man present on the porch, because in fact Louis Jackson had told police that there were four men present at the apartment and he had seen them in the kitchen. *See* Exhibit 18, p. 10-11 ("Louis Jerome Jackson, B/M 7, 3815 West Fuqua #140, No Phone. This witness is the son of the complainant and he was apparently in the house when the complainant was killed. This witness stated that the complainant, his mother, and

---

Q. How many?

A. Three.

Q. When you were describing three, was it three together at the same time; or were the people

7 that were there there at different times?

A. Like two -- two dudes with the working shirt. And then when I went in the room and came back, it was another dude. But I ain't seen the two dudes in the working shirts no more.

Q. Okay. And then you said that you saw someone sitting on the front porch talking to your mom --

A. Yes, ma'am.

Q. -- later?

A. Yes, ma'am.

Q. And did you -- when you saw that, did you tell the police about that; or was it all kind of -- how would you describe it?

A. I told the -- you know, they was asking me who I seen over at the house, you know. I said I seen two men with some working shirts on talking to my mama, over there with my mom. Then I seen another man on the porch with my mama. And I don't know if they came together or left together or, you know, how they coincide with each other. But those are the last three individuals I seen with my mama before I woke up and found her dead.

20 RR 30-32.

68

his brother and sister, and he, came home from a lady named "Portia's" and they got to the apartment around 7PM. Jackson said that his mother had come to the apartment a little before he got there and when he came in there were 4 men in the apartment and they were in the kitchen talking to the complainant…Jackson said that he thinks that he has seen all the 4 men before and that he can possibly identify the men if he sees them again in the future.")

Thus by falsely testifying that he told police in 1989 the same story that he was now telling the jury under direct examination by the prosecution, that only two men were present at the apartment besides Garland Harper, and that Louis Jackson had told the police in 1989 there were only three men present in the apartment that night, and that the last person seen alive with his mother was Garland Harper who was on the porch with his mother, the jury was left with a false impression during direct examination by the State that there was no fourth still-unidentified man who might be his mother's killer, and that Louis Jackson's story to police had been consistent throughout time.

Louis Jackson's father, Roy Steven Thomas, also reported to police on the night of Teasa Jackson's murder that his son Louis Jackson had told him that four people were in the house the night his mother Teasa Jackson was murdered, and thus the State was further on notice of Louis Jackson's observations inside the apartment that was knowingly concealed from the jury from this second source. Roy Steven Thomas provided a sworn statement on 3/31/1989 at 4:39AM, hours after Teasa Jackson's body was discovered at 12:56AM, where he swore: "My son told me that there were four people in the house tonight. One of their names was "Freeman" and another was his brother-in-law. I recognized them from the descriptions that my son gave of the men he saw in the house. These guys didn't have anything to do with the stolen merchandise though." State Writ Exhibit 20, p. 1. While Jackson ultimately later admitted under cross-examination that he had

69

told police that that there were four men in the apartment in the kitchen talking to his mother, 20 RR 61, the State itself never came forward with this information on direct examination, nor disclosed that Louis Jackson had told the same information to his father, nor corrected Louis Jackson's false testimony that he was not told Harper's DNA was found inside his dead mother, or the critical impeaching information that Louis Jackson was told Harper would not face justice for his mother's murder.

If the prosecution, although not actively soliciting false evidence, passively but knowingly allows it to go uncorrected or allows the jury to be presented with a materially false impression, it violated due process of law. *Napue v. Illinois*, *supra*; *Alcorta v. Texas*, *supra*. The same result may obtain even though the false nature of the evidence concerns only the credibility of an important witness, rather than the ultimate issue of guilt or innocence. *United States v. Anderson*, 574 F.2d 1347, 1355 (5th Cir. 1978) (citing *Brady v. Maryland*, supra; *William v. Dutton*, supra.) *See also Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (new trial required when Government witness testified falsely on matters relating to credibility and the prosecutor who served as trial counsel should have been aware of the falsehood). The State has special duty not to present evidence known to be false or to suppress evidence known to be impeaching. *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935). In *Mooney v. Holohan*, the Court rejected the State's contention that providing an opportunity to rebut false testimony by the State was sufficient to provide due process:

> [T]he Attorney General contends that it is only where an act or omission operates so as to deprive a defendant of notice or so as to deprive him of an opportunity to present such evidence as he has that it can be said that due process of law has been denied.
>
> Without attempting at this time to deal with the question at length, we deem it sufficient for the present purpose to say that we are unable to approve this narrow view of the requirement of due process.

That requirement, in safeguarding the liberty of the citizen against deprivation through the action of the state, embodies the fundamental conceptions of justice which lie at the base of our civil and political institutions. It is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a state has contrived a conviction through the pretense of a trial which, in truth, is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a state to procure the conviction and imprisonment of a defendant is an inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.

*Mooney v. Holohan*, 294 U.S. at 112. *United States v. Mason*, 293 F.3d 826, 829 (5th Cir. 2002)(prosecutors' failure to affirmatively correct government witnesses' false statements regarding plea improper and violated due process; defendant's opportunity to cross-examine witness and expose the false testimony does not relieve the government of its affirmative responsibility to correct false testimony)("By failing to correct the misrepresentation, we find that the government violated [defendants'] rights to due process under the Fourteenth Amendment.")

For purposes of the State meeting their burden of proof on future dangerousness and the jury's finding thus authorizing a death sentence, Louis Jackson was the most critical witness for the State. Louis Jackson's testimony that Harper was the last man seen with his mother still alive was the linchpin to proving Harper's involvement in his mother's murder—in effect, proving that Harper was a serial killer since age nineteen who killed women he was sexually involved with and a proven danger of future violence. 24 RR 8-9. Without Louis Jackson's testimony placing Harper as the man last seen with Teasa Jackson alive, there was no conclusive testimony under Texas' "clearly proven" standard for extraneous

71

offenses at punishment[33] that Harper did anything other than have consensual sex with Teasa Jackson.

Indeed, Louis Jackson has now recanted his testimony that Harper was the man on the porch with his mother, the last man seen alive with her. State Writ Exh. 52, Louis Jackson Affidavit. No other eyewitness placed Harper at the murder scene.[34] Louis Jackson has reaffirmed his recantation that Harper was not the man on the porch with his mother, and reaffirmed his prior affidavit. Exh. 62, Louis Jackson Affidavit.

### 3.  The False Testimony was Material

---

[33] In capital cases, the admissibility of extraneous-offense evidence offered during the punishment phase is governed by Texas Code of Criminal Procedure Article 37.071, section 2(a). *See* Tex. Code Crim. Proc. art. 37.071, § 2(a); *Hughes v. State*, 24 S.W.3d 833, 843 (Tex. Crim. App. 2000). Article 37.071 states, "In the [punishment phase] proceeding, evidence may be presented by the state and the defendant or the defendant's counsel as to any matter that the court deems relevant to sentence . . . ." Tex Code Crim. Proc. art. 37.071, § 2(a). This article affords trial courts wide latitude in admitting or excluding evidence of extraneous offenses during the punishment phase of a capital trial. *Hughes*, 24 S.W.3d at 843. Before the evidence can be declared admissible, however, "the State is burdened with the obligation of 'clearly proving' to the trial court that the extraneous offense was committed and that appellant was the perpetrator." Id.

[34] The other eyewitnesses present in Teasa Jackson's apartment the night of her murder, Abner Freeman, Ronnie Johnson, and Emory Lockett, all excluded Garland Harper as being with them inside Teasa Jackson's apartment on the night of the murder. Abner Freeman testified that Harper was not present with Freeman, his brother-in-law Ronnie Johnson, and Teasa Jackson neighbor Emory Lockett the night of Teasa Jackson's murder. 22 RR 13. Harper was also not present outside of Teasa Jackson's apartment or around the apartment complex when Abner Freeman, Ronnie Johnson and Emory Lockett were all three kicked out of Teasa Jackson's apartment at the same time. 22 RR 19. Ronnie Johnson testified he was one of the three men present together in Teasa Jackson's apartment on the night of her murder, that he knew Garland Harper in 1989, and that he did not see Garland Harper at any time the night of Teasa Jackson's murder. 22 RR 43.

[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. *United States v. Agurs*, 96 S.Ct. at 2402. The long-settled rule has been that the knowing use by the prosecution of false evidence or perjured testimony which is material to the issues in a criminal trial is a denial of due process. A conviction obtained by the use of such evidence cannot be permitted to stand. *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). *See also Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Alcorta v. Texas*, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); *White v. Ragen*, 324 U.S. 760, 65 S.Ct. 978, 89 L.Ed. 1348 (1945); *Pyle v. Kansas*, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1947); *Hysler v. Florida*, 315 U.S. 411, 62 S.Ct. 688, 86 L.Ed. 932 (1942). The same rule applies if the prosecution, although not actively soliciting false evidence, passively but knowingly allows it to go uncorrected or allows the jury to be presented with a materially false impression. *Napue v. Illinois*, *supra*; *Alcorta v. Texas*, *supra*. The same result may obtain even though the false nature of the evidence concerns only the credibility of an important witness, rather than the ultimate issue of guilt or innocence. *Brady v. Maryland*, *supra*.

*United States v. Anderson*, 574 F.2d 1347, 1355 (5th Cir. 1978)(internal citations omitted).

To receive a new trial, the defendant must show "(1) that there was false testimony or the jury was left with a materially false impression, even though the false nature of the evidence concerns only the credibility of an important witness, rather than the ultimate issue of guilt or innocence; (2) that the government knew or should have known it was false; and (3) that there is a likelihood that the false testimony affected the judgment of the jury." *United States v. Anderson*, 574 F.2d at 1355; *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993). The reasonable likelihood standard imposes a "considerably less onerous" burden than the *Brady* standard—the conviction "must be set aside if there is any reasonable likelihood

that the false testimony could have affected the jury's verdict." Id. at 497. In a capital sentencing proceeding, given the unanimity required at the Texas punishment phase on the jury finding of future dangerousness, the proper frame of reference, at least with regard to the punishment assessed, is whether the mind of one juror could have been changed with respect to the imposition of the sentence of death. *Id.*

The uncharged cold case murder of Teasa Jackson dominated the punishment phase of Harper's trial. Without Louis Jackson's testimony, the State presented no evidence placing Harper at Jackson's apartment on the evening that she was murdered. Thus, without Jackson's testimony, the State would have failed to meet the clear proof standard governing the introduction of extraneous offenses. *Kemp*, 846 S.W.2d at 307. The State knew or should have known that Jackson's testimony was false, and there is a reasonable likelihood that Jackson's false testimony affected the jury verdict. The misconduct prejudiced Harper and his sentence should be reversed.

## CLAIM FOUR

### TRIAL COUNSEL WAS INEFFECTIVE AT THE PUNISHMENT PHASE IN PREPARING FOR AND CONDUCTING DR. RICHARD DUDLEY'S TESTIMONY

Because trial counsel was not properly prepared for the punishment phase testimony of mental health expert Dr. Richard Dudley, counsel failed to elicit vital information concerning: (1) how mental health professionals arrive at psychiatric diagnoses; and (2) Harper's specific diagnosis, which would have combatted the State's contention at punishment that Harper was malingering. Due also to trial counsel's lack of preparation, jurors were never presented with a coherent explanation of how Harper's mental illness affected his ability to function, thus

74

reducing his moral culpability.   Harper's sentence of death was therefore unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law.

### A. Relevant Factual Background

In the fall of 2009, Dr. Dudley was retained by the defense to perform a psychiatric evaluation of Harper and consult with Harper's defense team.  (21 RR at 21; Ex. 46 at ¶14 [Aff. of Dr. Richard Dudley].)  Dr. Dudley subsequently reviewed numerous school, medical, and criminal records, several affidavits, interviewed Harper on two occasions, and wrote a summary of preliminary findings, which he sent to trial counsel.  (Ex. 46 at ¶¶15, 17, 20-21, 26.)

Dr. Dudley testified as an expert witness at the punishment phase of Harper's trial.  (21 RR at 7.)  Dr. Dudley testified as to his credentials as an expert witness, which include a medical degree from Temple University and the completion of an internship and residency in psychiatry at Northwestern University; a license to practice medicine in the state of New York and board certification from the American Board of Psychiatry and Neurology in psychiatry; teaching positions at the City University of the New York Medical School at City College and the New York University School of Law; publication in both medical and law journals; and prior testimony in a forensic capacity for both the State and defense in civil and criminal cases on numerous occasions.  (*Id.* at 8-11.)

On direct examination, Dr. Dudley discussed his involvement in Harper's case.  (21 RR at 21-23.)  He was then asked by counsel to talk about the various mental health diagnoses Harper received post-arrest: that of the Harris County Mental Health Authority evaluator, who found that Harper had major depressive disorder with psychotic features, and that of the State's expert, who found that Harper had paranoid schizophrenia.  (*Id.* at 26-39.)

After having explained those two diagnoses, Dr. Dudley was asked about his own diagnosis—that Harper suffered from schizoaffective disorder.  (21 RR at 39.) Dr. Dudley defined schizoaffective disorder as that of an individual who has schizophrenia and a mood disorder, which in Harper's case was depression.  (*Id.* at 40-42.)  Dr. Dudley then described in detail the voices Harper reported hearing. (*Id.* at 53-57.)  After discussion of all the various medications Harper had been prescribed while awaiting trial, Dr. Dudley's testimony concluded with his opinion that there was a reasonable medical probability Harper was mentally ill at the time of the murders.  (*Id.* at 58-71; 82.)

Unfortunately, trial counsel elicited hardly any testimony from Dr. Dudley on direct examination regarding the information he relied on in making his diagnosis other than what Harper self-reported.  This failure left Dr. Dudley extremely vulnerable to the State's argument that Harper was malingering.  What Dr. Dudley did not discuss on direct examination, but could have, included the hereditary nature of mental illness, the interplay between mental illness and substance abuse, and how anyone who was not mentally ill but taking the same antipsychotic medications in the same dosages as Harper would not be able to function.  (Ex. 46 at ¶¶ 65-66, 69-74, 76 [Aff. of Dr. Dudley].)  All of this information would have helped refute the State's malingering claim, and trial counsel should have had Dr. Dudley address, in detail, why Harper was not feigning symptoms of mental illness to avoid punishment.  Time and again, however, the State brought up the lack of support for a mental illness diagnosis beyond the symptoms Harper claimed to be experiencing, after committing the crimes, to bolster their theory of malingering.[35]

---

[35] (*See*, *e.g.*, 21 RR at 91 [DA: "Prior to the capital murders, is there any documentation of the defendant ever saying that he heard voices?  A: There's no -- we were not able to get ahold of any document that said that."]; 106 [DA: "Well,

76

## B. Trial Counsel was not Prepared to Present Expert Testimony about Harper's Mental Illness

It was not until a year after retaining Dr. Dudley that trial counsel spoke to him directly to discuss his findings and opinion.[36]   The first substantive conversation between trial counsel and Dr. Dudley occurred on September 25, 2010, after Harper's jury had already been selected and pre-trial hearings had been held.  (Ex. 46 at ¶27 [Aff. of Dr. Dudley].)[37]   Trial started on October 4, a little over a week after this initial in-person conversation.  (14 RR at 19.)  Trial counsel met with Dr. Dudley the night of October 12, and then Dr. Dudley testified the following day.  (21 RR at 7; Ex. 46 at ¶30.)  In all, trial counsel met with Dr. Dudley for a total of six hours.  (Ex. 46 at ¶39.)

The fundamental problem with the presentation of mental health evidence at Harper's trial was that defense counsel did not spend enough time preparing for Dr. Dudley's testimony, and so did not have a good understanding of the process by which an individual is evaluated and a psychiatric diagnosis is reached,

---

curiously enough, after he's charged with capital murder, he certainly doesn't have any problems opining about all of the voices that he's hearing and all the mental health problems that he has, correct?"].)

[36] Trial counsel delegated contact with Dr. Dudley to the mitigation team up until about a month before trial.  (Ex. 46 at ¶19 [Aff. of Dr. Dudley].)  In Harper's case, mitigation work was performed primarily by staff members at the Gulf Region Advocacy Center ("GRACE").

[37] Dr. Dudley does not recall and did not bill for any substantive discussions with trial counsel prior to September 25, 2010, though James Stafford's billing records indicate telephone conferences with Dr. Dudley of indeterminate length on January 15 (subject matter unspecified) and August 28, 2010 (regarding a neuropsychologist's assessment of Harper).  (Ex. 46 at ¶27 [Aff. of Dr. Dudley]; Ex. 35 [Dr. Dudley Invoices]; Ex. 36 at 20, 28 [James Stafford Billing Records].) Gerald Bourque's billing records do not reflect these telephone conferences with Dr. Dudley, or any others.  (Ex. 37 *passim* [Gerald Bourque Billing Records].) While there may have been other conversations not billed for by either trial counsel or Dr. Dudley, that issue will best be addressed at an evidentiary hearing.

Harper's specific diagnosis, or the impact of Harper's mental illness on his ability to function.  (Ex. 46 at ¶¶38, 43 [Aff. of Dr. Dudley].)  This failure to properly prepare for Dr. Dudley's testimony was deficient in that it fell below an objective standard of reasonableness.  *See Strickland*, 466 U.S. at 688.  Testifying mental health experts in capital cases can routinely spend in excess of twenty hours meeting with trial counsel well in advance of trial to prepare for their testimony, so that counsel can "effectively elicit testimony that helps jurors assess the credibility of [the expert's] findings and understand the impact mental illness can have on an individual and his behavior."  (*Id.* at ¶40.)

Between roughly January and May of 2010,[38] there was a period of several months during which Dr. Dudley did not hear from anyone regarding Harper's case.  (Ex. 46 at ¶¶21-23 [Aff. of Dr. Dudley].)  Dr. Dudley was under the impression that during that time Harper's defense team was "virtually certain there would be a plea and the case would not go to trial."  (*Id.* at ¶22.)  Trial counsel's lack of preparation during this time period was ill-advised, and left them scrambling to catch up once it became clear that there would not be a plea.[39] Insofar as Dr. Dudley's testimony is concerned, it appears that counsel never

---

[38] On May 5, 2010 Dr. Dudley received an email from a GRACE staff member notifying him that the State had decided to go forward in seeking the death penalty and asking if he would be available to testify that fall.

[39] In preparation for Harper's trial, James Stafford billed 5.25 hours in February, 6.75 hours in March, and 5.5 hours in April, 2010.  (Ex. 36 at 20-22 [Stafford Billing Records].)  Likewise, Gerald Bourque billed 4.75 hours in February, 1.75 hours in March, and .75 hours in April, 2010.  (Ex. 37 at 21-22 [Bourque Billing Records].)  Mr. Bourque, who conducted Dr. Dudley's direct examination, did not bill any time in May and only billed half an hour in June.  (*Id.* at 22.)  From an email from trial counsel to GRACE, it appears that trial counsel was still under the impression there might be a plea, which would obviate the need to prepare for trial, as late as the end of July (jury selection was held in September and trial started in October).  (Ex. 39 [James Stafford Email (8/2/10)].)

caught up.  Furthermore, having delegated contact with Dr. Dudley to GRACE, trial counsel had little familiarity with the evaluative work that Dr. Dudley had already performed upon which to build once they realized there would be a trial. (*Id.* at ¶42.)

Lack of preparation left trial counsel ill-equipped to conduct direct examination on basic aspects of Dr. Dudley's testimony, as outlined below, and resulted in a failure to appreciate and effectively rebut ways in which the State attacked Dr. Dudley's testimony on cross examination.  (Ex. 46 at ¶43 [Aff. of Dr. Dudley].)  Trial counsel's unpreparedness also resulted in an inability to respond effectively to objections raised by the State during direct examination.  (*Id.* at ¶44.)

### C. Trial Counsel's Lack of Preparation Resulted in a Failure to Dispel the State's Claim that Harper was Malingering

Despite having been warned by Dr. Dudley that the issue of malingering[40] needed to be addressed thoroughly and proactively on direct examination, trial counsel failed to question Dr. Dudley in a manner that would have allowed him to do so.  (21 RR at 24-25; Ex. 46 at ¶47 [Aff. of Dr. Dudley].)  On direct, the entirety of trial counsel's inquiry into whether Harper was malingering reads as follows:

> Q: Any of the documents or anything that you've read from [the State's expert] or from M.H.M.R.A. [the Mental Health and Mental Retardation Authority of Harris County], is there any indication at any time that Mr. Harper, seated to my right, was trying to -- a little trickeration on anybody?
> A: No.
> Q: I mean, that's what malingering is, isn't that trickeration?
> A: Essentially.

---

[40] The essential feature of malingering is defined in the fourth edition of the *Diagnostic and Statistical Manual of Mental Disorders – Text Revision* ("DSM-IV-TR") as "the intentional production of false or grossly exaggerated . . . psychological symptoms, motivated by external incentives such as . . . evading criminal prosecution."  (DSM IV-TR at 739.)

(21 RR at 24-25.)   Despite Dr. Dudley's credentials in psychiatry, trial counsel effectively chose to offer his own explanation as to how jurors could tell whether Harper was malingering, as opposed to allowing Dr. Dudley to educate the jury and explain his expert opinion to them.  (*Id.*)  In doing so, trial counsel reduced Dr. Dudley's contribution to one-word answers ("[n]o" and "[e]ssentially") rather than eliciting valuable information about how malingering is identified by practicing psychiatrists per the DSM-IV-TR and why Dr. Dudley did not believe Harper was malingering.  (*Id.*)

The State, in contrast, offered a much more coherent definition of malingering for Dr. Dudley to agree with:

> Q: . . . [malingering]'s a situation where you fake psychological symptoms to . . . avoid military duty, avoid work, obtain financial compensation, evade criminal prosecution, or you can do it to obtain drugs.  Like – I assume, like these psycho pharmacological drugs, antipsychotic drugs or whatever?

(21 RR at 87-98.)   The State also elicited testimony from Dr. Dudley that malingering should be strongly suspected if a person is facing criminal prosecution.  (*Id.* at 98-99.)

As predicted by Dr. Dudley in his prior warnings to counsel, the State argued effectively on cross examination that Harper was feigning mental illness to avoid punishment, by suggesting that Harper did not exhibit any signs of mental illness until after he was arrested.

> Q: …You would agree with me that everything -- most everything that you've talked to the jury about this morning are things that [Harper] told people after he was arrested and charged with capital murder, correct?
> A: I would say that's true with regard to most of the things within the medical records.
> Q: Okay.  So, so that we're clear, all of these things that the defendant is reporting that he's feeling or thinking are all things that he's telling people after he's been charged with killing three people?

80

> A: I would say all of the things -- not in all the information I reviewed
> but with regard to the medical records following the crime --
> Q: All right.
> A: -- that would be true for that subset of materials.

(21 RR at 85-86.)

In addition to allowing Dr. Dudley to more fully define malingering on direct, trial counsel should have elicited testimony from him regarding the diagnostic process; how mental illness is hereditary; Harper's prior treatment for mental illness; how substance abuse and mental illness interact; and Harper's mental health treatment in order to offensively combat the State's contention that Harper was pretending to be mentally ill, or malingering.

## 1. Testimony Regarding Dr. Dudley's Diagnostic Process was not Effectively Elicited

Dr. Dudley was not asked questions on direct examination that allowed him to give jurors a clear overview of the process by which he evaluated Harper and reached a diagnosis of schizoaffective disorder. Thus, Dr. Dudley was not able to explain how finding Harper mentally ill involved more than just interviewing him and taking what he said at face value, something that was repeatedly suggested by the State on cross examination.[41]

---

[41] (*See, e.g.*, 21 RR at 88 [DA: "[Y]ou would agree that all of the information that is used to make these diagnoses is self-reported by the defendant, correct?"]; 97 [DA: "Now, that -- again, when we talk about the depression, it's self-reported by the defendant, correct?]; 102 [DA: "So, with regards to, again, the clinician making the assessment, you're listening to what the person has to tell you, correct?" Dudley: "Yes." DA: "And if you do your job well, you would certainly want to -- if a person is reporting to you all of a sudden that they're hearing voices, you would want to first establish the possibility of malingering, correct?"]; 108 [DA: "So, just so that we're clear, the defendant goes in and then he tells them how he's feeling and as a result of what he tells them, then they come up with these diagnosis [sic]?"]; 110 [DA: "And again, this is his self-reporting to the screeners after he's been charged with capital murder, correct?"]; 112 [DA: ". . . And, of course, [the diagnosis] also changes depending on what the defendant tells you at

Jurors were not well informed how the combination of self-reported and otherwise-discovered symptoms can help experts confirm the existence of mental disorders.  (Ex. 46 at ¶55 [Aff. of Dr. Dudley].)  In Harper's case, it would have been important for jurors to understand that the more subtle associated symptoms he displayed, such as changes in affect, helped confirm Dr. Dudley's belief that Harper was also experiencing the self-reported auditory hallucinations they had discussed at length.  (*Id*. at ¶56.)  Instead, the erroneous impression that Harper told Dr. Dudley he heard voices and so Dr. Dudley found that Harper was psychotic, reinforced by the State's cross examination, was created.

Further damaging the credibility of Dr. Dudley's diagnosis was how trial counsel framed his expert assessments.  Rather than presenting Dr. Dudley's diagnosis as the affirmative finding it was, trial counsel presented it as some sort of compromise position.  Trial counsel did this by first questioning Dr. Dudley about what the mental health evaluator who saw Harper after his arrest diagnosed him with (major depressive disorder with psychotic features), then eliciting testimony about the State's expert's finding (paranoid schizophrenia), and only after that finally inquiring as to Dr. Dudley's opinion (schizoaffective disorder).  (21 RR at 26-30; 34-37; 39-40.)

Trial counsel then asked where Dr. Dudley's opinion "fit in" with the other two evaluations, and if it would be fair to say that his opinion "[fell] somewhere between the two." (21 RR at 40, 41.)  Trial counsel should have presented Dr. Dudley's diagnosis from a position of strength, however, as the affirmative finding reached after an extensive and thorough evaluation of both Harper and numerous secondary sources of relevant information that it was.  (Ex. 46 at ¶59 [Aff. of Dr. Dudley].)  Only then should counsel have asked Dr. Dudley to explain the

---

the time, correct?"];, 125 [DA: "And all this is just based on things that he's just telling people, right?"].)

82

relationship between psychosis-related symptoms (i.e. schizophrenia) and mood-related symptoms (i.e. depression), and discuss how mental health evaluators who saw Harper at different points in time could have been more impressed by one set of symptoms than the other, thereby rendering different, but not contradictory, diagnoses. (*Id*. at ¶60.)

## 2. Testimony Regarding Harper's Familial History of Mental Illness was not Effectively Elicited

It has been well-established that there is a genetic component to the development of certain psychiatric disorders. (Ex. 46 at ¶65 [Aff. of Dr. Dudley].) If Dr. Dudley had been asked by trial counsel to discuss generally how mental illness is hereditary, then lay witness testimony regarding the significant history of mental illness in Harper's family would have served both as additional corroboration of Harper's own mental illness and to negate the State's theory that Harper was malingering.

Trial counsel had given Dr. Dudley the medical records of Harper's mother to review. (Ex. 46 at ¶21 [Aff. of Dr. Dudley].) Those medical records included documents generated when Harper's mother went to the emergency room after having attempted to commit suicide in 1992. (Ex. 30 [Stephanie Harper Medical Records].) As a result, Dr. Dudley was aware that she was diagnosed as having psychiatric problems upon being admitted to the hospital, that she had a history of depression, and that she had also tried to kill herself in 1976 and 1984, and he could have testified to such if asked. (*Id*. at 1, 12-13.) Given Harper's diagnosis, evidence that his mother similarly suffered from depression would have been important for the jury to hear.

## 3. Testimony Regarding Harper's Prior Treatment for Mental Illness was not Effectively Presented

In Harper's TDCJ records, there were numerous screening reports that made no mention of any psychiatric issues Harper may have been experiencing. (21 RR

83

at 88-89.)  Dr. Dudley advised trial counsel that these screening reports needed to be addressed on direct examination, or the State would suggest on cross that they were further evidence of malingering.  (Ex. 46 at ¶64 [Aff. of Dr. Dudley].)  Dr. Dudley could have explained to jurors that such reports were in no way the equivalent of mental health evaluations, and so the fact that they did not make mention of Harper having mental health issues did not carry the type of significance suggested by the State.  (*Id*. at ¶63.)  Individuals suffering from mental illness may lack insight as to their symptoms, or be reluctant to volunteer information that might cause others to view them as "crazy," so the superficial nature of a screening oftentimes fails to identify legitimate mental health concerns. Dr. Dudley also could have pointed out that the existence of those screening reports did not prevent either the MHMRA evaluator or the State's expert from diagnosing Harper with mental illness. (*Id*.)

Dr. Dudley could have testified in more detail specifically about Harper's insight and lack thereof into the symptoms of mental illness he experienced.  (Ex. 46 at ¶62 [Aff. of Dr. Dudley].)  For example, Harper exhibited awareness of his psychiatric issues in regards to his depression, but lacked understanding that his auditory hallucinations, i.e. the voices in his head, were also a sign of mental illness.  (*Id*.)  Such testimony would have helped jurors understand why a routine screening report would not necessarily have uncovered Harper's psychosis, but because trial counsel had not spent enough time preparing for Dr. Dudley's testimony, they did not appreciate the importance of it and so neglected to enquire into the screening reports on direct examination.

As Dr. Dudley predicted, the State implied through their questions on cross examination that these screening reports cast doubt on Dr. Dudley's expert opinion that Harper suffered from mental illness:

> Q: All right.  Now, again, I want to focus on the records that you
> reviewed prior to the defendant being charged with capital murder.
> A: Okay.
> Q: In those records, you would agree that the defendant was screened
> on numerous occasions to determine whether or not he had mental
> health issues?
> A: Whether he believed he had mental health issues.
> Q: In September of 1991, it shows that there are no mental health or
> mental retardation restrictions in those T.D.C. [Texas Department of
> Corrections] records, correct?
> …
> Q: On July 24th of 1993, there were no mental health or mental
> retardation restrictions according to his T.D.C. records, correct?  Well,
> let me -- I guess -- August 9th of 1993, no mental health retardation
> records.  August 9th of 2002, the defendant claims no current or past
> mental health treatment, according to the T.D.C. medical records.
> June 28th of 2005, when the defendant was screened for mental
> health, he stated that he didn't have any current or past mental health
> treatment. And on May 16th of '09 -- I mean, of '06, the T.D.C.
> records reflect no present or past mental health treatment.  Correct?
> A: (No response.)

(21 RR at 88-89.)  Even though Dr. Dudley tried to draw the distinction between

having mental health issues and believing that you have mental health issues, the

proper time for such an explanation would have been on direct examination: on

cross, the State just ignored Dr. Dudley's comment.  (*Id.*)

Evidence that Harper had previously received psychiatric treatment while in

TDCJ custody, as Harper insisted he had, would have been of utmost importance in

combatting the State's argument that he was only claiming to be mentally ill after

having committed a crime.  (Ex. 46 at ¶67 [Aff. of Dr. Dudley].)  Dr. Dudley told

trial counsel this, and asked them to search for any type of documentation

regarding Harper's prior treatment.[42]   (*Id.*)   On cross, the State examined Dr. Dudley as follows, exploiting this very vulnerability:

> Q: And I think I've tried repeatedly to ask you this question; but just so that we're clear, we can both agree that the defendant has never been treated for any mental illness previously.  Can you agree to that?
> A: I can't agree to that.
> Q: Do you see any documentation of him ever being treated for mental illness?
> A: I agree that we don't have any documentation of that.  The records, we don't -- we couldn't get the records for that.

(21 RR at 118.)

Had trial counsel uncovered Harper's TDCJ prison travel cards (which provide a very basic summary of each of the years Harper was in prison), jurors would have learned that Harper's prison work assignment was temporarily limited in 1992 because of psychiatric issues he was experiencing at the time.  (Ex. 31 at 1 [Garland Harper TDCJ Travel Cards].)   Such evidence of prior mental health concerns would have served as further proof that Harper was not malingering, but trial counsel failed to discover—and then present—this important information to jurors.

### 4. Testimony Regarding the Interaction between Mental Illness and Substance Abuse was not Effectively Elicited

Testimony from a psychiatrist about how people suffering from painful mental health problems often self-medicate with alcohol or other drugs would have provided jurors with an alternate perspective on Harper's drug use.  (Ex. 46 at ¶69

---

[42] When GRACE staff members requested Harper's older TDCJ medical records, they were told the records had been destroyed after ten years from the date of his discharge, "in accordance with the Texas Department of Criminal Justice Health Services Retention/Destruction Policy Number H-65.I." (21 RR at 79-80.) However, a phone call by a post-conviction investigator to the Classification and Records Department at TDCJ led to their Office of the General Counsel, who subsequently provided a copy of Harper's travel card via fax.

[Aff. of Dr. Dudley].)  Lay witness testimony regarding how Harper learned self-medicating behavior at a very young age from both his mentally ill mother, who abused prescription drugs and was addicted to crack cocaine, and his maternal grandmother, who may have treated her psychological issues with alcohol, would have complemented and reinforced this kind of expert testimony, and allowed jurors to reconsider the criminality of Harper's behavior.  (*Id.* at ¶¶69, 74.)

Dr. Dudley could have also explained to jurors how there is a genetic component to the development of substance abuse issues.  (Ex. 46 at ¶69 [Aff. of Dr. Dudley].)  As the child of drug-addicted parents and grandchild of a likely alcoholic, Harper was placed at even further risk of developing substance abuse difficulties, separate from any desire he may have had to self-treat the symptoms of his mental illness.  (*Id.*)  This, too, might have led jurors to reconsider their assessment of Harper's blameworthiness regarding his use of drugs.

In order for jurors to understand how the interplay between drugs and mental illness impacted Harper's behavior, trial counsel should have elicited testimony from Dr. Dudley about how co-existing psychological impairment and substance abuse problems combine to result in even more severe impairment than either one produces in isolation.  (Ex. 46 at ¶71 [Aff. of Dr. Dudley].)  Alcohol and other depressants, for example, tend to make depressive disorders more severe.  (*Id.* at ¶72.)  Alcohol and other substances also impair judgment, which is especially problematic when the co-existing psychological impairment has already affected decision-making capabilities, as was the case with Harper.  (*Id.*)

Finally, Dr. Dudley could have spoken to how alcohol and other substances can decrease inhibitions, which leads individuals to behave in ways that they might not otherwise behave and to be unable to control behavior they might otherwise be able to control.  (Ex. 46 at ¶73 [Aff. of Dr. Dudley].)  Decreased inhibitions can be particularly problematic if individuals are already having impulses to act

inappropriately as a result of mental illness (i.e. acting in response to delusions and/or hallucinations).  (*Id*.)  Dr. Dudley could have explained to jurors how this may have been the case for Harper, who was already predisposed toward acting inappropriately even before drugs were introduced into the equation, due to delusions and paranoia that he was being betrayed and auditory hallucinations telling him what to do.

### 5.  Testimony Regarding Harper's Treatment was not Effectively Elicited

Dr. Dudley described on direct examination the different medications Harper was taking while awaiting trial and what they are generally prescribed to treat.  (21 RR at 58-71.)  The majority of medications discussed were either antipsychotics (prescribed to treat psychoses such as schizophrenia) or antidepressants (used to alleviate depression).  (*Id*.)  This evidence was noteworthy in that Harper was prescribed medication designed to treat symptoms specific to his mental illness as diagnosed by Dr. Dudley, which tended to confirm the validity of Dr. Dudley's diagnosis.

However, the greater significance of Harper having been prescribed all these medications, which Dr. Dudley had tried to explain to trial counsel prior to testifying, lay in the fact that a non-mentally ill person could not possibly tolerate such a medication regimen.  (Ex. 46 at ¶76 [Aff. of Dr. Dudley].)  Dr. Dudley could have testified about how a healthy person, i.e. a malingerer, taking the same medications in the same amounts as Harper would necessarily have been rendered virtually unconscious, which would have cast serious doubt on the State's malingering theory.  (*Id*.)  Unfortunately, trial counsel did not elicit the full significance of this information from Dr. Dudley on direct or on redirect.  (21 RR at 159-61.)

Finally, Dr. Dudley was not questioned about Harper's ability to function and conform his behavior so as not to present any danger when his mental illness is properly treated.

### 6. Testimony Regarding Why Harper's Mental Illness Mattered in Terms of Future Dangerousness and Mitigation was not Effectively Elicited

Even if jurors discounted the State's theory that Harper was malingering, they never heard an explanation of how his mental illness could be treated to prevent him from presenting a future danger or how his mental illness could be considered mitigating and thus reduced his moral culpability for his actions.

#### a. Future Dangerousness

Jurors never heard Dr. Dudley's expert opinion that if properly treated in prison, it is unlikely Harper would present a danger to himself or others based on his psychiatric issues. (Ex. 46 at ¶84 [Aff. of Dr. Dudley].) How well people with psychoses (like schizophrenia) and depression can function when appropriately medicated and lacking virtually any access to drugs and alcohol would have been important evidence for jurors to consider when deciding the first special issue.

#### b. Mitigation

In terms of mitigation, jurors never heard a clear explanation of how Harper's ability to function during the months leading up to the crime was impacted by his inherited and untreated mental illness, which was in turn made worse by a hereditary problem with substance abuse and a learned tendency to self-medicate. Dr. Dudley could have described to jurors how

> [r]ather than making Mr. Harper "feel better" about a situation wherein he believed the victim to be cheating on him[43] and her children to be complicit in that betrayal, drug use only worsened the delusions and associated distress that were already causing Mr. Harper

---

[43] It was undisputed at trial that Triska Rose was not having an affair. (Ex. 44 at 2 [CCA Direct Appeal Opinion].)

great mental anguish.  That feelings of betrayal, coupled with a fear of abandonment, exacerbated Mr. Harper's psychotic symptoms and symptoms of depression is not surprising.  Given the problems he endured during his early years, these particular underlying issues were ones that Mr. Harper had struggled with since childhood, and they had been affecting his ability to function in a healthy manner throughout his life.

(Ex. 46 at ¶¶80-81 [Aff. of Dr. Dudley].)  Dr. Dudley could have also talked about Harper's capacity for rational, well-reasoned decision-making steadily deteriorated due to the extreme paranoia, delusions, and depression he was experiencing during that time period.  (*Id*. at ¶79.)

### D. Trial Counsel's Ineffectiveness Prejudiced Harper in that Jurors Did not Hear Evidence that Would have Changed their Answers to Special Issues One and Two

Trial counsel obviously recognized the importance of presenting mental health testimony at punishment, as evidenced by the fact that they hired Dr. Dudley.  Because of trial counsel's failure to prepare for Dr. Dudley's testimony, however, incomplete mental health evidence, presented in an unorganized, often incomprehensible, and unpersuasive way, was ultimately discounted by jurors who were swayed by the much more coherent, albeit incorrect, argument of the State that Harper was malingering, which also tended to suggest that Harper would be a future danger.

If trial counsel had been prepared for Dr. Dudley's testimony, they could have elicited testimony that would have allowed jurors to realize Harper's very real mental illness, when treated, prevents him from presenting a future danger and when untreated acted as a mitigating circumstance reducing his personal moral culpability.  Hearing such testimony would have changed jurors' answers to one, if not both, special issue questions and so that jurors did not hear it impermissibly prejudiced Harper.  Because trial counsel's deficient conduct created "a probability sufficient to undermine confidence in" the outcome at trial, Harper's sentence

should be overturned.  *Porter*, 130 S. Ct. at 455-56 (quoting *Strickland*, 466 U.S. at 693-94).

## CLAIM FIVE

### TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO PRESENT LAY WITNESSES AT THE PUNISHMENT PHASE WHO WOULD HAVE CORROBORATED DR. DUDLEY'S OPINION THAT HARPER SUFFERS FROM MENTAL ILLNESS

Dr. Dudley's expert opinion that Harper was suffering from mental illness, specifically schizoaffective disorder, was seriously undermined by the State's contention that Harper was malingering.  Testimony from lay witnesses detailing signs of mental illness exhibited by Harper prior to his arrest would have corroborated Dr. Dudley's opinion and discredited the State's malingering charge.  Trial counsel's failure to present such witnesses constituted ineffective assistance of counsel and Harper's sentence of death was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law.

**A. Trial Counsel Failed to Present Lay Witness Testimony about Signs of Harper's Mental Illness Prior to the Crime, Leaving the State's Assertion that Harper was Malingering Unchallenged**

Trial counsel's lack of preparation prevented Dr. Dudley from presenting jurors with persuasive evidence of Harper's mental illness in an organized, compelling way.  (*See* Claim Four, *ante*.)  This failure made it easier for the State to attack Dr. Dudley's expert opinion and effectively argue that Harper was only pretending to be mentally ill.  Dr. Dudley told counsel prior to trial that "[l]ay witness testimony about [Harper's] behavior prior to and immediately after the murders would [be] invaluable for jurors to hear to counter assertions by the State that [Harper] was malingering."  (Ex. 46 at ¶49 [Aff. of Dr. Dudley].)

91

To bolster his expert opinion, Dr. Dudley tried several times to refer to lay witness accounts of the symptoms of mental illness Harper exhibited prior to the crime. When the State asked Dr. Dudley on cross examination about the sources of information supporting his belief that Harper was experiencing the symptoms he complained of, Dr. Dudley replied that he was relying in part on "[t]hings . . . such as in the information gathered from other people around [Harper]." (21 RR at 127.) On redirect, when trial counsel asked Dr. Dudley to outline what sources of information he considered as part of his forensic evaluation that led him to diagnose Harper with schizoaffective disorder, Dr. Dudley finally had the opportunity to list the various sources of information he relied on. (*Id.* at 146-47.) Dr. Dudley again mentioned that he had relied on "interviews by various people including people that saw [Harper] immediately after the crime" and "summaries of interviews . . . with people who had an opportunity to observe him and describe him in the weeks leading up to the crime as well." (*Id.*)

Given that Dr. Dudley relied on the information provided by these people to reach the conclusion that Harper was, in fact, mentally ill, it stands to reason that testimony from these same individuals would have assisted the jurors in reaching that same conclusion. However, trial counsel did not call any of the people who saw Harper immediately after the crime or witnessed his deterioration prior to, to testify, even though Dr. Dudley had found the information they provided useful in diagnosing Harper's mental illness. Trial counsel's failure to call any of these witnesses fell below an objective standard of reasonableness and thus constitutes deficient performance. *See Strickland*, 466 U.S. at 688.

### 1.  Failure to Present Mental Health Testimony from Jennifer Flores

On January 22, 2010, the defense team got a signed and sworn affidavit from Jennifer Flores ("Flores"). (Ex. 49 [Aff. of Jennifer Flores].) Flores was an instructor at the South Campus of the Trend Barber College in 2008, and she met

Harper in the spring or summer of that year after he transferred from the North Campus.  (*Id.* at ¶¶1-2.)  Harper was a student in Flores's hour-long theory class and she supervised him in his practical (where students cut hair for members of the public).  (*Id.* at ¶2.)  During the practical, there was a lot of down time for her and the students to talk, and Flores got to know Harper fairly well.  (*Id.* at ¶4.)  Harper told Flores that he had been in prison, and talked to her about his wife and children.  (*Id.*)[44]

Harper suddenly stopped attending classes after the first week of October 2008, and Flores did not see or hear from him for several weeks.  (Ex. 49 at ¶5.)  Then, on the morning of October 23 at around 8:45am, Harper came into the office of the barber college, looking uncharacteristically disheveled:

> [Garland] looked terrible, unlike I had ever seen him.  His hair and beard were all overgrown; he looked wild and he had lost weight.  I said, "Boy, where have you been?" and he said that he had been in the hospital.  He said that his wife had wrecked his car and tried to kill him with poison.

(*Id.*)  Flores reacted in disbelief, laughing off this crazy story.  (*Id.*)  When a co-worker of hers arrived, Harper repeated his story that he had been in the hospital because his wife had tried to kill him.  (*Id.*)

When Flores and her co-worker told Harper to "get real," he did not get angry, but kept insisting, calmly, that his wife had poisoned him.  (Ex. 49 at ¶5.)  Harper never deviated from this claim, even though Flores and her co-worker were laughing at him.  (*Id.*)  Flores did believe Harper had been in the hospital, "because he looked so crazy."  (*Id.*)  She also believes that Harper really thought his wife had tried to kill him, because of how serious he was when relating the story.  (*Id.*)

---

[44] Harper referred to Triska Rose and her children as his wife and children, even though he was not married to the victim and her children were not his biological children.  (Ex. 49 at ¶4 [Aff. of Jennifer Flores].)

Flores remembers thinking to herself, "that woman didn't poison you, you've lost your mind, Garland." (*Id.*)   To Flores, Harper's story "didn't make any sense." (*Id.*)

But a belief that does not make any sense is the very definition of a delusion, and Harper was suffering from delusions as a result of his schizoaffective disorder. (Ex. 46 at ¶80 [Aff. of Dr. Richard Dudley].)   Thus Flores's testimony would have been invaluable for jurors to hear, to corroborate Dr. Dudley's diagnosis and refute the State's malingering claim.   Moreover, Flores saw Harper *before* the crime, which would have challenged the State's theory that he started to malinger mental illness to escape punishment *after* a crime had been committed.   That trial counsel had this signed and sworn affidavit in their possession over eight months before trial but then failed to call Flores as a witness is unreasonable, and grossly ineffective.[45]

### 2.   Failure to Present Mental Health Testimony from Jesse Garza

On January 22, 2010, the defense team also got a signed and sworn affidavit from Jesse Garza ("Garza").   (Ex. 50.)   Garza, who worked at Raising Cane's Chicken Fingers, met Harper when Harper was hired to work at the restaurant in September 2008.   (*Id.* at ¶¶1-2.)   Garza was the night shift manager and he and Harper often worked night shifts together.   (*Id.* at ¶2.)

A few weeks after Harper was hired, he told Garza that he thought his wife was cheating on him and asked what Garza thought he should do.   (Ex. 50 at ¶4.)

---

[45] In an email to co-counsel and the mitigation team dated September 1, 2010, trial counsel wrote, "We feel that we can get the ground work for [Harper's] psychological problems through witnesses who were with Garland on the date of the offense and the days proceeding [sic] the offense.   This is why its [sic] so critical that these witnesses be found and subpoenaed to be available to testify." (Ex. 40 [James Stafford Email (9/1/10].)   Clearly, trial counsel understood how important testimony from witnesses like Flores was to their case, so their failure to call such witnesses cannot be considered strategic.

Garza remembers that Harper was tearing up when Harper came to him for advice, and seemed incredibly sad.  (*Id.*)  A week or so later, Harper confided to Garza that he now knew for sure his wife was cheating on him.  (*Id.* at ¶5.)  Harper was not angry, but the expression in his eyes made clear to Garza how hurt he was.  (*Id.*)  Harper said his wife was seeing someone else and that he did not want to leave her or the children but did not know what to do.  (*Id.*)

Around the third week of October, Harper came into work with a doctor's note because he had missed a shift.  (Ex. 50 at ¶6.)  Harper told Garza that he had gone to the doctor and the doctor told him he was being poisoned, and that there was poison in his system.  (*Id.*)  Harper said it was his wife who was poisoning him.  (*Id.*)  Garza was not sure what to think, but Garza did think it seemed strange that Harper's wife would poison him.  (*Id.*)  Harper did not show up for work or even call a few days later, which surprised Garza and his coworkers as uncharacteristic.  (*Id.* at 7.)

Additional testimony from Garza about Harper's delusions and paranoia would have illustrated for jurors just how mentally ill Harper was in the weeks leading up to the crime, supporting Dr. Dudley's testimony and rebutting the State's claim that Harper was feigning mental illness to avoid punishment.  That trial counsel had this signed and sworn affidavit in their possession over eight months before trial but then failed to call Garza as a witness is, again, unreasonable and grossly ineffective, especially given that they seemed to understand how important testimony like his would have been.  (*See* Ex. 40 [James Stafford Email (9/1/10)].)

### 3. Failure to Present Mental Health Testimony from Shevaughna Lockley

On December 17, 2009, the State filed a document entitled, "State's Notice Under *Brady v. Maryland*."  (2 CR at 452.)  In that filing, the State revealed that

95

"[w]itness Shevaughna Lockley stated that she was advised by the complainant, Triska Rose, that [Harper] was 'talking crazy' and mentioned 'pink elephants.'" (*Id.*)

At the punishment phase, trial counsel asked Dr. Dudley:

Q: . . . And then there was a Shavona [sic] Lockley statement--
A: Correct.
Q: -- that had been reported, correct?
A: Correct.
Q: And that statement had to deal with a period of time prior to the incident which makes the basis of the indictment?
A: Correct,
Q: What was it that Shavona [sic] Lockley reported?
A: He [sic] reported some things that --
DA: Judge, I would object, I guess to the form of the question as calling for hearsay.
The Court: Sustained.

(21 RR at 153.)  Trial counsel could have overcome the State's hearsay objection, however, by subpoenaing Lockley and having her testify herself about Harper's mental state (i.e. that he was "talking crazy" and possibly hallucinating).[46]  Trial counsel's attempt to elicit this pertinent information from Dr. Dudley, in disregard for the rules of evidence regarding hearsay, suggests that they knew how beneficial to Harper's case it would be for jurors to hear the information.

Testimony from yet another lay witness with knowledge of Harper's mental deterioration leading up to the crime would have given jurors even more reason to believe that Harper was, indeed, suffering from mental illness as opined by Dr.

---

[46] To the extent Lockley's knowledge was based solely on what the victim told her, her testimony may still have fallen under the hearsay exception for present sense impressions if the victim was describing an event or condition, made while perceiving the event or condition, or immediately thereafter.  The State did not provide sufficient detail in their *Brady* notice, however, for a determination at present time of whether Lockley's statements would have been hearsay, and if so, whether they would have fallen under any exceptions to the hearsay rule.

96

Dudley.  Trial counsel's failure to call Lockley, despite having gotten notice of her relevant knowledge over nine full months before trial, thus falls below any objective standard of reasonableness.

### 4.  Failure to Present Mental Health Testimony from Sandra McClennon

Harper's maternal aunt, Sandra McClennon ("McClennon"),[47] was called to testify on October 14, 2010.  McClennon testified about Harper's parents and childhood, and introduced some photos of Harper and his family.  (22 RR at 147-74.)  Trial counsel also questioned McClennon about Harper after his release from prison in 2008, eliciting information about who Harper was living with and who he was dating.  (*Id.* at 175-81, 184-85.)

McClennon testified that Harper was calling her much less frequently than when he was first released from prison and when they did talk, Harper sounded less hopeful. Trial counsel stopped short, however, of inquiring about Harper's mental health in the months leading up to the crime.  (22 RR at 186-88.)  If trial counsel had enquired further, McClennon could have provided additional information about the content of those calls wherein Harper said "strange things, like that he needed to remind God of something or other."  (Ex. 53 at ¶18 [Aff. of Sandra McClennon].)  Moreover, McClennon could have testified about how she found it odd that Harper was considering sleeping in the pastor's office at his church after his father and stepmother made him move out, rather than moving in with Triska Rose and being "tempted," in Harper's words, to have sexual relations with her.  (*Id.*)

McClennon's testimony about Harper's deteriorating mental state during the time period leading up to the crime would have served to further corroborate Dr. Dudley's diagnosis while further combatting the State's malingering claim.

---

[47] McClennon is incorrectly referred to as Ms. McLinton throughout the Report's Record.

### 5.  Failure to Present Mental Health Testimony from Monique Young

Monique Young ("Young"), who Harper had married in 1992, was never called to testify.[48]   If called, she too could have spoken about signs of mental illness Harper exhibited in the months preceding the crime.

Young and Harper had not spoken for many years after he found out that while he was incarcerated she had become pregnant.  (Ex. 56 at ¶12 [Aff. of Monique Young].)  When Harper was released from prison in 2008, however, he called Young and they started talking again.  (*Id.* at ¶14.)  Young remembers Harper telling her he thought Triska Rose was cheating on him: "[h]e told me some story about her being at a Chinese restaurant across from [where he worked], but it did not make any sense."  (*Id.* at ¶18.)  Similarly, Young was confused by a story about what Harper saw as further proof that the victim was cheating on him:

> He also told me how he usually came home for lunch and when he left there were no dishes in the sink, but when he came home there were some dishes in the sink.  He thought she had been there with some company.  But there were four people who lived in that house – of course there were dishes in the sink.  It seemed paranoid.

(*Id.* at ¶19.)  Finally, like McClennon, Young was troubled by some of Harper's religious talk.  (*Id.* at ¶20.)  To Young, it seemed that Harper thought Triska Rose cheating on him was God's punishment, which Young thought was "the oddest thing," and indicative of the fact that "[Harper's] mentality was not good."  (*Id.*)  Testimony from Young would have helped jurors understand how mentally ill Harper was in the months and weeks leading up to the crime, and trial counsel was ineffective for not having presented it.

### 6.  Failure to Present Mental Health Testimony from Jeff Harrison

---

[48]  Trial counsel knew about Young, as evidenced by a question posed to McClennon at punishment: "Now, in talking about this whole -- I want to hear about his relationships a little bit more with the different women.  Monique Young was his wife; is that correct?"  (22 RR at 192.)

Trial counsel was also put on notice by the State's December 2009 filing that:

> [w]itness Jeff Harrison[49] stated that on the date of the offense, [Harper] came to his home and made statements to [sic] there were bars on [Harrison's] apartment windows, [Harrison's] dog was a drug dog, [Harrison's] telephone was connected to the police, and that [Harrison] had a camera on his air conditioning vent.

(2 CR at 452.)   Neither the State nor the defense called Harrison to testify at punishment.

Trial counsel did refer to Harrison during Dr. Dudley's testimony, however:

> Q: . . . And what was it that you found in Mr. Harrington's [sic] statements that concerned you?
> A: Well, I mean, the -- part of it was the way [Harper] presented.  Part of it was things that he thought were going on, cameras, things like that; part of it was who he thought -- who he -- he was thinking that he was an informant against him.
> Q: Thinking that Mr. Harrington [sic] was?
> A: Yes, was an informant against him, things like that.

(21 RR at 152-53.)   Rather than having Dr. Dudley try to summarize, rather incoherently, what Harrison said about his encounter with Harper, trial counsel should have subpoenaed Harrison to testify himself about that encounter.  That way, jurors would have heard first-hand the information that Dr. Dudley relied upon in part to reach his belief that Harper was suffering from mental illness at the time of the crime.

Had Harrison testified, jurors would have heard that Harper went over to Harrison's home the day after the crime.  (Ex. 57 at 3.)  Harper said a lot of "weird stuff" to Harrison that day, including that he thought Harrison's dog was a drug dog and that there were security bars on Harrison's windows (which there were not).  (*Id.*)  Harrison remembers that Harper kept insisting that an air freshener

---

[49] Harrison was Harper's neighbor in October 2008 and saw him the day after the crime.  (Ex. 57 at 3.)

hanging from Harrison's air conditioner vent was a camera, and that in frustration Harrison finally took the air freshener down and threw it at Harper.  (*Id.*)

All of this information about strange behavior would have been important for jurors to hear in deciding whether Harper was mentally ill at the time of the crime, especially considering that it occurred prior to Harper's arrest and thus before he had any motivation to malinger, as alleged by the State.  Trial counsel had been on notice for almost ten months by the time Harper's punishment phase started that Harrison could have testified about the symptoms of mental illness he observed, such as Harper's various delusions detailed above, and counsel's failure to subpoena him as a witness is inexcusable.  (2 CR at 452.)

### 7.  Failure to Present Mental Health Testimony from Helen Vanwright

Trial counsel was aware from the offense report that a woman named Helen Sanroman Vanwright ("Vanwright")[50] also saw Harper immediately after the crime. (21 RR at 152.)  At punishment, trial counsel and Dr. Dudley had the following exchange in reference to Vanwright:

> Q: And, also, there was a woman by the name of Helen San Roman [sic] who saw him immediately after the incident, right?
> A: Yes.
> Q: And there were observations that she made?
> A: Correct.
> Q: And you used that in reaching some of your conclusions?
> A: Yes.

(*Id.*)  This exchange, rather than serving to inform the jury in any meaningful way, merely begged the question what those observations were.  But because trial counsel did not subpoena Vanwright to testify, that question went unanswered and the following important evidence went unheard.

Vanwright first met Harper at a barbeque in September 2008, and thought he always seemed depressed.  (Ex. 58 at 3.)  Harper would talk to her about his girlfriend, who he said was cheating on him, and he and Vanwright would smoke crack together.  (*Id.*)  Vanwright also thought Harper was paranoid, because he believed that people were setting him up, and that everyone was out to get him. (*Id.*)  When Harper went over to Vanwright's home the day after the crime, he appeared even more paranoid than usual, and kept looking out her window and accusing her of having set him up.  (*Id.*)

Vanwright's testimony would have corroborated Dr. Dudley's opinion that the affect disorder Harper suffered from as part of his schizoaffective disorder was depression.  Her testimony would also have illustrated precisely the vicious cycle of self-medicating that Dr. Dudley could have testified to, wherein an individual

---

[50] Vanwright was also neighbors with Harper in October 2008.  (Ex. 58 at 3.)

suffering from a mental illness attempts to alleviate the symptoms of that illness with drugs, which in turn worsen the mental illness symptoms.  (*See* Claim Four, *ante*.)

### B. Trial Counsel's Ineffectiveness Prejudiced Harper in that Jurors did not Hear Evidence that would have Corroborated Dr. Dudley's Opinion and thus Given the Jurors a Reason to Sentence Harper to a Life Term

There is a reasonable probability that the result of Harper's trial would have been different had trial counsel called these crucial witnesses to testify. *Strickland*, 466 U.S. at 694 (defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"); *Ex parte Ellis*, 233 S.W.3d 324, 329-30 (Tex. Crim. App. 2007); *Ex parte Chandler*, 182 S.W.3d 350, 353 (Tex. Crim. App. 2005).  Flores would have testified about how crazed Harper appeared the day before the crime, and how delusional she thought he was to believe Triska Rose was trying to kill him; Garza, too, could have testified to Harper's firmly-held delusion that Triska Rose was being unfaithful Harper.  Harper's aunt and wife would have testified about the strange things Harper articulated in the months and weeks leading up to the crime, like that Triska Rose was meeting her lover at a Chinese food restaurant that happened to be directly across the street from where Harper worked.  Finally, testimony from witnesses who interacted with Harper immediately after the crime would have put jurors on notice of his worsening depression immediately preceding the crime, and extreme paranoia and disturbed thought process (i.e., thinking that an air freshener was actually a camera) immediately afterwards.

Testimony from these witnesses would have corroborated Dr. Dudley's expert opinion that Harper was mentally ill at the time of the crime, and that illness could have been considered sufficiently mitigating—or treatable and therefore not dangerous—by one juror, resulting in a life verdict. *See Wiggins*, 539 U.S. at 535.

Instead, not having heard any such corroboration, jurors were persuaded by the State's argument that Harper was pretending to be ill to escape punishment, and his mental illness thus became an aggravating, rather than a mitigating, factor in their eyes.

## CLAIM SIX

## TRIAL COUNSEL WAS INFFECTIVE FOR FAILING TO PRESENT WITNESSES WHOSE TESTIMONY WOULD HAVE NEGATED THE STATE'S CLAIM THAT HARPER WAS A FUTURE DANGER

All evidence tending to negate future dangerousness must be presented for jurors to consider during sentencing deliberations. Harper's trial counsel failed to call any of the prison personnel who would have testified as to their highly positive interactions with Harper during his prior incarcerations, and so counsel's performance must be considered deficient. Defense counsel's failure to call these witnesses fell below the generally recognized standard of care and thus violated Harper's rights pursuant to applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law.

### A. Counsel Performed Deficiently by Not Presenting Available Evidence Tending to Disprove Harper's Future Dangerousness

In Harper's case, a sentence of death depended on the jury's answers to two specific questions. The first of these questions asked the jury whether "there is a probability that the defendant, Garland Bernell Harper, would commit criminal acts of violence that would constitute a continuing threat to society" (*see* 24 RR at 59); Tex. Code Crim. Proc. Art. 37.071(b)(1). In upholding Texas' death penalty statute, the Supreme Court reviewed this special issue and noted the central role a prediction of future behavior plays in criminal justice. *Jurek v. Texas*, 428 U.S. 262, 274-75 (1976). The Court stated that "prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal

justice system." *Id.*; *ABA Guidelines*, Guideline 10.11 cmt. ("Studies show that "future dangerousness is on the minds of most capital jurors, and is thus 'at issue' in virtually all capital trials," whether or not it is argued by the prosecution or is a statutorily mandated sentencing consideration.") (internal citation omitted).

At punishment, defense counsel called Susan Perryman-Evans ("Perryman-Evans"), who retired from being a senior TDCJ warden in 2003 and was acting as a defense expert at the time of Harper's trial.  (20 RR at 242-44.)  Based on her review of Harper's prison records, Perryman-Evans testified that in her opinion Harper was neither an escape risk nor likely to "create any violence within the prison."  (*Id.* at 244-45, 252, 258.)  Perryman-Evans, however, never had any interaction with Harper as a TDCJ employee, and therefore was unable to speak from personal experience or present any humanizing anecdotes regarding Harper's exemplary prior conduct.  (*Id.* at 243-44.)

Trial counsel was aware that Harper had previously served as both a boot black and an officers' barber, as demonstrated by his questioning of the State's future dangerousness expert about the significance of holding such positions:

> Q: [A] boot black is what, in case the jury doesn't know?
> A: Shines boots.  A shoe shiner.
> Q: For the guards?
> A: Yes, sir.
> Q: That's a fairly high position of trust, is it not?
> A: As far as prison jobs goes [sic], yes, sir.
> Q: Yeah.  And being a barber, cutting the warden and correctional officers' hair and giving them shaves is also a very high trust?
> A: Yes, sir.

(20 RR at 214.)  Despite being on notice that Harper had repeated contact with high-level TDCJ employees, including wardens, in these positions of trust, trial counsel did not investigate and subpoena even one TDCJ employee with whom Harper had interacted to testify.  (Exs. 59, 60.)

### 1.  J. P. Guyton

J.P. Guyton has been a TDCJ employee for twenty-five years and is currently an assistant warden.  (Ex. 59 at ¶2.)  Harper cut Guyton's hair every month for roughly two years.  (*Id.* at ¶ 3.)  Guyton first met Harper when Harper was incarcerated at the Darrington Unit in Rosharon—Guyton worked at the regional office next door but would go over to the prison to get his haircut by Harper.  (*Id.* at ¶4.)  After Harper got transferred to the Carol Vance Unit in Richmond, Guyton would make the hour-long drive up to Richmond to get haircuts from Harper.  (*Id.* at ¶5.)

> Guyton would have testified that:

> To be an officers' barber, Harper had to have had pretty good behavior.  He used clippers as a barber, so only inmates with good behavior and no violent incidents are allowed to work in the barbershop.  Harper was very well behaved as far as I know.  Some of the officers brought their kids to get haircuts from Harper.

(Ex. 59 at ¶6.)  Other officers also brought their children to get haircut from Harper.  (*Id.* at ¶ 7.)  Guyton would have told jurors that Harper was always fine when he was around, and how shocked he was when he read what had happened in the Houston newspaper.  (*Id.* at ¶ 8.)

### 2.  Failure to Hire Appropriate Expert-Dr. Victor Scarano

Trial counsel failed to hire an expert like Dr. Victor Scarano to appropriately assess Mr. Harper.  Doctor Scarano reviewed more than four thousands documents and records including medical and physiological history of Mr. Harper, affidavits of individuals who were with Mr. Harper when he was incarcerated, familial medical and sociological history, TDCJ records, and parole records including parole officer filed notes. That exhaustive review and assessment has led Doctor Scarano to conclude that at the time of the murder for which Mr. Harper was indicted for Mr. Harper suffered from ". . . a substance induced psychotic disorder

with delusions, the psychotic mental distortion is due to the drug." *See* Exhibit 61, Dr. Scarano Forensic Psychiatric Examination/Evaluation pg. 24.   "Once the voluntary ingestion/administration of the drug is stopped, the psychotic mental distortion gradually dissipates . . . " *Id.* Doctor Scarano's review of TDCJ records demonstrate that Mr. Harper acclimated well to the culture of TDCJ and had little to no discipline issues and more importantly Mr. Harper exhibited no violent behavior. *Id.*   For example, Doctor Scarano's review of the records illustrated that " . . . that during incarcerations, as noted in 1995, 1997, and 2005, Mr. Harper was assigned as an inmate barber." *Id.* J.P. Guyton who had worked for the TDCJ for 25 years indicated "Mr. Harper not only cut his hair, but also cut the hair of other officers who also brought their children to get haircuts from Mr. Harper. Mr. Guyton reported that to be an officers' barber, Mr. Harper had to have exhibited good behavior, i.e., only inmates with a clean prison record of good behavior and no instances of violent behavior were allowed to work in the barbershop. " *Id.*   It is therefore Doctor Scarano's conclusion that to a reasonable degree of medical certainty Mr. Harper's psychiatric diagnosis on or about 10/24/2008 was Substance Induced Psychotic Disorder with delusions and further it is Doctor Scarano's opinion to a reasonable degree of medical certainty that, as long as, Mr. Harper would remain in prison and away from drugs, the probability of future dangerousness would be negligible.   Such evidence would have been the most valuable asset a reasonable juror possessed to be able to answer "no" to the question of the probability of future dangerousness.

### 3.  Witness One[51]

---

[51]  Witness One was a long-time TDCJ employee.   Witness One is not being identified at this time out of respect for his preference not to be involved with Harper's case by signing an affidavit.   However, Harper will call Witness One at a hearing on this Application.

Witness One was a TDCJ warden for twenty-two years when he retired in 2006. (Ex. 60 at ¶¶3, 7.) He remembered Harper as an inmate at one of the prisons where he was a warden, because Harper was a barber there. (*Id.* at ¶ 7.) Witness One would have testified that correctional officers brought their family members to get haircuts from Harper. (*Id.*) Witness One used to take his own son to the prison barbershop, and thinks Harper must have cut his son's hair because "there were not too many inmates working as barbers at any given time." (*Id.*)

Witness One could have commented on how to be a barber, an inmate could not be a security threat. (Ex. 60 at ¶7.) He could have explained to jurors that if there were any concerns about Harper being dangerous, Harper would not have been allowed to be a barber. (*Id.*) Witness One would have told jurors that he does not remember Harper being any kind of trouble. (*Id.*)

## B. Harper was Harmed by Trial Counsel's Deficient Performance

If jurors had heard testimony from these two witnesses, or other wardens or correctional officers who had contact with Harper while he was previously incarcerated, they would have been able to consider whether the evidence these witnesses could have presented disproved Harper's future dangerousness. As opposed to Perryman-Evans, both Guyton and Witness One had regular, personal contact with Harper. Both witnesses could have provided jurors with a sense of what Harper was like as a person, and described experiences (like bringing their own child to get a haircut from him, or driving an hour one way to continue having him as their barber) that would have humanized Harper. Moreover, testimony about such experiences would have allowed jurors to hear that two long-time TDCJ employees, with years of experience interacting with inmates, did not view Harper as any sort of danger or threat. In fact, both were perfectly comfortable in close physical proximity to Harper while he handled tools like clippers in order to cut their hair.

Trial counsel's failure to present such testimony constituted deficient performance that was not reasonable under prevailing professional norms. *Williams*, 529 U.S. at 395-96 (counsel ineffective for failing to uncover and present evidence of, inter alia, defendant's good conduct in prison); *ABA Guidelines*, Guideline 10.11 cmt. (citing *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) as holding that "evidence of defendant's positive adaptation to prison is relevant and admissible mitigating evidence even though it does 'not relate specifically to petitioner's culpability for the crime he committed.'").  Had even just one juror found any of the information that should have been presented through these witnesses to negate the State's theory that Harper would present a continuing threat to society, Harper would not have been sentenced to death.  *Wiggins*, 539 U.S. at 536.

## CLAIM SEVEN

## TRIAL COUNSEL WAS INFFECTIVE FOR FAILING TO EXCLUDE DR. MOELLER'S TESTIMONY UNDER *DAUBERT*, *KUMHO TIRE* AND *KELLY* THAT HARPER WAS A FUTURE DANGER

Petitioner was charged with capital murder involving a triple homicide.  (1 CR 2).  Soon after the authorities arrived at the scene of the investigation the petitioner arrived and self-surrendered.  (12 RR 15) He was taken into custody and provided an opportunity give a voluntary statement which he did (12 RR 25). Therefore from the outset guilt of the Petitioner regarding the charged crime was in little doubt.  The main thrust of the Defense at trial was always to convince the jury to sentence the Petitioner to life without the possibility of parole. To achieve this outcome the Defense hired a psychiatrist to evaluate the Petitioner (21 RR 7).  The state hired Doctor Mark Moeller to evaluate the Petitioner and assist in obtaining the death penalty.

The Petitioner was found guilty of capital murder on October 7, 2010, the

State began to presents its punishment evidence on October 8, 2010 and rested on punishment on October 12, 2010. (20 RR 241). The Petitioner began its punishment evidence on October 12, 2010, his second witness, Dr. Richard Dudley, began his testimony on October 13, 2010. On October 14, 2010 the Petitioner rested his punishment phase, and the State indicated it intended to call Dr. Richard Moeller as a rebuttal witness. (22 RR 245-46). The Petitioner objected arguing that Doctor Moeller had not been excused from the rule and yet Dr. Moeller had been in the courtroom while witnesses were testifying in violation of the trial Court's order. (22 RR 246). Petitioner also informed the trial court that they had never been informed by the State that the State intended to call Dr. Moeller to testify. (22 RR 246). The trial court overruled the Petitioner's objection and allowed Doctor Moeller to testify. (23 RR 26).

Prior to Doctor Moller's testimony, while objecting counsel for the Petitioner informed the Court that it was his belief that the State was calling Doctor Moeller to directly contradict his own written report and testify that in fact Mr. Harper was a future Danger. (23 RR 27).

Doctor Moeller was allowed to testify by the trial court and contradicted Dr. Dudley's conclusion that Mr. Harper would not be a "future danger" if incarcerated for life for the first time in court, even though Doctor Moeller's own report indicated that the Doctor Moeller had previously determined that the petitioner was not a future danger. (23 RR 123). When asked why he had suddenly changed his mind Doctor Moller testified that the *only* rationale for the change in his opinion was that the prosecution informed him that the Petitioner will be housed in general population.  (23 RR 124). Doctor Moeller further contradicted his own report by testifying that the Petitioner was malingering. (23 RR 36). Finally, Doctor Moeller directly contradicted Dr. Dudley, the Petitioner's expert, testimony by opining that the Petitioner's paranoid schizophrenia had nothing to do with the offense and that

the Petitioner's auditory hallucinations and delusions would not have caused the Petitioner to kill Ms. Rose and her children. (23 RR 43, 88, 89, 96).

LEGAL ARGUMENT AND AUTHORITY

In order to sentence a defendant to death in Texas the jury must answer two questions.  *See* Tex. Crim. Proc. Code § 37.071(b)(1)&(2). The First question the jury must answer is whether there is a probability, beyond a reasonable doubt, that the person on trial would commit a future criminal act of violence which would constitute a continuing threat to society.  *Id.*  This question is commonly referred to as the future dangerousness of the defendant.  Many times the State seeks to show future dangerousness thorough the introduction of expert psychiatric testimony. Such "expert testimony" has been the center of much litigation, the Texas Court of Criminal Appeals, citing United States Supreme Court precedent, has ruled that trial judges must act as a true "gatekeeper" when addressing the reliability and relevance of expert testimony.  *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 589-92, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); *see also Kumho Tire v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (gatekeeping role assigned to trial judges under *Daubert* applies the same reliability standard to all scientific, technical, or other specialized matters within the scope of Rule 702 of the Texas rules of evidence).  In *Daubert*, the United States Supreme Court held that when the subject of the expert's testimony is "scientific knowledge," the basis of his testimony must be grounded in the accepted methods and procedures of science. As that court explained:

> [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation--*i.e.*, "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

110

*Id* at 590.   In *Kelly v. State*, the Texas Court of Criminal Appeals adopted several procedural and substantive limitations upon the admission of expert scientific testimony to ensure that unreliable expertise would be excluded from the jury's consideration. 824 S.W.2d 568 (Tex. Crim. App. 1992). Under *Kelly*, a trial judge must, upon request, conduct a "gatekeeping" hearing outside the presence of the jury to determine whether scientific evidence is sufficiently reliable and relevant to help the jury in reaching an accurate result. *Id*. at 573.   The trial judge must then decide whether, on balance, that expert testimony might nonetheless be unhelpful or distracting for other reasons. *Kelly*, 824 S.W.2d at 572.   To be considered reliable, evidence from a scientific theory must satisfy three criteria: "(a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question." *Id*. at 573.   The trial court's essential gatekeeping role is to ensure that evidence that is unreliable because it lacks a basis in sound scientific methodology is not admitted. *Hartman v. State*, 946 S.W.2d 60, 63 (Tex. Crim. App. 1997).   Forensic psychiatry is considered a "soft" science, however soft science does not allow for soft standards.   *Coble v. State*, 330 S.W.3d 253, 274 (Tex. Crim. App. 2010).   When "soft" sciences are at issue, the trial court must inquire "(1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field." *Id.*

This inquiry is somewhat more flexible than the *Kelly* factors applicable to Newtonian and medical science. *Id***.**   "The general principles announced in *Kelly* (and *Daubert*) apply, but the specific factors outlined in those cases may or may not apply depending upon the context." *Id.*   Under either *Daubert/Kelly* or *Nenno*, reliability should be evaluated by reference to the standards applicable to the

particular professional field in question. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (*Daubert* requires the trial court to assure itself that the experience-based expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

While the United States Supreme Court and the Texas Court of Criminal Appeals have both discussed the fallibility of psychiatric assessments of future dangerousness, and it's extremely poor accuracy, they have nevertheless acknowledged the necessity of certain psychiatric testimony to assist in judicial decision-making.[52] When the State seeks to introduce such evidence it bears the burden to establish its admissibility in each individual case.[53] The Texas Court of Criminal Appeals made clear that science is constantly evolving and, therefore, the "gatekeeping" standards of the trial court must keep up with the most current understanding of any scientific endeavor, including the field of forensic psychiatry and its professional methodology of assessing long-term future dangerousness. *Coble*, 330 S.W.3d 276. The objective of the "gatekeeping" requirement is to make

---

[52] In a concurring opinion judge Garza wrote "the scientific community virtually unanimously agrees that psychiatric testimony on future dangerousness is, to put it bluntly, unreliable and unscientific. It is as true today as it was in 1983 that [n]either the Court nor the State of Texas has cited a single reputable scientific source contradicting the unanimous conclusion of professionals in this field that psychiatric predictions of long-term future violence are wrong more often than they are right. As those in the field have often noted, nothing within the training of a psychiatrist makes him or her particularly able to predict whether a particular individual will be a continuing threat to society. In fact, not even the *Barefoot* majority could identify a "scientific" basis for predictions of future dangerousness; its opinion expressly rests on the analysis that "even a lay person" could make such predictions." *Flores v. Johnson*, 210 F.3d 456, 463-64 (5th Cir. 2000) (internal citations omitted).

[53] See *Hernandez v. State*, 116 S.W.3d 26, 30-31 (Tex. Crim. App. 2003) ("The State had the burden of proof at trial . . . to show, by clear and convincing evidence, that the ADx analyzer is a reliable method of determining the presence of marijuana in a person's body. It failed to offer *any* testimony, *any* scientific material, or *any* published judicial opinions from which the trial court might take judicial notice of its scientific reliability.") (footnote omitted); *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992) ("before novel scientific evidence may be admitted under Rule 702, the proponent must persuade the trial court, by clear and convincing evidence, that the evidence is reliable and therefore relevant"); *see also Daubert*, 509 U.S. at 592-93 ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.") (footnotes omitted).

certain that an expert employs the same professional standards of intellectual rigor in the courtroom as is expected in the practice of the relevant field. *Id.* The validity of the expert's conclusions depends upon the soundness of the methodology. *Id at* 277. Therefore "Under the regime of *Daubert* / [*Kelly*] a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Id (citing Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316 (7th Cir. 1996))

In *Coble* the State sought to introduce the testimony of doctor Dr. Coons who stated that he relies upon a specific set of factors: history of violence, attitude toward violence, the crime itself, personality and general behavior, conscience, and where the person will be (i.e., the free community, prison, or death row) to determine future dangerousness. *Id at* 278.

The Court ruled that doctor Coon's so called scientific analysis did not meet the *Kelly* standard. *Id.* The Court found that the " . . .factors sound like common-sense ones that the jury would consider on its own. . ." *Id.* The Court ultimately ruled that such analysis did not meet the scientific reliability standard and therefore the admission of Doctor Coon's testimony was error. *Id.* The essence of the Court's concern was the manner in which Doctor Coon had reached the decision that the accused was in fact a future danger, that analysis, the court ruled, was unscientific and not subject to peer review or testing, it was as simply a an opinion based on an analysis which could be undertaken by any ordinary person. *See generally Coble* 330 S.W.3d 276.

Application of Law to Relevant Facts

The case at bar involved the testimony of Doctor Moeller who meet with Petitioner, conducted a psychiatric evaluation, and created an expert report. (23 RR 57). In that report Doctor Moeller stated that " . . . [the Petitioner] should he

113

be sentenced to prison for  life without a possibility of parole, he is likely to adapt to prison life and it is unlikely that he will be dangerous. ." *Id.* Doctor Moeller was then called as a surprise rebuttal witness after being allowed to violate the court order barring testifying witnesses in the courtroom.  (22 RR 246).  At trial Doctor Moeller testified that the petitioner was in fact a future danger.   This sudden change of opinion was based on one conversation he had with the assistant district attorneys who had hired him and were seeking to obtain the death penalty (23 RR 127).  He had received no other new information or documentary material. *Id*.  The sum total of the "scientific" analysis conducted by Doctor Moeller in determining future dangerousness was that one conversation, and the only part of the conversation, which doctor Moeller testified caused him to come to that such a "scientific" conclusion was the prosecutor's statement to him that Petitioner will not be housed in a certain manner while in jail.  *Id.*  Such analysis is far short of the rigorous testing and analytical processes envisioned by the Texas Court of Criminal Appeals and Supreme Court. *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 589-92, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); *see also Kumho Tire v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999); *Kelly v. State* 824 S.W.2d 568 (Tex. Crim. App. 1992).  The admission of the evidence by the trial court was error as outlined and explained in *Coble*.  *See generally, Coble* 330 S.W.3d 276.   The trial court's error allowed the admission of uninformed –pseudoscientific opinion cloaked as expert testimony.

If this ground for relief is found to not have been presented on direct appeal or in state post-conviction proceedings, the failure to present it either was due to the ineffectiveness of direct appeal counsel, or initial state post-conviction counsel. Accordingly, any procedural default of the substantial claim of ineffective assistance of trial counsel is excused by prior direct appeal or state habeas counsels' ineffective failure to present it, and constitutes cause for the procedural

default. *See Martinez v. Ryan*, 132 S.Ct. 1309 (2012); *Trevino v. Thaler*, 133 S.Ct. 1911, 1918 (2013).

**CLAIM EIGHT**

**TRIAL COUNSEL WAS INEFFECTIVE FOR NOT HAVING A SOCIAL HISTORIAN TESTIFY AT THE PUNISHMENT PHASE OF HARPER'S TRIAL**

Because trial counsel did not have a social historian testify at the punishment phase of Harper's trial, his sentence of death was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law.

**A. Given the Importance of Telling Harper's Story via a Well-Qualified Social Historian, Not Hiring Such an Expert Constitutes Deficient Performance**

Since *Wiggins v. Smith*, defense attorneys in capital cases have been on notice as to the necessity of performing a wide-ranging investigation into their client's life history. *Wiggins*, 539 U.S. at 535. Defense attorneys now retain social historians to present this type of mitigating evidence in a single, comprehensive package to jurors, through testimony at the punishment phase, and trial counsel's unreasonable failure to hire such an expert in Harper's case constitutes deficient performance. *See Strickland*, 466 U.S. at 688; *ABA Guidelines*, Guideline 10.11 (retaining a social historian can facilitate compliance with the requirement in the ABA Guidelines of presenting "insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability . . . .")

Social historians review records and meet with witnesses, gathering and weaving the bare facts of a life into a compelling narrative through their particularized expertise that is relevant to the individual client. *See ABA Guidelines*, Guideline 10.11 cmt. (noting the importance of presenting "the client's complete social history" at punishment). Dr. Scott Bowman, or someone with a

similar background in criminal justice studies, would have been ideally suited to act as the social historian in Harper's case given Harper's familial history of involvement with the criminal justice system, repeated incarcerations, ultimate institutionalization, and failed attempts to negotiate reentry.

## B. A Social Historian Would Have Presented a Comprehensive Account of Harper's Life History

After having interviewed Harper, reviewed records, and read affidavits from multiple individuals who knew Harper as both a child and in adulthood, Dr. Bowman, or a similarly qualified expert, would have been able to testify about the most important aspects of Harper's life and how those experiences shaped him and ultimately contributed to the behavior for which he stood trial.

### 1. Theoretical Framework

Starting from an early age, the expectation of stability in a critically unstable environment was an immeasurable challenge for Garland Harper.[54]   Never was there a point where Garland's family, personal, and structural life were such that he could effectively produce balance.  Although Garland's socio-structure does not specifically equate to his actions, the personal and psychological challenges Garland faced were unmistakably exacerbated by his social setting.

Within the field of criminology, two closely-related theories substantiate and provide an academic foundation for understanding this interplay: Social Disorganization Theory and Collective Efficacy Theory.  (Ex. 45 at ¶17 [Aff. of Dr. Scott Bowman].)

The primary contention of Social Disorganization Theory is that disorganized neighborhoods (or "transition zones") themselves, as opposed to their individual residents had those residents existed in a vacuum, produce increased

---

[54] Harper will be referred to as "Garland" for this section of the Application, and family members will be referred to by their given names for ease of identification.

rates of criminal behavior. Several social and economic factors have been found to be directly associated with such crime-producing neighborhoods, including physical dilapidation of neighborhood structures; high mobility of residents; poverty; drug addiction; mental illness; and unemployment. The neighborhood in which Garland was primarily raised and its environs are consistent with a transition zone, both in their physical characteristics and in the relevant social and economic designations. (Ex. 45 at ¶¶18-20 [Aff. of Dr. Bowman].)

An additional theory associated with Social Disorganization Theory is Collective Efficacy Theory. Collective efficacy is defined as "social cohesion among neighbors, combined with their willingness to intervene on behalf of the common good." (Ex. 45 at ¶21 [Aff. of Dr. Bowman], internal citation omitted.) The Collective Efficacy Theory suggests that lack of communal supervision, positive community involvement, and law-abiding, communal relationships and social networks are directly correlated to an increase in community-driven criminal behavior(s). As a result, neighborhoods without a substantial measure of collective efficacy are characterized by residents who hold ambiguous views on crime and delinquency; low-levels of community participation towards minimizing crime and delinquency; and little control over structural (e.g. abandoned homes and businesses, drug and gang activities) and criminological factors within the neighborhood. The lack of collective efficacy in Garland's surroundings during childhood and adolescence significantly impacted his development. (*Id.* at ¶¶21-23.)

While there are numerous examples throughout Garland's upbringing pointing to the direct effects of both social disorganization and a lack of collective efficacy, three instances in particular clearly demonstrate these theories in action and how being raised within his particular context affected Garland. (Ex. 45 at ¶24 [Aff. of Dr. Bowman].)

The first example deals with the rampant drug and alcohol use by various members of Garland's family throughout his childhood and adult years.  Garland's paternal step-grandfather, father, maternal grandmother, and mother were known to use alcohol and use and sell drugs regularly.  Furthermore, Garland reports being introduced to prescription narcotics by his mother at an early age, using drugs by the time he was a young teenager, and learning how to sell drugs from his father.  Garland also may have frequently smoked crack with his mother.  Within an "organized" neighborhood with a measure of collective efficacy, such activities would not have been considered normal.  In organized neighborhoods, there would have been numerous opportunities for social intervention and/or a communal norm that would have limited—or eliminated—this type of delinquent behavior entirely. (Ex. 45 at ¶¶25-26 [Aff. of Dr. Bowman].)

The second example is demonstrated by Garland's experiences working in a mechanic's shop in his teens.   Consistent with a positive measure of social organization and collective efficacy, Garland took a job in the shop in the hopes of saving up to purchase a vehicle.  While he enjoyed a sense of legitimacy in having a regular job and "having a uniform with [his] name on it," he also stated that many of the criminal and delinquent behaviors he was attempting to avoid were equally rampant within the shop, where drugs were regularly bought and sold.  In a socially organized neighborhood with a measure of collective efficacy, a legitimate business would not simultaneously engage in criminal and delinquent behavior, and a knowing community would not allow such behavior to continue.  (Ex. 45 at ¶¶27-28 [Aff. of Dr. Bowman].)

Finally, around the time that Garland dropped out of school, an acquaintance from his neighborhood told him, "You already learned everything you needed in high school" and subsequently recruited him to sell drugs.  In a more organized neighborhood with a higher level of collective efficacy, Garland would have been

118

encouraged by either his family, his community, or his teachers to finish high school.  (Ex. 45 at ¶29 [Aff. of Dr. Bowman].)

Because Garland's world growing up was both socially disorganized and lacking in collective efficacy, he was instilled with a deep desire to find and/or create stability in his own life.  That Garland had no models of stability to emulate, however, meant that his quest was mostly unsuccessful.  "Whether turning to surrogate parental figures like his Aunt Sandra or grandmother, attempting to quiet the symptoms of his mental illness with drugs, or thriving in prison, Garland's behavior was almost always motivated, at a basic level, by his search for stability."  (Ex. 45 at ¶30 [Aff. of Dr. Bowman].)

### 2.  Life Narrative

Garland's parents, Stephanie Lucille Williams ("Stephanie) and Bernell Paul Harper ("Paul"), began dating when Stephanie was seventeen.  After Stephanie's mother found out about their relationship she went to Paul's probation officer, who threatened Paul with statutory rape charges if he did not marry Stephanie.  (Ex. 51 at ¶¶9-10 [Aff. of Paul Harper].)   Stephanie and Paul were married shortly thereafter and ten months later, on December 11, 1969, Garland Bernell Harper was born.  (Ex. 29 [Stephanie and Paul Harper Marriage License]; Ex. 27 [Garland Harper Birth Certificate].)  At the time of Garland's birth, Paul was incarcerated.  (Ex. 51 at ¶16 [Aff. of Paul Harper].)

### a.  Maternal Family History

Stephanie was born to Rose Washington ("Rose) and Jesse Williams ("Jesse") on November 10, 1950, in Houston, Texas.  (Ex. 28 [Stephanie Harper Birth Certificate].)  Stephanie was the youngest daughter of her parents and she and her older sister, Sandra, were born about fifteen months apart.  Rose and Jessie each had a daughter from previous relationships, but those girls were not raised with Stephanie and Sandra.  (Ex. 53 at ¶2 [Aff. of Sandra McClennon].)

119

Jesse held several jobs over the course of Stephanie's childhood, but he was a carpenter by trade, and Rose worked in the food service industry. Rose and Jesse separated when Stephanie was about thirteen. Jesse, an alleged womanizer, was kicked out of the family home by Rose, but he moved into a house across the street and continued to support the family financially. (Ex. 53 at ¶¶3-4 [Aff. of Sandra McClennon].)

Stephanie had serious health problems from an early age, including anemia that required blood transfusions. Stephanie also suffered from horrible migraines her entire life: as a little girl, Stephanie had migraines about once a week, and would lock herself up in her room and lie in the dark until they went away. Stephanie struggled academically, too, and was held back a grade, eventually dropping out of school in high school. (Ex. 53 at ¶¶5-6 [Aff. of Sandra McClennon].)

### b. Paternal Family History

Paul was born to Herman Harper and Martha Viola Harper on December 18, 1946 in Alexandria, Louisiana. For most of her adult life, Paul's mother worked hard as a seamstress to help support her family. Paul never knew his biological father. (Ex. 51 at ¶¶2-4 [Aff. of Paul Harper].)

Paul was raised by his stepfather, Odell Wright ("Odell"). Odell ran a bar called The Eight Ball Lounge, which Paul frequented after school. Paul spent much of his childhood at this bar, and Odell would take Paul with him to after-hours clubs after the bar closed. Odell was involved in several other legitimate businesses, including a restaurant and a shoe shine parlor, but he also bought and sold stolen merchandise, dealt drugs, and gambled, in addition to being a heroin addict. Odell never told Paul not to do something, or that anything was wrong; instead, he warned Paul to be careful and not get caught. (Ex. 51 at ¶¶5-7 [Aff. of Paul Harper].)

120

### c. Harper Family Life

Stephanie and Paul's marriage was short, traumatic, and marked by Paul's near-constant absence.   Stephanie had become addicted to pain killers and prescription medication by her early twenties.  Even when pregnant with Garland, she was consuming large amounts of powdered aspirin to alleviate her terrible headaches.[55]  Stephanie also abused cocaine and heroin.  Her family believes her addiction to painkillers, like Vicodin, stemmed from her perpetual struggle with migraines, and that she eventually began using drugs to cope with her mental health issues, which included severe depression.  (Ex. 51 at ¶¶12, 18 [Aff. of Paul Harper], Ex. 53 at ¶7 [Aff. of Sandra McClennon].)

In addition to suffering from depression, Stephanie was both paranoid and jealous—Paul could not talk to another woman without her going into a jealous rage.  In one such rage, she pulled a knife on Paul, and he threatened her in return with an empty liquor bottle.  Fortunately, Paul persuaded her to put the knife down before either of them got hurt. Moreover, provoked by the belief that Paul did not love her or want to be with her, Stephanie attempted suicide on at least two occasions during Garland's childhood.  (Ex. 51 at ¶¶13, 15 [Aff. of Paul Harper], Ex. 53 at ¶9 [Aff. of Sandra McClennon].)

One of Stephanie's early suicide attempts occurred at a party she and Paul threw at their home.  Paul was in the garage, playing cards with some men, while Stephanie was entertaining the women inside the house.  When Stephanie asked

---

[55] The experiences and behaviors of Garland's parents, and their parents, may have had detrimental effects on Garland's DNA structure.  Epigenetics is the study of changes to an individual's genetic material that do not involve alterations to the genetic code but still get passed down to at least one successive generation. Epigenetic "marks" tell genes to switch on or off, and it is through these marks that environmental factors like diet, stress, and prenatal nutrition can make an imprint on genes that are passed from one generation to the next.  While the study of this process is in its infancy, Harper raises the issue now for purposes of preservation.

Paul to come inside and he refused, she locked herself in the bathroom with a bottle of pills. After a party-goer heard her fall, Paul broke down the door and found Stephanie passed out on the floor. Paul had to drive her to the emergency room, where she had her stomach pumped. (Ex. 51 at ¶14 [Aff. of Paul Harper].)

Paul spent a lot of Garland's childhood incarcerated for burglary and drug-related crimes. Even when he was not in prison, Paul only saw Garland occasionally, on Garland's birthday or on holidays. Paul married two more times after he and Stephanie were divorced in 1977, giving Garland multiple half-brothers and half-sisters. According to family members, Garland suffered a lot not having his father's love. (Ex. 51 at ¶16 [Aff. of Paul Harper], Ex 53 at ¶12 [Aff. of Sandra McClennon], Ex. 54 at ¶¶5-6 [Aff. of Stacy McClennon].)

With Paul in and out of prison and busy with his new families, Garland was left in the care of the fragile and ill-equipped Stephanie. Garland's cousin Stacy McClennon remembers how, growing up, Stephanie always seemed like so much fun. It was not until later that she realized Stephanie was often just high. Stacy also described the relationship between Garland and his mother as more like siblings than mother and son, which would have been unsettling and confusing for Garland as a child. (Ex. 54 at ¶3 [Aff. of Stacy McClennon].)

Stephanie lived with her mother for the majority of Garland's childhood, though, so Rose served as Garland's primary caretaker. With both his mother and father emotionally and physically absent, Garland was a needy child and turned to substitute parental figures like his grandmother for love and affection. Affectionately dubbed "Dear Mother" (or just "Dear" for short) by family and friends, Rose provided much-needed support for a young Garland, and he was devoted to her. Rose was Garland's one source of stability in an otherwise unstable childhood, protecting him to some extent from his mother's mental illness and drug addiction. When Rose died in 1988, Garland was devastated. (Ex. 51 at

122

¶23 [Aff. of Paul Harper]; Ex. 53 at ¶¶14, 17 [Aff. of Sandra McClennon]; Ex. 55 at ¶5 [Aff. of Kenneth Mosby]; Ex. 56 at ¶3 [Aff. of Monique Young].)

Even when Garland tried to start his own family with Monique Young, who he met through his cousin Stacy, the promise of stability eluded him. Garland and Monique got married in 1992 but Garland Jr., born three months later, was not Garland's biological child. Monique got pregnant again the following year while Garland was incarcerated, and she and Garland's mother told Garland she had been raped to hide the fact that she was cheating on him. (Ex. 51 at ¶25 [Aff. of Paul Harper]; Ex. 54 at ¶10 [Aff. of Stacy McClennon]; Ex. 56 at ¶¶10-12 [Aff. of Young].)

### d. Multi-generational History of Mental Illness

Garland was born into a family plagued by mental illness. Family members recall his maternal grandmother Rose hallucinating and talking about exorcism during psychotic episodes she suffered in reaction to medication. During these episodes, Rose's eyes would dilate and she acted wildly, becoming agitated, yelling, and threatening to call the police when her daughters and Garland tried to prevent her from driving. Rose's frightened family members resorted to trying to keep her in her bedroom when she had particularly bad episodes, but eventually they had to take her to the hospital for psychiatric treatment. (Ex. 53 at ¶11 [Aff. of Sandra McClennon].)

Family and friends also thought Stephanie was strangely paranoid, in part because she kept knives all over the house so that she would be prepared in case anyone broke in. (Ex. 53 at ¶10 [Aff. of Sandra McClennon]; Ex. 55 at ¶7 [Aff. of Mosby].) Garland remembers that his mother frequently thought the police were coming or that somebody was after her, and he recalls that once she wrecked the car when she thought someone was chasing her. As a child, Garland was scared by this behavior because he believed his mother's fears were well-founded. He did

not realize that no one was really after them until he was twelve or thirteen years old.  (Ex. 45 at ¶57 [Aff. of Dr. Bowman].)   Stephanie also had a history of depression and psychiatric problems, and she received SSI payments for her mental disabilities. (Ex. 30 at 1, 13 [Stephanie Harper Medical Records]; Ex. 56 at ¶4 [Aff. of Young].)   Paul's side of the family also exhibited signs of mental illness: his sister Lois struggled her entire life and eventually committed suicide. (Ex. 51 at ¶8 [Aff. of Paul Harper].)

When Garland first started experiencing symptoms of mental illness in his teens, he was embarrassed and did not ask for help or talk about what was happening.  Instead, Garland began to use drugs more frequently and ultimately became addicted to crack cocaine.  Seeing a counselor or therapist would have been "unheard of" in Garland's community, and there is ample research demonstrating that racial minorities and individuals with low income and education levels receive mental health treatment at a much lower rate than whites and those with middle and upper income levels.  More specifically, studies have shown that African-Americans are fifty to sixty percent less likely to receive mental health services compared to their white counterparts.   Even when controlling for variables such as health care insurance and socioeconomic status, racial and ethnic minorities utilize mental health services at a disproportionately lower rate.  (Ex. 45 at ¶¶60-62 [Aff. of Dr. Bowman].)

Part of the reasoning for not seeking mental health services within the African-American community in particular is due to the stigma associated with both having mental health issues and seeking professional assistance for the treatment of mental health issues, and studies have shown that African-American patients raised more concerns regarding the stigma of seeking mental health treatment as compared to their white counterparts.  (Ex. 45 at ¶63 [Aff. of Dr. Bowman].)   Through her work as an intake specialist at a behavioral hospital,

124

Garland's cousin Stacy McClennon became familiar with how people suffering from psychiatric issues try to hide their illness or turn to drugs rather than seek professional treatment, and understands how Garland would have been embarrassed to ask for help to address the demons he was battling. (Ex. 54 at ¶13 [Aff. of Stacy McClennon].)

Even when individuals are willing to seek mental health services, the availability of practitioners within their area must be considered. Mental health practitioners who have completed multiple years of study tend to gravitate toward locations that have individuals with either disposable income for, or adequate insurance that covers mental health services. Poor communities, frequently inclusive of racial and ethnic minorities, tend to have neither the disposable income nor the insurance coverage that attracts or allows for mental health treatment. Even individuals who have adequate insurance still have to be able to afford accompanying copays. (Ex. 45 at ¶¶65-66 [Aff. of Dr. Bowman].)

### e. Multi-generational History of Substance Abuse

Growing up, Garland was surrounded by close family members who had significant substance abuse problems. Garland's grandmother Rose may have been an alcoholic—Paul remembers her drinking Johnny Walker Red and milk even when she was sick and on pain medication for heart trouble and emphysema. (Ex. 51 at ¶11 [Aff. of Paul Harper].)

Stephanie began abusing prescription and non-prescription drugs in her early teens. Stephanie's sister Sandra remembers Stephanie frequently consuming large amounts of powdered aspirin and drinking Robitussin, which used to contain codeine and would make Stephanie disoriented and cause her to slur. Stephanie often abused Valium and Vicodin as well, which she first tried after stealing pills from her mother and continued to be addicted to until her death. Later in life, Stephanie was addicted to crack cocaine and prescription medication like Seconal

125

and Tuinal (referred to on the street as "Red Birds" and "Christmas Trees").  (Ex. 51 at ¶¶12, 18 [Aff. of Paul Harper]; Ex. 53 at ¶7 [Aff. of Sandra McClennon]; Ex. 55 at ¶¶4, 6 [Aff. of Mosby]; Ex. 56 at ¶4 [Aff. of Young].)

Family members suspect that Stephanie was trading sex for drugs, both with doctors and drug dealers, in order to support her habit.  Sometimes she would bring strange men to the house and have no idea where Garland was when Paul came looking for him.  Garland did not like having all these men coming in and out, and Stephanie's relationships with them caused him to suffer.  Towards the end of her life, Stephanie would often be without gas or electricity because she had spent all her money on drugs and was embarrassed for anyone to know she was unable to pay her bills.  (Ex. 51 at ¶¶18, 20 [Aff. of Paul Harper]; Ex. 53 at ¶¶8, 13 [Aff. of Sandra McClennon]; Ex. 56 at ¶9 [Aff. of Young].)

Paul also struggled with addiction.  Starting in the early eighties, he used cocaine for a decade, and was only able to stop when arrested and subsequently imprisoned for possession of a controlled substance.  Paul's sister Lois was also addicted to drugs.  (Ex. 51 at ¶¶8, 21 [Aff. of Paul Harper].)

Growing up, Garland knew his mother had a drug problem and reports that she gave him Valium when he was only six years old.  Garland was also aware that his father sold cocaine, marijuana, and pills.  Garland began to experiment with drugs himself as a teenager, first smoking marijuana and doing acid, then trying PCP and using crack cocaine like both his parents.  He eventually dropped out of school to sell drugs to support his habit, with his father's tacit approval: Paul just told Garland to be careful and then explained the ins and outs of drug dealing, which may have been one of the only life lessons he ever imparted to his son.  (Ex. 51 at ¶22 [Aff. of Paul Harper].)

Garland continued to smoke marijuana and crack cocaine throughout his adult life.  He would disappear for days at a time and return sick, dirty, and having

126

lost weight.  Some suspect that Garland and Stephanie smoked crack together as adults, since Garland often bought drugs for his mother.  (Ex. 56 at ¶¶6-7 [Aff. of Young].)  Like his family members who struggled with substance abuse, Garland never got help for his addiction, which just worsened over time as his mental illness progressed.  Thus Garland became trapped in a vicious cycle, trying to stabilize his mental instability with drugs.  (Ex. 45 at ¶77 [Aff. of Dr. Bowman].)

### f.   Multi-Generational History of Criminal Behavior

A significant number of Garland's family members, close friends, and neighbors were involved in drug dealing and other criminal behavior.  Garland's own father has a lengthy criminal history.  In 1965, Paul was sentenced to five years for burglary.  In 1969, Paul was sentenced to eight years on a burglary charge.  Between 1982 and 1994, Paul was charged with four more burglaries and one possession of crack cocaine offense.  Garland's half-brother Allan Smith has been convicted of robbery and aggravated robbery, and is currently serving a sixty-five year sentence for injury to a child causing serious bodily injury.  (Ex. 45 at ¶¶78-80 [Aff. of Dr. Bowman].)

Garland's older cousin Kenneth Delcambre, with whom Garland spent a great deal of time with growing up, also has a criminal history consisting of several burglaries, an aggravated robbery, and injury to a child under fifteen causing bodily injury.  (Ex. 45 at ¶81 [Aff. of Dr. Bowman].)   Some family members suspect that Kenneth abused Garland as a young boy, perhaps sexually.  Some family members also suspect that the lady Garland allegedly hit over the head when he was in his early teens may have been molesting him.  (Ex. 53 at ¶¶15-16 [Aff. of Sandra McClennon]; *see also* Ex. 56 at ¶13 [Aff. of Young].)

When Garland was unable to sell a sufficient quantity of drugs to support his habit and alleviate his symptoms of mental illness, he started stealing purses, which began his involvement in the criminal justice system.  For having threatened a woman with a can opener to steal her purse in 1990, Garland was convicted of robbery and sentenced to fifteen years in TDCJ.  For having pushed a woman into her shopping cart and snatching her purse in 1992, Garland was convicted of robbery and received a seven-year sentence.  For having knocked a woman to the ground and fleeing with her purse in 1998, Garland was convicted of robbery and received a forty-year sentence.  (Ex. 45 at ¶¶83-86 [Aff. of Dr. Bowman].)

As a young, African-American male who dropped out of high school, the overall likelihood of incarceration for Garland was statistically high.  As found by a report by the Sentencing Project entitled "Schools and Prisons: Fifty Years after Brown v. Board of Education," one out of every three African-American males can be expected to be imprisoned in his lifetime.  Whereas whites are incarcerated at a rate of 708 per 100,000 people, African-Americans are incarcerated at a rate of 4,749 per 100,000 people, and within the measure of African-American incarceration rates, there are clear demographic variables (e.g. neighborhood of origin, family instability, job availability) that will distinctively and in combination increase the overall likelihood of incarceration.  Strong correlations between incarceration and mental illness and/or drug abuse also exist: not only is the incidence of mental illness two to four times higher among prisoners compared to the general population, but it has also been estimated that approximately seventy percent of prisoners with serious mental illness have also struggled with substance abuse. (Ex. 45 at ¶¶87-89 [Aff. of Dr. Bowman].)

Garland's incarceration was not inevitable, nor are all individuals of a certain description doomed to imprisonment.  Based on Garland's background, however, he would have had to be socially, intellectually, and emotionally superior and resilient in order to overcome his life circumstances and avoid the statistical probabilities.  Every personal, family-based, and social challenge presented to Garland made avoiding those probabilities increasingly more difficult.  (Ex. 45 at ¶90 [Aff. of Dr. Bowman].)

### g.  Garland Does Well in Prison

Garland has always done extremely well while incarcerated—in prison he seems to have found the stability that he sought, but never found, on the outside. Garland served in a position of trust as a barber to both officers and their family members; he earned his GED; and he participated in Bible study programs and

preached to other inmates.   In a structured environment where mental health services are provided as needed and with no real access to drugs, Garland has thrived.   Because he did so well in prison, Garland was even given permission to attend his mother's funeral while incarcerated.   (Ex. 45 at ¶92 [Aff. of Dr. Bowman].)

### h.  Garland Does Not Succeed at Reentry

Garland was most recently released on parole on March 7, 2008.   Since turning eighteen in 1987, Garland had spent less than three non-consecutive years outside of jail or prison: he was out for just four months in 1992 before re-offending, for four months in 1998, and for seven months in 2008.   Garland's father suggested Garland move in with him in 2008 because Garland's aunt Sandra, with whom Garland was originally planning to live, resides in Southside where drugs are more prevalent.   (Ex. 45 at ¶¶91, 93 [Aff. of Dr. Bowman]; Ex. 51 at ¶27 [Aff. of Paul Harper].)

Garland seemed frightened to be back in the free world each time he was paroled.   He had first been incarcerated at a fairly young age, and it appeared to others that Garland sometimes felt there was too much on the outside for him to deal with successfully.   When Garland was released in 2008, several people were concerned by how institutionalized he had become: Garland checked in via regular conversations with and phone calls to his father to "keep himself in line" the first few months he was out on parole.   (Ex. 51 at ¶27 [Aff. of Paul Harper]; Ex. 55 at ¶9 [Aff. of Mosby].)

Within criminal justice literature, this phenomenon is referred to as prisonization, which is described as the ascription to a constructed prison culture and is the process of becoming habituated to both the formal and informal rules associated with being imprisoned.   Studies have shown that short sentences, continuation of contacts with the outside world, a stable personality, and refusal to

become part of a larger prison group may weaken prisonization. Nothing in Garland's background or imprisonment, however, suggests his experiences would not have resulted in prisonization: he was not sentenced to short periods of time, he had little to no interaction with outside contacts, his mental state was unstable, and his overall length of imprisonment encouraged belonging to a prison culture. It seems to have been in TDCJ as a barber and part of a Christian fellowship, in fact, that Garland finally felt he belonged. (Ex. 45 at ¶¶96-97 [Aff. of Dr. Bowman].)

One significant effect of prisonization is difficulty adjusting to society upon release. The effects of prolonged prisonization and its resultant behaviors frequently prove challenging upon reentry and often lead to a state of anomie, which refers to an absence of social and moral regulations and can result in a return to recidivist activities. Not surprisingly, Garland found adjusting to life outside the prison walls difficult: amongst other challenges, he had trouble sleeping, showering, and interacting with others (though his interactions with other ex-convicts proved easier and more comfortable, as they shared personal and social similarities). For Garland, living in prison was "unequivocally" easier for him than living on the outside. (Ex. 45 at ¶¶98-99 [Aff. of Dr. Bowman].)

Statistics on reentry suggest that, regardless of Garland's race, gender, socio-economic status, or age, successful reentry (i.e. completion of the terms of his parole) was going to be challenging. According to recent Bureau of Justice Statistics data on reentry, 67.5% of prisoners who were released were rearrested for a new offense within three years and 51.8% eventually returned to prison for a new prison sentence or for a technical violation of the terms of their release. "Regarding statistics specific to Garland's demographics, 64.8% of male offenders were rearrested, 72.9% of African-Americans were rearrested, and younger prisoners and prisoners with lengthier prior criminal histories were more likely to be rearrested. In addition, prior arrests significantly affected the likelihood of

being arrested for a violent crime (more than one in five, or 22.5%, of those rearrested were rearrested for violent crimes)."  (Ex. 45 at ¶¶100-101 [Aff. of Dr. Bowman].)

One of biggest challenges facing people upon release from prison (in addition to the aforementioned effects of prisonization) is achieving social acceptance while labeled as an ex-convict.  This label can affect numerous aspects of life, such as finding gainful employment; finding safe, affordable living conditions; reconnecting with positive family members and peers; staying away from drugs, alcohol, and other criminal/delinquent activities; and receiving mental health services.  In regards to drug use specifically, Garland was ill-equipped to handle the challenges of staying sober upon reentry.  According to a study conducted by the National Institute of Health, only seven to seventeen percent of prisoners who are clinically diagnosed for alcohol and drug dependence actually receive treatment while incarcerated.  With limited treatment opportunities and a widespread aversion to seeking treatment, return drug use upon reentry is significantly more likely.  (Ex. 45 at ¶¶102, 104 [Aff. of Dr. Bowman].)

Moreover, Garland faced a particularly daunting task in attempting to find and/or create gainful employment.  Since Garland had been trained as a barber in prison, he enrolled in barber college upon release as a logical step towards achieving social and economic stability.  Even if Garland had completed barber college, however, there is a good chance he would have been denied a license to practice due to his felonious background.  Rather than being allowed and encouraged to successfully maneuver their reentry, ex-offenders oftentimes continue to be punished in such a manner even after they have paid their debt to society.  (Ex. 45 at ¶¶105-06 [Aff. of Dr. Bowman].)

## C. Expert Opinion

Garland Harper was a product of his personal, social, and structural environment.  Factors beyond his control, including but not limited to his unstable mother and frequently incarcerated father and a familial history of drug and alcohol abuse and mental illness, inexorably shaped him during his formative years.  Due to his disorganized upbringing, Garland has always been motivated by a desire for stability—or in academic terms, social organization and collective efficacy—in his world.  Because of Garland's apparent institutionalization, he has been able to enjoy a measure of stability within the prison setting.  When released from prison in 2008 Garland attempted to create a new, free-world stability by taking a job, attending classes and going to church, and trying to build a healthy romantic relationship.  Garland's search for stability on the outside, however, was frustrated by his untreated mental illness and concomitant drug use, with tragic results.  (Ex. 45 at ¶107 [Aff. of Dr. Bowman].)

## D. Prejudice

If Dr. Bowman or a similarly qualified expert had been retained as a social historian, he or she would have testified about Harper's life experiences as described above, which informed who he is and what he did.  A social historian would have been able to weave together the disparate threads of Harper's life into a single, compelling narrative.  Jurors would have heard how recurring themes (like instability and abandonment), learned behaviors (like attempting to quiet paranoia and delusions or alleviate depression with drugs and alcohol), and inherited mental illness started to shape Harper as soon as he came into this world.  Jurors could have understood how societal factors such as disorganized neighbors and increased rates of incarceration amongst African-Americans exacerbated the effects of Harper's personal circumstances, further contributing to his failures upon attaining adulthood.

Testimony from a social historian would have humanized Harper in the eyes of the jury and allowed individual jurors to view him more fully, as more than—or not simply—a man convicted of a terrible crime.  Having heard such humanizing testimony, jurors would have been able to consider whether any of the information presented reduced Harper's moral culpability for his crime, thus sparing him from execution.   Given  the  likelihood  of  even  just  one  juror  finding  any  of  the information that should have been presented through a social historian mitigating, Harper would not be facing certain death. *See Wiggins*, 539 U.S. at 536.

## CLAIM NINE

### TRIAL COUNSEL WAS INEFFECTIVE FOR NOT PRESENTING AVAILABLE MITIGATING EVIDENCE AT THE PUNISHMENT PHASE OF HARPER'S TRIAL

Trial counsel acted ineffectively at the punishment phase of Harper's trial in not calling additional lay witnesses who could have provided valuable mitigating information  for  jurors  to  consider.    Therefore,  Harper's  sentence  of  death  was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law.

### A. Given the Importance of Presenting All Available Mitigating Evidence, Trial Counsel's Failure to Do so Constitutes Deficient Performance

Trial counsel's unreasonable failure to call several available witnesses who could  have  presented  additional  mitigating  evidence  constitutes  deficient performance. *See Strickland*, 466 U.S. at 688.  At the heart of the punishment phase of a capital trial is the presentation of mitigation evidence and the concept of moral culpability.  Moral culpability acknowledges an elementary psychological reality—that people do not arrive at their choices from the same path.  Thus, it

follows that the degree of "blameworthiness" of an individual for capital murder may vary depending on what factors and experiences shape, influence, and/or compromise that choice. A jury's understanding of the evidence impacting the moral culpability of a defendant is critical to a jury's consideration of the appropriate punishment for a capital offense.

Further, mitigating evidence is not developed to provide a defense to the crime or to challenge evidence of guilt; nor is it an excuse or explanation for a crime. Instead, it provides a context for the crime by describing an individual's life experiences that serve to inspire compassion, empathy, mercy, and/or understanding. Indeed, mitigating evidence is *any* evidence that "might serve 'as a basis for a sentence less than death.'" *Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)) (emphasis added).

Post-conviction counsel identified five additional lay witnesses, all of whom trial counsel was aware of and should have called to testify at the punishment phase of Harper's capital trial. Failure to call these five witnesses and have them testify as to mitigating evidence was especially egregious given that trial counsel only put on testimony from two of Harper's friends (Curtis Chillis and Don McGinty) and three of his family members (Darion Coleman, Sandra McClennon, and Paul Harper) at punishment. (21 RR 195, 228; 22 RR 49, 147, 211.)

### 1. Stacy McClennon

Harper's cousin Stacy McClennon,[56] was not called by defense counsel to testify at Harper's trial. Had she been called, she was willing to testify and would

---

[56] Defense counsel should have been aware of Stacy's relevant knowledge and willingness to testify given that they called her mother, Sandra McClennon, to testify. (22 RR at 147.) Sandra McClennon is also referred to as "McClennon," in Claim Nine, *ante*.

have provided valuable insight into Harper's childhood and early adult years. (Ex. 54 at ¶15 [Aff. of Stacy McClennon].)

Stacy would have testified about Harper's mother, and how she interacted with her son in a sisterly, as opposed to a maternal, manner. (Ex. 54 at ¶3 [Aff. of Stacy McClennon].)   Stacy could have told jurors how Harper's mother seemed like a lot of fun when Stacy was little, but that Stacy now realizes she was probably just high on drugs. (*Id.*)   Stacy also could have discussed how Harper's mother went back and forth between relationships with different men, and how Harper's own father was not around, leading Stacy to observe that Harper "suffered from a lack of love growing up." (*Id.* at ¶¶4-6.)

Stacy would have been able to talk about how Harper declined when their grandmother, his "backbone," died. (Ex. 54 at ¶¶7-8 [Aff. of Stacy McClennon].) She could explained how their grandmother's death precipitated Harper's heavy use of crack cocaine, which she observed the effects of first hand when she once visited Harper in a "real low place" while he hid under his covers, reduced to skin and bones, and told her over and over again to leave him alone. (*Id.* at ¶¶8-9.)

Having introduced Harper to his wife, Stacy could have discussed how his wife's infidelities, and the fact that the child she bore was not his, affected Harper and left him with trust issues. (Ex. 54 at ¶10 [Aff. of Stacy McClennon].)   Stacy would have elaborated on this, explaining how Harper was repeatedly let down by women he trusted: his grandmother, who left him to be cared for by his ill-equipped mother when she passed away; his mother, who did not know how to show love other than by buying things and rarely hugged or kissed Harper; and his wife, who was unfaithful. (*Id.* at ¶¶10-11.)   Having known Harper since they were both small, Stacy could have testified to her experiences with him, letting jurors know that he is a "loving person" who would always tell others that he loved them, looking for—but never receiving—their love in return. (*Id.* at ¶12.)   Stacy could

have also spoken more specifically about how Harper looked to her parents for the affection he needed, but was denied, from his own. (*Id.*)

Finally, Stacy was particularly well-suited to testify on Harper's behalf given her experiences as an intake specialist at a behavioral hospital. (Ex. 54 at ¶13 [Aff. of Stacy McClennon].) Because she regularly sees people who are battling with demons and try to cope and hide from others the pain they are experiencing, she recognized how Harper could have been dealing with his own psychiatric issues throughout his life. (*Id.*) Stacy could have elaborated upon the feelings of embarrassment many mentally ill people struggle with. (*Id.*) Stacy also could have explained, through her first-hand experience, how in their shame many mentally ill people turn to the temporary fix of drugs, rather than asking for help or seeking treatment, to manage their illnesses. (*Id.*)

### 2. Kenneth Mosby

As a long-time on-again, off-again boyfriend of Harper's mother, Kenneth Mosby ("Mosby") had also known Harper since he was small and would have testified on Harper's behalf if he had been asked. (Ex. 55 at ¶¶2-3, 14 [Aff. of Kenneth Mosby].) Mosby could have told jurors how Harper's mother ("Stephanie") was constantly sick with headaches that lasted for days and how she was always taking powdered aspirin and popping pills, like Vicodin. (*Id.* at ¶¶4, 6.) In Mosby's own words, "[s]he was taking so many different pills that probably none of it helped. Sometimes I thought [she] would commit suicide, the way she took pain medication. She took it around the clock." (*Id.* at ¶6.)

Mosby also observed symptoms of Stephanie's mental illness, such as her excessive suspiciousness. (Ex. 55 at ¶7 [Aff. of Mosby].) Mosby could have described for jurors how she hid knives under the bed and under her pillow, and how she carried them when she would go outside in case anyone tried to "mess

with her." (*Id.*)  Mosby was also well-acquainted with the extreme depression Harper's mother suffered from:

> Even after the doctors discovered that Stephanie had real bad emphysema, she just did not care.  Her doctor would tell her she had the lungs of an eighty-year-old and that smoking was going to kill her, and she would go straight from the doctor's office to the store to buy more cigarettes. . . .  As far as I know[,] Stephanie never even tried to quit smoking, but I guess depression can make you act like that. Stephanie really struggled with depression.

(*Id.* at ¶8.)  Had it been presented, information from Mosby about Stephanie's total inability to mother Harper appropriately, whether because of her physical or mental illnesses or her addiction issues, could have elicited a degree of sympathy from jurors.

Mosby also could have old jurors about how Harper struggled with reentry after having been incarcerated, often seeming scared upon release.  (Ex. 55 at ¶9 [Aff. of Mosby].)  He understood how Harper, having been in and out of prison starting at a fairly young age, could have become "institutionalized" and unable to handle being on the "outside."  (*Id.*)  Like Stacy, Mosby also could have talked about how Harper's wife cheated on him and had twins by another man while he was incarcerated.  (*Id.* at ¶10.)  Mosby would have shared with jurors how if a person's not strong, "that kind of thing can get you real bad."  (*Id.*) Mosby also could have told jurors how Harper's mother passed away while he was incarcerated, and how when Harper was released in 2008 he thanked Mosby for having looked after his dying mother when he himself could not.  (*Id.* at ¶11-12) Finally, when Mosby saw Harper in 2008, he noticed that Harper was quieter, trying to adjust to the outside world again, and could have shared this humanizing observation with jurors.  (*Id.* at ¶12.)

### 3.  Monique Young

Monique Young ("Young") met Harper in 1991 and married him the following year.  (Ex. 56 at ¶¶2, 11 [Aff. of Monique Young].)  She would have been willing to testify on Harper's behalf.  (*Id.* at ¶27.)

Shortly after meeting Harper, Young moved in with him and his mother Stephanie.  (Ex. 56 at ¶2 [Aff. of Young].)  Young could have told jurors about Stephanie's failures as a parental figure.  Young knew Harper's mother was on SSI for her mental disability and addicted to Vicodin (and had been for many years).  (*Id.* at ¶4.)  Young also knew that Harper's mother smoked crack, which she had her son buy for her, and that Stephanie was aware of—and untroubled by—the fact that Harper smoked crack.  (*Id.* at ¶¶5-6.)  In fact, Young is fairly certain Harper and his mother smoked together, and she heard that Harper's father also smoked crack.  (*Id.* at ¶6.)

Young witnessed first-hand Harper's own struggles with addiction, and could have testified about how "he would disappear for three or four days and come back having lost weight and looking pretty sick and dirty."  (Ex. 56 at ¶7 [Aff. of Young].)  Young knew Harper did not want to live like that, but she also recognized he was powerless to change.  (*Id.*)

Young could also have told jurors about her own relationship with Harper and how even though they fought, he never raised a hand to her.  (Ex. 56 at ¶8 [Aff. of Young].)  Even when Young threw things at Harper in anger, like her keys, Harper never responded physically.  (*Id.*)  She could have told jurors how she was pregnant with another man's son when she and Harper got married.  (*Id.* at ¶¶10-11.)

Young also had valuable evidence regarding Harper's potential molestation.  (Ex. 56 at ¶13 [Aff. of Young].)  When cleaning out his mother's apartment after

her death, Young came across some papers from Harper's court cases and time in prison, one of which said he had been molested as a child.  (*Id.*)

When Harper was released in 2008, he and Young reconnected, becoming friends.  (Ex. 56 at ¶14 [Aff. of Young].)  Harper came by Young's house once to cut her children's hair, and after that they talked on the phone fairly regularly.  (*Id.*)  Young could have told jurors about the pain Harper still struggled with regarding his relationship with his mother: he would tell Young, "My mom loved you more than she loved me" and Young would try to convince him that was not true.  (*Id.* at ¶15.)  These exchanges made Young realize that Harper had not really come to terms with his mother's death.  (*Id.* at ¶16.)

Finally, Young could have explained how hard Harper was trying to make a good life for himself and Triska Rose when he got out of prison in 2008, working at a fast food restaurant and trying to learn how to be a husband and a father figure.  (Ex. 56 at ¶17 [Aff. of Young].)  Young never thought "in [her] wildest dreams" that Harper could have done something like this, especially since he never tried to hurt her after she cheated on him twice while they were married.  (*Id.* at ¶24.)  Such testimony from Young would have been invaluable for jurors to hear not just to put Harper's behavior in some sort of context but also as it reflected on his relationships with women more generally.

### 4.  Jennifer Flores

Jennifer Flores ("Flores")[57] was one of Harper's instructors at the barber college he attended in 2008 and could have testified for Harper at the punishment phase of his trial if subpoenaed by defense counsel.  (Ex. 49 at ¶2 [Aff. of Jennifer Flores].)  She could have told jurors how Harper was "very serious about getting

---

[57] As mentioned in Claim Five, *ante*, he trial defense team got a signed and sworn affidavit from Jennifer Flores containing the following information on January 22, 2010, yet failed to call her as a witness.

his barber's license and an above average student." (*Id.* at ¶3.)  Flores also would have testified about how well-liked Harper was:

> He was very well liked by the other students; they would often go to him for pointers and to ask questions.  In fact, I found myself having to assert that *I* was the teacher, not Garland, and I would joke about this with him and the other students.  He had a lot of clients that asked for him a long time after he was gone.

(*Id.*)

Harper opened up to Flores after a while, and Flores could have also told jurors how concerned he was with helping to raise Triska Rose's girls.  (Ex. 49 at ¶4 [Aff. of Flores].)  Harper often left school early so he could meet the school bus and spend time with the girls until their mother got home from work.  (*Id.*)  Harper struck Flores as "a real family man," though she was concerned for him given how hard it is to spend time in prison and then try to "jump right back into your family." (*Id.*)  *Flores* hoped things would work out for Harper and his family, who he seemed to love very, very much.  (*Id.*)  According to Flores, Harper "never had anything but good to say about [Triska Rose and the girls]." (*Id.*)

Given the casual nature of Flores's relationship with Harper, she would not have been seen as having any particular bias in Harper's favor and thus her positive testimony about Harper would have been afforded even greater credibility by jurors.

### 5. Jesse Garza

Jesse Garza ("Garza")[58] knew Harper form having worked with him in 2008 at Raising Cane's.  (Ex. 50 at ¶2 [Aff. of Jesse Garza].)  Had he been subpoenaed by trial counsel, Garza could have told jurors what a punctual and "very dependable" worker Harper was:

---

[58] As previously mentioned, the trial defense team got a signed and sworn affidavit from Jesse Garza containing the following information on January 22, 2010, yet failed to call him to testify.

> Garland was a very conscientious worker and would pick up shifts or
> stay late, he was agreeable to whatever was asked of him.  I saw him
> moving up quickly; I figured he would be a manager soon.  He was
> very good natured and got along with all the other employees, he
> really was a pleasure to work with.   Garland also responded to
> coaching really well, he would learn from his mistakes and move on.
> A lot of people will get an attitude about being told what to do, but not
> Garland.

(*Id.* at ¶3.)

Garza got to know Harper on a more personal level when Harper went to
Garza for advice about what to do because he believed Triska Rose was cheating
on him.  (Ex. 50 at ¶¶4-5 [Aff. of Garza].)  Garza could have testified about how
devastated Harper was by this belief, how "[Harper's] eyes were tearing up" and
how "he seemed incredibly hurt and sad."  (*Id.* at ¶4.)  When Harper subsequently
told Garza he had confirmed that Triska Rose was cheating, Garza observed that
"[Harper] was not angry, he just seemed so hurt.  It was in his eyes, they said it
all."  (*Id.* at ¶5.)  Garza could have told jurors how

> I couldn't understand why anyone would cheat on Garland because he
> worked so hard and seemed to be trying to do right by his family.  He
> did not say anything bad about his wife, just that she was seeing
> someone else and he didn't want to leave her or the kids and he didn't
> know what to do.  He never expressed any anger toward her.

(*Id.*)  Even after Harper told Garza Triska Rose had tried to poison him, he seemed
"down about it," as opposed to angry.  (*Id.* at ¶6.)

Jurors never heard any such evidence as Garza would have testified to, either
about what a good, pleasant employee Harper was or about how wrecked he was to
"discover" that the woman he loved and with whom he was trying to build a life
was cheating on him.   Because of this, not calling Garza to testify was
unreasonable.

142

### 6. Dr. Victor Scarano

Trial counsel never retained an expert such as Doctor Victor Scarano regarding future dangerousness to directly challenge why the State's expert, Doctor Moeller, was simply wrong in his assessment, and to demonstrate why Harper was not a future danger if given a sentence of life imprisonment. Doctor Scarano conducted a comprehensive analysis of Mr. Harper's history, including mental health records as well as records from Texas Department of Criminal Justice (TDCJ), TDCJ Parole records including field notes, and affidavits of individuals familiar with Mr. Harper. In an exhaustive report Dr. Scarano outlines numerous medical and factual circumstances which unmistakably illustrate Mr. Harper's ability to live in and in fact thrive in an environment such as the TDCJ. *See* Exhibit 61, Dr. Scarano Forensic Psychiatric Examination/Evaluation pg. 19-21; 23-24. Doctor Scarano determined that Mr. Harper suffered from Substance Induced Psychotic Disorder with delusions, and explained that

> In a substance induced psychotic disorder with delusions, the psychotic mental distortion is due to the drug. Once the voluntary ingestion/administration of the drug is stopped, the psychotic mental distortion gradually dissipates. The TDCJ Correctional Managed Care records, prior to March 2008 and following October 2010, support the diagnosis of Substance Induced Psychotic Disorder with delusions, and negates the possibility of other non-drug caused psychotic disorders, such as Schizophrenia, paranoid type.
> . . . . .
>
> [and therefore] Mr. Harper does not exhibit symptoms of a psychotic disorder, such as paranoid schizophrenia or any other psychotic disorder, when he is not voluntarily abusing illegal drugs, such as cocaine.

*See* Dr. Scarano Forensic Psychiatric Examination/Evaluation, p. 23-24. Dr. Scarano convincingly demonstrates that the evaluations by the defense and

prosecution psychiatric experts failed to take into account the overriding link between Harper's life-long cocaine addiction since age eighteen and the substance-induced delusional disorder brought on by cocaine addiction that Harper suffered from at the time of the Triska Rose murders:

> The records indicate that Mr. Harper did well in the prison institutional setting with its regimented routine, room and board, medical care, and the availability of work, as a barber.
>
> In March of 2008, Mr. Harper's history was well established as a drug addict and a felon who, when released from prison on parole, would quickly relapse into his drug abuse behaviors, commit crimes to pay for his drug addiction, and return to prison.
> …
> As documented by the records listed above, Mr. Harper does not exhibit symptoms of a psychotic disorder, such as paranoid schizophrenia or any other psychotic disorder, when he is not voluntarily abusing illegal drugs, such as cocaine.
>
> Mr. Harper's drug abuse history supports his description of himself as a drug addict. Each time he was released from prison on parole, Mr. Harper relapsed on cocaine, committed criminal acts, and was returned to prison within 4 to 5 months of his release.
>
> Mr. Harper was again released from prison in March 2008. Shortly after his release, Mr. Harper again began to voluntarily abuse cocaine. Due to his cocaine abuse, Mr. Harper developed a drug induced psychotic disorder, i.e., Substance Induced Psychotic Disorder with Delusions.[59]
>
> Harper's delusion was that his girlfriend, Triska Rose, was cheating on him with another man and was attempting to get rid of him by poisoning him. Mr. Harper's delusion included his belief that Ms.

---

[59] A delusion is a fixed, false belief that is firmly held to in the face of incontrovertible evidence that the belief is false.

Rose's older daughter, Briana, was acting as a lookout, i.e., when Mr. Harper would return from work, Briana would alert her mother and the man Mr. Harper believed she was having an affair with, who would then escape before Mr. Harper could catch him.

In a substance induced psychotic disorder with delusions, the psychotic mental distortion is due to the drug. Once the voluntary ingestion/administration of the drug is stopped, the psychotic mental distortion gradually dissipates. The TDCJ Correctional Managed Care records, prior to March 2008 and following October 2010, support the diagnosis of Substance Induced Psychotic Disorder with delusions, and negates the possibility of other non-drug caused psychotic disorders, such as Schizophrenia, paranoid type.

TDCJ records support the fact that Mr. Harper acclimated well and was not a problem in regards to violent behavior. The TDCJ records indicated that during incarcerations, as noted in 1995, 1997, and 2005, Mr. Harper was assigned as an inmate barber.

Assistant J.P. Guyton reported that he had worked for the Texas Department of Criminal Justice (TDCJ) for 25 years and that Mr. Harper not only cut his hair, but also cut the hair of other officers who also brought their children to get haircuts from Mr. Harper. Mr. Guyton reported that to be an officers' barber, Mr. Harper had to have exhibited good behavior, i.e., only inmates with a clean prison record of good behavior and no instances of violent behavior were allowed to work in the barber shop.

Review of the trial records presented indicate that the jury was not advised that Mr. Harper, during his years in prison,

     1. thrived in the institutional environment,
     2. was never identified as a dangerous inmate,
     3. was never diagnosed with a psychotic mental disorder, and
     4. as a result of his good behavior, he was granted the privilege and opportunity to accept the position of inmate barber.

*See* Exhibit 61, Dr. Scarano Forensic Psychiatric Examination/Evaluation, pp. 21-23, pg. 24 fn.11

Thus any rational juror would have understood that once free of illegal substances, Mr. Harper would assimilate into the culture of TDCJ just as he had in the past, and therefore, unlike the testimony of Doctor Moelller would suggest, Mr. Harper would not be a future danger: "In my opinion to a reasonable degree of medical certainty that, as long as, Mr. Harper would remain in prison and away from drugs, the probability of future dangerousness would be negligible." *See* Exhibit 62, Dr. Scarano Forensic Psychiatric Examination/Evaluation, pg. 25. The jury would also have understood that Mr. Harper's drug abuse history supported his description of himself as a drug addict. Each time he was released from prison on parole, Mr. Harper relapsed on cocaine, committed criminal acts, and was returned to prison within 4 to 5 months of his release. Mr. Harper was again released from prison in March 2008. Shortly after his release, Mr. Harper again began to voluntarily abuse cocaine. Due to his cocaine abuse, Mr. Harper developed a drug induced psychotic disorder, i.e., Substance Induced Psychotic Disorder with delusions. Mr. Harper's delusion was that his girlfriend, Triska Rose, was cheating on him with another man and was attempting to get rid of him by poisoning him. Mr. Harper's delusion included his belief that Ms. Rose's older daughter, Briana, was acting as a lookout, i.e., when Mr. Harper would return from work, Briana would alert her mother and the man, Mr. Harper believed she was having an affair with, who would then escape before Mr. Harper could catch him. Thus, the jury would have understood that Mr. Harper's criminal conduct was due to a DSM IV-TR mental illness, Substance Induced Psychotic Disorder with delusions[60], that Harper's mental illness was deteriorating at the time of his criminal conduct, and his diagnosed mental illness caused Mr. Harper to commit his criminal conduct due to his persistent delusions and the mental illness itself. This also would have

---

[60]A delusion is a fixed, false belief that is firmly held to in the face of incontrovertible evidence that the belief is false.

146

contradicted Dr. Moeller's testimony that Harper's criminal conduct was not due to a mental illness, and would have provided powerful mitigating evidence to the jury.

### B. That Jurors Did Not Hear Testimony From these Witnesses Prejudiced the Outcome of Harper's Case

During the punishment phase of Harper's trial, the State called over thirty witnesses to testify in support of their position that because (1) Harper was a future danger; and (2) there was no sufficiently mitigating evidence to warrant a sentence of life without parole, jurors should sentence Harper to death.  (18-20 RR *passim*.) In stark contrast, trial counsel presented just nine witnesses to counter the State's position, and of those nine only five had any significant interaction with Harper prior to the crime.  (20-22 RR *passim*.)

Therefore it stands to reason that testimony from additional witnesses who knew Harper well and would have spoken about both his character and circumstances could have had an impact on the jury in their deliberations. Harper's cousin with whom he was close, a long-time boyfriend of Harper's mother, Harper's wife, and a teacher and co-worker of Harper's all had important perspective on who Harper is, and those perspectives should have been shared with the jurors.  Testimony from these five additional lay witnesses and Dr. Victor Scarano's careful psychiatric analysis would have doubled the amount of mitigating evidence jurors heard, thus significantly improving Harper's chances that at least one juror would have heard something he or she found sufficiently mitigating, and Harper would not have been sentenced to death.  *See Wiggins*, 539 U.S. at 536.

## CLAIM TEN

## TRIAL COUNSEL WAS INEFFECTIVE BY FAILING TO EXPLAIN TO THE JURY DURING PUNISHMEN PHASE CLOSING ARGUMENT HOW TO GIVE FULL EFFECT TO THE MITIGATING EVIDENCE THEY PRESENTED

Juries must be given a vehicle through which mitigating evidence can be considered, and a reasonable application of this requires trial counsel to explain how this vehicle can be operationalized.  Harper's trial counsel failed to explain to the jury how to give effect to the mitigating evidence under the sentencing statute, thus their performance must be considered deficient.  Defense counsel's omission fell below the generally recognized standard of care and thus violated Harper's rights pursuant to applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law.

### A. Trial Counsel Performed Deficiently under the Recognized Standards of Care and Supreme Court Precedent

Deficient performance is performance that is "inconsistent with the standard of professional competence in capital cases that prevailed [at the time of the trial]." *Cullen v. Pinholster*, __U.S.__, 131 S. Ct. 1388, 1407 (2011).  The leading examples of the professional standards at the time of Harper's trial included the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases and the Guidelines and Standards for Texas Capital Counsel. A basic responsibility of trial counsel is empowering the jury to effectively consider the mitigating evidence that is presented.  *See ABA Guidelines*, Guideline 10.11(K) ("Trial counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to all relevant mitigating evidence.").  Logically, this requires counsel to explain to the jury how the mitigating evidence is relevant under the sentencing statute.

148

The Supreme Court has frequently addressed the importance of juries being able to properly consider mitigating evidence in capital trials.  Juries must be given an effective vehicle to consider mitigating evidence during the penalty phase. *Tennard v. Dretke*, 542 U.S. 274, 284-85, (2004); *Ex parte Smith*, 309 S.W.3d 53, 55 (Tex. Crim. App. 2010).  This vehicle must provide the jury with the ability to "give *full* consideration and *full* effect to mitigating circumstances."  *Penry v. Johnson*, 532 U.S. 782, 797 (2001) (emphasis in original) (internal citations omitted).  Trial counsel's merely noting circumstances that may be considered mitigating is not enough to satisfy constitutional requirements—further action is required.  *See id.* ("*Penry I* did not hold that the mere mention of 'mitigating circumstances' to a capital sentencing jury satisfies the Eighth Amendment.").  It is trial counsel's responsibility to place the jury in a position to give full effect to the mitigating evidence presented under the sentencing scheme.

In contrast to the relevant ABA Guideline provisions and Supreme Court precedent, Harper's counsel failed to ensure that the jury was able to give full consideration and effect to the mitigating evidence.  The only way to ensure the effectiveness of the vehicle for considering mitigating evidence is by defense counsel explaining to the jury how the presented evidence is mitigating under the statutory scheme.  Harper's trial counsel merely listed examples of what could be considered mitigating, but they failed to adequately explain to the jury what they should do with this evidence or how it is relevant under the statutory scheme.  (24 RR at 31-35.)  A mere summary of what could be considered mitigating is not enough; counsel should explicitly instruct the jury how to apply that evidence under the statutory sentencing scheme. *See Penry*, 532 U.S. at 797 (explaining that merely mentioning mitigating factors is insufficient).  Trial counsel's failure to do so prevented the jury from being able to give full consideration and effect to the mitigating evidence that was presented, and thus must be considered deficient

149

performance.  This failure was certainly not a strategic decision by counsel; just as the failure to correct a misstatement of law cannot be considered strategic, neither can a failure to properly explain the law.  *See Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005) ("There can be no reasonable trial strategy in failing to correct a misstatement of law that is detrimental to the client.").

### B. Harper was Harmed by the Deficient Performance

To establish harm the "appellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). Without clear direction as to the relevance of the mitigating evidence under the statutory scheme, confidence in the outcome of Harper's penalty phase is undermined.  The failure of counsel to provide this direction creates the possibility that the jury would be unable to understand how to properly utilize the mitigating evidence during deliberations.  If the jury had been properly informed by counsel as to the relevance of the mitigating evidence, there is a reasonable probability that the outcome of the penalty phase would have been different.  Thus, Harper was harmed by trial counsel's deficient performance.

Further, appellate counsel was ineffective for failing to raise this record-based claim on direct appeal.  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) ("the proper standard for evaluating [a petitioner's] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland v. Washington*"); *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985) (the Fourteenth Amendment requires the assistance of counsel to appellants for their first appeal as of right); *accord Ries v. Quarterman*, 522 F.3d 517, 531-32 (5th Cir. 2008); *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007).

## ISSUES RELATED TO JURY SELECTION

## CLAIM ELEVEN

# DEFENSE COUNSEL'S PERFORMANCE DURING VOIR DIRE WAS DEFICIENT AND RESULTED IN A CONSTITUTIONALLY-INFIRM JURY

Capital jurors must be able to give meaningful consideration and effect to mitigating evidence.  Jurors who will automatically vote for the death penalty in every case cannot follow this requirement of the law and are thus precluded from sitting on a capital jury.  Defense counsel failed to substantively question several jurors possessing this "automatic death penalty" disqualifying bias and failed to remove them from Harper's jury, either through a challenge for cause or a peremptory strike.  As such, Harper received ineffective assistance of counsel, and as a result, was sentenced to death by an unconstitutionally empaneled jury.  Because Harper's rights were violated under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law, Harper's sentence should be overturned and he is entitled to a new trial.

## A. Standard of Practice/Legal Background

A capital defense attorney's overarching goal during the voir dire process is to select a jury that is favorable to their client's interest, namely a life sentence.  Special care must be taken to plan a case-specific strategy for jury selection that will aid in "choosing a jury most favorable to the theories of mitigation that will be presented."  *ABA Guidelines*, Guideline 10.10.2 cmt.  Defense counsel must be familiar with questioning techniques that expose prospective jurors with constitutionally-disqualifying biases, such as automatically imposing the death penalty on a defendant found guilty.  *ABA Guidelines*, Guideline 10.10.2(A), (B).  When defense counsel discovers a biased juror, a challenge for cause should be lodged.   If available and necessary, biased jurors should be excused with peremptory challenges.  *See, e.g.*, *ABA Standards*, Standard 4-7.2(a), (c).

151

One of the most common disqualifying biases a prospective juror can have is that they are "automatic death penalty" ("ADP").  ADP jurors "will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Morgan*, 504 U.S. at 729.  "If even one such juror is empaneled and the death penalty is imposed, the State is disentitled to execute the sentence." *Id.*  It is not enough for a prospective juror to state that they can "follow the law," as "[a]ny juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law." *Id.* at 735.  "[S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir*, 550 U.S. at 246 (citing *Penry v. Lynaugh*, 492 U.S. 302 (1989)).

Constitutionally-infirm prospective jurors, including those who are ADP, can, and do, readily give full assurances that they can "follow the law," or "fairly consider" the required facts and special issues.  (Ex. 48 at ¶18 [Aff. of David Wymore].)  However, due to the complex principles involved in capital trials, prospective jurors often do not understand what is being asked of them and defense counsel must pay close attention to what the jurors are actually saying in response to determine which jurors are constitutionally-disqualified.  (*Id.* at ¶¶17, 19); *see Irvin v. Dowd*, 366 U.S. at 728.

Jurors who are substantially mitigation-impaired, those who cannot meaningfully consider mitigation evidence, are ineligible to serve on a capital jury. To determine whether a juror's impairment is consequential enough to warrant dismissal depends on the *Wainwright* standard, which asks whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469

U.S. 412, 424 (1985) (internal citation omitted); *see also Davis v. State*, 313 S.W.3d 317, 343 (Tex. Crim. App. 2010); *Segundo v. State*, 270 S.W.3d 79, 93 (Tex. Crim. App. 2008); *Murphy v. State*, 112 S.W.3d 592, 599 (Tex. Crim. App. 2003).

### B. Systemic Failure of Defense Counsel to Conduct Meaningful Voir Dire

The voir dire process for Harper's capital trial was plagued by the systematic and objectively unreasonable performance of defense counsel. (Ex. 48 at ¶27 [Aff. of Wymore].)  Defense counsel's questioning and performance did nothing to identify or reveal the disqualifying biases of the seated jurors discussed below. (*Id.*)  Moreover, defense counsel specifically failed to ask the prospective jurors whether they would be able to meaningfully consider a life sentence for the crime Harper was charged with, namely the murder of three people.[61]  (*Id.*)  Particularly egregious was defense counsel's failure to question, challenge or strike jurors who indicated that they would always choose the death penalty for the murder of a child. (*Id.*)

In fact, the manner in which defense counsel conducted voir dire interviews of prospective jurors actively harmed Harper's interests.  The term "processing effects" refers to the psychological conditioning of jurors to believe that the only issue in a case is whether the defendant is sentenced to death.  (*Id.* at ¶38.)  These psychological effects are the result of having extensive and graphic discussions

---

[61] A proper commitment question must contain only the facts necessary to test whether a prospective juror is challengeable for cause.  *See Standefer v. State*, 59 S.W.3d 177, 182 (Tex. Crim. App. 2001).  "[P]rospective jurors must be able to consider the full range of punishment for an offense or [are] challengeable for cause."  *Id.* at 181.  Because the murder of more than one person is a factual statutory element of the crime Harper was charged with, an inquiry into a prospective juror's ability to grant a life sentence for a defendant charged with the death of more than one person would not violate the *Standefer* restrictions on commitment questions.  *Id.*; Tex. Penal Code § 19.03(a)(7)(A).

regarding the death penalty during voir dire.  (*Id.*)  The result of processing effects is that jurors believe that they will inevitably reach the question of life or death, and that a death penalty is appropriate in the case at hand.  (*Id.*)  Even where the defendant's guilt is not at issue, questions regarding the defendant's eligibility for the death penalty can be affected by processing effects.  (*Id.* at ¶39.)  Furthermore, if mitigation evidence is presented during the guilt/innocence phase, its impact will be minimized if the jury has been preconditioned to disregard such evidence.  (*Id.*)

In Harper's case, defense counsel not only failed to object to the State's processing of jurors, but frequently did so itself as well.  (*Id.* at ¶40.)  Defense counsel routinely used language that communicated to the jurors several assumptions: (1) that a guilty verdict was imminent;[62] (2) that Harper was eligible for the death penalty;[63] and (3) that the jury would find Harper to be a future danger, thus answering Special Issue 1 in the affirmative.[64]  (*Id.*)

Defense counsel also failed to object to the misleading and factually incorrect hypothetical situations the State posed to prospective jurors.  The State routinely discussed the Andrea Yates case with prospective jurors.  (*Id.* at ¶28.)  In these discussions, the State told jurors that the Yates jury answered Special Issue 1 "Yes" but then answered Special Issue 2 "Yes" as well, because Yates's severe mental illness was a mitigating circumstance.  In fact, the Yates jury answered Special Issue 1 "No" and never reached the mitigation issue.  Yates was found not guilty by reason of insanity upon retrial.  (*Id.* at ¶¶28-29.)

Thus, the State directly implied that a capital jury in Texas found that insanity, a statutory affirmative defense, was a sufficient mitigating circumstance. (*Id.* at ¶30.)  This tactic was particularly aggravating and misleading, as potential

---

[62] (*See, e.g.,* 4 RR at 217; 9 RR at 42.)

[63] (*See, e.g.,* 9 RR at 42.)

[64] (*See, e.g.,* 9 RR at 42-44.)

jurors frequently confuse affirmative defenses with mitigation. (*Id.*) Often, the reasons prospective jurors give for when they would not automatically impose the death penalty, are legal defenses, not mitigation. (*Id.*)

The State also routinely used a reverse-*Witherspoon* hypothetical to rehabilitate ADP jurors with a far-fetched example of a case in which a life sentence would be appropriate. (*Id.* at ¶32; *see, e.g.*, 11 RR at 44.) *Witherspoon v. Illinois* established that prospective jurors who would never vote for the death penalty were ineligible to sit on capital juries. 391 U.S. 510 (1968). A reverse-*Witherspoon* scenario attempts to establish that there exists an extraordinary, unrealistic situation in which an ADP juror might not vote for a death sentence. (*Id.* at ¶33.) However, these hypothetical scenarios are meaningless for determining whether a juror satisfies the *Morgan* or *Wainwright* standards, especially when the hypothetical has nothing to do with and does not remotely resemble the case at hand. The reverse-*Witherspoon* hypothetical used by the State presented several obvious affirmative defenses, including necessity, self-defense, and acting under "adequate provocation." (*Id.* at ¶34; *see e.g.*, 11 RR at 44.) Upon hearing the State's scenario, prospective jurors likely took these common-sense affirmative defenses into account when vaguely answering they would consider a life sentence for the hypothetical defendant. (*Id.* at ¶35.)

Defense counsel's overall performance during voir dire was objectively and systematically deficient. Counsel did nothing to reveal the ADP views of the jurors discussed below and did not challenge them for cause. The State's false, misleading and meaningless hypothetical scenarios were similarly left unchallenged by defense counsel. Finally, defense counsel actively injured Harper's interests by "processing" prospective jurors into expecting that the trial would not only reach the punishment stage, but would reach Special Issue 2 as well. Defense counsel's deficient performance resulted in the seating of the

155

following constitutionally-infirm jurors.  Because Harper's rights were violated by defense counsel's objectively unreasonable performance, he is entitled to a new trial.

### C. Individual Jurors

Defense counsel's ineffectual performance during voir dire failed to expose the ADP and mitigation-impaired viewpoints of the following jurors.  Had defense counsel conducted a proper, rigorous voir dire examination of these jurors, numerous constitutional flaws would have become clear and these constitutionally-infirm jurors would not have served on Harper's jury.

### 1.  Juror Basey

At the time of Harper's trial, juror Basey worked as a corrections officer for TDCJ.   Her daughter also worked as an officer for TDCJ.   (Ex. 2 at 2-3 [Questionnaire – Basey].)   Juror Basey's answers on her questionnaire were facially-disqualifying, yet defense counsel made no substantive effort to highlight her ADP views.  (Ex. 48 at ¶58 [Aff. of Wymore].)  Basey agreed that "[a]ny person, man or woman, young or old, who commits capital murder should pay with his own life," and disagreed that "[t]he death penalty is justified only for capital murder."  (Ex. 2 at 11 [Questionnaire – Basey].)  She also indicated that she believed the death penalty was necessary and was not used often enough in Texas. (*Id.* at 12.)

Juror Basey was also substantially mitigation-impaired, and did not meet the *Wainwright* standard for impartial jurors.  (Ex. 48 at ¶57 [Aff. of Wymore].) Basey expressed considerable resistance to considering Harper's underprivileged background and history of mental illness as mitigating factors.  (*Id.*)  In fact, the only "mitigating circumstance" juror Basey could think of related to the

156

defendant's guilt.  (4 RR at 201-02.)[65]  Defense counsel conducted no substantive voir dire inquiry of juror Basey's inability to give meaningful consideration to mitigation.

The failure of defense counsel to expose juror Basey's ADP and mitigation-impaired viewpoints, as well as the failure to remove her from the jury with a challenge for cause or peremptory strike, constituted deficient performance under *Strickland*.

### 2.  Juror Dowlin

Juror Dowlin's questionnaire and voir dire testimony indicate that she was an ADP juror.  (Ex. 48 at ¶42 [Aff. of Wymore].)  On her questionnaire, Dowlin agreed that "[a]ny person, man or woman, young or old, who commits capital murder *should* pay with his own life.  (Ex. 4 at 11 [Questionnaire – Dowlin]) (emphasis added).  Dowlin also believed that the death penalty is justified for more crimes than premeditated murder and should be available as a punishment for more crimes than it is now.  (*Id.*)  Defense counsel questioned Dowlin briefly about her belief that more crimes should be eligible for the death penalty, but Dowlin's response only strengthened her status as an ADP juror.  (4 RR at 149-51.)  Dowlin stated that repeat pedophiles should be death eligible as well.  (*Id.*)  Defense counsel's failure to further examine juror Dowlin's ADP views, and subsequent failure to challenge her for cause because of them, was objectively unreasonable.

Defense counsel also did not make any meaningful effort to ensure that juror Dowlin satisfied the *Morgan* and *Wainwright* standards, namely that she could and would give meaningful consideration to the mitigation evidence in Harper's case.

---

[65] Indeed, juror Basey confirmed that she was an "automatic death penalty" juror in an October 6, 2012, interview with a post-conviction habeas investigator.  Basey stated that she made up her mind to vote for death *immediately* after finding Harper guilty and would not have considered any mitigating evidence.  (*See* Claim One, *ante*; Ex. 17 at 1, ¶3 [Juror Affidavits].)

(Ex. 48 at ¶45 [Aff. of Wymore].)  Juror Dowlin repeatedly expressed to defense counsel that, in her view, mitigation consisted of both pro and anti-death penalty factors.  (*Id.* at ¶¶50-51.)

> (Juror Dowlin): So, where mitigating -- and in a situation like this, mitigation just means to -- what are the components that maybe a person could have done to lessen their losses, *or on the flip side, what are factors that  may be contributing as, you know, mitigating factors*.

(4 RR at 139-40 (emphasis added).)

> (Juror Dowlin): It's just very hard to say that there is one mitigating factor that would sway one way or the other.

(4 RR at 140.)   Dowlin's inability to distinguish between mitigating and aggravating factors is further evidenced by her statements regarding how she would consider evidence of mental illness.

> (Defense): In a mental health capacity or in a mental health -- in a hypothetical case where there might be history of some mental health issues, would you want to know about that in answering Special Issue Number 2?
> (Juror Dowlin): In answering Special Issue Number 2, most definitely.
> (Defense): Okay.
> (Juror Dowlin): And if there was treatment and if there was noncompliance on someone's part with treatment, that would be important for me to know, yes.
> (Defense): Okay. And would it be something that you would want to consider in answering Special Issue Number 2?
> (Juror Dowlin): It could be a mitigating factor.
> (Defense): Could be a mitigating factor?
> (Juror Dowlin): Yes.

(4 RR at 144.)

Based on these exchanges, juror Dowlin was substantially mitigation-impaired in violation of the *Wainwright* standard.  Dowlin viewed any factor relating to the sentence as a mitigating factor.  Even when Dowlin acknowledged an interest in a true mitigating factor, severe mental illness, Dowlin was only concerned with "noncompliance," which clearly would be an aggravating factor.

(Ex. 48 at ¶¶52-53 [Aff. of Wymore].)   Defense counsel's weak questioning of juror Dowlin's interest in hearing "all sorts of mitigating factors" provided no reason to believe that she was not picturing pro-death penalty factors, or factors pertaining only to a defendant's guilt.  (*Id*. at ¶42.)

Juror Dowlin was an ADP juror who was also significantly mitigation-impaired to the point where her inclusion on Harper's jury violated the *Wainwright* standard.  Defense counsel's failure to meaningfully question juror Dowlin about these views was unreasonable, as was counsel's failure to remove her from the venire with a challenge for cause or peremptory strike.

### 3.  Juror Cotten

Juror Cotten's questionnaire was rife with answers that indicated he was an ADP and mitigation-impaired juror.  (Ex. 48 at ¶60 [Aff. of Wymore].)  Cotten stated that most criminal laws were too lenient, and that there were too many repeat offenders for serious crimes.  (Ex. 3 at 3 [Questionnaire – Cotten].)  This should have been a red flag to defense counsel, as Harper fell into this category, namely, repeat offenders who had received parole (what some would view as lenient treatment).   Cotten indicated he was "strongly in favor of capital punishment as an appropriate punishment" and in one section disagreed with every statement that could be interpreted as critical of the death penalty.  (*Id.* at 10.) During his testimony, Cotten expressed that his conservative beliefs led him to believe in an "eye for an eye."  (5 RR at 8.)  Cotten also expressly equated the guilt/innocence verdict with the decision on punishment, to which the State replied "And that's exactly right."  (*Id.*)  Defense counsel made no inquiry or challenge to juror Cotten's clearly ADP opinions.

Defense counsel also made no effort to determine whether juror Cotten was mitigation-impaired beyond the *Wainwright* standard.  (Ex. 48 at ¶66 [Aff. of Wymore].)  The State's leading, general questioning gave no indication that Cotten

envisioned anything beyond legal defenses as mitigation, nor did defense counsel's interview provide any assurance that Cotten could give meaningful consideration to the mitigation evidence at hand.  (*Id.* at ¶¶64-66.)

Because juror Cotten was ADP and mitigation-impaired, defense counsel's failure to eliminate him through meaningful voir dire, a challenge for cause, or a peremptory strike amounted to unreasonable performance.

Juror Williams

Juror Williams made numerous unequivocal ADP statements in her questionnaire and voir dire testimony.  In her questionnaire, Williams answered that any person who commits capital murder should pay with their life, and "the death penalty is an appropriate punishment for a rightly accused criminal if convicted."  (Ex. 16 at 11-12 [Questionnaire – Williams].)  These are unequivocal ADP views.  (Ex. 48 at ¶70 [Aff. of Wymore].)  She also expressed that she believed the death penalty should be available for more crimes than it is now.  (Ex. 16 at 11 [Questionnaire – Williams].)

During her voir dire testimony, juror Williams told the State "[I]n my opinion, if the accuser with all the facts and evidence comes up guilty, then I believe in it; so, the right punishment."  (5 RR at 161.)  Moreover, Williams stated that "it very well could" violate her believe system to follow the statutory legal sentencing process.  (*Id.* at 162.)  Even with the mildest prompting from defense counsel, juror Williams continued to espouse her ADP views.

> (Defense): Now, what I think I hear you telling me is once I've found the guy is a threat to my neighbors and/or me to commit continuing acts of violence, I'm not interested in going any further.
> (Juror Williams): Right.
> (Defense): I'm done.
> (Juror Williams): Uh-huh.

(5 RR at 197-98.)

Remarkably, defense counsel did not seize upon these disqualifying statements to have juror Williams stricken from the panel for cause.  Instead, defense counsel undertook to rehabilitate Williams's disqualifying ADP and mitigation-impaired viewpoints.  (Ex. 48 at ¶75 [Aff. of Wymore].)

> (Defense): What I hear you telling me is that I am going to wait until I hear the evidence and the evidence is complete.
> (Juror Williams): Yes.
> (Defense): Okay. And can you assure Mr. Stafford, Mr. Harper, and me that you'll be open to a fair and proper evaluation of all of the evidence?
> (Juror Williams): Yes.

(5 RR at 186-87.)  Defense counsel's inquiries thus only unnecessarily bolstered the record against the excusal of an objectively bad juror for Harper.  (Ex. 48 at ¶76 [Aff. of Wymore].)   At no time did juror Williams state that she could or would give meaningful consideration to mitigating evidence.  (*Id.* at ¶79.)  At best, Williams declared that she would not vote before the law allowed her to.  (*Id.*)  Defense counsel attempted to use the Andrea Yates case to ask if Williams could consider mental illness.  However, this inquiry only confirmed that juror Williams could be mindful of "not guilty by reason of insanity" as a factor in favor of a life sentence, even though such a defense was not at issue in Harper's case.  (Ex. 48 at ¶¶81-84 [Aff. of Wymore].)

Not only did defense counsel rehabilitate a bad juror, but they used extreme pejoratives to describe the offense that the juror would hear testimony about.  (Ex. 48 at ¶86 [Aff. of Wymore].)

> (Defense): …[y]ou might be in a situation where you get an opportunity to look at records that show this person you have just found guilty of *this vile, disgusting, inexcusable, despicable, and whatever other adjectives I can put to it, crime, capital murder*, you may be in a position where you can look up and say, look, but this guy is manageable, pliable, cooperative.

161

(5 RR at 191 (emphasis added).)

> (Defense): You've convicted someone of *this vile and disgusting capital murder* and the Judge walks up to you and says, Okay, Ms. Williams, you get to choose.  What's it going to be?
> (Juror Williams): That's not fair.
> (Defense): I know it's not.

(5 RR at 194 (emphasis added).)   It was unreasonable of defense counsel to increase the emotionalism surrounding the voir dire process and to endorse the State's argument that the charged offense was deserving of the death penalty.  (Ex. 48 at ¶87 [Aff. of Wymore].)

Juror Williams's ADP views and mitigation impairment should have sustained a challenge for cause.  However, defense counsel did not make such a challenge, but instead rehabilitated and "processed" her.  This performance was objectively deficient.

### 4.  Juror Morris

Juror Morris's questionnaire reflected his ADP viewpoints.  (Ex. 48 at ¶89 [Aff. of Wymore].)  Morris declared that he was in favor of capital punishment, that any person that commits capital murder should receive the death penalty, and wrote that "the death penalty is justified when another life has been taken."  (Ex. 10 at 11-12 [Questionnaire – Morris].)  Defense counsel never inquired about these disqualifying statements.  (Ex. 48 at ¶90 [Aff. of Wymore].)

Furthermore, defense counsel never attempted to determine if juror Morris could meaningfully consider mitigation evidence and possibly vote for a life sentence.  (*Id.*)  It was evident from Morris's voir dire testimony, though, that he did not understand what "mitigation" was.  First, the State tried to explain it to him, but conflated the issues of guilt and mitigation by using a hypothetical involving a third party, a scenario not even remotely similar to Harper's case.

162

Then, Morris explained to defense counsel that he thought "mitigating circumstances" included reasons in favor of a death sentence. (*Id.* at ¶¶91-92.)

> (Juror Morris): There again, she mentioned the mitigating circumstances that would come into play that would tip me to go death or life imprisonment.

(6 RR at 34.) Defense counsel never inquired into whether Morris could give mitigating effect to the type of evidence that would be presented on Harper's behalf. Morris's assertion that he could "listen to the evidence" was not constitutionally sufficient to meet the *Morgan* or *Wainwright* standards. (Ex. 48 at ¶96 [Aff. of Wymore].)

The "processing effects" of the State's and defense counsel's voir dire was significant. (*Id.* at ¶¶94-95.)

> (State): So, that aggravating circumstance is arson, rape, burglary, robbery, killing a police officer or a fireman in the line of duty, killing a child under 6 years old, killing more -- two or more people in the same episode, situations like that.
> (Juror Morris): Uh-huh.
> (State): Okay. In this case we have the killing of two or more people in the same episode. Okay?
> (Juror Morris): *Okay.*

(6 RR at 11 (emphasis added).)

> (State): And this is, of course, after you've found someone guilty of capital murder. So, after Denise and I have proven to you in your mind beyond a reasonable doubt that a defendant has committed capital murder and you've found him guilty -- okay?
> (Juror Morris ): All right.

(6 RR at 13.)

> (Defense): Look at yourself sitting on a jury. Okay? This is a capital murder case.
> (Juror Morris ): Right.
> (Defense): Okay. And look at yourself in that jury and your eleven people and you've gone back and you found the citizen accused guilty of *this heinous, vile, disgusting capital murder*. All right?

163

(Juror Morris ): All right.

(Defense): Now, that's a very good description. They're not seeking the death penalty on a Boy Scout case. Okay? This is a capital murder case.

(Juror Morris ): All right.

(Defense): We didn't get here without it being a vile, disgusting, horrible nightmare, terrible scenario. Okay?

(Juror Morris ): Yes.

(6 RR at 32-33 (emphasis added).)

The failure to effectively question and challenge an impermissibly biased juror such as juror Morris for cause constituted unreasonable performance by defense counsel.

### 5. Juror McHenry

Juror McHenry stated strong, unequivocal ADP views in her questionnaire and voir dire testimony.  (Ex. 48 at ¶98 [Aff. of Wymore].)  She gave no indication that she would or could give meaningful consideration to any mitigating evidence, other than a verdict of "not guilty."  (*Id.*)  McHenry's questionnaire stated that she believed anyone convicted of capital murder should receive the death sentence, the death penalty should be available for more crimes, and the death penalty is not used often enough in Texas.  (Ex. 7 at 11 [Questionnaire – McHenry].)   In response to open-ended questions on the death penalty, McHenry wrote "[m]ore people should be put to death if they have actually done the crime," and that the death penalty "should be done more quickly to free up room in the prisons."  (*Id.* at 12.)   In response to the State's voir dire, McHenry reiterated her views that the death penalty is warranted when a defendant has killed another.  (7 RR at 188.) She even repeated her personal financial motivation for voting for a death sentence.

(State): You say in here also that you believe the death penalty in Texas is not used often enough?

164

(Juror McHenry): It's not. You get a lot of prisoners that go to jail multiple times and they get out and then repeat the same thing all over again. And we continue to let them out. Why? *And then they sit up there for years and years and years. Why am I paying to have them set up there.*

(State): Okay. So, your -- this is really going to, look, it's not done quickly enough.

(Juror McHenry): Uh-huh. If you done sentenced them to death, what you holding them for? *If they going die, they're going die. It's just like we're going to die one day.* But they done done something to get there.

(7 RR at 203 (emphasis added).)

Given these responses, there is no reason for defense counsel to have concluded that juror McHenry was capable of giving meaningful effect to their mitigation evidence. (Ex. 48 at ¶103 [Aff. of Wymore].) McHenry expressed her thoughts that mitigation included reasons in favor of a death sentence. (*See, e.g.*, 7 RR at 216.) The only mitigating factor McHenry could think of was the defendant's motivation for the crime. (*Id.* at 217.)

Defense counsel demonstrated a fundamental failure to understand and appreciate the significance of juror McHenry's troubling answers. (Ex. 48 at ¶104 [Aff. of Wymore].) In response to her dismissive comments about mitigation evidence regarding mental illness, defense counsel agreed with her, and only asked her to "listen to [it]." (*Id.*)

(Defense): Also, in criminal cases from time to time you may have experts come in and testify about maybe various things, maybe mental conditions, other conditions. What's your overall thoughts about psychologists and psychiatrists?
(Juror McHenry): Half of the time, they're crazy.
(Defense): I understand. Well, could be. Do you think you could listen to them?
(Juror McHenry): Of course, I can listen. I could. I could.

(7 RR at 213.)  McHenry's assertion that "[o]f course, I can listen," is objectively meaningless and does not satisfy the *Morgan* or *Wainwright* standards.  (Ex. 48 at ¶105 [Aff. of Wymore].)

Defense counsel also engaged in "processing" juror McHenry, thus prejudicing her ahead of trial.  (*Id.* at ¶108.)

> (Defense): In our case, for example, my client is charged with taking the life of three people at the same time.  *That's what made it capital murder.*

(7 RR at 215 (emphasis added).)

Juror McHenry was objectively a very bad juror for Harper, espousing ADP viewpoints that included a personal financial interest in returning a death sentence. Defense counsel's failure to meaningfully question McHenry, as well as counsel's failure to challenge her for cause or remove her with a peremptory strike, was unreasonable performance.

### 6.  Juror Garcia

Juror Garcia expressed ADP viewpoints in his voir dire testimony and his questionnaire, even altering several questions on the questionnaire so his responses would be more strongly pro-death penalty.  (Ex. 48 at ¶111 [Aff. of Wymore]; Ex. 5 at 11 [Questionnaire – Garcia].)  Garcia stated that he believed the death penalty was necessary and that any person who commits capital murder should be put to death.  (*Id.*)  During his testimony, Garcia repeated these views to the State, saying that he was definitely in favor of the death penalty and "there's numerous places where it can be aimed."  (9 RR at 12.)

Defense counsel made no inquiry into these disqualifying opinions. Instead, counsel told Garcia that if he was merely able to "listen" to the evidence, counsel would seat him on the jury.  (Ex. 48 at ¶112 [Aff. of Wymore].)  Assurances that a juror can be "open" and will "listen" are meaningless, as even an ADP juror can honestly give such an answer.  (*Id.* at ¶113.)  Rather, jurors are required to be able

166

to give meaningful consideration to mitigation evidence, a much higher standard than being able to just "hear" or "listen" to it.  *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007).

Juror Garcia was also exposed to considerable processing effects from defense counsel. (Ex. 48 at ¶11 [Aff. of Wymore].)

> (Defense): Because if it wasn't bad, we wouldn't be here.
> (Juror Garcia): (Moving head up and down).
> (Defense): Okay?
> (Juror Garcia): (Moving head up and down).

(9 RR at 33.)

> (Defense): Now, if you were to answer Special Issue Number 1 "yes, he's going to be a continuing threat to our society" -- okay -- can you still promise me as you and I are talking right here, that you would be open to seeing and hearing about mitigating factors that would be so sufficient, sufficient enough to spare his life?
> (Juror Garcia): (Moving head up and down).
> (Defense): Okay. Can you?
> (Juror Garcia): Definitely.
> (Defense): All right.
> (Juror Garcia): *All that's been said leads me to – brings the realization that we're probably going to hit Number 2.* So –
> (Defense): Maybe not.
> (Juror Garcia): I'm just saying that's the assumption of what's been said to me.

(9 RR at 43-44 (emphasis added).)  This processing was so apparent that Garcia recognized it, stating that he was already assuming that the jury would reach Special Issue 2.

167

Defense counsel's timid questioning, blatant processing and failure to challenge juror Garcia for cause or with a peremptory strike constituted deficient performance.[66]

### 7. Juror Hargrave

Juror Hargrave's ADP viewpoints were clearly stated during the State's voir dire examination.  (Ex. 48 at ¶118 [Aff. of Wymore].)  Hargrave stated that premeditated murder justified the death penalty, and "If it's justified, then it's -- then it can be given, as far as I'm concerned."  (11 RR at 74.)  In response to defense counsel's tame questioning, Hargrave admitted that he was predisposed to giving the death penalty.  (Ex. 48 at ¶125 [Aff. of Wymore].)

> (Defense): If you're on this jury, do we have a shot of you considering life in prison as a proper punishment after you have found someone guilty of a capital murder case?
> (Juror Hardgrave): I'd have to listen to your argument.
> (Defense): All right.
> (Juror Hardgrave): You know, as on the face that you've presented it, killing three people, that's definitely, you know, on the bad side. So --
> (Defense): Right.
> (Juror Hardgrave): You're starting out, you know --
> (Defense): In the hole?
> (Juror Hardgrave): Yeah.

(11 RR at 104.)

Similarly, Hargrave repeatedly indicated that he could not give meaningful consideration to the mitigating evidence that would be presented on Harper's behalf.  Juror Hargrave made it clear that only facts relating to guilt would be relevant to his decision concerning punishment.  (Ex. 48 at ¶118 [Aff. of

---

[66] Juror Garcia's ADP views were confirmed during recent post-conviction investigation.  On October 11, 2012, juror Garcia spoke on the telephone with a post-conviction investigator.  When asked whether he decided to vote for a death sentence after the guilt phase, juror Garcia answered "I would say yes."  (Ex. 17 at 3, ¶6 [Juror Affidavits].)

Wymore].)   He also explicitly stated that he would not consider Harper's background or personal circumstances at all.  (*Id.* at ¶119.)

> (State):  What about a person's background? Do you think that would be important to look at in answering that question?
> (Juror Hardgrave): *No.*
> (State): No?
> (Juror Hardgrave): Well, the actual crime, yes.
> (State): Okay.
> (Juror Hardgrave):  But, no, that shouldn't be -- his own personal background should not be involved as far as I'm concerned.

(11 RR at 89 (emphasis added).)  The State then described a hypothetical scenario in which an abused girl killed the stepfather who was sexually abusing her and her sister.  Hargrave was unmoved and still believed that the State should seek the death penalty for the hypothetical defendant.  (11 RR at 114.)  Hargrave's assertions that he would listen to the evidence were little more than parroting the required steps of the capital sentencing process back to the court. (Ex. 48 at ¶¶126-28 [Aff. of Wymore].)

Hargrave consistently confused mitigation with legal defenses.  (*Id.* at ¶¶126-27.)  In one exchange, Hargrave stated that he would consider whether Harper presented any "excuses," suggesting that only issues of guilt were important to him.  (11 RR at 106.)  Hargrave also misunderstood the relevance of mental illness on mitigation suggesting "[I]f they have mental problems, then are you going to put on a case for competency?"  (11 RR at 107.)

Defense counsel's failure to inquire into Hargrave's ADP views and mitigation impairments was deficient performance, as was counsel's failure to challenge this objectively bad juror for cause or with a peremptory strike.

### D. Conclusion

The Supreme Court has held that even if only one juror who will automatically vote for the death penalty in every case is empaneled on a capital

jury, "and the death sentence is imposed, the State is disentitled to execute the sentence." *Morgan*, 504 U.S. at 729.  Here, through defense counsel's objectively deficient and unreasonable performance during voir dire, Harper's jury contained no fewer than eight jurors who would not meet the *Morgan* standard.  Defense counsel failed to uncover the disqualifying biases of these jurors, and most importantly, wholly failed to challenge these jurors for cause or remove them with peremptory strikes.   Harper was entitled to a jury that could follow the constitutional due process requirements of giving meaningful consideration to the mitigation evidence he would present.  Instead, due to defense counsel's failures, Harper faced a constitutionally-infirm jury, that convicted and sentenced him to death in violation of his constitutional rights.   Defense counsel's failings are highlighted by the fact that one of the jurors they failed to challenge for cause, juror Basey, acted directly in accordance with her "automatic death penalty" viewpoints during the punishment phase of Harper's trial.  (Ex. 17 at 1, ¶3 [Juror Affidavits]; *see* Claim One, *ante*.)  Because Harper's constitutional rights to due process were violated by defense counsel's deficient performance, and the inclusion of a number of constitutionally-infirm jurors, Harper is entitled to a new trial as to guilt/innocence as well as punishment.

## CLAIM TWELVE

### THE STATE ENGAGED IN PURPOSEFUL DISCRIMINATION BY USING A PEREMPTORY STRIKE TO REMOVE A MINORITY VENIRE MEMBER IN VIOLATION OF HARPER'S CONSTITUTIONAL RIGHTS

It is well-established law that the State may not exercise peremptory challenges to strike venire members based on the race.  During the voir dire process, the State exercised a peremptory strike against prospective juror Donna Banks, an African American female.  This strike was purposefully discriminatory,

in violation of Harper's rights under the state and federal Constitutions, Texas criminal law, and United States Supreme Court and Texas case law.

## A. Legal Standard

The Fourteenth Amendment of the United States Constitution and the Texas Code of Criminal Procedure bar the use of peremptory challenges to exclude potential jurors on account of the juror's race. *Batson v. Kentucky*, 476 U.S. 79, 89 (1985); *Johnson v. California*, 545 U.S. 162, 168 (2005); *Rice v. Collins*, 546 U.S. 333, 338 (2006); Tex. Code Crim. Proc. Art. 35.261(a). The United States Supreme Court explained that excluding jurors because of their race is particularly egregious because it "undermine[s] public confidence in the fairness of our system of justice." *Batson*, 476 U.S. at 87. Excluding even one juror on the basis of their race violates these core provisions of the law and entitles a defendant to a new trial. *See Linscomb v. State*, 829 S.W.2d 164, 166 (Tex. Crim. App. 1992).

A *Batson* challenge follows a three-step analytical process. First, the defendant must make out a prima facie case of intentional discrimination by the State. *Batson*, 476 U.S. at 93-94. A prima facie case is established by demonstrating that "the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 94. Next, the State must provide race-neutral reasons for using a peremptory challenge on the juror(s) in question. *Id.* at 94, 97. Finally, the court must determine whether the defendant has established purposeful discrimination. *Id.* at 98; *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008); *Miller-El v. Dretke*, 545 U.S. 231, 239-40 (2005); *Hernandez v. New York*, 500 U.S. 352, 363 (1991).

### 1. Demonstrating Purposeful Discrimination

The task of determining whether a discriminatory purpose motivates a peremptory strike despite a prosecutor's assertions otherwise is indeed a difficult one. *Miller-El*, 545 U.S. at 267-68 (J. Breyer, concurring) ("[A]t step three,

*Batson* asks judges to engage in the awkward, sometime hopeless, task of second-guessing a prosecutor's instinctive judgment . . . ."). Courts are obligated to undertake a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson*, 476 U.S. at 93 (internal quotation omitted). In determining the validity of the race-neutral reasons proffered, the Texas Court of Criminal Appeals has articulated a nonexclusive list of factors that weigh against the legitimacy of a race neutral explanation. *Whitsey v. State*, 796 S.W.2d 707, 713 (Tex. Crim. App. 1990). "The presence of any *one* of these factors tends to show that the State's reasons are not actually supported by the record or are an impermissible pretext." *Id*. These factors are:

> 1. The reason given for the peremptory challenge is not related to the facts of the case;
> 2. [T]here was a lack of questioning to the challenged juror or a lack of meaningful questions;
> 3. Disparate treatment—persons with the same or similar characteristics as the challenged juror were not struck;
> 4. Disparate examination of members of the venire, i.e., questioning a challenged juror so as to evoke a certain response without asking the same question of other panel members; and
> 5. [A]n explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.

*Nieto v. State*, 365 S.W.3d 673, 678 n. 3 (Tex. Crim. App. 2012) (quoting *Whitsey*, 796 S.W.2d at 713-14). The Supreme Court has also noted that the prosecution's failure to question a struck juror about a characteristic that the State asserts is important is evidence that the asserted reason was actually a pretext for discrimination. *See Miller-El*, 545 U.S. at 246 (citing *Ex parte Travis*, 776 So.2d 874, 881 (Ala. 2000)).

Most importantly, courts should examine the genuineness of the prosecutor's justifications for striking jurors who belong to a cognizable class. *See Nieto*, 365 S.W.3d at 676 ("[A] reviewing court must focus on the genuineness, rather than

the reasonableness, of the asserted non-racial motive."); *see also Purkett v. Elem*, 514 U.S. 765, 768 (1995) ("[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."); *see also Reed v. Quarterman*, 555 F.3d 364, 368 (5th Cir. 2009).   The mere fact that a proffered reason given for a strike is factually incorrect is not sufficient to show that the reason was a pretext for racial discrimination.   *Ford v. State*, 1 S.W.3d 691, 694 (Tex. Crim. App. 1999); *see also Grant v. State*, 325 S.W.3d 655, 660 (Tex. Crim. App. 2010).   However, when the State's explanation for striking a juror is "clearly contrary to the evidence," Texas courts have held that "there is no innocent mistake and reversed for *Batson* error."   *Greer v. State*, 310 S.W.3d 11, 16 (Tex. App.—Dallas 2009, no pet.) (citing *Reich–Bacot v. State*, 789 S.W.2d 401, 404-05 (Tex. App.—Dallas 1990) (reversing conviction where prosecutor's only reason for peremptory strike was flatly contradicted by venire member's answers during voir dire), pet. dism'd per curiam as improvidently granted, 815 S.W.2d 582 (Tex. Crim. App.1991)).

Comparative juror analysis is another powerful tool for uncovering purposeful discrimination.   In *Miller-El v. Dretke*, the Supreme Court described the underlying concept behind comparative juror analysis as follows:

> If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar non-black who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step.

*Miller-El*, 545 U.S. at 241.   The compared jurors do not need to be identical in all aspects to uphold a *Batson* claim.   *Id.* at 247 n. 6 ("A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters.").

Comparative juror analysis is an intensive process that requires close scrutiny and comparison of venire members' juror cards, juror questionnaires, and answers during the voir dire interview. Because of the utility of comparative juror analysis for determining whether the State engaged in purposeful discrimination, the Fifth Circuit Court of Appeals requires such an analysis to take place when investigating the merits of a *Batson* challenge. *See United States v. Brown*, 553 F.3d 768, 796 (5th Cir. 2008). Comparative juror analysis is an analytical theory that describes the record evidence regarding the jurors in question, and not a separate issue that is waived if not raised during earlier proceedings. *See Young v. State*, 826 S.W.2d 141, 146 (Tex. Crim. App. 1991).

Comparative juror analysis is not restricted to comparing jurors struck by the State to those who ultimately serve on the jury. Rather, minority jurors struck by the State can be compared to any white jurors accepted by the State, even if those white jurors were later struck by the defense. *Miller-El*, 545 U.S. at 294 n. 4 (Thomas, J., dissenting). If the State struck a minority juror but accepted a similarly-situated white juror, this is evidence of purposeful discrimination. *Id.* at 241.

## B. The Jury Selection in Harper's Case

Jury selection in Harper's case began on August 30, 2010. (3 RR at 7.) Prior to this proceeding, the venire panel was sworn in and the prospective jurors filled out their questionnaires. (*See* 3 RR at 7.) For reasons unstated, the State and defense counsel agreed to excuse several jurors before the individual voir dire examinations began on August 30, 2010. (*See* 3 RR at 7-12.)

Each side was given the opportunity to individually interview each prospective juror. (*See, e.g.*, 3 RR at 71-115.) However, occasionally, the State did exercise a peremptory strike before the defense had an opportunity to conduct its individual voir dire. (*See, e.g.*, 6 RR at 77.) The court considered challenges

174

for cause during each side's individual voir dire. (*See, e.g.*, 4 RR at 10, 24.) If the prospective juror was not stricken by the court for cause, the State was offered the first opportunity to remove the juror with a peremptory strike. (*See, e.g.*, 3 RR at 115.) If the State accepted the prospective juror, then the defense had the chance to exercise a peremptory strike of its own. (*Id.*)

Out of the nine total peremptory challenges the State used, the State exercised four against African-American panelists: Clark, Pugh, Broadnax, and Banks. Harper was left with a jury that consisted of four white females, four white males, one Hispanic female, one Hispanic male, two African-American females, one alternate white male, and one alternate white female.

## C. The State's Proffered Race-Neutral Explanations

Immediately after the State exercised a peremptory challenge to strike prospective juror Banks and the court excused her, trial counsel lodged a *Batson* objection. (7 RR at 182.) Prosecutor Denise Bradley responded with five reasons for striking Banks:

> First of all, I believe that the record will clearly show (1) Ms. Banks, in my opinion, inability to answer any of the questions that I asked her directly. Which is a concern of mine. I think she called it pondering for the next thirty minutes and that's, basically, I think the way that Ms. Banks appears to evaluate things.
>
> The other thing is that she stated that (2) she would do away with the death penalty in favor of life without parole. She believes that (3) rehabilitation is the most important thing to consider; and she believes, frankly, that everybody is capable of rehabilitation and that a person can actually do better in prison for life when given the opportunity with a life sentence than they could with the death penalty. She stated that – (4) she didn't answer the question on the questionnaire about whether or not she would—whether she thought life in prison was more effective than the death penalty. When asked just now, she stated that she believed life in prison was more effective than the death penalty.

175

She also indicated that her friend or son's friend was murdered and that the friend forgave that person who murdered her own son. (5) I believe it is clear based on Ms. Banks' background in ministry, the things she said today, forgiveness is something she's very capable of doing and rehabilitation is something she feels very strongly about. And those are reasons that I don't think that she would be a good juror for the State in this case.

(7 RR at 182-83) (numbers added).[67]

As demonstrated below, three of the State's proffered race-neutral reasons for striking prospective juror Banks are clearly contrary to the record and thus are evidence of pretext to mask purposeful discrimination. Furthermore, comparative juror analysis demonstrates that Banks' answers on her juror questionnaire and during her individual voir dire do not differ from jurors accepted by the State, which demonstrates that this strike was discriminatory. Finally, the State improperly applied a group bias without questioning whether it applied to Banks specifically and failed to engage in a meaningful voir dire examination on a subject that it was concerned about, both of which are further evidence of discrimination. *Miller-El*, 545 U.S. at 246; *Reed*, 555 F.3d at 377; *Whitsey,* 796 S.W.2d at 713-14.

## 2. Three of the State's Proffered Race-Neutral Reasons for Striking Prospective Juror Banks are Clearly Contrary to the Record

The State claimed that it struck prospective juror Banks because she did not answer questions "directly," she would do away with the death penalty, and she believed that everybody can be rehabilitated. (7 RR at 182-83.) The record

---

[67] Trial counsel seemed to launch a *Batson* claim more generally here for all four African-American jurors struck by the State thus far; however, trial counsel failed to preserve the record by requesting that the State proffer race-neutral reasons for their strikes for the three other African-American jurors struck. (*See* 7 RR at 183-84; Claim Thirteen, *post*.) Additionally, trial counsel stated, on the record, after the State's strike of potential African-American juror Broadnax, that "This was not a *Batson* challenge." (6 RR at 77-78.)

demonstrates that each of these proffered reasons is clearly contrary to the record and thus evidence that this strike was purposefully discriminatory.

The record reflects that Prospective Juror Banks answered each question asked of her in a clear and direct manner. (*See* 7 RR at 155-182.) "Directly" is defined as "in a direct manner or way" and "immediately (in time); straightaway; at once." (Oxford English Dictionary 1; OED 6(a)). In support of its assertion that Banks was unable to answer questions directly, the State commented that "she called it pondering for the next thirty minutes and that's basically, I think the way that Ms. Banks appears to evaluate things."[68]  (7 RR at 182.) In this assertion, the State referenced a question-answer exchange between itself and Banks:

> Q: So, you think that life imprisonment is more effective than the death penalty?
> A: When it is used effectively and people are being rehabilitated, yes .
> . . . I mean, I guess that would be my initial response, unless I had another 30 minutes to ponder on the question.

(7 RR at 179.) However, even this question-answer exchange demonstrates that Banks answers questions directly. When asked if she thought life imprisonment was more effective than the death penalty, she provided a direct answer, "yes," and explained it. (7 RR at 179.) Banks's answers may have been longer, but she never evaded the State's questions nor provided contradictory answers. To state that Banks was unable to answer questions directly is in no way supported by the record.

---

[68] It is curious that the State finds fault with someone who would like to take her time to think through things, when that is the very task all jurors are assigned with when sitting on a jury. Similarly, since the purpose of the individual voir dire is learning as much information as possible about the potential juror, it would seem obvious that the State would want to elicit as many details and as much information as possible from prospective jurors.

In addition, prospective juror Banks unequivocally stated that she would keep the death penalty. Banks' answers during the State's individual voir dire demonstrate that she would not do away with the death penalty:

> Q: Do you really think that we need the death penalty as a possible punishment or would you do away with the death penalty in favor of life without parole?
> A: No I would not.
> Q: You would keep the death penalty?
> A: I would keep the death penalty.

(7 RR at 165.) Appellate Counsel for the State has also conceded that Prospective Juror Banks would keep the death penalty: "The State also mistakenly stated that Banks would do away with the death penalty in favor of life imprisonment without the possibility of parole. (7 RR at 182.) However, the record reveals that Ms. Banks stated that she 'would keep the death penalty.' (7 RR at 165.)" (Ex. 43 at 18, n. 17 [Excerpts from the Appellate Record] (internal citations included).) The State's assertion that they used a strike against Banks because she would do away with the death penalty is patently false.[69]

Finally, contrary to the State's assertion otherwise, Banks never stated that she believed that "everybody is capable of rehabilitation." (7 RR at 183.) While she did stress the importance of rehabilitation,[70] she answered several times that

---

[69] The CCA similarly misinterpreted Banks's voir dire statements. In denying Harper's *Batson* claim on direct appeal, the CCA wrote that Banks stated "I'm pretty settled . . . I don't like people to see people die." *Harper v. State*, No. AP-76452, 2012 WL 4833834 at * 7 (citing 7 RR at 164). However, if the Court had read a few pages beyond that statement in the trial transcript, it would have discovered that Banks believed in facing consequences for one's actions, saw both sides of the death penalty issue, would want to see a person put to death for killing her loved one, stated that the death penalty is required sometimes, and that she would keep the death penalty as a punishment. (7 RR at 164-66.)

[70] The importance of rehabilitation to prospective juror Banks will be discussed later in this claim (*see* Section 3, *post*), along with a comparative analysis

not everybody can be rehabilitated and that the death penalty should be reserved
for those who cannot be:

> Q:  What purpose do you think it [the death penalty] serves?
>
> A:  I think it serves a purpose of someone that has no remorse or
> respect for human life. . . .  They'd do it again if they were given the
> opportunity to . . . .  there's no rehabilitation.
> ****
> A:  But for a person that has no desire to do better . . . that they
> have no respect for human life, I feel like there is no need to try to
> salvage their life, per se, to keep them here.

(7 RR at 165- 67, 175, 178.)  Banks states numerous times, on the record, that
while rehabilitation is important to her, it is not always possible.  The State's
proffered reason for striking Banks due to her belief that "everybody is capable of
rehabilitation" is thus in conflict with the record.

The State's proffered reasons that prospective juror Banks did not answer
questions "directly," would do away with the death penalty in favor of life without
parole, and believes everybody is capable of rehabilitation are patently contrary to
the record.  When the State's explanation for striking a juror is "clearly contrary to
the evidence," Texas courts have held that "there is no innocent mistake and
reversed for *Batson* error."  *Greer*, 310 S.W.3d at 16; *see also Reed*, 555 F.3d at
368 ("At the third step [of Batson analysis], 'implausible or fantastic justifications
may (and probably will) be found to be pretexts for purposeful discrimination.")
(citing *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

Here, the State offered not one factually incorrect reason, but three.  The
genuineness of the prosecutor's race-neutral reasons is severely undermined when
the majority of her alleged race-neutral reasons for her strike are factually

---

demonstrating that Banks was not the only venire person to stress the importance
of rehabilitation.

179

incorrect.  *See Nieto*, 365 S.W.3d at 676 ("[T]he reviewing court must focus on the genuineness, rather than the reasonableness, of the asserted non-racial motive.")  It is plausible, perhaps, to think of a situation where the State incorrectly attributes one juror's answer to another juror or is momentarily confused and provides one wrong reason for a preemptory strike.[71]  However, providing three factually incorrect reasons that are clearly contrary to the record, out of the five total reasons proffered, is not an "innocent mistake" and is thus evidence of pretext to mask purposeful discrimination.

### 3. Failure to Complete Questionnaire and Belief that Life Imprisonment is More Effective than the Death Penalty

Comparative juror analysis further demonstrates that this strike was purposefully discriminatory.  Banks was not the only prospective juror to fail to fill out a question on the juror questionnaire nor was she the only one to agree with the statement that "Life imprisonment is more effective than the death penalty."

Prospective juror Banks did not answer one of the questions on her juror questionnaire that asked her to select whether she agreed or disagreed with the statement "Life imprisonment is more effective than the death penalty." (Ex. 1 at 11 [Questionnaire - Banks].)  However, numerous seated white jurors failed to fill out their questionnaire completely.  Seated juror Hargrave did not complete the entirety of page twelve of the questionnaire, even leaving the signature line blank that asks the juror to certify that his responses are true and correct.  (Ex. 6 at 13 [Questionnaire - Hargrave].)  Despite his failure to complete the questionnaire, the

---

[71]  The Texas Court of Appeals-Dallas has iterated some instances in which the State's explanation is factually incorrect and may not show pretext: "good faith reliance on information which is later proved to be false may justify a strike, as might confusion of one prospective juror for another, or obvious and understandable confusion of a venire member's statements."  *Reich-Bacot*, 789 S.W.2d at 404.  None of these explanations are plausible here.

State did not question Hargrave regarding any of the questions on page twelve or ascertain why he did not finish the form.  Similarly, alternate juror Moore failed to answer if he agreed or disagreed with the statement "The State cannot teach the sacredness of human life by destroying it."  (Ex. 9 at 11 [Questionnaire - Moore].)  Even though this was the same section that prospective juror Banks left a question blank on, the State did not bring this up during juror Moore's individual voir dire or ask him if he agreed or disagreed with this statement.

During individual voir dire, the State asked Banks if she agreed or disagreed with the statement "Life imprisonment is more effective than the death penalty."  Banks replied "[w]ell, I would have to say yes, because there are more people that are serving life in prison than there are on death row.  Isn't there, or no?"  (7 RR at 179.)  She also reaffirmed this statement when asked again if she believed that life imprisonment is more effective than the death penalty, stating "When it is used effectively and people are being rehabilitated, yes."  (7 RR at 179.)

Similar to prospective juror Banks, one seated white juror, juror Smith, agreed with the statement that "Life in prison is more effective than the death penalty."  (Ex. 13 at 10 [Questionnaire – Smith].)  Juror Smith agreed with this statement on her questionnaire, and when questioned about it during individual voir dire responded "It depends on what the crime is.  I mean, to me, sometimes life imprisonment is worse than the death penalty.  That's my own opinion."  (9 RR at 55.)

If the State struck a minority juror but accepted a similarly-situated white juror, this is evidence of purposeful discrimination.  *Miller-El*, 545 U.S. at 241.  The State argued that it struck prospective juror Banks because she missed a question on the questionnaire and because she agreed that life in prison was more effective than the death penalty.  However, because the State accepted similarly-situated white jurors who also missed a question or expressed similar views on life

181

in prison, comparative analysis demonstrates these reasons are pretext for purposeful discrimination.

### 4. Importance of Rehabilitation

Banks was not the only prospective juror to state that rehabilitation is the most important objective for criminal offenses. Several similarly situated white jurors also expressed views on rehabilitation similar to Banks.

On her juror questionnaire, when asked "What do you believe is the <u>One Most</u> important objective of punishment for criminal offenses?  Please select only one and explain," prospective juror Banks selected "Rehabilitation" and wrote, "Although I believe that it is important that the punishment is comparable to the crime that was committed, it is <u>MORE</u> important to provide rehabilitation (if possible)."  (Ex. 1 at 10 [Questionnaire - Banks]) (emphasis in original).  During individual voir dire, Banks was questioned thoroughly by the State concerning her views on rehabilitation.  When asked by the State if rehabilitation was going to be "most important" to her, she responded "[r]ehabilitation, yes.  If you cannot be rehabilitated, then."  (7 RR at 178.)  The State elicited her feelings on rehabilitation several more times, and she responded similarly each time but continually affirmed that not everyone could be rehabilitated.  (*See* 7 RR at 166-67; 7 RR at 168; 7 RR at 175; 7 RR at 176-77; 7 RR at 178.)

Several seated white jurors also marked on their questionnaire that "rehabilitation" was the most important objective of punishment for criminal offenses.  Juror Price and alternate juror Moore both picked rehabilitation as the most important objective.  Neither Juror Price nor Juror Moore explained their choice, which the questionnaire requests that each prospective juror do, and neither were questioned at all about the subject of rehabilitation during their individual voir dires.  (Ex. 12 at 10 [Questionnaire - Price]; Ex. 9 at 10 [Questionnaire - Moore].)

182

Alternate juror Pavlovich also stated on her questionnaire that rehabilitation was the most important objective, without a written explanation. (Ex. 11 at 10 [Questionnaire - Pavlovich].)  When questioned about her views concerning rehabilitation during voir dire, she stated similarly to prospective juror Banks that not everybody could be rehabilitated: "But as I got older, you know . . . some people can be rehabilitated . . . and some people, in my opinion, cannot." (11 RR at 128.)

Juror Cotten also chose rehabilitation as the most important objective of criminal punishment but did not provide a written explanation on his questionnaire. (Ex. 3 at 10 [Questionnaire - Cotten].)  When asked about his selection of rehabilitation at voir dire, juror Cotten said, "[w]ell, I mean of the context of the question—I took it to be, you know, which means more.  And to me, if someone can be rehabilitated, of course, rehabilitation means more." (5 RR at 26.)  The State's next question was, "Do you have any questions of me?" to which juror Cotten delved further into his thoughts on rehabilitation: "Punishment—to me, punishment is not the end. Punishment is a means.  Unless you attempt to rehabilitate, you know, I don't see where—I don't see where punishment is a means to an end.  You know, I guess that's kind of how the context that I read that in and that's why I chose rehabilitation." (5 RR at 26.)  Instead of exploring his statements on rehabilitation in more detail, the State verified with him that he could follow the law and evidence to assess a death penalty and then passed juror Cotten to the defense. (5 RR at 27.)

Two State-accepted white jurors also selected rehabilitation as the most important objective of criminal punishment.  Prospective juror Summer picked "rehabilitation" and wrote in "This is a hard choise [sic]; however, rehab can be very good if obtainable.  Both rehab and punishment should go hand in hand." (Ex. 14 at 10 [Questionnaire - Summer].)  She was not questioned about

183

rehabilitation during voir dire.  Additionally, the State accepted prospective juror Vaughan who selected rehabilitation and wrote in "but I'm not sure that is always possible, seeing as there are so many repeat offenders."  (Ex. 15 at 10 [Questionnaire - Vaughan].)  She was not asked about her feelings concerning rehabilitation during voir dire.

Because the State struck prospective juror Banks but accepted several similarly-situated white jurors, this is evidence of purposeful discrimination. *Miller-El*, 545 U.S. at 241.  As demonstrated, numerous non-African-American seated jurors and State-accepted jurors later struck by the defense agreed on their questionnaire that rehabilitation was the "<u>One Most</u> important objective of punishment for criminal offenses[.]"[72]  Most of these jurors were not even questioned about their feelings on rehabilitation, despite their answer that rehabilitation was the most important objective to consider.[73]  Juror Cotten expressed views on rehabilitation that were very similar to Prospective juror Banks.  Cotten stated "rehabilitation means more" and "unless you attempt to rehabilitate . . . I don't see where punishment is a means to an end."  (5 RR at 26.) Even after this statement, the State did not attempt to delve further into Cotten's view on rehabilitation, as they did with Banks.  Because the State accepted

---

[72] (*See* Ex. 12 at 10 [Questionnaire - Price]; Ex. 9 at 10 [Questionnaire - Moore]; Ex. 14 at 10 [Questionnaire - Summer]; Ex. 15 at 10 [Questionnaire - Vaughan]; Ex. 3 at 10 [Questionnaire - Cotten]; Ex. 11 at 10 [Questionnaire - Pavlovich]; Ex. 2 at 10 [Questionnaire - Basey]; Ex. 8 at 10 [Questionnaire - Montemayor].)

[73] *See Miller-El*, 545 U.S. at 245 ("In sum, non-African-American jurors whose remarks on rehabilitation could well have signaled a limit on their willingness to impose a death sentence were not questioned further and drew no objection, but the prosecution expressed apprehension about a African-American juror's belief in the possibility of reformation even though he repeatedly stated his approval of the death penalty and testified that he could impose it according to state legal standards even when the alternative sentence of life imprisonment would give a defendant (like everyone else in the world) the opportunity to reform.").

similarly situated jurors but struck Banks, comparative juror analysis demonstrates that these rehabilitation-related reasons are pretext for purposeful discrimination.

### 5. Forgiveness and Ministry Background

While Banks was the only prospective juror with a minister's diploma, the State's explanation for striking her because of her background in the ministry and ability to forgive is not legitimate because the State improperly applied a group bias without questioning whether it applied to Banks specifically.  *See Whitsey*, 796 S.W.2d at 713-14.  Furthermore, the State did not engage in a meaningful voir dire examination on the subject of either forgiveness or Banks's background in the ministry. *See Reed*, 555 F.3d at 377; *Miller-El*, 545 U.S. at 246 (citing *Ex parte Travis*, 776 So.2d 874, 881 (Ala. 2000) ("[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination").

The subject of forgiveness came up during the State's questioning of prospective juror Banks about her personal experiences with crime, specifically in regards to her questionnaire answer that she had a close friend whose son was murdered.  (7 RR at 159.)   Prospective Juror Banks described the crime and commented that her friend forgave the perpetrator.  (7 RR at 159-60.)   The State proceeded to ask five questions about this crime: did they catch the perpetrator, was the perpetrator a stranger, what was the punishment, did Banks feel that was an appropriate punishment, and did Banks feel like the perpetrator had repented? (7 RR 160-163.)  Banks expressed admiration for her friend's ability to forgive, but wondered "if I could have been so forgiving and able to heal as quickly as she did."  (7 RR at 160.)  Later in voir dire, the State asked "You feel very strongly about forgiveness?  Is that fair to say?"  (7 RR at 170.)  Banks responded, "Yeah,

but even though I forgive you does not mean that you get to escape the consequences of your bad choice."  (7 RR at 170.)

In regards to Banks's background in the ministry, the State asked her a total of five questions related to her minister's diploma, three of which merely ascertained how long it had taken her to get the degree  and where the classes were held.[74]

In *Emerson v. State*, the Texas Court of Criminal Appeals found that the State's explanation for striking a juror was not legitimate when the State believed that the venire member was an unemployed college student or professor, and therefore liberal.  Because the State did not ask any questions to confirm whether the venire member was liberal, the State improperly "applied a group bias without inquiring whether it applied to [the venire member] specifically."  *Emerson v. State,* 851 S.W.2d 269, 274 (Tex. Crim. App. 1993); *see also Whitsey*, 796 S.W. at 714-716.  In the case at hand, the State's only question in regards to Banks's own views on forgiveness was "[y]ou feel very strongly about forgiveness?  Is that fair to say?" to which Banks replied, "[y]eah, but even though I forgive you does not mean that you get to escape the consequences of your bad choice."  (7 RR at 170.) During discussion about her friend's ability to forgive, Banks stated that she admired her friend's ability to forgive but wondered if she could have done the same.  (7 RR at 160.)

Here, just as in *Emerson*, the State did not ask questions to confirm that Banks had forgiveness characteristics that it associated with the type of person in

---

[74] "Q: And you also have a minister diploma?  . . . What does that allow to you do? Does it actually allow you to do services or sermons?  . . . Okay. When you, I guess, were getting this diplomas, do you—how long does the training last?  . . . Okay. And do you—is it there at the church or do you go someplace else like to seminary or—. . . So, you actually have, I guess, four semesters?" (7 RR at 157-58.)

the minister's field.  Furthermore, Banks's response to the State's one question concerning her own views on forgiveness and her other statements on her friend's ability to forgive suggest that she held opposite views, that forgiveness was *not* something she was capable of, at least not automatically.  Therefore, the State applied an impermissible group bias without determining whether it applied to Banks specifically.

Moreover, the State did not engage in a meaningful voir dire examination on the subject of forgiveness or on Banks's background in the ministry to actually ascertain her views as related to both.  In *Reed*, the Fifth Circuit Court of Appeals held that the State's failure to question a prospective juror about her job as a health care professional, even though this was a reason given for her strike, suggests pretext.  *Reed*, 555 F.3d at 377.  In the case at hand, the State asked Banks a total of five questions related to her minister's diploma, three of which were merely related to logistics.  (7 RR at 157-58.)  None of the questions regarding her background in the ministry dealt with her ability to forgive or her views on forgiveness.  This cannot be considered a meaningful voir dire on the subject of her ministry background or her ability to forgive, thus further demonstrating this strike was purposefully discriminatory.

### D. The State's Alleged Race-Neutral Reasons Are Pretextual

When the State proffers five reasons for a strike and three turn out to be false, this is no "innocent mistake" but evidence of pretext to mask discrimination. Similarly, when the State strikes a minority juror, but accepts a similarly-situated white juror, that is substantial evidence of purposeful racial discrimination.  *Miller-El*, 545 U.S. at 241.  Finally, the State improperly "applied a group bias without inquiring whether it applied to [the venire member] specifically" and failed to engage in a meaningful voir dire examination on a subject that it was concerned about, which are further evidence of discrimination.  *Emerson*, 851 S.W. at 274;

187

*Miller-El*, 545 U.S. at 246.  The genuineness of the prosecutor's justifications is highly suspect when not one, but three separate avenues of discrimination are evident behind their alleged race-neutral justifications.  *See Nieto*, 365 S.W.3d at 676.  Because the State's strike of prospective juror Banks was purposefully discriminatory, Harper suffered a violation of his rights under the Fourteenth Amendment as well as the constitution and criminal laws of Texas.  *Miller-El*, 545 U.S. at 241; Tex. Code Crim. Proc. Art. 35.261(a).  To the extent that these arguments should have been raised on appeal, appellate counsel was ineffective for failing to present them.  *See Robbins*, 528 U.S. at 285.

# CLAIM THIRTEEN

## APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO CONDUCT A COMPARATIVE JUROR ANALYSIS IN SUPPORT OF THE *BATSON* CLAIM ALLEGED

As discussed in Claim Eleven, *ante*, prospective juror Banks was improperly struck by the State on the basis of her race.  Harper's appellate counsel raised a *Batson* claim regarding juror Banks, however appellate counsel did not conduct a comparative juror analysis to expose the State's purposeful discrimination.  Due to appellate counsel's ineffectiveness, Harper's rights under the Fourteenth Amendment of the United States Constitution, comparable provisions of the Texas Constitution and statute, and United States Supreme Court and state case law were violated.  As such, Harper is entitled to a new trial with regards to guilt and punishment.

### A. Relevant Facts

Point of Error No. 2 in Harper's direct appeal is a *Batson* claim regarding the State's peremptory challenge of prospective juror Banks.  (Ex. 43 at 5 [Excerpts from the Appellate Record].)   As previously discussed, the State proffered five race-neutral reasons for striking Banks: (1) in the State's opinion, Banks did not answer questions directly; (2) Banks would do away with the death penalty in favor of life imprisonment without parole; (3) Banks believed that rehabilitation is the most important consideration; (4) Banks did not answer the question on her questionnaire about whether the death penalty was more effective than life imprisonment without parole, and on voir dire stated that she believed life without parole was more effective; and, (5) Banks had a background in ministry and felt strongly about forgiveness.  (*See* 7 RR at 182-83.)

189

**B. Harper Received Ineffective Assistance of Appellate Counsel**

It is well-settled that criminal defendants are entitled to effective assistance of counsel during their direct appeals.  The effectiveness of appellate counsel is determined using the familiar two-prong *Strickland* standard.  *See Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985); *Ries v. Quarterman*, 522 F.3d 517, 531 (5th Cir. 2008); *Amador v. Quarterman*, 458 F.3d 397, 410-11 (5th Cir. 2006); *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007).  Appellate counsel is considered ineffective if counsel's performance was objectively unreasonable, and this deficient performance prejudiced the defendant.  *See Ries*, 522 F.3d at 531; *Amador*, 458 F.3d at 411.

**1. Deficient Performance**

Appellate counsel has an obligation to research relevant facts and law, so as to raise "solid, meritorious arguments" based on controlling precedent in an appellate brief.  *United States v. Williamson*, 183 F.3d 458, 463 (5th Cir. 1999); *accord Ries*, 522 F.3d at 531-32; *see Ex parte Santana*, 227 S.W.3d at 704-05 (*Strickland* standard controls ineffective assistance of appellate counsel claims). Section 12.2(A) of the Texas Guidelines for capital counsel outlines the duties of appellate counsel.  Counsel must "review the appellate record for all reviewable errors" and prepare "a well researched and drafted appellate brief."  *Texas Guidelines*, Guideline 12.2(A)(8).12.2.

In Harper's case, appellate counsel's failure to conduct and present a comparative juror analysis was objectively deficient.  Following the United States Supreme Court's landmark ruling in *Miller-El v. Dretke*, which utilized comparative juror analysis to uphold a *Batson* challenge, defense attorneys have been on notice about the incalculable value of this analytical tool.  *See Miller-El v. Dretke*, 545 U.S. 231, 241 (2005).  The Fifth Circuit further highlighted the importance of comparative juror analysis more than a year prior to the filing of

Harper's direct appeal in the case of *United States v. Brown*, which required courts to conduct comparative juror analysis when contemplating a *Batson* challenge. *See United States v. Brown*, 553 F.3d 768, 796-97 (5th Cir. 2008).

As discussed in Claim Eleven, *ante*, comparative juror analysis requires close scrutiny and comparison of prospective jurors' voir dire testimony and juror questionnaires. Although the juror questionnaires were not incorporated into the clerk's record, appellate counsel was entitled to request their inclusion, thus giving counsel access to this vital information about the voir dire process at Harper's trial.[75] Indeed, in rejecting appellate counsel's *Batson* claim, the CCA noted that appellate counsel "failed to preserve the jury questionnaires (on which he seems to rely) which would tell us the racial composition of the venire and the racial composition of the seated jury." *Harper v. State*, No. AP-76452, 2012 WL 4833834 at *7.

### a. Appellate Counsel's Attempt to Conduct a Comparative Juror Analysis was Objectively Deficient

Appellate counsel's *Batson* claim was deficient, as counsel did not address or argue against each of the State's proffered reasons for striking prospective juror Banks. The State took issue with Banks's background in ministry and interest in forgiveness. This objection improperly applied a group bias to dismiss Banks, as discussed more fully in Claim Eleven, *ante*. *See Emerson*, 851 S.W.2d at 273-74.

---

[75] Appellate counsel's failure to include the questionnaires in the record was ineffective performance, as proper analysis of the voir dire process and the *Batson* claim at issue was not possible without them. Similarly, trial counsel's failure to include the questionnaires was also deficient, as trial counsel has a duty to preserve all possible issues for appeal. These failures, separately and together, prejudiced Harper, as access to the questionnaires would have led to a stronger *Batson* claim and would have altered the outcome of his direct appeal. *See Robbins*, 528 U.S. at 285.

However, appellate counsel provided no facts or arguments to rebut this reason proffered by the State.

Appellate counsel's challenges to the remaining race-neutral reasons given by the State were not rigorously contested, reflecting unreasonably deficient appellate performance. Had appellate counsel conducted a proper, rigorous comparative juror analysis, it would have been clear that each of the State's proffered reasons were in fact pretextual. (*See* Claim Eleven, *ante*.)

Appellate counsel attempted to compare prospective juror Banks's responses to those of other jurors, but this attempt fell far short of a true comparative juror analysis. First, appellate counsel argued that Banks's responses were as responsive as those of juror Williams. However, not only was a comparison not needed to dispute this issue, as the record clearly revealed that she was responsive, but appellate counsel did not explain this assertion or cite to specific relevant answers. Appellate counsel also attempted to compare prospective juror Banks's views on rehabilitation to other venire members. However, counsel only found two examples of other prospective jurors with similar views, whereas a more in-depth analysis reveals that eight State-accepted panelists had comparable opinions on rehabilitation. (*See* Claim Eleven, *ante*.)

Appellate counsel entirely failed to conduct a comparative juror analysis with respect to the issue of the missing question on prospective juror Banks's questionnaire. Two seated white jurors failed to answer questions on their questionnaires, with one even neglecting to sign the last page of the form certifying that his responses were true and correct. (*See* Ex. 6 at 13 [Questionnaire - Hargrave].) The State then cited Banks's answer to the missing question as a reason for the peremptory challenge. However, this reason is entirely pretextual, as an accepted white juror provided the same answer on his questionnaire as Banks did during her voir dire testimony. (*See* Ex. 13 at 10 [Questionnaire - Smith].)

Harper received ineffective assistance of appellate counsel due to counsel's failure to conduct a comparative juror analysis, as required by *Miller-El* and *Brown*, and appellate counsel's otherwise poorly researched and presented *Batson* claim.

## 2. Prejudice

Had appellate counsel conducted a thorough, proper comparative juror analysis, counsel would have presented a compelling argument that the State's reasons for striking juror Banks were entirely pretextual, as discussed more fully in Claim Eleven, *ante*. Harper was prejudiced by appellate counsel's deficient performance because a proper examination and presentation of this *Batson* claim would have led to a reasonable probability that the outcome of his direct appeal would have been different. *See Robbins*, 528 U.S. at 285; *Ex parte Santana*, 227 S.W.3d at 704-05.

## CLAIM FOURTEEN

## TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESERVE POTENTIAL *BATSON* CLAIMS

As detailed in Claim Eleven, *ante*, trial counsel lodged a *Batson* challenge to the State's peremptory strike of prospective juror Banks. However, counsel neglected to preserve a *Batson* claim for three other African-American jurors struck by the State, as defense counsel did not request the State to offer race-neutral explanations for these strikes. This failure to properly preserve the *Batson* issues regarding these jurors constituted ineffective assistance of counsel in violation of Harper's rights under the state and federal Constitutions, Texas criminal law, and United States Supreme Court and Texas case law.

### A. Relevant Facts

Defense counsel raised a *Batson* challenge immediately following the State's peremptory strike of prospective juror Banks, an African-American female. In the

challenge, counsel noted that the State had used three prior peremptory strikes to remove African-American jurors from the panel.  (7 RR at 184.)  Defense counsel did not raise *Batson* challenges to the strikes of these jurors, and thus the State was not required to provide race-neutral reasons for these strikes.  (*See* 5 RR at 110; 6 RR at 77; 7 RR at 117.)  With regards to the State's removal of prospective juror Broadnax, defense counsel specifically stated that "This was not a *Batson* challenge.  And I'm putting that in there so ten years from now when somebody wants to know."  (6 RR at 78.)

### B. Trial Counsel's Failure to Request Race-Neutral Reasons from the State Amounted to Unreasonable Performance

"One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review."  *ABA Guidelines*, Guideline 10.8 cmt. (quoting Stephen B. Bright, *Preserving Error at Capital Trials*, THE CHAMPION, Apr. 1997, at 42-43.).  Defense counsel's failure to preserve *Batson* challenges to prospective jurors Clark, Broadnax, and Pugh violated this important duty. Without requiring the State to produce race-neutral explanations for its peremptory strikes, these strikes are nearly impossible to review and challenge during the appeals process.  As discussed in Claim Eleven, *ante*, comparative juror analysis is an analytical tool that is designed to determine whether the State's proffered reasons are pretextual.   Because defense counsel did not require race-neutral reasons for these three peremptory strikes, comparative juror analysis is not possible.

Defense counsel not only neglected its duty to preserve potential legal claims for Harper's appeals, but also wavered from the duty to "act with competence, commitment and dedication to the interest of the client and with zeal in advocacy on the client's behalf."  Texas Rules Prof. Conduct. 1.01 (Comment

6).   Rather than make the appropriate *Batson* challenge to the State's peremptory strike of prospective juror Broadnax, defense counsel undermined Harper's rights to a constitutionally-selected juror and potential claims on appeal.   Indeed, defense counsel told the court that, with respect to juror Broadnax, it was not making a *Batson* claim and wanted that inaction noted for the record upon any possible appellate review "ten years from now."   (*See* 6 RR at 78.)   Whatever defense counsel's motive for this statement, it was certainly not designed to further Harper's interests, both during the selection of a jury that would decide his life's fate and during the future appellate review of his trial.

## C. Trial Counsel's Performance Prejudiced Harper's Appellate Proceedings

Had defense counsel raised *Batson* challenges to prospective jurors Clark, Broadnax, and Pugh, the State would have had to issue race-neutral reasons explaining these peremptory strikes.   There is a reasonable probability that a comparative juror analysis upon appellate review would have indicated that the State's strikes were improperly motivated by race, in violation of Harper's state and federal constitutional rights.   As there is a reasonable probability that the result of Harper's appeals would be different absent defense counsel's deficient performance, Harper suffered prejudice and is entitled to a new trial.   *See Robbins*, 528 U.S. at 285; *Strickland*, 466 U.S. at 694; *Ex parte Ellis*, 233 S.W.3d at 329-30. To the extent that these arguments should have been raised on appeal, appellate counsel was ineffective for failing to present them.   *See Robbins*, 528 U.S. at 285.

195

ISSUES RELATED TO PRE-TRIAL AND GUILT/INNOCENCE

CLAIM FIFTEEN

**TRIAL COUNSEL WAS INEFFECTIVE BY NOT REDUCING TO WRITING AN AGREEMENT BY THE STATE THAT HARPER COULD PLEA TO A LIFE SENTENCE IF THE STATE'S MENTAL HEALTH EXPERT CAME TO THE SAME CONCLUSION AS THE DEFENSE'S EXPERT**

Defense counsel facilitated an interview between the State's expert, Dr. Mark Moeller, and Harper on the understanding that if Dr. Moeller agreed with defense expert Dr. Richard Dudley's finding that Harper suffered from mental illness, Harper would be allowed to plea to a life sentence. However, trial counsel failed to obtain a written record of this agreement, preventing them from enforcing it when the state did not offer Harper the opportunity to plead to life without parole as agreed. Defense counsel's omission fell below the generally recognized standard of care and thus violated Harper's rights pursuant to applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law.

**A. Trial Counsel Performed Deficiently by Failing to Get a Written Copy of the State's Agreement to Allow Harper to Plea to Life**

The right to the effective assistance of counsel extends to the plea bargaining process. *Missouri v. Frye*, __U.S.__, 132 S. Ct. 1399, 1405 (2012). While courts are wary to wade into the requirements of the negotiation process, counsel, at the very least, must not perform deficiently. *Id.* at 1408. Deficient performance during plea bargaining is governed by the *Strickland* standard, *id.* at 1405, and is performance that is "inconsistent with the standard of professional competence in capital cases that prevailed [at the time of the trial]." *Pinholster*, 131 S. Ct. at 1407. One of the leading examples of professional conduct at the time of trial was the ABA Guidelines for the Appointment and Performance of Defense Counsel in

196

Death Penalty Cases.  According to the ABA Guidelines, "[d]uring entry of the plea, counsel should make sure that the full content and conditions of any agreements with the government are placed on the record."  *ABA Guidelines*, Guideline 10.9.2(B)(2).  This applies with full logical force to the plea negotiating process—when trial counsel has received a favorable, beneficial offer from the prosecutor, common sense dictates reducing it to writing.

During pre-trial negotiations, prosecutors conveyed to trial counsel that if the State's mental health expert agreed with defense expert Dr. Dudley that Harper was mentally ill, they would offer Harper a life sentence.[76]  Trial counsel made this clear during his communications with the district attorney's office: "[I] was under the impression that if we permitted the State expert access to our client and he agreed with our expert then [the district attorney] would approve letting us plea to life without parole."  (Ex. 38 [James Stafford Email (7/23/10)].)  Trial counsel believed that the prosecutor was in agreement with this position.  *Id.*  Despite the obvious importance of such an agreement, counsel failed to reduce the agreement to writing, and was thus unable to enforce it when the State reneged on the arrangement.  As a result, Harper proceeded to trial and was sentenced to death.

This failure placed counsel's conduct outside the realm of professional conduct.  Under relevant ABA Guidelines, trial counsel should have obtained written confirmation of the agreement between the parties allowing Harper to plea to life.  *See ABA Guidelines*, Guideline 10.9.2.  No plausible strategic reason for the failure to do so; obtaining a plea agreement for a life sentence was, in fact, trial counsel's strategy from the beginning.  Common sense dictates that trial counsel should have reduced to writing a crucially important agreement such as the opportunity to plead to a life sentence.

---

[76] To the extent that evidence is later uncovered to show that the State acted in bad faith, Harper reserves the right to raise a claim alleging prosecutorial misconduct.

### B. Harper Was Harmed by the Deficient Performance Because Dr. Moeller Agreed with Dr. Dudley's Diagnosis and Harper Would Have Pleaded to a Life Sentence

To establish harm the "appellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). This involves a multi-step process: showing that Dr. Moeller's diagnosis was the same as Dr. Dudley's, and if so that there was a reasonable probability that Harper would have accepted the offer of life in prison if it had been formalized. *See Frye*, 132 S. Ct. at 1409.

Both experts came to the same conclusion, that Harper suffered from a severe mental illness—although there was disagreement as to how the illness should be classified.[77]  Dr. Moeller testified that he diagnosed Harper as suffering from paranoid schizophrenia with auditory hallucinations.  (23 RR at 33.)  This diagnosis was largely consistent with that of Dr. Dudley (that Harper suffered from schizoaffective disorder), but the experts disagreed on whether the schizophrenia or the depression was the leading cause of Harper's illness.[78]  (21 RR at 40-42.)  In comparing the diagnoses, Dr. Dudley stated that "I was in fact in agreement with

---

[77] Although Dr. Moeller agreed with the defense that Harper was mentally ill, he testified at trial that Harper was also a future danger.  (23 RR at 55.)  In his initial report, Dr. Moeller had written "[s]hould [Harper] be sentenced to prison for life without a possibility of parole, he is likely to adapt to prison life and it is unlikely that he will be dangerous."  (*Id*. at 59.)  In attempting to determine why Dr. Moeller changed his opinion prior to testifying, post-conviction counsel called and left messages for Dr. Moeller on several occasions.  On October 9, 2012 Dr. Moeller's assistant Carmen left post-conviction counsel a voicemail stating, "I spoke with Dr. Moeller and he is not going to be returning your call regarding Mr. Harper."

[78] The MHMRA assessment completed immediately after Harper's statement to police is also consistent with the diagnoses reached by both experts.  (21 RR at 37-38.)

both the MHMR[A] evaluator and Dr. Moeller with regard to … Harper's symptoms, despite our each having come to a different diagnosis." (Ex. 46 at ¶61 [Aff. of Dr. Dudley].)  Because the experts came to similar conclusions, the first step in the harm analysis is met.

The second step requires establishing a reasonable probability that Harper would have accepted a life sentence had it been offered.  Harper was willing to plead to life; in fact, this was the only reason that trial counsel agreed to allow Dr. Moeller to interview Harper at that time.  (Ex. 41 [James Stafford Letter (1/25/10)] (describing Harper's "hopes of resolving this case."); *see also* Ex. 38 [James Stafford Email (7/23/10)] (noting that the opportunity to plea to life "was the only reason we agreed to the interview.").)  The harm suffered by Harper was severe—instead of receiving a life sentence, he was forced go to trial and was subsequently sentenced to death.  This was a direct result of trial counsel's deficient performance in failing to reduce the agreement to writing that would have allowed Harper to plea to life.

## CLAIM SIXTEEN

### TRIAL COUNSEL WAS INEFFECTIVE FOR NOT PRESENTING EVIDENCE THAT HARPER SUFFERED FROM A SEVERE MENTAL ILLNESS AS A BASIS FOR SUPPRESSION OF HIS POST-ARREST CONFESSION TO POLICE

Defense counsel was aware that Harper suffered from a severe mental illness, diagnosed as schizoaffective disorder by defense expert Dr. Richard Dudley.  (*See* Claim Four, *ante*.)  However, trial counsel failed to present compelling, readily available evidence of Harper's mental illness as a basis for suppression of his post-arrest confession to police.  Defense counsel's omission fell below the generally recognized standard of care and thus violated Harper's rights pursuant to applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law.

199

### A. Trial Counsel's Failure to Present Compelling Evidence they Possessed Detailing Harper's Severe Mental Illness was Deficient Performance under the Recognized Standards of Care

Neither in the motion to suppress the confession or the hearing based on that motion did counsel mention Harper's psychotic disorder and the compelling evidence of it that they possessed. (*See* 7 CR at 1771-75; 12 at RR 6-50.) Counsel could have used this evidence in two separate ways: to argue that Harper's confession was not voluntary, or to argue that he had not knowingly and intelligently waived his rights before being questioned. The failure to use this evidence to litigate either of these claims by itself can constitute ineffective assistance; counsel's cumulative failure to do either must certainly be ineffective.

### 1. Counsel Performed Deficiently by Failing to Argue that Harper's Confession was Involuntary Based on his Severe Mental Illness

Texas's standard for evaluating the voluntariness of statements is significantly broader than the federal constitutional protection. *Oursbourn v. State*, 259 S.W.3d 159, 172 (Tex. Crim. App. 2008). Under the federal standard, the defendant is required to establish that police coerced him into giving the statement. *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). In the absence of such a showing, a statement cannot be considered involuntary as a violation of due process, regardless of the defendant's mental illness or other abnormalities. *Id.* In contrast, the Texas voluntariness standard is significantly broader:

> These [voluntariness] inquiries do not turn solely on police overreaching. The behavior of the police may or may not be a factor. *A confession given under the duress of hallucinations, illness, medications, or even a private threat, for example, could be involuntary* under Article 38.21 and the Texas confession statute. The defendant in *Connelly* did not have a valid federal constitutional involuntariness claim, but, had he confessed in Texas, he might have had a viable claim under Articles 38.21 and 38.22. As Professor Dix has noted, "evidence of a defendant's psychological abnormality"

(such as Connelly's evidence of hallucinations and following God's command) "has its full logical relevance" under Texas law.

*Oursbourn*, 259 S.W.3d at 172 (emphasis added) (internal citations omitted). Thus, under Texas law, a defendant's statement can be involuntary based solely on mental illness.

Defendants in Texas are able to challenge the voluntariness of statements that they have made at a pre-trial hearing outside of the presence of the jury. Tex. Code Crim. Proc. Art. 38.22(6). Even if the judge determines that the statement was made voluntarily, the defendant is permitted to argue before the jury at trial that the statement was not voluntary—and the jury is forbidden from knowing the judge's decision to the contrary. *Id.* The defendant is entitled to the added benefit of an instruction that any involuntary statements cannot be considered for any purpose. *Id.* This two-step process gives trial counsel added incentive to fully litigate issues regarding the voluntariness of their client's statements.

Trial counsel was in possession of a wealth of evidence that Harper suffered from a severe and debilitating mental illness, as illustrated by their other pre-trial motions. In a motion filed on August 24—three weeks prior to the suppression hearing—counsel moved to precluded the death penalty as a sentencing option based on Harper's mental illness. (5 CR at 1190-1204.) The motion contained a summary of the evidence that counsel possessed regarding Harper's mental illness, labeling it "a severe and debilitating mental illness . . . . [including] major depressive disorder with psychosis, bipolar disorder with psychotic features, and Post-Traumatic Stress Disorder." (*Id.* at 1191.) The motion further argued that Dr. Dudley found that Harper's hallucinations "had a significant impact on his ability to function," as well as noting that the State's expert witness (Dr. Mark Moeller) reached a similar conclusion. (*Id.*) Additionally, counsel was in possession of an assessment completed by the Harris County MHMRA directly after Harper's

201

confession to police during which Harper reported hearing voices—at the time of the assessment—that were telling him what to do.  (Ex. 34 at 1 [Garland Harper MHMRA Assessment].)

In *Oursbourn* the CCA specifically noted that "hallucinations, illness, [and] medications" are viable grounds under which the voluntariness of a statement can be attacked.  *Oursbourn*, 259 S.W.3d at 172.  Counsel possessed precisely this type of evidence as three separate experts came to the conclusion that Harper suffered from hallucinations.  (21 RR at 57; 23 RR at 33.)  Inexplicably, counsel failed to use this to challenge the voluntariness of Harper's confession.  This failure falls short of the requirements outlined in the ABA Guidelines to "litigate all of the possible legal and factual bases" and to "tailor[] the presentation to the particular facts and circumstances in the client's case."  *ABA Guidelines*, Guidelines 10.8.  Counsel's deficient performance is even more egregious based upon the opportunities presented by Art. 38.22(6).  Tex. Code Crim. Proc. Art. 38.22(6).  Art. 38.22(6) provide two opportunities—before the judge and, if that fails, the jury—to challenge the voluntariness of the confession.  *Id.*  Trial counsel took advantage of neither opportunity, despite the wealth of evidence in their possession supporting this claim.

The failure to present evidence of Harper's mental illness is particularly confusing in light of one of counsel's main themes at the suppression hearing— that officers coerced Harper into waiving his rights prior to giving his confession.  (12 RR at 36.)  An individual with a severe mental illness, such as Harper, is more susceptible to coercive tactics employed by police officers.  But, despite having the opinions of three medical personnel—Dr. Dudley, Dr. Moeller, and the MHMRA evaluator—that Harper suffered from a severe mental illness, counsel failed to argue that it facilitated the officer's coercion.  Thus, counsel's deficiency includes

202

failing to raise the mental illness evidence both as a claim standing on its own and to strengthen the argument that was actually proffered.

Counsel's failure can in no way be considered strategic.   While strategic decisions are virtually unchallengeable, "when no reasonable trial strategy could justify the trial counsel's conduct, counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflects the trial counsel's subjective reasons for acting as she did." *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005).   Counsel's failure to present a compelling factual basis for a claim, as required by both relevant guidelines, is not a strategic decision.   *See Ex parte Dunham*, 650 S.W.2d 825, 827 (Tex. Crim. App. 1983) (en banc) ("[A]bdication of a basic threshold responsibility . . . is the antithesis of a considered strategy.").   One appellate court has made its opinion clear as to the failure to challenge the voluntariness of a confession with readily available evidence:

> The record before the court demonstrates a total failure on the part of trial counsel to raise the issue of the voluntariness of [the defendant's] statement.   The result was the waiver of appellant's constitutional and statutory rights.   It is inconceivable that such an omission can be attributed to trial strategy.

*Sanders v. State*, 715 S.W.2d 771, 775 (Tex. App.—Tyler 1986, no pet.)   In *Sanders*, trial counsel was ineffective because of the failure to use significant available evidence to challenge the voluntariness of the defendant's statement.   *Id.* at 774-75.   Harper deserves the same result.

Instead of being a strategic decision to not use available evidence of mental illness, such evidence was not used due to trial counsel's inability to understand the importance of that evidence and their failure to prepare properly to use it.   In his affidavit, Dr. Dudley stated that "[t]he fundamental problem regarding the presentation of evidence related to Mr. Harper's mental health at trial is that

203

defense counsel did not spend enough time preparing for my testimony." (Ex. 46 at ¶38 [Aff. of Dr. Dudley].)  Trial counsel failed to meet with Dr. Dudley or discuss his diagnosis until nine days *after* the hearing on the Motion to Suppress. (*Id.* at ¶27.)  In light of trial counsel's failure to properly prepare testimony regarding Harper's mental illness, it is not surprising that they failed to use it effectively.

### 2. Counsel Performed Deficiently by Failing to Argue that Harper's Waiver of his Constitutional Rights was not Knowing and Intelligent Based on his Severe Mental Illness and History of Drug Abuse

Counsel also performed below the recognized standard of care by failing to argue that Harper's pre-confession waiver of rights was not knowing and intelligent.  This is a separate inquiry from the voluntariness of a statement. *Ripkowski v. State*, 61 S.W.3d 378, 384 (Tex. Crim. App. 2001).  A waiver of constitutional rights "must be made 'with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* (quoting *Colorado v. Spring*, 479 U.S. 564, 573 (1987)).  Both mental illness and drug use are relevant factors under this totality of the circumstances analysis. *Id.* A defendant suffering from a severe mental illness exacerbated by drug use such as Harper is unable to understand the consequences of his actions.  Despite this, trial counsel failed to litigate this issue with readily available evidence.

Trial counsel failed to present testimony from Dr. Dudley that would have established that Harper's waiver of his rights was not knowing and intelligent:

> Given [Harper's post-arrest diagnosis of major depressive disorder with psychotic features] and its proximity in time to when he spoke to police, *Mr. Harper's waiver of his rights cannot be considered knowing and intelligent*.  Because of the mental illness symptoms Mr. Harper was experiencing at the time he made his statement, his decision-making process was severely compromised.  It is apparent to me from viewing his statement that Mr. Harper did not make an intelligent decision to waive his rights and in fact barely recognized

what he was saying or doing: in response to prodding by police interviewers he just started talking. *An individual who is experiencing symptoms of schizophrenia such as auditory hallucinations while also suffering from such severe depression would not have been able to appreciate the consequences of waiving his rights and giving a statement.*

(Ex. 46 at ¶86 [Aff. of Dr. Dudley] (emphasis added).)   Harper's functioning during his confession to police was "severely impacted" by his mental illness and his capacity for "rational, well-reasoned decision-making [had] steadily deteriorated due to the extreme paranoia and depression he was experiencing." (*Id.* at ¶79.)   Critically, trial counsel could have presented evidence that individuals suffering from mental illness similar to Harper's are regularly able to hide their illness from others, thus making them appear coherent to the untrained observer. (*Id.* at ¶87.)

The MHMRA assessment performed directly after Harper's confession to police also supports a finding that he did not knowingly and intelligently waive his rights.   During this assessment, Harper received a Global Assessment of Functioning ["G.A.F."] score of 35.   (21 RR at 33.)   G.A.F. scores estimate a person's ability to function and are scaled from 1 to 100, with 100 being a perfect score.   (*Id.* at 32-33.)   A score of 35 is a "profound dysfunction," meaning that Harper was not functioning normally at the time.   (*Id.* at 33-34.)   Thus, the MHMRA assessment supports Dr. Dudley's analysis that Harper was incapable of understanding the consequences of his actions during his confession to police.

In addition to mental health, drug use is a relevant factor under the knowing and intelligent analysis. *Ripkowski*, 61 S.W.3d at 384.   And again, trial counsel was in possession of relevant, powerful evidence that they failed to use.   Harper had a history of self-medicating his mental health issues with cocaine and other drugs.   (*See* Ex. 34 at 2 [MHMRA Assessment]) (during which Harper admitted to

drug use since the age of thirteen, including cocaine on a weekly basis, and reported that he had last used cocaine after the crime). This drug use worsened the effects of Harper's mental illness and harmed his decision making capabilities. (Ex. 46 at ¶¶72, 80 [Aff. of Dr. Dudley].) This evidence, in combination with that Harper's mental illness, would have enabled counsel to craft a powerful argument that Harper did not knowingly and intelligently waive his rights.

Counsel used none of this evidence to challenge that Harper's waiver of his rights was not knowing and voluntary. This failure placed them far below the requirements outlined in the ABA guidelines, which include "tailoring the presentation to the particular facts and circumstances in the client's case." *ABA Guidelines*, Guideline 10.8. Similar to their failure to argue the voluntariness of Harper's confession under Texas law, no possible strategic reason exists for this failure to challenge that the waiver was not knowing and intelligent; rather, this failure was due to trial counsel's inability to grasp the significance of the evidence. (Ex. 46 at ¶38 [Aff. of Dr. Dudley].)[79]

## B. Harper was Harmed by this Deficient Performance

To establish harm the "appellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). For Harper, this requires a two-step process: establishing a reasonable probability that the confession would not have been admissible, and a reasonable probability that this would have affected the outcome of his trial.

---

[79] A lengthier discussion of trial counsel actions not being strategic is contained in the previous section and, as it is largely similar, has been omitted here for brevity.

206

### 3.  A Reasonable Probability Exists that Harper's Confession would have been Suppressed or that the Jury would have Considered it Involuntary

Because of Texas's two-step process for challenging the voluntariness of a confession, Harper succeeds in establishing harm if there is a reasonable probability that either the judge would have suppressed the confession or that the jury would have considered in involuntary.   The severity of Harper's mental illness, highlighted by documented hallucinations occurring in close proximity to his confession to police, establishes a reasonable probability that either the judge or the jury would have considered the confession to be involuntary.  (*See* Ex. 34 at 1 [MHMRA Assessment]) (during which Harper reported that "voices are talking to him now").

Expert witnesses for both the state and the defense concluded that Harper was suffering from a severe mental illness that included hallucinations.  (5 CR at 1191.)   The MHMRA assessment completed after the confession was given established that Harper was suffering from hallucinations in close proximity to the confession.  (Ex. 34 at 1 [MHMRA Assessment].)   The wealth of available evidence diagnosing Harper's severe mental illness provides, at the very least, a reasonable probability that the confession would have been suppressed by the judge had it been presented.

But, even if the judge were to have determined that the confession was made voluntarily, a reasonable probability exists that at least one juror would have deemed it involuntary and thus not considered it as evidence against Harper.  Texas's two-step process allows counsel to repeat the argument that has previously failed with the judge to the jury.   The fact that the judge has determined the confession voluntary is irrelevant at this stage; the jury is prevented from knowledge of the judge's ruling.  Tex. Code Crim. Proc. art. 38.22(6).  This second

opportunity increases the chances that Harper's confession would not have been used against him.

Alternatively, a reasonable probability exists that the confession would have been suppressed based on Harper's waiver of his rights not being knowing and intelligent.  Both drug use and mental illness are relevant this inquiry.  *Ripkowski*, 61 S.W.3d at 384.   Presentation of Dr. Dudley's testimony and evidence of Harper's low G.A.F. score and drug use provide a substantial chance of success that this claim would have succeeded.  Dr. Dudley was of the opinion that this combination prevented Harper from knowingly and voluntarily waiving his rights. (Ex. 46 at ¶86 [Aff. of Dr. Dudley].)  Harper's waiver of his constitutional rights, rather than being the product of his rational intellect and free will, was the product of his severe mental illness and drug use.

Harper has presented three theories under which harm can be established: that the judge may have suppressed his confession as involuntary; that the jury may have considered it involuntary; or, that the judge may have suppressed the confession based on the police's failure to gain a knowing and intelligent waiver of Harper's rights.  Any of these standing alone is enough establish harm, but the cumulative impact of trial counsel's failures makes the harm all the more severe.

### 4. A Reasonable Probability Exists that Harper Would Not have been Convicted Absent his Confession to Police Being Admitted

A confession confessing to the crime represents some of the most damning evidence available against a suspect.  *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) ("defendant's own confession is probably the most probative and damaging evidence that can be admitted against him") (internal cite omitted); *see Mosley v. State*, 983 S.W.2d 249, 258 (Tex. Crim. App. 1998) (en banc) ("[A] confession can be especially strong evidence of guilt.").  Any time that a confession is erroneously admitted should, standing on its own, be sufficient to undermine confidence in the

outcome.  *Smith v. Zant*, 887 F.2d 1407, 1408 (11th Cir. 1989) (en banc) (reinstating the district court's ruling that the admission of confession was harmless as to guilt but prejudicial as to sentence).  Its importance to reaching the verdict, in either phase of trial, cannot be overlooked, particularly in a case such as Harper's where, outside of the confession he made to police, the evidence was largely circumstantial.  *See Harper v. State*, No. AP-76452, 2012 WL 4833834 at *2-3 (in discussing the evidence linking Harper to the crime that was presented at trial, the CCA only references information available from Harper's confession).

The importance of Harper's confession to police was highlighted by the State during opening argument and reinforced in closing.  The prosecutor spent significant time during her opening guilt phase argument explaining how vital Harper's confession was to the case, noting that "[y]ou'll see the statement, and you hear the defendant describe in his own words what happened in the early morning hours of October the 24th." (14 RR at 25.)  During her closing argument, the focus predictably remained on Harper's confession.  The prosecutor quoted Harper's confession to police on seven separate occasions to persuade the jury of his guilt.  (17 RR at 83-84.)  Without the benefit of the involuntary confession, there is a reasonable probability that he would not have been convicted, as the case would then have rested largely on circumstantial evidence alone.[80]

### a. The Erroneous Admission of Harper's Confession was Prejudicial at the Punishment Phase.

Even if the court determines that Harper was not harmed at guilt by the erroneous admission of his confession, it caused harm at the punishment phase. *See Smith*, 887 F.2d at 1408 (finding that the improper admission of a confession

---

[80] Other than Harper's confession, the State's case rested largely on evidence that merely established that Harper had a contentious family relationship. *See Harper v. State*, No. AP-76452, 2012 WL 4833834 *2-3. Certainly this, standing alone, is not enough to convict someone of capital murder.

was harmful at punishment but not guilt); *United States v. McCullah*, 76 F.3d 1087, 1102 (10th Cir. 1996) (same).  Based on the evidence presented at the guilt phase—of which Harper's confession was a critical part—one juror admitted that there was no possibility that she would find mitigating evidence that would have warranted a life sentence.  (Ex. 17 at 1, ¶¶3-4 [Juror Affidavits].)  The prosecutor also referenced the importance of Harper's confession during her closing argument, offering it as a reason that there were no mitigating circumstances warranting a life sentence.  (24 RR at 18-19.)  Removing Harper's confession from the balancing of aggravating and mitigating factors creates a reasonable probability that he would have received a life sentence, and thus a new sentencing phase is warranted.

## CLAIM SEVENTEEN

## TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO TIMELY OBJECT TO IMPERMISSIBLE VICTIM IMPACT TESTIMONY DURING GUILT/INNOCENCE PROCEEDINGS

The ex-husband and father of the victims, Lloyd Roberson, testified during the guilt phase of Harper's trial and was permitted to provide several instances of victim impact testimony which had no "tendency to make more or less probable the existence of any fact of consequence" regarding Harper's guilt.  *See Miller-El v. State*, 782 S.W.2d 892, 895 (Tex. Crim. App. 1990).  Trial counsel did not properly object so as to keep Mr. Roberson's testimony from the ears of the jurors. Because victim impact evidence is inadmissible during the guilt/innocence phase of a criminal trial, Harper's conviction and sentence of death were unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law.

210

### A. Relevant Facts

Lloyd Roberson ("Roberson") was Triska Rose's ("Triska") husband and Briana Roberson's ("Briana") father. (17 RR at 66).  Though Roberson and Triska had been separated since the mid-1990s, the two maintained a cordial, friendly relationship.  (*Id.* at 67-68.)  Roberson was involved in Briana's life, as well as Mya Love's. (*Id.* at 69.)

Roberson testified that on October 23, 2008 he went to Triska's apartment to pick up Briana to run an errand.  (*Id.* at 69.)  He talked to Ms. Rose for a while and briefly played with Mya.  (*Id.* at 69.)  Harper came by and spoke with Roberson too, and everything seemed normal to Roberson.  (*Id.* at 70.)

The next day, Roberson learned of the killings.  (*Id.* at 70-71.)  The State asked Roberson how he reacted to the news:

> Q: How did that make you feel when you learned that?
> A: Very frustrated and mad, you know, at that situation.
> Q: Did you stay at the scene?
> A: Yes.  I stayed to the scene until about maybe 1:00 o'clock that night.
> Q: You stated that when you found out what had happened to them, that you were frustrated and mad?
> A: That's correct.
> Q: How were you – why were you frustrated and mad, and how?
> A: I mean, as a parent, you know, you look at, you know, your kid and your wife and everybody laid out, you know, been deceased, I mean. They dead.  This guy has killed them.
> Q: What guy?
> Mr. Bourque: Objection, Judge. It's outside . . .
> The Court: Sustained.

(*Id.* at 72.)

Roberson then stated the apparent reason for his testimony, namely that he agreed to identify the victims in court.  (*Id.* at 73.)  Roberson identified two photographs of Triska before the State asked about her:

> Q: Mr. Roberson, can you tell us about Triska?
> A: That's a mother that cares about everything and would help you with any need you need, of anything.  Her heart is out to everyone.
> Mr. Bourque: Judge, we object to this being improper timing.
> The Court: That's sustained at this time.
> Q: Would Triska have fought for her children?
> Mr. Bourque: Objection. It's immaterial and irrelevant.
> The Court: Sustained.

(*Id.* at 74.)

Following his testimony identifying Triska, Roberson identified two pictures of his oldest daughter, Briana.  (*Id.* at 74-75.)  Despite the previous sustained objection to its questioning, the State asked Roberson about Briana:

> Q: Mr. Roberson, can you tell us about Briana?
> A: She didn't ever – don't bother no one.  Always be asking everything that you need.  She's a good kid that wouldn't harm no one.
> Mr. Bourque: Objection, Judge.  Improper victim impact.
> The Court: Sustained.

(*Id.* at 75-76.)

Roberson then identified two pictures of Mya Love.  (*Id.* at 76.)  For the third time in a row, the State questioned Roberson about Mya:

> Q: Can you tell us about Mya?
> A: Mya's a good kid.  Always asking a lot of questions.  Wanted to learn.  Without no problems.  Everything is real lovely with her.
> Mr. Bourque: Objection. Improper victim impact.
> The Court: Sustained.

(*Id.* at 76-77.)

After defense counsel declined to cross-examine Roberson, the State rested its case.  (*Id.* at 77.)  Without calling any witnesses, the defense rested immediately thereafter.  (*Id.* at 77.)

## B. Victim Impact Testimony is Inadmissible During the Guilt/Innocence Phase

"Victim impact" evidence is testimony "about the victim and about the impact of the murder on the victim's family." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991). Because evidence of the specific harm caused by the defendant may assist the jury in assessing the defendant's moral culpability and blameworthiness, victim impact evidence is generally admissible during the sentencing phase of a trial. *Ford v. State*, 919 S.W.2d 107, 114 (Tex. Crim. App. 1996) (en banc) (citing *Payne*, 501 U.S. at 825).

However, victim impact evidence is not admissible during the guilt phase of a criminal trial because such evidence does not have "any tendency to make more or less probable the existence of any fact of consequence at the guilt stage of trial." *Miller-El v. State*, 782 S.W.2d 892, 895 (Tex. Crim. App. 1990) (citing Tex. R. Cr. Evid. Rule 401).

## C. Trial Counsel's Failure to Properly Object to Victim Impact Testimony During the Guilt/Innocence Phase Constituted Ineffective Assistance of Counsel

The State elicited four instances of victim impact evidence during the testimony of Lloyd Roberson. Trial counsel failed to object to one such instance and improperly objected to the three others. These failures were objectively unreasonable and prejudiced Harper's trial.

### a. Deficient Performance

The first instance of victim impact evidence provided by Roberson was when the State asked how he felt when he learned about the deaths of the three victims. (17 RR at 72.) Roberson responded that he was "Very frustrated and mad, you know, at that situation." (*Id.*) Several questions later, when asked to explain these feelings, Roberson stated he was frustrated "[A]s a parent, you know, you look at, you know, your kid and your wife and everybody laid out, you know,

213

been deceased." (*Id.*)  Trial counsel did not object to either of Roberson's statements.[81]

Roberson's statements about his feelings upon hearing of the victims' deaths did not "make more or less probable the existence of any fact of consequence" regarding Harper's guilt for the crime. *See Miller-El*, 782 S.W.82 at 895.  In fact, the question asked by the State, "How did that make you feel when you learned [of the deaths]?" cannot be interpreted in any way other than a solicitation of the impact of the crime on the witness, nor could it be answered in a way so as to not provide this information.  (17 RR 72.)  Moreover, Roberson's personal emotions upon hearing of the crime were completely irrelevant to the issue of Harper's guilt. As such, these statements were clearly impermissible victim impact testimony and trial counsel's failure to object to the admission of both statements was unreasonable.

The State then foreshadowed that testimony about Triska, Briana, and Mya was imminent when Roberson stated that he had agreed to identify the victims in court.  After identifying two photographs of Triska, the State asked Roberson to "tell us about Triska[.]"  (17 RR 74.)  This question clearly called for the witness to provide testimony about the victim, ostensibly in the form of impermissible victim impact evidence.  As Roberson had already provided the substantive content of his testimony, specifically the identification of Triska, there was no other relevant information he could provide about her to the jury that would have any bearing on a "fact of consequence" relating to the issue of guilt.  Thus, trial counsel should have realized as soon as the question was asked that improper victim impact

---

[81] Trial counsel did object to Lloyd's statement "This guy has killed them," but on the basis that "It's outside –."  (17 RR at 72.)  Regardless of whether trial counsel meant that it was outside the record or outside the witness' personal knowledge or outside something else, counsel did not object on the basis of improper victim impact testimony.

testimony was immediately forthcoming and objected before Roberson could respond.  However, trial counsel's objection did not occur until after Roberson had answered the question by describing Triska as "a mother that cares about everything and would help you with any need you need . . . . Her heart is out to everyone." (17 RR 74.)  Though the Court sustained the objection,[82] this glowing description of Triska was heard by the members of the jury.[83]

This exact pattern of questioning was repeated twice more in quick succession as Roberson identified his daughter Briana, and then Triska's youngest daughter Mya.  Roberson identified two pictures of Briana before the State asked him to "tell us about Briana[.]" (17 RR 75.)  He answered that Briana "don't bother no one.  Always be asking everything that you need. She's a good kid that wouldn't harm no one." (*Id.*)  Trial counsel's objection again came after Roberson's response, too late to keep the testimony from the jury's ears.[84] Roberson then identified two pictures of Mya and was asked by the State to "tell us about Mya[.]" (17 RR at 76.)  His response was that "Mya's a good kid.  Always asking a lot of questions.  Wanted to learn.  Without no problems.  Everything is real lovely with her." (*Id.*)  It was only at this point that trial counsel objected, yet again too late to prevent this victim impact evidence from the jury.

The State's questioning about Briana and Mya was exactly the same as its questioning about Triska.  Explicitly asking Roberson to tell the jury about the victims after he had already identified them was necessarily calling for him to

---

[82] At a minimum, defense counsel should have also requested the evidence to be stricken from the record and for the jury to be instructed to disregard Roberson's highly prejudicial statement.

[83] The prejudice resulting from this, and the following instances of improper victim impact evidence, will be discussed in the next section.

[84] At a minimum, defense counsel should have also requested the evidence to be stricken from the record and for the jury to be instructed to disregard Roberson's highly prejudicial statement.

provide improper victim impact evidence.  Trial counsel should have recognized that the question "Can you tell us about [the victim]?" required a response containing such impermissible evidence.  This failure in perception is amplified by the fact that the State asked the exact same question three times in quick succession, each time leading to victim impact testimony reaching the jury and each time trial counsel's late objection was sustained by the Court on this ground.  As such, trial counsel's failure to timely and properly object to the State's questioning and Roberson's responses constituted objectively unreasonable performance.

### b. Prejudice

Though the Court sustained trial counsel's three belated objections, the jury still heard four instances of improper victim impact evidence, including Roberson's testimony regarding his emotional response to hearing about the deaths.  The impact of such emotionally-charged and highly improper evidence was necessarily immediate and unforgettable.  "Otherwise stated, one 'cannot unring a bell'; 'after the thrust of the saber it is difficult to say forget the wound'; and finally, 'if you throw a skunk into the jury box, you can't instruct the jury not to smell it'." *Dunn v. United States*, 307 F.2d 883, 886 (5th Cir. 1962); *accord Walker v. State*, 610 S.W.2d 481, 484 (Tex Crim. App. 1980).  Because there is a reasonable probability that the outcome of Harper's trial would have been different, Harper suffered prejudice as a result of trial counsel's failure to prevent this evidence from being heard by the jury.

### D. Trial Counsel was Ineffective for Failing to Move for a Mistrial

Though the Court granted trial counsel's belated objections to Roberson Roberson's victim impact testimony during the guilt/innocence phase, trial counsel failed to take the next step and request a mistrial.  Juries are presumed to obey the instructions of a trial court to disregard evidence, however, when "evidence is

clearly calculated to inflame the minds of the jury and is of such a character to as to suggest the impossibility of withdrawing the impression produced on their minds," a mistrial is needed to remove the prejudice of the improper evidence. *See Gardner v. State*, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987) (internal quotation omitted).

In Harper's case, there were four clear instances of improper victim impact evidence elicited during the testimony of Roberson. Each piece of evidence was deliberately prompted through the State's questioning. Indeed, the State repeated the same tainted question, "Can you tell us about [the victim]?" two times after the question was initially excluded by the Court. The State disregarded the Court's first ruling, as well as the rules of evidence. Given the inflammatory nature of such evidence, as well as the fact that the "bell had been rung," there is a reasonable probability that a motion for mistrial on this ground would have been granted. Thus, trial counsel's failure to request a mistrial was objectively unreasonable and caused Harper prejudice.

### E. Appellate Counsel Was Ineffective for Failing to Raise Claims Regarding the Improper Victim Impact Evidence

Though claims of ineffective assistance of trial counsel typically call for extensive factual investigation outside the trial record, such claims are not barred from being raised in a direct appeal if they are wholly supported by the trial record. Appellate counsel neglected to raise any claims in Harper's direct appeal concerning the introduction of and failure to properly object to Roberson's improper victim impact testimony. To the extent that the claims in this section could have been raised in Harper's direct appeal, appellate counsel was ineffective for not including them. *See Robbins*, 528 U.S. at 285.

## CLAIM EIGHTEEN

## TRIAL COUNSEL WAS INEFFECTIVE FOR CONCEDING HARPER'S GUILT DURING CLOSING ARGUMENTS AFTER HARPER HAD PLEAD NOT GUILTY

Harper received ineffective assistance of counsel when defense counsel argued at the close of the guilt phase that Harper "accepted responsibility" for the crimes, after Harper had already plead "not guilty."   This error gave the jury a conflicting impression as to whether Harper was accepting responsibility for his actions, which then prejudiced Harper during the punishment phase.   Counsel's ineffective performance violated Harper's rights under the state and federal Constitutions, state statutory law, United States Supreme Court and state case law.

### A. Relevant Facts

On October 4, 2010, Garland Harper was formally arraigned before the jury and a plea of "not guilty" was entered on his behalf.  (14 RR at 18-19.)  Defense counsel's opening statement promised that the jury would hear evidence of Harper's mental illness and that Harper's mentor, Don McGinty, would testify on Harper's behalf.[85]   The State presented sixteen witnesses during the guilt phase, twelve of whom were cross-examined by defense counsel.   No affirmative witnesses were called on Harper's behalf during the guilt phase.

Despite the plea of "not guilty" at the beginning of Harper's trial, defense counsel was quick to concede Harper's guilt during closing arguments.

> And we do not deny our responsibility in this case.  Mr. Harper has never denied his responsibility in this case.  He's never denied his guilt in this case.

(17 RR at 87.)

---

[85] Don McGinty testified for the defense during the punishment phase.  (22 RR at 50.)

> But as the prosecutor said, your role here is to determine whether he did this crime or not.  We take responsibility for it.  There will be another phase . . . .  And I trust you will return a verdict, what the family has been waiting for, to satisfy what had happened.  We accept the responsibility.

(17 RR at 89.)

> This is a horrible tragedy, just as Mr. Stafford says and just as the State says; and [Harper's] responsible.

(17 RR at 92.)

### B. Ineffective Assistance of Counsel

When capital defense counsel is unable to negotiate a plea for a life sentence, defense counsel must strive at the guilt phase to adopt a course that supports the defense case at punishment.  *See Florida v. Nixon*, 543 U.S. 175, 191 (2004).  In doing so, "counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed."  *Id.* at 192.

Not only was defense counsel's guilt phase presentation at odds with its case at punishment, but counsel's guilt phase presentation was not consistent between opening and closing arguments.  In opening arguments, defense counsel did not concede Harper's guilt, or accept responsibility for the crime, but rather promised the jury that evidence of Harper's mental illness would be forthcoming and described the delusional behavior that Harper exhibited before the crime.  (14 RR at 30.)  Defense counsel also named Don McGinty, Harper's mentor, as a witness who would describe the dark spiral that Harper slipped into.  (*Id.*)  These assertions did not suggest that Harper was accepting responsibility for his actions, but rather that he was asserting his mental illness negated his guilt of capital murder.

Studies have shown that jurors in capital trials view the defense case for a life sentence "cynically" when defense counsel's presentation at punishment is inconsistent with the presentation during the guilt phase.  *See* Scott E. Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse and the*

*Death Penalty*, 83 CORNELL L. REV. 1557, 1588-96 (1998); Andrea Lyon, *Defending the Death Penalty Case: What Makes Death Different?*, 42 MERCER L. REV. 695, 708 (1991) ("It is not good to put on a 'he didn't do it' defense and a 'he is sorry he did it' mitigation. This just does not work."). Logically, this concept would also hold true when defense counsel's guilt presentation is not consistent with itself.

Here, defense counsel's opening statement gave the jury the expectation of a defense involving mental illness, whether it be due to Harper's lack of intent or possibly even an insanity defense. However, defense counsel did not present any such evidence during the course of the guilt phase, and only after hearing the State's case for guilt, conceded Harper's guilt during closing arguments. This left the jury with the false impression that Harper thought he could avoid responsibility due to his mental illness, but after seeing the State's evidence realized that this attempt to "beat the system" would not be successful. *See* Sundby, 83 CORNELL L. REV. at 1590 (Interviews of jurors in capital trials revealed that "[p]utting the prosecution's evidence to the test . . . may cause jurors to perceive the defendant as not simply exercising his due process rights, but rather as once again trying to "beat the system.").

If defense counsel's guilt presentation was predicated upon admitting Harper's responsibility for the crime, this theme should have been carried throughout the guilt phase of the trial. To this end, counsel should have advised Harper that pleading guilty to the charge of capital murder was the most beneficial path. A guilty plea, or at least an opening statement conceding responsibility, would have told the jury that Harper accepted responsibility for his actions, and would have strengthened evidence of his remorse presented during his mitigation case. *See* Sundby, 83 CORNELL L. REV. at 1591-92 ("[J]urors were more receptive to mitigation cases when the defendant previously had expressed some acceptance

220

of responsibility for the killing . . . . especially [where] the defendant acknowledged [his guilt] from the outset of the trial.").  Instead, defense counsel's attempt to both challenge and concede Harper's guilt was ineffectual, and constituted unreasonable performance.

Harper suffered prejudice as a result of defense counsel's inconsistent guilt presentation as there is a reasonable likelihood that a consistent admission (or plea) of guilt would have led the jury to recommend a life sentence.  In 2011, a Hidalgo County jury sentenced Roberto Aguirre Rojas to a sentence of life without parole for the murder of four people, three of whom were under the age of eight, after Rojas plead guilty to the crime.  (*See* Ex. 42 [Articles on the Rojas Trial].)  The Rojas case illustrates the strength of the aforementioned principle of presenting a unified case across both phases of a capital trial.  Thus, had defense counsel adopted a similar course in Harper's trial, there is a reasonable probability that the outcome of the proceeding would have been different.  *Strickland*, 466 U.S. at 694.

## ISSUES RELATED TO POST-CONVICTION

### CLAIM NINETEEN

### APPELLATE COUNSEL EFFECTIVELY ABANDONED HARPER BY WAIVING ORAL ARGUMENT

Appellate counsel filed a brief on behalf of Garland Harper on March 14, 2012.  Though appellate counsel requested oral argument before the Court of Criminal Appeals, counsel subsequently waived argument on July 9, 2012.  By this waiver, appellate counsel effectively abandoned Harper, in violation of his rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law.

### A. Relevant Facts

Appellate counsel filed a written brief with the CCA on March 14, 2012, in which counsel requested oral argument.  The State filed its brief in response on June 11, 2012.  Two days later, the CCA set the case for submission, requiring any requests for oral arguments within ten days.  Appellate counsel waived oral argument on July 9, 2012, and did not file a reply brief. (Ex. 43 at 23 [Excerpts from the Appellate Record].)

### B. Appellate Counsel Effectively Abandoned Harper by Waiving Oral Argument

The Sixth Amendment of the United States Constitution guarantees criminal defendants not only the right to counsel, but the right to effective legal representation.  *Strickland*, 466 U.S. at 688, 694.  Generally, the effectiveness of counsel is analyzed by the familiar two-prong standard promulgated by *Strickland*, whereby counsel's performance must be objectively unreasonable and said performance must have prejudiced the defendant.  *Id.* at 688, 694.

However, there are certain circumstances in which counsel's performance, or lack thereof, is "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."  *United States v. Cronic*, 466 U.S. 648, 658 (1984).  The Supreme Court in *Cronic* identified three scenarios in which counsel's performance would be seen as so deficient that prejudice to the defendant would be presumed. First, error would be found where the defendant was completely denied legal counsel at a critical stage of the criminal proceeding. *Id.* at 659.  Second, the defendant's right to counsel would be violated if counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.*  Finally, prejudice would be presumed when counsel was available to assist the defendant at trial, but the likelihood that any lawyer could provide effective assistance was minimal. *Id.* at 659-60.

222

Due to appellate counsel's waiver of oral argument, the State's case in opposition to Harper's appeal was not subjected to meaningful adversarial testing. While the State was able to respond to and critique the claims raised in appellate counsel's brief, appellate counsel made no effort to do the same with the State's arguments. Appellate counsel had two possible avenues for subjecting the State's appellate case to an adversarial test. First, appellate counsel could have filed a reply brief. *See* Tex. Rules App. Proc. 38.3. Second, appellate counsel could have requested and participated in oral argument. However, appellate counsel neglected to file a reply *and* waived oral argument, leaving the State's appellate case unchallenged. Thus, prejudice is presumed due to appellate counsel's effective abandonment of Harper.

### C. Appellate Counsel's Waiver of Oral Argument Constituted Ineffective Assistance of Counsel

According to the Texas Rules of Professional Conduct, "[a] lawyer should act with competence, commitment and dedication to the interest of the client and with zeal in advocacy on the client's behalf." Texas Rules Prof. Conduct. 1.01 (Comment 6). The ABA Guidelines similarly dictate that appellate counsel should "seek to litigate all issues . . . under the standards applicable to high quality capital defense representation." *ABA Guidelines*, Guideline 10.15.1(C). Appellate counsel's decision to waive oral arguments on Harper's behalf did not meet the high standards promulgated by the State of Texas and the ABA, and thus constituted deficient performance.

Oral argument before an appellate court is a crucial procedure in the appellate process as counsel can isolate and clarify the most important issues in the appellate brief. Further, oral argument provides the only opportunity for an attorney to speak directly to the judges about the case at hand. Myron H. Bright, *The Power of the Spoken Word: In Defense of Oral* Argument, 72 IOWA L. REV.

35, 36 (1986). Chief Justice William Rehnquist noted that oral argument was a way to ensure "that the judge is focused on exactly what you want him to focus on in that brief." *Id.* at 36-37 (quoting C.J. William Rehnquist, *Oral Advocacy*, 27 S. Tex. L.J. 289 (1986)).

The face-to-face interaction with the judges also gives appellate counsel the chance to more personally convey the importance and impact of a particular decision on his client. "[C]old printed words convey little in regard to the sense of urgency under which a party may be operating." *Id.* at 37. Indeed, it is difficult, if not impossible, to imagine a party with a greater sense of urgency than one facing a sentence of death.

Oral argument would have also provided appellate counsel the opportunity to respond to, counter, and critique the State's assertions in its appellate brief. Though appellate counsel could have filed a reply brief for this purpose, counsel neglected to do so. *See* Tex. Rules App. Proc. 38.3. As such, appellate counsel left the State with the final word on the status of Harper's direct appeal.

Had appellate counsel not waived oral argument, and proceeded to argue the merits of Harper's direct appeal before the CCA, there is a reasonable probability that the outcome would have been different. *See Robbins*, 528 U.S. at 285.

## CLAIM TWENTY

### HARPER'S DEATH SENTENCE SHOULD BE VACATED BECAUSE THE PUNISHMENT PHASE JURY INSTRUCTION RESTRICTED THE EVIDENCE THE JURY COULD DETERMINE WAS MITIGATING

"[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (emphasis in original,

footnote deleted); *see also id.* at 605 ("[A] statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty."). Texas' statute governing capital trials expressly limits the evidence that a jury may consider mitigating, in violation of this Constitutional mandate. Therefore, Harper's death sentence violates his applicable state and federal Constitutional rights, as well as state statutory law, United State Supreme Court case law, and state case law, and should be vacated.

## A. The Texas Statute and Harper's Jury Instructions

Article 37.071 of the Texas Code of Criminal Procedure governs the instructions given to Texas capital juries. The statute instructs that a trial court shall submit at least two issues to the jury: (1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and (2) whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed. Tex. Code Crim. Proc. Art. 37.071 §2 (b)(1), (e)(1).

Regarding this second special issue, the trial court shall also instruct the jury that if the jury finds a circumstance warranting life, the court will sentence the defendant to life in prison and the defendant will not be ineligible for parole. *Id.* at §2 (e)(2)(A-B). Further, the court instructs that the jury must answer this question "Yes" or "No," that it may not answer "No" unless unanimous or "Yes" unless ten or more jurors agree, and that the jurors need not agree on the particular evidence that is mitigating. *Id.* at §2 (f)(1-3).

Along with these procedural instructions, the Texas statute requires the trial court to instruct the jury that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's *moral blameworthiness*." Tex. Code Crim. Proc. Art. 37.071 §2 (f)(4) (emphasis added).   No further definition of "moral blameworthiness" is provided.   Neither are there further instructions regarding the relationship of this instruction to the dictates of the special issue itself.

As directed by the statute, the trial court in Harper's case gave the statutorily required instructions during the punishment phase of trial before the jury retired to deliberate.  (6 CR at 1530.)  Specifically, the court instructed the jury

> In answering Special Issue No. 2 you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness, including evidence of the defendant's background, character, or the circumstances of the offense that mitigates against the imposition of the death penalty.

(6 CR at 1531-32.)  The court did not provide further instructions on the meaning or application of mitigating evidence, and specifically refused to include the following instruction proposed by defense counsel.

> A mitigating circumstance may include, but is not limited to any aspect of the Defendant's character, background, record, emotional stability or instability, intelligence or circumstances of the crime which you believe make a death sentence inappropriate.

(6 CR at 1473.)

## B. Texas' Statute Unconstitutionally Limits the Categories of Evidence a Capital Jury May Find Mitigating and Warrant a Life Sentence

The Supreme Court has long required that a jury "must be permitted to 'consider fully' . . . mitigating evidence" and that such consideration is meaningless "unless the jury not only [has] such evidence available to it, but also [is] permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence."  *Abdul-Kabir*, 550 U.S. at 260.  Each juror must have broad

discretion to give impact to the mitigation evidence put forward by the defense and cannot be limited to certain categories of evidence the State approves as mitigating. *Tennard*, 542 U.S. at 285 ("[A] State cannot bar the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.") (internal quotations omitted); *McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) ("[T]he Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence.") (emphasis in original).

Furthermore, the avenues of mitigation open to a capital jury is not, and must not be, limited to evidence that relates solely to the defendant's culpability for the crime, the nature of the crime, or even what the crime says about that individual defendant. *Abdul-Kabir*, 550 U.S. at 246 ("[S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future."). For example, the Supreme Court has upheld the mitigating potential of evidence that an inmate has adjusted well in prison leading up to his trial. *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986).

In *Skipper*, the Court considered evidence that the defendant wished to present from two jailers and a visitor that the defendant had "made a good adjustment" in jail. *Id.* at 3. The Court noted that "there is no question but that [inference drawn from the evidence] would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" *Id.* at 4-5 (quoting *Lockett v. Ohio*, 438 U.S. at 604.). Thus, such evidence could not "be excluded from the sentencer's consideration." *Id.* at 5.

Importantly, the Court noted that evidence regarding Skipper's adjustment in prison "would not relate specifically to petitioner's culpability for the crime he

227

committed."   *Id.* at 4; *see also Abdul-Kabir*, 550 U.S. at 259 ("Like Penry's evidence, Cole's evidence of childhood deprivation and lack of self-control did not rebut either deliberateness or future dangerousness but was intended to provide the jury with an entirely different reason for not imposing a death sentence.").   Yet the Court found that it could "hardly be disputed" that this evidence's exclusion "deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment."   *Skipper*, 476 U.S. at 47 ("[A] defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination.").

Like the defendant in *Skipper*, Harper presented to the jury evidence regarding his disadvantaged background and character as mitigation evidence. Some of this evidence related to the conceptualization of mitigation expressed in *Wiggins* that "defendants who commit criminal acts that are *attributable* to a disadvantaged background . . . may be less *culpable*."   *Wiggins*, 539 U.S. at 535 (quoting *Penry v. Lynaugh*, 492 U.S. at 319) (emphasis added).   Harper also presented evidence that he suffered from schizoaffective disorder, a severe mental illness, which also diminished his moral culpability.   However, other evidence—*i.e.*, Harper's good behavior in prison, namely, the lack of personal infractions, his position as an officer's barber, and his devotion to the prison ministry as well as his efforts upon release to rejoin society, by working at a restaurant and attending barber school—bore no specific link to his legal or moral blameworthiness for the crime in question.   Rather, such evidence offered compelling sentiment that, although legally to blame for the crime, Harper was not deserving of a death sentence.   Just as much as evidence that Harper's background and severe mental illness contributed to the crime, this type of evidence held equal potential for jurors to weigh and decide it mitigated Harper's overall deservingness of being executed. *See Penry v. Lynaugh*, 492 U.S. at 327 ("[S]o long as the class of murderers

228

subject to capital punishment is narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant.").

Because of the statutorily mandated instruction, the jury was precluded from giving effect to evidence of severe mental illness or any category of mitigation evidence that did not specifically relate to Harper's "moral blameworthiness." Moreover, the statute specifically lists three categories of mitigation evidence ("background, character, or circumstances of the offense"), none of which encompass or allow a juror to give full effect to evidence of severe mental illness.[86] For any of Harper's jurors to have given full effect to evidence they found warranted a sentence of life, but that did not reduce Harper's blameworthiness for the crime, the juror would have had to violate their instructions. *See Penry v. Johnson*, 532 U.S. 782, 800 (2001). Because, "[w]e generally presume that jurors follow their instructions," there is a reasonable probability that the result of Harper's trial would have been different had a constitutionally adequate instruction been given. *Id.* at 799.

### C. Conclusion

"[W]hen the jury is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence—because it is forbidden from doing so by statute or a judicial interpretation of a statute—the sentencing process is fatally flawed." *Abdul-Kabir*, 550 U.S. at 264. At Harper's trial, the

---

[86] Absent an instruction informing jurors about the specific mitigating effect of mental illness, jurors are likely to misunderstand and incorrectly consider such evidence. Mental illness is often viewed by jurors as a "double-edged sword," and give it aggravating, rather than mitigating effect. *See Atkins*, 536 U.S. at 321; Claim Twenty-Two, *post*. Jurors also regularly confuse the legal defense of insanity with mitigation. (Ex. 48 at ¶21 [Aff. of David Wymore].) This confusion means that there is a heightened risk that Harper "face[s] a special risk of wrongful execution." *Atkins*, 536 at 321.

jury was prohibited from giving effect to any mitigation evidence that did not meet a narrowed category of evidence, unconstitutionally limiting their ability to give that reasoned moral response.  *Skipper*, 476 U.S. at 8 ("The exclusion by the state trial court of relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender.")   The trial court erred by refusing defense counsel's requested instruction.  This proposed instruction would have permitted the jury to give meaningful, constitutionally-required effect to the mitigating evidence, while staying within the bounds of Texas law.  Further, appellate counsel did not challenge the court's error in Harper's direct appeal.  This omission constituted deficient performance, and without it there is a reasonable probability that the outcome of Harper's appeal would have been different.  *See Robbins*, 528 U.S. at 285; *Ex parte Santana*, 227 S.W.3d at 704-05.

The Supreme Court previously upheld the validity of the Texas death penalty statute "on the basis of assurances that the special issues would be interpreted broadly enough to enable sentencing juries to consider all of the relevant mitigating evidence a defendant might present."  *Penry v. Lynaugh*, 492 U.S. at 318.  Since that time, repeat warnings have been "issued from th[e] Court regarding the extent to which the jury must be allowed not only to consider such evidence, or to have such evidence before it, but to respond to it in a reasoned, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly deserving of death."  *Brewer v. Quarterman*, 550 U.S. 286, 296 (2007).

In this case, the application of the Texas death penalty statute impaired Harper's rights to have *all* mitigating evidence considered by the jury in assessing whether he deserved a life or death sentence.  *Penry v. Lynaugh*, 492 U.S. at 320 ("[T]he Texas death penalty statute was applied in an unconstitutional manner by

precluding the jury from acting upon the particular mitigating evidence he introduced.").  Therefore, Harper's death sentence should be reversed.

**CLAIM TWENTY-ONE**

**APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO ARGUE THAT THE DEATH PENALTY IS UNCONSTITUTIONAL AND THAT THE TRIAL COURT ERRED IN NOT GRANTING HARPER'S TRIAL MOTIONS PRECLUDING THE DEATH PENALTY**

On August 24, 2010 and October 15, 2010, defense counsel filed several motions challenging the constitutionality of the death penalty and requesting jury instructions to protect Garland Harper's constitutional rights.  (*See* 5 CR at 1190, 1206, 1233, 1239, 1249; 6 CR at 1317, 1427, 1440, 1445.)   The trial court erroneously denied each of defense counsel's motions.   Appellate counsel neglected to raise these erroneous denials in Harper's direct appeal, and neglected to challenge the constitutionality of the death penalty scheme in Texas.  As such, appellate counsel was ineffective, thus violating Harper's rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law.

**A. Appellate Counsel Was Ineffective by Not Raising Any of the Erroneously Denied Death Penalty Motions in Harper's Direct Appeal**

In order to win an ineffective assistance of counsel claim under *Strickland v. Washington*, the applicant must show by a preponderance of the evidence that counsel's performance fell outside the ambit of proficient professional conduct and that there is a probability sufficient to undermine the confidence of outcome that the result of the proceeding would have been different but for counsel's unprofessional errors.  *Ex parte Miller*, 330 S.W.3d 610, 615 (Tex. Crim. App. 2009) (citations omitted).  This Court must consider the claim under the totality of the circumstances and this consideration can be general or related to counsel's isolated acts or omissions.  *Id.* at 615-16 (citation omitted).

231

Harper's rights were prejudiced by appellate counsel's failure to raise any of Harper's pretrial motions and that series of omissions constitutes ineffective assistance. Appellate counsel has a constitutional duty to review the record and present any meritorious claims. *Meza v. State*, 206 S.W.3d. 684, 689 (Tex. Crim. App. 2006) (noting appellate counsel's "constitutional duty to review the record for any arguable error"). Here, appellate counsel's performance was deficient. *See, e.g.*, *Evitts*, 469 U.S. at 394 n.6 (noting that "[i]n a situation like that here, counsel's failure was particularly egregious in that it essentially waived respondent's opportunity to make a case on the merits; in this sense, it is difficult to distinguish respondent's situation from that of someone who had no counsel at all").

## B. Appellate Counsel was Ineffective for Failing to Argue the Trial Court's Denial of Harper's Motion to Preclude the Death Penalty Due to Severe Mental Illness

Harper filed a pretrial motion arguing that the State was precluded from seeking the death penalty due to his severe mental illness. (5 CR at 1190.) The trial court erroneously denied this motion.[87] (5 CR at 1205; 13 RR at 53.) Appellate counsel did not challenge the trial court's improper denial in Harper's direct appeal. As such, appellate counsel's performance was deficient and it prejudiced Harper.

## C. Appellate Counsel was Ineffective for Failing to Argue the Trial Court's Denial of Harper's Motion to Preclude the Death Penalty as Arbitrary

Harper's pretrial motion to preclude the death penalty on the basis of its arbitrary application in Texas was erroneously denied by the trial court. (5 CR at 1206, 1232; 13 RR at 53.) The trial court's ruling on this motion was incorrect and appellate counsel's failure to raise it in Harper's direct appeal constituted deficient performance, causing prejudice to Harper.

---

[87] For a discussion of why this ruling was in error, *see* Claim Twenty-Two, *post*.

**D. Appellate Counsel was Ineffective for Failing to Argue the Trial Court's Denial of Harper's Motion to Hold the Death Penalty Unconstitutional for Improperly Shifting the Burden of Proof**

The trial court denied Harper's motion to preclude the death penalty because the Texas statute impermissibly shifts the burden of proof to the defendant.  (5 CR at 1233, 1238; 13 RR at 53.)  This ruling was in error and was left unchallenged by appellate counsel.  It is a core tenet of American law that the defendant does not shoulder the burden of proof.  That Harper, and other capital defendants, must bear a shifted burden of proof requiring them to demonstrate their life-worthiness violates the basic principles of justice and due process.  Thus, the trial court's ruling on this issue was in error, and Harper suffered prejudice when appellate counsel deficiently failed to challenge it on direct appeal.

**E. Appellate Counsel was Ineffective for Failing to Argue the Trial Court's Denial of Harper's Motion to Hold the Death Penalty Unconstitutional due to the Use of Victim Impact Evidence**

Harper's motion to preclude the death penalty due to the use of victim impact testimony was erroneously decided by the trial court.  (5 CR at 1239, 1248; 13 RR at 54.)  Appellate counsel's failure to challenge this ruling on direct appeal was ineffective performance.

**F. Appellate Counsel was Ineffective for Failing to Argue the Trial Court's Denial of Harper's Motion to Hold the Death Penalty Unconstitutional under *Furman v. Georgia***

Harper filed a motion to preclude the death penalty because the capital punishment process in Texas is unconstitutional and does not comply with United States Supreme Court precedents, including *Furman v. Georgia*, 408 U.S. 238 (1972) (5 CR at 1249; 6 CR at 1316; 13 RR at 55.)  The trial court's denials of this motion was in error and appellate counsel neglected to challenge the denials on direct appeal.  Appellate counsel's failure to contest the trial court's denial was unreasonable performance.

233

### G. Appellate Counsel was Ineffective for Failing to Argue the Trial Court's Denial of Harper's Motion to Preclude the Imposition of the Death Penalty

Harper filed a motion to preclude the death penalty because the capital punishment process in Texas is unconstitutional, specifically that it violates *Penry v. Lynaugh*, 492 U.S. 302 (1989) is cruel and unusual under the state and federal constitutions, and does not provide meaningful appellate review.  (6 CR at 1317, 1336; 13 RR at 56.)  The trial court's denials of these motions were in error and appellate counsel neglected to challenge the denials on direct appeal, which was ineffective performance.

### H. Appellate Counsel was Ineffective for Failing to Argue the Trial Court's Denial of Harper's Motions Regarding the "10-12 Rule"

Prior to the giving of jury instructions for the punishment stage, Harper filed a motion requesting an instruction regarding the consequences of the jury's failure to unanimously agree on the special issues.  (6 CR at 1445.)  The trial court erroneously denied this motion.[88]  (23 RR at 208.)  Appellate counsel did not challenge the trial court's improper denial in Harper's direct appeal.  As such, appellate counsel's performance was deficient and it prejudiced Harper.

### I. Appellate Counsel was Ineffective for Failing to Argue the Trial Court's Denial of Harper's Motions Regarding Proper Jury Instructions

Harper filed several motions requesting certain inclusions and omissions from the jury instructions.  (6 CR at 1427, 1440.)  Specifically, Harper requested to omit a "no sympathy" instruction and the inclusion of a definition of "criminal acts of violence."  The trial court erroneously denied these motions and appellate counsel did not raise them in Harper's direct appeal, which was unreasonable performance by appellate counsel.  (23 RR at 214.)

---

[88] For a discussion of why this ruling was in error, see Claim Twenty-Three, *post*.

## J. Conclusion

Separately or collectively, appellate counsel's failure to raise these issues in Harper's direct appeal was ineffective assistance and prejudiced Harper's appeal, as there is a reasonable probability the outcome would have been different had these challenges been included.

## OTHER ISSUES

## CLAIM TWENTY-TWO

## HARPER EXPERIENCED WITHDRAWAL SYMPTOMS DURING TRIAL AS A RESULT OF A SUDDEN STOPPAGE OF DEPAKOTE, KLONOPIN, RISPERDAL, AND PROZAC, RENDERING HIM UNABLE TO ASSIST COUNSEL

During Harper's trial, prison officials abruptly ceased administering Harper's recommended dosages of Klonopin (used to treat anxiety), Prozac (used to treat depression), Depakote (used to treat bipolar disorder), and Risperdal (used to treat schizophrenia), leaving him to experience symptoms of withdrawal, as well as a return of the symptoms of his debilitating mental illness. These symptoms left Harper unable to meaningfully assist his attorneys during his trial, in violation of his rights under the state and federal Constitutions, state statutory law, United States Supreme Court and state case law.

### A. Relevant Facts

During various stages of his trial, Garland Harper did not receive his prescribed doses of Klonopin, Prozac, Depakote, and Risperdal . As of September 1, 2010, Harper's daily prescriptions consisted of 2 milligrams of Klonopin, 40 milligrams of Prozac, 1500 milligrams of Depakote, and 3 milligrams of Risperdal. (Ex. 32 at 4 [Harris County Jail Medication Records].)

Jury selection for Harper's capital murder trial began August 30, 2010, and lasted until September 14, 2010. During that period, Harper missed four days of

235

his Klonopin and Prozac prescriptions.  (Ex. 32 at 1 [Harris County Jail Medication Records].)    From September 3 to September 7, Harper did not receive his prescribed daily doses of Klonopin and Prozac.  (*Id.* at 1.)

The guilt/innocence phase of Harper's trial lasted from October 4 to October 7, 2010.  From October 3 to October 6, 2010, Harper did not receive his prescribed daily doses of Klonopin and Prozac, even though those dates fell within the ninety-day period for which he was told to regularly take those medications.  (Ex. 32 at 2 [Harris County Jail Medication Records].)    For seven days, from October 5 to October 12, 2010, Harper was not given the same prescribed doses of Klonopin and Prozac.  (*Id.* at 3.)  Thus, from October 3 to October 12, 2010, a period of ten days, Harper went without his daily doses of Klonopin and Prozac.

The punishment phase of Harper's trial ran from October 8 to October 18, 2010, meaning that Harper was without his medication for at least the first four days of this phase of his trial.  During the punishment phase, the State and defense counsel called a combined total of forty-one witnesses to the stand.  Notably, on October 11, 2010, Harper endured a direct examination by defense counsel, a cross-examination by the State, and a re-direct examination, all outside the presence of the jury, in the middle of the ten-day period during which Harper did not receive Klonopin or Prozac.  (19 RR at 123-36; Ex. 32 at 3 [Harris County Jail Medication Records].)

As of October 20, 2010, Harper had not received any Depakote, Klonopin or Risperdal for a five day period.  (Ex. 33 at 1 [TDCJ Medication Records].)  Thus, Harper had not received these medications starting on October 15, 2010, which fell in the middle of his punishment phase.  Harper had been prescribed, and should have been taking, these medications consistently before October 15, 2010.  (Ex. 32 at 1-2, 4 [Harris County Jail Medication Records]; Ex. 33 at 1-2 [TDCJ Medication Records].)

236

### B. Harper Likely Experienced Withdrawal Symptoms as a Result of a Sudden Stoppage of Klonopin

Klonopin is used alone, or in combination with other medications, to control certain types of seizures.[89]   It is also used as an anti-anxiety medication to relieve panic attacks.[90]   Klonopin is in a class of medications called benzodiazepines.   The drug works by decreasing abnormal electrical activity in the brain.[91]

A patient who stops taking Klonopin abruptly may experience the following withdrawal symptoms: panic attacks, behavioral or personality changes, hallucination, memory loss, rapid heartbeat or heart palpitations, diarrhea, nausea, or vomiting, numbness or tingling, fever, and light or sound sensitivity.[92]

The duration of Klonopin withdrawal symptoms generally depends on when and how much of the medication has been taken.[93]   Klonopin is formulated to stay in the body for a long time, so the larger the dose, the more time it would take for the medication to clear the body and for the withdrawal symptoms associated with Klonopin to go away.[94]   It is possible that withdrawal symptoms could last for several months, with the worst withdrawal symptoms lasting two to four weeks.[95]   A patient must be slowly weaned off Klonopin, or else run the risk of contracting protracted withdrawal syndrome, whereby the withdrawal symptoms from stopping Klonopin can drag on for months up to a year before starting to subside.[96]

---

[89]   "Clonazepam," *Medline Plus*, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html (Published by the U.S. National Library of Medicine and the National Institutes of Health.)

[90]   *Id.*

[91]   *Id.*

[92]   *Klonopin Withdrawal Symptoms*, http://klonopinwithdrawalsymptoms.com/how-long-does-klonopin-withdrawal-symptoms-last/.

[93]   *Id.*

[94]   *Id.*

[95]   *Id.*

[96]   *Id.*

Harper regularly took Klonopin to deal with symptoms associated with anxiety.   TDCJ records establish that he had been prescribed Klonopin for treatment of these symptoms before, and during, the time he was on trial.  (Ex. 33 at 1-2 [TDCJ Medication Records].)   Harper did not receive his daily dose of Klonopin at times during voir dire, the guilt/innocence phase, and the punishment phase, and thus likely experienced withdrawal symptoms during those periods. (Ex. 32 at 1-3 [Harris County Jail Medication Records].)   TDCJ records also establish that Harper had not been given his prescribed doses of Klonopin for a five-day period beginning October 15, 2010, which overlapped with the final days of the punishment phase of his trial.  (Ex. 33 at 1 [TDCJ Medication Records].)

## C. Harper Likely Experienced Withdrawal Symptoms as a Result of a Sudden Stoppage of Prozac

Prozac is used to treat depression, obsessive-compulsive disorder, some eating disorders, panic attacks, and is also used to sometimes treat other mental illnesses.[97]   Fluoxetine is in a class of medications called selective serotonin reuptake inhibitors (SSRIs).[98]  It works by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance.[99]

Though antidepressants such as Prozac are not considered addictive, abrupt discontinuation of Prozac can alter the brain's chemistry, much as the brain chemistry was altered with its use.[100]  Withdrawing from Prozac produces several neurological and physical effects.   Withdrawal symptoms may be mild or debilitating and can begin as soon as eight hours after the last dose is taken,

---

[97]  "Fluoxetine," *Medline Plus*, http://www.nlm.nih.gov/medlineplus/druginfo/ meds/a689006.html (Published by the U.S. National Library of Medicine and the National Institutes of Health.)

[98] *Id.*

[99] *Id.*

[100]  "Prozac Withdrawal Stories," *eHow Health*, http://www.ehow.com/ info_8260486_prozac-withdrawal-stories.html.

although withdrawing from the drug generally causes less severe withdrawal symptoms due to its long half-life.[101]   The emotional and mental effects of fluoxetine withdrawal are often among the most troubling.

Common neurologically-based symptoms include irritability, nightmares, unprovoked crying spells, and the electric shock-like sensations known as "brain zaps."[102]   There may also be a worsening of the condition for which the medication was prescribed, such as anxiety or depression, as well as new symptoms.   Also possible during fluoxetine withdrawal is the emergence of akathisia, the feeling of restlessness that causes constant bodily movement.[103]

Prozac withdrawal also manifests in the form of physical symptoms. Headaches are the most commonly reported effect, but users withdrawing from Prozac have also reported experiencing fatigue, nausea, and flu-like aches and pains.[104]   Some users also experience dizziness, diarrhea, and painful skin sensations similar to the pins-and-needles phenomenon.[105]

Harper regularly took Prozac to deal with symptoms associated with depression.   Harris County and TDCJ records establish that he had been prescribed Prozac for treatment of these symptoms before, and during, the time he went to trial for the murder of Triska Rose.   (Ex. 33 at 1 [TDCJ Medication Records].) Harper did not receive his daily dose of Prozac at times during voir dire, the guilt/innocence phase, and the punishment phase, and thus would have experienced withdrawal symptoms during those periods.   (Ex. 32 at 1-3 [Harris County Jail Medication Records].)   TDCJ records also establish that Harper had not been given

---

[101]   "Fluoxetine Withdrawal Effects," *eHow Health*, http://www.ehow.com/ about_5454071_fluoxetine-withdrawal-effects.html.
[102]   *Id.*
[103]   *Id.*
[104]   *Id.*
[105]   *Id.*

his prescribed doses of Prozac for a five-day period beginning October 16, 2010, which overlapped with the final days of the punishment phase of his trial. (Ex. 33 at 1 [TDCJ Medication Records].)

### D. Harper Likely Experienced Withdrawal Symptoms as a Result of a Sudden Stoppage of Depakote

Depakote is a prescription medication used to treat certain types of seizures.[106] It is also used to treat mania in people with bipolar disorder and migraine headaches.[107] As with most medications for seizures, stopping Depakote without first obtaining the approval of a healthcare provider is not recommended.[108] Stopping Depakote suddenly is also not recommended because doing so could prompt a return of the symptoms the drug is being used to treat.[109]

There are several severe withdrawal symptoms which patients who have taken Depakote for any period of time will likely experience once they stop taking the drug. Seizures are the most common severe withdrawal symptom when going off of Depakote.[110] Withdrawal can also cause bipolar mood episodes and migraine headaches. A severe withdrawal symptom is more likely to occur if the patient is taking Depakote for the issue related to that symptom. For example,

---

[106] "Valproic Acid," *Medline Plus*, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682412.html (Published by the U.S. National Library of Medicine and the National Institutes of Health.) Depakote is a common brand name for valproic acid. *Id.*

[107] Mania is defined as episodes of frenzied, abnormally excited mood. Bipolar disorder is also referred to as manic-depressive disorder, a disease that causes episodes of depression, episodes of mania, as well as other abnormal moods. *Id.*

[108] "Depakote Withdrawal," *MedTV*, http://bipolar-disorder.emedtv.com/depakote/depakote-withdrawal.html.

[109] "Depakote," *NetDoctor*, http://www.netdoctor.co.uk/depression/medicines/depakote.html.

[110] "Side Effects of Going Off of Depakote," *eHow Health*, http://www.ehow.com/about_5037807_side-effects-going-off-depakote.html.

withdrawal-related bipolar episodes are more likely to occur in people taking Depakote for bipolar disorder.[111]

Harper regularly took Depakote to deal with symptoms associated with bipolar disorder. TDCJ records establish that he had been taking Depakote for treatment of these symptoms before, and during, the time he went to trial. (Ex. 33 at 1-2 [TDCJ Medication Records].) TDCJ records also establish that Harper had not been given his prescribed doses of Depakote for a five-day period beginning October 15, 2010, which overlapped with the final days of the punishment phase of his trial. (*Id.* at 1.)

### E. Harper Likely Experienced Withdrawal Symptoms as a Result of a Sudden Stoppage of Risperdal

Risperdal is used to treat the symptoms of schizophrenia in adults and teenagers thirteen years of age and older.[112] Risperdal is also used to treat episodes of mania or mixed episodes (symptoms of mania and depression that happen together) in adults and in teenagers and children ten years of age and older with bipolar disorder.[113]

Risperdal is in a class of medications called atypical antipsychotics. It works by changing the activity of certain natural substances in the brain.[114] Risperdal withdrawal symptoms can include, but are not limited to, insomnia, symptoms of schizophrenia (such as hallucinations or delusions), bipolar disorder symptoms (such as mania or depression), and irritability.[115]

---

[111] *Id.*

[112] "Risperdone," *Medline Plus*, http://www.nlm.nih.gov/medlineplus/druginfo/ meds/a694015.html (Published by the U.S. National Library of Medicine and the National Institutes of Health.)

[113] *Id.*

[114] *Id.*

[115] "Risperdal Withdrawal," *MedTV*, http://schizophrenia.emedtv.com/risperdal/ risperdal-withdrawal.html.

Harper regularly took Risperdal to deal with symptoms associated with schizophrenia.    Harris County and TDCJ records establish that he had been prescribed Risperdal for treatment of these symptoms before, and during, the time he went to trial.  (Ex. 33 at 1-2 [TDCJ Medication Records].)  TDCJ records also establish that Harper had not been given his prescribed doses of Risperdal for a five-day period beginning October 15, 2010, which overlapped with the final days of the punishment phase of his trial.  (*Id.* at 1)

### F. Prejudice

In Texas, "[a] person is incompetent to stand trial if he lacks: (1) a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against him." *Luna v. State*, 268 S.W.3d 594, 598 (Tex. Crim. App. 2008).  Taking the Harris County and TDCJ records at face value, the withdrawal symptoms that Harper likely experienced during various periods throughout his capital murder trial would have rendered him unable to meet either of the two thresholds for finding him competent to stand trial.

In addition to dealing with the return of whatever symptoms his Klonopin prescription quelled, Harper likely experienced panic attacks, behavioral or personality changes, hallucinations, and memory loss due to the Klonopin withdrawal he experienced as he underwent trial.  Furthermore, once Harper began experiencing withdrawal from Risperdal, Depakote, and Prozac, he likely suffered from insomnia, hallucinations and delusions, mania, depression, irritability, bipolar episodes, and migraine headaches.

Grappling with these withdrawal symptoms during the course of his trial likely left Harper unable to assist his trial counsel in a meaningful way during all three phases of his trial.  His inability to assist his counsel in preparing his defense means that Harper should have been found incompetent to stand trial.  Harper's

242

inability to assist his trial counsel in preparing his defense also prejudiced both the resulting verdict finding him guilty of capital murder and the following determination that he be sentenced to death.   Such prejudice is in violation of Harper's rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. [116]

## CLAIM TWENTY-THREE

## HARPER IS INELIGIBLE FOR A DEATH SENTENCE BECAUSE OF HIS SEVERE MENTAL ILLNESS

Harper's conviction and sentence of death were unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law, because his mental impairments rendered him functionally and developmentally below the requisite level that is subject to execution.

In *Atkins v. Virginia*, the Supreme Court held the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibited the execution of mentally retarded individuals.   536 U.S. 304, 321 (2002).   The Court determined that society recognized the lesser moral culpability of criminal offenders with mental retardation, as evidenced by a national consensus prohibiting the execution of persons with mental retardation.   *Id.* at 315-16.   Because of their diminished culpability, the execution of a person with mental retardation would not serve any valid retributive or deterrent function.   *Id.* at 321.   Furthermore, several factors

---

[116] To the extent trial counsel observed any signs of withdrawal, or was informed by Harper (or anyone else) that he was not receiving his prescribed medication, trial counsel was ineffective for not raising this issue at trial.  Furthermore, because trial counsel was already on notice that Harper suffered from mental illness, they had an independent duty to monitor his mental health status throughout trial to make sure he was capable of meaningfully assisting in his defense.

indicated that persons with mental retardation were at much greater risk of wrongfully receiving a sentence of death.  *Id.* at 320-21.

The underlying rationale behind the national consensus observed by the Court was the lesser individual culpability of a person with mental retardation.  In *Atkins*, the Court noted that persons with mental retardation, by definition, have "diminished capacities to understand and process information . . . to engage in logical reasoning, [and] to control [their] impulses . . . ."  536 U.S. at 318.  Recognizing these cognitive deficits, the Court then held that "the large number of States prohibiting the execution of mentally retarded persons . . . provides powerful evidence that . . . our society views mentally retarded offenders as categorically less culpable than the average criminal."  *Id.* at 315-16.  The Court reaffirmed the importance of decision-making and impulse control on culpability when it extended immunity from execution to juveniles in *Roper v. Simmons*.  543 U.S. 551, 571 (2005).

Next, the Court examined what impact this diminished culpability had on the legitimate goals of criminal punishment.  Unless the imposition of the death penalty "measurably contributes" to one or both of the penological goals of retribution or deterrence, "it is nothing more than the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment." *Enmund v. Florida*, 458 U.S. 782, 798 (1982) (internal quotation omitted).  The Court held that the retributive value of punishment "necessarily depends on the culpability of the offender."  *Atkins*, 536 U.S. at 319.  With respect to capital punishment "the lesser culpability of the mentally retarded individual surely does not merit that form of retribution."  *Id.* at 319.  Subjecting persons with mental retardation to capital punishment similarly did not serve a deterrent purpose.  The deterrent value of punishment is necessarily reduced when an individual's cognitive and behavioral impairments "make it less likely that they can process the

information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information." *Id.* at 320. Executing persons with mental retardation would also have no deterrent effect with respect to offenders who are not mentally retarded. *Id.*

Finally, the Court reasoned that the reduced capacity of mentally retarded offenders increases the risk that "the death penalty will be imposed in spite of factors which may call for a less severe penalty ." *Atkins,* 536 U.S. at 320 (internal quotation omitted). Mentally retarded individuals are less able to "make a persuasive showing of mitigation . . . and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse . . . ." *Id.* at 320-21. Mental retardation is often inaccurately viewed by juries as an aggravating factor, rather than as mitigating. Such defendants are also less able to give meaningful assistance to their counsel. Each of these factors demonstrated that persons with mental retardation "face a special risk of wrongful execution." *Id.* at 321.

Harper suffers from schizoaffective disorder, a serious mental illness that Harper was laboring under at the time of the crime. (Ex. 46 at ¶32 [Aff. of Dr. Richard Dudley]; 21 RR at 39.) The hallucinations and delusions associated with schizophrenia impaired Harper's judgment; he believed and acted as if they were true, and nothing could convince him otherwise. (21 RR at 57.) Because of his illness, Harper's capacity for rational, well thought-out decision making was significantly diminished. (Ex. 46 at ¶79 [Aff. of Dr. Dudley].) As Harper's mental illness left him unable to consider the future repercussions of his actions, there is no deterrent value in his execution. Harper's severe mental illness and deteriorated mental condition was the product of a long genetic, familial history of mental illness, abandonment issues, and self-medication. (*Id.* at ¶¶79-83.) If his schizoaffective disorder is properly treated in prison, it is unlikely that Harper will

245

be a future danger to himself or others.   (*Id. a*t ¶84.)   As in *Atkins*, these deficiencies significantly reduce Harper's moral culpability.   Furthermore, evidence of Harper's schizoaffective disorder was likely misinterpreted by the jury as an aggravating factor, rather than mitigating, leaving him susceptible to an enhanced risk of wrongful execution.  *See Atkins*, 536 U.S. at 321.

The same concerns that underlie execution of mentally retarded and juvenile offenders exist in Harper's case as well. The imposition of the death penalty would be grossly disproportionate to Harper's moral culpability, would not "measurably advance the deterrer or retributive purpose of the death penalty," and carries an enhanced risk of error.  *Atkins*, 536 U.S. at 321.  For these reasons, this Court should vacate Harper's death sentence.

## CLAIM TWENTY-FOUR

### HARPER'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN THE TRIAL COURT FAILED TO INSTRUCT THE JURY THAT A VOTE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE

In Texas, the jury is instructed that it cannot answer the two special issues so as to give a defendant a life sentence unless at least ten jurors agree on that answer. This "10-12 rule," as it is commonly referred, violates Harper's rights under the state and federal Constitution, state statutory law, and state and United States Supreme Court case law.

### A. The "10-12 Rule" Generally

In Texas capital cases, up to three special issues are submitted to the jury during the sentencing phase of a capital trial: (1) whether there is a probability that the defendant constitutes a continuing threat to society (Tex. Code Crim. Proc. Art. 37.071,  §  2(b)(1)); (2) if the person was convicted as a party, whether the defendant actually "intended to kill the deceased or anticipated that a human life would be taken"  *Id.* at § 2(b)(2); and (3) whether, considering all the evidence,

there are sufficient mitigating circumstances to warrant life without parole rather than death. *Id.* at § 2(e)(1).

After being given these questions, the jury is instructed that it cannot answer "Yes" to either of the first two special issues without unanimous agreement and that it cannot answer "No" to those questions unless at least ten jurors agree. *Id.* at § 2(d)(2). The jury is further instructed that it may not answer "No" to the third special issue without unanimous agreement and that it may only answer "Yes" if at least ten or more jurors agree. *Id.* at § 2(f)(2).

If the jury answers "Yes" to the subsection (b) questions and "No" to the subsection (e)(1) question, the sentence is death. If the jury returns "No" answers to either of the subsection (b) questions, a "Yes" to the section (e)(1) question, *or if the jury is unable to answer any of the questions submitted to them, the sentence is life without parole. *Id.* at § 2(g). However, the jury is prohibited from being informed about the effect of its failure to agree on any of the questions submitted to them. *Id.* at § 2(a)(1).

## B. The "10-12 Rule" in Harper's Case

Defense counsel contested the constitutionality of the "10-12 rule" both in pretrial motions and in argument before the court. (5 CR at 1233; 6 CR at 1445; 23 RR at 208.) As Harper was the only defendant charged in his case, the jury only received the first and third questions discussed above. Despite defense counsel's efforts to the contrary, the jury was instructed in accordance with the requirements noted above (6 CR at 1530), and the jury returned a unanimous answer of "Yes" to the continuing threat question and "No" to the mitigating circumstances question. (6 CR at 1534-35.)

## C. The "10-12 Rule" Violates Harper's Constitutional Rights

United States Supreme Court precedent challenges the constitutional validity of the 10-12 jury instruction in the Texas capital sentencing scheme. In *Mills v.*

247

*Maryland*, 486 U.S. 367, 375 (1988), the Supreme Court held Maryland's capital sentencing scheme unconstitutional.

In Maryland, a capital sentencing jury proceeded through three sections of a verdict form. In Section I, the jury was asked to evaluate whether any of ten aggravating factors was present.   *Mills*, 486 U.S. at 385-86.   If the jury unanimously found at least one aggravating factor, it was instructed to move on to Section II where they were instructed to mark "yes" next to any mitigating factors it unanimously found as proven.  *Id.* at 386-88.  The jury was only instructed to move on to Section III if one of more of the mitigating factors in Section II had been marked "yes."  *Id.* at 388.  In Section III, jurors were asked to balance the mitigating circumstances marked "yes" in Section II against the aggravating circumstances marked "yes" in Section I.  *Id.* at 388-89.  If all the mitigating factors in Section II were marked "no," the defendant was sentenced to death.  *Id.* at 389.

In assessing the constitutionality of this sentencing scheme, the *Mills* Court noted that "in a capital case 'the sentencer [may] not be precluded from considering, *as a mitigating factor*, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence of less than death.'"  *Mills*, 486 U.S. at 374 (alteration and emphasis in original) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion))). The *Mills* Court held that the Maryland capital sentencing scheme ran afoul of this command from *Eddings* and *Lockett* because a reasonable jury could have interpreted the jury instructions, as delivered, and the accompanying verdict form to require that the jury should mark "no" next to a mitigating factor in Section II even if all but one of the jurors thought that circumstance was present.  *See id.* at 378-79, 384. Given this potential interpretation by a reasonable juror, there was an unacceptable risk

248

that the jury could be prevented from reaching the balancing stage even if all twelve jurors believed mitigating circumstances were present but could not agree on the presence of any particular mitigating circumstance.  *Id.* at 384 ("[T]he sentencer must be permitted to consider all mitigating evidence.  The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk.").

In *McKoy v. North Carolina*, 494 U.S. 433 (1990), the Supreme Court examined a similar capital sentencing scheme in North Carolina. However, the requirement that the jury find the presence of an individual mitigating factor unanimously was explicit in the statute rather than being a possible interpretation of the instructions by a reasonable jury. Because the unanimity "requirement prevent[ed] the jury from considering, in deciding whether to impose the death penalty, any mitigating factor that the jury does not unanimously find," the North Carolina statute violated the Eighth and Fourteenth Amendments "by preventing the sentencer from considering all mitigating evidence." *McKoy*, 494 U.S. at 435.

*Mills* and *McKoy* establish that the Constitution requires that a sentencer in a capital case cannot be precluded from weighing all proffered mitigating evidence during its evaluation of mitigating circumstances that could result in a sentence less than death, yet the 10-12 scheme flies in the face of this constitutional command.  A hypothetical, applied to Harper's case, illustrates how the 10-12 Rule violates the constitutional commands of *Mills* and *McKoy* by enshrining a majority rules protocol for the consideration of mitigation evidence.

Suppose that in Harper's jury, Jurors 1 through 5 wanted to answer "No" to the future dangerousness question, while jurors 6 through 12 wanted to answer "Yes."  Without knowledge that under Texas law a single holdout "No" juror on this special issue would result in a life sentence, there is  a reasonable possibility that Jurors 1 through 5 would feel compelled to change their vote in the face of a 7-

249

vote majority for "Yes." Having thus been coerced into a unanimous "Yes" answer on the first issue, Harper's jury would move to the second of the two special issues presented to them.

Now, suppose Jurors 1 through 7 believe there were no mitigating circumstances sufficient to merit life rather than death, while Jurors 8 through 12 want to answer "Yes" to the final mitigation question. Again, without having received an instruction that under Texas law a single holdout "Yes" vote on this question would result in a sentence of life without parole, there is a reasonable probability that the 5 "Yes" jurors would feel compelled to change their votes in the face of the 7-vote "No" majority.

With the jury thus answering the future dangerousness special issue "Yes" and the mitigation special issue "No" under these circumstances, Harper would be sentenced to death even though 10 jurors (Jurors 1 through 5 and 8 through 12)—the number that the 10-12 rule instructs the jury is required to answer the special issues in a way that results in a life sentence—found the presence of mitigating evidence in the record, even though they did not agree on a particular mitigating factor.[117]   Such a scenario runs afoul of the constitutional commands of the Supreme Court, expressed in *Mills* and *McKoy*, and thus the 10-12 capital sentencing scheme employed in Texas is unconstitutional.   Finally, appellate

---

[117] The first of the two special issues submitted during Harper's sentencing was the future dangerousness special issue.  As a finding that a capital defendant does not pose a future threat to society is a constitutionally recognized mitigating factor, s*ee Franklin v. Lynaugh*, 487 U.S. 164 (1988); *Skipper v. South Carolina*, 476 U.S. 1 (1986), the future dangerousness special issue evaluates the presence of mitigation criteria.   The second, and final, special issue presented to Harper's jury was whether there was sufficient mitigation evidence to warrant life without parole rather than a death sentence. This "*Penry*" special issue implicates a potentially limitless range of mitigating factors, including "troubled background" evidence. *See Penry v. Lynaugh*, 492 U.S. 302 (1989).

counsel did not challenge the validity of the "10-12 Rule" in Harper's direct appeal and thus, appellate counsel's performance, as to this claim, was deficient. *See Robbins*, 528 U.S. at 285.

## CLAIM TWENTY-FIVE

### HARPER'S DEATH SENTENCE IS UNCONSTITUTIONAL BECAUSE IT WAS ASSIGNED BASED ON TEXAS' ARBITRARY SYSTEM OF ADMINISTERING THE DEATH PENALTY

Because of the prosecutorial discretion established under Texas' system of administering criminal justice, a vast minority of Texas counties are responsible for a sizable majority of death sentences assessed over the last thirty-six years. Both geographic and racial disparities have created a system of capital punishment in Texas that punishes, not based on the heinousness of a defendant's crime, but on the irrelevant factors of where he lives and what races were involved in the crime. Harper's capital sentence was handed down in the midst of this arbitrary system. As such, he has been denied his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.  Harper's sentence of death violates his applicable state and federal Constitutional rights, as well as state statutory law and United States Supreme Court and state case law and should be vacated.

### A. Supreme Court Precedent Mandates That the Death Penalty Not Be Applied Arbitrarily

The United States Supreme Court has long held that proceedings surrounding the imposition of a death sentence must meet a "heightened standard of reliability" because of the severe and irreversible nature of the death penalty. *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) ("This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different."). The Court briefly suspended the death penalty in *Furman v. Georgia* during the 1970s based on this heightened standard. *Furman v. Georgia*, 408 U.S. 238 (1972). The Court rested its decision

251

on the basis that the lack of guidance and narrowing in a jury's decision of who was to receive the death penalty created an arbitrariness too cruel and unusual to withstand constitutional scrutiny. *Id.* at 309 (Stewart, J., concurring) ("These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual.").

Following *Furman*, the Court has been careful to weigh a death penalty sentencing scheme to determine whether there are suitable safeguards to prevent the arbitrary assignment of death. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (noting "the need for reliability in the determination that death is the appropriate punishment in a specific case."). In finding mandatory death sentencing unconstitutional, the Court noted that juries will often refuse to convict defendants because they are deterred from automatically sentencing someone to death. *Id.* at 302. "Instead of rationalizing the sentencing process, a mandatory scheme may well exacerbate the problem identified in *Furman* by resting the penalty determination on the particular jury's willingness to act lawlessly." *Id.* at 303. Instead, a death penalty scheme must have "objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." *Id.*

In 1976, the Court believed States had developed an answer to *Furman*'s requirement that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976). The Court held that procedural reforms—such as a bifurcated trial, narrowing of death eligible crimes, and proportional appellate review—"focus the jury's attention on the particularized nature of the crime and the particularized

characteristics of the individual defendant" preventing it from "wantonly and freakishly impos[ing] the death sentence." *Id.* at 206-07.

Even those procedures, however, continue to be reviewed for their effectiveness in preventing the arbitrary assessment of death. *Godfrey v. Georgia*, 446 U.S. 420, 432-33 (1980) (reviewing the application of Georgia's aggravating factor that a crime was "outrageously or wantonly vile, horrible or inhuman"). When it can be said that "[t]here is no principled way to distinguish [a] case, in which the death penalty was imposed, from the many cases in which it was not," a state's death penalty scheme can no longer be said to be imposing a death sentence "based on reason rather than caprice or emotion." *Id.* at 433.

## B. Texas' Death Penalty Scheme Is Unconstitutional

The Supreme Court upheld Texas' death penalty statute in *Jurek v. Texas* in 1976.  428 U.S. 262, 273-74 (1976) ("[T]he Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death.").  The Court found that Texas' narrowing of death eligible crimes and bifurcation of the guilt/innocence and penalty trials would likely ensure "the evenhanded, rational, and consistent imposition of death sentences under law." *Id.* at 276.  However, even this judgment has been the subject of repeated review to ensure that the practical effect of Texas's system is not the creation of an arbitrary assignment of death. *See, e.g.*, *Penry v. Lynaugh*, 492 U.S. at 302 (invalidating Texas' statute for failing to instruct juries they may consider mitigating evidence); *Penry v. Johnson*, 532 U.S. at 782 (invalidating Texas' supplemental instruction on mitigation for failing to sufficiently provide a jury the mechanism to consider mitigation evidence).

Were a court to review the state of the death penalty in Texas today, it would find much the same "lightning strike" phenomenon that was found unconstitutional

253

in *Furman*.  In 2010, Texas had 1,248 murders.  Tex. Dep't of Pub. Safety, *Index Crime Analysis 2010*, *available at* http://www.txdps.state.tx.us/crimereports/10/citCh3.pdf (last visited on May 26, 2012).  Yet, only nine death sentences were assessed by Texas juries in 2010.  Tex. Dep't Crim. Justice, *Offenders on Death Row*, *available at* http://www.tdcj.state.tx.us/stat/dr_offenders_on_dr.html (last visited on May 26, 2012).  Further, the number of death sentences assessed throughout the state has declined significantly over the three decades.  *Id.*  Despite being the "capital of capital sentencing," the numbers show that even in Texas a death sentence is becoming increasingly rare as a utilized punishment.

Although Texas juries continue to be guided by the special issues under Texas law in making a judgment in an individual capital case, there are other factors at work that mean that Texas' system no longer function as an "evenhanded, rational, and consistent imposition of death." *Jurek*, 428 U.S. at 276.

### a.  Geography

Since 1976, there have been 782 offenders that either have been executed or are currently housed on death row in Texas.  Tex. Dep't Crim. Justice, *Death Row Information*, *available at* http://www.tdcj.state.tx.us/death_row/index.html (last view September 20, 2012).  Yet only 102 out of the 254 counties in Texas have contributed an offender to that list.[118]  *Id.*  Seven counties (Bexar, Dallas, Harris, Montgomery, Nueces, Smith, and Tarrant) accounted for nearly sixty percent of these offenders.  *Id.*

---

[118] Only 120 counties of the 254 have ever sentenced an inmate to death, including people who are no longer on death row, making up the over 1000 inmates that have received a death sentence in Texas since 1976.  Tex. Dep't Crim. Justice, *Number of Offenders Sentenced to Death From Each County*, *available at* http://www.tdcj.state.tx.us/death_row/dr_number_sentenced_death_county.html (last visited May 26, 2012).

Texas is not alone in this phenomenon.   Multiple studies conducted throughout the country have identified geographic discrepancies with the imposition of the death penalty within a particular state.[119]   *See, e.g.*, Jules Epstein, *Death-Worthiness and Prosecutorial Discretion in Capital Case Charging*, 19 TEMPLE POL. & CIVIL RIGHTS L. REV. 389 (2010) (discussing studies in Arizona, Pennsylvania, Missouri, and South Carolina); Adam Gershowitz, *Statewide Capital Punishment: The Case For Eliminating Counties' Role in the Death Penalty* (March 2009), *available at* http://works.bepress.com/adam_gershowitz/5/ (last visited September 20, 2012).   In one study, the authors found that over a four year period in Missouri, seventy-six percent of cases charged as either murder one, murder two, or involuntary manslaughter met the statutory definition to be eligible for the death penalty.   Katherine Barnes, et al., *Place Matters (Most): An Empirical Study of Prosecutorial Decision-Making in Death-Eligible Cases*, 51 ARIZ. L. REV. 305, 309-311 (2009).   However, only five percent of those ever faced a death penalty trial.   *Id.* at 309.   As a result, prosecutors throughout the state made the decision not to seek death in seventy-one percent of death eligible cases.   *Id.*   This discretion was not spread evenly, though, as prosecutors in St. Louis City and Jackson County charged capital cases far less frequently (6.5 percent of cases) than prosecutors in the rest of the state (20 percent).   *Id.* at 344.

A commission created to study the death penalty in New Jersey similarly noted concern about "the existence of variability among counties in the application

---

[119] This, of course, says nothing of the geographic discrepancy identified *between* the various states that assess the death penalty.   *See* Jeffrey Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme*, 6 WM. & MARY BILL OF RIGHTS J. 345, 386-87 (Spring 1998) ("Because each jurisdiction creates its own death penalty statute, each statute is unique.   The result is that—not only does punishment differ between death penalty jurisdictions and jurisdictions without the death penalty— significant discrepancies exist among the death penalty jurisdictions.").

of the death penalty." New Jersey Death Penalty Commission Report at 43 (Jan. 2007) available at http://www.njleg.state.nj.us/committees/dpsc_final.pdf (last visited May 26, 2012). The commission considered a hypothetical where:

> The exact same case of a killing occurs in neighboring counties. All of the circumstances are the same. In one county the defendant is capitally prosecuted, is subject to a penalty trial, and is subject to the ultimate outcome of death. In the other county the defendant is not so treated; either through a plea bargaining or other processes he receives a penalty that is much less harsh.

*Id.* Although the facts of the hypothetical could be attributed to multiple factors, the commission was "troubled by the degree to which the geographic location where the crime was committed appears to affect the ultimate disposition of the case." *Id.*

In *Jurek* and in *Gregg*, the Supreme Court considered the issue of whether prosecutorial discretion in choosing which cases to seek the death penalty created an impermissible arbitrariness in capital sentencing. *Gregg*, 428 US. at 199; *Jurek*, 428 U.S. at 274 ("we reject it for the reasons set out in our opinion today in *Gregg*"). The Court determined that this decision-making worked to remove defendants from the risk of death and did not violate the constitution, as long as the "decision to impose [a death sentence was] guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Gregg*, 428 U.S. at 199. Justice White, in his concurrence, noted that the decision of prosecutors would likely mirror that of juries in deciding which cases to seek death based on the seriousness of the offense.

> Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments[,] the standards by which they decide whether to

> charge a capital felony will be the same as those by which the jury
> will decide the questions of guilt and sentence.

*Id.* at 225 (White, J., concurring).

Experience of the last thirty-six years has shown that the practical effect of the use of prosecutorial discretion has not been to narrow the field of death eligible defendants to the most serious and heinous cases. It stretches credulity to imagine that the seven counties in Texas that are responsible for sixty percent of the inmates executed or currently on death row correspondingly have significantly more heinous crimes occurring than other counties. Rather, other factors like ideological beliefs regarding the death penalty, the depth of experience in prosecuting capital cases, and the available resources (both time and money) to prosecute a capital case impact a prosecutor's decision whether the seek the death penalty. *See* Gershowitz, *Statewide Capital Punishment*, at 11-15 (noting various times prosecutor offices have declined to pursue the death penalty because of available resources).

The influence of such factors on the capital system in Texas renders it no longer the "evenhanded, rational, and consistent" system of imposing the death penalty the Supreme Court expected it to be in 1976. *Jurek*, 428 U.S. at 276. The Court on a prior occasion reversed course in its belief that the Texas system would work properly in practice. *Compare Penry v. Lynaugh*, 492 U.S. at 318 ("the facial validity of the Texas death penalty statute had been upheld in *Jurek* on the basis of assurances that the special issues would be interpreted broadly enough to enable sentencing juries to consider all of the relevant mitigating evidence a defendant might present"), *with Jurek*, 428 U.S. at 272 (noting the Texas CCA indicated it would "interpret this second question so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show"). The geographic disparities in the imposition of the death penalty in Texas offer equally

compelling grounds to abandon the expectation that prosecutorial discretion can offer a consistent application of the law. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) ("The government of the United States has been emphatically termed a government of laws, and not of men.").

**b. Race**

In addition to geography, studies continue to show that race is a motivating factor behind jury verdicts in capital cases. David Baldus, et al., *Race and Proportionality Since* McCleskey v. Kemp *(1987): Different Actors with Mixed Strategies of Denial and Avoidance*, 39 COLUM. HUMAN RIGHTS L. REV. 143 (Fall 2007); Isaac Unah, *Choosing Those Who Will Die: The Effect of Race, Gender, and Law in Prosecutorial Decision to Seek the Death Penalty in Durham County, North Carolina*, 15 MICHIGAN J. OF RACE & LAW 135 (2009) (finding that prosecutors were more likely to pursue capital cases for white victims than African-American victims); Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 HOUSTON L. REV. 807 (2008-2009) (same).

One study considered the Harris County District Attorney's decisions regarding the charging of capital cases. Phillips, 45 HOUSTON L. REV. at 816. The study found that disparities existed between the treatment of African-American and white defendants and victims. *Id.* at 830. Although African-American and white defendants were charged with capital murder at relatively similar rates, African-American defendant were more likely to have committed a less serious offense than their white counterparts. *Id.* In contrast, African-American victims were significantly less likely to prompt a capital charge than white victims. *Id.* at 834.

In another study, a random sample of 276 adults were given a file summary for a triple murder case. Epstein, 19 TEMPLE POL. & CIVIL RIGHTS L. REV.at 407-08. The variables in the experiment were 1) some of the group was given a maximum sentence to allot of life without parole, while others could give a death

sentence and 2) the suspect's name for some was a race-neutral name and for others was a name traditionally associated with minorities. *Id.* The results of the study showed that the verdicts of guilt varied little when only life without parole was possible, but when the maximum sentence was death the defendants with traditional minority names were significantly more likely to be found guilty. *Id.*

The existence of racial disparities in capital sentencing can also cut in the opposite direction, depending on the geographic region of the study. *See* Barnes, 51 ARIZ. L. REV. at 348. A study of Missouri's death penalty revealed that African-American defendants were about a third as likely to face a capital charge as white defendants. *Id.* White defendants were also more likely to have those capital charges go to trial, while African-American defendants were more likely to have a jury reject the capital charge. *Id.*

Regardless of the direction of the disparity, these studies show that race continues to be a motivating factor behind the imposition of the death penalty—even if that factor is unconsciously applied. When the law is utilized in such a way that it becomes more directed at a "particular class of persons," especially in the context of racial discrimination, the implementation of that law violates an individual's right to equal protection under the law. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886).

**C. Conclusion**

For the foregoing reasons, Texas' death penalty scheme is unconstitutional. Therefore, Harper's sentence of death should be vacated.

**CLAIM TWENTY-SIX**

**TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT TIMELY OBJECTIONS TO THE TRIAL COURT'S DENIAL OF DEFENSE MITIGATION EVIDENCE UNDER STATE HEARSAY RULES, UNDER *GREGG V. GEORGIA, JUREK V. TEXAS* AND *GREEN V. GEORGIA* AND  HARPER'S FOURTEENTH AMENDMENT DUE**

259

**PROCESS AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED BY THE EXCLUSION OF DEFENDANT'S MITIGATION EVIDENCE.**

Trial counsel was ineffective for failing to present timely objections to the trial court's denial of defense mitigation evidence under state hearsay rules, under *Gregg v. Georgia, Jurek v. Texas* and *Green v. Georgia*, 442 U.S. 95 (1979), and state habeas counsel was ineffective for failing to present and exhaust this claim in state courts.

The trial attorney made an untimely objection to the prior exclusion of defense mitigation evidence using state hearsay rule at Harper's capital sentencing. 21 RR 226-28. While trial counsel objected that hearsay was admissible before the capital sentencing jury in presenting Harper's capital mitigation evidence citing *Green v. Georgia*, 442 U.S. 95 (1979), prior State hearsay objections were granted by the trial court without defense exception or objection made. The trial court then violated Harper's Fourteenth Amendment due process and Eighth Amendment rights when, after the defense objection to exclusion of their mitigation evidence using state hearsay rules, the trial court continued to exclude defense mitigation evidence. The state district court granting state hearsay objections to evidence presented in the defense mitigation case violated *Gregg v. Georgia*, 428 U.S. 153, 204 (1976), *Jurek v. Texas*, 428 U.S. 262, 276 (1976), and *Green v. Georgia*, 442 U.S. 95 (1979).


The following hearsay objections by the State to defense mitigation evidence were sustained during the testimony of the following witnesses:

Paul Motard 19 RR 258

Paul Motard 19 RR 260


Dr. Richard Dudley 21 RR 153

260

Curtis Chillis 21 RR 205

Curtis Chillis 21 RR 206

Curtis Chillis 21 RR 211

Curtis Chillis 21 RR 216

Darion Coleman 21 RR 244

Darion Coleman 21 RR 261

Don McGinty 22 RR 70

Don McGinty 22 RR 82

Sandra McLinton 22 RR 176

Sandra McLinton 22 RR 184

Dr. Mark Moeller 23 RR 133

In *United States v. Jones*, 132 F.3d 232, 241-42 (5th Cir. 1998), the Fifth Circuit set forth the Supreme Court's established precedent allowing for introduction of defense hearsay evidence in capital sentencing proceedings, and requiring that the defendant must be given the opportunity to introduce information regarding mitigating factors, without traditional evidentiary restraints, in order to provide the jury with the fullest possible information about the defendant.

> Although the Eighth Amendment requires a heightened reliability standard in capital sentencing proceedings, the jury must also receive sufficient information regarding the defendant and the offense in order to make an individual sentencing determination. *See Lowenfield v. Phelps*, 484 U.S. 231, 238-239, 108 S.Ct. 546, 551-552, 98 L.Ed.2d 568 (1988)(the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death

261

sentence is imposed"). The Court has recognized that the defendant must be given the opportunity to introduce information regarding mitigating factors, without traditional evidentiary restraints, in order to provide the jury with the fullest possible information about the defendant. See *Gregg v. Georgia*, 428 U.S. 153, 204 (1976) ("So long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision."). *See also Jurek v. Texas*, 428 U.S. 262, 276 (1976) (stating that it is "essential ... that the jury have before it all possible relevant information about the individual defendant whose fate it must determine").

The state trial court violated Harper's right to present mitigating evidence at his capital sentencing hearing by granting the State's hearsay objections to Harper's mitigation evidence. The trial court denied Harper the opportunity to introduce information regarding mitigating factors without traditional evidentiary restraints, in order to provide the jury with the fullest possible information about the defendant. The granting of these objections and the denial of the introduction of this mitigating information prejudiced Harper, and he should be granted a new sentencing proceeding.

If this ground for relief is found to not have been presented on direct appeal or in state post-conviction proceedings, the failure to present it either was due to the ineffectiveness of direct appeal counsel, or initial state post-conviction counsel. Accordingly, any procedural default of the substantial claim of ineffective assistance of trial counsel is excused by prior state habeas counsels' ineffective failure to present it, and constitutes cause for the procedural default. *See Martinez v. Ryan*, 132 S.Ct. 1309 (2012); *Trevino v. Thaler*, 133 S.Ct. 1911, 1918 (2013).

## CLAIM TWENTY-SEVEN

### THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT THE JURY'S FINDING OF "FUTURE DANGEROUSNESS" PURSUANT TO TEX. CODE. CRIM. PROC. ANN. ART. 37.071, SEC. 2(B)(1) AT PUNISHMENT.

A review of the legal sufficiency of the evidence to support a finding of "future dangerousness" requires the record evidence to be viewed "in the light most favorable to the jury's finding to determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability the defendant would commit future acts of violence that would constitute a continuing threat to society." *Berry v. State*, 233 S.W. 3rd 847, 860 (Tex. Crim. App. 2007) citing *Jackson v. Virginia*, 443 U.S. 307 (1974). If a rational jury would necessarily have such a reasonable doubt as to the probability of the appellant's future dangerousness, the court must reform the trial court's judgment to a sentence of life imprisonment. *Id.* at 861 citing *Holberg v. State*, 38 S.W. 3rd 137, 139 (Tex. Crim. App. 2000).

Sufficiency of the evidence review for "future dangerousness" is to be decided on a case-by-case basis. *Dinkins v. State*, 894 S.W. 2nd 330, 357-61 (Tex. Crim. App, 1995). The question posed by the first special issue is considered "a normative one" as the Legislature has not specified a specific level of risk or probability of violence. *Coble v. State*, 330 S.W. 3rd 253, 268 (Tex. Crim. App. 2010). The "future dangerousness" special issue is intended to ensure "that no defendant, regardless of how heinous his capital crime, will be sentenced to death unless the jury finds that he possesses a real threat of future violence." *Id.* (emphasis added). While the facts of the capital murder itself may support a finding of future dangerousness, *Dinkins* at 357-61, many other factors may be considered. These include, but are not limited to, the following:

263

"(1) The circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of prior criminal record, and the severity of the prior crime; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the commission of the offense; (7) psychiatric evidence; and (8) character evidence." *Keeton v. State*, 724 S.W. 2„d 58, 61 (Tex. Crim. App. 1987).

It has been noted these considerations do not take into account how long a defendant will be incarcerated for his offense, how prison will endeavor to restrain his future dangerousness, and the defendant's ability to conform and live peacefully within that structured environment. *Estrada v. State*, 313 S.W. 3rd 274, 280 n. 6 (Tex. Crim. App. 2010). However, this is because *Keeton* was decided at a time when a capital murder defendant receiving a life sentence might be considered for parole like any other felony offender.

To prevent the early release of such offenders, the Legislature periodically increased the time a capital murder inmate would have to serve on their life sentence before becoming eligible for parole. Recognizing that not informing juries as to how long a capital murder defendant might serve on their life sentence before becoming eligible for parole presented jurors with "a false choice" in sentencing, the Legislature required jurors should be informed as to exactly how long a defendant would have to serve on their life sentence before becoming eligible for parole. *Id*. Since 2005 defendants such as Mr. Harper must fulfill their life sentence without any prospect of parole.

In spite of the fact a life sentence now means life without parole, the Texas Court of Criminal Appeals has decided it will follow its prior case law and

"construe the future dangerousness special issue to ask whether a defendant would constitute a continuing threat whether in or out of prison without regard to how long the defendant would actually spend in prison if sentenced to life." *Id.* at 281.

In deciding that the legal sufficiency review of the first special issue should be determined in terms of whether the appellant would be a threat outside as well as inside prison, *Estrada* at 284, the Court of Criminal Appeals ignores the reality of the capital-life-offender's actual surroundings and likelihood of violence in prison. By framing the "future dangerousness" review in terms of whether an appellant is the same person he was when he received an anti-social personality disorder diagnosis or committed some prior extraneous act of extraneous misconduct, the Court appears to have decided to focus exclusively on the defendant's character and "internal restraints" in deciding if a defendant will pose a "heightened risk of violence" while incarcerated. *Coble* at 269. In the space of a single sentence the Court recognizes prison's ability to impact a defendant's risk of violence as a "relevant" and "important criterion" for deciding his "future dangerousness" and then gives it scant consideration as it focuses on the defendant's character. *Id.*

The convicted capital murderer's life will invariably contain prior criminal acts of violence and psychological problems that will allow the "future dangerousness" issue to be answered "yes" upon review unless how that person acts in prison is given adequate consideration. Mr. Harper's lack of "future dangerousness" if incarcerated for life is not a matter of creating "a prison environment so confining, isolated, and highly structured," *Coble* at 269, in which he would never commit an act of criminal violence, but of returning him to TDCJ as it exists today and where he has proven not to be a danger to others. There he has not had, nor will he have, access to those things and people who have led him to his repeated incarcerations.

265

Application of Law to Relevant Facts

Although born of a father who was in and out of prison as he grew up and was an admitted "terrible role model" and a weak willed mother addicted to drugs, Mr. Harper was a happy, playful, youth who would rather avoid, or talk, his way out of violence then perpetrate it. It was only after his grandmother who took his parents place in rearing him died, that his life spun downward. (21 RR 164-65).

From early adulthood through his final incarceration eight months prior to the instant cause, the appellant was in and out of TDCJ three times for essentially the same crime, causing some slight bodily injury to the woman when he stole her purse. His sentences for these three convictions were for 7, 15, and 40 years.

Over the course of this three incarcerations Mr. Harper was a near model prisoner. During his last incarceration he was selected to participate in the Carol Vance Unit's pre-release program where he was allowed to work outside the prison and sing in a local choir. (21RR 210, 222). He became a trustee, "boot black" and the warden's personal barber. (20RR 214, 22RR 79). When his grandmother died he was given a furlough to attend her funeral.

His mentor at the Carroll Vance pre-release Interfaith program, Don McGinty, had never seen an inmate turn his life around in prison the way the appellant had and considered him a role model for other inmates and an asset to the prison. (22 RR 68, 118). Mr. Harper's ability to adapt and conform to prison life without being violent was one of the factors Dr. Richard Dudley relied upon in concluding he would not be a future danger in prison. (21 RR 43). This was also a significant factor in Dr. Moeller's initial assessment that Mr. Harper would not be a danger if incarcerated. (See Defense Exhibit 20). Indeed, the appellant fell within that group of older capital murder offender that the State's prison classification expert, Steve Rogers, believe did better in prison. (20 RR 212).

266

The appellant's prison classification expert, former TDCJ Warden Susan Perryman-Evans, reviewed his 1990, 1992 and 1998 TDCJ records and concluded Mr. Harper was not a threat to its guards and staff regardless of their sex. (20 RR 254). This comported with her overall assessment Mr. Harper was not a threat to escape or commit acts of violence if sentenced to life without parole. (20 RR 261). Moreover, he would never regain any of the levels of trustworthiness, or privilege, he had previously attained. (20 RR 260).

Unlike in *Estrada v. State*, the State presented no evidence that parole-eligible inmates would pose less risk of "future dangerousness" in prison than parole-ineligible offenders such as the appellant. *Estrada* at 283.

Also discrediting the conclusion that Mr. Harper constitutes a future danger in society are the unique circumstances surrounding the death of Ms. Rose and her children. Darion Coleman and Don McGinty believed the Garland Harper who committed this offense was not the same person they knew. (21 RR 253; 22 RR 137). The appellant's father and aunt, Paul Harper and Sandra McClinton, had both seen him with his prior girlfriend, Marie Rusk, and were not aware of any violent or unpleasant altercations between the two. (22 RR 178-79; 22 RR 231). Neither they nor Briana's father, Lloyd Roberson, ever saw any violence between the appellant and Ms. Rose that gave rise to concern about the possibility of future violence between the two. (22 RR 233, 236; 17 RR 70).

Don McGinty described the paranoid delusional thinking that gripped Mr. Harper earlier the day of the offense when the appellant enlisted his mentor's assistance in trying to find Ms. Rose's new boyfriend. (22 RR 91-97). Without reason, or explanation, the appellant identified three different African-American males who visited and left Walgreen's as her new boyfriend. Mr. Harper was so convinced of the last man's relationship with Ms. Rose that he had McGinty drive

to the rear of the daycare center to find him only to learn there was no rear door to the building to allow such an assignation. (22 RR 109, 110).

After interviewing Mr. Harper on two occasions almost a year apart for 20 to 30 hours, Dr. Richard Dudley concluded with a reasonable degree of medical certainty that the appellant was suffering from a mental illness at the time of the incident. (21 RR 82, 83). This involved a schizoaffective disorder that combined schizophrenia with a mood disorder, namely depression. (21 RR 39). This impaired Mr. Harper's judgment at the time of the incident as he believed the hallucinations and delusions he was experiencing were true. In support of this finding Dr. Dudley noted the high level of medication the appellant was now receiving as well as the diagnosis from Ben Taub/MHMRA in October 2008 that found Mr. Harper's general level functionality was "profoundly dysfunctional" and "impaired." (21 RR 33). Continued medication while incarcerated, and counseling would not only minimize the damage that had already occurred, but also prevent subsequent episodes and increase his ability to function thereby reducing his "future dangerousness." (21 RR 48). Dr. Dudley also noted there was nothing in the appellant's psychiatric evaluations that indicated he hated women. (21 RR 58).

Although it has been reasoned that a lack of remorse may infer "future dangerousness", *Trevino v. State*, 991 S.W. 2nd 849, 853-54 (Tex. Crim. App. 1999), the evidence in the instant cause supports no such inference. McGinty allowed the appellant held himself responsible for what happened and was sorry for the tragedy. (22 RR 75, 138). In addition, the letters that comprised defense Exhibits 26 and 27 actually demonstrate his remorse. (22 RR 70). One may also infer the appellant's sorrow for what occurred by his return to the scene to surrender to the police and request to "kill me now. Kill me now." (15 RR 139). Dr. Dudley concluded this conduct on Mr. Harper's part was an expression of his remorse over what had occurred. (21 RR 192).

Because of the unique circumstances of the offense, the appellant's mental illness at the time of the incident, and his history of peaceful behavior while incarcerated and prison's ability to provide ongoing medical care and counseling, Dr. Dudley did not believe the appellant would constitute a future danger if incarcerated. (21 RR 43).

Dr. Richard Moeller reached a similar conclusion prior to trial. (See Dr. Moeller's written report, Defense Exhibit 20). He allowed he only changed his opinion over the summer preceding trial after talking with the district attorneys. (23 RR 124).

This expert admitted that he had no new data to justify his changed opinion. He allowed it arose only after talking with the prosecutors over the summer and learning for the first time the appellant would not be confined to a single cell if incarcerated. (23 RR 125). Moeller testified nothing in the prison reports he reviewed indicated TDCJ could not handle Mr. Harper and that he knew the appellant had been in general population during each of his prior incarcerations and done well when so placed. (23 RR 141, 140, 129).

Further, a defendant's limited access while incarcerated for life to that narrow segment of the population he has previously victimized is also a factor to be considered in any "future dangerousness" review. *Estrada* at 283; *Berry* at 863-64. Tina Flores, Bonita Holmes, and Ms. Rose and her children are all women with whom Mr. Harper lived, however shortly, and had a relationship. If incarcerated for life he would not have the opportunity to live with or form such relationships.

Not even the female prison guards called by the State allowed for the possibility of such interaction in TDCJ and did not complain of any attempts by the appellant to form such a relationship when they knew him. In addition, none claimed the appellant had threatened or assaulted them. Ms. Woods' primary complaint about the appellant was his distaste for busy work as a trustee. (20 RR

95). Ms. Randall's complaint centered on Mr. Harper failing to work and returning to his bunk after going to the doctor for a bad back. (20 RR 193-44, 153.)

Conclusion

Because the likelihood a particular defendant will not pose a risk of violence if sentenced to life-without-parole is a "relevant" and "important criterion" in assessing "future dangerousness", and because the cases focusing on the defendant's record, character, and the facts of his case sentencing foreclose adequate consideration of this sentencing factor, the evidence is not legally sufficient to support an affirmative finding of the future dangerousness special issue in the appellant's case.

**CLAIM TWENTY-EIGHT**

**MR. HARPER WAS DENIED HIS FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION WHEN THE STATE USED A PREEMPTORY STRIKE TO PREVENT VENIREPERSON DONNA BANKS FROM SERVING ON HIS JURY IN VIOLATION OF *BATSON V. KENTUCKY.***

The Equal Protection Clause of the 14th Amendment precludes racial discrimination injury selection. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).

*Batson* provides for a three part burden shifting inquiry into whether one party has purposefully excluded a prospective juror on the basis of race. *Id.* 96-97. See also *Hernandez v. New York*, 500 U.S. 352, 358-59 (1991). The challenging party must (1) first make a prima facie showing the opposing party exercised a preemptory strike on the basis of race; (2) the burden then shifts to the other party to provide a race-neutral explanation for the strike, and (3) after providing the challenging party with an opportunity to offer further relevant circumstances supporting an inference of discrimination, the trial court must decide whether a case of purposeful discrimination has been established. *Id.* at 96-98; *Miller-El v, Dretke*, 545 U.S. 231, 251-52 (2005).

270

*Batson's* three-step process is "designed to produce actual answers" to any suspicions, or inferences, of racial discrimination that may have infected the jury selection process." *Johnson v. California*, 545 U.S. 162, 172 (2005). It seeks to end any speculation of discriminatory jury selection by obtaining a "direct answer" to the "simple question" of whether a party's preemptory strike was based on race. *Id.* at 172-73.

When making its *Batson* finding, the trial court "should consider all the relevant circumstances." *Batson* at 96. On appellate review "all of the circumstances that bear on the issue of racial animosity must be consulted." *Snyder v. Louisiana*, 128 S. Ct. 1203, 1208 (2008) citing *Miller-El* at 239.

For the purpose of the third step the court must assess the plausibility of the party's explanation in light of all of the evidence bearing upon it. *Miller-El*, at 257. The critical question in determining whether the challenging party has proven purposeful discrimination is "the persuasiveness of the prosecutor's justification for his preemptory strike." *Miller-El v. Cockrell*, 537 U.S. 322, 338-39 (2003). "If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." *Miller-El v. Dretke*, 545 U.S. at 252.

Circumstances that might bear on whether the use of a preemptory strike was motivated by racial considerations include "a pattern" of strikes against black jurors. *Batson* at 97. They may also include the composition of the venire, the number of preemptory strikes used on minority jurors as well a comparison of the veniremen's responses during voir dire. *Miller-El*, 545 U.S. at 241. the plausibility of the prosecutor's actual explanation should also be considered. *Snyder* at 1212.

Application of Law to Relevant Facts

At the conclusion of the individual voir dire of Donna Banks the following exchange occurred between trial counsel, the trial court, and the State:

271

"MR. BOURQUE: Judge, before she gets out of the building, we wanted to lodge a <u>Batson</u> objection to her being excused.

THE COURT: Okay.

MR. BOURQUE: Much on the fact that she is not only African-American female, which is the same race as our client, she is actually roughly about the same age as the victim in this case. She has four women - she has four daughters and a son and she's a 3, 3. Her questionnaire is very objective and very fair and we would like a race neutral explanation from the State.

THE COURT: What says the State?

MS. BRADLEY: First of all, I believe that the record will clearly show Ms. Banks', in my opinion, inability to answer any of the questions that I asked her directly. Which is a concern of mine. I think she's called it pondering for the next 30 minutes and that's, basically, I think the way that Ms. Banks appears to evaluate things.

The other thing is that she states that she would do away with the death penalty in favor of life without parole. She believes that rehabilitation is the most important thing to consider; and she believes, frankly, that everybody is capable of rehabilitation and that a person can actually do better in prison for life when given the opportunity with a life sentence than they could with the death penalty. She stated that - she didn't answer the question on the questionnaire about whether or not she could - whether she thought life in prison was more effective than the death penalty. When asked just now, she stated that she believed life in prison was more effective than the death penalty.

She also indicated that her friend or her son's friend was murdered and that the friend forgave that person who murdered her own son. I believe it is clear based on Ms. Banks' background in ministry the things that she said today, forgiveness is something she's very capable of doing and rehabilitation is something she feels very strongly about. And those are reasons that I don't think that she would be a good juror for the State in this case.

THE COURT: Alright.

272

MR. BOURQUE: If I may, judge, just for the record Ms. Banks made it very clear you don't escape - simply because of her feelings about you don't escape the nastiness of your deeds or your penalty simply because of her feelings about whether it's punishment or rehabilitation. Also, I'd like to put it, make sure in the record that so far, the State has exercised a preemptory. On those eight preemptories. On those eight preemptories, four have been African Americans: Kelvin Clark was a black male with - he scored a 4, 3 on the scale; Deitra Broadnax was the second black female; she scored a 3,3; then there was Martha Pugh who scored a 4,3, and she was a black female; and then Ms. Banks scored a 3,3; she was a black female.

In comparison to the six jurors that we have, we have one 4,3, which was Ms. Dowlin, a white female; Carolyn Basley is a black female, scored a 4,3; Richard Cotton, white female [sic] scored a 5,3; Randall Price was a 2,3, a white female [sic] - a white male; Jennifer Williams was a 4,3; and Dwight Morris was also, No. 37, scored a 4,3.

So, we have - so, we've, basically - the State of Texas has used four of its eight strikes on African-American males or females that scored well within the acceptable range when you look at the jurors that we have.

THE COURT: I believe that the State's reason for striking is race neutral; so, I'm not going to grant any type of <u>Batson</u> challenge on that." (7RR182-85)

In the instant cause the trial court did not decide on the record whether the appellant established prima facie case of racial discrimination, but rather asked the State to respond to counsel's challenge. (7 RR 182-85). The prosecutor then provided her explanation for striking Ms. Banks. (7 RR 182-83). When a prosecutor offers their race-neutral explanation and the trial court rules on the ultimate issue of intentional discrimination as here, the preliminary question of whether the defendant made a prima facie case becomes moot. *Hernandez* at 359.

In striking Donna Banks the State had used four of its preemptory strikes to exclude African-American men and women. (7 RR 182-83). At that point it had used 50% of its preemptory strikes to exclude African-Americans. This constitutes a significant "pattern" of strikes against black jurors.

273

The fact that the State had accepted one African-American, Ms. Basey, as a juror does not "immunize" against striking other African-Americans for discriminatory reasons as the exclusion of a single minority member justifies *Batson* relief. *Batson* at 95; *Snyder* at 128.

As noted by trial counsel, Ms. Banks' 3/3 jury questionnaire evaluation score was similar to that of jurors the State had previously accepted. Her score of 3/3 was comparable to the following accepted scores: 3/3; 3/3; 5/3; 2/3; 4/3, and 4/3. (7 RR 182- 83).

In reviewing the decision of the trial court to deny a *Batson* challenge, ". . . all of the circumstances that bear on the issue of racial animosity must be consulted." *Snyder* v. *Louisiana*, 128 S. Ct. 1203, 1208 (2008) citing *Miller-El*, 545 U.S. at 239. These circumstances include "a pattern" of strikes against black jurors. *Batson* at 97. They may also include the composition of the venire, the number of preemptory strikes used on minority jurors as well as a comparison of the veniremen's responses during voir dire. Id. at 241. The plausibility of the prosecutor's actual explanation must also be considered, *Snyder* at 1212, without regard to whether the trial court, or appeals court, "... can imagine a reason that might not have been shown up as false." *Miller-El*, 545 at 252.

The State's initial explanation for striking Ms. Banks was her inability answer their questions directly. This explanation is pretextual and not worthy of belief. Ms. Banks answered all of the questions put to her. She was simply more loquacious in her responses than the jurors they had previously chosen to accept.

This explanation flows largely from the manner in which the State chose to questions Ms. Banks and not from her answers. The manner in which the State chose to question Ms. Banks is quite distinct from the manner in which it voir dired other members of the panel. The State's voir dire followed a rigid format in which it: (1) ascertained the venireperson's views on the death penalty; (2)

explained what constitutes capital murder; (3) learned what other offenses the venireperson thought warranted the death penalty; (4) explained the special issues; (5) explained "society" included prison and the people who worked there, and (6) reviewed certain responses from the jury questionnaire.

The prosecutor's discussion of these topics dominated their 30 minutes with each venireperson as they appeared satisfied with "yes", "I agree", or "uh huh-huh" responses to their lengthy questions. For example, compare the voir dire of Juror No. 6, Jennifer Williams at 5 RR 160-181. Ms. Banks' answers were simply longer and more personal. At no time did she seek to evade the prosecutor's questions. At no time did the prosecutor seek to shorten her responses by attempting to have her address the specific issue posed by their question, or summarize what they thought her response was to their question for her confirmation or denial.

Thus, the manner in which Ms. Banks was questioned was inconsistent with the manner in which previously accepted jurors were questions. The prosecutor's explanation could not be more pretextual. The State should not be allowed to complain their questions were not answered directly when they did not seek direct answers.

The State follows this explanation by complaining Ms. Banks would do away with the death penalty for life-without-parole. (7 RR 182). The record indicates that Ms. Banks also said the death penalty was appropriate, that she would keep the death penalty, and that it was not just for serial killers. (7 RR 161, 165, 171). Moreover, she demonstrated an understanding of the special issues and the ability to answer them based on the evidence presented. (7 RR 75, 78). She affirmed the facts of the underlying capital murder could provide sufficient reason for assessing the death penalty. (7 RR 174). Ms. Banks also demonstrated particular sensitivity to cases involving the death of children. (7 RR 173).

While Ms. Banks indicated rehabilitation was important to her, her aforementioned statements indicate her willingness to answer the special issues in a manner that the death penalty would be assessed. Furthermore, Ms. Banks was not the only prospective juror expressing a belief in the importance of rehabilitation. Richard Cotton said rehabilitation was the most important consideration for him as well. (5 RR 26). Ms. Basey believed people can be rehabilitated and had friends involved in prison rehabilitation programs. (5 RR 206.) Although Ms. Basey described herself as "open minded" and allowed that a member of her family had gotten two life sentences for his particular crimes, (5RJR. 223, 210), she was accepted as a juror while Ms. Banks was not.

While Ms. Banks may not have answered the questionnaire inquiry about "whether she thought life in prison was more effective than the death penalty", there was no showing by the State that she was being deceptive, or untruthful, in failing to answer that question. (7RR 184-85). Moreover, when the State sought her oral response to that question they never explained to Ms. Banks, or the trial court, in what manner and why life-without-parole might be more effective for the purpose of that question.

### Conclusion

Because the prosecutor's race-neutral explanation for striking Ms. Banks was pretextual, and not credible, this Court should grant *Batson* relief and remand Mr. Harper's case for a new trial in all things.

### CLAIM TWENTY-NINE

**THE TRIAL COURT ERRED IN ADMITTING MR. HARPER'S STATEMENT TO HPD OFFICER JAMES BENFORD ON OCTOBER 23, 1995 WHILE INCARCERATED IN TDCJ FOR THE REASON THAT THE STATEMENT WAS NOT FREELY AND VOLUNTARILY MADE IN VIOLATION OF THE APPELLANT'S RIGHTS UNDER THE 5TH AND 14TH AMENDMENTS OF THE U.S. CONSTITUTION.**

276

Relevant Law

The 5th and 4th Amendments of the U.S. Constitution prohibit the use of a defendant's involuntary statement against him at trial except when used for the purpose of impeachment. *Lykins v. State*, 784 S.W. 2nd 32, 36 (Tex. Crim. App. 1989) citing *Mincey v. Arizona*, 437 U.S. 385 (1978). The State cannot compel an accused to waive his 5th Amendment privilege against self incrimination "'by threatening to impose economic or other sanctions' capable of forcing the self incrimination which the Amendment forbids.'" *Lykins* at 37 citing *Minnesota v. Murphy*, 465 U.S. 420, 434-35 (1984). When a direct penalty may be imposed for the failure to answer a question a defendant need not invoke his privilege against self-incrimination and does not waive the privilege by merely answering the questions . . . "Id. at 37.

TEX. CODE CRIM. PROC. ANN. art. 38.21, 38.22, Sec. 5, and 38.23(a) respectively recognize that only freely and voluntarily given statements may be used at a defendant's trial and that statements taken in violation of the U.S. Constitution should not be admitted into evidence.

Application of Law to Relevant Facts

Prior to trial the attorneys for the appellant filed multiple motions seeking to suppress any statements Mr. Harper made to agents of the State. (See 1 CR 32, 5 CR 1099, 5 CR 1106, 7 CR 1771, and 7 CR 1778). The motions vary in their specificity. Counsel sought to suppress the appellant's statements because they were obtained in violation of the U. S. Constitution and the constitution and laws of the State of Texas.

At punishment the State sought to introduce Mr. Harper's oral statements to HPD Officers James Benford and M.E. Doyle on October 23, 1995 while he was incarcerated in TDCJ. The officers sought to obtain an explanation from Mr.

Harper as to why his thumbprint was on a piece of paper found in the bathroom in Tessa Jackson's apartment at the time of her death. (19 RR 123-154).

At the Motion to Suppress hearing it was established that Officers James Benford and Doyle made arrangements with TDCJ to visit and interview the appellant. (19RR 138). Mr. Harper was then advised by the warden at the Sugar Land Unit where he was then housed of the officers' impending visit and its purpose. The appellant was told by the warden that he was to assist and cooperate with the officers in their inquiries as to Ms. Jackson's death. (19 RR 125). Mr. Harper knew from his prison experience that the failure to answer the officers' questions as directed by the warden would result in disciplinary proceedings which could result in his punishment. (19 RR 127). It was never explained to the appellant that he did not have to answer their questions and could leave the interview. (19 RR 127).

On October 23, 1995 Benford and Doyle interviewed the appellant in a conference room at the Sugar Land Unit. (19 RR 138, 141). A TDCJ guard stood outside the door. (19 RR129). The officers talked with the appellant prior to Mirandizing him. After doing so they continued with the statement which was not recorded. (19 RR 142). Instead, Benford summarized his notes in a supplement to the Tessa Jackson offense report. (19RR 142).

Mr. Harper provided that he lived four doors from Ms. Jackson at the Chateau Village Apartments and that people would congregate at her apartment to smoke crack. (19 RR 179). The appellant denied any involvement in her death and explained his thumbprint might have been on the piece of paper as a result of smoking crack at her apartment a couple of days prior to her death. (19RR 169,167).

The trial court found Mr. Harper's statements were noncustodial and voluntary. (19 RR 153).

The instant cause mirrors that of the defendant in *Lykins v. State*, 784 S.W. 2d 32 (Tex. Crim. App. 1989). There this Court found that failing to follow, or answer, a prison official's order or question, as in the instant cause, was a Level 3 offense for which the inmate could be punished by a loss of one year of good conduct time, reduction in his time-earning class, loss of privileges, suspension of contact visitations, suspension of non-contact visitation, cell restriction, extra duty, punitive segregation, or a combination of these punishments. *Lykins* at 37 (citing *Garner v. United States*, 424 U.S. 648, 661 (1976), and *Minnesota v. Murphy*, 465 U.S. 420, 434-35, 437-38 (1984).

Because Lykins was subject to punishment for not answering the prison officers' questions regarding the incident being investigated, the Court held his statements were in violation of his 5th and 14th Amendment rights and reversed his case. *Lykins* at 37. While it is unknown exactly what penalties would have befallen the appellant had he not complied with the warden's directive to assist and cooperate with Benford and Doyle, they would have undoubtedly been of a similar nature. Therefore, the Court should find that Mr. Harper's statements to Benford and Doyle were also in violation of his 5th and 14th Amendment rights. (See also *Brown v. State*, 35 S.W. 3rd 183, 189 (Tex. App. - Waco 2000).

Because Mr. Harper's statements to Benford and Doyle were compelled within the meaning of the federal constitution and its "penalty cases", see *Lykins* at 37 citing *Minnesota v. Murphy* at 437-38, the Court should determine whether this error contributed to his punishment. *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991). The uncharged extraneous murder of Tessa Jackson was the State's most aggravating evidence at punishment. If believed it was the appellant's fourth murder and not excused, or explained, by the mental illness that controlled his faculties at the time of the instant cause. It dwarfed the severity of his purse snatching/robbery convictions which were also unlikely to be repeated if he was

279

incarcerated. A dislike for "busy work" and going to his bunk with a bad back and not to his assigned workplace demonstrate little likelihood of "future dangerousness."

Benford acknowledged Mr. Harper's name had not come up in the investigation of Ms. Jackson's murder until his thumbprint was found six years later. (19 RR 158, 180). Motard confirmed neither Abner Freeman, Ronnie Johnson, nor Lewis Jackson ever reported seeing the appellant at Ms. Jackson's apartment the night of her death, or on any other occasions. (19 RR 256, 269).

Lewis Jackson's dramatic identification of the appellant as a visitor to his mother's apartment the night of her death is of questionable veracity. He was 7 at the time of her death and had not come forward with this information in the intervening 22 years. He initially identified four men coming to her apartment that evening and was unable to provide a plausible explanation for not telling the police of the appellant's presence. (20 RR 51, 52). His identification of the appellant came only after discussing the case with the prosecutors prior to trial and learning of the facts in the instant cause. (20 RR 34, 53).

The appellant's statement to Benford was significant for his punishment as it confirmed he lived in the same apartment complex and placed himself in her apartment near the time of her death. His admitted use of crack provided an explanation for his presence at her apartment as well as another aggravating circumstance for his sentencing.

Conclusion

Mr. Harper's oral statement to Benford and Doyle was compelled and not voluntary under the "penalty cases" of the Court of Criminal Appeals and the Supreme Court interpreting the 5th and 14th Amendments. Because the admission of the appellant's statement contributed to his punishment, this Court should order a new punishment hearing.

## CLAIM THIRTY

**MR. HARPER WAS DENIED HIS FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS OF LAW WHEN THE STATE KNOWINGLY ALLOWED ITS EXPERT, DR. RICHARD MOELLER, TO REMAIN IN THE COURTROOM THROUGHOUT THE APPELLANT'S PUNISHMENT EVIDENCE WITHOUT ADVISING THE TRIAL COURT AND COUNSEL OF HIS PRESENCE OR SEEKING HIS EXEMPTION FROM THE RULE AT ANY TIME DURING THE APPELLANT'S TRIAL.**

## CLAIM THIRTY-ONE

**THE TRIAL COURT DENIED MR. HARPER HIS FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS OF LAW WHEN IT ALLOWED THE STATE'S EXPERT, DR. RICHARD MOELLER, TO TESTIFY AT PUNISHMENT AFTER THE STATE HAD KNOWINGLY ALLOWED HIM TO REMAIN IN THE COURTROOM DURING THE APPELLANT'S PUNISHMENT EVIDENCE WITHOUT FIRST ADVISING THE COURT AND COUNSEL OF HIS PRESENCE, OR SEEKING HIS EXEMPTION FROM THE RULE.**

## ARGUMENT AND AUTHORITIES IN SUPPORT OF CLAIMS THIRTY AND THIRTY-ONE

Witnesses shall be excluded from the courtroom during Texas trials upon the request of any party. Tex. R. Evid. 614. Once discretionary, the Rule is now mandatory upon proper request. *Moore v. State*, 882 S.W. 2nd 844, 848 (Tex. Crim. App. 1994); *Russell v. State*, 155 S.W. 3rd 176, 181 (Tex. Crim. App. 2005). When placed under the Rule the Court should admonish the witnesses they are not to discuss the case with one another, or with others, except as permitted by the Court, and should not read any report of or comment upon the testimony in the case. TEX. CODE CRIM. PROC. ANN. art. 36.06. Witnesses placed under the Rule are not

allowed to hear the testimony in the case. TEX. CODE CRIM. PROC. ANN. art. 36.05.

The witness sequestration rule is intended to minimize the risk witnesses will tailor their testimony to that of other witnesses and prevent collusion among the witnesses for one side. *Drilex System*, *Inc.,* v. *Flores*, 1 S.W. 3rd 122, 116 (Tex. 1999). The Rule also enhances the jury's ability to detect falsehoods by exposing inconsistencies in the testimony. *White v. State*, 958 S.W. 2d 460, 462 (Tex. App.-- Waco 1997). It is not essential that the prospective witnesses be present when the Rule is invoked and placed under its auspices. *Id.* at 120. When the Rule is invoked each party has the obligation to ensure its witnesses comply with the Rule, or are exempt from it. *Id.*

When the Rule is invoked a party may seek to exempt a witness from its application. Rule 614(3) allows a person whose presence is essential to the presentation of one party's case to be exempt from the Rule upon proper request. The requesting party has the burden of convincing the Court the witness is essential to the presentation of its case. *Russell* at 180. A conclusory statement, or assertion, that the witness' presence is essential is not enough. *White* at 463.

Error may occur under the sequestration rule when (1) the Court erroneously exempts a witness from its application or (2) when the Court errors in overruling an objection to testimony that was inadmissible as a result of the Rule having been invoked. *White* at 464. In either case, the error is non-constitutional and will be disregarded unless it effects a substantial right of the appellant. *Russell* at 181. Said in another manner, if after reviewing the entire record the court of appeals determines the error had more than a slight influence on the verdict, or the Court has grave doubts about the error's effect on the outcome, it should order a new trial. *White* at 464-65.

To preserve error the appellant must raise his sequestration violation objection with the trial court at the earliest possible moment. *Bryant v. State*, 282 S.W. 3rd 156, 162 (Tex. App. - Texarkana 2009). Harm is shown when the sequestered witness (a) actually confers with or heard testimony from other witnesses and (b) when the witness' testimony contradicts the testimony of an opposing witness or corroborates the testimony of a witness with whom he has confirmed, or heard. *Bryant* at 161-62; *Webb v. State*, 166 S.W. 2d 236, 240 (Tex. Crim. App. 1989).

Application of Law to Relevant Facts

The appellant sought to invoke Tex. R. Evid. 614 through pretrial motion and orally at the commencement of guilt/innocence. (5 CR 1118; 14 RR 9, 10). The State informed the trial court of a purported agreement to allow the victim's mother, grandmother, and Lloyd Roberson to be exempt from the Rule, or to at least have the victim's mother exempted. (14 RR 11, 13). The attorney for Mr. Harper indicated he had changed his mind and objected to the exemption of any witness to which the trial court concurred. (14 RR 11, 13).

After the appellant was found guilty of capital murder on October 7, 2010, the State began to presents its punishment evidence on October 8, 2010 and rested on punishment on October 12, 2010. (20 RR 241). The appellant began its punishment evidence on October 12, 2010. His second witness, Dr. Richard Dudley, began his testimony on October 13, 2010.

On October 14, 2010 the appellant rested on punishment, and the State indicated it intended to call Dr. Richard Moeller in rebuttal. (22 RR 245-46). The appellant immediately objected that this witness had not been excused from the rule and that Dr. Moeller had been in the courtroom for the last three days and should not be allowed to testify. (22 RR 246). Trial counsel also informed the

283

Court without contradiction the appellant had never been told the State intended to call Dr. Moeller to testify. (22 RR 246).

The prosecutor argued Dr. Moeller was exempt from the Rule "because he's an expert; he is allowed to" be in the courtroom. (22 RR 246 and 248). The trial court observed "nobody mentioned anything to the Court about releasing him from the Rule." (22 RR 248).

The prosecutor's explanation is conclusory and does not justify Dr. Moeller's exemption from the Rule even if made at the time the Rule was invoked. *White* at 463. While experts are frequently exempt from the rule pursuant to 614(3), they are not automatically excluded, and the requesting party must make a "fair showing" as to why their presence is essential. *Drilex*, 1 S. W. 3 at 119.

The trial court recessed the appellant's case until the following morning requesting any case law the parties might provide. Better prepared, the State now admitted Dr. Moeller had not been placed under the Rule and now argued that he had not learned anything from listening to the appellant's evidence as he had received and reviewed an affidavit from Don McGinty and a sketch of Mr. Harper's life that had been prepared during plea negotiations for a life sentence. (23 RR 7-9). The prosecutor also referred to an "agreement" with opposing counsel wherein Dr. Moeller could be in the courtroom during Dr. Dudley's testimony. (23 RR 7).

Trial counsel quickly informed the court there was no agreement to allow Dr. Moeller to be in the courtroom during Dr. Dudley's testimony and none was ever requested. (23 RR 17). The appellant had not learned of Dr. Moeller's presence until a midday break during Dr. Dudley's testimony when Mr. Bourque introduced himself to the man who had been passing notes to the prosecutor during the witness' testimony. (22 RR 247). Trial counsel's assertion that the State had

not informed the court or counsel of Dr. Moeller's identity was not contradicted. (23 RR 12, 13).

Trial counsel further explained that the prosecutors had never informed the court or counsel it intended to call Dr. Moeller as a witness. (23 RR 20). The prosecutors explained that they had always intended to call Dr. Moeller. It was for this reason that they did not object on grounds of hearsay to the admission of Dr. Moeller's written report during the appellant's evidence. (23 RR 19).

Counsel further objected that calling Dr. Moeller at this point in the trial violated the appellant's right to due process of law and was tantamount to prosecutorial misconduct. (23 RR 20, 26). Therefore, the appellant has preserved complaint for this point of error.

It can also not be contested that Dr. Moeller heard the appellant's punishment evidence thereby fulfilling the first prong of *Webb*'s harm analysis. The record is also clear that he contradicted the appellant's punishment evidence in his testimony. He contradicted Dr. Dudley's conclusion that Mr. Harper would not be a "future danger" if incarcerated for life. (23 RR 123). He also contradicted the appellant's expert by finding for the first time there was a component of malingering in the appellant's case and that he had an antisocial personality disorder. (23 RR 36). He further contradicted Dr. Dudley's testimony by opining Mr. Harper's paranoid schizophrenia had nothing to do with the offense and that his auditory hallucinations and delusions would not have caused the appellant to kill Ms. Rose and her children. (23 RR 43, 88, 89, 96).

Dr. Moeller's conclusion that Mr. Harper would be a "future danger" even if incarcerated for life essentially corroborated all of the other punishment evidence offered by the State, thereby further fulfilling the second prong of the *Webb* harm analysis. (23 RR125).

That Dr. Moeller may have known everything the appellant's witnesses were going to testify to at punishment as evidenced in State's Exhibits H-l, 2 and 3 is of no moment. He had that information when he provided his February 25, 2010 lack of "future dangerousness" report. Thus, the appellant has preserved this point of error for the state appellate court's review and provided evidence of harm.

Relevant Law

The touchstone of the 14th Amendment's guarantee of due process of law involving prosecutorial misconduct is the fairness of the resulting trial. *Smith v. Phillips*, 455 U.S. 209, 219-20 (1981). "Past decisions of this Court demonstrate that the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Id.* at 219. A state violates a capital defendant's right to due process under the Fourteenth Amendment when it uses evidence at the sentencing phase of the trial which the defendant does not have a meaningful opportunity to rebut. *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (plurality); *Blackmon v. Scott*, 22 F.3d 560, 566 (5th Cir. 1994). Due process is violated when there is unfair surprise due to the state's use of evidence at the sentencing phase of the trial which the defendant does not have a meaningful opportunity to rebut. *Blackmon v. Scott*, 145 F.3d 205, 209 (5th Cir. 1998). Harper obtained a ruling from the trial court granting his motion to apply the Rule. When the State sought to exempt certain witnesses from the Rule, it did not list Dr. Moeller, and the witnesses requested to be exempted from the Rule were denied by the trial court. The combination of not requesting Moeller's exemption from the application of the Rule to trial witnesses, with the granting of the motion for enforcement of the Rule by the Court, together worked to cause unfair surprise to Harper by inducing Harper to excuse Dr. Dudley, who could have been called to rebut Dr. Moeller's changed testimony regarding future dangerousness and that no mental illness contributed to Harper's

286

commission of the murders. The unfair surprise created by the State's tactics of causing Moeller to change his expert opinion at the last minute, and then concealing that change from the defense,  violated Harper's right to due process under the Fourteenth Amendment due to the State's use of evidence at the sentencing phase of the trial which the defendant did not have a meaningful opportunity to rebut. *Gardner v. Florida*, supra.

Application of Law to Relevant Facts

During the hearing to exempt Dr. Mark Moeller from the Rule at the conclusion of the appellant's punishment evidence, the State did not contradict trial counsel's assertion that it failed to inform the court or counsel that it was going to call Dr. Moeller. (23 RR 20). The State also confessed it did not place Dr. Moeller under the Rule. (23 RR 7). Nor did the State contest counsel's assertion that the appellant did not learn of Dr. Moeller's presence in the courtroom until sometime during a midday break during Dr. Dudley's testimony. (22 RR 246).

In its argument against exempting Dr. Moeller from the Rule, trial counsel argued that allowing him to testify would deny Mr. Harper due process of law and be tantamount to prosecutorial misconduct. (23 RR 20, 26).

Just months before Mr. Harper's trial began in October, 2010 Dr. Moeller met with the prosecutors about his written report of February 25, 2010 in which he opined the appellant would not be a "future danger" if incarcerated for life. (23 RR 124).

Rules of criminal procedure and evidence plausibly exist so they will be followed thereby allowing counsel for either side to formulate a sound strategy that will result in a fair trial for both sides.

Trial counsel's strategy at punishment was to emphasize Mr. Harper would not be a "future danger" if incarcerated for life. Counsel did this through the cross-examination of the State's TDCJ - classification expert and prison guards as well

287

as through his own classification expert and lay witnesses. In addition, the appellant called Dr. Richard Dudley who provided the appellant committed his capital murder as a result of the auditory hallucinations and delusions that were symptoms of his paranoid schizophrenia and that he would not be a "future danger" if incarcerated for life. Early in his testimony counsel offered without objection Dr. Moeller's hearsay report of February 25, 2010 as defense Exhibit 20 wherein Dr. Moeller provided a similar opinion.

The State's trial strategy was to secure the appellant's death through the presentation of "future dangerousness" evidence and subverting the law. It pursued the former in the presentation of its evidence on direct at punishment. It pursued the latter in its violation of the Rule in a manner that contributed to the appellant's death sentence.

When requested the State is to give notice of its witnesses under Texas law. *Martinez v. State,* 867 S.W. 2nd 30, 39 (Tex. Crim. App. 1993). If the trial judge allows a witness to testify who does not appear on the State's witness list, Texas courts consider whether the prosecutor's actions constitute "bad faith" and whether the defendant could have reasonably anticipated the witness' testimony. Id. at 39. When the Rule is invoked, any party seeking to exempt its witnesses from their exclusion from the courtroom has the burden to show that the witness is essential to the presentation of its case. Tex. R. Evid. 614(3); *Russell v. State*, 155 S.W. 3rd 176, 181 (Tex. Crim. App. 2005).

Although the State provided Mr. Harper with written notice it intended to use Dr. Moeller as an expert witness in one of its nine original or amended expert witness notifications, see notice of July 28, 2010, 4 CR 789, prosecutors never contradicted counsel's assertion that they never told the court or counsel they intended to call Dr. Moeller. (23 RR 20). While the State sought to obtain the exemption of the victim's mother, grandmother, and Lloyd Roberson from the

288

Rule at the commencement of trial, (14 RR 11), it never sought Dr. Moeller's exemption from the Rule until after it had allowed him to remain in the courtroom throughout the appellant's punishment evidence without notifying the court or counsel of his presence. (22 RR 245-46).

Counsel did not become aware of Dr. Moeller's presence in the courtroom until midway through Dr. Dudley's testimony during a midday break when Mr. Bourque introduced himself. At that point it was assumed by counsel that he was there to assist with the prosecutor's cross-examination of Dr. Dudley as the witness was observed passing notes to the prosecutor during Dudley's testimony. (23 RR 11).

In their final effort to have Dr. Moeller exempted from the Rule the prosecutors revealed it was always their intention to have him testify. The duplicity of their trial strategy involving Dr. Moeller was immediately apparent as they admitted they did not object to the admission of his written February 25, 2010 report on obvious hearsay grounds "because I planned to call him anyway." (23 RR 19).

By not informing the Court or Mr. Harper that they intended to call Dr. Moeller at the commencement of trial, or to seek his exemption from the Rule at that time, the prosecutors gave counsel no reason to doubt they were pursuing a sound trial strategy in calling Dr. Dudley as a punishment witness. By not advising the Court or counsel that the State intended to call Dr. Moeller at the commencement of punishment, or to seek his exemption from the Rule at that time, the prosecutors gave counsel no reason to believe that they should reconsider their trial strategy involving Dr. Dudley. By not seeking Dr. Moeller's exemption from the Rule at the commencement of the appellant's punishment evidence, or even as late as the commencement of Dr. Dudley's testimony, the prosecutors prevented counsel from accurately assessing the advisability of releasing Dr. Dudley as a

witness back to his home in New York thus prejudicing their ability to rebut Dr. Moeller's rebuttal testimony.

However, the State chose to circumvent the law in its pursuit of Mr. Harper's death until after the appellant had utilized Dr. Dudley.

Had the State told the court and counsel of its intention of calling Dr. Moeller, or sought his exemption on the multiple occasions when it might, trial counsel could have made an informed tactical decision on whether to use Dr. Dudley. He was not essential in portraying Mr. Harper as an inmate who would not be a "future danger" if incarcerated for life. The appellant's evidence on this issue was already quite compelling through its cross-examination of the State's TDC witnesses and its utilization of its own prison expert and lay witnesses. Further development and use of these existing witnesses and records would have only made the appellant's case more compelling in the absence of Dr. Dudley.

By allowing the State to pursue its devious strategy and circumvent the law, the trial court ensured that the last witness the jury heard would be Dr. Moeller whose testimony revisited the most violent aspects of the case and of the appellant's past as well as the psychiatric problems that plagued him during the offense and compromised his future.

Exacerbating these due process concerns is the fact that had Dr. Moeller not been called as a witness his presence in the courtroom would have been otherwise excused as merely assisting the State in its cross-examination of an expert. Indeed, this was counsel's initial impression of his participation in the case when they finally learned of his identity. (23 RR 11). Dr. Moeller's notes to the prosecutors were obviously intended to assist their questioning of Dr. Dudley. However, in assisting the prosecutors in this manner Dr. Moeller was also shaping Dr. Dudley's testimony for Moeller's planned rebuttal and contradiction. This further

contributed to the harm sustained by the appellant, and underscores the duplicity of the State's trial strategy.

Therefore, the appellant never received the fair punishment hearing the due process clause contemplates as a result of the prosecutor's machinations and trial court's ruling.

Conclusion

The State's strategy regarding the Rule, its use of Dr. Moeller and the Court's ruling denied Mr. Harper due process of law by causing unfair surprise due to the State's use of evidence at the sentencing phase of the trial which the defendant did not have a meaningful opportunity to rebut. *Gardner v. Florida*, supra.

Therefore, Mr. Harper should receive a new punishment hearing.

## V.

## PRAYER FOR RELIEF

WHEREFORE, Garland Harper prays that this Court:

1. Order an evidentiary hearing for the purpose of examining the merits of Garland Harper's claims;

2. Vacate his death sentence and conviction;

3. Grant any other relief that law of justice may require.


DATED:     February 23rd, 2017

Respectfully submitted,

MCGUIRE LAW FIRM

BY:   /s/ Ken McGuire
Kenneth W. McGuire
Federal Admission No. 21917
State Bar No. 00798361
P.O. Box 79535
Houston, TX 77279
Telephone:   (713) 223-1558
Facsimile:   (713) 335-3340
Email: kennethmcguire@att.net

SCARDINO & FAZEL

/s/ Ali R. Fazel
Ali R. Fazel
State Bar of Texas:  24012611
4801 Woodway Drive, Suite 165 E
Houston, Texas 77056
Telephone: (713) 229-9292
Facsimile:   (713) 229-9931

ATTORNEYS for PETITIONER
GARNELL HARPER

292

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 23rd day of February 2017, I electronically filed the foregoing DEATH PENALTY CASE APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Woodson Erich Dryden
Office of the Attorney General
300 W. 15th St
Austin, TX 78701
512-936-1400
Fax: 512-320-8132
Email: erich.dryden@oag.texas.gov

Edward Larry Marshall
Office of the Attorney General
P O Box 12548
Capitol Station
Austin, TX 78711
512-936-1400
Fax: 512-320-8132
Email: edward.marshall@oag.texas.gov

Garland Harper
Polunsky Unit #999560
3872 FM 350 South
Livingston, Texas 77351
(Via U.S. Mail)


/s/ *Ken McGuire*
KENNETH MCGUIRE