IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GARLAND BERNELL HARPER, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 4:16-cv-00762 |
| | § | *CAPITAL CASE* |
| LORIE DAVIS, | § | |
| Director, Texas Department | § | |
| of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

**RESPONDENT DAVIS'S MOTION FOR SUMMARY JUDGMENT AND
ANSWER WITH BRIEF IN SUPPORT**

Petitioner Garland Bernell Harper was convicted and sentenced to death
in Texas state court for the murders of Triska Rose and her two daughters
Briana and Mya. Harper has filed a federal habeas petition challenging his
conviction and sentence in this Court pursuant to 28 U.S.C. §§ 2241 & 2254.
Docket Entry (DE) 17. Harper's petition should be denied because he fails to
demonstrate that he is entitled to federal habeas relief.

# HARPER'S ALLEGATIONS

The Director understands Harper to raise the following grounds for relief in his petition:

1.     Harper was denied his due process right to an impartial jury when juror Basey committed misconduct by automatically voting for death.

2.     Trial counsel ineffectively challenged the State's allegation that he killed Teasa Jackson, and the State's manipulation of Louis Jackson's testimony violated his constitutional right to due process.

3.     Trial counsel was ineffective at the punishment phase in preparing for and conducting Dr. Richard Dudley's direct examination.

4.     Trial counsel was ineffective in failing to present lay witnesses at the punishment phase who would have corroborated Dr. Dudley's opinion that Harper suffers from mental illness.

5.     Trial counsel was ineffective for failing to present witnesses whose testimony would have negated the State's claim that Harper was a future danger.

6.     Trial counsel was ineffective for failing to exclude Dr. Moeller's testimony under *Daubert*,[1] *Kumho Tire,*[2] and *Kelly*[3] that Harper was a future danger.

---

[1]     *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

[2]     *Kumho Tire v. Carmichael*, 526 U.S. 137 (1999).

[3]     *Kelly v. State*, 824 S.W.2d 568 (1992).

7. Trial counsel was ineffective for not having a social historian testify at the punishment phase of Harper's trial.

8. Trial counsel was ineffective for not presenting available mitigating evidence at the punishment phase of Harper's trial.

9. Trial counsel was ineffective by failing to explain to the jury during punishment phase closing argument how to give full effect to the mitigating evidence they presented.

10. Trial counsel's performance during voir dire was deficient and resulted in a constitutionally infirm jury.

11. The State engaged in purposeful discrimination by using a peremptory strike to remove a minority venire member, in violation of Harper's constitutional rights.

12. Appellate counsel was ineffective for failing to conduct a comparative juror analysis in support of the *Batson*[4] claim.

13. Trial counsel was ineffective for failing to preserve potential *Batson* claims.

14. Trial counsel was ineffective by not reducing to writing an agreement with the State that Harper could plea to a life sentence if the State's mental health expert came to the same conclusion as the defense's expert.

15. Trial counsel was ineffective for not presenting evidence that Harper suffered from a severe mental illness as a basis for suppression of his post-arrest confession to police.

16. Trial counsel was ineffective for failing to timely object to impermissible victim impact testimony during guilt/innocence proceedings.

---

[4]   *Batson v. Kentucky*, 476 U.S. 79 (1985).

17. Trial counsel was ineffective for conceding Harper's guilt during closing arguments after Harper had pled not guilty.

18. Appellate counsel effectively abandoned Harper by waiving oral argument.

19. Harper's death sentence should be vacated because the punishment phase jury instruction restricted the evidence the jury could determine was mitigating.

20. Appellate counsel was ineffective for failing to argue that the death penalty is unconstitutional and that the trial court erred in not granting Harper's trial motions precluding the death penalty.

21. Harper experienced withdrawal symptoms during trial as a result of a sudden stoppage of Depakote, Klonopin, Risperdal, and Prozac, rendering him unable to assist counsel.

22. Harper is ineligible for a death sentence because of his severe mental illness.

23. Harper's constitutional rights were violated when the trial court failed to instruct the jury that a vote by one juror would result in a life sentence.

24. Harper's death sentence is unconstitutional because it was assigned based on Texas's arbitrary system of administering the death penalty.

25. Trial counsel was ineffective for failing to present timely objections to the trial court's denial of defense mitigation evidence under state hearsay rules, pursuant to *Gregg v.*

*Georgia*,[5] *Jurek v. Texas*,[6] and *Green v. Georgia*,[7] and Harper's Fourteenth Amendment due process and Eighth Amendment rights were violated by the exclusion of his mitigation evidence.

26. The evidence is legally insufficient to support the jury's finding of "future dangerousness" pursuant to Texas Code of Criminal Procedure, Article 37.071, section 2(b)(1), at punishment.

27. Harper was denied his Fourteenth Amendment right to equal protection when the State used a preemptory strike to prevent venireperson Donna Banks from serving on his jury, in violation of *Batson*.

28. The trial court erred in admitting Harper's statement to Houston Police Department (HPD) Officer James Benford on October 23, 1995, while incarcerated in TDCJ for the reason that the statement was not freely and voluntarily made, in violation of his rights under the Fifth and Fourteenth Amendments.

29. Harper was denied his Fourteenth Amendment right to due process of law when the state knowingly allowed its expert, Dr. Moeller, to remain in the courtroom throughout Harper's punishment evidence without advising the trial court and counsel of his presence or seeking his exemption from the witness sequestration rule at any time during Harper's trial.

30. The trial court denied Harper his Fourteenth Amendment right to due process of law when it allowed the State's expert, Dr. Moeller, to testify at punishment after the State had

---

[5]     428 U.S. 153 (1976).

[6]     428 U.S. 262 (1976).

[7]     442 U.S. 95 (1979).

knowingly allowed him to remain in the courtroom during Harper's punishment evidence, without first advising the court and counsel of his presence or seeking his exemption from the rule.

A number of these claims are procedurally defaulted. In any event, all of these allegations lack merit and should be denied.

## STATEMENT OF THE CASE

Harper was indicted, convicted, and sentenced to death in Harris County, Texas, for the October 24, 2008, capital murder of Triska Rose, Brianna Roberson, and Maya Love during the same criminal transaction. CR 3, 1528, 1530–38.[8] His conviction and sentence were affirmed on direct appeal by the Texas Court of Criminal Appeals (CCA) in an unpublished opinion delivered on October 10, 2012. *Harper v. State*, No. AP-76,452, 2012 WL 4833834 (Tex. Crim. App.). Harper did not seek a writ of certiorari with the United States Supreme Court from his direct appeal.

---

[8] "CR" refers to the clerk's record, followed by the relevant page number(s). "RR" refers to the Reporter's Record of transcribed trial proceedings, preceded by volume number and followed by page number(s). "SX" refers to the State's exhibits, followed by exhibit number and page number(s) where applicable. "DX" refers to the defense's exhibits, followed by exhibit number and page number(s). "SHCR" refers to the state habeas clerk's record—the transcript of pleadings and documents filed with the court during Harper's state habeas proceeding—followed by the relevant page number(s).

On October 22, 2012, Harper filed a state habeas application in the trial court. SHCR 2. The trial court ultimately entered findings of fact and conclusions of law recommending that relief be denied. SHCR 1253–1325. The CCA adopted a majority of the trial court's findings and denied habeas relief on February 24, 2016. *Ex parte Harper*, No. 81,576-01 at cover and Order.

## STATEMENT OF FACTS

### I. Facts of the Crime

The CCA summarized the facts of the crime as follows:

[Harper] and Triska Rose began dating in the spring of 2008. Their relationship progressed quickly, and [Harper] moved in with Rose and her two daughters: Mya, aged seven, and Briana, aged sixteen. The couple's relationship soon deteriorated as [Harper] became convinced that Rose was having an affair. (It was undisputed at trial that Rose was not having an affair.) [Harper] began following her, calling her obsessively, and dropping by her place of employment without warning.

On the evening of October 23, 2008, [Harper] told Rose that he wanted to have sex. Rose responded that she was tired, which [Harper] took as further evidence of her infidelities. Rose told him that she was sick of his accusations and wanted to end things. This led to a fight in which Rose and Briana were somehow cut with a knife. Believing that he would go to jail for domestic violence if the police were called, [Harper] bound and gagged Rose and the girls. He questioned them one at a time in order to "get to the bottom of this." After several hours, Mya "admitted" that Rose had been cheating on him. This sent him into a jealous rage, he later claimed. He stabbed Rose repeatedly and then strangled Briana with his hands, telling her that she should not have sided with her mother. Finally, he strangled Mya with a phone charger.

Afterwards he went out "to think." When he returned he thought that Briana and Rose still might be alive, so he slit their throats.

After [Harper] cleaned up, he visited some friends. Later that morning, he called Chandra Parson, a friend of the family, to say that Mya was ill and would not be coming over before school as she usually did. When Parson asked about Rose, [Harper] hung up. After learning that Rose was not at work and Briana was not at school, Parson became worried. She went by the apartment, called repeatedly, and filed a missing-person report with the police. Finally, late in the afternoon, Parson and some other friends decided to enter Rose's apartment.

The friends broke in through the back door and found Rose, Briana, and Mya dead in the master bedroom. All three were tied up. An autopsy showed that Rose was stabbed approximately thirty-six times: her throat was slit, she had defensive wounds on her hands and arms, cuts on her chest, stomach, and face. Briana died from strangulation, but she also had cuts on her neck and chest, and three of her fingernails were broken. Mya had been strangled with the cord of a phone charger. The medical examiner said that it would have taken about three minutes for the children to die from asphyxiation.

While the police were processing the crime scene, [Harper] approached and said he wanted to turn himself in. At the police station, [Harper] confessed to the murders.

*Harper v. State*, 2012 WL 4833834 at *1–*2.

## II.     Evidence Relating to Punishment

### A.     State's case

#### 1.     Prior crimes

On August 14, 1989, Harper put a knife to Bonita Holmes's neck, demanded money, and threatened to kill her. 18 RR 77–85. Harper took

money from Holmes's sock when she refused to give him money. 18 RR 86. Holmes jumped out of Harper's car and reported the robbery to the police. 18 RR 86–87. Harper was indicted for theft of property while using and exhibiting a deadly weapon, but Holmes did not remember testifying in the case. 18 RR 87–89. *See* SX 411.

In 1989, Harper prevented Tina Flores from leaving his apartment and forced her into his car the next day after she managed to get out of the apartment. 18 RR 106–13. Harper slapped Flores, locked the car doors, and accelerated when Flores tried to get out of the window, causing her to fall out of the car. 18 RR 108–13. Harper took Flores to his mother's apartment where he pushed a table against his mother and pinned her to the wall after they argued. 18 RR 113–14. Flores did not call the police about the incident. 18 RR 115–16.

On February 3, 1990, Harper hit Lewis Traylor, a cab driver, in the head after Traylor told Harper he was going to jail if he did not pay the fare. 18 RR 170–72. Harper jumped out of the cab and ran inside an apartment where police found him hiding under the bed. 18 RR 171–72. Harper was charged with theft of service and was given deferred adjudication on March 28, 1990,

but he was adjudicated and sentenced to 80 days in jail on November 16, 1990, for violating his probation. 18 RR 172.

On September 21, 1990, Harper entered the office of Re/Max Westside Realtors where Sharon Galavitz was working alone, made a motion as if to stab her with a metal key used to open cans, grabbed her purse containing cash and traveler's checks, and ran. 18 RR 185–92. Harper managed to withdraw $800 from Galavitz's bank account because she forgot to report her ATM card was stolen. 18 RR 192–93. Harper had been fired from the office cleaning crew about two or three weeks earlier after Galavitz reported him for stealing money. 18 RR 186. Harper was indicted for aggravated robbery and sentenced to fifteen years in prison. 18 RR 20.

Around 8:30 a.m. on August 24, 1992, a man grabbed Patricia Thompson's purse in a store parking lot and fled. 18 RR 38–40. The man fled in a car that drove into the parking lot; a license plate check showed that the car belonged to Harper's wife, Monique Young. 18 RR 41, 47–50. Charges were not filed because Thompson was not able to make an identification; instead, charges were filed against Harper for a robbery committed later the same day. 18 RR 50–54.

Around 3:20 p.m. on August 24, 1992, Harper approached Shama Hashmi, her pregnant sister Birjees Quzi, and their children in a store parking lot, grabbed Hashmi's purse, and pushed Quzi into a shopping cart, bruising her stomach and wrist. 18 RR 24–32. Harper stole a car and fled, and Hashmi was able to get part of the car's license plate. 18 RR 31. Hashmi's purse contained approximately $2,400 cash, her credit cards, and a gold pendant, none of which were recovered. 18 RR 33. Harper pled guilty to the robbery and was sentenced to 7 years in prison. 18 RR 21.

On May 12, 1998, Harper approached Jeanette Murray in a store parking lot, grabbed her purse containing $250 in cash and her mother's ring, knocked Murray down, and fled in a car. 18 RR 129–35. A nearby patrol officer pursued Harper who eventually stopped, ran from the car, burst into an elderly woman's apartment, and hid in her bathroom where he was arrested. 18 RR 133–34, 143–49, 150–59. Murray's purse, cash and ring were recovered at the time of Harper's arrest. 18 RR 161–62. Harper, who was on parole, was sentenced to 40 years in prison for robbery with bodily injury, enhanced by two prior robbery convictions. 18 RR 22, 139–40.

On March 31, 1989, Teasa Jackson's seven-year old son Louis found Jackson's nude body in the bathroom of their apartment. 19 RR 22–32, 183.

Ronnie Johnson, Emory Lockett, and Abner Freeman had been at Jackson's apartment earlier but had left. 19 RR 231. Afterwards, Louis saw his mother on the porch talking with a man Louis recognized as someone from the apartment complex; Louis discovered his mother's body after he was awakened by his six-month old baby sister crying. 19 RR 22, 25–27. Jackson had seven stab wounds to her chest, and a rape kit was done at her autopsy. 19 RR 65–81, 93.

On April 26, 1995, an identification was made of Harper's fingerprint and thumbprint on a piece of paper recovered by Jackson's body. 19 RR 100–109, 168. John Lazzaretto, latent print examiner, also examined the prints and determined they belonged to Harper. 19 RR 108–09. On October 23, 1995, James Benford, Houston Police Department, homicide division, interviewed Harper, who was in prison for robbery, about Jackson's murder. 19 RR 161–65. Harper, who was nineteen at the time of Jackson's murder, admitted living four doors down from Jackson's apartment and smoking crack in her bathroom a few days before the murder, but he denied having a sexual relationship with her and denied killing her. 19 RR 166–70. No charges were brought against Harper as a result of the interview. 19 RR 171.

On May 5, 2009, Eric Mehl, Houston Police Department, homicide cold-case investigator, sent the biological evidence in Teasa Jackson's murder to Strand Analytical Laboratories in Indiana. 19 RR 187–95. DNA analysis revealed an unknown male DNA profile from the vaginal swab taken from Jackson. 19 RR 206–19. The male profile was entered into the CODIS databank, and on February 8, 2010, the male profile from Jackson's vaginal swab matched the male profile that had been obtained from the triple homicide of Triska Rose and her daughters and entered into CODIS on October 29, 2009. 19 RR 12–15, 232; 20 RR 71–73. On March 24, 2010, a buccal swab was taken from Harper who was in jail pending trial for the instant triple homicide. 20 RR 14–16. DNA analysis showed that Harper could not be excluded from the DNA profile obtained from Jackson's vaginal swab; the probability statistics excluded any other person from being a possible contributor. 20 RR 74–76. On August 19, 2010, Louis Jackson identified Harper from a photo array as the man he saw talking to his mother on the porch the night of her murder. 20 RR 34–35.

### 2.  Prison infractions

On September 12, 1991, Harper refused to be quiet when asked four times by Joelynn Duke, former TDCJ correctional officer; Harper became

belligerent and told Duke she could not make him stop. Harper was found guilty of creating a disturbance and given thirty days of recreation restriction, had his in-prison classification reduced, and given commissary restriction. 20 RR 107.

On July 24, 1993, Harper caused a disruption when Audrey Randall, former TDCJ correctional officer, told Harper that he needed to wait to eat. 20 RR 131–35. Harper, who refused to get up from the table, received a reprimand, restriction of commissary for ten days, and twenty-hours of extra duty. 20 RR 136–37.

On August 9, 1993, Harper was twice not in the place where he was supposed to be in the prison unit. 20 RR 138–42. Harper's prison classification was lowered after he refused to begin his work assignment. 20 RR 144.

On February 17, 1997, Connie Young, who was a TDCJ correctional officer when Harper was in prison, ordered Harper and another inmate to stop fighting. 20 RR 117–18. Harper claimed that the other inmate had been standing too close to him. 20 RR 121.

In late 2008, Ira Woods, TDCJ correctional officer, encountered Harper at the Carol Vance Unit where Harper listened more to male officers than

female officers, and he resisted orders a couple of times based on who gave the order.  20 RR 87–89.[9]

### 3. Victim impact testimony

Mary Rose, the mother of Triska Rose, testified that Triska did ministry work, attended Bible study, was a hard worker, and a good mother.  20 RR 232–33.  Briana was looking forward to college and wanted to be a singer or a teacher. 20 RR 234.  Mya was feisty, an A-student, and good in math.  20 RR 234–35.  Both Briana and Mya were involved in the church.  20 RR 234. After the murders, Mary Rose could not function and wanted to die.  20 RR 236.

### B. Defense's evidence at punishment

### 1. Dr. Richard Dudley

Dr. Richard Dudley testified that he became involved in Harper's case in the fall of 2009 when defense counsel asked that he perform a psychiatric evaluation of Harper focusing on whether Harper suffered from any psychiatric difficulties.  21 RR 22.  Dr. Dudley reviewed the following items: Harper's prison records; his mental-health evaluations, treatment, and diagnostic evaluations made by the jail system; Mental Health and Mental Retardation

---

[9]    Testimony was also provided by TDCJ personnel regarding inmate classification procedures.  20 RR 158–84.

(MHMR) reports; a summary of what various people who knew Harper at different times might say if called to testify; over twenty-six documents; Harper's videotaped statement; and the report of State's expert Dr. Mark Moeller. 21 RR 17–21, 25.

Dr. Dudley spent two days with Harper in October 2009 performing a psychiatric examination. 21 RR 22. In Dr. Dudley's opinion, Harper was suffering from major psychiatric problems, and Dr. Dudley thought that he needed to continue to explore Harper's complex history and course of symptoms. 21 RR 21. Dr. Dudley gave the defense a preliminary report in October 2009 and re-interviewed Harper in September 2010. 21 RR 21, 24. Harper was compliant and cooperative during the evaluation process, he was open in discussing his history, and Dr. Dudley found him credible. 21 RR 25. None of the documents Dr. Dudley reviewed indicated that Harper was malingering. 21 RR 24.

Dr. Dudley also reviewed what was actually said during Harper's videotaped statement, Harper's description of what he was thinking at the time, and Harper's affect—the way he looked and presented. 21 RR 25–26. Dr. Dudley testified that the MHMR report noted that Harper suffered from a major depressive disorder with psychotic features, meaning that the

depression is so profound that the person becomes psychotic as well as being depression—the person may hear voices or be delusional. 21 RR 26–28. Because a major depressive disorder with psychotic features is episodic, the person could have some period of recovery and then have another major depressive episode. 21 RR 29. Although it is possible to have a major depressive disorder without having psychotic features, a severe major depressive episode would be so severe that the person would also have psychotic symptoms associated with it. 21 RR 28. Harper's October 26, 2008 MHMR assessments showed a G.A.F. (general assessment functioning score) of 35, indicating profound dysfunction and impairment because of mental illness. 21 RR 33.

Dr. Dudley reviewed the February 2010 report of the State's expert Dr. Mark Moeller, who had an Axis I diagnosis for Harper of schizophrenia paranoid type in partial remission, as well as cocaine dependence and alcohol abuse in remission. 21 RR 34–35. Dr. Dudley agreed that schizophrenia was present and agreed with the history of substance abuse and dependence. 21 RR 35. Dr. Dudley affirmed that according to Dr. Moeller's report made over a year after the offense, Harper was still manifesting psychotic behavior. 21 RR 37. According to Dr. Dudley, both Dr. Moeller's diagnosis of

schizophrenia paranoid type and the MHMR diagnosis with psychotic features indicated that Harper is psychotic, with the difference in the two diagnoses being whether psychosis or mood disorder is the primary symptom. 21 RR 37–38. Regardless, both are profound mental illnesses and are indicative of psychosis. 21 RR 38.

In Dr. Dudley's opinion, Harper suffers from schizoaffective disorder—a disorder where the individual simultaneously has the symptoms required for a diagnosis of schizophrenia and the symptoms required for a diagnosis of major mood disorder. 21 RR 39–40. Dr. Dudley defined schizophrenia as a disorder characterized by psychosis that could be hallucinations and/or delusions, i.e. fixed beliefs. 21 RR 44–45. An example of a schizophrenia paranoid type would be someone having hallucinations and/or delusions such that the person would fear that he was going to be harmed. 21 RR 45. Paranoid schizophrenia grandiose type would be a person thinking he has special powers. 21 RR 45. The onset of schizophrenia occurs in a person's late teens or early 20s, and he will continue to have these episodes over his life. 21 RR 46. Untreated schizophrenia, particularly paranoid type, results in a gradual deterioration over time such that the person does not recover as fully

from forthcoming episodes. 21 RR 47. It is degenerative in nature, but medication can treat the symptoms. 21 RR 48.

After the offense, Harper indicated in a mental-health questionnaire that he sometimes has auditory hallucinations, and he reported to Dr. Dudley that he had been having auditory hallucinations since his late teens—the time period when there is usually an initial episode of schizophrenia. 21 RR 49–51. Harper reported hearing two sets of voices that would debate the decisions he had to make and his perceptions of his surroundings. 21 RR 53. Harper described each set as having both a male and female voice, with one speaking proper English and the other speaking another dialect with the voices varying in intensity at different time periods. 21 RR 54–55. However, Harper did not perceive the voices as a problem; rather, they were friends who helped him solve problems in the past. 21 RR 56. Dr. Dudley testified that was not surprising because schizophrenia causes the person to believe the hallucinations and delusions to be true, not indicative of a psychiatric problem. 21 RR 57.

Dr. Dudley acknowledged that there had been at least three psychiatric evaluations of Harper and each found in part a major mood disorder with psychotic features. 21 RR 58. Dr. Dudley testified that Harper had been

heavily medicated over the past ten years.  21 RR 58.  Harper had been placed

on a host of antidepressants, anxiolytics, and antipsychotic medications.

21 RR 60–66.  Changing medications and dosages continued throughout

Harper's trial.  21 RR 77.  Harper was usually taking at least two medications

at the same time and usually taking substantial doses of each medication.

21 RR 66–67.  When asked to rank Harper on a scale of one to ten for an

individual with the most medication or combination of medications that Dr.

Dudley has seen during his thirty years of experience, Dr. Dudley placed

Harper as an eight or nine.  21 RR 67.  During re-redirect examination Dr.

Dudley acknowledged that if the same medications given to Harper were given

to trial counsel, counsel would be asleep and not sitting up in the courtroom;

the amount of medication given to Harper would affect other people differently.

21 RR 161, 194.  Dr. Dudley found no evidence that Harper refused to take his

medications or sold them to others in the jail, issues which indicate

malingering.  21 RR 193–94.

Dr. Dudley noted that Harper's October 26, 2008, intake for MHMR done

within a day or two of the offense stated that Harper reported hearing voices,

previously saw a psychiatrist, had been diagnosed as paranoid schizophrenic,

and had mood swings and panic attacks.  21 RR 72.  Harper also reported that

he had been suicidal all his life after he was sexually assaulted by a friend or cousin when he was six years old. 21 RR 72. Harper also reported cutting himself in the past. 21 RR 72. Harper stated that he tried to kill himself after he killed his girlfriend and her two children but was unable to do so. 21 RR 73. Harper reported hearing voices who tell him that everyone is against him, and he described himself as paranoid. 21 RR 73. The intake form noted the following as factors to review for evaluation: dysthymic disorder, major depression disorder with psychotic features, panic disorder, polysubstance dependence, and PTSD. 21 RR 76.

Dr. Dudley agreed with Dr. Moeller's notation in his report that Harper would function well in prison. 21 RR 43–44. Dr. Dudley found nothing in his forensic evaluation to indicate that Harper hated women. 21 RR 58. Dr. Dudley noted that Harper's IQ is somewhere between 87 and 96 and that Harper did not go to college or graduate from high school. 21 RR 46–47. At the conclusion of his direct testimony, Dr. Dudley opined based on reasonable medical probability that Harper was mentally ill at the time of the offense and during the period from September to October 2008; that Harper was deteriorating; that he was suffering from a disorder characterized by psychotic thinking; that he truly believed that Triska Rose was having an affair that put

his life in danger; and that he thought Rose attempted to poison him. 21 RR 82–83.

During redirect examination, Dr. Dudley reiterated that his evaluation of Harper consisted of his 2009 and 2010 examination of Harper and the previously named records and documents. 21 RR 146–47. Dr. Dudley also read the offense report containing summaries of interviews with people who knew Harper at different times in his life or who saw Harper immediately after the offense, and Dr. Dudley used those observations in reaching his conclusions. 21 RR 152. Dr. Dudley stated that he would not be surprised if Harper asserted that he was not mentally ill; schizophrenics lack insight into the fact that they have a mental illness. 21 RR 150.

In conducting his evaluation of Harper, Dr. Dudley was able to eliminate a traumatic brain injury through Dr. McGarrhan's neuropsychological testing of Harper. 21 RR 156. Dr. Dudley disagreed with the State's expert's opinion that Harper had an antisocial personality disorder. 21 RR 156–57. According to Dr. Dudley, Harper was clearly remorseful for his actions—something that would not be expected from a person with antisocial personality disorder—and Harper turning himself in was a sign of remorse. 21 RR 157, 192.

## 2.    Evidence from family members

Sandra McClennon, Harper's aunt and sister of Harper's mother, testified that Lucille, Harper's mother, was slow in school had trouble reading and quit school in the eleventh grade because of her learning difficulties. 22 RR 148–50.   Lucille was living with Harper's grandmother—Lucille's mother—when Harper was born.   Harper's father, Paul "Red" Harper, was in prison at the time and did not play a significant part in Harper's life.  22 RR 151.

Harper's grandparents were divorced before Harper was born, but Harper's grandfather lived across the street from Harper's grandmother. 22 RR 157–58. Harper and his grandfather had a good relationship, but his grandfather died when Harper was a teenager. 22 RR 151–52.  Harper found his grandfather's body, and his death devastated Harper.   22 RR 152–55. Harper's grandmother was the mother-figure and was influential in Harper's life; she made the rules, and Harper wanted to please her.   22 RR 152–54. According to McClennon, Harper was very sharp in school and was a loving, caring person who was respectful of his elders.   22 RR 153–54, 158, 173. Harper used a sack of coins to buy his mother a necklace for Mother's Day when he was nine years old. 22 RR 158–59. Harper and McClennon's children

played together and were like brothers and sisters, and McClennon never saw Harper lose his temper or have a tendency for being violent, hurting animals, or destroying property. 22 RR 153, 155–56, 159–60.

Harper loved his father and saw him sometimes when his father was not in prison. 22 RR 156. Harper's mother dated other men when Harper's father was in prison, but McClennon was not aware of how Harper got along with these men. 22 RR 163. McClennon testified that her husband was somewhat of a male role model for Harper. 22 RR 157.

When Harper was thirteen or fourteen, he, his mother, and his grandmother moved closer to McClennon in southeast Houston, and McClennon saw Harper at least three weekends a month. 22 RR 162. Although Harper supposedly hit a neighbor when he was thirteen or fourteen-years old, McClennon never talked to Harper about the incident. 22 RR 160. Harper had never gotten into fights or displayed any type of violence before the incident. 22 RR 161. Rather than being a fighter, Harper would talk his way out of something. 22 RR 162.

Harper spent more time at McClennon's house when his mother's health began to fail. 22 RR 162. In 1988, Harper's grandmother died, and her death was hard on him; his life started spiraling out of control. 22 RR 163–64. After

Harper's grandmother's death, his mother started trying to be a mother, but it was too late, and Harper did not listen to her. 22 RR 165. According to McClennon, Harper's mother suffered from migraine headaches and was addicted to medications. 22 RR 155. McClennon did not know if Harper's grandmother had ever tried to get psychiatric help for Harper's mother, who attempted suicide twice before finally killing herself in 2004. 22 RR 150–55. His mother's death devastated Harper even more than his grandfather's death; Harper was escorted to her funeral by prison guards. 22 RR 155, 169.

In 1990, while living with his mother, Harper was arrested for robbery and went to prison. 22 RR 165–66. In 1992, Harper was again arrested for robbery. 22 RR 166. While Harper was in prison, his wife Monique had a son, and Monique and Harper's mother lied to him about him being the father of the child. 22 RR 181–84. However, Harper acted as if the child was his after he was released from prison and learned the truth. 22 RR 183–84. According to McClennon, Harper would immediately accept responsibility and admit it when he did something wrong. 22 RR 166–67. McClennon testified that Harper was the type of person whom she could believe; she was not aware if he ever lied to her. 22 RR 168.

Harper wrote McClennon about once a month from prison, and she was aware that he was in a faith-based prison unit. 22 RR 175. In 2008, Harper was released from prison and lived with his father in Spring, Texas. 22 RR 175. Harper was ready to go on with his life, and he wanted to get a job and buy a car. 22 RR 156. Harper dated a nurse named Marie for some time after he was released, and McClennon never saw Harper violent or disrespectful toward Marie. 22 RR 177–78. McClennon was not aware of any police calls about any domestic violence against Marie, and there was nothing about their relationship that alarmed McClennon. 22 RR 179. McClennon also met Triska Rose and her children after Harper moved in with Rose. 22 RR 179–80. Harper and Rose had a relationship like husband and wife; they were a normal loving couple with no problems, and Harper treated her children like a father. 22 RR 180–81. After Harper and Rose began seeing each other, they went to church regularly, and Harper was a youth minister. 22 RR 185.

McClennon testified that she did not see Harper in August or September prior to the offense and rarely talked to him, although she talked with him almost daily after he first got out of prison. 22 RR 186. After a time, Harper's conversations were not as hopeful and aspiring as they had been. 22 RR 188. After the offense, McClennon received numerous letters and phone calls from

26

Harper, who was remorseful. 22 RR 189–90. During cross-examination, McClennon testified that Harper told her after the offense that he just lost his mind and went crazy. 22 RR 209.

Bernell Paul Harper, Harper's father, testified that he first went to prison when he was in his early twenties and that he had been on probation prior to then. 22 RR 211–12. Bernell was convicted in 1982 of burglary and received a three-year sentence; he was convicted of burglary again in 1988 and received a twelve-year sentence; he was convicted of burglary in 1990 and received a twenty-three-year sentence; and, he received a twenty-five-year sentence for a 1994 conviction. 22 RR 212. Bernell had been out of prison for about eight years at the time of Harper's trial. 22 RR 213.

Bernell married Harper's mother when he was on parole; Bernell was in jail awaiting transfer to prison when Harper was born, and Harper was three-years old when Bernell was released from prison. 22 RR 213. At the time, Harper's mother was living with her mother, and Bernell moved in with them. 22 RR 213. Bernell stayed there for about a year but moved out when he learned that Lucille had an affair when Bernell was in prison 22 RR 214. Bernell's decision caused some conflict because Lucille did not agree with his moving, but Lucille later filed for divorce. 22 RR 214–15. Bernell saw Harper

27

every other weekend when Harper was three or four years old, but Harper's mother began making visitation difficult. 22 RR 215–17. Bernell did not see Harper during the periods of time when Bernell was in prison until Harper was about fifteen years old. 22 RR 218. When Bernell attended Harper's fifteenth birthday party, it was the first time he had seen Harper in almost ten years. 22 RR 218.

Bernell was aware that Lucille used intravenous drugs and certain pill medications, but he did not know if she did drugs in front of Harper. 22 RR 219. Bernell testified that Harper would not have been aware of Lucille's first suicide attempt because he was so young, and Bernell did not know if Harper was aware of her second suicide attempt. 22 RR 219. After Harper's grandmother died, Lucille was a poor mother because of her drug use. 22 RR 221. Bernell was not aware of anyone giving Harper guidance at that time. 22 RR 221.

Bernell never knew Harper to be violent, and Lucille never called Bernell about Harper's conduct. 22 RR 223. There was an incident with the mother of Harper's best friend when Harper was a teenager, but Bernell thought that the woman should have been charged because it would have been different if a fifteen-year-old girl had been groped. 22 RR 223–24. Bernell and Lucille

talked with a judge about the matter. 22 RR 224. Bernell also said that Harper was hit in the forehead with a baseball bat when he was young. 22 RR 222.

Bernell was aware of Harper going to prison in 1990, 1992, and 1998. 22 RR 220. In fact, there were years when both Bernell and Harper were in prison, and they once had an in-unit visitation. 22 RR 225. Harper lived with Bernell for a time after he was paroled from prison in 2008 and worked at Burger King and attended barber college at night. 22 RR 226–68. Harper was able to buy a car after a few months, and he got money for barber college from grants. 22 RR 228. Bernell thought that Harper had finally learned a lesson; he had participated in a religious program in prison and would talk about the Bible with Bernell. 22 RR 229. Harper also dated Marie for two or three months after his release, and he was not controlling or demanding of her. 22 RR 229–31. Instead, he confessed to Bernell that he was scared to have sex with her. 22 RR 231.

At some point, Harper began using drugs again, and Bernell asked him to move out of his house. 22 RR 234. Harper appeared to be back on track and apologized to Bernell about the drugs the last time Bernell saw him before the offense. 22 RR 235–36. After Harper began seeing Triska Rose and moved in

with her, he told Bernell that they were going to get married.  22 RR  233–34. According to Bernell, Harper and Rose had a good relationship.  22 RR 233.

Bernell testified that he was a terrible role model for Harper, who followed in Bernell's footsteps.  22 RR 237.  Harper wrote Bernell a couple of letters from jail and said that he was sorry and that he could not explain what happened.  22 RR 237–38.

### 3.    Other evidence

Susan Perryman-Evans, social worker and former employee of TDCJ, testified that an offender sentenced to life without parole would be assigned to a maximum-security facility for the first ten years—a unit similar to death row with single-cell housing and one hour of recreation and twenty-three hours in the cell.  20 RR 246–48.  The offender on a maximum-security facility is strip-searched and handcuffed when transported from the cell, is not allowed contact visits, and has limited commissary privileges.  20 RR 249.  Harper's 1990, 1992, and 1998 prison records reflect one major write-up that did not involve a weapon and show that Harper had no history of segregation, serious violations, or assaults on prison personnel during approximately seventeen years of incarceration.  20 RR 249–50, 257.  In Perryman-Evans's opinion, Harper was not an escape risk and would not be violent in prison.  20 RR 252, 258.

Curtis Chillis, the resident manager for a Christian transformation facility where men study the Bible after they are released from prison, testified that he went to elementary school with Harper and came into contact again with Harper in 2007 when they both were in prison. 21 RR 197–207. Harper went to Bible study in prison, always tried to help others, and participated in a program where inmates were allowed to leave the prison on Sunday and preach to the community. 21 RR 208–10. According to Chillis, men wept when Harper was released from prison. 21 RR 212–14.

Darion Coleman, a neighbor of Harper's family, testified that she had known Harper all his life, that Harper was like a little brother, and that Harper was a happy, respectful child who cared about others and did well in school. 21 RR 229–39. The death of Harper's grandmother was a loss to him. 21 RR 242–43. In March of 2008, Harper visited Coleman after his release from prison and talked about his goal of attending barber school—a goal he attained. 21 RR 244–46. Coleman, who knew Harper had found God, attended the first sermon Harper preached in July. 21 RR 246–47. Coleman, who met Triska Rose that Sunday, testified that Rose and Harper seemed like a happy couple. 21 RR 248–49. Coleman talked with Harper about a month before the murders and did not see any difference in Harper at that time. 21 RR 251.

Harper wrote Coleman from jail and said he was very remorseful about what happened, and he wanted Coleman to call the family and let them know he was sorry. 21 RR 253–54.

Don McGinty, a volunteer mentor at the Carol Vance Unit of TDCJ, testified that he was more impressed with Harper than with anyone else he mentored. 22 RR 50–61. Harper was an excellent role model in prison and probably impacted thirty to forty inmates. 22 RR 58–59, 67. After Harper was released from prison in 2008, McGinty talked with him on the phone and sometimes took him to lunch, although McGinty had less contact with Harper after he moved out of his father's house. 22 RR 65–66, 79. Harper worked as a barber in prison and went to barber school after his release. 22 RR 77.

On October 23, 2008, McGinty picked up Harper for lunch, and Harper talked about concerns he was having. 22 RR 85. Harper, who seemed stressed and nervous, directed McGinty to drive to the Walgreens next to where Triska Rose worked so he could see a boyfriend who was going to meet Rose. 22 RR 87–91. While McGinty and Harper were parked by the Walgreens, two men separately entered and then left the Walgreens. 22 RR 94–97. Harper "alerted" on both men but declared each was the wrong person when he left the store. 22 RR 94–97. When a third man entered Walgreens, followed by two

women from the nearby Kids 'R Kids, McGinty followed them into Walgreens and tried to listen to any conversation to give credibility to what Harper had been saying, but McGinty could not even tell if they were talking to each other. 22 RR 99–102. The man got in his car and left, and the two women went back to work at Kids 'R Kids. 22 RR 103–04.

After a while, Triska Rose came outside Kids 'R Kids, made a call on her cell phone, and then went back inside. 22 RR 106. At Harper's instructions, McGinty drove around the block to see if the man was circling in his car and then drove to the back of Kids 'R Kids. 22 RR 110. McGinty dropped off Harper at barber college around 1:30 p.m. and recommended that Harper not return to Rose's condo. 22 RR 111–12.

Harper wrote McGinty from jail that he was facing the possibility of life in prison or the death penalty, and he looked for a reason not to take his life. 22 RR 73. Harper wrote that "I made my bed so I should lie in it" and "I struggle to regain my sanity in Christ and find forgiveness within myself." 22 RR 74. In another letter, Harper wrote, "I'm very sorry the way some things turned out. I hold myself accountable for my actions." 22 RR 76. According to McGinty, Harper would be a role model in prison and an asset to other inmates. 22 RR 118.

Abner Freeman, who had known Harper since the late 1980s or early 1990s, testified that he and Ronnie Johnson went to Teasa Jackson's apartment around 7:00 or 7:30 on the evening of March 31, 1989, and Harper was not there. 22 RR 7–13. At one point, an African-American male came to the apartment, and Johnson bought drugs from him. 22 RR 14–16. Jackson became angry and ordered Johnson, Freeman, and the other man to leave. 22 RR 16. The other man talked to Johnson and Freeman in the parking lot for a while and then Freeman and Johnson left; Freeman did not know where the man went afterwards. 22 RR 16–18. Freeman did not see Harper outside of the apartment or around the apartment complex or the car that evening. 22 RR 19. According to Freeman, Harper was a normal guy. 22 RR 20–21. Ronnie Johnson also provided testimony similar to Freeman's. 22 RR 40–47.

## C.    State's rebuttal evidence

Dr. Mark Moeller, psychiatrist, testified that he met with Harper on February 10 and February 15, 2010, for a mental-health evaluation. 23 RR 31. In his assessment of Harper, Dr. Moeller reviewed Harper's videotaped statement, the offense report, letters written by Harper, his medical records from the Sheriff's office, his school and employment records, a defense mitigation packet, his substance abuse program records, information supplied

by the defense, and the letter from defense expert Dr. Dudley, who never made a formal report. 23 RR 43–44, 186. Harper told Dr. Moeller that he had intermittent hallucinations and heard voices that had waxed and waned during his life. 23 RR 32. Based on what Harper presented and the records, Dr. Moeller diagnosed Harper as schizophrenic, paranoid type, in partial remission with mild symptomology. 23 RR 33–35.

However, Dr. Moeller noted that the possibility of malingering needed to be considered in a forensic setting. 23 RR 35–36. The presence of a medical/legal setting, antisocial personality disorder, and disparity between subjective complaints and what can be seen are factors to consider when checking for malingering regarding claimed auditory hallucinations. 23 RR 36. Further, Harper's records for the past ten years were devoid of a history of hearing voices and treatment or medications for mental illness—something that would be expected. 23 RR 37. This, coupled with the fact that Harper had no prior history of any symptoms until he was charged with capital murder, heightened the suspicion of malingering. 23 RR 38–39. Dr. Moeller was not able to objectively verify any of the symptoms Harper claimed he was having after the capital murder, which was a time when it was in Harper's best

interests to say he was hearing voices. 23 RR 56, 194. In Dr. Moeller's opinion, there was a component of malingering in Harper's case. 23 RR 35–36.

In Dr. Moeller's opinion, mental illness—specifically paranoid schizophrenia—had nothing to do with the murders. 23 RR 44. There was no evidence of auditory hallucinations and severe pervasive delusions that would have caused Harper to commit the murders. 23 RR 45. Instead, it was clear that Harper understood what he was doing; he cleaned up after the murders, moved the victim's car, and called the baby sitter to excuse the seven-year old's absence. 23 RR 45–46, 48. In his statement, Harper talked about getting caught and going to jail for domestic violence, indicating that he knew what he was doing was wrong. 23 RR 190. Harper was also concerned about witnesses who would be left behind. 23 RR 190. Harper was not acting from a delusion but from jealousy—a normal human emotion. 23 RR 48–49. There was no evidence of Harper having delusional thinking or being psychotic at the time of the murders. 23 RR 49.

There was nothing in Harper's statement that led Dr. Moeller to believe that Harper was remorseful; he appeared to justify his actions and did not show empathy for his victims. 23 RR 50–51. Harper thought the murders were the victims' fault because he believed Rose was cheating on him. 23 RR 187–

89. Blaming the victims indicates that Harper is a sociopath and will not change. 23 RR 51. Antisocial personality disorder, what used to be termed a sociopath, is characterized by a lack of remorse, failure to comply with societal norms, impulsivity, failure to plan ahead, aggressiveness, and reckless disregard for others. 23 RR 39–41. Dr. Moeller noted that Harper can be charming, personable, and manipulative to get what he wants. 23 RR 41–42.

Dr. Moeller testified that he was also asked to evaluate Harper for future dangerousness, an evaluation he had not previously done in a legal arena even though he did risk assessments for other behaviors as part of his practice. 23 RR 52. Thus, Dr. Moeller divided his report into two categories: prison and "society" without being aware of the legal definition of "society." 23 RR 52. When Dr. Moeller made his initial future danger assessment, he was not aware that general population in prison had quite a bit of movement; that there were many female workers in the prison; and, that inmates moved from jobs to recreation to meals. 23 RR 54. In Dr. Moeller's opinion, Harper is in a high-risk category for committing future violence, in or out of prison. 23 RR 55. It is likely that Harper will reoffend, and his offense will be violent, based in part on how Harper justified the murders. 23 RR 192–93.

Harper's ability to conform his behavior when he wants to makes him more unpredictable. 23 RR 193. Any mental illness has not kept Harper from working, being a leader, or having a relationship. 23 RR 195. If Harper suffered from mental illness, it did not cause issues in his day-to-day functioning. 23 RR 194.

During a lengthy cross-examination, the defense focused on the fact that Dr. Moeller's testimony contradicted his report, wherein he stated that he did not believe Harper would be a future danger and would function well in prison. 23 RR 56–186. Dr. Moeller conceded that he changed his opinion not on new evidence pertaining to Harper himself, but on additional evidence pertaining to the prison system or housing in TDCJ's general population. 23 RR 123–27. Dr. Moeller also conceded that his report did not mention that Harper was malingering. 23 RR 122–23.

## STANDARD OF REVIEW

With regard to claims adjudicated on the merits by the state court, § 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in state criminal justice systems, not a substitute for ordinary error correction through appeal. The statute imposes a highly deferential standard that demands a federal court grant habeas relief only where one of

two conditions are present in the state court judgment. A federal court may grant relief if the state court adjudicated a constitutional claim contrary to, or unreasonably applied clearly established federal law as determined by the Supreme Court. *Harrington v. Richter*, 562 U.S. 86, 100–01 (2011) (citing (*Terry*) *Williams v. Taylor*, 529 U.S. 362, 412 (2002)). Or the court may grant relief if the state court decision was based on an unreasonable determination of facts in light of the record. *Id.* This standard is necessarily difficult to meet because it was so designed.

A state court decision can be "contrary" to established federal law in two ways: (1) if the state court applies a rule that contradicts Supreme Court precedent, and (2) if the state court confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent, but reaches an opposite result. (*Terry*) *Williams*, 529 U.S. at 405–06.

A state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *Id.* at 406. A state court unreasonably applies Supreme Court precedent only if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407–09. The focus of this test is not on the state court's method of reasoning, but rather on

its ultimate legal conclusion. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) ("It seems clear to us that a federal habeas court is authorized by [§] 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision.").

To determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 562 U.S. at 87. Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Further, in reviewing a state court's merits adjudication for reasonableness, a federal court is limited to the record that was before the state court. § 2254(d)(2); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

# I.    Harper's Claim of Juror Misconduct or Bias Lacks Merit.

In his first claim for relief, Harper claims that a juror, Carolyn Basey Higgs, engaged in misconduct because she decided to "vote for death" based on

Harper's guilt for capital murder before hearing the punishment phase evidence. Harper states:

> During post-conviction habeas investigation . . . juror Basey revealed that she had not followed her promises to counsel or her oath. On October 6, 2012, Basey met with a post-conviction investigator and discussed her participation in Harper's trial. [DE 17, Exhibit 17 at 2 (Juror Affidavits)]. While speaking with the investigator, Basey revealed that she had not considered the mitigation evidence presented by the defense during trial. Instead, Basey stated that "[b]ecause of what was done to the children and their mother, after we found [Harper] guilty, I decided then that I was going to vote for the death penalty." (*Id.* at 1, ¶3.) Basey further stated that "[t]here is nothing I could have heard during the punishment phase that would have changed my mind." (*Id.* at 1, ¶4.).

DE 17 at 18. Harper claims that he has demonstrated a constitutional violation under *Morgan v. Illinois*, 504 U.S. 719 (1992). *Id.* at 15–19.

## A.      State habeas findings and conclusions

The state habeas court rejected this claim as follows:

> The Court finds pursuant to [Texas Rule of Evidence] 606(b), a juror can only testify about whether any outside influence was improperly brought to bear upon any juror or to rebut a claim that a juror was not qualified to serve.

> The Court finds that the October 6, 2012 habeas affidavit statements of juror Carolyn Basey Higgs that she decided to vote for the death penalty after finding [Harper] guilty "because of what was done to the children and their mother" and that "nothing I could have heard during the punishment phase would have changed my mind" consists of her emotional or mental processes[––]processes inadmissible pursuant to Rule 606(b).

41

The Court finds that Basey Higgs'[s] inadmissible habeas affidavit does not state that she did not consider the evidence at punishment and does not state or imply that she refused to deliberate; instead, the inadmissible habeas affidavit is Basey Higgs'[s] view of the heinous nature of the guilt-innocence evidence and the difficulty, if not the inability, of overcoming the view that [Harper] was a future danger based on the facts of the offense.

The Court finds that Basey Higgs acknowledged during voir dire that there were cases where a person convicted of capital murder should receive a life sentence; that she would answer the first special issue depending on the circumstances; that she could envision a situation where a person convicted of capital murder might not be a continuing threat; that there were circumstances where someone deserves life and someone else might deserve death; and, that she could spare someone's life if there was a reason [4 RR 198–203, 223].

The Court finds that Basey Higgs was not a juror challengeable for cause on the basis that she would automatically assess a sentence of death.

**********

Because the postconviction affidavit of juror Carolyn Basey Higgs concerns her emotional or mental processes as a juror, it is inadmissible pursuant to [Texas Rule of Evidence] 606(b); thus, it is non-dispositive to [Harper's] habeas allegations and is not substantive evidence of anything. *See Golden Eagle Archery Inc. v. Jackson*, 24 S.W.3d 362, 369–73 (Tex. 2000) (Texas Supreme Court holding that both Rule 606(b), incorporated into civil rule governing procedures for seeking new trial, and civil rule prohibit all proof of jury misconduct except those involving outside influences).

In the alternative, [Harper] fails to show that Basey Higgs did not consider the evidence at punishment or that she refused to deliberate. *See Wilson v. State*, 7 S.W.3d 136, 142 (Tex. Crim. App.

1999) (citing *Bell v. State*, 938 S.W.2d 35, 41 (Tex. Crim. App. 1996) (noting circumstances of the offense may be sufficient to support finding of future dangerousness)); *Harper* [*v. State*, 2012 WL 4833834 at *2] (noting that [Harper's] crime was so "heinous as to display wanton and callous disregard for human life," so that "circumstances of the offense and the events surrounding it" were sufficient to sustain "yes" answer to future dangerousness special issue); *Shannon v. State*, 942 S.W.2d 591, 597 (Tex. Crim. App. 1996) (holding there is no evidence that must be viewed as per se mitigating).

[Harper] fails to show that Basey Higgs would automatically assess a sentence of death or that she was a juror challengeable for cause on that basis. *Cf. Morgan* [], 504 U.S. [at 729–34] [] (holding that trial court erred in not allowing defense to voir dire on issue of whether prospective juror would automatically vote for death); *see Gonzales v. State*, 353 S.W.3d 826, 836–37 n.7 (Tex. Crim. App. 2011) (rejecting capital defendant's claim that trial court erred in denying challenge for cause; distinguishing *Morgan* [] by noting that it stands for proposition parties should be allowed to voir dire about biases against the law; noting "[t]o the extent that *Morgan* stands for the proposition that a juror is challengeable for cause if he would automatically assess a sentence of death," *Morgan* not on point because juror stated during voir dire she could follow law).

SHCR 1259–60, 1307–08. This decision is not objectively unreasonable.

## B. Harper's claim has no merit, and his evidence cannot be considered.

To prove a juror was biased, a petitioner must show that the juror had such a fixed opinion that the juror could not judge impartially. *See Patton v. Yount*, 467 U.S. 1025, 1035 (1984). Preconceived notions, as to guilt or innocence for example, are not adequate to show bias. *See Murphy v. Florida*,

43

421 U.S. 794, 800 (1975). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961).

Harper has not made this showing because he does not point to any statements Basey Higgs made during voir dire revealing that she would automatically vote for a death sentence or otherwise not judge impartially. Instead, his claim is premised on an affidavit she supplied on state habeas review long after Harper was tried. This evidence is not reviewable. In keeping with the state rule, Rule 606(b) of the Federal Rules of Evidence bars testimony from jurors on four topics: "(1) the method or arguments of the jury's deliberations, (2) the effect of any particular thing upon an outcome in the deliberations, (3) the mindset or emotions of any juror during deliberation, and (4) the testifying juror's own mental process during the deliberations." *Pyles v. Johnson*, 136 F.3d 986, 991 (5th Cir. 1998) (citation omitted). The only exception to this rule is that "a juror may testify on the question whether extraneous prejudicial information was improperly brought

to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." Fed. R. Evid. 606(b).[10]

Basey Higgs's statements about what she considered or did not consider clearly fall within the proscriptions of Rule 606(b); the exception obviously does not apply. Therefore, the Court cannot consider it. Further, *Morgan* is not on point because the issue there involved the adequacy, or inadequacy, of voir dire procedures in fleshing out potential juror biases. 504 U.S. at 722–25. The Court stated: "Any juror who states that he or she will automatically vote for the death penalty without regard to the mitigating evidence is announcing an intention not to follow the instructions to consider the mitigating evidence and to decide if it is *sufficient* to preclude imposition of the death penalty." *Id.* at 738 (emphasis in original). But, again, this is in the context of voir dire inquiries, and Harper has pointed to nothing occurring during voir dire that would have disqualified Basey Higgs. Her thought processes during trial and deliberations are precluded, as the Supreme Court has held. *Tanner v. United States*, 483 U.S. 107, 121 (1987) ("Petitioners have presented no argument

---

[10]    In *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 869 (2017), the Supreme Court held that the Rule 606(b) proscriptions do not apply to post-verdict affidavits where a juror states that he or she relied on racial stereotypes or animus to convict a defendant. Basey Higgs does not make that assertion in her affidavit; thus, *Pena-Rodriguez* is inapplicable.

that Rule 606(b) is inapplicable to the juror affidavits and the further inquiry they sought in this case, and, in fact, there appears to be virtually no support for such a proposition.").

For these reasons, the state court's decision is not objectively unreasonable, and habeas relief must be denied.

## II. Harper's Claims that Trial Counsel Was Ineffective for Failing to Challenge the State's Allegation that Harper Killed Teasa Jackson and that the State manipulated Louis Jackson's Testimony Are Meritless.

In his next two claims, Harper alleges that trial counsel was ineffective for failing to effectively challenge the State's punishment phase evidence demonstrating that Harper committed the extraneous offense of murdering Teasa Jackson. He also claims that prosecutorial misconduct contributed to the error because the State manipulated the testimony from Louis Jackson. These claims are lacking in merit.

### A. State habeas findings and conclusions

#### 1. Findings pertaining to ineffective assistance

Trial counsel objected to the admission of Jackson's unadjudicated extraneous murder arguing it was a circumstantial case and the prejudicial value outweighed the probative value, and the trial court overruled the objection [19 RR 9–10].

The State presented punishment evidence that seven-year-old Louis Jackson discovered his mother's body on the bathroom floor

46

of their apartment on March 31, 1989, and that, in 1995, [Harper's] prints were identified on a piece of paper recovered near Jackson's body [19 RR 100–01; 20 RR 20–29].

Retired Houston Police Sergeant James Benford testified that he and Sergeant Doyle interviewed [Harper] on October 23, 1995[,] about Teasa Jackson's murder, and [Harper], who was nineteen years old and lived four doors down from Jackson at the time of her 1989 murder, admitted smoking crack in Jackson's apartment a few days before the murder but denied having a sexual relationship with Jackson or murdering Jackson [19 RR 165–70].

Benford testified that the October 23, 1995 interview with [Harper] did not lead to any charges being filed against [Harper] concerning Teasa Jackson's murder [19 RR 170–71].

Retired Houston Police Sergeant Eric Mehl, cold case investigator, testified that Teasa Jackson's autopsy kit was sent to Strand Analytical Lab in Indiana for examination on May 5, 2009; Cynthia Cale, Strand Lab DNA analyst, detected semen on Jackson's vaginal and anal swabs and obtained a single source unknown male DNA profile from the vaginal swab and obtained a mixture from the anal swab with the major component being the same unknown male profile [19 RR 194–95, 218–19].

The unknown male DNA profile was entered into CODIS, and, on February 8, 2010, there was a CODIS hit between the DNA profile obtained from the vaginal and anal swabs from Teasa Jackson's autopsy and the DNA profile from the triple homicide committed by [Harper] [19 RR 233–34; 20 RR 72–74].

On March 24, 2010[,] a buccal swab was obtained from [Harper] and [Harper's] DNA profile from the buccal swab was compared with the CODIS hit; [Harper] could not be excluded from the DNA profile obtained from Teasa Jacksons rape kit evidence [19 RR 235, 243-44; 20 RR 14–16, 75].

Jennifer Deleon Clay, Houston Crime Lab, testified that the probability that a randomly chosen unrelated individual would be included as a possible contributor to the male DNA profile found in Jackson's rape kit evidence is approximately 1 in 1.8 sextillion for Caucasians, 1 in 990 quintillion for African-Americans, 1 in 3.9 quintilliion for Southeast Hispanics, and 1 in 54 sextillion for Southwest Hispanics [20 RR 75].

Jennifer Deleon Clay also compared the known DNA profile from [Harper's] buccal swab to the DNA profile on Jackson's anal swab and got exactly the same statistics [20 RR 76].

Paul Motard, Houston Police Department, homicide division cold case investigator, testified that he was aware from Sergeant Benford's 1995 interview notes with [Harper] that [Harper] claimed that he never had sex with Jackson [19 RR 242–43].

On October 8, 2010, John P. Lazzaretto, forensic consultant and latent print examiner, examined the latent prints previously developed on the piece of paper found by Jackson's body and determined that [Harper's] left middle finger and his left thumb print were on the paper [19 RR 99–109].

Louis Jackson, who was seven years old when his mother Teasa Jackson was murdered, testified that some guys he knew by sight came to their apartment the night of the murder and then left; that he came out of his room later that night and saw his mother on the porch with another man Louis recognized as being from the apartment area; that he went back to bed but was awakened by his baby sister crying; and, that he went to a neighbor's apartment and then discovered his mother's body on the bathroom floor when he returned to his apartment [20 RR 20–21, 23–29].

Louis Jackson testified that he described to police the men who had been in the apartment that night; that prosecutors showed him a photo spread on August 19, 2010; and, that he identified the man in the #2 position—[Harper]—as the man he saw talking to his mother on the porch after the other men left [20 RR 30–35].

The Court finds that trial counsel effectively attempted to rebut the State's presentation of the extraneous offense through vigorous cross-examination of the State's witnesses, including Louis Jackson [19 RR 16–19, 39–55, 82–93, 110–15, 171–82, 184–85, 197–204, 244–68, 270–71; 20 RR 7–13, 44–56, 60–67, 77].

The Court finds that trial counsel attempted to impeach Louis Jackson concerning the lack of any notation in the extraneous offense report about Jackson seeing his mother and a man sitting on the porch that night [20 RR 46]; . . . and that trial counsel presented the punishment testimony of Abner Freeman and Ronald Johnson, questioned them about a man who was at Jackson's apartment that evening, and elicited testimony that neither Freeman nor Johnson, who both knew [Harper], saw [Harper] at the apartment or around the apartment complex that evening [22 RR 16–20, 31–35, 43–44, 46].

**\*\*\*\*\*\*\*\*\*\***

[T]rial counsel effectively attempted to challenge the evidence concerning Teasa Jackson's murder; counsel objected to the admission of Jackson's unadjudicated extraneous murder; counsel objected to the admission of [Harper's] oral statements made concerning Jackson's murder; counsel obtained a suppression hearing concerning [Harper's] oral statement made about Jackson's murder; counsel vigorously cross-examined the State's witnesses concerning Jackson's murder, and counsel presented punishment witnesses to attempt to rebut the State's evidence concerning Jackson's murder [19 RR 9–10, 16–19, 39–55, 82–93, 110–15, 123–54, 171–82, 184–85, 197–204, 244–68, 270–71; 20 RR 7–13, 44–56, 60–67, 77; 22 RR 16–20, 31–35, 43–44, 46]. *See Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001) (holding review is highly deferential and presumes counsel's actions fell within wide range of reasonable and professional assistance); *see also Solis v. State*, 792 S.W.2d 95, 100 (Tex. Crim. App. 1990) (reviewing court will not "second-guess through hindsight" the strategy of counsel, nor will fact that another

attorney might have pursued different course support finding of ineffectiveness).

Trial counsel are not ineffective for being unable to overcome the evidence that the DNA recovered from Jackson's rape kit was consistent with [Harper's] DNA profile, even though he denied ever having sexual relations with Jackson, and that such DNA profile is found in approximately 1 in 1.8 sextillion for Caucasians, 1 in 990 quintillion for African-Americans, 1 in 3.9 quintilliion for Southeast Hispanics, and 1 in 54 sextillion for Southwest Hispanics [20 RR 75]. *See Powell v. State*, 898 S.W.2d 821, 830 (Tex. Crim. App. 1994) (noting that State need not prove all elements of extraneous offense offered at punishment in capital [trial] and does not have to prove beyond reasonable doubt that defendant committed extraneous offense).

SHCR 1260–63, 1309.

### 2.    Findings regarding the claim of prosecutorial misconduct

The Court finds, based on the April 21, 2014 credible affidavit of prosecutor Anna Emmons and the August 7, 2014 credible affidavit of former prosecutor Denise Bradley, that prosecutors Emmons and Bradley, along with Harris County District Attorney Investigator David Worley, visited Jackson at TDCJ prior to [Harper's] trial; that Investigator Worley read admonishments to Jackson concerning the viewing of a photo spread, including admonishments that Jackson was not obligated to identify anyone, not to identify anyone unless he was certain, and to take his time to look at each photo; and that Jackson immediately identified [Harper] after he was shown the photo spread.  [SHCR 1036–45].

The Court finds, based on the credible affidavits of prosecutor Emmons and former prosecutor Bradley, that the prosecutors did not tell Jackson about the CODIS hit linking [Harper's] DNA to Teasa Jackson's body prior to the photo spread; that the prosecutors identified themselves, told Jackson that they were

investigating the murder of his mother, and asked if he remembered that night; and that Jackson gave the same reply that he gave at trial—he remembered it like it was yesterday. [SHCR 1036–45].

The Court finds, based on the credible affidavits of prosecutor Emmons and former prosecutor Bradley, that when asked what he remembered, Jackson remembered a man sitting on the porch with his mother, his mother making him go to bed, his being awakened by his sister crying, and his discovery of his mother's body. [SHCR 1036–45].

The Court finds, based on the credible affidavits of prosecutor Emmons and former prosecutor Bradley, that when asked if he remembered what the man on the porch looked like, Jackson stated that he did; Jackson was then shown the photo array and Investigator Worley only talked with Jackson about the identification procedure—not the facts of the offense. [SHCR 1036–45].

The Court finds, based on the credible affidavits of prosecutor Emmons and former prosecutor Bradley, that the prosecutors did not read portions of the offense report concerning Teasa Jackson's murder to Louis Jackson; that they did not tell Jackson that [Harper] killed his mother or that [Harper] was the man on the porch with his mother; that they did not tell Jackson they had someone locked up and wanted to see if Jackson could recognize him; that Jackson was not shown two photo arrays, only one; and, that they did not tell Jackson he needed to testify that [Harper] was the man on the porch. [SHCR 1036–45].

The Court finds, based on the credible affidavits of prosecutor Emmons and former prosecutor Bradley[,] that prosecutors told Jackson what [Harper] was charged with; that Jackson's mother's case would only be used in punishment at [Harper's] trial; that they wanted him to testify truthfully about what he remembered about the night of the murder and about the identification he made; and, that Jackson's trial testimony was consistent with

what he told prosecutors when interviewed at the prison unit and was consistent with the identification that he made. [SHCR 1036–45].

The Court finds unpersuasive and suspect Louis Jackson's postconviction habeas affidavit concerning the events of the prosecutors' interview with him based on the contradictions between the prosecutors' credible statements and Jackson's postconviction affidavit statements.

The Court finds, based on the credible affidavit of prosecutor Emmons, that Louis Jackson sent a letter to Emmons after [Harper's] trial in which he stated that he was afraid for his safety because a relative of [Harper] was housed in the same prison unit as Jackson; that Jackson asked how he could be moved from the unit; and, that prosecutor Emmons contacted a prison official and gave him the information in Jackson's letter. [SHCR 1038–39].

The Court finds that Louis Jackson's identification of [Harper] was not needed to establish [Harper's] role in Teasa Jackson's death based on the CODIS hit from the DNA recovered from her body after [Harper] denied ever having sex with her and based on [Harper's] fingerprints found on a piece of paper recovered near Jackson's body.

The Court finds that the State did not manipulate Louis Jackson's testimony or present false testimony through Louis Jackson.

**********

[Harper] fails to show that the State "manipulated" Louis Jackson's testimony that [Harper] was the last person he saw with his mother on the night of her death or that his trial testimony was false in light of Jackson's suspect and unpersuasive postconviction affidavit and in light of the credible affidavits of prosecutor Anna Emmons and former prosecutor Denise Bradley. *Cf.* [*United States*] *v. Adi*, 759 F.2d 404, 408 (5th Cir. 1985) (noting that recanting affidavits and witnesses viewed with extreme suspicion

for purposes of motion for new trial based on newly discovered evidence).

SHCR 1263–65, 1310.

### B.  Trial counsel was not ineffective.

#### 1.  The standard

Claims of ineffective assistance of counsel are governed under the familiar standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984).  A defendant's claim that he was denied constitutionally effective assistance requires him to affirmatively prove both that (1) counsel rendered deficient performance, and (2) his actions result in actual prejudice.  *Id.* at 687–88, 690.  Importantly, failure to prove either deficient performance or resultant prejudice will defeat an ineffectiveness claim, making it unnecessary to examine the other prong.  *Id.* at 687.

To demonstrate deficient performance, Harper must show that in light of the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness," i.e., "prevailing professional norms."  *Id.* at 689–90; *see also Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014) (per curiam) (emphasizing that the "performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances") (citation omitted).  The Supreme Court has admonished

that judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effect of hindsight." *Strickland*, 466 U.S. 689–90; *Richter*, 562 U.S. at 105 ("It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'"); *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.") (citations omitted). Accordingly, there is a "strong presumption" that the alleged deficiency "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even if deficient performance can be established, Harper must still affirmatively prove prejudice that is "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Id*. at 687. This requires him to show a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different." *Id*. at 694. A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Id*. And as explained by the Supreme Court, the question in conducting *Strickland*'s prejudice analysis "is *not* whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel [had] acted differently." *Richter*, 562 U.S. at 111

54

(emphasis added and citations omitted). Rather, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id.* at 112 (citation omitted); *see also Jordan v. Dretke*, 416 F.3d 363, 371 (5th Cir. 2005) (reiterating that the burden of affirmatively proving prejudice rests with petitioner; it is not the State's burden to disprove prejudice).

With respect to errors at the sentencing phase of a death penalty trial, the relevant prejudice inquiry is "whether there is a reasonable probability, that absent the errors, the sentencer [] would have concluded the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."); *see also Wong v. Belmontes*, 558 U.S. 15, 26 (2009) ("reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice").

Finally, relief is not warranted even if this Court believes Harper has satisfied *Strickland*. Instead, Harper is entitled to relief only if this Court concludes that the state court's determination that Harper did not satisfy *Strickland* is objectively unreasonable under § 2254(d). *Richter*, 562 U.S. at 101.

## 2. Counsel did not perform deficiently.

Harper claims that counsel performed deficiently for a host of reasons, namely that counsel: (1) failed to present alternate suspects to the Jackson murder, such as Abner Freeman, Ronnie Johnson, Steve Jackson, and Craig Roberson; (2) failed to explain why evidence tied to Harper would have been found in the apartment; (3) failed to elicit outcry testimony from Louis Jackson; (4) failed to elicit testimony from police detectives concerning the investigation into other suspects; (5) failed to account for why Harper's DNA would have been at the scene; (6) failed to object to extraneous victim impact testimony from Shirley Williams, Teasa Jackson's mother, and from Louis Jackson, her son; and (7) failed to object when the State argued in closing that Jackson had been raped. DE 17 at 35–53.

The initial problem with Harper's claims is that they ignore the fact that counsel elicited much of this evidence on cross-examination and through the presentation of defense witnesses. For instance, counsel elicited the following:

- Beverly Trumble did not note anything that would indicate sexual assault or a struggle inside the apartment, 19 RR 41–43, 53;

- Dr. Steve Wilson, who reviewed the autopsy of Teasa Jackson, found no signs of trauma to Jackson's genitalia and acknowledged that spermatozoa can remain alive in a woman for up to six days, 19 RR 86, 92;

56

- Officer John Lazzaretto testified that five other latent fingerprints found in the apartment were not identified as being Harper's, and there is no way to tall how long a print has been on a surface, 19 RR 110–11;

- Sergeant James Benford, who took Harper's oral statement, agreed that the key to the case was the identity of the fourth man who came back to Teasa's apartment and they still did not know who that was, although he had suspicions, 19 RR 173–74;

- Benford said that Harper admitted he knew Teasa and had been in her apartment to smoke crack, and that Harper brought this up before the police mentioned that his print had been found in the apartment, 19 RR 175–78;

- Benford said the police got multiple leads in the case and Harper was not one of them, 19 RR 181;

- Officer Eric Mell testified that he saw nothing in the reports to indicate that Teasa had been raped, 19 RR 201;

- Sergeant Paul Motard said that a Mary Humphries, who lived in the complex, was shown a photo spread and identified Roberson as being there, and Louis Jackson said there were four men at the apartment that night, so Roberson became a "topic of concern," 19 RR 245–46;

- Motard acknowledged that Roberson had previously threatened Teasa Jackson's life, but Roberson died before they could talk to him, 19 RR 247, 255;

- Motard agreed that of all the people HPD talked to, no one indicated Harper had been in the complex or that specific apartment the night Teasa was murdered, 19 RR 256;

- Motard acknowledged that after Freeman and Johnson left, Lockett stayed behind, although he lived above Teasa, 19 RR 260–61;

- Motard said it was "fair to say" Louis Jackson did not mention Harper as one of the men being there that evening, 19 RR 263–64;

- Motard stated that Louis Jackson did not give them any names but gave them detailed descriptions that led to the police finding some of these suspects, such as Freeman and Johnson, 19 RR 270–71;

- Louis Jackson testified that there was an unknown man on the porch with his mother the evening she was killed, but, in 1989 when he was interviewed by the police, he never mentioned a man being on the porch; he provided this information to the prosecution only a few months before trial, or 21 years later, 20 RR 51–56;

- Louis Jackson acknowledged on one occasion before his mother was killed, he was at a store with his father when some men came up and made a threat that someone was "going to have to pay" for some stolen merchandise brought to his apartment that his mother threw out, 20 RR 64; and

- Louis Jackson acknowledged that it was routine for his mother to sit out on the porch and socialize with others, 20 RR 65–66.

The defense also called Abner freeman and Ronnie Johnson to testify.

Freeman and Johnson testified that they knew Harper at the time of Teasa's murder. On the night in question, Freeman and Johnson got off work and went to Teasa's apartment about 7:00 or 7:30 p.m. to visit with her husband Steve,

who was not there. 22 RR 9–12, 41–42. Harper was also not there. 22 RR 13. They went into the kitchen and sat down, and while in the kitchen, Teasa's son Louis came out, but she told him to go back in his room. 22 RR 13–14. Then, someone came and knocked on the door; Teasa answered, and it was another black male who came into the kitchen and talked to Teasa privately, apparently about some drugs. 22 RR 14-16, 43. This man, later identified as Emory Lockett, gave Teasa—who had a drug problem—some crack cocaine, and they smoked it. 22 RR 25, 33. Teasa got angry and told them all to leave; so, the three men left. 22 RR 16–17, 33, 43. Emory wanted to get a ride with Freeman and Johnson, but they told him no. 22 RR 17. He got upset and then headed down the sidewalk in the complex. 22 RR 18, 44, 47. Freeman and Johnson then left. 22 RR 44. Freeman stated that when they came outside the apartment after Teasa told them to leave, he did not see Harper and did not see Harper anywhere in the complex that night. 22 RR 19–20. The following day, after he learned Teasa had been murdered, Freeman went back to the complex to find the third man, Lockett, because he wanted to confront him about what happened that night. 22 RR 33–34. Freeman explained that he wanted answers from Lockett. 22 RR 36–37.

Therefore, much of the evidence Harper complains was not elicited or presented was, contrary to his allegation, before the jury. The defense clearly tried to show that Harper was not the person who murdered Teasa Jackson and attempted to point toward other suspects, including Lockett and Roberson. Harper is essentially claiming not that counsel failed to investigate and present evidence, but that counsel failed to do so to the extent he desired. However, "courts must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Ward v. Stephens*, 777 F.3d 250, 265 (5th Cir. 2015) (internal quotation marks and citations omitted); *see also Richter*, 562 U.S. at 105 (If there is *any* "reasonable argument that counsel satisfied *Strickland*'s deferential standard," the state court's denial will be upheld.). Further, because counsel did most of what Harper claims they did not do, Harper is complaining about counsel's failure to present cumulative evidence, which is inadequate to demonstrate ineffective assistance. *Norman v. Stephens*, 817 F.3d 226, 233 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 1201 (2017); *Trottie v. Stephens*, 720 F.3d 231, 244–47 (5th Cir. 2013); *Carty v. Thaler*, 583 F.3d 244, 264 (5th Cir. 2009).

Further, many of Harper's individual claims are meritless. First, Harper claims that counsel failed to explain why his fingerprint was in Teasa's bathroom. But Sergeant Benford testified that Harper told him his print was in the bathroom because he had been in the bathroom smoking crack in the days before she was murdered. 19 RR 168–69. Because that was Harper's statement, there was nothing else counsel could have offered to explain the matter. Moreover, Benford said that finding the print, in and of itself, did not lead to charges being filed against Harper.

Second, Harper faults counsel for not explaining why Harper's DNA would have been at the scene. He states:

> Counsel failed to demonstrate the extent of Teasa Jackson's addiction to crack cocaine—they failed to elicit testimony about Teasa's desperate search for drugs or money to buy drugs on the day of her murder. Trial counsel failed to demonstrate that Teasa was separated from her husband and that her apartment had become a haven for male drug users. Considering the extent of her addiction and the frequent presence of male visitors at her apartment, it is entirely plausible that she engaged in consensual sexual activities in exchange for drugs. Moreover, Harper's reluctance to fully disclose his sexual relationship with Teasa during his 1995 police interrogation is understandable considering that he was in state custody, without an attorney, and being questioned about an unsolved crime.

DE 17 at 48. However, the jury was quite aware that Teasa Jackson had drug problems and that her apartment was frequented by men seeking to do drugs.

19 RR 173, 240–41. In fact, Harper said to Sergeant Benford that Teasa's apartment was a "gathering place" where people smoked crack. 19 RR 179. And Freeman testified that Teasa had a drug problem. 22 RR 25. But given that Teasa was also the victim of a brutal murder, it would not have aided Harper's cause to try to further disparage her character. Moreover, Harper's explanation for why he chose not to tell the police about having sex with Teasa is nonsensical. He did not hide the fact that he had been in her apartment doing drugs. If she had a reputation as a person who would exchange sexual favors for drugs, it would have made little difference for him to concede that as well, unless he had something to hide.

Third, Sergeant Motard testified that he was essentially able to rule out Freeman, Johnson, and Lockett as suspects because, through his investigation, he determined they left the scene prior to Teasa's murder. 19 RR 242. And given that Freeman and Johnson testified on behalf of Harper, counsel had little reason to try to cast them as suspects.

Fourth, Harper alleges that counsel failed to object to extraneous victim impact testimony from Shirley Williams and Louis Jackson about the effect of Teasa's death on Louis. DE 17 at 49–51. But Williams's testimony was hardly significant. It comprises less than four pages of the record, and she merely

identified her daughter in a photo and briefly explained some of the difficulties Louis had following the murder. 20 RR 78–82. Even if an objection was warranted, the failure to do so was hardly prejudicial. With regard to Louis Jackson's testimony, trial counsel did object on multiple occasions when questioning strayed into matters unrelated to his mother's murder—for instance, tattoos Jackson had on his body pertaining to his mother's death—and the trial court sustained many of these objections. 20 RR 35, 38, 58, 59.

Finally, Harper claims that counsel was ineffective for failing to object when the State argued in closing that Teasa Jackson had been raped because rape was unsubstantiated by Dr. Wilson or any other evidence. DE 17 at 51–53. But Dr. Wilson did not address whether or not Teasa had been raped. Further, Teasa was found naked and stabbed to death in her bathroom, and Harper was ultimately determined to be the contributor of the spermatozoa. A reasonable inference from these facts is that she was raped and murdered. Counsel is not required to make futile objections. *Koch v. Puckett,* 907 F.2d 524, 527 (5th Cir. 1990).

### 3.   **Harper cannot demonstrate prejudice.**

Harper cannot demonstrate that any actions by trial counsel, or lack thereof, resulted in prejudice due to the overwhelming evidence of his future

dangerousness. The State presented substantial evidence that Harper was indeed the person who murdered Teasa Jackson. Although he acknowledged doing drugs in her apartment, he lied to the police about having sex with her when he clearly did, given the DNA evidence. And she was found stabbed to death and naked on her bathroom floor. This evidence was more than adequate to demonstrate his culpability. *See Brown v. Dretke*, 419 F.3d 365, 376–77 (5th Cir. 2005) (at the punishment phase, the Constitution does not require that "unadjudicated extraneous offenses be proved beyond a reasonable doubt for evidence of those offenses to be admitted at trial").

But even if counsel had been able to somehow prove that Harper was not responsible for murdering Jackson, the additional evidence presented by the State showed conclusively that Harper is a future danger to society. The State demonstrated that Harper (1) robbed Bonita Holmes at knifepoint while threatening to kill her; (2) essentially kidnapped and beat Tina Flores; (3) assaulted a cab driver; (4) committed an aggravated robbery against Sharon Galavitz; (5) robbed Shama Hamshi; and (6) robbed Jeanette Murray. Harper had multiple convictions and, for the robbery of Murray, he was sentenced to forty years in prison.

Moreover, the facts of Harper's capital offense preclude a finding of prejudice. There is no question that Harper brutally murdered Triska Rose and her daughters. He bound and gagged them for hours while he questioned them repeatedly about his belief that Triska was having an affair. And when Mya eventually told him what he wanted to hear, he stabbed Triska to death, strangled her daughters, and then slit Triska's and Briana's throats believing they were still alive. The medical testimony demonstrated that Harper stabbed Triska 36 times. Thus, the facts of the offense alone were more than sufficient to prove Harper's future dangerousness. *See Druery v. State*, 225 S.W.3d 491, 507 (Tex. Crim. App. 2007) (circumstances of offense alone may be sufficient to support an affirmative answer to the first special issue). But in combination with the evidence of Harper's criminal history, Harper cannot demonstrate prejudice. *See Strickland,* 466 U.S. at 698–99 (finding no prejudice due to State's overwhelming evidence on aggravating factors supporting death penalty); *Clark v. Thaler*, 673 F.3d 410, 424 (5th Cir. 2012) ("[T]he aggravating evidence in Clark's case was overwhelming, a circumstance which we have observed makes it "virtually impossible to establish prejudice.") (quoting *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002)); *Santellan v. Cockrell*, 271 F.3d 190, 198 (5th Cir. 2001) ("[c]onsidering

[petitioner's] history in light of the horrific nature of this offense, a reasonable court could conclude that there was no substantial likelihood that the outcome of the punishment phase would have been altered by evidence that he suffered organic brain damage."). At the very least, the state court's decision denying habeas relief is not objectively unreasonable.

As a final matter, Harper states that his case is comparable to that in *Rompilla v. Beard*, 545 U.S. 374 (2005). DE 17 at 54–55. Harper is incorrect. In *Rompilla*, trial counsel relied upon the defendant's own description of his childhood as "normal"; as a result, trial counsel failed to thoroughly investigate the defendant's background and social history and instead presented a mitigation case consisting of the defendant's family pleading with the jurors for sympathy. 545 U.S. at 379. Despite Rompilla's statements to the contrary, counsel was in possession of various documents indicating that Rompilla's childhood was anything but "normal," namely the prosecution's file. *Id.* at 382. The Court held that where capital defense attorneys have access to the prosecution's files and are provided notice that the prosecution will rely upon such information contained within the file at sentencing, yet neglect to review the file before trial, counsel performs below an objective standard of reasonableness. *Id.* at 389. And if counsel had

66

reviewed the contents of the prosecutor's file and other readily available documents, they likely would have uncovered other mitigating evidence regarding Rompilla's parents' alcoholism and domestic violence issues, as well as the severe discipline and harsh living conditions he endured as a child. *Id.* at 391–93.

The instant case has no similarity. First, Harper's claim does not pertain to mitigating evidence of the sort at issue *Rompilla*. Instead, he is claiming counsel failed to investigate and present evidence negating some of the State's evidence of future dangerousness. Second, as shown, counsel did what Harper claims they did not do: they cross-examined State's witnesses, pointed to others as potential suspects, and presented testimony from their own witnesses to show Harper was not there the night Teasa Jackson was murdered. Third, the *Rompilla* Court found that the defendant was prejudiced by counsel's omissions. Here, as shown, Harper could not have suffered any prejudice due to the overwhelming evidence of his future dangerousness. Consequently, *Rompilla* affords Harper no relief.

### 4. A related claim is unexhausted.

In his federal petition, Harper attempts to raise one claim in relation to the above that is unexhausted. Harper alleges that counsel failed to elicit

outcry testimony by Louis Jackson that would have excluded Harper as a suspect in Teasa Jackson's murder. He refers to an exhibit by Kevin Charles Hopkins, wherein Hopkins states that he was standing outside the apartment with Harper, Steven Thomas, and Louis Jackson when the ambulance came for Teasa. Hopkins states: "Louis was telling his father, 'Daddy, Daddy, you know the man that did it.' Garland Harper and I were standing right there and Louis Jackson did not point to Harper or Kevin Hopkins while saying that. Louis Jackson was obviously talking about someone not present that his Father knew." DE 17 at 44 & Exhibit 63. Harper now alleges:

> If Kevin Charles Hopkins had been interviewed and his testimony presented to Harper's punishment phase trial judge, there is a reasonable probability that the Teasa Jackson extraneous offense murder would have been excluded from the jury as not being "clearly proven" under Texas law that Garland Harper was the perpetrator of the Teasa Jackson murder.

DE 17 at 44.

Harper did not raise this claim on state habeas review nor direct appeal. Habeas relief "shall not be granted" under any circumstances unless it appears that "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1). A petitioner must have first provided to the highest court of the state a fair opportunity to apply (1) the controlling federal constitutional principles to (2) the same factual allegations

before a federal court will entertain the alleged errors. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995).

In order to satisfy exhaustion, all of the grounds raised in a federal habeas application must have been "fairly presented" to the state courts prior to being presented to the federal courts. *Id.*; *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997). Moreover, "[t]he exhaustion requirement is not satisfied if the prisoner presents new legal theories or *factual claims* in his federal habeas petition." *Id.* at 420 (emphasis added) (citing *Anderson v. Harless*, 459 U.S. 4, 6-7 (1982)).

Further, unexhausted claims are procedurally defaulted for the purposes of federal habeas review because, as in this case, if Harper returned to state court in order to exhaust his claim by filing a successive state application, the application would be dismissed for abuse of the writ. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *Beatty v. Stephens*, 759 F.3d 455, 465 (5th Cir. 2014); *Nobles*, 127 F.3d at 422.

To the extent Harper argues that he can overcome his default via *Martinez v. Ryan*[11] and *Trevino v. Thaler*,[12] that argument fails. In *Martinez*,

---

[11]   566 U.S. 1 (2012).

[12]   569 U.S. 413 (2013).

69

the Supreme Court found for the first time an equitable exception to the statement previously asserted in *Coleman* that an error by an attorney in a state postconviction proceeding does not qualify as cause to excuse a procedural default. 566 U.S. at 9. *Trevino* held that this limited equitable exception generally applies to Texas capital cases. 569 U.S. at 417. To meet the *Martinez/Trevino* exception, Harper must show that (1) his underlying ineffectiveness claims are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit," *Martinez,* 566 U.S. at 14; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *See id.*; *Trevino,* 569 U.S. at 429.

Harper cannot satisfy this burden. First, neither trial counsel nor state habeas counsel could have advanced this issue because Hopkins's statement is hearsay offered to prove the truth of the matter asserted. And Louis Jackson testified at trial. Thus, the testimony was not admissible.

Second, Louis Jackson did not testify that he made this statement, and it does not appear in any of the police reports. Thus, Hopkins's claim is not supported.

Third, even if Hopkins had been permitted to testify, this would not have altered the outcome. The phrase "Daddy, Daddy, you know the man that did

it" is simply too ambiguous to be meaningful. Perhaps it could be interpreted in the manner Harper suggests, or it could have been a question. Regardless, it does not point to or exclude anyone in particular as being involved. More importantly, as will be discussed below, Louis Jackson's testimony was not pivotal because he did not witness the crime; he was asleep in his bedroom when his mother was murdered. Although he apparently identified Harper as the man on the porch with his mother that evening, that proves nothing other than Harper was on the porch with his mother. That is hardly surprising because during the initial investigation, Harper's fingerprint was found in the apartment, he admitted to going there on occasion, and he lived in the same apartment complex. The evidence conclusively tying Harper to the murder was his DNA, coupled with the fact that Teasa Jackson was found stabbed to death and naked on the bathroom floor.

Last, for the reasons addressed above, Harper cannot demonstrate prejudice. Because this claim has no merit, state habeas counsel had no reason to pursue it. Thus, Harper cannot demonstrate cause and prejudice, and his claim is defaulted.

### C. The prosecution did not engage in misconduct.

Harper contends that the State knowingly manipulated Louis Jackson's testimony and presented false testimony that Louis last saw his mother with Harper on the porch of the apartment. DE 17 at 55–74. He claims that "[t]here are significant factual inconsistencies between what Louis Jackson reported to police as a seven year old in 1989 and his testimony at Harper's trial in 2010, twenty-one years later." *Id.* at 56. Harper contends, based on an affidavit Louis Jackson provided on state habeas review, that when the police and prosecutors interviewed him before trial, they "showed Louis two photo spreads, and Louis said that he recognized a photo, which he circled and initialed." *Id.* at 58. The State informed Louis that Harper's DNA was found at the scene, that they were sure Harper had killed his mother, and that "they needed [him] to testify that Garland was the man on the porch." *Id.*; *see also* SHCR 849–51 (Jackson affidavit). At trial, Louis testified that he recognized one of the men at the apartment that evening with his mother on the porch, and he picked Harper out of a photospread. 20 RR 34.

Harper now argues that Louis Jackson's testimony was false because he claimed in his affidavit that he did not remember who he saw on the porch and he felt "manipulated" into testifying to that effect. Harper claims that when

the State visited Louis in jail before trial, they provided him facts that Harper was responsible for killing his mother and basically suggested to him, or convinced him, that Harper was the man on the porch. DE 17 at 60–61. He further states that "the significant inconsistencies between Louis's 1989 statement to police, the corroborated statements given by other witnesses in 1989, and Louis's trial testimony cast serious doubt on Louis's reliability as a witness and strongly suggest that that his trial testimony was manipulated by the State." *Id.* at 62. Specifically, he refers to the differences in the number of people he said he saw that night when he was interviewed in 1989 and when he testified at trial, and that he never told the police in 1989 that he saw a man on the porch. DE 17 at 64–70. Harper finally claims that the false testimony uncorrected by the State was material. *Id.* at 72–74. This claim is meritless.

### 1. The standard

It is well settled that the State may not knowingly use perjured testimony, and the state must correct perjured testimony if known. *Giglio v. United States,* 405 U.S. 150, 154 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959). To prevail on such a claim, a petitioner must show the testimony was false, the testimony was material, and the prosecutor knew the testimony was false. *Kutzner v. Johnson,* 242 F.3d 605, 609 (5th Cir. 2001). Contradictory

testimony from witnesses, inconsistencies within a witness's testimony, and conflicts between reports, written statements and the trial testimony of prosecution witnesses do not, standing alone, establish perjury. *See Koch*, 907 F.2d at 531 (holding that contradictory testimony from witnesses or inconsistencies in a witness's testimony at trial are to be resolved by the trier of fact and do not suffice to establish that certain testimony was perjured); *United States v. Martinez-Mercado,* 888 F.2d 1484, 1492 (1989) (holding that the omission of certain facts from disclosed reports and written statements of the prosecution's witnesses, alone, goes to the credibility of the witnesses, an area within the province of the jury, and does not establish perjury occurred); *United States v. Viera,* 819 F.2d 498, 502 (5th Cir. 1987) (holding that inconsistencies between pre-trial and in-trial testimony do not, standing alone, establish perjury or put the prosecution on notice of possible perjury).

## 2. Harper's claim has no merit.

The first problem with Harper's claim is that it is based on an affidavit deemed not credible by the state habeas court. Moreover, the state habeas court did consider credible the affidavit by prosecutor Anna Emmons. SHCR 1036–40. In this affidavit, Emmons stated that Louis Jackson sent a letter to

her after Harper's trial in which he said that he was afraid for his safety because a relative of Harper's was housed in the same prison unit as him. *Id.* Jackson asked how he could be moved from the unit, so prosecutor Emmons contacted a prison official and gave him the information in Jackson's letter. *Id.* Jackson's attempt to distance himself from his identification of Harper via his affidavit is suspect based on Jackson's expressed fear of retaliation from Harper's relative. And it is settled in this Circuit that recanting affidavits and witnesses are viewed with extreme suspicion. *Spence v. Johnson*, 80 F.3d 989, 1003 (5th Cir. 1996).

Second, Harper's claims are refuted by the prosecutors' affidavits because Louis Jackson's affidavit contains false statements about the prosecutors' interview with him. When prosecutors Denise Bradley and Anna Emmons and investigator David Worley visited Jackson at TDCJ prior to Harper's trial, Worley read admonishments to Jackson concerning the viewing of a photo spread, including admonishments that Jackson was not obligated to identify anyone, that he was not to identify anyone unless he was certain, and that he was to take his time to look at each photo. SHCR 1037. Jackson immediately identified Harper after he was shown the photo spread. *Id.* Prior to being shown the photo spread, the prosecutors did not tell Jackson about the

CODIS hit linking Harper's DNA to Teasa Jackson's body. *Id* at 1038. Instead, the prosecutors identified themselves, told Jackson that they were investigating the murder of his mother, and asked him if he remembered that night. *Id.* at 1037–38. Jackson gave the same reply that he gave at trial—he remembered it like it was yesterday. *Id.* at 1037. When asked what he remembered, Jackson remembered a man sitting on the porch with his mother, his mother making him go to bed, being awakened by his sister crying, and his discovery of his mother's body. *Id.* When asked if he remembered what the man on the porch looked like, Jackson stated that he did. *Id.* At that time, Jackson was shown the photo array. *Id.*

Investigator Worley only talked with Jackson about the identification procedure, not the facts of the offense. *Id.* Contrary to Harper's claims, the prosecutors did not read portions of the offense report concerning Teasa Jackson's murder to Louis Jackson. *Id.* at 1038. They did not tell Jackson that Harper killed his mother or that Harper was the man on the porch with his mother, that they had someone locked up and wanted to see if Jackson could recognize him, or that Jackson needed to testify that Harper was the man on the porch. *Id.* Instead, prosecutors told Jackson what Harper was charged with, that Jackson's mother's case would only be used in punishment at

Harper's trial, and that they wanted him to testify truthfully about what he remembered about the night of the murder and about the identification he made. *Id.* Jackson's trial testimony was consistent with what he told prosecutors and was consistent with the identification that he made. *Id.* In fact, at trial, Jackson did not equivocate when he said he recognized the man with his mother: "[I] recognized him from being in the apartment areas and coming over to the house. He wasn't a stranger either." 20 RR 26. These were the findings by the state habeas court, as shown above. They are entitled to a presumption of correctness, and Louis Jackson's recanting affidavit is inadequate to rebut this presumption. 28 U.S.C. § 2254(e)(1).

Third, at best, Harper points to inconsistencies in the testimony that were brought out at trial. For instance, Harper's counsel forced Jackson to concede that he originally told investigators in 1989 that he saw four men in the apartment, whereas he testified on direct examination that he saw three. 20 RR 31–32, 51, 56. Further, Jackson conceded that he did not tell police in 1989 he saw a man on the porch with his mother; rather, he first provided that information before trial. 20 RR 54–56. As this Court has observed, testimony that is mistaken or flawed in certain respects is insufficient to demonstrate a due process violation. Instead, such testimony "merely establishes a credibility

question for the finder of fact." *Napper v. Thaler*, 2012 WL 1965679, at \*40 (S.D. Tex. 2012) (citing *Kutzner* & *Koch*).  Because these discrepancies were before the jury, there was no due process violation.

Fourth, Harper cannot demonstrate that Jackson's testimony was material.  Jackson may have testified that he recognized Harper as the person he last saw with his mother.  But as stated above, that simply means that he saw Harper—a resident at the apartment complex and prior visitor—with his mother, who frequently socialized with others on the porch.  When the murder occurred, Jackson was asleep, and he was only awoken by his baby sister crying.  He did not witness the offense.  And the police already knew long before Harper's trial that Harper had been in Teasa's apartment because his fingerprint was found in the bathroom.  If finding Harper's fingerprint in the bathroom—the very bathroom where Teasa was found dead—was insufficient to warrant a further investigation of him, Jackson's testimony about seeing Harper with his mother would likewise have been inadequate.  Rather, the State narrowed in on Harper after his DNA was found in Teasa's body.  As the state habeas court found, Jackson's testimony was not needed to prove Harper's involvement in the murder given the DNA evidence, the fingerprint, and the fact that he lied about having sex with Teasa.

Moreover, as discussed previously, the Teasa Jackson murder was hardly the only evidence of Harper's future dangerousness. Harper has a lengthy criminal history consisting of multiple robberies and assaults. And the facts of the offense for which he was convicted are particularly brutal. Even if the State had failed to prove he murdered Teasa Jackson, there was still a reasonable probability that the jury's answers to the special issues would have resulted in a death sentence.

Finally, Harper has failed to demonstrate that the State *knowingly* presented false testimony. His claim is premised on Jackson's discredited affidavit, but also distortions of the record. For instance, he states that prosecutor Emmons said she told Jackson about the CODIS hit but, at trial, Jackson denied being given this information. Harper takes the particular exchange in question out of context. On cross-examination, Harper's counsel suggested to Jackson that the prosecution immediately started sharing information about the Triska Rose case with Jackson when they interviewed him before trial. Jackson responded, "No, sir." 20 RR 52. Jackson then said, "You want me to tell you what they told me?" Defense counsel responded, "No." Then Jackson asked defense counsel to "[r]ephrase your question." Defense counsel then asked Jackson if the prosecutors talked to him about the Rose

case.  Jackson indicated that they gave him brief information about the case.

20 RR 52–53.  Then the following exchange occurred:

> Q:    Okay.  So, they started sharing information with you; and they started doing this long before they show you a photo spread, correct?

> A:    Correct.

> Q:    Okay.  And, so, once they've shared certain information with you, they're talking about DNA and they're talking about similarities and they're giving you this and giving you that and then they show you this photo spread and ask you if you recognize that person as being someone with your mother that night, didn't they?

> A:    No, sir.

> Q:    Okay.  Well, would it be fair to say now, after having reviewed this, that the story about Mr. Harper being on the porch with your mother on March the 31st, 1989, the first time that you've told anyone in law enforcement - - including the D.A.'s Office, about there being a porch incident, was when they came to talk to you - - "they" being the D.A.'s Office, came to talk to you just a few months ago?

> A:    Yes, sir.

20 RR 53–54.  Jackson did not deny being told about the CODIS hit.  Rather,

he denied that the prosecutors gave him an excess of information before

showing him the photospread.  Clearly, defense counsel's tactic was to paint

the prosecutors in a bad light by insinuating that they "suggested" the answers

to Jackson beforehand.  To the extent Jackson's answers were conflicting, it is

only because defense counsel was asking loaded questions in narrative form in an attempt to elicit inconsistencies and discredit Jackson and the prosecution. But, again, conflicting testimony does not prove a due process violation. Further, Harper has presented nothing to show that the prosecution knowingly presented false testimony. At best, his claim is premised on supposition, not actual evidence. At the very least, the state court's denial of this allegation is not objectively unreasonable. Therefore, habeas relief must be denied.

## III. Harper's Claim that Trial Counsel Was Ineffective for Failing to Adequately Prepare Dr. Dudley Is Meritless.

Harper alleges that trial counsel was ineffective in preparing and conducting Dr. Richard Dudley's testimony. He states:

> Because trial counsel was not properly prepared for the punishment phase testimony of mental health expert Dr. Richard Dudley, counsel failed to elicit vital information concerning: (1) how mental health professionals arrive at psychiatric diagnoses; and (2) Harper's specific diagnosis, which would have combatted the State's contention at punishment that Harper was malingering. Due also to trial counsel's lack of preparation, jurors were never presented with a coherent explanation of how Harper's mental illness affected his ability to function, thus reducing his moral culpability.

DE 17 at 74–75. And aside from the above, Harper alleges that trial counsel failed to effectively elicit testimony from Dr. Dudley about (1) his diagnostic process; (2) Harper's family history of mental illness; (3) Harper's prior

treatment for mental illness; (4) the interaction between substance abuse and mental illness; (5) Harper's current treatment; and (6) why Harper's mental illness mattered in terms of future dangerousness and mitigation. *Id.* at 81–90. Harper's allegation is also premised on an affidavit Dr. Dudley supplied on state habeas review. SHCR 752–69. Harper claims that counsel's failures resulted in prejudice. For the following reasons, Harper's allegation must be denied.

## A.    State court findings

The state court issued thorough findings of fact and conclusions of law rejecting each of these contentions:

> During the punishment phase of [Harper's] trial, defense expert Dr. Richard Dudley, psychiatrist, testified that any opinion rendered during his testimony would be given with a reasonable medical certainty; that a forensic psychiatric evaluation entailed examining the particular individual and gathering a family history, including any family history of mental illness; and that [Dr.] Dudley, while gathering a family history, makes a clinical assessment of various mental functions, such as memory, mood, and organized thinking [21 RR 10–12].

> [Dr.] Dudley testified that, as opposed to a regular clinical evaluation, a primary concern in a forensic evaluation is whether the person is malingering; that steps must be taken to determine whether the person is pretending to be ill; that these were the generally accepted scientific principles for conducting a forensic psychiatric evaluation; that the DSM-IV (Diagnostic and Statistical Manual of Mental Disorders-IV) sets out the diagnostic criteria for each of the mental disorders, so that the DSM is

another tool in a forensic psychiatric evaluation; and, that experience and education are important to understand the symptoms in the DSM and to be able to assess whether a person has those symptoms [21 RR 13–16].

[Dr.] Dudley testified that he became involved in [Harper's] case in the fall of 2009 when defense counsel asked that he perform a psychiatric evaluation of [Harper], focusing on whether [Harper] suffered from any psychiatric difficulties that could be presented to the jury to aid in its decision-making, and that [Dr.] Dudley reviewed the following items supplied by the defense: [Harper's] prison records, [Harper's] mental health evaluations, treatment, and diagnostic evaluations, made by the jail system; MHMR reports; a summary of what various people who knew [Harper] at different times might say if called to testify; over twenty-six documents; [Harper's] videotaped statement; and the report of State's expert [Dr.] Mark Moeller [21 RR 17–22, 25].

[Dr.] Dudley testified that he spent two days with [Harper] in October, 2009, performing the type of psychiatric examination he explained earlier to the jury; that, in [Dr.] Dudley's opinion, [Harper] was suffering from major psychiatric problems; that [Dr.] Dudley thought that he needed to continue to explore [Harper's] complex history and the course of his symptoms; that people may exhibit symptoms in a different order and for different periods and lengths of time with different psychiatric disorders; that [Dr.] Dudley gave the defense a preliminary report in October, 2009, and re-interviewed [Harper] in September, 2010; that [Harper] was compliant and cooperative with the evaluation process; that [Dr.] Dudley found him credible; and, that none of the documents [Dr.] Dudley reviewed indicated that [Harper] was malingering [21 RR 22–25].

[Dr.] Dudley testified that he also reviewed what was actually said during [Harper's] videotaped statement and [Harper's] affect and description of what he was thinking at the time; that the MHMR report noted that [Harper] suffered from a major depressive disorder with psychotic features, meaning that the depression is so

profound that the person becomes psychotic as well as being depressed[—]the person may hear voices or be delusional; that the person could have some period of recovery and then another major depressive episode because a major depressive disorder with psychotic features is episodic; and, that a severe major depressive episode would be so severe that the person would also have psychotic symptoms associated with it although it is possible to have a major depressive disorder without psychotic features [21 RR 25–28].

[Dr.] Dudley testified that Axis V in the DSM is a general assessment of the person's capacity to function with a scale of 1 to a hundred; and, that [Harper's] October 26, 2008 MHMR assessments show a general assessment functioning score (G.A.F.) of 35, indicating profound dysfunction and impairment as a result of mental illness [21 RR 31–33].

[Dr.] Dudley testified that he reviewed the February, 2010 report of the State's expert, Dr. Mark Moeller, who diagnosed [Harper] with schizophrenia paranoid type in partial remission, as well as cocaine dependence and alcohol abuse in remission; that [Dr.] Dudley agreed that schizophrenia was present and agreed with the history of substance abuse and dependence; that schizophrenia, as with mood disorders, is episodic; that partial remission means either a person has not fully recovered from an episode or it means that the person is on medication during the course of an episode and the medication is not getting rid of all the symptoms; and that [Harper] was still manifesting psychotic behavior over a year after the offense [21 RR 34–37].

[Dr.] Dudley testified that both [Dr.] Moeller's diagnosis of schizophrenia paranoid type and the MHMR diagnosis with psychotic features indicate that [Harper] is psychotic with the difference in the two diagnoses being whether psychosis or mood disorder is the primary symptom, and that, regardless, both are profound mental illnesses and both are indicative of psychosis [21 RR 37–38].

[Dr.] Dudley testified that [Harper] suffers from schizoaffective disorder, a disorder where the individual simultaneously has the symptoms required for a diagnosis of schizophrenia and those required for a diagnosis of major mood disorder; that schizophrenia is a disorder characterized by psychosis that could be hallucinations and/or delusions; that an example of a schizophrenia paranoid type would be someone having hallucinations and/or delusions so that the person would fear that he was going to be harmed; that it is episodic in nature so there would be periods of time where a person functioned but then longer periods of time where the full symptoms of hallucinations and delusions would be present; and, that findings are influenced by what the expert sees at the time and the information available to him [21 RR 39, 44–46, 51].

[Dr.] Dudley testified that, after the offense, [Harper] indicated in a mental health questionnaire that he sometimes has auditory hallucinations; that he told [Dr.] Dudley he had been having auditory hallucinations since his late teens, the time period when there is usually an initial episode of schizophrenia; that [Harper] reported hearing two sets of voices, each with a male and a female voice, that would debate the decisions he had to make and his perceptions of his surroundings; that the voices varied in intensity at different time periods; that [Harper] did not perceive the voices as a problem but as friends who helped; and, that was not surprising because schizophrenia causes the person to believe the hallucinations and delusions to be true, not indicative of a psychiatric problem [21 RR 49–57].

[Dr.] Dudley acknowledged that there had been at least three psychiatric evaluations of [Harper] and each found, in part, a major mood disorder with psychotic features, and that [Harper] has been heavily medicated over the past ten years with antipsychotic and other medications such as Lexapro, Trazadone, Depakote, lithium and BuSpar and, from October 13, 2009, Prozac, Geodon, Klonopin, and Topamax [21 RR 58–66].

[Dr.] Dudley testified that the antipsychotic and antidepressant medications were consistent with the diagnosis of major depressive disorder with psychotic features; that changing medications and dosages continued throughout [Harper's] trial; that [Harper] was usually taking a couple of medications at the same time and usually taking substantial doses of each medication; and, that [Dr.] Dudley ranked [Harper] as an eight or nine on a scale of one to ten for an individual with the most medication or combination of medications that [Dr.] Dudley has seen during his thirty years of experience [21 RR 66–67].

[Dr.] Dudley acknowledged that counsel would be asleep and not sitting up in the courtroom if the same medications given to [Harper] were given to trial counsel; that the amount of medication given to [Harper] would affect other people differently; and, that [Dr.] Dudley found no evidence that [Harper] refused to take his medications or sold them to others in the jail[—]issues to look at for malingering [21 RR 161, 193–94].

[Dr.] Dudley testified that [Harper's] October 26, 2008 intake for MHMR, done within a day or two of the offense, states that [Harper] reported he heard voices, previously saw a psychiatrist, had been diagnosed as paranoid schizophrenic, and had mood swings and panic attacks; that [Harper] also reported that he had been suicidal all his life after he was sexually assaulted by a friend or cousin when he was six years old; that [Harper] reported cutting himself in the past; and, that [Harper] stated that he tried to kill himself after he killed his girlfriend and her two children but was unable to do so [21 RR 72–73].

[Dr.] Dudley testified that [Harper] reported hearing voices who tell him that everyone is against him; that [Harper] described himself as paranoid; and, that the intake form noted the following as factors to review for evaluation: dysthymic disorder, major depression disorder with psychotic features, panic disorder, polysubstance dependence, and PTSD [21 RR 73, 76].

[Dr.] Dudley testified that [Harper] would function well in prison; that there was nothing in his forensic evaluation to indicate he hated women; that his IQ is somewhere in the area between 87 and 96; that he did not go to college or graduate from high school; and, that a request was made for [Harper's] prison records from 1992 to 1998 but the records had been destroyed by prison policy [21 RR 43–47, 58, 79–80].

[Dr.] Dudley testified that his opinion, based on reasonable medical probability, was that [Harper] was mentally ill at the time of the offense and during the period from September to October, 2008; that [Harper] was suffering from a disorder characterized by psychotic thinking and was deteriorating; and, that he truly believed that Triska Rose was having an affair and tried to poison him [21 RR 82–83].

During redirect examination, [Dr.] Dudley reiterated that his evaluation consisted of his 2009 and 2010 examination of [Harper] and the previously named records and documents; that [Dr.] Dudley also read the offense report containing summaries of interviews with people who knew [Harper] at different times in his life or who saw [Harper] immediately after the offense; that [Dr.] Dudley used those observations in reaching his conclusions; that it was important to review sources other than [Harper] because of [the] issue of malingering; that he found those sources in [Harper's] case; and, that he would not be surprised if [Harper] asserted that he was not mentally ill because schizophrenics lack insight into the fact that they have a mental illness [21 RR 146–52].

[Dr.] Dudley explained the difference between a psychiatric evaluation, such as he conducted on [Harper], and a screening for factual information to determine whether the person is someone about whom to be concerned; [Dr.] Dudley eliminated traumatic brain injury in his evaluation of [Harper]; [Dr.] Dudley disagreed with the State's expert's opinion that [Harper] had an antisocial personality disorder; and, [Dr.] Dudley believed [Harper] was clearly remorseful for his actions[—]something that would not be

expected from a person with antisocial personality disorder [21 RR 154–57, 192].

[Dr.] Dudley testified that [Harper's] discovery of his grandfather's body after he died from a stroke when [Harper] was twelve or thirteen years old was a traumatic event, particularly considering [Harper's] relationship with his grandfather, and that the incident where a woman had to get stitches from being hit with a wrench was in response to an unwanted sexual advance [21 RR 158–59].

The Court finds that [Dr.] Dudley testified that [Harper] would function well in prison[—]an opinion directly related to the future dangerousness special issue[—]and [Dr.] Dudley testified about events the jury could consider as mitigating, such as [Harper's] mental illness, his belief that Triska Rose was cheating on him and his life was in danger, his remorse, his trauma from discovering his grandfather's body, [Harper] being sexually assaulted at a young age, and his reaction after an unwanted sexual advance.

The Court, based on [Dr.] Dudley's trial testimony, finds erroneous [Dr.] Dudley's following postconviction assertions as to what trial counsel allegedly failed to do:

| [DR.] DUDLEY'S ERRONEOUS HABEAS ASSERTION | TRIAL EVIDENCE CONTRADICTING [DR.] DUDLEY'S ERRONEOUS HABEAS ASSERTION |
| --- | --- |
| [Dr.] Dudley warned trial counsel that [the] issue of malingering needed to be addressed on direct. [SHCR 759–60]. | Counsel elicited testimony on direct of [the] importance of ruling out malingering and that [Harper] was not malingering [21 RR 13–14, 24]. |
| Jurors were not informed that [an] expert does not just say "okay" and diagnose [a] person with mental illness if | Counsel elicited testimony how it was important to review sources other than |

88

| | |
|---|---|
| he says he hears voices. [SHCR 761]. | [Harper] for [the] issue of malingering [21 RR 150–51]. |
| Jurors would have learned that [Harper's] prison work assignment was limited in 1992 because of psychiatric issues if trial counsel had uncovered [Harper's] TDCJ travel card. [SHCR 764]. | [Dr.] Dudley testified that [Harper's] prison records contain a March, 1992 notation that [Harper] not be given some type of promotion in prison due to psychological instability [21 RR 18]. During punishment argument, counsel referred to evidence that [Harper] was refused a promotion in prison because of his mental health [24 RR 31]. |
| Trial counsel was unable to elicit information that the amount and type of medication [Harper] was taking would render [a] healthy person virtually unconscious. [SHCR 766–67]. | Counsel elicited testimony that if [the] same medications were given to trial counsel, counsel would be asleep and not sitting up in [the] courtroom [21 RR 194]. [Dr.] Dudley also testified that the medications would have a strong effect probably sedative on persons not mentally ill [21 RR 188]. |
| Jurors did not hear evidence that it was unlikely that [Harper] would be a future danger in prison if properly treated. [SHCR 768]. | [Dr.] Dudley testified that [Harper] would function well in prison [21 RR 43–44]. Trial counsel also presented punishment testimony of Susan Perryman-Evans that [Harper] was not an escape risk and would not be violent in prison [20 RR 252, 258]. |
| Lay witnesses' testimony about familial mental illness | [Dr.] Dudley testified that a family history was important |

| | |
|---|---|
| would have negated [the] State's theory that [Harper] was malingering. [SHCR 764]. | "because there's many mental illnesses that are genetic and run in families" [21 RR 11–12]. Trial counsel presented testimony from [Harper's] aunt, father, and former neighbor about [Harper's] family history, including his mother's suicide [21 RR 229–54; 22 RR 148–90, 211–38]. |
| It was not made clear to jurors that screening reports were not the equivalent of mental health evaluations. [SHCR 763]. | [Dr.] Dudley testified as to the difference between [a] psychiatric evaluation and a screening report [21 RR 154]. |

The Court finds unpersuasive [Dr.] Dudley's hindsight assertion of how he thinks his testimony should have been presented or how he would have preferred it to have been presented.

The Court finds that trial counsel are not ineffective for the manner in which they prepared and presented [Dr.] Dudley's extensive, thorough testimony; the Court finds that trial counsel effectively presented testimony concerning how mental health professionals arrive at psychiatric diagnoses, [Harper's] specific diagnosis and how [Dr.] Dudley reached the diagnosis, [Harper's] family history of mental illness, [Harper's] prior treatment for mental illness, [Harper's] drug and alcohol history, [Harper's] substance abuse, and why [Harper's] mental illness mattered in terms of the special issues.

**********

Trial counsel are not ineffective for the manner in which they prepared and presented Dr. Richard Dudley's thorough [and] extensive testimony concerning how mental health professionals arrive at psychiatric diagnoses, [Harper's] specific mental health

diagnosis, how [Dr.] Dudley reached the diagnosis, [Harper's] family history of mental illness, [Harper's] prior treatment for mental illness, [Harper's] drug and alcohol history, the interaction between mental illness and substance abuse, and the relationship of [Harper's] mental illness to the special issues. *See and cf. Tucker v. Johnson*, 242 F.3d 617, 622–24 (5th Cir. 2001) (rejecting claim of ineffective assistance of counsel where defendant argued that counsel should have presented additional evidence of abuse; recognizing that defendant essentially arguing that counsel should have presented stronger mitigating case; distinguishing [(*Terry*) *Williams* []], 529 U.S. [at] 369–72 []); *Roberts v. Dretke*, 381 F.3d 491, 498 (5th Cir. 2004) (stating trial counsel must investigate defendant's mental health history if he has reason to believe defendant suffers from mental health issues).

SHCR 1266–73, 1310. This decision is not objectively unreasonable.

## B.    Trial counsel was not deficient.

The flaw with Harper's claim is that he is complaining not that his expert, Dr. Dudley, failed to provide mitigating evidence, but rather failed to provide it to the extent he now desires. Dr. Dudley's testimony consists of nearly 200 pages of the reporter's record. *See* 21 RR 7–195. As shown above, Dr. Dudley reviewed extensive background evidence on Harper and conducted a two-day psychiatric examination. He testified that Harper suffers from a major depressive disorder resulting in profound mental dysfunction; he exhibited psychotic behavior related to schizophrenia; this type of schizophrenia—paranoid type—results in gradual deterioration over time without treatment; Harper suffers from auditory hallucinations he believes to

be real; Harper has taken a host of medications over the years, many of which would render unconscious a "normal" person; Harper was suicidal after he was sexually assaulted; Harper suffers from panic disorder, mood disorders, substance abuse, and PTSD; and Harper experienced a psychotic episode when he murdered Triska Rose and her daughters because he truly believed Triska was having an affair that put his life in danger. Nonetheless, Dr. Dudley testified that Harper would function well in prison, was remorseful, and did not appear to be malingering.

Thus, contrary to Harper's assertions, a review of Dr. Dudley's extensive direct, redirect, and re-redirect testimony shows that trial counsel elicited testimony concerning how mental health professionals arrive at psychiatric diagnoses; how Dr. Dudley arrived at his diagnosis for Harper; Harper's specific diagnosis; his history of mental illness; his drug and alcohol history; Harper's treatment for mental illness; and malingering or lack thereof. Consequently, Harper is complaining that counsel failed to elicit more than this. But "[i]n order to prevail on a claim that trial counsel was ineffective for failing to conduct a sufficient mitigation investigation and presentation, a habeas petition must do more than complain

that the presentation at trial could have been better." *Ochoa v. Davis*, 2016

WL 5122107, at *11 (N.D. Tex. 2016) (citing *Strickland*).

Harper's claim is clearly rooted in the disfavored practice of hindsight.

The Supreme Court has admonished:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland*, 466 U.S. at 689. "*Strickland* does not guarantee perfect

representation, only a reasonably competent attorney." *Richter,* 562 U.S. at

110 (citation and internal quotation marks omitted). With that in mind, a

claim challenging "the effectiveness of [an] expert witness, and [a petitioner's]

attorneys for being lax in their oversight of [the experts] efforts" is unavailing.

*Woodard v. Thaler*, 702 F.Supp.2d 738, 775 (S.D. Tex. 2010). As stated

previously, a court "'must be particularly wary of 'argument[s] [that]

essentially come[ ] down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing.'" *Id.* (quoting *Dowthitt v. Johnson,* 230 F.3d 733, 743 (5th Cir. 2000) (quoting *Kitchens v. Johnson,* 190 F.3d 698, 703 (5th Cir. 1999)); *see also Pape v. Thaler*, 645 F.3d 281, 291 (5th Cir. 2011) (in hindsight, counsel's strategy may not be second-guessed "merely because an alternative course of action existed during trial"); *Coble v. Quarterman*, 496 F.3d 430, 441–42 (5th Cir. 2007) ("At most, Coble is challenging the strategy employed by trial counsel, arguing that witnesses should have been better prepared and that more witnesses should have been proffered. Coble's challenge is measurably distinct from the failure to investigate social history in *Wiggins*."). Nor was trial counsel deficient for "not canvassing the field to find a more favorable defense expert." *Dowthitt*, 230 F.3d at 748.

In short, it is one thing to claim that trial counsel failed to investigate and present mitigating evidence altogether. It is quite another to argue that the evidence presented should have been better. The latter is not sufficient grounds for finding trial counsel ineffective. At the very least, the state court's decision cannot be considered unreasonable.

## C. Harper cannot demonstrate prejudice.

Even if Harper could demonstrate deficient performance, he cannot prove prejudice. Eliciting more testimony from Dr. Dudley would have added little considering that he provided substantial testimony in the first place. And to the extent that Dr. Dudley could have added anything significant, this does not necessarily mean it would have been beneficial. The Fifth Circuit has long held that evidence of severe mental illness and accompanying problems such as substance abuse are double-edged, in that they can harm as much as help a case that the defendant would not be a future danger. *United States v. Fields*, 761 F.3d 443, 459 (5th Cir. 2014) (noting that evidence of mental illness "can lead a jury to conclude that a defendant poses a future risk of violence"); *Druery v. Thaler*, 647 F.3d 535, 541–42 (5th Cir. 2011) (noting that "expert testimony suggesting that [petitioner's] condition was permanent would have eviscerated counsel's defensive theory"); *Martinez v. Dretke*, 404 F.3d 878, 890 (5th Cir. 2005) ("The introduction of evidence that Martinez suffered from organic (i.e., permanent) brain damage, which is associated with poor impulse control and a violent propensity, would have substantiated the [S]tate's evidence and increased the likelihood of a future dangerousness finding."); *Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002) ("[E]ven if [petitioner's] recent

95

claims about [his alleged brain injury, abusive childhood, and drug and alcohol problems] is true, it could all be read by the jury to support, rather than detract, from his future dangerousness.").

More importantly, Harper cannot demonstrate prejudice given his criminal history and the facts of the offense. The State demonstrated that Harper was responsible for four brutal murders, including the killing of Teasa Jackson. Harper also has a substantial history of assaults and robberies. The evidence of his future dangerousness was overwhelming. And considering that Harper also had a long history of taking numerous psychiatric medications while committing these crimes, it is arguable that psychiatric or psychological assistance was of little benefit. Because he cannot show prejudice, habeas relief should be denied.

## IV. Harper's Claim that Trial Counsel Was Ineffective for Failing to Present Corroborating Testimony from Lay Witnesses Lacks Merit.

Next, Harper alleges that trial counsel was ineffective for failing to present testimony from seven lay witnesses who could have corroborated Dr. Dudley's testimony that Harper suffers from mental illness. DE 17 at 91–103. This claim fails because trial counsel is not ineffective for failing to present cumulative evidence.

## A. State court findings

The Court finds that [Harper] presents the postconviction affidavits of Jennifer Flores, [Harper's] instructor at barber college; Jesse Garza, [Harper's] manager at Raising Canes; Monique Young, [Harper's] wife; and Sandra McClennon, [Harper's] aunt, asserting in toto that [Harper] came to the barber college on October 23, 2008, looking disheveled; that [Harper] thought Triska Rose was cheating on him and tried to poison him; that [Harper's] mother was crazy; and that [Harper] said strange things after he got out of prison in 2008, such as "he needed to remind God of something or other."

The Court finds that neither Flores, Garza, McClennon, nor Young assert in their affidavits that they thought [Harper] was mentally ill.

The Court finds that the same evidence was presented at trial that [Harper] is now contending should have been presented through the presentation of Flores, Garza, Young, and McClennon; that [Harper] was upset the day of the offense [22 RR 85–108]; that [Harper] thought Rose was cheating on him and tried to poison him [16 RR 105; 21 RR 83]; that [Harper's] mother had mental problems [22 RR 155, 219]; and that [Harper] was religious [21 RR 208–10, 247; 22 RR 185].

The Court finds that Triska Rose's statements to Shevanghna Lockley that [Harper] was talking crazy and mentioned pink elephants would constitute inadmissible hearsay if Lockley had attempted to testify about them at trial.

The Court finds that "talking crazy" could be reasonably interpreted as Rose's opinion of [Harper] thinking she was cheating on him and does not establish mental illness, and that [Harper] mentioning "pink elephants" could be construed as more representative of malingering than actual mental illness

The Court finds that the hearsay affidavits of Ariane Eigler, investigator for the Office of Capital Writs, concerning conversations she allegedly had with Jeff Harrison and Helen Sanroman [Vanwright] are non-dispositive to any habeas allegations and not substantive evidence of anything, pursuant to *Hogue v. Johnson*, 131 F.3d 466, 505 (5th Cir. 1997).

The Court finds according to the State's December, 2009 notice to trial counsel, Jeff Harrison stated that [Harper] came to his home the day of the offense and made statements that there were bars on Harrison's windows; that his dog was a drug dog; that his phone was connected to the police; and, that he had a camera in his air conditioning vent.

The Court finds, according to the offense report available to trial counsel, Harrison told police on October 26, 2008[,] that [Harper], whom he had met only once before, came to his apartment around noon or 12:30 p.m. on October 23, 2008; that [Harper] wanted Harrison to give him a ride so Harrison left [Harper] alone in his apartment about thirty-five minutes while Harrison got his car; that [Harper] did not appear depressed, distraught, intoxicated or under the influence of drugs; and, that [Harper] kept washing his hands in the kitchen sink. [SHCR 1047].

The Court finds, according to the offense report that was available to counsel, Helen Sanroman told police during a phone conversation that [Harper] came by her apartment around 3:00 p.m. and appeared to be a little depressed, but she had known him to be depressed for some time; that [Harper] said he thought his girlfriend was cheating on him; that Sanroman thought [Harper] was acting a little strange and looking around nervously; that he kept looking out her window and telling her that she was calling the police on him; and, that police went to Sanroman's apartment on October 27, 2008[,] where she gave them a bloody shirt she had found in her laundry after [Harper] had asked to borrow a t-shirt while he was at her apartment. [SHCR 1048–49].

During [Harper's] trial, defense expert [Dr.] Richard Dudley referred to [Harper] thinking that Harrison was an informant against him and also testified that he used Sanroman's observations about seeing [Harper] after the offense in reaching his conclusions [21 RR 152–53].

The Court finds that neither Jeff Harrison nor Helen Sanroman's statements, if they had been presented as witnesses at trial, would have corroborated [Dr.] Dudley's diagnosis of mental illness; the Court finds that their statements would have shown that [Harper] was naturally nervous and afraid of police arrival and activity hours after killing Triska Rose and her two children.

The Court finds that Harrison's statement to police, contained in the offense report, that [Harper] did not appear distraught or depressed hours after the offense could be used to impeach any testimony elicited from Harrison in an attempt to show that [Harper] was mentally ill.

The Court finds that trial counsel are not ineffective for not presenting Jennifer Flores, Jesse Garza, Monique Young, Jeff Harrison, Helen Sanroman, and Sandra McClennon[—]albeit McClennon testified as a defense punishment witness[—]as lay witnesses to corroborate [Dr.] Dudley's diagnosis; such witnesses would have presented essentially the same testimony as elicited from other witnesses and would not have corroborated [Dr.] Dudley's diagnosis of [Harper] as mentally ill.

**********

[Harper] fails to show that trial counsel are ineffective for not presenting as witnesses Jennifer Flores, Jesse Garza, Monique Young, Jeff Harrison, Helen Sanroman, and Sandra McClennon[–ch—]albeit McClennon testified as a defense punishment witness[—] to corroborate [Dr.] Dudley's testimony; such witnesses would have presented essentially the same testimony as elicited from other witnesses and/or would not have corroborated [Dr.] Dudley's diagnosis of [Harper] as mentally ill, and/or would have

constituted inadmissible hearsay, and/or would have emphasized to the jury [Harper's] natural anxiety and fear of being caught after killing three people. *See and cf. Harris v. Cockrell*, 313 F.3d 238 (5th Cir. 2002) [] (holding counsel not ineffective for allegedly failing to investigate and present mitigation evidence in light of weakness of evidence defendant argues should have been presented); *Wilkerson v. State*, 726 S.W.2[d] 542, 551 (Tex. Crim. App. 1986) (holding that absent a showing that witnesses were available or that their testimony would have benefited the defendant, claim of ineffective assistance of counsel cannot be sustained); *see also Hogue* [], 131 F.3d [at] 505 (holding affidavit of defense investigator concerning conversation he allegedly had with juror is hearsay and not substantive evidence of anything).

SHCR 1273–76, 1310–11. This decision is not objectively unreasonable.

## B.    Trial counsel was not ineffective.

The major flaw with Harper's claim is captured by the following

assertion:

> *Given that Dr. Dudley relied on the information provided by these people to reach the conclusion that Harper was, in fact, mentally ill, it stands to reason that testimony from these same individuals would have assisted the jurors in reaching that same conclusion.* However, trial counsel did not call any of the people who saw Harper immediately after the crime or witnessed his deterioration prior to, to testify, even though Dr. Dudley had found the information they provided useful in diagnosing Harper's mental illness. Trial counsel's failure to call any of these witnesses fell below an objective standard of reasonableness and thus constitutes deficient performance.

DE 17 at 92 (emphasis added). Even if these witnesses could have provided

the exact testimony that Harper claims should have been offered, Dr. Dudley

testified unequivocally that Harper suffers from severe mental illness. Because only a trained and qualified expert could render this diagnosis, lay witness testimony was unnecessary corroborate it. In other words, only Dr. Dudley could provide the corroboration, which he did. And as the state court findings demonstrate, Dr. Dudley utilized some of this information when he testified—for instance, that Harper thought he had been poisoned—and some of this factual evidence was elicited from other witnesses.

It is well-settled that trial counsel is not ineffective for failing to present cumulative evidence. *Wong*, 558 U.S. at 22 (defendant not prejudiced by counsel's failure to present mitigating evidence where "[s]ome of the evidence was merely cumulative of the humanizing evidence [counsel] actually presented; adding it to what was already there would have made little difference"); *Trottie*, 720 F.3d at 246 (rejecting ineffectiveness claim where witnesses petitioner claims should have been called could have only provided cumulative evidence); *Carty*, 583 F.3d at 264 ("We agree with the district court that Carty has not shown any deficiency related to her proffer of cumulative evidence."); *Skinner v. Quarterman*, 528 F.3d 336, 345 n.11 (5th Cir. 2008) ("No reasonable jurist would debate whether counsel's failure to present the evidence deemed cumulative by the district court was prejudicial."). And that

is precisely what Harper is claiming counsel failed to present. Thus, his claim fails for this reason alone.

Moreover, "[t]o prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (citing *Alexander v. McCotter,* 775 F.2d 595, 602 (5th Cir. 1985)). Although Harper names the witnesses and sets out the supposed content of their testimony, he cannot show that the testimony would have been favorable given that, at best, it would have only "corroborated" evidence already provided.

Further, the state court correctly found that the affidavits from Ariane Eigler regarding her conversations with Jeff Harrison and Helen Sanroman are inadmissible. SHCR 873–77. These statements are hearsay, unreliable to support a meritorious claim, and cannot be considered. *Goodwin v. Johnson*, 132 F.3d 162, 186 (5th Cir. 1997) (where petitioner submitted affidavit from his ex-wife claiming a State's witness told her his testimony was in exchange for a deal with the prosecution, the statement was hearsay and incompetent to defeat motion for summary judgment); *Hogue*, 131 F.3d at 505 ("[W]e note that

Hackett's affidavit as to what Belew said to Hackett on the telephone approximately a year after the trial is hearsay, and is not substantive evidence of anything.").

Finally, for the reasons Harper cannot demonstrate prejudice regarding the allegation addressed in the section above, he cannot show prejudice here. Specifically, this evidence could have detracted from, rather than benefitted, Harper's case, and the evidence of his future dangerousness was overwhelming. Because the state court's decision is not unreasonable, habeas relief should be denied.

## V.  Harper's Claim that Trial Counsel Was Ineffective for Failing to Call Prison Personnel Is Unavailing.

Harper claims that trial counsel was ineffective because "trial counsel failed to call any of the prison personnel who would have testified as to their highly positive interactions with Harper during his prior incarcerations." DE 17 at 103.  He specifically alleges that counsel should have called J. P. Guyton, a long-time TDCJ employee and current assistant warden who had contact with Harper over the years; Dr. Victor Scarano, who would have testified that Harper's psychotic disorder was drug induced and, since he has been at TDCJ and free from drugs, he has behaved normally; and an unnamed witness— "Witness One"—who was supposedly a former warden who "could have

explained to jurors that if there were any concerns about Harper being dangerous, Harper would not have been allowed to be a [TDCJ] barber." *Id.* at 105–07. For the following reasons, Harper's claim is meritless.

## A. State court findings

The state court entered the following findings and conclusions rejecting Harper's claim:

> During the punishment phase of [Harper's] trial, trial counsel presented the testimony of Susan Perryman-Evans, a social worker and former TDCJ employee, that [Harper's] prison records showed only one major-write-up in seventeen years of incarceration; that the one write-up did not involve a weapon; that [Harper] had no history of segregation, serious violations, or assaults on prison personnel during approximately seventeen years of incarceration; and, that, in Perryman-Evans'[s] opinion, [Harper] was not an escape risk and would not be violent in prison [20 RR 249–52, 257–58].
>
> Trial counsel presented the testimony of Curtis Chillis that [Harper] attended Bible study in prison, always tried to help others, and participated in a program where inmates were allowed to leave the prison on Sunday and preach to the community [21 RR 208–10].
>
> Trial counsel presented the testimony of Don McGinty, [Harper's] mentor at the Carol Vance Unit at TDCJ, that [Harper] was an excellent role model in prison; that he probably impacted thirty to forty inmates; that he would be an asset to other inmates; and that he worked as a barber in prison [22 RR 58–59, 67, 77, 118].
>
> The Court finds that trial counsel essentially presented the same evidence at punishment that [Harper] now alleges should have been presented through the testimony of prison official J.P.

104

Guyton: that [Harper] worked as a barber in prison[—]allowing for the reasonable inference that he was allowed to use clippers[—] and that he was well-behaved in prison.

The Court finds that the hearsay affidavit of the investigator with the Office of Capital Writs concerning an alleged conversation with "Witness One" where "Witness One" supposedly said that [Harper] might have cut his hair and his son's hair at the prison barber shop and a prisoner could not be a security threat to be a barber is non-dispositive to any habeas allegations and not substantive evidence of anything pursuant to *Hogue* [], 131 F.3d [at] 505 [].

The Court finds that trial counsel are not ineffective for not presenting the testimony of prison official J.P. Guyton and an unnamed "Witness One" concerning their positive interactions with [Harper] while he was incarcerated.

**********

Trial counsel are not ineffective for not presenting the testimony of prison personnel, in particular assistant warden J. P. Guyton and someone named "Witness One" in the hearsay affidavit of defense investigator, about their positive interactions with [Harper] while incarcerated, in light of trial counsel presenting the testimony of Susan Perryman-Evans, Curtis Chillis, and Don McGinty concerning the fact that [Harper] had only one major write-up in seventeen years of incarceration; that he would not be an escape risk and not be violent in prison; that he worked as a barber in prison; that he mentored other inmates; and, that he participated in religious programs in prison [20 R.R. 249–52; 21 RR 208–10; 22 RR 58–59, 67, 77, 118]. *See Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002) (noting "[a] vague, inarticulate sense that counsel could have provided a better defense is not a legal basis for finding counsel constitutionally incompetent."); *see also Ex parte Kunkle*, 852 S.W.2d 499, 506 (Tex. Crim. App. 1993) (holding counsel's strategic choices made after thorough investigation of law and facts virtually unchallengeable under Sixth Amendment).

> Trial counsel are not ineffective based on the choice of presentation of evidence, i.e., the witnesses counsel chose to present the same evidence [Harper] now alleges should have been presented by someone whose only averred contact with [Harper] was in the prison barber shop. *See and cf. Harris* [], 313 F.3d [at] 238 [] (holding counsel not ineffective for allegedly failing to investigate and present mitigation evidence in light of weakness of evidence defendant argues should have been presented); *Wilkerson*, 726 S.W.2d at 551 (holding that, absent a showing that witnesses were available or that their testimony would have benefited the defendant, claim of ineffective assistance of counsel cannot be sustained); *see also Hogue*, 131 F.3d at 505 (holding affidavit of defense investigator concerning a conversation he allegedly had with juror is hearsay and not substantive evidence of anything).

SHCR 1276–77, 1311–12. This decision is not objectively unreasonable.

## B. Evidence pertaining to Dr. Victor Scarano is barred under *Pinholster.*

*Pinholster* holds that "review under §2254(d)(1) is *limited to the record that was before the state court* that adjudicated the claim on the merits." 563 U.S. at 181 (emphasis added). Thus, "evidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.* at 185. The Fifth Circuit has recognized this holding and will not review new evidence submitted to the federal court pertaining to claims the state court

adjudicated on the merits. *Trottie*, 720 F.3d at 247; *Lewis v. Thaler*, 701 F.3d 783, 791 (5th Cir. 2012).

Harper refers to the forensic psychiatric evaluation by Dr. Scarano as Exhibit 61. There is no Exhibit 61 in the state court record; the exhibits stop at Exhibit 60. SHCR 884–85. Harper, therefore, is referring to a new exhibit, although it does not appear with the instant docketed petition. Nonetheless, because this report or evaluation is clearly new and not referenced in the state habeas application, *see* SHCR 104–08, it is barred from review under *Pinholster*.

## C.     Regardless, Harper's claim has no merit.

As the state court found, Harper presented testimony about his positive behavior in prison through Susan Perryman-Evans, Curtis Chillis, and Don McGinty. *See* Statement of Facts, *supra.* Perryman-Evans said Harper had no history of segregation, serious violations, or assaults on prison personnel during approximately seventeen years of incarceration. 20 RR 249–50, 257. She also opined that Harper was not an escape risk and would not be violent in prison. 20 RR 252, 258. Curtis Chillis testified that Harper went to Bible study in prison, always tried to help others, and participated in a program where inmates were allowed to leave the prison on Sunday and preach to the

community. 21 RR 208–10. He claimed that men "wept" when Harper was released from prison. 21 RR 212–14. And Don McGinty testified that Harper was an excellent role model in prison and probably impacted thirty to forty inmates. 22 RR 58–59, 67. Harper worked as a barber in prison and went to barber school after his release. 22 RR 77.

Harper's evidence adds nothing to what was provided at trial. J. P. Guyton's supposed testimony about Harper being a barber in prison, that prison barbers must be well-behaved, and that he allowed Harper to cut his hair simply confirms the above testimony. The testimony from "Witness One" is entirely hearsay and cannot be considered, since it is based on what the witness told a defense investigator. *Goodwin*, 132 F.3d at 186. Nonetheless, it simply mirrors Guyton's statement and, thus, the trial testimony. And even if the Court could consider Dr. Scarano's opinion that Harper would not be dangerous in prison if free from drugs, this is not significant. Dr. Dudley reviewed Dr. Moeller's written report and concurred that Harper should be sentenced to life in prison, that he is likely to adapt to prison life and would unlikely be dangerous, and would function well in prison. 21 RR 43–44. This is essentially what Dr. Scarano has said.

As stated above, trial counsel is not deficient for failing to present evidence that merely duplicates that offered at trial. *Trottie*, 720 F.3d at 246; *Carty*, 583 F.3d at 264. And Harper has not shown that "Witness One" was willing and able to testify, or that any of this proposed testimony would have been favorable. *Gregory*, 601 F.3d at 352.

Finally, for the reasons addressed above—namely the facts of the offense and overwhelming evidence of his future dangerousness—Harper cannot demonstrate that the alleged deficiency by trial counsel resulted in prejudice. *See Strickland,* 466 U.S. at 698-99. At the very least, the state court's decision is not objectively unreasonable.

## VI. Harper's Claim that Trial Counsel Was Ineffective for Not Seeking to Exclude Dr. Moeller's Testimony Is Procedurally Barred and Meritless.

Next, Harper alleges that trial counsel was ineffective for failing to exclude Dr. Moeller's testimony as scientifically invalid under *Daubert v. Merrell Dow Pharms., Kumho Tire v. Carmichael,* and *Kelly v. State.* DE 17 at 108–14. Harper complains that trial counsel should have challenged the admissibility of Dr. Moeller's testimony because he changed his opinion about Harper's future dangerousness when he testified. Harper states:

> The sum total of the "scientific" analysis conducted by Doctor Moeller in determining future dangerousness was that one

conversation, and the only part of the conversation, which [D]octor Moeller testified caused him to come to that [] "scientific" conclusion was the prosecutor's statement to him that Petitioner will not be housed in a certain manner while in jail.

*Id.* at 114. As shown in the Statement of Facts, Dr. Moeller did change his opinion based on information about general population and where Harper would be housed, but this was all brought out during a lengthy and contentious cross-examination by the defense. Nonetheless, for the reasons addressed below, the claims must be denied.

Harper never raised this particular ineffectiveness claim on direct appeal or state habeas review.[13] *See* SHCR 3–248; *Harper v. State*, 2012 WL 4833834. Thus, it is unexhausted and, for the reasons addressed above, is procedurally barred from federal habeas review.

Further, Harper cannot demonstrate cause and prejudice pursuant to *Martinez* and *Trevino* because his claim has no merit. First, his allegation is foreclosed by Fifth Circuit precedent. The Fifth Circuit has held "that *Daubert* does not apply to the standards governing the admissibility of expert evidence at a capital sentencing hearing, and has rejected the notion

---

[13] On direct appeal, Harper did claim that the trial court erred in allowing Dr. Moeller to testify because he had been present in the courtroom in violation of the witness sequestration rule. *Harper v. State*, 2012 WL 4833834, at *4–*5. But that is a separate issue.

that trial counsel is deficient for not challenging the continued validity of *Barefoot* [*v. Estelle*, 463 U.S. 880 (1983)]," which held that psychiatric testimony about future dangerousness is admissible. *Williams v. Stephens*, 761 F.3d 561, 571 (5th Cir. 2014) (citing *Fields,* 483 F.3d at 341–46 and *Johnson*, 306 F.3d at 255). Consequently, "[i]n light of these holdings, reasonable jurists could not debate the district court's ruling that that the state courts did not unreasonably apply *Strickland* in concluding that trial counsel were not deficient for failing to object to the testimony from the State's psychiatric and psychological experts." *Id.*; *see also Rivas v. Thaler*, 432 F. App'x 395, 404 (5th Cir. 2011).

Second, a motion to exclude would not have been granted anyway. An expert witness's opinion testimony is admissible when his specialized knowledge will assist the jury in understanding the evidence or determining a fact in issue. Tex. R. Crim. Evid. 702; *Duckett v. State,* 797 S.W.2d 906, 910 (Tex. Crim. App. 1990), *disapproved on other grounds, Cohn v. State,* 849 S.W.2d 817 (Tex. Crim. App. 1993); *Perryman v. State,* 798 S.W.2d 326, 329–30 (Tex. App.–Dallas 1990, no pet.). The expert witness must also be competent and qualified to testify, and the testimony's probative value must outweigh its prejudicial effect. *Wade v. State,* 769 S.W.2d 633, 635 (Tex. App.–

Dallas 1989, no pet.). The Texas Rules of Criminal Evidence favor the admission of relevant expert testimony, just as they favor admissibility of any relevant evidence. *Ortiz v. State,* 834 S.W.2d 343, 347 (Tex. Crim. App. 1992), *overruled on other grounds*, *Ellison v. State*, 201 S.W.3d 714 (Tex. Crim. App. 2006). The trial court has discretion in deciding whether to allow a witness to testify as an expert. *Duckett,* 797 S.W.2d at 910.

Here, before Dr. Moeller testified, defense counsel objected because Dr. Moeller was present in the courtroom while other punishment witnesses— including the defense's expert Dr. Dudley—testified, in violation of "the rule." 23 RR 6–26. But part of the discussion outside the presence of the jury concerned the substance of his testimony. 23 RR 22–28. After the judge ruled that he would allow Dr. Moeller to testify, defense counsel complained that the State would be calling Dr. Moeller so that he could disavow the findings in his written report. 23 RR 27. The judge responded, "I guess we'll see what he testifies to." 23 RR 28. Before Dr. Moeller took the stand, the defense renewed its previous objections, and the trial court stated that its ruling would stand. 23 RR 28. And during direct examination, the trial court sustained a number of the defense's objections, particularly objections to leading the witness, but overruled objections pertaining to Dr. Moeller's conclusions. 23 RR 29–56.

Because the trial court had the discretion to allow Dr. Moeller to testify even if he changed his opinion and clearly was going to permit Dr. Moeller to testify, a motion to exclude Dr. Moeller under *Daubert* and *Kelly* would not have succeeded. Counsel is not required to make futile motions and objections. *Koch*, 907 F.2d at 527.

Third, *Daubert* only pertains to a hearing in federal court to screen expert testimony pursuant to the Federal Rules of Evidence. *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 356 (5th Cir. 2007). *Daubert* itself does not implicate due process or a constitutional right. *See Bojaj v. Berghuis*, 702 F. App'x 315, 320–21 (6th Cir. 2017). More importantly, where a petitioner, like Harper, cross-examines the State's expert, the admission of the expert testimony does not render his trial fundamentally unfair. *Story v. Collins,* 920 F.2d 1247, 1255–56 (5th Cir. 1991) (holding admission of allegedly inadmissible expert testimony not fundamentally unfair because "[petitioner's] attorney had ample opportunity to cross-examine [the expert] on her testimony; and in light of [the expert's] professional status, education, and experience, [petitioner had] not shown that the admission of [the expert's] testimony rendered his trial fundamentally unfair"); *see also Stevenson v. E.I. DuPont De Nemours and Co.,* 327 F.3d 400, 407 (5th Cir.

2003) ("vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence") (citing *Daubert,* 509 U.S. at 599) (internal quotation marks omitted).

Here, the defense's cross-examination consisted of approximately 130 pages of the state court record. 23 RR 56–186. And the defense repeatedly challenged Dr. Moeller on the fact that his testimony contradicted his written report. *See, e.g.,* 23 RR 59 ("Then, when you think you're working for the D.A.'s Office, we get a different result, right?"), 108–09 ("So that's consistent. [Harper's] telling you a consistent thing that he's telling [Dr.] Dudley."), 122 (Q: "And your own report is absent of any indicators - - you don't use the word 'malingering,' do you?" A: "No, I didn't put it in there."), 123 (Q: "There was no reference in your report back in February 2010 about him being manipulative?" A: "Right."), *id.* (Q: "Okay. So, that's a risk assessment that he's not a problem, correct, in prison?" A: "That was my belief when I wrote this report."), 124 (Q: "When was it that the D.A.'s Office came to you and said 'this risk assessment is a problem for us'?" A: "I'm thinking summer."), 125, 127 (Dr. Moeller conceding that his changed opinion was not based on new data about Harper but about more data regarding the prison system), 127–28, 142

(Dr. Moeller conceding that he believed when he wrote his report that Harper would function well in prison environment), 141 (Dr. Moeller conceding that he never produced a report stating that Harper "is now a risk"), 154 (Dr. Moeller agreeing that Harper's belief that he had been poisoned is "what you call crazy"), 164–65 (Dr. Moeller agreeing that many of Harper's stories pertain to people who do not exist), 182–83 (Dr. Moeller conceding that neither MHMR nor Dr. Dudley found Harper to have antisocial personality disorder). And during final argument, defense counsel premised much of their argument on challenging Dr. Moeller's testimony. 24 RR 24–26, 39–42. In fact, one of Harper's attorneys stated the following:

> Dr. Moeller is a liar. Pure and simple. If you don't see Dr. Moeller as a liar, there's nothing I can do about that. The man sat right there and lied to you. He knew you knew he was lying to you. They knew you knew he was lying to you. And they still put him up there. He lied, and they're going to want you to kill my client based on his lies knowing that he lied. And some of you will go back knowing that he lied and say, "Well, Dr. Moeller said so. So, I'm going to kill him."

24 RR 39. Because trial counsel was able to effectively challenge and impeach Dr. Moeller on his changed opinion, Harper cannot show that counsel was ineffective for not seeking to exclude Dr. Moeller's testimony.

Finally, Harper cannot demonstrate that he was prejudiced by counsel's inaction. During final argument, the State mentioned Dr. Moeller only twice,

115

24 RR 51, 55, without getting into the substance of his testimony. Instead, the State relied on the facts of the crime and Harper's extensive and violent criminal history. In other words, Dr. Moeller's opinion was not significant given the totality of the aggravating evidence presented against Harper. Consequently, because there is no merit to this claim, it is barred from federal habeas review.

## VII. Trial Counsel Had No Need to Present a Social Historian.

Next, Harper alleges that trial counsel was ineffective for not hiring a social historian in order to "tell[] Harper's story." DE 17 at 115–34. Harper claims that a social historian would have placed his life history into the proper context and would have provided his maternal family history; paternal history; his family life including information regarding the lives of others in his family; multi-generational history of mental illness, substance abuse, and criminal behavior; and Harper's "success" in prison and difficulty once paroled. *Id.* at 115–32. Harper states:

> A social historian would have been able to weave together the disparate threads of Harper's life into a single, compelling narrative. Jurors would have heard how recurring themes (like instability and abandonment), learned behaviors (like attempting to quiet paranoia and delusions or alleviate depression with drugs and alcohol), and inherited mental illness started to shape Harper as soon as he came into this world. Jurors could have understood

how societal factors such as disorganized neighbors and increased rates of incarceration amongst African-Americans exacerbated the effects of Harper's personal circumstances, further contributing to his failures upon attaining adulthood.

Testimony from a social historian would have humanized Harper in the eyes of the jury and allowed individual jurors to view him more fully, as more than—or not simply—a man convicted of a terrible crime. Having heard such humanizing testimony, jurors would have been able to consider whether any of the information presented reduced Harper's moral culpability for his crime, thus sparing him from execution.

*Id.* at 133–34. Harper's claim fails because trial counsel presented abundant mitigating evidence. His complaint is, again, that trial counsel did not present enough evidence or did not present it as federal habeas counsel would have. At the very least, the state court's rejection of this claim is not unreasonable.

## A.    State court findings

The state court issued extensive findings rejecting Harper's claim:

During the punishment phase of [Harper's] trial, Sandra McClennon, [Harper's] aunt and sister of [Harper's] mother, testified that Lucille, [Harper's] mother, was slow in school, had trouble reading, and quit school in the eleventh grade because of her learning difficulties; that she was living with her mother when [Harper] was born; and, that [Harper's] father was in prison at the time and did not play a significant part in [Harper's] life [22 RR 148–51].

McClennon testified that [Harper's] grandparents were divorced but [Harper's] grandfather lived across the street and he and [Harper] had a good relationship; that [Harper] found his grandfather's body when his grandfather died and [Harper] was

devastated; and, that [Harper's] grandmother was the mother-figure who made the rules and was influential in [Harper's] life [22 RR 151–58].

McClennon testified that [Harper] was very sharp in school; that he was a loving, caring person who was respectful of his elders; that [Harper] used a sack of coins to buy a present for his mother for Mother's Day when he was nine years old; that [Harper] and McClennon's children played together and were like brothers and sisters; and, that McClennon never saw [Harper] lose his temper or have a tendency for being violent, hurting animals, or destroying property [22 RR 153–60, 173].

McClennon testified that [Harper] loved his father and saw him sometimes when his father was not in prison; that [Harper's] mother dated other men when [Harper's] father was in prison but McClennon was not aware of how [Harper] got along with these men; and, that McClennon's husband was somewhat of a male role model for [Harper] [22 RR 157, 163].

McClennon testified that she saw [Harper] at least three weekends a month after he, his mother, and his grandmother moved closer to McClennon; that [Harper] supposedly hit a neighbor, the mother of his friend, when he was thirteen or fourteen; that [Harper] had never gotten into fights or displayed any type of violence before the incident; and, that [Harper] would talk his way out of something rather than fight [22 RR 160–62].

McClennon testified that [Harper] spent more time at McClennon's house when his mother's health began to fail; that [Harper's] grandmother died in 1988 and her death was hard on [him and his] life started spiraling out of control; that it was too late for [Harper's] mother to be a mother to [Harper]; that [Harper's] mother suffered from migraine headaches and was addicted to medications; that McClennon did not know if [Harper's] grandmother ever tried to get psychiatric help for [Harper's] mother who attempted suicide twice before finally killing herself in 2004; that his mother's death devastated

118

[Harper] even more than his grandfather's death; and, that [Harper] was escorted to her funeral by prison guards [22 RR 150–55, 162–65, 169].

McClennon testified that [Harper] was arrested for robbery in 1990 while he was living with his mother and went to prison; that [Harper] was arrested for robbery again in 1992; that [Harper's] wife Monique had a son while [Harper] was in prison and [Harper's] mother lied to him about him being the father of the child; that [Harper] acted as if the child were his after he was released from prison and learned the truth; that [Harper] would immediately accept responsibility and admit it when he did something wrong; that [Harper] was the type of person whom McClennon could believe; and, that she was not aware if he ever lied to her [22 RR 165–69, 181–84].

McClennon testified that [Harper] wrote her about once a month from prison; that she was aware that he was in a faith-based prison unit; that he was released from prison in 2008 and lived with his father; that he was ready to go on with his life and he wanted to get a job and buy a car; that he dated a nurse named Marie for some time after he was released; that McClennon never saw [Harper] violent or disrespectful toward Marie; that McClennon also met Triska Rose and her children after [Harper] moved in with Rose; that [Harper] and Rose had a relationship like husband and wife; that they were a normal, loving couple with no problems and [Harper] treated her children like a father; and, that they went to church regularly and [Harper] was a youth minister [22 RR 175–81, 185].

McClennon testified that she did not see [Harper] in August or September prior to the offense and rarely talked to him, although she talked with him almost daily after he first got out of prison; that, after a time, [Harper's] conversations were not as hopeful and aspiring as they had been; and, that McClennon received numerous letters and phone calls from the remorseful [Harper] after he was arrested [22 RR 186–90].

Defense witness Bernell Paul Harper, [Harper's] father, testified that he first went to prison when he was in his early twenties and had been on probation prior to going to prison; that he was convicted in 1982 of burglary and received a three-year sentence; that he was convicted of burglary again in 1988 and received a twelve-year sentence; that he was convicted of burglary in 1990 and received a twenty-three year sentence; that he received a twenty-five year sentence for a 1994 conviction; and, that he had been out of prison for about eight years at the time of [Harper's] trial [22 RR 211–13].

[Bernell] testified that he married [Harper's] mother when he was on parole; that he was in jail awaiting being sent to prison when [Harper] was born; that [Harper] was three years old when [Bernell] was released from prison; that [Harper's] mother was living with her mother and Harper moved in with them for about a year but moved out after he learned that [Harper's] mother had an affair while [Bernell] was in prison; that Lucille later filed for divorce; that [Bernell] saw [Harper] every other weekend when [Harper] was three or four years old, but [Harper's] mother began making visitation difficult; and, that [Bernell] did not see [Harper] during the periods of time when [Bernell] was in prison until [Harper] was about fifteen years old [22 RR 213–18].

[Bernell] testified that he knew that Lucille used intravenous drugs and certain pill medications, but he did not know if she did drugs in front of [Harper]; that [Harper] would not have been aware of Lucille's first suicide attempt because he was so young; that [Bernell] did not know if [Harper] was aware of her second suicide attempt; that Lucille was a poor mother because of her drug use; and, that [Bernell] was not aware of anyone giving [Harper] guidance after his grandmother died [22 RR 218–21].

[Bernell] testified that he never knew [Harper] to be violent; that Lucille never called Harper about [Harper's] conduct; that there was an incident with the mother of [Harper's] best friend when [Harper] was a teenager, but [Bernell] thought that the woman should have been charged because it would have been different if

a fifteen-year old girl had been groped; and, that [Harper] was hit in the forehead with a baseball bat when he was young [22 RR 222–24].

[Bernell] testified that he was aware of [Harper] going to prison in 1990, 1992, and 1998; that there were years when both [Bernell] and [Harper] were in prison and they once had an in-unit visitation; that [Harper] lived with [Bernell] for a time in 2008 after he was paroled and worked at Burger King and attended barber college at night; that [Harper] was able to buy a car after a few months; that he got money for barber college from grants; that he participated in a religious program in prison and would talk about the Bible with [Bernell]; and, that [Harper] dated Marie for two or three months after his release and he was not controlling or demanding of her [22 RR 220, 225–31].

[Bernell] testified that he asked [Harper] to move out of his house after [Harper] began using drugs again; that [Harper] appeared to be back on track and apologized to [Bernell] about the drugs the last time Harper saw him before the offense; that [Harper] told [Bernell] that he and Triska Rose were going to get married; and, that [Harper] and Rose had a good relationship [22 RR 233–36].

[Bernell] testified that he was a terrible role model for [Harper] who followed in [Bernell's] footsteps, and that [Harper] wrote [Bernell] a couple of letters from jail and said that he was sorry and he could not explain what happened [22 RR 237–38].

The Court finds that trial counsel also presented the extensive punishment testimony of Richard Dudley, psychiatrist, concerning [Harper's] mental problems and history, including his being molested at a young age and his drug use [21 RR 17–83]; the testimony of Susan Perryman-Evans concerning [Harper's] ability to function well in prison [20 RR 248–58]; the testimony of Curtis Chillis concerning how [Harper] helped other inmates in prison [21 RR 208–10]; the testimony of Don McGinty concerning [Harper's] role model behavior in prison, his odd behavior the day before the offense, and his remorse [22 RR 50–67, 73–76, 85, 112];

121

and, the testimony of Darion Coleman, a neighbor of [Harper's] family, concerning the effect of his grandmother's death on him, his being a happy, respectful child who did well in school, his goals after being released from prison, his finding God, and his remorse for the instant offense [21 RR 229–32, 242–43, 244–47, 253–54].

The Court finds that, during punishment, the State published a letter to the jury written by [Harper] to the trial court when he was awaiting sentencing in a prior case, stating that he had been an addict since the age of fifteen and asking the court to use him to show the destruction of drugs and alcohol [22 RR 201–03].

The Court finds that trial counsel presented essentially the same evidence at trial that [Harper] now asserts should have been presented through a social historian: the mental problems of [Harper's] mother, [Harper's] mother's suffering from migraines, [Harper's] mother's drug use and ultimate suicide after two suicide attempts, [Harper's] mother's lack of parental skills, the absence of [Harper's] father while he was in prison, [Harper's] father's lengthy criminal history and resulting prison sentences, the effects of the deaths of [Harper's] grandfather, grandmother, and mother on [Harper], the loss of a parental figure after the death of his grandmother, [Harper's] loving nature, [Harper's] respect for adults, [Harper's] alleged molestation by a relative when young, [Harper's] use of drugs, the incident where it seems that [Harper] was inappropriately groped by an older woman resulting in [Harper] hitting her, [Harper's] wife having another man's child while [Harper] was in prison, [Harper's] ability to do well in prison, [Harper's] mentoring skills in prison, [Harper]s religious faith, [Harper's] attempts to better himself through barber college, [Harper's] mental health history and diagnoses, [Harper's] thinking that Triska Rose was cheating on him and tried to poison him, and [Harper's] remorse after the offense.

The Court finds that some of the so-called evidence that [Harper] contends should have been presented to the jury through a social historian is either speculative or hearsay, such as social historian Bowman's postconviction speculation that [Harper's] grandmother

"may" have been an alcoholic because [Harper's] father remembers her drinking Johnny Walker Red and milk when she was sick and on pain medication, and Monique Young's postconviction assertion that she was "pretty sure" that [Harper] did drugs with his mother and that she "heard" that [Harper's] father smoked crack.

The Court finds that social historian Bowman's postconviction theory that the selling of drugs would not have occurred in a legitimate business in an "organized" neighborhood, as it did when [Harper] worked in a mechanic shop when he was a teenager, is irrelevant and naive.

The Court finds unsupported social historian Bowman's postconviction assertion that [Harper] was not encouraged to finish high school as he supposedly would have been in an "organized" neighborhood.

The court finds unpersuasive the habeas assertion of [Harper's] cousin, Stacy McClennon, that [Harper] had no love growing up in light of ample evidence that [Harper] was provided a loving environment for most of his young life by his grandparents and his aunt Sandra McClennon.

The Court finds that trial counsel are not ineffective for choosing to present extensive punishment evidence through a mental health expert, relatives, and friends, rather than a social historian.

**********

[Harper] fails to show ineffective assistance of trial counsel based on counsel not presenting the testimony of a social historian to tell the story of [Harper's] life[—]something that counsel thoroughly and effectively presented through the testimony of a mental health expert, relatives, and friends. *See Tucker,* 242 F.3d at [622–24] (rejecting claim of ineffective assistance of counsel where defendant argued that counsel should have presented additional evidence of abuse; recognizing that defendant essentially arguing that counsel should have presented *stronger* mitigating case;

123

distinguishing [(*Terry*)] *Williams* [], 529 U.S. [at] 369–72); *cf. Wiggins* [], 539 U.S. 510 [] (holding that there was reasonable probability that outcome would have been different in light of defendant's lack of violent conduct, based on defense counsel not investigating and presenting evidence of defendant's social history, an action that was prevailing norm in that jurisdiction, and failing to pursue defendant's social service records showing defendant's extensive abuse); *Ex parte Kunkle*, 852 S.W.2d [at] 506 [] (holding counsel's strategic choices made after thorough investigation of law and facts virtually unchallengeable under Sixth Amendment).

SHCR 1277–83, 1312–13. This decision is not objectively unreasonable.

## B.    Trial counsel was not ineffective.

Harper's claim fails because it refers to evidence that was in fact presented at trial. Defense counsel presented nine punishment witnesses, including a mental-health expert, a social worker, and Harper's aunt and father. As shown, the jury knew about the essential details of his life, including mental-health problems, family history, his troubled mother and father, substance abuse, and success and failures in prison. What Harper is actually alleging is that the evidence presented at trial was not packaged correctly.

In a similar case, this Court rejected the very claim that Harper is raising. In *Batiste v. Davis,* this Court held as follows:

Batiste's briefing suggests that not relying on social historian is *per se* ineffective assistance. Dkt. 9 at 57–58. Constitutional law does not require that mitigating evidence come through one specific vehicle. Because "counsel has wide latitude

124

in deciding how best to represent a client," an attorney may decide the best manner in which to put information before jurors. *Ward* [], 777 F.3d [at] 264 []. The state habeas court found the affidavit proffered by a social historian to be "similar" to the trial evidence. S.H.R. at 956. Without the gloss of expert testimony, the basic tone and tenor of the social historian's habeas affidavit mirrors the mitigation case that the jurors considered. Without being summarized by an expert, trial counsel "presented a comprehensive social history of [Batiste] through the testimony of [Batiste himself], his family, and friends ...." S.H.R. at 955. Batiste has not shown that the Constitution demands that trial counsel call an expert to summarize and extrapolate conclusions from the same basic information jurors have already heard. In the end, "this is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face ...." *Bobby v. Van Hook*, 558 U.S. 4, 11 [] (2009). The state habeas court was not unreasonable in finding that trial counsel did not perform deficiently in investigating, preparing, and presenting mitigating evidence.

2017 WL 4155461, at *19 (S.D. Tex. 2017) (footnote omitted).

Likewise, the Fifth Circuit has rejected claims of this nature. In *Alexander v. Quarterman*, the petitioner alleged that trial counsel was ineffective for failing to present mitigating evidence on a host of topics, most of which were addressed at trial. 198 F. App'x 354, 359–60 (5th Cir. 2006). The Fifth Circuit rejected this claim, holding:

After an independent review of the record, we agree with the state court that Alexander failed to establish that his counsel's representation was deficient. This is not a case in which counsel failed to discover significant punishment phase evidence due to lax investigation. The state court's finding that trial counsel made a reasonable

effort to investigate and present facts for mitigation is fully supported by the record. Counsel interviewed Alexander, his family members and mental-health experts. They presented extensive testimony covering Alexander's drug addiction and attempts at treatment, his family background (including its dysfunction), his work and personal history, his mental and intellectual challenges and his remorse. Part of the information Alexander alleges was lacking in his mitigation case was interwoven with the state's punishment evidence regarding his learning and behavior problems in school and his school records. In summary, the evidence in Dr. Cunningham's report simply enlarges on the extensive evidence counsel presented at trial and contains speculative conclusions. . . . Although trial counsel did not discover everything revealed by the post-conviction investigation in this case, the undisclosed evidence, including evidence of his father's sexual orientation and behavior, does not reveal a significantly different picture of Alexander's background from what was actually presented during the punishment phase of Alexander's trial. In short, trial counsel's representation was not deficient.

*Id.* at 360, 362.

Here, the addition of a social historian to "weave together the disparate threads of Harper's life into a single, compelling narrative" would have added little of significance. In fact, Harper's claim centers in large part on the lives of other family members and their problems, such as their mental-health issues and substance abuse. At best, such evidence is only tangentially related to Harper's "character or record and any of the circumstances of the offense that [he] proffer[ed] as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). But even if this evidence is relevant, trial counsel

presented Harper's life history to the jury. Harper cannot demonstrate ineffectiveness just because he believes counsel did not do enough. *See Trottie*, 720 F.3d at 248 ("[A]lthough the jury may not have had all of the facts that Trottie now wishes it had, Trottie's counsel did offer meaningful information regarding Trottie's childhood and how it may have impacted Trottie's decisions on the day of the incident.").

Finally, Harper cannot demonstrate prejudice. As shown above, the aggravating case against Harper was overwhelming. And considering that trial counsel presented a thorough mitigation case, the addition of a social historian would not have tipped the scales in Harper's favor. As this Court held in *Batiste*:

> Batiste has also not shown that the state habeas court unreasonably decided that he had not shown actual prejudice. Batiste has not adduced any mitigating evidence that would cause jurors to respond differently than they did at trial. "When compared to the strong aggravating evidence, any incremental increase in mitigation evidence would not create 'a reasonable probability that ... the result of the proceeding would have been different.'" *Davila v. Davis*, 650 Fed. Appx. 860, 870 (5th Cir. 2016) (quoting *Wiggins*, 539 U.S. at 534 [])[, *affirmed*, 137 S. Ct. 2058 (2017)]. The Court, therefore, finds that the state habeas court was not unreasonable in denying Batiste's claim that trial counsel should have better prepared mitigating witnesses, called more mitigating witnesses, or presented his cumulative evidence through a social historian.

2017 WL 4155461, at *20. For these reasons, Harper's claim should be denied.

## VIII. Harper's Claim that Trial Counsel Was Ineffective for Failing to Investigate and Present Mitigating Evidence Has No Merit.

Harper alleges that trial counsel was ineffective for failing to present mitigating testimony from Stacy McClennon, Kenneth Mosby, Monique Young, Jennifer Flores, Jesse Garza, and Dr. Victor Scarano. DE 17 at 134–47. These witnesses would have provided the following testimony: (1) information about Harper's mother and her problems—mental illness, suicidal tendencies, and depression—and failures as a mother; (2) Harper's decline after his grandmother died; (3) Harper's wife's infidelities; (4) Harper's difficult re-entry after his release on parole; (5) Harper's drug addiction and potential molestation; (6) his dedication at being a barber and good worker; and (7) his concern for Triska and her kids. Dr. Scarano would have provided a link between Harper's drug use and violent behavior and testified that because Harper would be drug free in prison, he would not be violent. *Id.* Harper's claim is meritless and must be denied.

### A. State court findings

The state court issued the following findings and conclusions pertaining to this claim:

> The Court finds that [Harper] presents the postconviction affidavits of Jennifer Flores, [Harper's] instructor at barber college; Jesse Garza, [Harper's] manager at Raising Canes;

Kenneth Mosby, an ex-boyfriend of [Harper's] mother; Monique Young, [Harper's] wife; and, Stacy McClennon, [Harper's] cousin asserting *in toto* that [Harper] was a good worker; that he thought his wife was cheating on him and had tried to poison him; that he was well-liked by other barber students; that he talked about his wife and children; that he was a real family man; that [Harper's] mother suffered from headaches, was addicted to Vicodin, used drugs, and was depressed; that [Harper's] mother got SSI for an unknown mental disability; that [Harper's] father was not around; that [Harper] took it hard when his grandmother died; that [Harper] started doing drugs; that [Harper] was molested when he was young; that he was not violent to his wife Monique Young; that [Harper's] wife cheated on him and got pregnant while he was in prison; that [Harper] could have psychiatric issues; and, that [Harper] is a loving person.

The Court finds unsupported the habeas assertion of Monique Young that she was "pretty sure" [Harper] and his mother did drugs together and finds unsupported and hearsay Young's habeas assertion that she "heard' that [Harper's] father smoked crack.

The Court finds that trial counsel are not ineffective for choosing not to present through Garza, Flores, Mosby, Young, and McClennon essentially the same testimony that was presented through other mitigation witnesses. *See* [SHCR 1277–81].

**********

[Harper] fails to show that trial counsel are ineffective for not presenting as witnesses Stacy McClennon, Kenneth Mosby, Monique Young, Jennifer Flores, and Jesse Garza; trial counsel presented essentially the same mitigating evidence through other witnesses that [Harper] now contends should have been presented through McClennon, Mosby, Young, Flores, and Garza. *See Ex parte Martinez*, 195 S.W.3d 713, 721 (Tex. Crim. App. 2006) (holding reviewing court must consider evidence already known to counsel and whether known evidence would lead reasonable attorney to investigate further when assessing reasonableness of

attorney's investigation); *Bone*, 77 S.W.3d at 835 (stating "[i]f a reviewing court can speculate about the existence of further mitigating evidence, then it just as logically might speculate about the existence of further aggravating evidence. Ineffective assistance of counsel claims are not built on retrospective speculation; they must be firmly founded in the record.").

SHCR 1283–84, 1313. This decision is not objectively unreasonable.

## B. Trial counsel was not ineffective.

Harper's claim fails for the same reason many of the claims addressed above fail: his argument pertains to uncalled witnesses, he is offering cumulative evidence, and he is complaining that counsel did not present enough evidence to his liking. Most of the topics that would have been discussed by these witnesses were in fact addressed at trial, as shown above and in the state court findings. And there is not a reasonable probability that any topic not addressed to Harper's liking would have been sufficient to alter the jury's decision.

With regard to Dr. Scarano's proposed testimony, as stated above, this is new evidence that was not presented on state habeas review. Thus, it is barred from review under *Pinholster*. Regardless, his opinion offers nothing new. He states: "In my opinion to a reasonable degree of medical certainty that, as long as, Mr. Harper would remain in prison and away from drugs, the probability of future dangerousness would be negligible." DE 17 at 146. Yet, Dr. Dudley

130

testified that Harper would function well in prison, and Dr. Moeller conceded the same in his written report, which was brought out on cross-examination. In fact, lay witnesses also testified that Harper behaved well in prison and was a role model. Moreover, Dr. Dudley also addressed Harper's substance abuse. Thus, the new information from Dr. Scarano would have added little to the thorough mitigation case presented by trial counsel.

Finally, for the reasons addressed above, Harper cannot demonstrate prejudice. The state court's decision is not objectively unreasonable, and habeas relief should be denied.

## IX. Harper's Claim that Trial Counsel Failed to Explain to the Jury How to Give Effect to Mitigating Evidence Has No Merit.

Harper contends that trial counsel was ineffective for failing to explain to the jury how to give full effect to the mitigating evidence presented. DE 17 at 148–50. He further alleges that appellate counsel was ineffective for failing to raise this issue on appeal. The state court rejected these claims as follows:

> During punishment argument, trial counsel reminded the jury that [Harper] had never denied his responsibility for the offense; that [Harper] did not have a "mean heart"; that the jury would decide whether [Harper] would spend his life in prison; that [Harper] was not a future danger; and, that if one juror thought that [Harper] was not going to be a continuing threat, the juror had the right to answer that way [24 RR 22–26].

During punishment argument, trial counsel noted the mitigating evidence of [Harper's] background: his grandmother dying, his being a loving and caring child, his doing well in school, his spiraling out of control without proper support, his being in prison so much he was institutionalized, his lack of violence in prison, and his good works in prison society [24 RR 27–29].

Trial counsel argued that the jury had the right to consider all the evidence; that the jury cannot answer the special issue based on sympathy for the family [of the victims]; that [Harper] was mentally ill and had a family history of mental illness; that he was on medication; that he was denied a promotion in prison because of psychological instability; that [Harper] reported hearing voices; that both experts agreed that he suffered from schizophrenia paranoid type disorder; that he was having major problems and his conduct got worse the closer in time to the offense; that his mental illness impaired his judgment at the time of the offense; that his mother had a drug problem; that he was remorseful and turned himself in; and, that he held jobs and worked [24 RR 29–35].

Trial counsel reminded the jury that "mitigation is something that belongs to you" and each juror should make his own determination of what is mitigating, and trial counsel asked the jury to "banish" [Harper] to his cell for the rest of his life to die a natural death and argued that there were mitigating circumstances to justify it [24 RR 35–36].

Trial counsel argued that [Harper] functioned well in a structured society where he was not given decisions; that "decisions are stressors" that a person with mental illness is not capable of making; that [Harper's] life should be spared because he was mentally ill and abused drugs; that he should be held accountable by receiving life without parole; and, that he was not a future danger [24 RR 38–44].

At the conclusion of the punishment phase, the trial court instructed the jury that it was to consider all the evidence in the

whole trial as to [Harper's] background or character or the circumstances of the offense that militates for or mitigates against the death penalty when answering the special issues; that the jury need not agree on what particular evidence supports an affirmative finding to the mitigation special issue; and, that the jury shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness, including evidence of the defendant's background, character, or the circumstances of the offense that mitigate against the imposition of the death penalty [CR 1530–32].

The Court finds based on the trial court's jury instructions and on trial counsel's punishment argument that [Harper's] jury was well aware of how to apply the evidence presented to them to the special issues.

The Court finds that trial counsel are not ineffective based on punishment argument; the Court finds that trial counsel effectively argued that the answer to the future dangerousness issue should be "no" and that the mitigating evidence justified a "yes" answer to the mitigation special issue so that [Harper] would spend the rest of his life in prison.

The Court finds that appellate counsel is not ineffective for not raising on direct appeal the meritless claim of ineffective assistance of trial counsel based on counsel allegedly not explaining how the jury could give effect to mitigating evidence

**\*\*\*\*\*\*\*\*\*\***

[Harper] fails to show that trial counsel are ineffective based on the allegation that counsel's punishment argument did not adequately explain to the jury how it should consider the mitigating evidence; trial counsel effectively argued that [Harper] was not a future danger and that the answer to the mitigation issue should be "yes" so that a life sentence would result, and the trial court's instructions to the jury specified the exact procedure for answering the special issues. *See Bone*, 77 S.W.3d at 836

> (noting "[a] vague, inarticulate sense that counsel could have provided a better defense is not a legal basis for finding counsel constitutionally incompetent.").
>
> Appellate counsel is not ineffective for not raising on direct appeal the meritless claim that trial counsel was ineffective for allegedly not explaining how the jury could give effect to mitigating evidence. *See Ex parte Butler*, 884 S.W.2d 782, 783 (Tex. Crim. App. 1994) (holding *Strickland* standard applies to appellate counsel as well as trial counsel); *Jones v. Barnes*, 463 U.S. 745 [] (1983) (holding appellate counsel does not have constitutional duty to raise every non-frivolous issue).

SHCR 1284–86, 1313–14. This decision is not objectively unreasonable.

Harper's claim lacks merit. First, the Eighth Amendment requires that the jury be given a vehicle to consider and give effect to a defendant's mitigating evidence. *Penry v. Johnson*, 532 U.S. 782, 797 (2001) (*Penry II*). But Harper cites no case law for the proposition that it is trial counsel's responsibility to either provide that vehicle to the jury or explain it to the jurors. The "failure to give effect to mitigating evidence" rule pertains to the Eighth Amendment, not the Sixth.

Second, the jury was properly instructed by the trial court on how to give effect to mitigating evidence per the second special issue. CR 1530–36. Further, the State re-read and explained the second special issue to the jury twice. 24 RR 17–18, 50. For instance: "When we talked about that, remember, what does mitigation mean? It's something that lessens a defendant's moral

134

blameworthiness for this offense." 24 RR 50. The defense also provided a "list" of mitigating circumstances. 24 RR 31–35. Defense counsel even stated: "Each one of you makes your own determination of what is mitigating to you, that one factor that is sufficient to save [Harper's] life." 24 RR 35; *see also* 24 RR 36 ("And that's what I'm asking you to do is to banish [Harper] for the rest of his life to a felon's cell where he will die a natural death. And there are mitigating circumstances that will give you comfort to do that."). Moreover, defense counsel objected when counsel believed the State misstated the criteria for determining what evidence could be mitigating, and the trial court sustained the objection. 24 RR 52.

In short, the jury was provided the proper vehicle for considering mitigating evidence. Nothing more was required. And Harper cannot show that additional explanation of the second special issue was necessary given the assertions by both the State and defense. In other words, Harper cannot demonstrate prejudice.

Finally, because there is no merit to this allegation, appellate counsel was not ineffective for not raising this issue on appeal. *Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among

them in order to maximize the likelihood of success on appeal") (citing *Jones*,

463 U.S. at 751).

## X.  Harper's Claim that Trial Counsel Was Ineffective for Not Challenging Certain Jurors for Cause Lacks Merit.

Harper alleges that trial counsel was ineffective for failing to challenge

for cause or exercise peremptory strikes against jurors Basey Higgs, Dowlin,

Cotton, Williams, Morris, McHenry, Garcia, and Hardgrave, whom Harper

claims were "ADP," or "automatic death penalty."  DE 17 at 151–70.  He states:

> Defense counsel's questioning and performance did nothing to identify or reveal the disqualifying biases of the seated jurors discussed below.  Moreover, defense counsel specifically failed to ask the prospective jurors whether they would be able to meaningfully consider a life sentence for the crime Harper was charged with, namely the murder of three people.  Particularly egregious was defense counsel's failure to question, challenge or strike jurors who indicated that they would always choose the death penalty for the murder of a child.

*Id.* at 153.  Harper also argues that counsel failed to object to "the misleading

and factually incorrect hypothetical situations the State posed to prospective

jurors[,]" as well as other tactics utilized by the State.  *Id.* at 154–55.

As a preliminary matter, in support of his argument, Harper relies on

the affidavit of another attorney, David Wymore, to make the case for Harper

that trial counsel performed deficiently and ineffectively during voir dire.

SHCR 782–829.  Wymore states that he has reviewed the record of voir dire

136

and concluded that, in his opinion, trial counsel was ineffective. *Id.* Harper's reliance on the opinion of another attorney in this manner is unquestionably improper. The Fifth Circuit has repeatedly rejected such legal opinions as invading the province of the trier of fact. *United States v. Thomas*, 847 F.3d 193, 206–07 (5th Cir.), *cert. denied*, 137 S. Ct. 2229 (2017); *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997); *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *Matthews v. Ashland Chem., Inc.*, 770 F.2d 1303, 1311 (5th Cir. 1985); *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). Moreover, although Rule 704 of the Federal Rules of Evidence allows for expert opinion testimony that embraces an ultimate issue to be decided by the trier of fact, it "does not open the door to all opinions." *Owen,* 698 F.2d at 240. Specifically, it does not allow for testimony that tells the trier of fact what result to reach in a case. *Id.* It likewise does not allow a witness to give legal conclusions. *Id.* Thus, the issue is whether the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Salas,* 980 F.2d at 305. As the Advisory Committee Notes to Rule 704 state, "allowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant." *Id.* Because this Court is well able to judge the standard of reasonableness under *Strickland* without the

assistance of purported legal experts, there is no reason for this declaration.

As the Fifth Circuit has aptly noted:

> "[I]t would not matter if a petitioner could assemble affidavits from a dozen attorneys swearing that the strategy used at his trial was unreasonable. The question is not one to be decided by plebiscite, by affidavits, by deposition, or by live testimony. It is a question of law to be decided by the state courts, by the district court, and by this Court, each in its own turn."

*Johnson v. Quarterman*, 306 F. App'x 116, 129 (5th Cir. 2009) (quoting *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998)).

At any rate, for the reasons addressed below, Harper's allegations pertaining to these jurors have no merit.

## A. State court findings

The state court issued the following findings and conclusions recommending the denial of habeas relief:

> During voir dire of juror **Carolyn Basey Higgs**, she acknowledged that there were cases where a person convicted of capital murder should receive a life sentence; that she would answer the first special issue depending on the circumstances; that she could envision a situation where a person convicted of capital murder might not be a continuing threat; that there were circumstances where someone deserves life and someone else might deserve death depending on the circumstances; and, that she could spare someone's life if there was a reason [4 RR 198–203, 223].

138

During voir dire examination of juror **Deborah Dowlin**, she indicated that she had a master's degree in behavioral sciences; that she referred people to the appropriate sources, such as for outpatient counseling and to psychiatrists; that she also authorized inpatient mental health and substance abuse care precertifications; that she could be fair; that she did not agree with the concept that a psychologist could come up with a reason or diagnosis for any bad behavior; that she was open to the idea that some people who commit capital crimes should get a life sentence and some should get the death penalty; and, that she understood the State's burden of proof [4 RR 111–17].

Dowlin indicated that she understood the punishment results of the answers to the special issues; that the more information the better in answering the special issues; that it was possible to envision a situation where a person could be guilty of capital murder but not be a continuing threat to society; that she was open to answering the first special issue "yes" or "no" depending on the circumstances; that she was open to considering all the evidence for the mitigation issue; and, that she could follow the law and evidence whether it meant a life or death sentence [4 RR 119–23, 127, 131–32].

Dowlin understood mitigation as contributing factors and gave examples of background, history, and circumstances of the offense; Dowlin explained that she was aware that some mental illness, such as schizophrenia, have medical causes; that some psychotic behavior can be controlled by medication; that she would want to know about a history of mental health issues when answering the mitigation special issue; that she was open to all mitigating factors, including mental health issues; and, that she would be okay if there were mitigating circumstances that led to a life sentence even if the crime was horrible [4 RR 139–46].

Dowlin acknowledged that she would be open to the fact that prison records might show that someone was fine in prison in answering the first special issue; that it could go to both the first

and second special issue; and, that life without parole was a legitimate punishment [4 RR 146–48].

When asked about her notation on the juror questionnaire that "repeat offenders should not be given the opportunity to rehabilitate," Dowlin stated that she was geared toward celebrities repeatedly getting D.U.I.s and then receiving special treatment and affirmed that someone could rehabilitate himself in prison [4 RR 148–49].

When asked if she would be leaning toward the death penalty or leaning toward life if she found someone guilty, Dowlin stated that was hard to say because "we have to consider Issue Number 2" [4 RR 153].

During voir dire, juror **Richard Cotton** stated that taking another[] person's life needed to be considered very seriously; that elements had to be met to establish guilt beyond a reasonable doubt; that a death sentence is not automatically warranted for someone who commits capital murder; that there would probably be some extenuating circumstances that would lead to his decision of which punishment for capital murder is more appropriate; that there would have to be evidence to answer the first special issue; and, that the past was the best evidence to predict the future [5 RR 8–18].

Cotton affirmatively answered that he would be able to consider all the evidence and determine how much weight to give it to answer the mitigation issue, and that he would be able to hear all the evidence and answer the special issues so that a sentence of life without parole would result [5 RR 19–22].

Cotton acknowledged that the verdict was set at life at the beginning of the punishment phase unless the State met its burden to prove the first special issue; that he could see how information about a person functioning better in a prison environment could be used to answer the first special issue and maybe even the second special issue; and, that he would be open to mental health issues

and childhood issues and use that to answer the special issues [5 RR 33–39].

During voir dire, juror **Jennifer Williams** said that the best evidence for the first special issue would be someone's history, growing up, psychological records, and "anything like that"[;] that she acknowledged that she could see where death might not always be appropriate; and, that she could answer the special issues based on the law and evidence and it could result in a life sentence or death sentence [5 RR 168–78].

Williams affirmed that she was going to wait to hear the evidence that would provide the answers to result in life or death; that she would be open to a fair evaluation of the evidence; that she could see mental health issues leading someone to find a sufficient mitigating factor in a proper case; that there were people who functioned in prison but could not function in the outside world; that she could see how that might weigh in answering the first special issue; and, that it depended on the case whether life without parole could be a legitimate punishment [5 RR 186–94].

Williams first said she would answer death if there were no evidence presented after a guilty verdict, but she changed her answer to life without parole after the concept of the State having the burden of proof on the first special issue was explained; she did not feel as if she were done after answering the first special issue, in particular if the answer was "yes," and she would be willing to listen [5 RR 194–201].

During voir dire, juror **Dwight Morris** stated that he believed in the death penalty if it is warranted and the evidence is there, but he acknowledged that not all capital murders warrant the death penalty; that having two choices gives options; and, that he affirmed he could answer the special issues so that it resulted in life or death, based on the evidence and the law [6 RR 7–22].

Morris agreed that there were different ways children can grow up that could impact them; that he would be in the "middle" as

141

opposed to leaning toward life or death if the trial went in the second phase; and, that the mitigating circumstances would determine how he felt about life or the death penalty [6 RR 32–37].

During voir dire, juror **Sandra McHenry** stated that it depends on what the person did as to whether he needs the death penalty or imprisonment; [and,] that she agreed that life is more appropriate in some cases and death in other cases [7 RR 188–203].[14]

McHenry repeated her view that punishment depends on the circumstances; "everything has a weight to it"[;] and, "it depends on what he did, how he did it, and what he's done in his past to whether he's going to have life imprisonment or death"[;] that she agreed that mental illness might be a mitigating factor to some people and not to others; that she agreed that someone's prior prison record could help determine whether he would be a threat to society; and, that she would keep an open mind and listen to the relevant mitigating evidence to determine whether life or death was appropriate [7 RR 206–17].

During voir dire, juror **Joshua Garcia** acknowledged that there were cases where the death penalty was appropriate and cases where it might not be appropriate; that he agreed that a sentence of life without parole is punishment; that he could listen to the evidence and answer the special issues so that a life sentence or a death sentence would result; and, that he was open to answering the special issues wherever the evidence and law takes him [9 RR 12–26].

Garcia indicated that he could spare someone's life after listening and determining in his own heart that there was a reason to spare

---

14    The CCA declined to adopt "the portion of finding number one hundred and sixty-six (166) which states that juror Sandra McHenry 'agreed with her juror questionnaire statement that the death penalty is not necessary in modern civilization—it depends on what the person has done and the case.'" *Ex parte Harper*, No. 81,576-01, Order at 2.

it; that he could be open; that he was not there just to give the death penalty; that he understood that life without parole was the presumptive sentence at the beginning of the second phase of the trial; that he would still be open to hearing about sufficient mitigating factors to spare [the defendant's] life if the answer to the first special issue were "yes"[;] and, that there were people who need a structured environment [9 RR 33–43].

During voir dire, juror **Harry Hardgrave** stated that the death penalty could be given if it was justified; that he would look at a person's past experience and history to answer the first special issue; that he believed he could answer the first special issue "yes" or "no" depending on the information; that he understood how one person might deserve a lesser punishment than another involved in the same offense; and, that he could see how there might be something about the crime itself or the person that indicates a life sentence is more appropriate than death [11 RR 74–89].

Hardgrave affirmed that he could be open to the idea that something could be mitigating so that a life sentence would result even after the first special issue was answered "yes"[;] that he could answer the special issues so that either death or a life sentence resulted; that he agreed that life in prison was a bad punishment; and, that he believed it must be absolutely proved that the person was guilty to receive the death penalty [11 RR 94–99].

Hardgrave acknowledged that a bad or abused childhood would be a factor; that he could put aside any bad feelings he might have for the defendant and answer the special issues based on the law and the evidence if he were on the jury; that he would take mitigating evidence into consideration if it was presented; and, that he would have to hear the life story [11 RR 104–16].

The Court finds that none of the cited jurors[—]Basey Higgs, Dowlin, Cotton, Williams, Morris, McHenry, Garcia, and Hardgrave[—]indicated that they would automatically vote for the death penalty in every case; instead, they all expressed the opinion

143

that they could answer the special issues in such a way that either life or death would result, based on the evidence and the law.

The Court finds that trial counsel conducted meaningful voir dire and substantively questioned the cited jurors; the Court finds that none of the cited were "substantially mitigation-impaired" or that they were "processed" so that they expected to reach the punishment phase.

The Court finds that prospective jurors commonly express different and/or more complete opinions during voir dire than on juror questionnaires after legal proceedings and the law are explained to them during voir dire.

The Court finds unpersuasive the postconviction affidavit of Colorado defense attorney David Wymore in light of Wymore basing his hindsight evaluation of trial counsels' voir dire performance on his own opinion and his interpretation of ABA guidelines.

The Court finds that trial counsel are not ineffective for concentrating voir dire examination on the prospective jurors ability to answer the special issues[—]a common occurrence in capital cases.

The Court finds that trial counsel are not ineffective for not exercising a peremptory strike against the cited jurors or for not challenging the cited jurors for cause on the ground that the cited jurors would allegedly automatically vote for the death penalty in every case.

**********

[Harper] fails to show ineffective assistance of trial counsel for not exercising a peremptory strike against jurors Basey Higgs, Dowlin, Cotton, Williams, Morris, McHenry, Garcia, and Hardgrave or for not challenging the cited jurors for cause; none of the cited jurors indicated that they would automatically vote for the death penalty

144

in every case and all expressed the opinion that they could answer the special issues in such a way that either life or death would result based on the evidence and the law. *See Gonzales v. State*, 353 S.W.3d 826, 836[–37] n.7 (Tex. Crim. App. 2011) (rejecting capital defendant's claim that trial court erred in denying challenge for cause; distinguishing *Morgan v. Illinois* by noting that it stands for proposition parties should be allowed to voir dire about biases against the law; noting "[t]o the extent that *Morgan* stands for the proposition that a juror is challengeable for cause if he would automatically assess a sentence of death," *Morgan* not on point because juror stated during voir dire she could follow law).

[Harper] fails to show that trial counsel are ineffective based on a lack of meaningful voir dire examination of the cited jurors or based on the meritless allegation that such jurors were "substantially mitigation-impaired" or "processed" so that they expected to reach the punishment phase. *See Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000) (citing *Strickland*, 466 U.S. at 689) (holding that review of counsel's representation is highly deferential; counsel is afforded strong presumption that actions fall within wide range of reasonably effective assistance); *see also Ex parte Lahood*, 401 S.W.3d 45, 50 (Tex. Crim. App. [] 2013) (noting publications such as ABA standards and other similar sources are only guides "because no set of detailed rules can completely dictate how best to represent a criminal defendant.").

SHCR 1286–91, 1314–15 (footnote and bold added). This decision is not objectively unreasonable.

## B. None of the jurors in question were "automatic death penalty" jurors.

### 1. Juror Basey Higgs

The voir dire pertaining to Basey Higgs was addressed in Section I, *supra,* and demonstrates that she was not biased. Trial counsel was not ineffective for not challenging her for cause.

### 2. Juror Dowlin

During the State's voir dire examination of Dowlin, she stated that she had a master's degree in behavioral sciences and had some experience in the mental-health field. 4 RR 111. Dowlin stated that while she might have biases to certain illnesses or situations, she could nonetheless be fair. 4 RR 112. Dowlin did not agree with the concept that a psychologist could come up with a reason or diagnosis for any bad behavior. 4 RR 113. She recognized that there was a difference between someone with a mental illness and someone who just does things that are wrong. 4 RR 113. Dowlin believed that some people who commit capital crimes should get a life sentence and some should get the death penalty depending on the circumstances. 4 RR 115.

The State explained that the trial would move to the second part only if the defendant is found guilty, and that the State has the burden of beyond a reasonable doubt on the first special issue. 4 RR 117–18. Dowlin understood

146

that a "yes" answer to the first special issue and a "no" answer to the second special issue would result in the defendant being sentenced to death, and that any other combination of answers would result in a life sentence. 4 RR 119. When asked if it would be helpful to consider the circumstances of the capital offense in answering the first special issue, Dowlin stated: "the more information that you have the better informed -- the better you'll be able to answer that question." 4 RR 122. Dowlin then acknowledged that she was open to answering the first special issue either "yes" or "no" depending on the circumstance. 4 RR 122–23. Dowlin said she believed it was possible to envision a situation where a person could be guilty of capital murder but would not be a continuing threat to society. 4 RR 123.

The State explained that if the jury answered the first special issue "yes," only then would the jury move to the second special issue. 4 RR 123. The State noted the mitigation special issue as a time to review all the evidence. 4 RR 124. The State gave the example of the getaway driver in a bank robbery where the bank teller is killed as not being as morally culpable as the triggerman, and Dowlin acknowledged that the example made sense. 4 RR 126. The State also gave the example of Andrea Yates, where the jury found her history of mental illness sufficiently mitigating. 4 RR 126–27. When asked what kind

of information Dowlin thought of in relation to the second special issue, Dowlin stated the person's history, his "position" within the trial, his psychological background, and the facts that were presented at trial. 4 RR 127. The State explained that Dowlin did not have to list the things she considered mitigating, but she needed to be open to listening to all the evidence to see if there was something that lessened moral blameworthiness so that life was more appropriate than death. 4 RR 127. Dowlin answered, "okay." 4 RR 127. The State gave the examples of age and drug use as evidence some jurors might find mitigating and others not. 4 RR 128–30. The State also pointed out that a defendant being mentally slow and easily swayed could be considered in the mitigation issue. 4 RR 130.

Dowlin stated that being on the jury is "a grave responsibility" and she "would approach it seriously." 4 RR 130. Dowlin acknowledged that she had her beliefs, but "in a situation like this, you really have to follow what the Court says"; that if she were selected, "there's a set of rules I have to follow . . . I have a code that I need to follow when I come in here." 4 RR 131. When the State said it wanted a juror who could follow the law and evidence, whether it meant the defendant got a life sentence or a death sentence, Dowlin nodded in agreement and said, "I can do that." 4 RR 131–32.

Dowlin informed the State that her brother had some issues with drugs, had been in and out of court, and was on probation. 4 RR 132. Dowlin classified it as a family disappointment rather than something that would affect her ability as a juror. 4 RR 132. Dowlin further said that although her sister was an investigator with the District Attorney's Office, that would not influence her decision. 4 RR 133. She then reiterated that she would be able to base her decision on the evidence presented and that she would not have a problem telling her sister the State failed to prove its case if it did not. 4 RR 133. The State also informed the trial court that Dowlin's sister was not a witness in the case. 4 RR 134.

During defense counsel's voir dire examination, when asked what she generally thought about as mitigating factors, Dowlin said it may be what a person has done to "lessen their losses" or it may be contributing factors. 4 RR 139–40. Dowlin gave the examples of a person's personal background, personal history, and the circumstances of the crime. 4 RR 140. Dowlin explained that based on her experience as a case manager, she was aware that people with alcohol and substance abuse problems needed to work the program every day; that some mental illness such as schizophrenia have medical causes; that some

psychotic behavior can be controlled by medication; and, that some people do not like to be on the medication because it dulls their senses. 4 RR 143. Dowlin answered "most definitely" when asked if she would want to know about a history of mental-health issues in answering the mitigation special issue because "[i]t could be a mitigating factor." 4 RR 144. Dowlin responded that it was a "fair statement" that there are all sorts of mitigating factors she might want to hear in answering the mitigation special issue. 4 RR 144–45. Dowlin acknowledged that she would be okay if there were mitigating circumstances that led to a life sentence, even if the crime was intentional and horrible; she would be open to all mitigating factors, even mental-health issues. 4 RR 146.

Dowlin also acknowledged that she would be open to the fact that prison records might show that someone was fine in prison in answering the first special issue, and that it could go to both the first and second special issue. 4 RR 146–47. Dowlin affirmed that life without parole was a legitimate punishment. 4 RR 148. When asked about her notation on the juror questionnaire that repeat offenders should not be given the opportunity to rehabilitate, Dowlin stated that she was geared toward celebrities repeatedly getting D.U.I.s and then receiving special treatment. But she affirmed that someone could rehabilitate himself in prison. 4 RR 148–49. When asked if she

would be leaning toward the death penalty or leaning toward life if she found someone guilty, Dowlin stated: "That's hard to say because we have to consider Issue Number 2. I mean it's hard to answer." 4 RR 153. Defense counsel responded: "Stop. That's a great answer." 4 RR 153.

### 3. Juror Cotton

During the State's voir dire examination of Richard Cotton, he stated that taking another person's life needed to be considered very seriously, and he acknowledged that the trial court had set out the elements that have to be met to establish guilt beyond a reasonable doubt. 5 RR 8. Cotton affirmed that a death sentence is not automatically warranted for someone who commits capital murder. 5 RR 13. Cotton stated that there would probably be some extenuating circumstances that would lead to his decision of which punishment for capital murder is more appropriate, such as whether it was the first offense. 5 RR 14. Cotton acknowledged that there would have to be evidence to answer the first special issue, and that the past was the best evidence to predict the future. 5 RR 15, 18. Cotton answered "All right" when told that he needed to keep an open mind when answering the issue. 5 RR 19.

The State explained that if the answer to the first special issue is "no," then the jury is done, but if the answer is "yes," then the jury answers the

mitigation special issue.  5 RR 19.  When asked if he would be able to consider all the evidence and determine how much weight to give it to answer the mitigation issue, Cotton answered: "Yeah.  Actually my job kind of requires me to think in that manner."  5 RR 21.  He further said that he understood the concept that everything must be taken into consideration before making a decision.  5 RR 22.  Cotton affirmatively answered that he would be able to hear all the evidence and answer the special issues so that a sentence of life without parole would result.  5 RR 22.

During defense counsel's voir dire examination, counsel informed Cotton that when entering the punishment phase of the trial, the verdict was already set at life unless the State met its burden of proving the first special issue beyond a reasonable doubt.  5 RR 33–34.  Cotton acknowledged the information by repeating "okay' several times.  5 RR 33–34.  Trial counsel gave Cotton the hypothetical of a person who has been in prison before and was a model prisoner and a person who functions better in a structured prison environment. 5 RR 37–39.  Cotton acknowledged that he could see how that information could be used to answer the first special issue and maybe even the second special issue.  5 RR 37–39.  Cotton acknowledged that he would be open to mental health issues and childhood issues—i.e., a bad childhood—and use that

information to answer the special issues.  5 RR 39.  Cotton also affirmed that he would not be bullied by other jurors into making a decision, stating: "I'm going to make my own decision."  5 RR 41–42.

### 4.    Juror Williams

During the State's voir dire examination of Jennifer Williams, when the first special issue was explained, she said that the best evidence for her would be someone's history, growing up, psychological records, "anything like that." 5 RR 168–70.  The State then explained the mitigation issue giving examples of various things that might be considered.  5 RR 174–76. When asked if she could see where death might not always be appropriate, Williams answered "of course," although she agreed that she could think of situations where it might be appropriate.  5 RR 176.  Williams affirmed that she could answer the special issues based on the law and evidence, such that her verdict could result in death or a life sentence.  5 RR 176–78.

During defense counsel's voir dire examination, Williams again affirmed that she was going to wait to hear the evidence and, depending on the evidence, would either provide mercy or answer the questions to result in death.  5 RR 186–87.  Williams also acknowledged that she would be open to a fair evaluation of the evidence.  5 RR 187.  When asked if she could see mental-

health issues leading someone to find a sufficient mitigating factor in a proper case, Williams answered "absolutely." 5 RR 188. Trial counsel then explained that there were people who functioned in prison but could not function in the outside world. 5 RR 189–91. Williams acknowledged that she could see how that might weigh in answering the first special issue, and she would be open to a "situation like that." 5 RR 191–92. When asked if she thought life without parole could be a legitimate punishment, Williams stated that it "depends on the case." 5 RR 193–94.

Although Williams first said that she would answer death if there were no evidence presented after a guilty verdict, she changed her answer to life without parole after the concept of the State having the burden of proof on the first special issue was explained. 5 RR 194–96. Trial counsel stated that what he heard her say was that once she found someone a future danger, she was done, but Williams answered "no" and explained that she needed to get through both special issues before she made her decision. 5 RR 197–98. Trial counsel explained that the special issues were answered in sequence, 5 RR 198–99, and the following exchange later occurred:

> Q: But the point is if you feel that you're done when you finish with Special Issue Number 1 if - - especially if it's answered yes - -

A:  I don't feel that way.

Q.  - - I need to know that.

A.  No.  I don't feel I'm done after that.

5 RR 200.  Trial counsel asked Williams if she would be willing to listen and really consider not giving death, and Williams said: "Sure.  I'm a woman.  I'm compassionate.  I'm a human being.  I mean it just depends on all the circumstances."  5 RR 201.  She further stated: "I'm pretty sure I can do this, to the best of my ability."  5 RR 201.

### 5.    Juror Morris

During the State's voir dire examination of Dwight Morris, he stated that he believed in the death penalty if it is warranted and the evidence is there, but he acknowledged that not all capital murders warrant the death penalty. 6 RR 7–8.  Morris stated that having two choices—death or life without parole––gives options as far as the circumstances of the crime.  6 RR 12.  The State explained that the jury may hear additional evidence in the second phase of the trial, such as past criminal history, the defendant's character, and background and any mental illness.  6 RR 14.  The State explained the first special issue and the State's burden of proof.  6 RR 15–17.  The State also explained that if the answer to the first special issue is "yes," then the jury goes

155

to the second question. 6 RR 17. The State then thoroughly explained the second special issue to Morris. 6 RR 19–21. Morris answered "yes" when asked if he could answer the questions so that it resulted in life or death based on the evidence and the law. 6 RR 22.

During defense counsel's voir dire of Morris, counsel explained that "it's a life case" unless the State presents evidence beyond a reasonable doubt that death is appropriate. 6 RR 27. Trial counsel noted that Morris had indicated that one of his children got counseling, and Morris acknowledged that it made a difference in his child's life. 6 RR 28–29. However, Morris acknowledged that there were people who did not have that support group. 6 RR 30. Morris agreed that there were different ways children can grow up that could impact their futures. 6 RR 32. When asked if he would go into the second phase of the trial leaning toward death or life, Morris said he thought he "could still be in the middle." 6 RR 34–35. When asked what evidence he would like to hear to convince him not to vote for a death sentence, Morris stated that it would be circumstances similar to those described by the prosecutor, namely that the person had been abused and past experiences that led to that point. 6 RR 35. Trial counsel explained that if the first issue is answered "yes" and if the second

issue is answered "yes," the defendant would live even though he had been found to be a continuing threat to society. 6 RR 36–37. Morris then responded:

> A: Well, there again, it would depend on the circumstances that I would hear, the mitigating circumstances. To me, that's what's going to determine how I feel about the life imprisonment or the death penalty.
>
> Q: Okay.
>
> A: I mean, that's how I would determine it.
>
> Q: I wanted you to say that.
>
> A: Yeah. That's - - I mean, I've got to hear something to sway me to go to the death penalty. I mean, it has to be, in my mind, very detailed and believable and those kinds of things before I would make that decision on the death penalty.

6 RR 37. When asked if another juror could force him or bully him out of his decision, Morris said: "I don't see that happening." 6 RR 42.

### 6.    Juror McHenry

During the State's voir dire examination of Sandra McHenry, she stated that it depends on what the person did as to whether he needs the death penalty or imprisonment. 7 RR 188. In response to McHenry's statement that the death penalty is warranted when the person kills someone, the State explained the difference between murder and capital murder and the corresponding punishment ranges. 7 RR 188–89. The State explained that it

157

has the burden of proof on the first special issue and that the jury hears about the defendant's family, character, and criminal history in the second phase of the trial. 7 RR 190–92. If the State proves the first special issue beyond a reasonable doubt and the jury answers "yes," then the jury answers the second issue. 7 RR 195. McHenry answered affirmatively when asked if she agreed that life in prison is more appropriate in some cases and death is more appropriate in others. 7 RR 198. McHenry affirmed that she could answer the special issues either way depending on the evidence. 7 RR 199. The State noted that McHenry agreed with the statement on her questionnaire that the death penalty is not necessary in modern civilization, and McHenry stated that she did agree—it depends on what the person has done and on the case. 7 RR 202–03.

During defense counsel's voir dire, McHenry repeated her view that punishment depends on the circumstances; "everything has a weight to it," and "it depends on what he did, how he did it, and what he's done in his past to whether he's going to have life imprisonment or death." 7 RR 206–07. McHenry agreed that mental illness might be a mitigating factor to some people and not to others. 7 RR 207–08. McHenry also agreed that someone's prior prison record could help determine whether he would be a threat to

society. 7 RR 212–13. McHenry promised that she could keep an open mind and listen to the relevant mitigating evidence to determine whether life or death was appropriate. 7 RR 216–17. When asked if she "could pause and look over my client's shoulder to see where he was coming from – when all this happened," McHenry answered: "I've been taught that lesson....So, I can pause and look." 7 RR 219–20.

### 7. Juror Garcia

During the State's voir dire examination of Joshua Garcia, he acknowledged that there are cases where the death penalty was appropriate and cases where it might not be appropriate. 9 RR 12. Garcia answered "definitely" when asked if he agreed that a sentence of life without parole is punishment. 9 RR 24. Garcia acknowledged that he could listen to the evidence and answer the special issues so that a life sentence or a death sentence would result. 9 RR 24–25. Garcia answered "definitely" when asked if he was open to answering the special issues wherever the evidence and law took him. 9 RR 26.

During defense counsel's voir dire, counsel gave the example of Timothy McVeigh and Terry Nichols as two co-defendants involved in the same offense––the Oklahoma City bombing—who received different sentences with McVeigh

being executed and Nichols being sentenced to life. 9 RR 31–32. Trial counsel used this example to show that it was a juror's personal decision when determining whether there were sufficient mitigating factors. 9 RR 32. Garcia indicated that he could spare someone's life after listening and determining in his own heart that there was a reason to spare it. 9 RR 33. When asked if he could be open, Garcia stated, "Yes sir. Most definitely open. This is not something - - I'm not at all - - you know, I don't want to just give him the death penalty. That's not why I'm here." 9 RR 34. Trial counsel explained that life without parole is the presumptive sentence at the beginning of the second phase of the trial because the State has to prove beyond a reasonable doubt that the defendant is probably going to commit acts of criminal violence. 9 RR 42. Garcia acknowledged that he understood by nodding when asked, "you see." 9 RR 42. Garcia also acknowledged that he would still be open to hearing about sufficient mitigating factors to spare the defendant's life if the answer to the first special issue were "yes." 9 RR 43. Garcia also agreed that there were people who need a structured environment. 9 RR 44.

### 8. Juror Hardgrave

During that State's voir dire examination of Harry Hardgrave, he stated that the death penalty could be given if it was justified. 11 RR 74. After the

State explained what constitutes murder and capital murder, Hardgrave stated that he would look at a person's past experience and history to answer the first special issue. 11 RR 74–82. When asked if he could answer the first special issue either "yes" or "no" depending on the information he had, Hardgrave said that he believed so. 11 RR 82–83. When asked if he could take the information he gets and answer the first special issue either "yes" or "no," Hardgrave said "right" and nodded his head when the State repeated that a "no" answer would mean that the defendant would receive a life sentence. 11 RR 86. After the State explained the second special issue, Hardgrave indicated that he understood how one person might deserve a lesser punishment than another involved in the same offense. 11 RR 87–88. Hardgrave acknowledged that he could see how there might be something about the crime itself or the person that indicates a life sentence is more appropriate than death. 11 RR 88–89.

When the State asked Hardgrave if he could be open to the idea that there could be something mitigating so that a life sentence would be more appropriate even after answering the first special issue "yes," Hardgrave said "yeah." 11 RR 93. The State also explained that the defense does not have to prove mitigation; it could even come from the State or the offense itself. 11 RR

93–94. Hardgrave acknowledged that he could answer the special issues so that either death or a life sentence resulted. 11 RR 94–95. He also agreed that life in prison was a bad punishment, stating: "You're taking a person's life. It's just that one is going to be terminated earlier than the other. 11 RR 97. Hardgrave believed that it must be absolutely proved that the person was guilty to receive the death penalty. 11 RR 98–99.

During defense counsel's voir dire examination, Hardgrave said, "I'd have to listen to your argument" when trial counsel asked if Hardgrave could consider that life was a proper punishment. 11 RR 104. Hardgrave later said that he would have to seriously consider "what you have as an excuse or not." 11 RR 106. Hardgrave also clarified an earlier answer by acknowledging that a bad or abused childhood would be a factor, but it would not be a controlling factor. 11 RR 106–07. Hardgrave promised trial counsel that he could put aside any bad feelings he might have for the defendant and answer the special issues based on the law and the evidence if he were on the jury. 11 RR 111–12. When asked where he fell in the spectrum of accepting or rejecting mitigating evidence, Hardgrave said he could take it into consideration, but it would have to be presented to him in a way that he could follow. 11 RR 115–16. Hardgrave agreed he would have to hear the life story. 11 RR 116. And

when asked if he would "be a rubber stamp for the State" or make his own independent decision, Hardgrave said: "I should be able to make my own decisions." 11 RR 116. He also affirmed that he could respect another juror's decision who decided that life was the proper punishment. 11 RR 120.

## C. Trial counsel was not ineffective.

As a matter of constitutional due process, to prove a juror was biased, a petitioner must show that the juror had such a fixed opinion that the juror could not judge impartially. *See Patton*, 467 U.S. at 1035; *see also Soria v. Johnson*, 207 F.3d 232, 242 (5th Cir. 2000) ("The standard for determining when a venire member may be excluded for cause is whether the prospective 'juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'") (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)). Further, preconceived notions, as to guilt or innocence for example, are not adequate to show bias. *See Murphy*, 421 U.S. at 800. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 722-23. Moreover, an "attorney's actions during voir dire are considered to be a matter of trial strategy." *Teague v. Scott,* 60 F.3d 1167, 1172 (5th Cir. 1995). Decisions made during jury selection are not an

actionable ground for relief unless the underlying strategy is "so ill chosen that it permeates the entire trial with obvious unfairness." *Garland v. Maggio,* 717 F.2d 199, 206 (5th Cir. 1983).

Here, the record does not support Harper's claim as it pertains to these jurors. None of the jurors indicated that they would automatically vote for the death penalty in every case. Instead, the cited jurors all expressed the opinion that they could answer the special issues in such a way that either life or death would result, based on the evidence and the law. Harper's claim that the inclusion of these jurors violated *Morgan v. Illinois* simply has no merit. 504 U.S. at 729 (holding that the seating of a juror "who will automatically vote for the death penalty in every case" violates the Due Process Clause)

Harper takes certain statements the jurors made, primarily on questionnaires, views them in isolation, and then claims that these statements indicated that the jurors were "ADP" and "mitigation impaired." But it is not unusual for prospective jurors to express different and/or more complete opinions during voir dire than on the questionnaires after the legal proceedings and law are explained to them. *See Wessinger v. Vannoy*, 704 F. App'x 309, 313 (5th Cir. 2017) ("In light of this colloquy, a reasonable attorney could easily believe that, after clearing up her misunderstanding of the law regarding

parole, this juror would actually be reluctant to impose the death penalty. In view of the highly deferential standard of review, reasonable jurists would not find the district court's dismissal of this claim debatable."), *cert. denied*, 138 S. Ct. 660 (2018).

More importantly, the standard is not whether certain jurors provided statements that, at first glance, might indicate a certain bias. The question is "whether the jurors in a given case had 'such fixed opinions that they could not judge impartially.'" *Chavez v. Cockrell*, 210 F.3d 805, 811 (5th Cir. 2002) (quoting *Patton*, 467 U.S. at 1035). Contrary to Harper's claim, all of the above jurors said they could consider both aggravating and mitigating evidence, consider both special issues, and vote for either life or death based on the evidence. The jurors clarified their viewpoints after being questioned by both the State and defense. Thus, trial counsel had no grounds on which to lodge a challenge for cause or to utilize a peremptory strike. "Failure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994). And Harper has not shown that the answers would have changed had counsel simply questioned the jurors in a different manner; the questions posed by trial counsel were direct and to the point. In short, Harper has not shown that trial counsel was ineffective. *Davis*

*v. Thaler*, 511 F. App'x 327, 332 (5th Cir. 2013) ("In light of . . . our duty to give substantial deference to counsel's decisions, we cannot conclude that the choice to forgo a for-cause challenge to strike these four jurors constitutes deficient performance."). At the very least, the state court's decision cannot be deemed objectively unreasonable. Habeas relief, therefore, should be denied.

## XI. Harper's *Batson* Claim Is Procedurally Defaulted and Meritless.

Harper alleges that the State improperly struck prospective juror Donna Banks for cause, in violation of *Batson v. Kentucky*. Although the state supplied several race-neutral reasons for striking Banks, Harper contends that a comparative juror analysis refutes these reasons and that the reasons were merely pretext for discrimination. DE 17 at 170–88. This claim, however, is procedurally defaulted and meritless.

### A. The claim is procedurally barred.

It is well settled that federal review of a claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default. *Coleman*, 501 U.S. at 729; *Harris v. Reed*, 489 U.S. 255, 265 (1989); *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995). As shown below, Harper did raise a *Batson* claim pertaining to Banks on direct appeal, but the claim did not include the extensive briefing

and analysis that Harper provided on state habeas review. As a result, the CCA held that the claim was procedurally barred. *Ex parte Harper*, No. 81,576-01, Order at 2 (citing *Ex parte Jimenez*, 364 S.W.3d 866, 880 (Tex. Crim. App. 2012), and *Ex parte Nelson*, 137 S.W.3d 666, 667 (Tex. Crim. App. 2004)). The CCA bars all record-based claims not raised on direct appeal as procedurally defaulted. *Ex parte Rojas,* 981 S.W.2d 690, 691 (Tex. Crim. App. 1998); *Ex parte Gardner,* 959 S.W.2d 189, 199 (Tex. Crim. App. 1998). The Fifth Circuit has recognized that this ruling—first announced in *Gardner* and thereafter in the above cases—constitutes an adequate state ground barring federal habeas relief. *Aguilar v. Dretke*, 428 F.3d 526, 535 (5th Cir. 2005); *Gutierrez v. Quarterman*, 201 F. App'x 196, 205 (5th Cir. 2006).

Further, where a state court has explicitly relied on a procedural bar, a state prisoner may not obtain federal habeas relief absent a showing of cause for the default and actual prejudice that is attributable to the default, or that the federal court's failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. Harper does not address his procedural default in his petition; thus, he cannot overcome it. Consequently, the instant claim is barred from federal habeas review.

## B.	Facts pertaining to Harper's *Batson* claim

During the State's voir dire of Banks, she stated that she previously attended New Life Christian Center Church and obtained a minister diploma after two years of training. 7 RR 157. Banks, who initially obtained the diploma for her own spiritual growth, used her minister diploma to lead small Bible study groups. 7 RR 157.

Banks also mentioned the murder of a close friend's son who had dated her daughter. 7 RR 159. Banks stated that it was phenomenal because her friend forgave the murderer, and Banks "watch[ed] her grow and go through faith …" 7 RR 160. Banks described her friend as "at total peace with God" because she forgave the murderer. 7 RR 160. She said that she learned a lot watching her friend go through this process. 7 RR 160. Banks thought the murderer was sentenced to 40 plus years, and she thought it was an appropriate punishment because both families—the victim's and the murderer's—were distraught. 7 RR 161. Banks described the murderer as married with small children whose family was destroyed because they would see him behind bars, and he would not be able to contribute or raise his family. 7 RR 161. Banks stated:

> I mean, if you give him life in prison its more - - I think whenever
> there's an opportunity to rehabilitate someone and when someone

has true repentance - - I say, true repentance to me is not, "I'm sorry but there's a chance it would happen again." True repentance to me is, "If I was ever put in this position again, this would not occur again." And it's not that I'm just sorry that I got caught, but I'm really ailing in my heart about my actions.

So - - and I think at the end of the day when this man finally sobers up and gets the opportunity to look back over his actions that day, he'll have to deal with it the rest of his life.

7 RR 162.

When asked if she felt that the offender had repented, Banks replied:

At that particular time, probably not. But that's the thing about being in strong faith because you have to forgive whether that person is - - if they're dealing with it or not.

Some people, they'll say, yeah, I'm sorry that I did what I did. But you know, you're pulling me into another area because my thoughts are - - is this here: My faith tells me that God looks at the heart. Man looks at the outer appearance. I could be here just as guilty as the next person and you'll look at my outer appearance and determine a certain thing about me, but only the Father knows my true heart. He's the one that knows whether I'm truly sorry about the mistakes that I've made. So, forgiving someone cannot be based upon an outward appearance.

So, he could have told her he was sorry and maybe he didn't, but she had to make the decision to forgive based upon her own faith. Because at the end of the day, you know, she's got to stand before the Father herself. That's just my belief.

7 RR 162–63.

When asked if she had thought about the death penalty more since filling

out the juror questionnaire, Banks said that she was pretty settled on her

169

thoughts on the death penalty, asserting: "I don't like to see people die."  7 RR 163–64.  Banks stated that she was not one to say "oh, you killed somebody so that means you die too.  I don't feel that strongly about it.  I would have to hear more.  I would need to know the full circle of what was going on, what happened."  7 RR 164.  Banks stated that if one of her loved ones was taken from her, she would look at it from a victim's standpoint and "then on the flip side of it."  7 RR 164–65.  If one of her children did this, she questioned how much she would want her own child to suffer because of his action.  7 RR 165.

Banks then said that she would keep the death penalty for someone who had no remorse or respect for human life, such as serial killers without rehabilitation.  7 RR 165, 171.  However, she also thought life in prison was an opportunity to change, become educated, and become a role model to others in prison.  7 RR 165–66.  Banks answered "absolutely" when asked if she felt strongly about people's potential to be rehabilitated.  7 RR 166.  She thought most people could be rehabilitated if given the opportunity and if the person chose to be.  7 RR 167.  When asked if she was saying that a life sentence rather than a death sentence could serve a valuable purpose to other people, or to help others once rehabilitated, Banks replied:

> Yeah, that's what I'm definitely saying, if rehabilitation is an
> option where there will be value added, where this person can one

day add value to someone else's life. Because whatever this person did that caused them to be, you know, a candidate for capital murder, if you encounter someone that may be just selling drugs on the street and they're going to be locked up for two or three years or whatever, maybe that's where you started off. You know, I don't know what the case would be. I don't know if those types of prisoners would ever have the opportunity to comingle. I don't know very much about the jail system. I'm just saying if you take that person's life, take that person that's on death row, and they're able to be rehabilitated, and they can be used to minister to or mentor or counsel someone that's in there for something not so major and it turns that person's life around and it keeps that person from going out committing crimes, from that standpoint, yeah, I think that person should live.

7 RR 168–69. Banks then stated that the "flip side," the death penalty, was a hard decision and that the punishment was not to be left to the jurors—it was just a matter of how the jury answers the two questions. 7 RR 169. Banks agreed that she felt very strongly about rehabilitation and forgiveness, but that forgiving did not mean escaping the consequences of a bad choice. 7 RR 170.

Banks agreed that motive was important, and then she recounted a long example of a father's motive when he chose to drink and use his cell phone while driving with his children, who were killed in an accident. 7 RR 171–73. When Banks was re-directed to discussing the death penalty, she stated she could "say death penalty" depending on "what was done, how it was done, what was the motive," and how well the prosecutor presented the information and whether there was no chance for rehabilitation. 7 RR 175. Banks, who

exhibited initial confusion that the jury did not return a life or death verdict, also thought that the special issues were answered privately, not as a group with other jurors. 7 RR 176. When Banks again acknowledged that rehabilitation was very important to her, the following exchange occurred:

> Q: Right. So, what you're saying is that if there's that case where the person shows no evidence of remorse, regret about what happened, you think there's a chance that they can be rehabilitated, that's something that you're always going to consider?
>
> A: That is something that I will consider. And I think that that should be the case always.
>
> Q: Okay.
>
> A: You should always consider rehabilitation. Life is so very precious. This is not a rehearsal, we don't get to come back and do it again.

7 RR 177. Banks then stated that she would give the death penalty to someone whose crime justifies death. 7 RR 177. Banks acknowledged that whether the person can be rehabilitated is most important. 7 RR 178.

When Banks was told that she did not indicate on her questionnaire whether she agreed or disagreed with the statement: "Life imprisonment is more effective than the death penalty[,]" Banks said that she "would have to say 'yes,' because there are more people that are serving life in prison than there are on death row." 7 RR 178–79. Banks stated that her initial response

would be life in prison is more effective than the death penalty, unless she had

thirty more minutes to ponder on the question.  7 RR 179.  Banks then said:

> I would have to say life imprisonment, it's more effective because,
> wouldn't you say that because once a person is dead, they can't be
> effective.  So, I would say life in prison with the rehabilitation
> would be more effective than someone that's on death row that's
> just waiting to die.  I guess.  I guess.

7 RR 179.

During defense counsel's voir dire, counsel pointed out that the special

issues or questions did not say anything about proof of rehabilitation.  7 RR

180.  Counsel also asked Banks is she was able "to listen to the facts and reach

a determination based on the questions that are proposed to them, their

understanding of the facts, and their understanding of the law and not be close-

minded."  7 RR 180–81.  Banks answered "yes."  7 RR 181.  Defense counsel

did not ask any other questions.

At the conclusion of voir dire, the State exercised a peremptory strike

against Banks.  7 RR 181.  Then, defense counsel noted that Banks was

African-American and asked for a race-neutral explanation from the State.

7 RR 182. The prosecutor responded:

> First of all, I believe that the record will clearly show Ms.
> Banks'[s], in my opinion, inability to answer any of the questions
> that I asked her directly.  Which is a concern of mine.  I think she

called it pondering for the next 30 minutes and that's, basically, I think the way that Ms. Banks appears to evaluate things.

The other thing is that she stated that she would do away with the death penalty in favor of life without parole. She believes that rehabilitation is the most important thing to consider; and she believes, frankly, that everybody is capable of rehabilitation and that a person can actually do better in prison for life when given the opportunity with a life sentence than they could with the death penalty. She stated that - - she didn't answer the question on the questionnaire about whether or not she would - - whether she thought life in prison was more effective than the death penalty. When asked just now, she stated that she believed life in prison was more effective than the death penalty.

She also indicated that her friend or her son's friend was murdered and that the friend forgave that person who murdered her own son. I believe it is clear based on Ms. Banks'[s] background in ministry, the things that she said today, forgiveness is something she's very capable of doing and rehabilitation is something she feels very strongly about. And those are the reasons that I don't think that she would be a good juror for the State in this case.

7 RR 182–83.

Defense counsel argued that the State had exercised eight peremptory strikes, that four of those were against African-Americans: Kelvin Clark, Deidra Broadnax, Martha Pugh, and Donna Banks, and that their ratings on the juror questionnaires were the same as some of the accepted jurors. 7 RR 184. The trial court ruled that the State's reason for striking Banks was race neutral and denied the *Batson* challenge. 7 RR 184–85.

## C.    State court decisions

### 1.    Direct appeal

[Harper] next argues that the State exercised a peremptory challenge in violation of the Equal Protection Clause of the United States Constitution.  Finding no reversible error, we overrule [Harper]'s second issue.

In *Batson v. Kentucky,* the United States Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race..."  The Supreme Court set out the procedure for bringing a *Batson* objection in *Purkett v. Elem:*

> Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a *prima facie* case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.

[514 U.S. 765, 767 (1995)].  The ultimate burden of persuasion rests with the opponent of the strike (here [Harper]) to establish by a preponderance of the evidence that the strike was the product of the proponent's purposeful discrimination.

[Harper's] only evidence of discrimination is the similarity of the challenged venire-member's "jury questionnaire evaluation score" and those of the accepted members.  He does not explain what this score represents or why it should be more important than the venire-members' oral statements.  [Harper] also failed to preserve the jury questionnaires (on which he seems to rely) which would

tell us the racial composition of the venire and the racial composition of the seated jury.[15]

The State argues (and the record reflects) that the challenged venire-member gave long-winded and non-committal answers to some questions while appearing opposed to the death penalty during others. At one point she stated, "I'm pretty settled....I don't like to see people die." Further, she expressed a strong belief in rehabilitation and the desirability of forgiveness. These are race-neutral reasons for a peremptory challenge.

[Harper] has not met his burden. The trial court accepted the State's many race-neutral explanations for its peremptory challenge. On the record before us, we cannot say that this decision was clearly erroneous.

*Harper v. State*, 2012 WL 4833834 at *3 (additional footnotes omitted).

## 2.    State habeas findings and conclusions

The state habeas court issued the following findings and conclusions

pertaining to this claim:

During the State's voir dire, prospective juror Donna Banks stated that she obtained a minister diploma that she used to lead Bible study groups; that she thought it was phenomenal that a close friend had forgiven her son's murderer; that her friend was at total peace with God because she forgave the murderer; that there is an opportunity for a person given life in prison to rehabilitate himself; that being strong in faith is having to forgive a person; and, that

---

[15]    [Harper] made a record of the fact that when the State struck the contested venire-member, it had used half of its exercised-peremptory strikes against African–Americans. The record does not reflect the racial composition of the six accepted members (the races of two were not read into the record), the reasons for the other strikes against African–Americans, or the racial breakdown of the later seated jurors.

God looks at the heart and knows if someone is truly sorry [7 RR 159–62].

When asked if she had thought about the death penalty more since filling out the juror questionnaire, Banks said that she was "pretty settled" on her thoughts on the death penalty: "I don't like to see people die" and she was not one to say that you die too if you killed somebody [7 RR 164].

Banks stated that she would keep the death penalty for someone who had no remorse or respect for human life, such as serial killers without rehabilitation, but she thought life in prison was an opportunity to change, become educated, and become a role model; that she answered "absolutely" when asked if she felt strongly about people's potential to be rehabilitated; and, that she thought most people could be rehabilitated if given the opportunity and if the person chose to be [7 RR 165–7, 171].

Banks stated that rehabilitation is an option where they can minister to others or mentor others in prison; that she felt strongly about rehabilitation and forgiveness; that rehabilitation should always be considered; and, that whether a person can be rehabilitated is most important [7 RR 168–70, 177–78].

Banks stated that she would have to say that life imprisonment is more effective than the death penalty, and that would be her initial response unless she had thirty more minutes to ponder on the question [7 RR 178–89].

At the conclusion of voir dire, the State exercised a peremptory strike against Banks, and trial counsel noted that Banks was African-American and asked for a race-neutral reason for the strike [7 RR 181–82].

The prosecutor stated that Banks was unable to answer the questions directly; that she called it "pondering for the next thirty minutes"[;] that the prosecutor thought that was the way that Banks appeared to evaluate things; that Banks stated that she

would do away with the death penalty in favor of life without parole; that she believed that rehabilitation is the most important thing and everybody is capable of rehabilitation; that a person can do better in prison for life; that she did not answer the question on the juror questionnaire about whether she thought life in prison was more effective than the death penalty; that, when asked, she stated that she believed life in prison was more effective; that she talked about her friend forgiving the person who murdered her own son; and, that based on Banks'[s] background in ministry and the things she said during voir dire that forgiveness is something she is capable of and rehabilitation is something she feels very strongly about [7 RR 182–83].

The trial court ruled the State's reason for striking Banks was race-neutral and denied trial counsel's *Batson* challenge [7 RR 184–85].

On direct appeal of [Harper's] conviction, appellate counsel presented a *Batson* claim concerning the State's strike of Banks and the Court of Criminal Appeals rejected the claim, noting that the record showed that Banks "gave long winded and non-committal answers to some questions while appearing opposed to the death penalty during others"[;] that she stated that she was pretty settled and did not like to see people die; and, that she expressed a strong belief in rehabilitation and forgiveness. *Harper* [*v. State*, 2012 WL 4833834, at *3].

**********

The Court finds that State exercised nine peremptory strikes . . . [including] four against African-Americans, including Donna Banks.

The Court finds that [Harper] exercised ten peremptory strikes.[16]

---

16      In its order denying habeas relief, the CCA stated that it rejected the following findings: "finding number one hundred and eighty-nine (189); the portion of finding one hundred and ninety (190) which states that the State exercised 'five [peremptory

178

The Court finds that the prosecutor was in the best position for determining that Banks did not answer the questions directly and the trial court was in the best position to render an opinion as to the genuineness of the prosecutor's statement.

The Court finds, based on the credible affidavit of former prosecutor Denise Bradley, the prosecutor's mistaken comment that Banks would do away with the death penalty was not an improper implausible or fantastic justification to strike Banks; it was an honest mistake based on the prosecutor's impression after Banks repeatedly emphasized her belief in forgiveness and rehabilitation. *See* [SHCR 1044].

The Court finds that the prosecutor's statement that Banks thought everyone was capable of rehabilitation and that a person could do better in prison for life than they could with the death penalty is a fair assessment of Banks'[s] voir dire answers.

The Court finds, based on the credible affidavit of former prosecutor Bradley, that although she noted that Banks left something blank on her juror questionnaire[—]something that other prospective jurors also did[—]Bradley did not strike Banks because she left a blank on the questionnaire; she struck Banks because of her repeated fervent pervasive belief in rehabilitation. *See* [SHCR 1044].

The Court finds, based on the credible affidavit of former prosecutor Bradley, that although Banks was labeled a 3/3 on her juror questionnaire[—]the same number ratio given to other prospective jurors who were not struck[—]the prosecutor did not strike Banks because of her number ratio because it is not uncommon to gain a different perspective of a juror after voir dire. [SHCR 1044].

---

strikes] against Caucasians'; [and,] the portion of finding number one hundred and ninety-one (191) which follows the phrase, 'The Court finds that [Harper] exercised ten peremptory strikes.'" *Ex parte Harper*, No. 81,576-01, Order at 2.

The Court finds, based on juror Royce Ann Smith's voir dire, that juror Smith did not exhibit the same or similar characteristics as Banks; that Smith did not talk about rehabilitation during voir dire; and, that Smith did not use rehabilitation as a reason for a life sentence [9 RR 50–60].

The Court finds, based on juror Richard Cotton's voir dire, that juror Cotton did not exhibit the same or similar characteristics as Banks; that although Cotton marked on his juror questionnaire that rehabilitation is the most important objective of punishment, Cotton explained during voir dire that he read the question as [meaning] more if someone can be rehabilitated; and, that Cotton did not proffer additional discourse on rehabilitation or emphasize rehabilitation throughout voir dire as did Banks [5 RR 8, 15, 21–22].

The Court finds based on juror Randall Price's voir dire, that juror Price did not exhibit the same or similar characteristics as Banks; that Price did not mention rehabilitation during voir dire; that he thought the death penalty was unfortunate but necessary; and, that there are some crimes where it is a fitting punishment [5 RR 47–83].

The Court finds, based on alternate juror Thomas Moore's voir dire, that alternate juror Moore did not exhibit the same or similar characteristics as Banks; that Moore did not discuss rehabilitation during voir dire; that he stated he could be a juror on a death penalty case; and, that he was comfortable answering the special issues on the law and evidence, regardless of the result [11 RR 206–17].

The Court finds, based on alternate juror Nita Pavlovich's voir dire, that Pavlovich did not exhibit the same or similar characteristics as Banks; that although Pavlovich thought everyone could be rehabilitated when she was younger, she realized as she got older that some people could not; and, that she acknowledged that the special issues do not ask if a defendant is capable of rehabilitation [11 RR 127–28, 158].

The Court finds that [Harper] exercised a peremptory strike against prospective juror Roberta Summer who referred to the theory of "pull yourself up by your bootstraps" when discussing the mitigation special issue and who did not mention the concept of rehabilitation during voir dire [4 RR 252–53].

The Court finds that [Harper] exercised a peremptory strike against prospective juror June Vaughan who did not discuss the concept of rehabilitation and who would keep the death penalty if she had a choice, because there are some things that are so awful she did not think the people deserved a second chance [8 RR 29].

The court finds that the State's peremptory strike of Banks is not racially-based when compared with the State's acceptance of jurors Smith, Cotton, and Price and alternate jurors Moore and Pavlovich and to the State's willingness to accept prospective jurors Summer and Vaughan who were struck by [Harper].

The Court finds, based on the credible affidavit of former prosecutor Bradley, she struck Banks for several reasons, including her strong belief in forgiveness and rehabilitation, and that "although there were other prospective jurors who mentioned rehabilitation or thought it was important, they did not reach the intensity of Banks'[s] belief in rehabilitation and forgiveness." *See* [SHCR 1044].

The Court finds that the State engaged in meaningful voir dire of Banks and that the State did not apply a group bias; the Court finds, based on the credible affidavit of former prosecutor Bradley, that Bradley did not strike Banks because she was a member of any particular religion; instead, she struck Banks, "because, based on her background in ministry, she was strongly in favor of forgiveness and rehabilitation to the point where it was not overreaching to say that she seemed to think everyone could be rehabilitated." [SHCR 1044].

The Court finds that the State provided facially race-neutral reasons for its peremptory strike of Banks out of a venire of 120

individuals; the Court finds that the State's reasons for the strike were not pretextual or implausible or fantastic justification.

**********

[Harper's] *Batson* claim concerning the State's peremptory strike of prospective juror Donna Banks was raised and rejected on direct appeal. *Harper*[*v. State*, 2012 WL 4833834, at *3]. As such, the claim need not be addressed in the instant habeas proceedings or in subsequent proceedings. *See Ex parte Acosta*, 672 S.W.2d 470, 472 (Tex. Crim. App. 1984) (holding that reviewing court need not address previously raised and rejected issues).

In the alternative, [Harper] fails to show that the prosecutor's reasons for striking Banks were racially-based; [Harper] fails to show that the prosecutor's reasons were implausible or fantastic justifications or had a discriminatory intent. *See Harper*[*v. State*, 2012 WL 4833834, at *3] (holding that prosecutor's reasons for striking Banks were race-neutral and that Court cannot say that trial court's acceptance of such reasons as race-neutral was clearly erroneous on record before Court); *see also Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004) (holding "clearly erroneous" standard highly deferential because trial court is in best position to determine whether prosecutor's facially race-neutral reason for strike is genuinely race-neutral).

A comparative analysis of Banks to the cited jurors and prospective jurors shows that [Harper] fails to establish purposeful discrimination. *See and cf. Reed v. Quarterman*, 555 F.3d 364 (5th Cir. 2009) (employing type of comparative analysis of jurors used by Supreme Court in *Miller-El v. Dretke*, 545 U.S. 231 (2005) [*Miller-El II*]); *see also Watkins v. State*, 245 S.W.3d 444, 448 (Tex. Crim. App. 2008) (citing *Young v. State*, 826 S.W.2d 141 (Tex. Crim. App. 1991) (noting that reviewing court should consider entire record of voir dire when reviewing for clear error; reviewing court not limited to specific considerations stated by attorney)); *see also Young v. State*, 283 S.W.3d 854, 869 (Tex. Crim. App. 2009) (noting inconsequential whether prosecutor was accurate in

assertion that sole purpose of Outreach Ministries was rehabilitation; trial court not required to find *Batson* violation simply because proffered explanation proved to be incorrect).

[Harper] fails to show that the State improperly applied group bias without questioning whether it applied specifically to Banks; the prosecutor questioned Banks extensively and Banks exhaustively gave her views on forgiveness and rehabilitation, interspersed with her religious views. *Williams v. State*, 804 S.W.2d 95, 101 (Tex. Crim. App. 1991) (noting that appellate court reviews evidence from *Batson* hearing in light most favorable to trial court's ruling); *Alexander v. State*, 866 S.W.2d 1, 8 (Tex. Crim. App. 1993) (holding trial court's decision re[:] issue of purposeful discrimination is given great deference because determination requires assessment of credibility and content of striking party's explanation and all other relevant facts and circumstances).

SHCR 1292–96, 1315–16.

## D.    Harper's *Batson* claim has no merit.

### 1.    The standard

Claims of race-based use of peremptory strikes are governed by the three-step test of *Batson*. *See Rice v. Collins*, 546 U.S. 333, 973 (2006). At trial, a defendant must first make out a prima facie case that race motivated the challenged strikes. *Batson*, 476 U.S. at 96–97. If such a showing is made, the prosecutor must then provide race-neutral explanations for the strikes in question. *Id*. at 97–98. "The second step of this process does not demand an explanation that is persuasive, or even plausible." *Purkett*, 514 U.S. at 767–68. "[S]o long as the reason is not inherently discriminatory, it suffices." *Rice*,

546 U.S. at 974. Finally, the trial court must weigh the evidence and determine whether the race-neutral explanation is credible or whether it is merely pretext for purposeful discrimination. *Batson*, 476 U.S. at 98. The final step "largely will turn on evaluation of credibility." *Id*. at 98 n.21.

In turn, "[c]redibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) (*Miller-El I*). In short, the trial court considers the relevant circumstances bearing upon racial animosity. *Miller-El II*, 545 U.S. at 239. But "the best evidence often will be the demeanor of the attorney who exercises the challenge." *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality opinion).

A trial court's denial of a *Batson* claim "is entitled to 'great deference' and 'must be sustained unless clearly erroneous.'" *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)). That, however, "is the standard on direct review," but AEDPA imposes an even higher standard of review which "'demands that state-court decisions be given the benefit of the doubt.'" *Id*. (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)). "Therefore, the federal court's role is to 'determine whether the trial court's

determination of the prosecutor's neutrality with respect to race was objectively unreasonable and has been rebutted by clear and convincing evidence to the contrary.'" *Hoffman v. Cain*, 752 F.3d 430, 448–49 (5th Cir. 2014) (quoting *Murphy v. Dretke*, 416 F.3d 427, 432 (5th Cir. 2005)).

### 2. The prosecution struck Banks for race-neutral reasons.

Harper contends that three of the proffered race-neutral reasons provided by the State for striking Banks are clearly contrary to the record, specifically that Banks "did not answer questions 'directly,' she would do away with the death penalty, and she believed that everybody can be rehabilitated." DE 17 at 176–80. This is incorrect, as the prosecution was mistaken with regard to only one of its explanations.

First, as the CCA found, Banks did indeed give extremely long-winded answers that were noncommittal and often gave the impression that she would have a difficult time sentencing anyone to death. For instance, the example she gave of persons for whom the death penalty was appropriate were serial killers. She stated: "They have no respect for human life. They don't regret what they've done. They'd do it again if they were given the opportunity to. So, what is the purpose of - - there's no rehabilitation." 7 RR 165. This statement is telling because Banks did not just single out those on death row

185

who lack remorse and cannot be rehabilitated; she expressly named serial killers, who represent a minute fraction of those on death row. Given the emphasis that Banks repeatedly placed on rehabilitation, and the fact that she stated life imprisonment is more effective than the death penalty, the prosecutor could have rightly assumed that Banks would reserve the death penalty only for a specific and extreme class of murderers. Further, as shown above, Banks provided many answers in narrative form that meandered and left the impression that she was equivocating. *See Miller-El II*, 545 U.S. at 248 (noting that peremptorily striking a venireperson for inconsistent answers can be a race-neutral reason).

Second, the prosecutors statement that Banks believed "that everybody is capable of rehabilitation and that a person can actually do better in prison for life when given the opportunity with a life sentence than they could with the death penalty" is a fair assessment of Banks's voir dire answers. Banks repeatedly emphasized the importance and value of rehabilitation, leaving the impression that she viewed everyone through that prism and was inclined to find rehabilitation except in extreme cases. Indeed, she emphasized that of all factors to consider in sentencing, rehabilitation was the most important. 7 RR 178. Even though she stated she would keep the death penalty for someone

who shows no remorse, namely serial killers, she still acknowledged that she would always consider rehabilitation even in a case where the person shows no remorse. 7 RR 165, 177; *see Haynes v. Quarterman*, 526 F.3d 189, 200 (5th Cir. 2008) (where prospective juror stated "to sentence someone to death is a last resort" and that the sentence of death would be applied if there is "not a possibility of redemption, of improvement on that person," these are valid and acceptable race-neutral explanations). Again, her answers illustrate that she was inclined to reserve death only for the extreme of the extreme and that nearly everyone else could likely be rehabilitated. *See Davis v. Ayala*, 135 S. Ct. 2187, 2200 (2015) ("[The venireperson's] voir dire responses amply support the prosecution's concern that he might not have been willing to impose the death penalty."); *Hoffman*, 752 F.3d at 449 (accepting hesitancy to impose a death sentence as race-neutral).

Third, although the prosecutor mistakenly said that Banks would do away with the death penalty, it is understandable that the prosecutor came away with this impression. Although Banks stated at one point that she would keep the death penalty, she qualified her answer by pointing to those who had no remorse—i.e., serial killers—and if there was no potential for rehabilitation. 7 RR 165. Throughout her voir dire, Banks repeatedly

emphasized her belief in life being more effective and her belief in rehabilitation and forgiveness. As prosecutor Denise Bradley noted in her affidavit, her mistaken comment was not a "fantastic justification" to strike Banks; "it was an honest mistake based on the impression I came away with after Banks repeatedly emphasized her belief in forgiveness and rehabilitation in her voir dire." SHCR 1044. The prosecutor's mistaken recall when viewed against the tenor of Banks's voir dire was not an improper or implausible or fantastic justification. Also, the prosecutor's assertion is only one of several race-neutral reasons that the prosecutor gave for striking Banks. In fact, the prosecution provided at least six reasons, as shown above.

Given these facts, the state courts' denials of relief cannot be deemed unreasonable.

### 3. Harper's additional complaints lack merit.

Harper alleges:

While Banks was the only prospective juror with a minister's diploma, the State's explanation for striking her because of her background in the ministry and ability to forgive is not legitimate because the State improperly applied a group bias without questioning whether it applied to Banks specifically. Furthermore, the State did not engage in a meaningful voir dire examination on the subject of either forgiveness or Banks'[s] background in the ministry.

DE 17 at 185. Harper also claims that, regarding the ministry and forgiveness, the State asked Banks only superficial questions about these topics. *Id.* This allegation lacks merit. A review of Banks's voir dire shows that she was overwhelmingly forthcoming with her views on forgiveness, regardless of the questions. As previously noted, the prosecutor questioned Banks about her background in the ministry, and Banks repeatedly emphasized her feelings of forgiveness, equating it with her faith. 7 RR 157–62. Indeed, one of the characteristics of Banks's voir dire—and one of the reasons the State stuck her—is that she provided lengthy answers in narrative form describing her beliefs and feelings in detail, such that the State had no reason to probe any further.

Further, Harper fails to show that the State improperly applied group bias without questioning whether it applied specifically to Banks. Harper relies on the holding in *Emerson v. State*[17] to support his allegation. However, *Emerson* is factually distinguishable. In *Emerson*, the prosecutor testified that he struck a prospective juror because he was an unemployed college student or professor suggesting "a very liberal attitude." *Id.* at 272. When the prosecutor

---

[17]     851 S.W.2d 269 (Tex. Crim. App. 1993).

remembered that the prospective juror was a college teaching assistant, he repeated his belief that this suggested severe liberalism. *Id.* at 272–73. However, the prosecutor did not individually question the prospective juror. Therefore, the prosecutor applied a group bias without inquiring whether it applied to her specifically. *Id.* at 274. Harper also relies on *Reed v. Quarterman* where the State struck a juror because she was health care professional and did not ask the juror any questions about her profession. 555 F.3d at 377.

In Harper's case, the prosecutor questioned Banks extensively, and Banks exhaustively gave her views on forgiveness and rehabilitation, interspersed with her religious views. As the prosecutor stated when giving several reasons for striking Banks, "I believe it is clear based on Ms. Banks'[s] background in ministry, the things she said today, forgiveness is something she's very capable of doing and rehabilitation is something she feels very strongly about." 7 RR 183. Also, the prosecutor did not strike Banks because she was a member of any particular religion; instead, the prosecutor struck Banks because, based on her background in ministry, "she was strongly in favor of forgiveness and rehabilitation to the point where it was not overreaching to say that she seemed to think everyone could be rehabilitated."

SHCR 1043–44.  In other words, this is not a case where the prosecution struck a juror based on a single piece of information without inquiring further.  The totality of Banks's voir dire left the State with the impression, arguably correct, that she would not be a favorable juror.

### 4.    Comparative juror analysis

Harper claims that he has demonstrated a *Batson* violation because other jurors who were not struck also failed to complete juror questionnaires and also emphasized on their questionnaires the importance of rehabilitation.  DE 17 at 180–85.

As a preliminary matter, the Fifth Circuit has recently rejected the argument that a state is required, under *Miller-El II*, to conduct a comparative juror analysis.  *Chamberlin v. Fisher*, 885 F.3d 832, 838–39 (5th Cir. 2018) (en banc).  "This is especially true where, as here, the defendant never sought a comparative juror analysis."  *Id.* at 839.  Regardless, the state court's comparative analysis here demonstrates that no *Batson* violation occurred.

### a.    Juror Smith

Harper states:

Similar to prospective juror Banks, one seated white juror, juror Smith, agreed with the statement that "Life in prison is more effective than the death penalty."  [DE 17, Exhibit 13 at 10 (Questionnaire – Smith)].  Juror Smith agreed with this statement

191

on her questionnaire, and when questioned about it during individual voir dire responded "It depends on what the crime is. I mean, to me, sometimes life imprisonment is worse than the death penalty. That's my own opinion." [9 RR 55].

DE 17 at 181.

According to the affidavit of prosecutor Bradley, which the state court deemed credible, although she noted that Banks left an answer blank on her juror questionnaire—something that other prospective jurors also did—Bradley did not strike her for that reason. SHCR 1044. The reason for the strike was Banks's assertion that she believed life in prison was more effective. *Id.* She also struck Banks due to her repeated, pervasive belief in rehabilitation, one not espoused in the same manner by juror Smith. A review of juror Smith's voir dire shows a marked difference from Banks's answers. Smith initially stated that after she filled out the questionnaire, she went home and thought she "probably should have put some different stuff" but she did believe in the death penalty. 9 RR 50. When asked about her questionnaire agreement that life is more effective than the death penalty, Smith stated that it depends on what the crime is, that the person never gets out of prison, and that life without parole is a horrible life. 9 RR 55–56. Smith did not talk about rehabilitation during her voir dire, and she did not use rehabilitation as a reason for life without parole, as did Banks. Smith stated that she would keep

the death penalty because there are certain cases where the crime is horrific, such as brutal multiple murders and torture. 9 RR 56. That is a significant difference from Banks's suggestion that the death penalty should be reserved for serial killers.

When asked if she would be more likely to give someone life because she thought that life without parole was a horrible, miserable life and bad punishment, Smith stated that it depends on the circumstances and evidence. 9 RR 60. Smith acknowledged that she had been in favor of the death penalty all her life. 9 RR 74. If Smith opened up the newspaper ten years from now and read that the defendant had been executed, she would feel that "[j]ustice was served." 9 RR 75. Smith also clarified a mistaken answer on her questionnaire where she indicated that she did not believe in the death penalty; Smith stated that is not true, and she does believe in the death penalty. 9 RR 77–78. Because juror Smith did not exhibit the same or similar characteristics as Banks, the State's strike of Banks cannot be considered racially-based when compared with the State's acceptance of Smith.

### b.    Juror Cotton

Harper claims that Juror Cotton on his questionnaire "also chose rehabilitation as the most important objective of criminal punishment" and

emphasized rehabilitation during his voir dire. DE 17 at 183. But Cotton stated that he was a believer in "an eye for an eye," acknowledged that there had to be evidence to answer the first special issue, and that he would consider all the evidence in answering the mitigation special issue. 5 RR 8, 15, 21–22. When asked about his questionnaire answer concerning rehabilitation, Cotton explained that he said rehabilitation was more important than punishment because, in context, rehabilitation encompasses more. 5 RR 26. In other words, he considered punishment as a "means" but it is not an "end" "[u]nless you attempt to rehabilitate." 5 RR 26. Cotton did not say anything else about rehabilitation or emphasize rehabilitation throughout his voir dire as did Banks.

### c. Juror Price

Harper also claims that Juror Randall Price picked rehabilitation as the most important objective of punishment for criminal offenses. DE 17 at 182. Price thought that the death penalty was unfortunate but necessary, and that there are some crimes where it is the fitting punishment. 5 RR 47. Price said he envisioned a case where the crime itself was so bad that the defendant was a continuing threat to society. 5 RR 58–59. Price was open to answering the first special issue depending on the circumstances. 5 RR 61. Price understood

that different defendants might be deserving of different sentences based on their personal moral culpability. 5 RR 66–67. Price stated that he was capable of following the law and understood the guidelines. 5 RR 75. Price also acknowledged that life without parole is a horrible punishment. 5 RR 83. Importantly, Price did not mention rehabilitation during his voir dire examination.

### d. Alternate Juror Moore

Like Price, Harper claims that alternate juror Thomas Moore picked rehabilitation as the most important objective but was not questioned about it. However, Moore stated that he could be a juror on a death penalty case. 11 RR 206. Moore would want to know someone's track history to predict the future. 11 RR 212. Moore acknowledged that he could keep an open mind in answering the first special issue, and that one person's moral culpability could be greater than another's. 11 RR 213–14, 216. Moore was comfortable answering the special issues based on the law and evidence regardless of the result. 11 RR 217. Moore did not discuss the concept of rehabilitation during voir dire.

### e. Alternate Juror Pavlovich

Harper claims:

> Alternate juror Pavlovich also stated on her questionnaire that rehabilitation was the most important objective, without a written

195

explanation. [DE 17, Exhibit 11 at 10 (Questionnaire – Pavlovich)]. When questioned about her views concerning rehabilitation during voir dire, she stated similarly to prospective juror Banks that not everybody could be rehabilitated: "But as I got older, you know . . . some people can be rehabilitated . . . and some people, in my opinion, cannot." [11 RR 128].

DE 17 at 183. But Pavlovich thought that the special issues were fair questions. 11 RR 131. She was open to answering the first special issue and the mitigation issue either "yes" or "no" depending on the evidence. 11 RR 135, 143. Pavlovich stated that when she was younger she thought that everyone could be rehabilitated, but that as she got older she realized that some people could not. 11 RR 127–28. She also acknowledged that the special issues do not ask if the defendant is capable of rehabilitation. 11 RR 158.

f. **Juror Summer**

Harper claims: "Prospective juror Summer picked 'rehabilitation' and wrote in 'This is a hard choise [sic]; however, rehab can be very good if obtainable. Both rehab and punishment should go hand in hand.' [DE 17, Exhibit 14 at 10 (Questionnaire – Summer)]. She was not questioned about rehabilitation during voir dire." DE 17 at 183–84. But prospective juror Roberta Summer, who was peremptorily struck by Harper's trial counsel, thought that the death penalty was appropriate for premeditated murder and that she strongly felt that someone does not have the right to take another's

life.  4 RR 227.  When asked if the first special issue asks for a prediction of the future, Summer stated a "little bit" but "probably they're going to be pretty bad people."  4 RR 233.  Summer acknowledged that she was open to answering the first special issue and the mitigation issue either "yes" or "no" depending on the evidence.  4 RR 235–41.  Summer thought it would be hard to actually put someone to death, "but, you know, if that's what they need, that's, you know -- because I do believe in the death penalty."  4 RR 243.  Summer, on her juror questionnaire, indicated that she felt that she did not want someone in society who does not respect someone else's life, and she did not want to use her tax dollars for their welfare.  4 RR 247.  Summer also referred to the theory of "pull yourself up by your bootstraps" when discussing the mitigation special issue.  4 RR 252–53.  Summer did not mention the concept of rehabilitation during voir dire.

### g.    Juror Vaughan

Harper states: "Additionally, the State accepted prospective juror Vaughan who selected rehabilitation and wrote in 'but I'm not sure that is always possible, seeing as there are so many repeat offenders.' [DE 17, Exhibit 15 at 10 (Questionnaire – Vaughan)].  She was not asked about her feelings concerning rehabilitation during voir dire."  DE 17 at 184.  Prospective juror

June Vaughan did not believe the death penalty was a deterrent, but she did not have a problem with it in cases where a defendant has repeatedly broken the law. 8 RR 14. Vaughan thought that walking in somewhere with a gun for a robbery meant that a person already had the idea that a murder could happen. 8 RR 18. Vaughan thought that a person could predict the future by looking at the past. 8 RR 21. Vaughan was open to answering the first special issue either "yes" or "no" depending on the circumstances and the evidence. 8 RR 22–24. Vaughan stated that she would keep the death penalty if she had the choice because there are some things that are so awful she did not think the people needed a second chance. 8 RR 29. Vaughan did not discuss the concept of rehabilitation. The State accepted Vaughan as a juror, but defense counsel exercised a peremptory strike. 8 RR 47.

### h.    Juror Hardgrave

Harper states:

> Seated juror Hargrave did not complete the entirety of page twelve of the questionnaire, even leaving the signature line blank that asks the juror to certify that his responses are true and correct. [DE 17, Exhibit 6 at 13 (Questionnaire – Hargrave)]. Despite his failure to complete the questionnaire, the State did not question Hargrave regarding any of the questions on page twelve or ascertain why he did not finish the form.

DE 17 at 180–82. Juror Hardgrave's testimony was addressed above. As shown, he did not give the State any reason to question his impartiality, as did Banks.

### 5. A comparative analysis undermines Harper's claim.

A review of the voir dire examinations does not support Harper's claim. The State logically would not choose to strike either Summer or Vaughan because both were apparently pro-State jurors, regardless of one response on their lengthy juror questionnaires. Also, juror Price and alternate juror Moore never mentioned rehabilitation during their voir dire examinations. Juror Cotton only responded to a question about the concept, and he did not repeatedly return to it as an underlying principle in his belief system, as did Banks. Alternate juror Pavlovich stated that she realized some people could not be rehabilitated and acknowledged that it was not part of the special issues. Unlike Banks, Pavlovich did not dwell on the concept of rehabilitation. As Bradley stated in her affidavit, she did not strike Banks for racially-based reasons; Bradley struck Banks for several reasons, one of which was that her entire voir dire seemed to be focused on her very strong belief in forgiveness and rehabilitation, which gave Bradley the impression that Banks seemed to think that everyone could be rehabilitated. SHCR 1043.

Although there were other prospective jurors who mentioned rehabilitation or thought that it was important, they did not reach the intensity of Banks's belief in rehabilitation and forgiveness. To Banks, the concept of rehabilitation was paramount and essentially the theme of her entire voir dire. Thus, a comparative analysis of the cited jurors, prospective jurors, and Banks shows that Harper fails to establish purposeful discrimination. *See and cf. Reed*, 555 F.3d at 376–82 (employing type of comparative analysis of jurors used by Supreme Court in *Miller-El v. Dretke*).

### 6. The prosecution's reasons for striking Banks were not a pretext for discrimination.

"Whether a defendant has carried his burden under *Batson*'s third step to prove purposeful discrimination is based on the persuasiveness and credibility of the prosecutor's justification for his exercise of the peremptory strike. Because of the importance of demeanor and credibility evidence in making such determinations, we give strong deference to the determination of the trial judge, consistent with AEDPA." *Woodward v. Epps*, 580 F.3d 318, 336 (5th Cir. 2009). As shown, the prosecution offered numerous valid race-neutral reasons for striking Banks. The trial court deemed the prosecution's race-neutral reasons for striking Banks to be credible, and Harper has failed to rebut this presumption with clear and convincing evidence. Harper, moreover,

offers nothing to demonstrate that the prosecutor's reasons were pretext for discrimination. He simply assumes pretext by claiming that three of the prosecutor's reasons were untrue, DE 17 at 187–88, but that claim is itself incorrect. Without more, Harper's claim is conclusory and must be rejected. Because the state court's decision is not unreasonable, habeas relief must be denied.

## XII. Harper's Claim that Appellate Counsel Was Ineffective for Failing to Conduct a Comparative Juror Analysis in the Direct Appeal Brief Is Meritless.

In connection with the above claim, Harper alleges that appellate counsel was ineffective for failing to properly brief a *Batson* claim on direct appeal. In particular, Harper faults appellate counsel for not conducting a comparative juror analysis. DE 17 at 189-93. The state habeas court correctly rejected this claim. SHCR 1296, 1316.

Appellate counsel did raise a *Batson* claim on direct appeal, as shown. The claim was not briefed to the extent that Harper briefed it on state habeas review and in the instant federal petition. But this is of no moment. A comparative juror analysis was not required, *see Chamberlin*, and reveals no *Batson* error, as discussed above. Thus, appellate counsel was not ineffective

for failing to more thoroughly brief this matter. The state court's denial is not objectively unreasonable, and this claim should be denied.

## XIII. Trial Counsel Was Not Ineffective for Failing to Preserve Additional *Batson* claims.

Harper alleges that trial counsel was ineffective for failing to request race-neutral reasons, or making *Batson* challenges, when the State struck prospective jurors Clark, Broadnax, and Pugh. DE 17 at 193–95. The state court rejected this claim as follows:

> During voir dire, prospective juror Deidra Broadnax stated that she was not sure she could have it on her conscience to send someone to death; that she could never be put in the position of making a decision that would result in a "living human being executed"[;] that she would not want to be judge or juror involving another person's life; that it would affect her for the rest of her life and she did not want to be in that position; that everybody can "repent" and be rehabilitated but a person could never be rehabilitated from the death penalty; [] that she answered "probably not" when asked if she could participate in the proceedings knowing that death was a possible punishment; and, that she answered "I don't think so" when asked if she could follow the law if the law tells her the person should get the death penalty [6 RR 61–71].

> During the voir dire of Kelvin Clark, he stated that he was nervous, speechless, and uncomfortable about the whole thing; that he "freezes up a lot, especially when it comes to situations like this"[;] that he was new to Texas and had heard of more death penalties in Texas and he did not think that was right; that he shook his head when asked if he did not feel like he could give someone the death penalty; that he answered "no" when asked "regardless of the circumstances"[;] that he affirmed his answer on

202

the questionnaire that he thought execution of criminals is a disgrace to civilized society; that he would feel like a murderer if he participated in something where a person got the death penalty; and, that he could not live with that [5 RR 99–106].

During the voir dire of Martha Pugh, she stated that she would do away with the death penalty if she were Governor; that [s]he thought a life sentence was more punishment; that she thought that blacks get punished more harshly than whites and the death penalty is given more to blacks than whites; that when asked whether [Harper] being a black male would influence her decision at punishment if he were found guilty, she stated "I would say probably do life imprisonment"[;] that she answered "I guess I couldn't" when asked what her thoughts were about sitting on a jury and making a decision that might result in a death sentence; that when asked if she would always answer the mitigation issue in such a way so that life would result instead of death, she stated, "I would go with the life sentence" and answered "Uh-huh" when asked "always?" [7 RR 112–13].

The State exercised peremptory strikes against Broadnax, Clark, and Pugh after unsuccessfully challenging Pugh for cause [5 RR 110;] [6 RR 77;] [7 RR 113–17].

After the State exercised a peremptory strike against Broadnax and after Broadnax left the courtroom, trial counsel stated that Broadnax made it very clear that "she was not going to be able to do this" and that counsel was not making a *Batson* challenge [6 RR 77–78].

The Court finds that there is a distinct difference between the voir dire examinations of the sitting jurors and the voir dire examinations of Clark, Broadnax, and Pugh who all exhibited an extreme reluctance or unwillingness to render a death sentence.

The Court finds that even though the voir dire of Clark, Broadnax, and Pugh may have made them barely ineligible for a challenge for

cause, the entirety of their voir dire examinations indicate the race-neutral reasons why the State struck them.

The Court finds, based on the credible affidavit of former prosecutor Denise Bradley, that she reviewed the voir dire examinations of Clark, Broadnax, Pugh, and Donna Banks, and she did not strike any of the prospective jurors for racially-based reasons. *See* [SHCR 1045].

The Court finds that trial counsel are not ineffective for not requiring race-neutral reasons for striking Clark, Broadnax, and Pugh to preserve meritless *Batson* claims in light of the fact that the State's strikes were race-neutral.

\*\*\*\*\*\*\*\*\*\*

[Harper] fails to show that the State's peremptory strikes of prospective jurors Deidra Broadnax, Kelvin Clark, and Martha Pugh were not race-neutral; a comparison of their voir dire examinations with those of sitting jurors shows that the cited prospective jurors were apparently unable or exhibited an overwhelming unwillingness to render a death sentence. *Cf. Reed*[,] 555 F.3d [at] 372 [] (quoting *Miller-El II*, 545 U.S. [at] 241 [] that "more powerful than these bare statistics . . . are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve.").

[Harper] fails to show that trial counsel are ineffective for not lodging meritless *Batson* challenges to the State's peremptory strikes of Broadnax, Clark, and Pugh to preserve meritless *Batson* claims. *See Bone*, 77 S.W.3d at 833 (stating that to prove ineffective assistance defendant must show not only that counsel was deficient, but also that deficiency was prejudicial).

SHCR 1297–98, 1316–17.

In his petition, Harper provides no briefing explaining why a *Batson* challenge was warranted after the State struck these jurors. *See* DE 17 at 193–95. Indeed, he does not address their voir dire testimony at all, and it is clear defense counsel did not believe a *Batson* challenge was warranted for Broadnax. Without more, Harper cannot demonstrate that he is entitled to relief. The Fifth Circuit "has made clear that conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding." *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000).

## XIV. Harper's Ineffectiveness Claim Pertaining to Counsel Not Seeking a Written Agreement for a Plea Deal with the State Has No Merit.

Next, Harper alleges:

> Defense counsel facilitated an interview between the State's expert, Dr. Mark Moeller, and Harper on the understanding that if Dr. Moeller agreed with defense expert Dr. Richard Dudley's finding that Harper suffered from mental illness, Harper would be allowed to plea to a life sentence. However, trial counsel failed to obtain a written record of this agreement, preventing them from enforcing it when the state did not offer Harper the opportunity to plead to life without parole as agreed.

DE 17 at 196. Harper's claim is premised on an e-mail from defense counsel in which counsel states that he "was under the impression that if we permitted the State expert access to our client and he agreed with our expert then [the district attorney] would approve letting us plea to life without parole." *Id.* at

205

197 (quoting SHCR 671).  Harper states: "Despite the obvious importance of such an agreement, counsel failed to reduce the agreement to writing, and was thus unable to enforce it when the State reneged on the arrangement."  *Id.*  This allegation has no merit.

## A.  State court findings

The Court finds, according to the credible affidavits of prosecutor Anna Emmons and former prosecutor Denise Bradley, that trial counsel requested several meetings and made numerous attempts to get the State to agree to a plea of life but was never successful; that there was never an agreement with trial counsel that [Harper] could plead to life if the State's mental health expert agreed with the defense expert; and, that while trial counsel might have hoped or assumed that the State would agree to a plea to life if the State's expert agreed with the defense expert, there was never a potential agreement based on the State's expert's findings. [SHCR 1039–40, 1043].

The Court finds, according to the credible affidavits of prosecutor Anna Emmons and former prosecutor Denise Bradley, that trial counsel did not talk about any so-called agreement based on the State's expert's findings and never approached the State or the trial court with any complaint that a so-called agreement had been breached.  [SHCR 1039–40, 1043].

The Court finds that trial counsel are not ineffective for not getting in writing a non-existent plea agreement.

**********

[Harper] fails to show ineffective assistance of trial counsel based on counsel not getting in writing an agreement that did not exist; [Harper] fails to show that the State agreed to a plea of life if the State's mental health expert agreed with the defense expert.

206

*Cf. Kinnamon v. State*, 791 S.W.2d 84, 97 (Tex. Crim. App. 1990) (counsel not ineffective for failing to request jury charge on lesser-included [offense] of murder when the evidence did not support such charge).

SHCR 1299, 1317. This decision is not objectively unreasonable.

**B.     Harper's claim has no merit.**

The only evidence Harper points to as evidence that a plea agreement existed is an e-mail from defense counsel James Stafford to a Harris County prosecutor. In this e-mail, Stafford appears to be under the impression that Harris County might be amenable to a plea agreement, subject to the condition that the State's expert—who would be allowed to interview Harper—agreed with the defense's expert about Harper's mental state. SHCR 671. But in a subsequent e-mail, Stafford states that the prosecutors actually trying Harper's case "had denied my request for a plea." SHCR 673. The latter e-mail comports with the affidavits from the prosecutors that they had no intention of seeking a plea agreement and never offered one to Harper. As the state court findings make clear, defense counsel cannot be ineffective for failing to secure an agreement that never existed. And Harper cannot demonstrate any prejudice. *Cf. Missouri v. Frye*, 566 U.S. 134, 148 (2012) ("In order to complete a showing of *Strickland* prejudice, defendants who have shown a reasonable probability they would have accepted the earlier plea offer must

also show that, if the prosecution had the discretion to cancel it or if the trial court had the discretion to refuse to accept it, there is a reasonable probability neither the prosecution nor the trial court would have prevented the offer from being accepted or implemented."). Moreover, "there is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial. It is a novel argument that constitutional rights are infringed by trying the defendant rather than accepting his plea of guilty." *Weatherford v. Bursey*, 428 U.S. 545, 561 (1977). For these reasons, Harper's claim has no merit, and habeas relief must be denied.

## XV. Harper's Claim that Trial Counsel Was Ineffective for Failing to Seek to Suppress Harper's Confession Due to Severe Mental Illness Lacks Merit.

Harper alleges that trial counsel was ineffective for failing to present evidence of his mental illness as a basis for suppressing his confession. DE 17 at 199. He claims that counsel had compelling evidence of his psychotic disorder that counsel could have used to argue his confession was involuntary and that he did not voluntarily waive his *Miranda* rights. *Id.* at 200. For instance, Harper argues that, three weeks before the suppression hearing, counsel filed a motion to preclude the death penalty as a sentencing option based on his mental illness, which included a summary of the evidence

documenting Harper's history of mental illness. *Id.* at 201. The motion included evidence from Dr. Dudley and a Harris County MHMR assessment. *Id.* at 201–02. Harper claims counsel should have utilized this evidence to challenge the admission of his confession, particularly because the evidence indicated Harper was "suffering from hallucinations in close proximity to his confession." *Id.* at 202, 207. Harper also refers to Dr. Dudley's affidavit, in which he essentially opines that Harper's confession was not voluntary due to his mental illness. *Id.* at 204–05. Finally, Harper alleges that the admission of the confession resulted in prejudice. *Id.* at 208–10.

Harper's allegations are meritless because given the totality of the circumstances, his confession was not involuntary. Indeed, evidence of mental illness would not have changed the judge's mind because the judge viewed the videotaped confession in its entirety and, thus, was able to observe Harper while he confessed. Consequently, the state court properly rejected this claim.

### A. Hearing on pretrial motion to suppress

In Harper's October 28, 2008 motion to suppress, he alleged that his confession was not voluntary; that it was the result of promises and other coercive actions; that he was not given his statutory warnings and constitutional rights; that his right to remain silent was not honored after he

repeatedly attempted to stop the questioning; that he was not provided an attorney after requesting counsel; that he was not immediately taken before a magistrate; and that his arrest was illegal. CR 32–35. Harper also filed a motion to suppress on August 24, 2010, asserting that his statement was involuntary and coerced, that he was not immediately taken before a magistrate, and that he was not given his warnings and rights. CR 1106–07.

During the September 16, 2010 pre-trial motion to suppress hearing, Collin Howard, HPD homicide division, testified that he arrived at the scene of the offense at approximately 6:12 or 6:15 p.m. on October 24, 2008. He found the three victims in the condo, talked to Triska Rose's friends and relatives at the scene, and learned that Triska Rose was wanting to leave her boyfriend Harper. 12 RR 12–15. Howard then learned that Harper had arrived at the scene and turned himself in to police; Howard approached the patrol unit in which Harper had been placed. 12 RR 15–17. Howard asked Harper if he was okay and if he needed medical attention. Harper said "no" but did say he was hungry. 12 RR 18. Harper was coherent at this time. 12 RR 18. Howard instructed one of the other officers to take Harper to the homicide office and, after remaining at the scene for a little longer, Howard stopped by Whataburger to get food for Harper. 12 RR 19.

When Howard arrived at the homicide office, he learned that Harper had been given water and allowed to use the restroom. 12 RR 20. Howard then gave Harper his food and left him alone in the interview room to eat. 12 RR 21. Howard returned to the interview room after Harper finished eating and introduced himself again to Harper. Harper asked Howard: "Are you going to read me my rights?" 12 RR 22. Howard indicated that he was, left the room to start the tape, and then returned to the room with Officer Johnston. 12 RR 22. The tape was started on 1:45 a.m. on October 25, 2008. 12 RR 25. Howard testified that State's Exhibit 1 fairly and accurately depicted the conversation he had with Harper on October 25, 2008. 12 RR 24.

Howard testified that Harper did not appear to be under the influence of drugs or alcohol, and he appeared to understand what was going on. 12 RR 25. Harper was not promised anything, threatened in any way, or coerced to give a statement. 12 RR 25. Instead, Harper appeared eager to give a statement and tell what happened. 12 RR 25. Howard testified that he read Harper his *Miranda* warnings after the tape was started, that Harper indicated that he understood the warnings, and that he waived those rights on the tape. 12 RR 25–26. Harper was not handcuffed during the interview and the officers were not armed. 12 RR 26–27. The interview lasted approximately one hour and

twenty minutes and ended at 3:15 a.m.  12 RR 27.  After the interview, an officer escorted Harper to the restroom.  12 RR 28.  While Harper was using the restroom, Howard called the District Attorney's Office, where charges of capital murder were accepted.  12 RR 28.  Officer Lozano transported Harper to jail, but Harper threatened to kill himself at approximately 5:30 a.m. at the jail.  Harper was then taken to the neuropsychiatric center, where he was examined by a doctor, cleared, and then taken to the jail.  12 RR 29–30. Howard testified that Harper never threatened to kill himself in Howard's presence, and he did not appear suicidal when Howard was talking with him 12 RR 31.

On cross-examination, defense counsel elicited testimony that Howard was at the crime scene about six hours before Harper appeared and turned himself in to police.  12 RR 32.  Also, Harper had an abrasion on his cheek from being taken into custody.  12 RR 33.  Howard knew that Harper had been arrested before because Howard knew he was on parole.  12 RR 35.  Howard acknowledged that Harper made the statement, "That's why I may not need to waive them rights," and said that he was not sure if he should waive his rights. 12 RR 35–36.  In answer to Harper's statement, Howard indicated his agreement that Harper had to have an attorney prior to talking if he did not waive his rights.  12 RR 36–37.  In response to Howard's testimony about

212

Harper being taken to the hospital because he threatened suicide, trial counsel asked if threatening suicide was not uncommon for people charged with capital murder. 12 RR 41–42. Howard responded that he did not know because he did not work in the jail. 12 RR 42. Howard also testified that HPD officers did not take Harper before a magistrate. 12 RR 42–43.

During redirect examination, Howard testified that after he read Harper his rights, Harper stated: "I waive my rights. I waive my rights." Then, the conversation continued. 12 RR 43. Also, Harper was given his magistrate's warnings around 1:00 p.m. on October 25, 2008, after he had been to the jail, then the psychiatric hospital, and then booked into the jail. 12 RR 44.

After testimony, defense counsel argued that there was an unreasonable delay in taking Harper before a neutral magistrate to give him his warnings; that Harper did not intelligently and voluntarily waive his *Miranda* rights; and that he asserted his right to remain silent. 12 RR 46–47, 49–50. However, defense counsel stated that although the police "definitely wanted a confession out of [Harper] . . . I won't say it was duress. I won't say they were coerced but they definitely had not my client's interests at heart." 12 RR 47. The trial court—after stating that it had watched the video of Harper's statement— made the following findings: that there was no unnecessary delay in taking

Harper before a magistrate; that Harper was taken before a magistrate within the forty-eight hour period allowed; that the video clearly shows that Harper was given his warnings; that Harper did not appear in any way intoxicated or under the influence of anything; that he was not promised anything; that he was not coerced or forced in any way; that he appeared to understand all his warnings and specifically asked questions about the warnings; that asking a question about a warning is not asserting a right; that he never said he did not want to talk to the officers; and that he specifically said he waived his rights a couple of times. 12 RR 51–52. The trial court found that Harper's statement was voluntary; that he waived his rights; that he did not assert his right to remain silent; and that his statement was properly taken 12 RR 52. The trial court admitted the statement for purposes of the trial. 12 RR 52. Defense counsel also conceded that he would not object to Harper's voluntary statement to the police at the scene—"I've come to turn myself in"—being presented to the jury.

### B.  State court findings

The Court finds that [Harper], in his October 28, 2008 motion to suppress his statement, alleged that his confession was not voluntary; that it was the result of promises and other coercive actions; that he was not given his statutory warnings and constitutional rights; that his right to remain silent was not honored after he repeatedly attempted to stop the questioning;

214

that he was not provided an attorney after requesting counsel; that he was not immediately taken before a magistrate; and, that his arrest was illegal [CR 32–35].

The Court finds that [Harper], in his August 24, 2010 motion to suppress his statement, alleged that his statement was involuntary and coerced; that he was not immediately taken before a magistrate; and, that he was not given his warnings and rights [CR 1106–07].

During the September 16, 2010 pre-trial motion to suppress hearing, Collin Howard, Houston Police Department homicide division, testified that [Harper] declined medical attention after he turned himself in but said he was hungry; that [Harper] was coherent; that [Harper] was given food and water at the homicide office and allowed to use the restroom; that [Harper] was read his rights; that [Harper] did not appear to be under the influence of drugs or alcohol and he appeared to understand what was going on; that [Harper] was not promised anything, threatened in any way, or coerced to give a statement; that [Harper] indicated that he understood the warnings and he waived those rights on the tape; and, that he was given his magistrate warnings around 1:00 p.m. on October 25, 2008, after he had been to the jail, then the psychiatric hospital, and then booked into the jail [12 RR 18–26, 43–44].

The Court finds that, at the conclusion of the September 16, 2010 motion to suppress hearing, trial counsel argued that there was an unreasonable delay in taking [Harper] before a neutral magistrate to give him his warnings; that [Harper] did not intelligently and voluntarily waive his *Miranda* rights; and, that he asserted his right to remain silent [12 RR 46–47, 49–50].

The Court finds that the trial court, after stating that it had watched the video of [Harper's] statement, made the following findings: that there was no unnecessary delay in taking [Harper] before a magistrate; that [Harper] was taken before a magistrate within the forty-eight hour period allowed; that the video clearly

shows that [Harper] was given his warnings; that [Harper] did not appear in any way intoxicated or under the influence of anything; that he was not promised anything; that he was not coerced or forced in any way; that he appeared to understand all his warnings and [specifically] asked questions about the warnings; that asking a question about a warning is not asserting a right; that he never said he did not want to talk to the officers; and, that he specifically said he waived his rights a couple of times [12 RR 51–52].

The trial court admitted [Harper's] statement for purposes of the trial after finding that [Harper's] statement was voluntary; that he waived his rights; that he did not assert his right to remain silent; and, that his statement was properly taken [12 RR 52].

The Court finds trial counsel are not ineffective for not arguing involuntariness based on [Harper's] alleged mental illness or history of drug usage in light of the fact that the same legal standard would have been applied to the same circumstances surrounding [Harper's] confession regardless of the argument presented by trial counsel[—]a standard applied to circumstances resulting in a finding of voluntariness.

The Court finds that [Harper's] jury, based on its answer to the mitigation issue, did not find [Harper's] alleged mental illness or drug usage sufficiently mitigating, so the Court finds speculative that at least one juror would have found [Harper's] confession involuntary based on the same factors.

**********

[Harper] fails to show ineffective assistance of counsel based on counsel not arguing that [Harper's] confession was involuntary based on mental illness. *See Delao v. State*, 235 S.W.3d 235 (Tex. Crim. App. 2007) (holding that totality of circumstances standard for determining voluntariness of confession is appropriate for persons of all mentalities).

Considering that the same totality of circumstances standard would have been applied if trial counsel had argued that [Harper's] confession was involuntary based on his alleged mental illness or drug usage, [Harper] fails to show that the trial court's proper finding of voluntariness would have been different in light of there being no showing of government misconduct that caused [Harper's] will to be overborne. *See and cf. Ex parte White*, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004) (noting that to show ineffective assistance of counsel for failure to object, defendant must show trial court would have erred in overruling objection); *cf. Davis v. State*, 313 S.W.3d 317, 337 (Tex. Crim. App. 2010) (holding statement is obtained in violation of due process if causally related to coercive government misconduct causing defendant's will to be overborne).

SHCR 1299–1301, 1317. This decision is not objectively unreasonable.

## C.     Counsel was not deficient

### 1.     Federal due process

As Harper concedes, his alleged mental illness, standing alone, is insufficient to demonstrate a Fifth Amendment violation. For a defendant to establish that his confession was involuntary, he must demonstrate (1) that it resulted from coercive police conduct, *Colorado v. Connelly*, 479 U.S. 157, 163–64 (1986); and (2) was not "the product of his free and rational choice." *Mincey v. Arizona*, 437 U.S. 385, 401 (1978) (quoting *Greenwald v. Wisconsin*, 390 U.S. 519, 521 (1968)). It is essential that there be a link between the coercive conduct of the police and the confession of the defendant. *Connelly*, 479 U.S. at 165.

The sole concern under the Fifth Amendment is government coercion, nothing else. *Connelly*, 479 U.S. at 170. "Although mental condition may be a significant factor in the voluntariness calculus, 'this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.''" *Carter v. Johnson*, 131 F.3d 452, 462 (5th Cir. 1997) (quoting *Id.* at 164). The voluntariness of the Fifth Amendment waiver of self-incrimination depends on the absence of police overreaching. *Connelly*, 479 U.S. at 170. "Indeed, the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Id.* (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)). The requirement of official coercion applies equally in the context of a waiver of a suspect's *Miranda* rights. *Id.* at 169–70 ("There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context.").

At no point in his briefing does Harper refer to conduct by the homicide investigators or Officer Howard that crossed the line. In fact, he does not address the substance of the interrogation at all. Moreover, following the suppression hearing, defense counsel basically conceded that there was no

coercion or duress. And, as shown, the record in the case contains no evidence that Harper's confession was coerced or that he involuntarily waived his *Miranda* rights, particularly considering that he expressly waived those rights several times.

### 2. State law

Harper is raising this claim in the context of ineffective assistance of trial counsel, rather than a due process challenge to the voluntariness of his confession, which is governed by *Connelly*. But an examination of trial counsel's effectiveness in applying, or not applying, state law to Harper's confession does not change the outcome. Harper relies primarily on *Oursbourn v. State*[18], wherein the CCA distinguished state law claims of involuntariness from federal due process claims. 259 S.W.3d at 170–73; *see also* DE 17 at 200–02. In *Oursbourn*, the CCA stated:

> Claims of involuntariness under Article 38.22 can be, but need not be, predicated on police overreaching, and they could involve the "sweeping inquiries into the state of mind of a criminal defendant who has confessed" found in *Connelly* that are not of themselves relevant to due process claims. . . .These inquiries [under Article 38.22] do not turn solely on police overreaching. The behavior of the police may or may not be a factor. A confession given under the duress of hallucinations, illness, medications, or even a private threat, for example, could be involuntary under Article 38.21 and the Texas confession statute.

---

[18]     259 S.W.3d 159 (Tex. Crim. App. 2008).

259 S.W.3d at 172. The CCA noted that the potential fact scenarios governed by state law are broader in scope than those covered by *Miranda* or the Due Process Clause. Thus, based on *Oursbourn*, Harper alleges that his mental illness alone was sufficient to render his confession involuntary. DE 17 at 201.

The discussion in *Oursbourn*, however, was provided in the context of a claim that the trial court failed to instruct the jury on the voluntariness issue. And although Harper appears to also claim that counsel could have presented this evidence again and sought a jury instruction, his primary claim is that trial counsel failed to present evidence of his mental illness at the suppression hearing. As the state court found, the true case on point is *Delao v. State*, where the CCA held "that the totality of the circumstances standard for assessing the voluntariness of a confession given by a person of normal mentality is also the appropriate standard to apply when a confession is made by someone suffering from mental retardation and mental illness." 235 S.W.3d at 241. *Oursbourn* did not overrule or alter the *Delao* standard. *See Woodall v. State*, 376 S.W.3d 122, 128 (Tex. App.–Texarkana 2012) (recognizing and applying *Delao*).

With that in mind, defense counsel could have submitted evidence demonstrating Harper's mental illness and drug use, including the evidence

referenced in his petition. But that would not have changed the outcome of the suppression hearing given the totality of the circumstances. The primary flaw with Harper's claim is that not only did Officer Howard testify that the confession was obtained voluntarily, but the trial judge himself also viewed the videotape of the confession in its entirety before making his findings. Evidence of mental illness from a psychiatric expert or additional sources would not have changed what the judge witnessed on the tape, including Harper's demeanor, state of mind, and responses to questions. Under Texas law, the trial court "is the 'sole and exclusive trier of fact and judge of the credibility of the witnesses,' particularly when a motion to suppress is based on the voluntariness of a confession" and an appellate court "must give great deference 'to the trial judge's decision to admit or exclude such evidence, which will be overturned on appeal only where a flagrant abuse of discretion is shown.'" *Carter v. State*, 309 S.W.3d 31, 41–42 (Tex. Crim. App. 2010) (quoting *Delao*, 235 S.W.3d at 238). Thus, Harper cannot show that trial counsel was deficient for not presenting the evidence in question.

## D.      Regardless, Harper cannot demonstrate prejudice.

Harper cannot demonstrate that there is a reasonable probability that but for counsel's omissions, the result of the trial would have been different.

Harper's confession was going to be admitted because it was clearly voluntary and he waived his *Miranda* rights. Further, as the state court found, the jury was not moved at the punishment phase by Harper's presentation of evidence demonstrating his mental illness; that the jury would have found the same evidence sufficient to prove that the confession was involuntary—had trial counsel sought a voluntariness instruction—is undoubtedly speculative at best. Indeed, such evidence would have been tempered by testimony from other trial witnesses—in addition to the police—who knew Harper and stated that he did not behave like he had severe mental problems, such as delusions. 14 RR 123, 149, 208, 225, 236.

But even if trial counsel had successfully suppressed the confession, there is not a reasonable probability that the outcome would have changed at either phase. At the guilt phase, the State presented evidence that: (1) Harper stalked and followed Triska Rose for weeks before the offense, 14 RR 137–38, 152–53, 161–63, 200–06, 215, 223, 231; (2) on October 24th, the morning after committing the murder, Harper called Chandra Parson from Triska's apartment around 5:50 or 6:00 a.m. and said Mya was sick and he would be keeping her; when Parson asked Harper where Triska was, Harper hung up the phone and would not answer when Parson called back; Parson then called

Triska's workplace and learned she had not come in to work, 14 RR 122; (3) when the police were at the crime scene, Harper voluntarily approached them and threw up his hands; someone in the gathered crowd said, "That's him," and the police cuffed Harper and placed him in the back of the patrol car, 15 RR 124–26; (4) when Officer Howard approached Harper, Harper voluntarily stated, "I came to turn myself in," 15 RR 152[19]; and (5) DNA evidence showed that Harper could not be excluded from a mixed sample on a 9-inch knife found in the kitchen of Triska's apartment. 17 RR 60–61. Moreover, Parson told the 911 operator that she thought Harper committed the murder because of the call she got from him, and Beacky Anthony testified that she was convinced Harper committed the crime. 14 RR 137, 176–77.

In short, Harper stalked the victims, made a suspicious call to a witness from the crime scene after the offense, was the primary suspect, voluntarily turned himself in to the police and told that to Officer Howard, and DNA evidence linked him to one of the murder weapons. The confession may have provided the specific details of the offense, but it was arguably not necessary to secure the conviction. Harper cannot demonstrate prejudice.

---

[19] *See Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.").

Finally, Harper alleges prejudice at the punishment phase because one juror stated in an affidavit that there was no possibility she would find mitigating circumstances based on the facts of the crime and because the prosecution relied on the facts of the crime at punishment. DE 17 at 209–10. As shown above, juror affidavits are not reviewable under *Pyles* and *Tanner*. Regardless, Harper's confession was unnecessary to prove the facts of the offense because the medical examiner's testimony and that from the witnesses and officers who found the victims was more than adequate to demonstrate Harper's brutality and how he killed his victims. Thus, Harper cannot prove prejudice with respect to punishment. Finally, at the very least, Harper fails to show that the state court's rejection of the instant claim is objectively unreasonable. Consequently, habeas relief should be denied.

## XVI.  Harper's Claim that Trial Counsel Was Ineffective for Failing to Object to Victim Impact Evidence at Guilt-Innocence Has No Merit.

Harper alleges that trial counsel was ineffective for failing to object to victim-impact testimony provided by Lloyd Roberson during the guilt-innocence phase. Roberson was Triska's husband and Briana's biological father. Harper complains that in the process of identifying the victims, Roberson made several improper statements that arguably amounted to

victim-impact testimony, which is impermissible at guilt-innocence. Although Harper concedes that counsel did object on several occasions, he complains that counsel did not object to every instance and failed to request a mistrial. DE 17 at 210–17. Harper also alleges that appellate counsel was ineffective for not challenging Roberson's testimony on direct appeal. *Id.* at 217. Harper's claims are meritless.

## A. State court findings

During guilt-innocence, Lloyd Roberson, Briana's biological father, testified that he brought Briana to Triska Rose's condo around 6:30 or 7:00 p.m. on the night of the murders; that he spoke to Rose, Mya, and [Harper] who seemed to be normal; and, that he went to the condo the next day, saw caution tape and news people, and learned that Rose, Mya, and Briana had been murdered [17 RR 66–71].

Roberson testified that he was very frustrated and mad at the situation as a parent and further testified, "They dead. This guy killed them" [17 RR 72].

When the prosecutor asked "what guy," trial counsel objected and stated "it's outside -" before the trial court sustained the objection [17 RR 72].

The Court finds that Robertson's cited testimony concerning being mad and frustrated does not constitute victim-impact testimony.

Roberson identified a photo of Triska Rose and, when asked to tell [the jury] about Triska, testified that she was a mother who cared about everything and would help anyone; trial counsel objected to "this being improper timing" and the trial court sustained the objection [17 RR 74].

The trial court also sustained [Harper's] objection of immaterial and irrelevant to the prosecutor's question of whether Triska Rose would have fought for her children, before Roberson answered the question [17 RR 74].

When asked to tell [the jury] about Briana, Roberson testified that she did not bother anyone and she was a good kid who would not harm anyone; trial counsel objected as improper victim impact and the trial court sustained the objection [17 RR 75–76].

When asked to tell [the jury] about Mya, Roberson testified that she was a good kid who asked a lot of questions, wanted to learn, and had no problems; trial counsel objected as improper victim impact and the trial court sustained the objection [17 RR 76–77].

The Court finds that Roberson's objected-to testimony was brief and set in the context of the testimony of sixteen State's guilt-innocence witnesses whose testimony comprised over seven hundred pages of the appellate record.

The Court finds that Roberson's brief testimony about Triska Rose being a good mother, about Briana being a good kid who did not bother anyone, and about Mya being a good kid who asked a lot of questions and wanted to learn and had no problems is not harmful when set in the context of [Harper's] trial.

The Court finds, based on the lack of harm from the testimony, that trial counsel are not ineffective for alleged untimely objection to victim-impact or victim-character testimony or for not moving for a mistrial.

The Court finds, based on the lack of harm from the testimony, that appellate counsel is not ineffective for not presenting on direct appeal a claim of ineffective assistance of trial counsel for alleged untimely objection to victim-impact or victim-character evidence or for not moving for a mistrial.

**********

Trial counsel are not ineffective for not lodging an objection based on improper victim-impact or victim-character evidence after Lloyd Roberson testified at guilt-innocence that he was mad and frustrated on learning of the deaths of Triska Rose, Briana, and Mya. *Cf. Mathis v. State*, 67 S.W.3d 918, 928 (Tex. Crim. App. 2002) (noting "the testimony in the present case did not involve testimony about how third persons were affected by the crime, nor was there any discussion about the character of the victim.").

Trial counsel's objection of "being improper timing" to the State's question asking Roberson to tell about Triska Rose does not comport with [Harper's] habeas complaint concerning victim-impact evidence. *See Carmona v. State*, 941 S.W.2d 949, 953 (Tex. Crim. App. 1997) (holding that trial objection based on attorney-client privilege does not preserve error for appellate claim based on work-product doctrine); *Guevara v. State*, 97 S.W.3d 579, 583 (Tex. Crim. App. 2003) (holding defendant did not preserve error where complain[t] on appeal differed from trial objection).

In the alternative, [Harper] fails to meet the two-prong *Strickland* standard of ineffective assistance of counsel based on counsel's alleged untimely objection to Roberson's brief testimony in response to the State's questions asking him to tell about Rose, Mya, and Briana; Roberson's succinct answers were set in the context of guilt-innocence testimony comprising over seven hundred pages of the appellate record and the State made no mention of the testimony during argument. *See Smith v. State*, 919 S.W.2d 96, 103 (Tex. Crim. App. 1996) (holding erroneous admission of victim-impact evidence harmless error in light of "sparsity" of evidence and fact it was not unduly emphasized during testimony or argument); *see also Graves v. State*, 994 S.W.2d 238, 249 (Tex. App–Corpus Christi 1999, pet. ref'd) (holding that trial counsel not ineffective for failing to object to victim impact evidence introduced at guilt-innocence, because appellate court unable to say that, but for counsel's error, result of proceeding would have been different based on the overwhelming evidence of defendant's guilt).

[Harper] fails to show ineffective assistance of appellate counsel based on not presenting on direct appeal a claim concerning objections to victim-impact or victim-character evidence; appellate counsel would have been unable to show harm on direct appeal. *See Butler*, 884 S.W.2d at 783 (holding *Strickland* standard applies to appellate counsel as well as trial counsel); *Hinojosa v. State*, 4 S.W.3d 240, 252–[53] (Tex. Crim. App. 1999) (holding that trial court's instruction to disregard victim-impact evidence cured admission of victim-impact testimony at guilt-innocence in light of overwhelming evidence of guilt and admission of one sentence of irrelevant testimony)[.]

SHCR 1301–03, 1318–19. This decision is not objectively unreasonable.

**B.  Regardless of counsel's actions, Harper cannot demonstrate any prejudice.**

As the state court found, trial counsel did object several times when Roberson testified, including several instances where counsel believed the testimony constituted victim-impact evidence. Harper's complaint is that counsel failed to object more often and at the proper points. Ultimately, this is irrelevant. Roberson's testimony was hardly necessary to the State's case. There was no question Harper was guilty, and given the facts of the crime and the abundant evidence presented of Harper's future dangerousness, Roberson's testimony had no bearing on punishment. Thus, Harper cannot demonstrate that he was prejudiced by counsel's inaction.

Further, Harper cannot show that counsel was ineffective for failing to request a mistrial because the court would not have granted it. Under Texas

law, a trial court's decision to declare a mistrial is limited to the inquiry of if there was a "manifest necessity" to grant a mistrial. *Ex parte Garza*, 337 S.W.3d 903, 909 (Tex. Crim. App. 2011). In *Garza*, the CCA explained that a trial court abuses its discretion in granting a mistrial

> whenever the trial court declares a mistrial without first considering the availability of less drastic alternatives and reasonably ruling them out. But the trial court appropriately exercises its discretion to declare a mistrial—that is to say, manifest necessity for the mistrial exists—when the particular circumstances giving rise to the declaration render it impossible to arrive at a fair verdict before the initial tribunal, when it is simply impossible to continue with trial, or when any verdict that the original tribunal might return would automatically be subject to reversal on appeal because of trial error.

*Id.* Given the insignificance of Roberson's testimony considering the totality of the evidence presented, these circumstances clearly did not exist. Trial counsel is not ineffective for refusing to make futile motions or objections. *Koch*, 907 F.2d at 527.

Finally, for these same reasons, appellate counsel was not ineffective. Assuming trial counsel had properly preserved error for appeal, there is not a reasonable probability that the result of the appeal would have been different because appellate counsel would not have been able to demonstrate harm from any error. And to the extent Harper is claiming appellate counsel should have raised a claim on appeal that trial counsel was ineffective for failing to properly

object and request a mistrial, that allegations fails because appellate counsel could not have shown prejudice. The state court's decision is not objectively unreasonable, and habeas relief should be denied.

## XVII. Harper's Claim that Trial Counsel Was Ineffective for Conceding His Guilt Has No Merit.

Harper alleges that trial counsel was ineffective for arguing at the close of the guilt-innocence phase that Harper 'accepted responsibility" for the murders after pleading "not guilty" because this gave the jury the conflicting impression as to whether he did accept responsibility, "which then prejudiced Harper during the punishment phase." DE 17 at 218. Harper goes on to state that trial counsel's opening and closing arguments conflicted:

> Here, defense counsel's opening statement gave the jury the expectation of a defense involving mental illness, whether it be due to Harper's lack of intent or possibly even an insanity defense. However, defense counsel did not present any such evidence during the course of the guilt phase, and only after hearing the State's case for guilt, conceded Harper's guilt during closing arguments. This left the jury with the false impression that Harper thought he could avoid responsibility due to his mental illness, but after seeing the State's evidence realized that this attempt to "beat the system" would not be successful. . . .

> If defense counsel's guilt presentation was predicated upon admitting Harper's responsibility for the crime, this theme should have been carried throughout the guilt phase of the trial. To this end, counsel should have advised Harper that pleading guilty to the charge of capital murder was the most beneficial path. A guilty plea, or at least an opening statement conceding responsibility,

would have told the jury that Harper accepted responsibility for his actions, and would have strengthened evidence of his remorse presented during his mitigation case.

DE 17 at 220. Harper's allegation lacks merit and should be denied.

## A.    State court findings

During guilt-innocence argument, trial counsel noted that [Harper] never denied his responsibility; that he accepted responsibility; and that he never denied his guilt [17 RR 87, 89, 92].

The Court finds that trial counsel's argument is a summary of the evidence that [Harper] readily admitted to police that he committed the offense.

The Court finds that trial counsel's evident trial strategy was to attempt to convince the jury that [Harper] was suffering from mental illness and, in the event of a guilty verdict, concentrate on obtaining a life sentence based on evidence of mental illness and remorse.

The Court finds that trial counsel's evident strategy is reflected in counsel's guilt-innocence argument where counsel stated that "there was a cancer eating at his mind," that people saw him "getting worse and worse"[;] that there was a troubled and sick mind; and, that he was delusional [17 RR 87–88, 90–92].

The Court finds that trial counsel's strategy at guilt-innocence was not inconsistent with the strategy at punishment[—]an attempt to mitigate [Harper's] punishment through a showing of mental illness and remorse, especially in light of the overwhelming evidence of [Harper's] guilt.

The Court finds that trial counsel are not ineffective for arguing at guilt-innocence that [Harper] "accepted responsibility" for the

murder[—]an acknowledgment of [Harper's] confession[—]after [Harper] entered a plea of not guilty.

**********

Trial counsel are not ineffective for properly summarizing the evidence and arguing to the jury at guilt-innocence that [Harper] accepted responsibility for the offense. *See Borjan v. State*, 787 S.W.2d 53, 55 (Tex. Crim. App. 1990) (holding summary of evidence, reasonable inference from evidence, response to opposing counsel's argument and plea for law enforcement proper areas for jury argument).

Trial counsel are not ineffective for the reasonable trial strategy of recognizing that [Harper] confessed to the murders and attempting to convince the jury that he had a "troubled and sick mind'[—]something that could be considered as mitigating at punishment. *See Hathorn v. State*, 848 S.W.2d 101, 118 (Tex. Crim. App. 1992) (holding defense counsel not ineffective for apparent trial strategy of conceding guilt during guilt-innocence argument to try to persuade jury to convict on lesser-included offense); *see also Ex parte Davis*, 866 S.W.2d 234, 237 (Tex. Crim. App. 1993) (holding not per se ineffective for trial counsel to concentrate efforts on punishment in capital trial; counsel not ineffective for attempting to persuade jury that defendant's actions were not deliberate and that he accepted responsibility, thus eliciting negative answers to special issues).

SHCR 1303, 1319. This decision is not objectively unreasonable.

## B.     Trial counsel was not ineffective.

Counsel was not ineffective because it is evident that counsel intended to utilize the entire trial to set up the mitigation case for Harper. Harper was guilty; there was no way of convincing the jury otherwise. Stating that Harper

had accepted responsibility was merely a way of transitioning from one phase to another while employing the same theme of persuading the jury to spare Harper's life.

Harper can hardly claim that this tactic amounts to ineffective assistance when it has been endorsed by the Supreme Court. In *Florida v. Nixon*, the Court was faced with a scenario where a petitioner claimed counsel was ineffective for conceding his guilt. The Court rejected the claim, stating the following:

> Although such a concession in a run-of-the-mine trial might present a closer question, the gravity of the potential sentence in a capital trial and the proceeding's two-phase structure vitally affect counsel's strategic calculus. Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear. Prosecutors are more likely to seek the death penalty, and to refuse to accept a plea to a life sentence, when the evidence is overwhelming and the crime heinous. In such cases, avoiding execution [may be] the best and only realistic result possible.
>
> Counsel therefore may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared. Unable to negotiate a guilty plea in exchange for a life sentence, defense counsel must strive at the guilt phase to avoid a counterproductive course. In this light, counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in "a useless charade." Renowned advocate Clarence Darrow, we note, famously employed a similar strategy as counsel for the youthful, cold-blooded killers Richard Loeb and Nathan Leopold. Imploring the judge to spare the boys' lives, Darrow declared: "I do

not know how much salvage there is in these two boys. . . .I will be honest with this court as I have tried to be from the beginning. I know that these boys are not fit to be at large."

To summarize, in a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed. When counsel informs the defendant of the strategy counsel believes to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent. Instead, if counsel's strategy, given the evidence bearing on the defendant's guilt, satisfies the *Strickland* standard, that is the end of the matter; no tenable claim of ineffective assistance would remain.

543 U.S. 175, 190–92 (2004) (internal quotations, citations, and footnotes omitted). Several appellate courts, including the Fifth Circuit, have likewise found this strategy to be legitimate. *Woodward v. Epps*, 580 F.3d 318, 328 (5th Cir. 2009); *Stenson v. Lambert*, 504 F.3d 873, 891 (9th Cir. 2007) ("When the evidence against a defendant in a capital case is overwhelming and counsel concedes guilt in an effort to avoid the death penalty, 'counsel cannot be deemed ineffective for attempting to impress the jury with his candor [.]'") (quoting *Nixon*, 543 U.S. at 192).

Ultimately, taking a certain approach during jury arguments is a strategic decision that is "given a heavy measure of deference and should not be second guessed." *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002) (citation omitted); *see also Pape*, 645 F.3d at 292 ("we continue to extend highly

deferential treatment to counsel's sentencing strategy and tactical decisions").
"[C]ounsel has wide latitude in deciding how best to represent a client, and
deference to counsel's tactical decisions in his closing presentation is
particularly important because of the broad range of legitimate defense
strategy at that stage." *Gentry*, 540 U.S. at 5–6. As a result, "[j]udicial review
of a defense attorney's summation is therefore highly deferential—and doubly
deferential when it is conducted through the lens of federal habeas." *Id.* at 6.
Harper has not demonstrated that the state court's decision rejecting this
claim is unreasonable.

Harper's claim that defense counsel's opening and closing statements
conflicted is likewise meritless. Both the opening and closing statements were
brief, likely because counsel knew they had a losing case on guilt-innocence.
*See* 14 RR 27–33; 17 RR 86–92. It is abundantly clear from the opening
statement that counsel knew contesting Harper's guilt was a poor argument;
thus, counsel used the opening to set up the punishment phase case, namely
that Harper suffered from mental illness and "spiral[ed] down into a Hellhole"
until the crime. 14 RR 29. Counsel returned to this theme in closing, stating:
"But there's plenty of evidence here of how delusional he was." 17 RR 92.
Further, during opening argument, counsel conceded that Harper surrendered

to the police. 14 RR 29. Stating that Harper had accepted responsibility for the crime in closing argument was hardly inconsistent with what was said during opening. And, as shown above, a decision to essentially concede guilt and focus on punishment throughout trial, which is what counsel chose to do, is a legitimate strategy under circumstances like these. It was not necessary for counsel to convince Harper to plead guilty to maintain a coherent strategy.

Finally, Harper cannot demonstrate prejudice. Clearly, there was none with regard to guilt-innocence. Harper claims the harm occurred at punishment because the jury was provided conflicting information about Harper's acceptance of responsibility, whereas "there is a reasonable likelihood that a consistent admission (or plea) of guilt would have led the jury to recommend a life sentence." DE 17 at 221. As shown, counsel's arguments were not inconsistent. Regardless, counsel presented abundant mitigating evidence and, yet, could not secure a life sentence. This is because the State's case on future dangerousness was overwhelming, as explained above. Further, counsel's closing statement comprised seven pages out of the eleven trial volumes, i.e., the record of the guilt-innocence and punishment phases. 17 RR 86–92. Given the totality of the evidence presented at both phases, the notion that there is a reasonable probability that an alteration in brief jury arguments

would have changed the outcome is farfetched at best. Therefore, Harper's claim should be denied.

## XVIII. Appellate Counsel Was Not Ineffective for Waiving Oral Argument.

Harper alleges that appellate counsel was ineffective for waiving oral argument on direct appeal, thereby "effectively abandon[ing]" him. DE 17 at 221–24. The state court rejected this claim of abandonment, finding that "[a]ppellate counsel presented eight claims on direct appeal: sufficiency of the evidence to support a finding of future dangerousness, a *Batson* claim, three separate claims concerning the admission of [Harper's] statement and three separate claims concerning alleged violation of The Rule." SHCR 1303–04. The court concluded that appellate counsel was not ineffective, stating:

> [Harper] fails to show that the waiver of oral argument or lack of a reply brief to the State's appellate brief is encompassed within the precepts of [*United States*] *v. Cronic*, 466 U.S. 648 (1984), where prejudice is presumed if counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing." *See Butler*, 884 S.W.2d at 783 (holding *Strickland* standard applies to appellate counsel as well as trial counsel).

SHCR 1320. This decision is not objectively unreasonable.

Harper argues that this alleged error fits within the confines of *Cronic*, but he is mistaken. In *Cronic*, the Supreme Court held that prejudice can be presumed in those cases in which defense counsel "entirely fails to subject the

prosecution's case to meaningful adversarial testing." 466 U.S. at 659. The Court identified three circumstances in which prejudice may be presumed: (1) if the defendant is completely denied counsel entirely or during a critical stage of his trial; (2) if counsel entirely fails to subject the prosecution's case to a meaningful adversarial testing; or (3) if counsel is called upon to render assistance where competent counsel very likely could not. *Id.* at 654, 659-60. Prejudice will be presumed only in cases in which the attorney's failure was complete, such as if counsel failed to oppose the prosecution throughout the sentencing proceeding "as a whole." *Bell v. Cone*, 535 U.S. 685, 697 (2002) (emphasis added). *Cronic* is reserved only for extreme cases where an attorney fails to present any defense. *Haynes v. Cain*, 298 F.3d 375, 380–81 (5th Cir. 2002).

Appellate counsel raised numerous claims on direct appeal, as the state court found, and then filed a reply brief. Counsel merely chose not to present an oral argument, which "does not automatically amount to ineffective assistance of counsel." *Brown v. Louisiana State Penitentiary*, 2014 WL 4287961, at *8 (W.D. La. 2014). Obviously, appellate counsel challenged the trial court's decision and, thus, conducted a meaningful adversarial testing. *Cronic* clearly does not apply, which means Harper must

show that "had counsel acted as the client argues counsel should have, there is a reasonable probability the client would have won on appeal." *Id.* (citing *Robbins*, 528 U.S. at 286–87).

Here, Harper merely argues that appellate counsel was ineffective because oral argument is "crucial," provides attorneys the opportunity to speak directly to the judges, and "would have also provided appellate counsel the opportunity to respond to, counter, and critique the State's assertions in its appellate brief." DE 17 at 223–24. He provides nothing specific to his case that demonstrates ineffectiveness. In this regard, his claim is conclusory and must be rejected on that basis. Moreover, appellate counsel filed a reply brief, which was appellate counsel's opportunity to counter the State's brief. Because there is no merit to this claim, the state court's decision is not objectively unreasonable. Habeas relief must be denied.

## XIX. Harper's Challenge to the Mitigation Special Issue Is Procedurally Defaulted and Meritless.

Harper alleges that his death sentence should be vacated because Texas's mitigation special issue unconstitutionally limits the categories of evidence a jury may consider as mitigating. DE 17 at 224–31.

First, the claim is procedurally defaulted because, per the CCA's order, the claim should have been raised on direct appeal and was not. Second, the

state court rejected this claim as lacking in merit, SHCR 1304, 1320, and this decision is not objectively unreasonable. The Fifth Circuit has consistently rejected the argument that the mitigation special issue unconstitutionally narrows the mitigating evidence that can be considered. *Sprouse v. Stephens*, 748 F.3d 609, 622 (5th Cir. 2014); *White v. Thaler*, 522 F. App'x 226, 235 (5th Cir. 2013); *Blue v. Thaler*, 665 F.3d 647, 666 (5th Cir. 2011); *Cantu v. Quarterman,* 341 F. App'x 55, 61 (5th Cir. 2009); *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001). In fact, at least implicitly, the *Penry II* Court approved of Texas's mitigation special issue. 532 U.S. at 803 ("A clearly drafted catchall instruction on mitigating evidence also might have complied with [*Penry v. Lynaugh*, 492 U.S. 302 (1989)] (*Penry I*). Texas'[s] current capital sentencing scheme (revised after Penry's second trial and sentencing) provides a helpful frame of reference."). Therefore, habeas relief must be denied.

## XX. Appellate Counsel Was Not Ineffective for Not Challenging the Trial Court's Denial of Harper's Pre-trial Motions.

Harper alleges that appellate counsel was ineffective for failing to challenge the trial court's denial of his various pretrial motions challenging the death penalty. Specifically, he argues that appellate counsel was ineffective for failing to challenge the denial of his pretrial motion arguing that (1) his

240

death sentence should be precluded due to severe mental illness; (2) the death penalty is arbitrary as applied in Texas; (3) the Texas statute impermissibly shifts the burden of proof to the defendant; (4) the use of victim impact evidence is unconstitutional; (5) the Texas death-penalty scheme is unconstitutional under *Furman v. Georgia*[20]; the capital punishment process in Texas "violates [(*Penry I*)], is cruel and unusual under the state and federal constitutions, and does not provide meaningful appellate review"; (6) the Texas "10-12" rule is unconstitutional; and (7) "no sympathy" and "criminal acts of violence" instructions should be submitted to the jury. DE 17 at 231–34. The state court rejected these claims, finding that they lacked merit, SHCR 1304–06, and concluding as follows:

> Appellate counsel is not ineffective for not presenting on direct appeal the meritless claim that the trial court erred in denying [Harper's] following motions: motion to preclude the death penalty due to [Harper's] alleged mental illness, motion to preclude the death penalty as arbitrary, motion to hold death penalty unconstitutional based on alleged shifting burden of proof, motion to hold death penalty unconstitutional due to victim-impact evidence, motion to hold death penalty unconstitutional under *Furman v. Georgia*, motion to preclude imposition of death penalty as unconstitutional under *Penry I*, as cruel and unusual, and as not providing meaningful appellate review, motion concerning the 10-12 rule and motion concerning jury instructions. *See Jurek* [], [428 U.S. at 276] (holding that Texas death[-]penalty scheme with its three special issues adequately narrows the class of death-

---

[20]    408 U.S. 238 (1972).

eligible defendants and does not permit unfettered discretion in sentencing determinations); [*Penry II*,] 532 U.S. [at] 788–800 [] (noting correction of deficiency in Texas death[-]penalty scheme found in *Penry I*); *see also Rayford v. State*, 126 S.W.3d 521 533–34 (Tex. Crim. App. 2003) (rejecting claim that mitigation special issue allegedly prevents meaningful appellate review); *Escamilla v. State*, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004) (holding mitigation issue constitutional despite lack of burden of proof); *Luna v. State*, 268 S.W.3d 594, 609 (Tex. Crim. App. 2008) (rejecting defendant's claim that [Article] 37.071 [is] unconstitutional because it impermissibly shifts burden of proof to defendant); *Williams v. State*, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009) (rejecting argument that statutory mitigation instruction permits open-ended discretion condemned in *Furman v. Georgia*); *Leza v. State*, 351 S.W.3d 344, 361–62 (Tex. Crim. App. 2011) (holding 10-12 rule in [Article] 37.071 does not violate Eighth Amendment).

SHCR 1320–21.

The state court's decision is not objectively unreasonable. As the state court demonstrated, CCA precedent does not support Harper's argument. In fact, the CCA has rejected each of the claims Harper presented in his pretrial motions. *Mays v. State*, 318 S.W.3d 368, 379–80, 391–93 (Tex. Crim. App. 2010) (refusing to extend *Atkins v. Virginia*[21] to encompass mental illness and rejecting claim challenging victim-impact evidence); *Coble v. State*, 330 S.W.3d 253, 297 (Tex. Crim. App. 2010) (rejecting claim that Texas's death-penalty statute is arbitrary, rejecting claim based on the 10-12 rule, and rejecting claim

---

[21]    536 U.S. 304 (2002).

that the statute fails to define the term "criminal acts of violence"); *Threadgill v. State*, 146 S.W.3d 654, 671–73 (Tex. Crim. App. 2004) (rejecting claim that mitigation special issue unconstitutionally shifts burden of proof, rejecting claim that Texas scheme violates *Furman*, and rejecting claim that the death penalty violates Eighth Amendment); *Cantu v. State*, 939 S.W.2d 627, 639 (Tex. Crim. App. 1997) (rejecting claim that Texas scheme runs afoul of *Penry I*, noting that changes to the scheme were implemented to rectify deficiency found in *Penry I*); *Fuller v. State*, 253 S.W.3d 220, 234 (Tex. Crim. App. 2008) (rejecting claim that Texas death penalty scheme is unconstitutional for not providing meaningful appellate review); *Tong v. State*, 25 S.W.3d 707, 710–11 (Tex. Crim. App. 2000) (holding anti-sympathy charges are appropriate). Because these claims would not have succeeded on appeal, Harper cannot show that appellate counsel was ineffective for not raising them.

## XXI. Harper's Claim that Medication Withdrawal Rendered Him Incompetent Is Meritless.

In his next claim, Harper alleges that he experienced symptoms of withdrawal and symptoms of mental illness due to abrupt cessation of a host of medications during trial. "These symptoms left Harper unable to meaningfully assist his attorneys during his trial in violation of his rights under the state and federal Constitutions state statutory law United States

243

Supreme Court and state case law." DE 17 at 223. In other words, Harper appears to be claiming that he was incompetent to stand trial. This allegation is meritless because it is conclusory.

## A.    State court findings

The state court submitted the following findings and conclusions pertaining to this claim:

> The Court finds that [Harper] presents a list of symptoms gathered from internet sites such as Medline Plus, MedTV, NetDoctor, eHow Health, and Klonopin Withdrawal Symptoms concerning possible withdrawal symptoms from [Klonopin,] Prozac, Depakote, and risperdal.
>
> The Court finds speculative and unsupported the habeas assertion that [Harper] "likely" experienced some of the listed withdrawal symptoms and that he "likely" was unable to assist counsel.
>
> The Court finds, during [Harper's] testimony given outside the presence of the jury during the October 11, 2010 suppression hearing concerning the admission of his oral statement he made to Sergeant James Benford about the extraneous murder of Teasa Jackson, [Harper] recalled and recounted an interview that occurred years before, exhibited an understanding of questions, and gave lucid and articulate responses [19 RR 123–36].
>
> The Court finds that, during [Harper's] testimony outside the presence of the jury, [Harper] did not complain of any physical or mental symptoms that would prevent him from being unable to consult with counsel [19 RR 123–36].

**********

[Harper] fails to show that he was suffering adverse symptoms from any medication either because of dosage or withdrawal from such medication, and [Harper] fails to show that he was unable to consult with counsel based on alleged adverse symptoms. *See McDaniel v. State*, 98 S.W.3d 704, [711] (Tex. Crim. App. 2003) (noting that "naked assertion" of "I am incompetent" unsupported by any facts or evidence is not sufficient to require competency inquiry or competency hearing); *see also* [Tex. Code Crim. Proc.] art. 46.02.

SHCR 1306, 1321–22. This decision is not objectively unreasonable.

### B.     Harper's claim has no merit.

The Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial. *Cooper v. Okla.,* 517 U.S. 348, 354 (1996); *Godinez v. Moran,* 509 U.S. 389, 394. The standard for determining competency is whether, by a preponderance of the evidence, the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 402 (1960) (per curiam).

As a preliminary matter, Harper's claim is refuted by Dr. Dudley's testimony that Harper was in fact taking his medication during trial. At no point during his testimony did Dr. Dudley mention that Harper was suffering

from any withdrawal symptoms or symptoms related to medication. Harper presents no evidence to the contrary.

Regardless, as the state court found, Harper's claim has no basis in fact because at no point in his petition does Harper point to questionable behavior on his part—or any behavior, for that matter—demonstrating actual incompetence. He also does not provide any evidence from trial counsel demonstrating that they had difficulty consulting with Harper. Harper merely states that he was not taking these medications during trial; withdrawal from these medications can cause severe symptoms, per the articles he cites; and, consequently, he "likely" was experiencing symptoms that rendered him incompetent. DE 17 at 235–43. Because Harper's claim is based only on supposition, it fails to state a claim for relief. *Ross v. Estelle*, 694 F.2d 1008, 1011–12 (5th Cir. 1983) ("Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue . . . to be of probative evidentiary value."); *see also Moss v. Davis*, 2018 WL 1155996, at *6 (N.D. Tex. Jan. 31, 2018) ("[P]etitioner has put forth no evidence to show that he was incompetent at the time of his trial or even that there was any reason for either his trial counsel or the state trial judge to question his competence. Petitioner merely makes a self-serving allegation that his self-

described suicide attempt and failure to attend trial rose to the level of incompetency to stand trial. Petitioner has failed to demonstrate there was a competency issue at all . . .").  Moreover, "mental illness and incompetence . . . are not necessarily coexistent conditions." *LaHood v. Davis,* 653 F. App'x 253, 263 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 1079 (2016).

Finally, as shown, the state court found evidence in the record demonstrating that Harper was not incompetent, namely his coherent responses to questions by the State and defense during a hearing outside the presence of the jury.  19 RR 123–36.  The state court's finding of fact is presumed to be correct, and Harper has failed to rebut this presumption by clear and convincing evidence, or any evidence at all.  Therefore, habeas relief must be denied.

## XXII.  Harper's Claim that He Is Ineligible for a Death Sentence due to Severe Mental Illness Is Procedurally Barred and Meritless.

Harper alleges that his death sentence is unlawful and unconstitutional "because his mental impairments rendered him functionally and developmentally below the requisite level that is subject to execution."  DE 17 at 243.  Harper argues that *Atkins v. Virginia* and *Roper v. Simmons*[22]—which

---

[22]    543 U.S. 551 (2005).

preclude the imposition of the death penalty on the intellectually disabled and those who were juveniles when they committed their capital offenses—should be extended to capital offenders who have mental illness, like him. DE 17 at 243–46. The state court correctly rejected this claim. SHCR 1306, 1322.

First, the claim is procedurally barred because the CCA held that the claim should have been raised on direct appeal but was not. *Ex parte Harper*, No. 81,576-01, Order at 2. Harper does not demonstrate, or even argue, cause and prejudice to overcome this default.

Second, the Fifth Circuit has repeatedly declined to extend *Atkins* and *Roper* to encompass the mentally ill or defendants with brain impairments. *Rockwell v. Davis*, 853 F.3d 758, 763 (5th Cir. 2017); *Mays v. Stephens,* 757 F.3d 211, 219 (5th Cir. 2014); *ShisInday v. Quarterman*, 511 F.3d 514, 521 (5th Cir. 2007); *In re Neville,* 440 F.3d 220, 221 (5th Cir. 2006); *Johnson v. Stephens*, 2015 WL 4035251, at *9 (5th Cir. 2015); *Turner v. Epps*, 460 F. App'x 322, 328 (5th Cir. 2012); *Ripkowski v. Thaler*, 438 F. App'x 296, 303 (5th Cir. 2011); *In re Woods,* 155 F. App'x 132, 136 (5th Cir. 2005).

Likewise, every court—state and federal—that has addressed this issue has held the same. *Franklin v. Bradshaw,* 695 F.3d 439, 455 (6th Cir. 2012); *Carroll v. Secretary, DOC*, 574 F.3d 1354, 1368–69 (11th Cir. 2009); *Runyon v.*

*United States*, 2017 WL 253963, at *58–*60 (E.D. Va. 2017); *Grissom v. Duckworth*, 2016 WL 4146157, at *16 (W.D. Okla. 2016); *Pike v. Freeman*, 2016 WL 1050717, at *24–*25 (E.D. Tenn. 2016); *Busby v. Stephens*, 2015 WL 1037460, at *22 (N.D. Tex. 2015); *Carpenter v. Martel*, 2011 WL 5444165, at *6–*7 (N.D. Cal. 2011); *State v. Kleypas*, 382 P.3d 373, 443–48 (Kan. 2016); *State v. Hopkins*, 2016 WL 3128776, at *3–*5 (N.M. 2016); *Dickerson v. State*, 175 So.2d 8, 17–18 (Miss. 2015); *People v. Boyce*, 330 P.3d 812, 852–53 (Cal. 2014); *Com. v. Robinson*, 82 A.3d 998, 1019–22 (Pa. 2013); *State v. Dunlap*, 313 P.3d 1, 36 (Idaho 2013); *Dunlap v. Com.*, 435 S.W.3d 537, 616 (Ky. 2013); *Malone v. State,* 293 P.3d 198, 216 (Okla. Crim. App. 2013); *Simmons v. State,* 105 So.3d 475, 511 (Fla. 2012); *Mays v. State,* 318 S.W.3d 368, 379 (Tex. Crim. App. 2010); *State v. Johnson,* 207 S.W.3d 24, 51 (Mo. 2006); *State v. Hancock,* 840 N.E.2d 1032, 1059–60 (Ohio 2006); *Lewis v. State,* 620 S.E.2d 778, 786 (Ga. 2005); *Matheney v. State*, 833 N.E.2d 454, 458 (Ind. 2005); *State v. Weik*, 587 S.E.2d 683, 687 (S.C. 2002); *see also United States v. Akbar*, 74 M.J. 364, 406 (C.A.A.F. 2015) (opinion of the United States Court of Appeals for the Armed Forces); *Allen v. Ornoski*, 435 F.3d 946, 951–54 (9th Cir. 2006) (declining to extend *Atkins* to the elderly and infirm).

Third, Harper's claim is barred under the non-retroactivity doctrine of *Teague v. Lane*[23] "because it does not rely on the holding of any Supreme Court precedent but instead seeks to extend the reasoning of *Atkins* . . . and *Roper*." *Shore v. Davis*, 845 F.3d 627, 634 (5th Cir.), *cert. denied*, 138 S. Ct. 88 (2018); *see also Ripkowski*, 438 F. App'x at 303. For these reasons, habeas relief should be denied.

## XXIII. Harper's Challenge to the 10-12 Rule Is Defaulted and Meritless.

Harper alleges:

> In Texas, the jury is instructed that it cannot answer the two special issues so as to give a defendant a life sentence unless at least ten jurors agree on that answer. This "10-12 rule," as it is commonly referred, violates Harper's rights under the state and federal Constitution, state statutory law, and state and United States Supreme Court case law.

DE 17 at 246. Ultimately, his complaint is that the rule in Texas prohibits the jury from being informed about the effect of its failure to agree on the special issues submitted when lack of agreement would result in a life sentence. *Id.* at 247; *see* Tex. Code Crim. Proc. art. 37.071, § 2. The state court rejected this claim, SHCR 1307, 1322, and this decision is not objectively unreasonable.

---

[23]     489 U.S. 288 (1989).

First, the claim is procedurally barred because the CCA determined that the claim should have been raised on direct appeal but was not. *Ex parte Harper*, No. 81,576-01, Order at 2. Harper has failed to demonstrate, or even allege, cause and prejudice to overcome his default.

Second, the claim has no merit. The Supreme Court has rejected the theory that a trial court's failure to instruct the jury as to the consequences of deadlock gives rise to an Eighth Amendment violation. *Jones v. United States,* 527 U.S. 373, 381 (1999). Further, Harper's complaint about the 10-12 rule has been rejected on numerous occasions by the Fifth Circuit. *Reed v. Stephens*, 739 F.3d 753, 779 (5th Cir. 2014); *Blue v. Thaler*, 665 F.3d 647, 669–70 (5th Cir. 2011); *Druery*, 647 F.3d at 542–44; *Greer v. Thaler,* 380 F. Appx. 373, 389 (5th Cir. 2010). And because the Supreme Court has never held that this particular rule is unconstitutional, Harper is seeking a new rule of law, which is barred under *Teague v. Lane. Blue*, 665 F.3d at 670; *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000). For these reasons, habeas relief should be denied.

## XXIV.  Harper's Claim that the Administration of the Death Penalty in Texas Is Arbitrary Is Defaulted and Meritless.

Harper next argues that his death sentence is unconstitutional because his sentence was imposed based on Texas's arbitrary system of administering

capital punishment. DE 17 at Petition at 251–59. Specifically, Harper argues that the death penalty in Texas is sought and imposed often based on geographic and racial disparities, in violation of the Constitution. *Id*. The state court correctly rejected this claim. SHCR 1307, 1322–23.

First, the claim is procedurally barred because the CCA held that the claim should have been raised on direct appeal but was not. *Ex parte Harper*, No. 81,576-01, Order at 2. Harper does not demonstrate, or even argue, cause and prejudice to overcome this default.

Second, the claim has no merit. The Fifth Circuit has previously rejected the claim that the Constitution prohibits imposition of the death penalty because it is imposed disparately depending on the county in which the capital murder was committed. *Allen v. Stephens*, 805 F.3d 617, 628–31 (5th Cir. 2015), *abrogated on other grounds*, *Ayestas v. Davis*, --- S. Ct. ---. 2018 WL 1402425 (2018). The Fifth Circuit in *Allen* held that the claim was without merit because "no Supreme Court case has held that the Constitution prohibits geographically disparate application of the death penalty due to varying resources across jurisdictions." *Id*. at 629. Indeed, the Supreme Court has expressly acknowledged prosecutorial discretion and varying law-enforcement

capabilities and held that capital punishment is nonetheless permissible. *Id.* at 631 (citing *McCleskey v. Kemp*, 481 U.S. 279, 307 n.28 (1987)).

Additionally, the Supreme Court has held that "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision, whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). So long as the crime fits within a constitutionally valid definition of a chargeable offense, "'the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation' so long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Id.* at 364 (citing *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). Indeed, prosecutorial discretion is essential to the criminal justice process. *See McCleskey*, 481 U.S. at 297. "Exceptionally clear proof" is required before courts will infer abuse of prosecutorial discretion. *Id.*

The decision to seek the death penalty ultimately boils down to prosecutor discretion, based upon an examination of all the facts. In *Jurek v. Texas,* the Supreme Court rejected an argument alleging "that arbitrariness still pervades the entire criminal justice system of Texas from the prosecutor's

decision whether to charge a capital offense in the first place and then whether to engage in plea bargaining, through the jury's consideration of lesser included offenses, to the Governor's ultimate power to commute death sentences" finding that "[t]his contention fundamentally misinterprets the *Furman* decision." 428 U.S. at 275 (footnote added).  In *Gregg v. Georgia*, the Supreme Court noted:

> The existence of these discretionary stages is not determinative of the issues before us.  At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman*, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution.

428 U.S. at 199.  The Supreme Court went on to say that "*Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Id*. at 199.  In a footnote, the Court explained that,

> [i]n order to repair the alleged defects pointed to by [petitioner], it would be necessary to require that prosecuting authorities charge a capital offense whenever arguably there had been a capital murder and that they refuse to plea bargain with the defendant.

> If a jury refused to convict even though the evidence supported the charge, its verdict would have to be reversed and a verdict of guilty entered or a new trial ordered, since the discretionary act of jury nullification would not be permitted. Finally, acts of executive clemency would have to be prohibited.

*Id.* at 199 n.50. The Court rejected such a system as it "would have the vices of the mandatory death penalty statutes" held unconstitutional in *Woodson v. North Carolina*[24] and *Roberts v. Louisiana*.[25] *Id.*

The Supreme Court also acknowledged the concerns of *Furman* that the imposition of the death penalty not be "arbitrary or capricious" and said that "a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance" will alleviate such. *Gregg,* 428 U.S. at 195. The *Furman* concerns were "best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information." *Id.* Harper received a trial that comported with these requirements. Consequently, Harper's claim fails because he cannot show, in light of the Supreme Court precedent discussed above, that the state court unreasonably rejected the claim. *Allen*, 805 F.3d at 631.

---

[24]    428 U.S. 280 (1976).

[25]    428 U.S. 325 (1976).

Harper does not dispute that the prosecutor has discretion to seek or not seek the death penalty. He argues instead that the inclusion of geographic and, consequently, financial considerations in the prosecutor's discretionary determination impermissibly injects arbitrariness into the Texas capital sentencing scheme, and that minority defendants are sentenced to death at a higher rate than Caucasian defendants. But Harper does not even allege that these considerations played any part in the prosecutor's decision to charge him with capital murder or the jury's unanimous verdict sentencing him to death. The fact remains, Harper committed an act for which the United States Constitution, and Texas laws permit the imposition of the death penalty. *McCleskey*, 481 U.S. at 297. And Harper chose to commit this crime in Harris County. The decision to seek the death penalty was clearly within the prosecutor's discretion, and Harper fails to demonstrate that these "arbitrary" considerations played any part in the prosecutor's decisionmaking, that a prosecutor would not have sought the death penalty if Harper had only committed his crime in a different county or if he was Caucasian, or that similarly-situated individuals of other races could have been prosecuted in a like manner but were not.

Harper's claim fails because he does not attempt to show that the decisionmakers in his case acted with a discriminatory purpose. *McCleskey*, 481 U.S. 292. Rather, Harper seeks to prove a culture of racial discrimination through law articles and statistics. However, the Fifth Circuit has rejected a similar argument:

> [R]elying on various newspaper articles and statistics, [petitioner] complains that he was the victim of racially discriminatory prosecution policies at the Dallas County District Attorney's Office. He makes no effort to prove purposeful discrimination against him or a discriminatory effect on him, as are required to make such a claim under [*McCleskey*, 481 U.S. at 292]. In light of this fundamental failing, we cannot grant relief.

*Goss v. Johnson*, 199 F.3d 439, 1999 WL 1067676, at *5 (5th Cir. 1999) (unpublished); *see also Batiste*, 2017 WL 4155461 at *30–*31 ("Nothing suggests that the prosecutor in this case considered anything other than the severity of Batiste's crime in asking for a severe punishment. Batiste can only speculate that Harris County's resources made his a capital prosecution when another county would have sought a lesser penalty. . . .Batiste has not shown that racism [premised on studies], rather than a permissible exercise of prosecutorial discretion, was the motivating factor in the State's decision to seek a sentence of death."); *Johnson v. Stephens*, 2013 WL 4482865, at *23 (S.D. Tex. 2013) (denying *McCleskey* claim where petitioner relied on "various

social-science studies and 'a long history of racial discrimination in the application of the death penalty in the United States' to argue that 'his chances of receiving the death penalty in the United States, and in particular Harris County, Texas, are far greater simply because he is an African-American'"); *White v. Thaler*, 2011 WL 4625361, at *9 (S.D. Tex. 2011) ("the Supreme Court foreclosed this argument more than 20 years ago"). Consequently, Harper's claim fails.

Finally, Harper's proposed rule—that either capital punishment is unconstitutional or that due process and the Eighth Amendment should prevent Texas prosecutors from exercising their discretion to seek the death penalty—was not dictated by precedent at the time his conviction became final. The Supreme Court has never held that the death penalty itself, rather than the means to impose it or mechanisms to carry it out, violates the constitution. *Glossip v. Gross*, 135 S. Ct. 2726, 2739 (2015) ("[C]apital punishment is not *per se* unconstitutional."); *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) ("[T]he death penalty is not invariably unconstitutional[.]"); *Baze v. Rees*, 553 U.S. 35, 47 (2008) ("[C]apital punishment is constitutional."). Thus, this claim is *Teague*-barred and not subject to any exception, as well as being plainly meritless under AEDPA. 489 U.S. at 301 n.2.

**XXV. Harper's Claim that Trial Counsel Was Ineffective for Failing to Make Timely Objections to the Trial Court's Denial of Mitigation Evidence under State Hearsay Rules Is Actually a Challenge to Trial Court Rulings. Regardless, the Claim Is Defaulted and Meritless.**

Harper alleges that trial counsel failed to object when the trial court sustained the State's objections to hearsay testimony during the punishment phase. DE 17 at 260–62. Harper alleges that the hearsay rules do not apply at sentencing and that the trial court, by sustaining the State's objections, "continued to exclude defense mitigation evidence." *Id.* at 260.

Harper never raised this allegation on direct appeal or state habeas review; thus, it is unexhausted and procedurally barred. Recognizing this fact, Harper argues that his default can be excused under *Martinez* and *Trevino*. *Id.* at 262. However, Harper is incorrect because his claim does not in fact challenge trial counsel's effectiveness; rather, he is complaining about the trial court's rulings sustaining the State's hearsay objections. *Id.* ("The state trial court violated Harper's right to present mitigating evidence at his capital sentencing hearing by granting the State's hearsay objections to Harper's mitigation evidence."). It has long been held that challenges to the admissibility of evidence and state evidentiary errors are not cognizable on federal habeas review. *See Swarthout v. Cooke,* 526 U.S. 216, 219

(2011) (finding federal habeas review does not lie for errors of state law). Habeas corpus review is instead limited to questions of a constitutional dimension, and federal courts generally do not review the admissibility of evidence under state law. *Estelle v. McGuire,* 502 U.S. 62, 67–68 (1991); *Gonzales v. Thaler,* 643 F.3d 425, 429 (5th Cir. 2011); *Jernigan v. Collins,* 980 F.2d 292, 298 (5th Cir. 1992). Federal courts do not sit to review the propriety of state court evidentiary rulings, unless the proceedings were so extreme that they violated a petitioner's federal constitutional rights or rendered his trial fundamentally unfair. *Woods. v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007); *Peters v. Whitley,* 942 F.2d 937, 940 (5th Cir. 1991).

Harper has made no such showing because he simply cites to fourteen instances in the state court record where the trial court sustained the State's objections. At no point does Harper explain how these particular rulings harmed him. Further, he does not demonstrate how this precluded him from presenting mitigating evidence. Indeed, that claim is meritless considering that he presented numerous witnesses at punishment, as shown above. In short, his claim is wholly conclusory, which is insufficient to show that his trial was rendered fundamentally unfair.

To the extent Harper is raising an ineffectiveness claim, it nonetheless lacks merit. Harper is arguing that trial counsel failed to object or request an exception after the trial court already sustained the State's objections. The claim is illogical, and trial counsel is not ineffective for refusing to make futile objections. *Koch*, 907 F.2d at 527. Regardless, Harper cannot demonstrate any prejudice because, as stated, at no point does he explain how trial counsel's inaction specifically harmed him. Again, Harper simply cites to the record without offering any evidence of prejudice. *Miller*, 200 F.3d at 282 (conclusory allegations of ineffectiveness are insufficient to raise a constitutional issue). His briefing fails to satisfy the *Martinez* exception, let alone demonstrate a viable ineffectiveness claim. Thus, habeas relief should be denied.

## XXVI. The Evidence Was Sufficient to Support the Jury's Finding that Harper Would Be a Future Danger.

Harper alleges that the evidence is insufficient to support the jury's finding that he would be a future danger to society. DE 17 at 263–70. In support of his claim, Harper refers to "the unique circumstances of the offense, [his] mental illness at the time of the incident, and his history of peaceful behavior while incarcerated . . ." *Id.* at 269. In particular, Harper states that he has proven to be a model prisoner and that his acute mental difficulties at

the time he murdered Rose and her daughters rendered him a much different person than he actually was, according to friends. *Id.* at 266–69.

On direct appeal, the CCA rejected this claim as follows:

In [Harper's] first point of error, he argues that the evidence at trial was legally insufficient to support the jury's finding of a probability that he would commit future criminal acts of violence which would constitute a continuing threat to society. Finding ample evidence to support the jury's verdict, we overrule this point of error.

We assess the sufficiency of future-dangerousness evidence in the light most favorable to the jury's findings. We must determine whether any rational trier of fact could have found a probability that the defendant would commit future criminal acts of violence which would constitute a continuing threat to society, and we will reverse only if a rational jury would necessarily have had a reasonable doubt about this probability.

The special issue asks if "a defendant would constitute a continuing threat whether in or out of prison without regard to how long the defendant would actually spend in prison if sentenced to life." In other words, the issue concentrates on "the character for violence of the particular individual, not merely the quantity or quality of the institutional restraints put on that person." Some factors a jury may consider in determining future dangerousness include:

1. the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties; 2. the calculated nature of the defendant's acts; 3. the forethought and deliberateness exhibited by the crime's execution; 4. the existence of a prior criminal record, and the severity of the prior crimes; 5. the defendant's age and personal circumstances at the time of the offense; 6. whether the defendant was acting under

duress or the domination of another at the time of the commission of the offense; 7. psychiatric evidence; and 8. character evidence.

This list is not exhaustive. The jury is entitled to consider all the evidence at both the guilt and punishment stages of trial.

The circumstances of the offense and the events surrounding it can be sufficient to sustain a "yes" answer when the crime is "so heinous as to display a wanton and callous disregard for human life." This was such a crime. After stalking Rose for a month or more, [Harper] stabbed her at least 36 times while her children were restrained nearby. [Harper] then stabbed Briana repeatedly, slit her throat, and strangled her for three minutes. Finally, the appellant strangled Mya with a phone charger. This "infliction of multiple wounds at close range indicates a wanton and callous disregard for human life" and is legally sufficient to support the jury's finding.

Further, the jury could find that [Harper] would commit future acts of violence because of his criminal history, which spans more than two decades. [Harper's] prior criminal acts of violence were severe and unpredictable, occurring after periods of nonviolence and apparent repentance. His victims included intimate partners and complete strangers. There was no evidence that his violent tendencies would change.

The evidence was legally sufficient to support a finding that [Harper] would constitute a future danger to society, whether in or out of prison. [Harper's] first point of error is overruled.

*Harper v. State*, 2012 WL 4833834, at *2–*3 (footnotes omitted). This decision is not objectively unreasonable.

In *Jackson v. Virginia,* the Supreme Court set out the standard of review for when a state prisoner challenges the sufficiency of the evidence in a federal

habeas corpus proceeding as "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 320 (1979) (emphasis in original). In applying this standard, all of the evidence is to be considered in the light most favorable to the prosecution, with all reasonable inferences and credibility choices made in support of the verdict. *Id.*; *United States v. Jones,* 133 F.3d 358, 362 (5th Cir. 1998); *United States v. Tencer*, 107 F.3d 1120, 1124 (5th Cir. 1997). The Fifth Circuit has employed the *Jackson* standard to assess the adequacy of the evidence of the future-dangerousness special issue in Texas sentencing decisions. *See, e.g., Woods v. Cockrell*, 307 F.3d 353, 357–58 (5th Cir. 2002) (affirming Court of Criminal Appeals's application of *Jackson* to reviewing sufficiency of future dangerousness special issue); *Martinez v. Johnson*, 255 F.3d 229, 244–45 (5th Cir. 2001) (applying *Jackson* to future dangerousness inquiry); *Miller*, 200 F.3d at 286.

As a prerequisite to imposing the death penalty in the instant case, the State was required to prove beyond a reasonable doubt that there was a probability that Harper would commit criminal acts of violence that would constitute a continuing threat to society. Tex. Code Crim. Proc. Ann. art.

37.071 § 2(b) & (c).  Although a number of factors may be considered in making the determination as to future dangerousness, including the ones listed by the CCA, under Texas law the facts of the crime alone, if severe enough, can be sufficient to support an affirmative finding to the special issue.  *Miller*, 200 F.3d at 286 (citing *Vuong v. State*, 830 S.W.2d 929, 935 (Tex. Crim. App. 1992)).

Harper's claim lacks merit because of the triple homicide and his criminal history.  The horrific murder of Rose and her daughters, described above, was heinous and, standing alone, was likely sufficient to support the jury's verdict.  But that was not the only evidence of his future dangerousness. Harper has committed multiple thefts and robberies, often threatening his victims with death or severe bodily harm while exhibiting a deadly weapon. More importantly, the State showed that he brutally murdered and likely raped Teasa Jackson.  Harper's past does not include merely one or two episodes of poor behavior; it is littered with violent acts and spans decades, as the CCA held.  Thus, he cannot legitimately claim that the murder of Rose and her daughters was "unique" or that, at the time, he "was not the same person" his friends knew.  DE 17 at 267.  If anything, Harper's good behavior was the exception, not the rule.

As for Harper's prior good behavior in prison, this does not undermine the jury's verdict for several reasons. First, "[g]ood behavior in prison does not preclude a finding of future dangerousness. All that is required is that the evidence be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Bible v. State*, 162 S.W.3d 234, 245 (Tex. Crim. App. 2005). Second, the evidence is to be considered in the light most favorable to the prosecution, with all reasonable inferences and credibility choices made in support of the verdict. Given Harper's history of violence, his prison behavior fails to undermine the jury's determination. Third, the CCA's "precedent states clearly that 'society,' as used in Article 37.071, includes both prison and the 'free world,' and the jury must consider dangerousness in that context." *Berry v. State*, 233 S.W.3d 847, 863 (Tex. Crim. App. 2007). Although Harper presented evidence of good behavior in prison, he has clearly demonstrated horrific behavior in the "free world." Thus, based on the latter, the jury was permitted to conclude Harper would be a future danger to society.

Finally, Harper concludes:

Because the likelihood a particular defendant will not pose a risk of violence if sentenced to life-without-parole is a "relevant" and

266

"important criterion" in assessing "future dangerousness", and because the cases focusing on the defendant's record, character, and the facts of his case sentencing foreclose adequate consideration of this sentencing factor, the evidence is not legally sufficient to support an affirmative finding of the future dangerousness special issue in [Harper's] case.

DE 17 at 270. However, the jury was not foreclosed from considering any evidence that might be mitigating. Regardless, this is irrelevant to the sufficiency issue under *Jackson*, as explained above. By referring to "cases," Harper appears to be challenging CCA precedent pertaining to review of sufficiency of the evidence regarding future dangerousness. *See* Brief for Appellant (Harper's brief on direct appeal) at 42–43 (stating that the CCA "should revisit" two of its cases and find that the evidence is not legally sufficient). But the CCA's determination of a matter under state law is not reviewable by this Court. *McGuire,* 502 U.S. at 67–68. For these reasons, habeas relief should be denied.

## XXVII.   Harper's *Batson* Claim Has No Merit.

In his next claim, Harper alleges that the prosecution used a peremptory strike to prevent Donna Banks from serving on the jury, in violation of *Batson v. Kentucky*. DE 17 at 270–76. This allegation was addressed above. Harper appears to raise this claim a second time because it mirrors the *Batson* claim he raised on direct appeal. *See id.* & Brief for

Appellant at 43–50.  The CCA denied the claim on the merits, rather than procedural grounds.  *Harper v. State*, 2012 WL 4833834, at *3.  Thus, unlike the claim addressed previously, this one is likely not procedurally defaulted. Regardless, for the reasons stated above, the claim has no merit, and the state court's denial is not objectively unreasonable.

## XXVIII. Harper's Claim that the Trial Court Erred in Admitting His Statement to Police Regarding the Teasa Jackson Murder Is Procedurally Defaulted and Meritless.

Harper alleges that the trial court erred in admitting his statement to police officers when he was questioned about the Teasa Jackson murder.  He alleges that the statement was compelled, in violation of the Fifth and Fourteenth Amendments, in large part because he was in prison at the time of the interview and feared punishment, or disciplinary action, if he did not cooperate with the police.  DE 17 at 277–80.  This claim is procedurally defaulted and meritless.

### A.    Harper's claim is procedurally barred.

As previously stated, federal review of a claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default.  *Coleman*, 501 U.S. at 729; *Reed*, 489 U.S. at 265.  On direct appeal, Harper raised the instant claim, but

the CCA held that the argument was not properly preserved because it did not comport with the arguments he made at trial. *Harper v. State*, 2012 WL 4833834, at *3–*4. This is "a version of the Texas contemporaneous objection rule," which is an adequate an independent state ground barring federal habeas relief. *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999); *Thompson v. Quarterman*, 629 F.Supp.2d 665, 675 (S.D. Tex. 2007) ("The Court of Criminal Appeals relied on a Texas rule that is part of the contemporaneous-objection rule and requires a defendant to raise the same objection at trial and on appeal."); *see also Scheanette v. Quarterman*, 482 F.3d 815, 823 (5th Cir. 2007) ("We have recognized a federal petitioner's failure to comply with the Texas contemporaneous objection rule as an adequate and independent state procedural bar to federal habeas review.").

Thus, federal habeas relief is barred unless Harper can demonstrate cause and prejudice or a fundamental miscarriage of justice to overcome his default. *Coleman*, 501 U.S. at 750. Harper does not even address the procedural bar in his petition. Consequently, this Court is precluded from considering the claim.

## B. In the alternative, the claim has no merit.

### 1. Hearing outside the jury's presence

Both Harper and Officer James Benford testified outside the jury's presence about the circumstances of the statement. Harper testified that in 1995 or 1996, two police officers came to talk to him about the Teasa Jackson murder. 19 RR 123. Harper was in prison at the time, and he received notice that the warden wanted to see him. 19 RR 124. According to Harper, the warden gave him "instructions" or "an order" about who was coming to see him, and he was transported to another facility. 19 RR 124–25. Harper did not recall the detectives' names, but they said they were there to talk to him about the case. 19 RR 126. Harper stated that he felt "restrained" at the time; the officers did not "initially" tell him he had the right to leave the room and not talk to them and did not "initially" read him his *Miranda* warnings. 19 RR 126. Harper said the police talked to him about ten minutes before they read him his *Miranda* warnings and that they never told them he had the right not to speak to them. 19 RR 127. According to Harper, he talked to them because the prison warden told him to, and, if he did not, he could get "written up" for disobeying a direct order. 19 RR 127. Harper said that at no time did he feel he had the right to get up and leave. 19 RR 127.

On cross-examination, Harper stated that the police asked him about the other men, namely Abner Freeman, and whether he knew Jackson. 19 RR 128–29. The officers were dressed in plain clothes and asked him about the murder; Harper stated that he was aware Jackson had been murdered. 19 RR 130–31. Harper conceded that the officers did read him his *Miranda* warnings and explained to him that he had the right to terminate the interview at any time. 19 RR 131. When asked if he understood those legal warnings, Harper said, "Not at first because I was under the impression that I was there to help them, you know, from the warden." 19 RR 131. But then Harper admitted that he understood he had the right to terminate the interview at any time and that the warden was not present. 19 RR 132. Harper gave the officers all the information he knew about Jackson and told them he knew her and never had sex with her. 19 RR 132–33. Harper conceded that the officers did not threaten him; they did not force him to stay in the room; he was not handcuffed to the chair; and he agreed to talk to the police after they gave him his warnings. 19 RR 133. Harper said that he got up midway through the questioning to leave "[b]ecause I seen where the questioning was going." 19 RR 134. Harper said they accused him of killing Jackson but he denied the allegation. 19 RR 134. After the conversation ended, he was transported back to his cell. 19 RR

135.  Harper conceded that he had been given *Miranda* warnings on other occasions, knew what they were, and that he was informed he had the right to terminate the interview.  19 RR 135–36.

Officer James Benford testified that he and Sergeant M. E. Doyle interviewed Harper.  19 RR 137.  Benford said that he and Doyle went to the prison unit and were escorted into a conference room a door or two away from the warden's office.  19 RR 138.  Benford could not recall if the door to the room had glass on it.  19 RR 138.  Harper was then brought into the room and they "Mirandized him very early in the conversation.  There were some greeting and shaking of hands but Mirandizing."  19 RR 139.  Benford stated that he "personally made sure in my mind that [Harper] understood all of his *Miranda* warnings and the seriousness of the investigation that was going on."  19 RR 140 (italics added).  Per prison policy, a guard was standing outside the door. 19 RR 141.  Harper was not handcuffed, and Benford did not threaten or coerce Harper.  19 RR 141.  Benford also said the prison warden was out of town on that day, but that he had no knowledge of the warden telling Harper to cooperate.  19 RR 141.  The conversation lasted an hour and a half to two hours, but the statement was not recorded or reduced to writing.  19 RR 141–42.

On cross-examination, Benford reiterated that he gave Harper his *Miranda* warnings and that he understood those warnings. 19 RR 142. Benford was in plain clothes and not armed. 19 RR 142–43. Sergeant Doyle took notes of the interview, which was summarized in a supplemental report. 19 RR 143. Benford had talked to other individuals before interviewing Harper and, at the time, he considered "everybody" to be a suspect. 19 RR 144. Although the police had Harper's fingerprint and questioned him about that, no charges were filed at the time because there was "[n]ot enough to file." 19 RR 144. On redirect examination, Benford stated that Harper "explained away" the fingerprint found on the piece of paper in the bathroom, stating that he had been in the bathroom "smoking crack" several days before the murder. 19 RR 145–46.

On recross-examination, Benford said that Harper was in prison custody at the time but not custody for purposes of the interview. 19 RR 147. With regard to Harper's statement, Benford said Harper told them he had converted to Islam and "cleaned himself up"; Harper spoke freely and made sense; Harper knew Teasa Jackson but denied ever having sexual relations with her; he was not involved in her death; he had been in Jackson's apartment several days before the murder but could not remember the specific day; he did

273

not want to take a polygraph examination; he lived four doors down from Jackson at the time she was murdered; and he used Jackson's bathroom to smoke crack cocaine. 19 RR 148–49. Benford further said that Harper never tried to leave during the conversation; did not indicate that he wanted to terminate the interview; never told them he did not want to be there or was forced to talk to them; was courteous and cooperative; and was willing to talk with them. 19 RR 151.

Following this testimony, the trial court found that for purposes of this particular investigation, Harper was not in custody and, consequently, Article 38.22 of the Texas Code of Criminal Procedure did not apply. The trial court also determined that the statement was made voluntarily. 19 RR 153.

> **2.   Harper's claim that his statement was compelled has no merit, and any potential error was harmless.**

First, as an initial matter, it is arguable that Harper's claim fails to raise a constitutional issue. Harper's statement was not admitted at the guilt-innocence phase but at the punishment phase "where the State has a less-stringent evidentiary burden" which "further diminishes any federal constitutional concerns." *Bible v. Stephens*, 2014 WL 5500722, *30 (S.D. Tex. 2014). As this Court noted in *Bible*, extraneous offenses offered at punishment

do not need to be proven beyond a reasonable doubt. *Id.* (citing *Reed*, 739 F.3d at 789). Thus, "the relevant standard of proof necessarily was lower" for the Jackson murder than the murder of Rose and her daughters. *Harris*, 313 F.3d at 246. Here, the evidence that tied Harper to the Jackson murder was not his statement but the DNA evidence the authorities eventually obtained. The only significance of the statement was that the DNA evidence proved Harper lied when he said he never had sexual relations with Jackson. Although that revelation might have rendered Harper's denial to killing Jackson somewhat suspicious, the police never would have pursued the matter without the DNA evidence. In fact, as shown, no charges were filed against Harper after he made the statement. Because the state was not required to prove Harper murdered Jackson beyond a reasonable doubt, and given that Harper has never contested the admission of the DNA evidence, it is certainly arguable that even an erroneous admission of the statement did not implicate Harper's constitutional rights.

Second, the trial court found that Harper was not in custody for purposes of Article 38.22 at the time he made the statement. Thus, the prerequisites for admission of the statement under the law did not apply. The trial court's ruling is supported by the Supreme Court's decision in *Howes v.*

*Fields*,[26] where the Court held that a prison inmate who was escorted from his cell and interviewed in a conference room about an extraneous offense was not in custody for *Miranda* purposes. In *Fields,* the inmate, while serving a sentence in a Michigan jail, was escorted by a corrections officer to a conference room. There, two armed sheriff's deputies questioned him about allegations that, prior to his incarceration, he engaged in sexual conduct with a twelve-year-old boy. In reaching its decision, the Court stated that the following facts supported a finding of custody: Fields did not invite the interview and was not advised that he could decline to speak to the deputies; the interview lasted five to seven hours and continued past the inmate's typical bedtime; the deputies who questioned Fields were armed; and one of the deputies used "a very sharp tone" and profanity. 565 U.S. at 514–15. The Court found, however, that these circumstances were offset by others. Most importantly, Fields was told at the outset that he could get up and leave the interview whenever he wanted; Fields was not physically restrained or threatened; the interview took place in a well-lit, average-sized conference room; Fields was offered food and water; and the door to the conference room was sometimes left open. *Id.* at 515. The Court

---

[26]     565 U.S. 499 (2012).

concluded that these factors created an interrogation environment in which "a reasonable person would have felt free to terminate the interview and leave." *Id.* (internal quotations and citation omitted).

The circumstances in the instant case were even less demonstrative of "in custody" for *Miranda* purposes. Harper was escorted to the interview room, and although a guard was standing outside, he apparently never entered the room. Benford and Doyle were in plain clothes and unarmed, unlike the officers in *Fields*. The interview lasted an hour and a half to two hours, in comparison with the five to seven-hour interview in *Fields*. The officers in *Fields* used a sharp tone and profanity, whereas Harper did not testify the same occurred in his case. In fact, he stated that the officers did not threaten him. Further, Harper was not handcuffed, and he conceded that the officers did not force him to stay in the interview room and that he agreed to talk to the police after they gave him his warnings. And although Harper said that he felt "restrained" and that he did not believe he was free to leave the interview, this was due to the alleged instructions from the warden, not anything the officers did. Indeed, Harper admitted the officers told him that he was free to terminate the interview at any time. Officer Benson testified that Harper was cooperative and understood his rights. Therefore, pursuant

to *Fields*, Harper was not in custody at the time, and the protections of *Miranda* did not even apply. The statement was clearly admissible.

Regardless, Harper, unlike Fields, was provided *Miranda* warnings, and he voluntarily waived them and spoke to police. Thus, Harper was afforded constitutional protections even if they did not apply under the circumstances. Moreover, the only argument Harper offers for claiming that the admission of the statement violated his constitutional rights was that he believed he would be subject to disciplinary action if he did not cooperate with the police. But this belief was supposedly based on his conversation with the warden, not anything that occurred during the interview itself. Further, Harper never testified that the warden said, or even indicated, that he would be subject to disciplinary action if he did not cooperate with the officers. His claim, therefore, is premised on an assumption. Indeed, comparing his case to another state court holding, Harper states in conclusory fashion: "While it is unknown exactly what penalties would have befallen [Harper] had he not complied with the warden's directive to assist and cooperate with Benford and Doyle, they would have undoubtedly been of a similar nature." DE 17 at 279. Conclusory allegations fail to raise a constitutional issue. *Ross*, 694 F.2d at 1011–12.

Further, the record here demonstrates that the police did not engage in any coercive activity necessary for a legitimate Fifth Amendment violation. The police read Harper his *Miranda* warnings. He stated that he understood his rights, and he agreed to waive them. Harper spoke freely and voluntarily in response to the questions, and he even conceded that he was never threatened in any manner. The evidence, therefore, does not support Harper's claim.

Finally, the Supreme Court has held that the admission of an involuntary confession is trial error subject to a harmless-error analysis. *Arizona v. Fulminante,* 499 U.S. 279, 310 (1991). Following *Fulminante,* the Court also held that trial error is subject to a lower harmless-error test on collateral review. *Brecht v. Abrahamson*, 507 U.S. 619, 623, 637–38 (1993). Pursuant to *Brecht v. Abrahamson*, federal habeas relief may not be granted for trial error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Here, even if the statement was erroneously admitted, any error was harmless for the reasons stated above. In short, the State was not required to prove that Harper committed the offense beyond a reasonable doubt, and the DNA

evidence was more than adequate to demonstrate Harper's culpability. Consequently, Harper fails to demonstrate a constitutional violation even if his constitutional rights were implicated. Thus, habeas relief must be denied.

## XXIX. Harper's Claims Pertaining to Dr. Moeller Remaining in the Courtroom in Violation of the Witness Sequestration Rule and Testifying Following Violation of "The Rule" Is Defaulted and Meritless.

In his last two claims, Harper alleges (1) that the State knowingly allowed its expert, Dr. Moeller, to remain in the courtroom throughout Harper's presentation of punishment evidence without advising defense counsel or the trial court of his presence, in violation of the witness sequestration rule and Harper's due process rights, and (2) the trial court erred in allowing Dr. Moeller to testify after the State knowingly allowed him to remain in the courtroom, in violation of due process. DE 17 at 281–91.

These allegations are procedurally barred under the Texas contemporaneous objection rule. The CCA held that defense counsel failed to object when counsel first learned that Dr. Moeller was in the courtroom. It was only when the State notified the court that it intended to call Dr. Moeller as a witness that the defense, which assumed he would not be called, objected. The CCA held this was insufficient to preserve error on appeal. *Harper v.*

*State*, 2012 WL 4833834, at *4–*5. Thus, for the reasons addressed above, these claims are defaulted and cannot be reviewed by this Court.

Even if not defaulted, the claims have no merit. First, as a matter of trial court error, Harper's claim fails to raise a constitutional issue. By complaining of matters regarding the witness sequestration rule, Harper is alleging violations of state law, which are not cognizable on federal habeas corpus review. *McGuire,* 502 U.S. at 67–68. As one federal district court found in a similar case:

> [E]ven if the trial court had violated its rules regarding sequestration or improperly failed to exclude the victims from the courtroom, that claim does not merit federal habeas corpus relief. The Fifth Circuit has held that a "state court's failure to follow its own procedural rules [on sequestration of witnesses] does not of itself raise federal constitutional questions cognizable in habeas corpus." *Passman v. Blackburn*, 652 F.2d 559, 569 (5th Cir. 1981). The Fifth Circuit has also held that a habeas petitioner's "complaint that the trial court failed to invoke the rule of sequestration of witnesses does not raise a question that can be reached by federal habeas corpus, since such denial does not amount to a deprivation of [the petitioner's] constitutional rights." *Mathis v. Wainwright*, 351 F.2d 489 (5th Cir. 1965). Likewise, other courts have found that a trial court's failure to sequester witnesses does not amount to the deprivation of a constitutional right and therefore cannot form the basis of federal habeas relief. *See Bell v. Duckworth*, 861 F.2d 169, 170 (7th Cir. 1988); *King v. Elo*, 2000 WL 791721, at *10 (E.D. Mich. 2000); *Hammond v. Snyder*, 2000 WL 1239993, at *5 (D. Del. 2000); *Gonzalez v. Quarterman*, 2007 WL 999019, at *6 (W.D. Tex. 2007); *Conroy v. Leone*, 2006 WL3246597, at *10 (D. N.J. 2006).

*Pollard v. Cain*, 2007 WL 4299991, at *15 (W.D. La. 2007); *see also Brown v. Cain*, 2015 WL 4325054, at *10–*11 (W.D. La. 2015) (same); *Brown v. Director, TDCJ-CID*, 2008 WL 1998691, at *5 (E.D. Tex. 2008) (same).

Second, even as a matter of state law, Harper's claims are suspect. Although expert witnesses are not automatically exempt from the witness sequestration rule, "an expert witness may typically be found exempt under the essential presence exception." *Drilex Systems, Inc. v. Flores*, 1 S.W.3d 112, 118 (Tex. 1999). In *Drilex Systems, Inc.*, the Texas Supreme Court stated:

> The Notes of the Advisory Committee to the Proposed Federal Rule, upon which the Texas rule is based, suggest that the essential presence exception contemplates an expert needed to advise counsel in the management of litigation. [Federal Rule of Evidence] 615 advisory committee's note. In addition, courts have held that expert witnesses expected to testify in an expert capacity only, and not to the facts of the case, should typically be exempt so that they can form opinions based on more accurate factual assumptions. *See, e.g., Opus 3 Ltd. v. Heritage Park, Inc.*, 91 F.3d 625, 629 (4th Cir. 1996); *see also* [Tex. R. Evid.] 703. However, expert witnesses who are also fact witnesses provide a closer case.

*Id.* n.4. Dr. Moeller was not a fact witness; he was there to offer an opinion about Harper's future dangerousness. And although the defense strenuously objected when the State called Dr. Moeller, 23 RR 10–28; 22 RR 246–49, the defense conceded that experts are generally allowed to be in the courtroom at least when an opposing expert is testifying. 22 RR 247. Further, under Texas

law, trial judges are given broad discretion to determine whether an expert witness is exempt from the sequestration rule. *Drilex Systems, Inc.*, 1 S.W.3d at 118–19. Arguably, therefore, there was not a violation of state law, let alone a due process violation.

Third, regardless of the above, Harper cannot demonstrate any harm or prejudice from Dr. Moeller's presence in the courtroom or his testimony. As explained above, Dr. Moeller was thoroughly impeached by defense counsel when he testified because he changed his opinion about Harper based on additional information about the prison system rather than information pertaining to Harper himself. Contrary to Harper's claim, Dr. Moeller's testimony was arguably not helpful for the State because of the reason he altered his testimony and the defense's cross-examination. During final argument of the punishment phase, the State barely mentioned Dr. Moeller's testimony, whereas the defense referred to him as a "liar."

More importantly, as explained above, the evidence of Harper's future dangerousness was overwhelming given the horrific facts of the murders and Harper's extensive and violent criminal history. Dr. Moeller's testimony was not essential to the State's case. Considering the totality of the evidence, there

is not a reasonable probability that Harper would not have received a death sentence had Dr. Moeller's testimony been excluded.

Finally, in support of his claims, Harper relies on *Gardner v. Florida*, 430 U.S. 349 (1977). Citing *Gardner*, Harper claims:

> The unfair surprise created by the State's tactics of causing [Dr.] Moeller to change his expert opinion at the last minute, and then concealing that change from the defense, violated Harper's right to due process under the Fourteenth Amendment due to the State's use of evidence at the sentencing phase of the trial which the defendant did not have a meaningful opportunity to rebut.

DE 17 at 287. *Gardner* is not on point. In *Gardner*, a jury found the defendant guilty of the capital murder of his wife, and in a separate sentencing proceeding, expressly found that the mitigating circumstances outweighed the aggravating circumstances and therefore recommended a sentence of life imprisonment. 430 U.S. at 352–53. However, the trial judge, who was the sentencer at the time, considered a presentence report containing confidential information not disclosed to the defense. Based on information in the report, the judge sentenced the defendant to death. *Id.* at 353. The Supreme Court reversed, with a plurality concluding, apparently broadly, "that [the defendant] was denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." *Id.* at 362. The instant case is easily

distinguishable. Gardner was sentenced to death based on information neither the defense nor the jury received. The defense, therefore, had no means of challenging the evidence. Dr. Moeller, on the other hand, testified before the jury and was rigorously cross-examined and impeached by the defense. As stated above, where a petitioner, like Harper, cross-examines the State's experts, the admission of the expert testimony does not render his trial fundamentally unfair. *Story*, 920 F.2d at 1255–56; *Stevenson*, 327 F.3d at 407. Thus, *Gardner* does not save Harper, and habeas relief should be denied.

## CONCLUSION

For the above reasons, the Director respectfully requests that Harper's federal habeas petition be denied with prejudice.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

ADRIENNE McFARLAND
Deputy Attorney General for
Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

_/s/ Erich Dryden_____

**\*ERICH DRYDEN**

\*Attorney-in-Charge       Assistant Attorney General

State Bar No. 24008786

So. Dist. Admission No. 23717

P.O. Box 12548, Capitol Station

Austin, Texas 78711-2548

(512) 936-1400

(512) 320-8132 (Fax)

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the above and foregoing Motion for Summary Judgment and Answer has been served electronically to Kenneth McGuire and Ali R. Fazel, counsel for Petitioner, on this the 19th day of April, 2018.

_/s/ Erich Dryden_____

ERICH DRYDEN

Assistant Attorney General